## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO.  05-440-22 |
| | : | |
| v. | : | |
| | : | |
| THAIS Y. THOMPSON | : | |

### GOVERNMENT'S RESPONSE TO THAIS Y. THOMPSON'S MOTION IN LIMINE

The United States of America, by Patrick L. Meehan, United States Attorney for the Eastern District of Pennsylvania, and Richard A. Lloret and Michael J. Bresnick, Assistant United States Attorneys, respectfully submits the Government's Response To Defendant, Thais Y. Thompson's, Motion in Limine.

## I.    BACKGROUND

On March 22, 2006, a federal grand jury returned a 175-count Fourth Superseding Indictment against defendants Alton Coles, James Morris, and others for, among other things, multiple narcotics distribution, firearms, and financial crimes.

On June 7, 2006, defendant Thais Thompson testified in the federal grand jury about a number of subjects. She lied throughout her testimony, including about the $559,000 in cash that had been recovered from her home, saying under oath that it had been left to her by her dead grandfather, who had been a boilermaker. She also denied making a $25,000 payment to anybody. In fact, Coles's prior attorney, Dennis Cogan, and his secretary, gave statements to ATF agents that defendant Thompson had previously given Cogan $25,000 in cash to help pay Alton Coles's attorney fees. In addition, Coles' former attorney filed a Form 8300 with the IRS, pursuant to IRS regulations, declaring that he had, in fact, received a payment of $25,000 in cash

1

from Thompson.  Last, the attorney's secretary made a photocopy of Thompson's driver's license when Thompson gave the cash.

During her grand jury testimony, Thompson also denied knowledge of any bank accounts of James Morris.  On April 17, 2006, however (almost three months before her grand jury testimony), Morris, who was detained at the FDC, called Thompson.  She asked Morris if his account number to the credit union was at his grandmother's house.  Morris told her she did not need the account number because all she was doing was depositing a check into his account; she was not taking money out.  On April 18, Morris asked Thompson if she deposited the check. Thompson responded, "That's what I'm going to Delaware to do."  The records of the Delaware Federal Credit Union reveal that Morris has had an account there since December 2, 2002, and that someone deposited a check into Morris's account on April 27, 2006, in the amount of $2,783.69.  A surveillance photograph of the teller's station at the bank on April 27 shows two women at the station, one of whom is Thompson.

On February 21, 2007, a federal grand jury returned a 194-count Fifth Superseding Indictment against defendants Coles, Morris, and others, charging all crimes included in the Fourth Superseding Indictment, as well as new crimes committed by all previously-charged defendants, as well as by three new defendants.  One of these three new defendants was Thais Thompson, who was charged with lying under oath before the federal grand jury (Counts 189, 190, and 191), in violation of 18 U.S.C. § 1623(a), and for acting as an accessory after the fact to the drug conspiracy, in violation of 18 U.S.C. § 3 (Count 192). This latter charge is the result of her knowing that Morris had conspired to distribute more than 50 grams of crack and more than 5 kilograms of cocaine (as alleged in Count 1), and Thompson's

subsequent perjury in the federal grand jury to assist defendant Morris by preventing his trial and punishment, in violation of 18 U.S.C. § 3.  Thompson also is charged in Count 67 with co-defendant Morris with jointly possessing the firearm found in the kitchen of their house in furtherance of a drug trafficking crime, to wit, (i) the conspiracy charged in Count 1 of the Fifth Superseding Indictment, and (ii) maintaining a house for the purpose of storing and distributing cocaine, in violation of 21 U.S.C. § 856.

Defendant Thompson now moves the Court, *in limine*, to exclude from the trial of defendants Thompson and Morris the several phone calls between them while Morris was incarcerated at the Federal Detention Center in Philadelphia.  A disc containing the clips of the conversations the government requests to play, and the corresponding transcripts, is attached to this Response.

## II.     **The Law**

Defendant Thompson claims that the phone calls are inadmissible as to her because she was not aware that she was being recorded and, therefore, did not consent to it. Thompson's argument fails for two reasons.

First, pursuant to 18 U.S.C. § 2511(2)(c), it is lawful for a person acting under color of law to intercept a wire or oral communication when one of the parties to the communication has given prior consent.  This obviates any need for a warrant or court approval prior to the interception of this type of communication.  United States v. Armocida, 515 F.2d 49, 52 (3d Cir.), cert. denied, 423 U.S. 858 (1975); United States v. Santillo, 507 F.2d 629 (3d Cir.), cert. denied, 421 U.S. 968 (1975).  Since Morris, a prisoner at the FDC, consented to the recording of these phone calls, it is irrelevant whether Thompson was aware that the calls were

being recorded.[1]

It does not violate an individual's constitutional or statutory privacy interests to introduce at a criminal trial tape recordings of her private conversations if the other party to those conversations voluntarily consented to their recording.  See, e.g., United States v. Caceres, 440 U.S. 741, 744 (1979).  Neither the Constitution nor an Act of Congress affords protection "to a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it."  Hoffa v. United States, 385 U.S. 293, 302 (1966).  Thus, no justifiable expectation of privacy is violated if the government subsequently uses that conversation at trial.  See United States v. Kelly, 708 F.2d 121, 124-125 (3d Cir.1983).

Second, as the transcript of one of the phone calls (on May 23, 2006) makes plain, Thompson was completely aware that her conversations with Morris were being recorded.  In fact, she and Morris said the following:

JAMES MORRIS:      Yeah.  Yeah, I knew them mother fuckers [the federal agents] lie.

THAIS THOMPSON:        Yeah, that's all they are, a bunch of fuckin' liars.  I hope they can hear that too!

It is clear, based on that excerpt alone, that Thompson was aware that she was

---

[1]  Morris has stipulated that the calls were properly recorded and that Morris was aware that the calls were being recorded.  This stipulation obviates the need for the government to call as a witness a representative from the Federal Detention Center, who would testify that every prisoner signs a release form stating that he/she is aware that phone calls are recorded and may be monitored by prison officials.  In addition, every phone station within the prison is adorned with a large sign that notifies the prisoner using the phone that the calls are being recorded.

The cases cited by Thompson merely prove the government's point.  None of these opinions require the consent of the recipient of the prison call–in this case, Thompson–before those calls are deemed admissible against the recipient at a trial.

being recorded and that her motion to suppress the statement should fail.

The defendant further moves to suppress these phone calls, in the alternative, pursuant to Federal Rule of Evidence 403, claiming that the calls are unduly prejudicial to her. While the government admits that the calls are, indeed, prejudicial to Thompson–indeed, it is precisely for that reason the government would like to play the calls–they are not unduly prejudicial requiring their suppression. The defendant asserts that the government would like to play these calls mere "to sully the character and reputation" of Thompson. This is wrong. Upon listening to these conversations between Thompson and Morris, it becomes undeniably evident that Thompson had absolutely no interest in providing truthful testimony in the federal grand jury investigating this case. The conversations are highly probative of Thompson's state of mind, which, obviously, is a critical element proving that she later committed perjury before the grand jury and acted as an accessory after the fact to the conspiracy in which her children's father and co-defendant, James Morris, was charged.

In all but one of the clips from the phone conversations the government would like to play at trial, Morris and Thompson discuss the federal investigation and the grand jury subpoenas issued to Thompson and her family. In one clip on April 17, 2006 (clip 2), Thompson and Morris discuss Thompson's depositing a check into Morris's credit union account. Thompson later testified in the grand jury that she was not aware of any bank accounts belonging to Morris.[2] A disc containing the audio clips (and entire corresponding transcripts) is enclosed

---

[2] While Thompson is free to argue to the jury the distinction between a credit union and a bank, the FDC phone calls would tend to prove that Thompson was not concerned with that distinction at the time of her subsequent testimony and, instead, did everything she could to thwart the investigation of James Morris.

with this Response.  Selections from these clips are quoted below:

April 17, 2006 (Clip 1)

THAIS THOMPSON:          Well, they damn sure subpoenaed my Mom today for Wednesday.

JAMES MORRIS:     Yeah.

THAIS THOMPSON:          Um hmm. . .

JAMES MORRIS:     Is ah, they want her to go before the Grand Jury.  That's a Grand Jury

thing.

THAIS THOMPSON:          Oh.

JAMES MORRIS:     Did y'all let [S/L Wayne] know?

THAIS THOMPSON:          Yeah, I called him, um, Thompson guy called me back; he was going on, he was on another phone call, cause I had actually missed his when he called; so, um, I had, Wayne ain't in the office yet, he was out to court, but she said as soon as he called in for his messages, she'll let him know.

JAMES MORRIS:     Right.

THAIS THOMPSON:          So, I'll just um, I'm just waitin' for them to call back.

JAMES MORRIS:     Where's your Mom?

THAIS THOMPSON:          Um, she at work.

JAMES MORRIS:     Oh.  Yeah, that's all that is.

THAIS THOMPSON:          No.

JAMES MORRIS:     But, I imagine she could plead the Fifth just like ah. .

THAIS THOMPSON:          Yeah.

JAMES MORRIS:     Just like you did.


April 18, 2006 (Clip 1)

THAIS THOMPSON:          Man, these these mother fuckers is full of bullshit.  I just got ah, got word that your Grandmom got subpoenaed too.  So, she was upset, because they told her she wouldn't allowed to talk to me.

JAMES MORRIS:      Who wouldn't?

THAIS THOMPSON:          That's what the A-T-F told her.

JAMES MORRIS:      That's she's not allowed to talk to you?

THAIS THOMPSON:          Yeah.


April 18, 2006 (Clip 2)

JAMES MORRIS:      That's right.  Oh, so, that was corny, cause you know what I'm sayin'. . . that that that went from they're sayin' that we tryin' to post bail, you understand what I'm sayin'?

THAIS THOMPSON:          Yeah!

JAMES MORRIS:      So, now you, man get the fuck outta here with that bullshit.

THAIS THOMPSON:          That's what, and then they want um every everybody deeds and shit that they had put up. .

JAMES MORRIS:      Yeah.

THAIS THOMPSON:          . . . that they were gonna put up, they want all the deeds and all such such as that.

JAMES MORRIS:      It don't matter.  I didn't buy no houses.

THAIS THOMPSON:          Because they stupid!


April 18, 2006 (Clip 3)

THAIS THOMPSON:          I'm um, gettin' ready to take a couple of Tylenol; these mother fuckers been givin' me headaches.  Then the dog kept barkin'; [U/I] out back cause he kept pointin' towards the woods, somebody was probably back there in the woods, you know what I'm sayin'?  Cause then I go and look towards forty-nine and there's a car parked on the side of

the road.

JAMES MORRIS:          [LAUGHS]

THAIS THOMPSON:          You know what I'm sayin'?  But, I guess I'm stupid, you know?

JAMES MORRIS:      Yeah.

THAIS THOMPSON:          I'm not dumb!  I'm, ain't nothin' dumb about me, and I really wish mother fuckers would realize that.

JAMES MORRIS:      That's crazy, man.

THAIS THOMPSON:          Yeah, man.  Y'all, y'all investigation is over.

JAMES MORRIS:      Yeah, what you, I mean what what is keep goin' on for?

THAIS THOMPSON:          Exactly!  Y'all investigation is over.

JAMES MORRIS:      Yeah.  You be doin' all this, that, and the other; people works all their lives.  How, how the hell they need influence on anything?

THAIS THOMPSON:          They better take that shit on somewhere. . .


April 18, 2006 (Clip 4)

JAMES MORRIS:      Uh uh.  So, there ain't nothin' else goin' on?

THAIS THOMPSON:          Nah, there ain't nothin' else.

JAMES MORRIS:      You ain't never heard no, from Fats or nothin'?

THAIS THOMPSON:          No!  I, I been catchin' hell tryin' to catch up with her, too.

JAMES MORRIS:      Yeah.  You got her number there.

THAIS THOMPSON:          But she probably been working over and shit, you know what I mean?

JAMES MORRIS:      You got her number don't you?

THAIS THOMPSON:          No, I don't.

JAMES MORRIS:      Six-twenty-five; zero-six-two-five.

THAIS THOMPSON:           Oh!  No, I don't.  Let me write that down right now.  Everything else, I'll handle it, so. . .

JAMES MORRIS:      Yeah.

THAIS THOMPSON:           I'm okay there.

JAMES MORRIS:      Did you deposit the check?

THAIS THOMPSON:           I'm I'm that's what I'm going to Delaware to do.


May 23, 2006 (Clip 1)

JAMES MORRIS:      Dude felt that that [U/I] pretty good.  And and I thought it said that man, too, man. . . but see what they put in the in the in the jawn, man, is that they searched the vehicle, you know what I'm sayin'?  On the premises.

THAIS THOMPSON:           No, they didn't!

JAMES MORRIS:      That's what I'm sayin'. .

THAIS THOMPSON:           No, they did not!

JAMES MORRIS:      I know they didn't either.  And then they put in the other jawn, that they obtained a search warrant, then they searched it.

THAIS THOMPSON:           Bullshit!

JAMES MORRIS:      Yeah.  They said that they ah, they did, they did a search in the in the ah, driveway, parked in the driveway.

THAIS THOMPSON:           That's a fuckin' lie.

JAMES MORRIS:      Cause I be tellin'. .

THAIS THOMPSON:           That was the one thing that they didn't touch. . .

JAMES MORRIS:      Yeah.
THAIS THOMPSON:           They went through mine; they did not go through that!

JAMES MORRIS:      Exactly.  And they went through that Mustang.

9

THAIS THOMPSON:          Yeah!

JAMES MORRIS:     Exactly.  Cause remember. .

THAIS THOMPSON:          . . . because they couldn't get in the trunk.

JAMES MORRIS:     That's right, and the mother fucker was sayin', "Yo, man, I'm a bust it open, man, if you ain't got the key."  Yeah. .

THAIS THOMPSON:          And that's when I told 'em, "Well, you do what you gotta do, cause the owner will see you about something, not me."

JAMES MORRIS:     Yeah.  Yeah, I knew them mother fuckers lie.

THAIS THOMPSON:          Yeah, that's all they are, a bunch of fuckin' liars.  I hope they can hear that too!

JAMES MORRIS:     Cause if you, if you sayin' that, though, I mean, why you, you know what I'm sayin'?  You didn't put that shit on that inventory sheet.

THAIS THOMPSON:          That's bullshit, cause they didn't.  They didn't search nothin', if that was the case, and then what they sayin' they found, the mother fucker we wouldn't sat there. .

JAMES MORRIS:     Yeah.

THAIS THOMPSON:          Bullshit, they're lyin' mother fuckers. . .  that's all the fuck they are.


May 30, 2006 (Clip 1)

JAMES MORRIS:     Hello?

THAIS THOMPSON:          Yeah?

JAMES MORRIS:     What's up?

THAIS THOMPSON:          Nothin'. . .

JAMES MORRIS:     What you doin'?

THAIS THOMPSON:          Nothin'.

JAMES MORRIS:     What's wrong?

THAIS THOMPSON:          Nothin'. . .

JAMES MORRIS:     Why you keep sayin' it like that?

THAIS THOMPSON:          Say it like what?  I said nothin'. .

JAMES MORRIS:     What's wrong?

THAIS THOMPSON:          Well, we all got subpoenaed again today.

JAMES MORRIS:     All y'all?

THAIS THOMPSON:          All of us, including my Dad this time. Wanna know about his company.

JAMES MORRIS:     [MAKES A NOISE]

THAIS THOMPSON:          And we all must appear.

JAMES MORRIS:     So, uh, when y'all gotta go?

THAIS THOMPSON:          Next week.

JAMES MORRIS:     Oh. . . oh Grandmom, everybody?

THAIS THOMPSON:          Um hmm.

JAMES MORRIS:     So there ain't no pleadin' the Fifth then?

THAIS THOMPSON:          No, we can. .

JAMES MORRIS:     Oh.

THAIS THOMPSON:          But, we have to appear and do it.  Do it our self, person.  And then ah Lorrette wrote Wayne a little nasty letter, tellin' him since he's involved in your case, he will not represent me. . um, for this subpoena.  I said, "It's cool.  I'm straight."

JAMES MORRIS:     So, Wayne called him a faggot.

THAIS THOMPSON:          [LAUGHS] he was like this guy's a fuckin' trip [LAUGHING]. . .so, who knew. . .

11

\* \* \* \*

JAMES MORRIS:      So, y'all gotta go next week?

THAIS THOMPSON:        Yeah.

JAMES MORRIS:      I oun't understand.  But, you can plead the Fifth?

THAIS THOMPSON:        Yeah.  But, we have to appear.  It's stupid.

JAMES MORRIS:      Nah, what they tryin' to do though, is is is give. . .

THAIS THOMPSON:        [YELLING AT KIDS:  Talene, I'm on the phone with your Dad!]

TALENE:      [IN BACKGROUND]:  Hi Daddy.

JAMES MORRIS:      Hey.

THAIS THOMPSON:        He said, "hey."  Thaijay will you do somethin' for him, please, so um, he could leave me the fuck alone?  Talene, she said she'll get it in a minute.  Now, shut the hell up.

JAMES MORRIS:      What they try, what they try to do is give you immunity.

THAIS THOMPSON:        [MAKES NOISE]

JAMES MORRIS:      Try to give you immunity, then go ahead and talk.

THAIS THOMPSON:        You'd be my, I ain't got nothin' to talk to them about.  Fuck them!  They tried to ruin my life.  Fuck them!  That's how I feel about it.

JAMES MORRIS:      Yeah, there ain't nothin' to talk about, though, you know what I'm sayin'?

THAIS THOMPSON:        Shit. . .


May 30, 2006 (Clip 2)

JAMES MORRIS:      Oh, so you guys goin' by yourself?  Oh, you. .

THAIS THOMPSON:        I ain't gonna in by myself.

JAMES MORRIS:        Uh?

THAIS THOMPSON:        I'll get somebody; I ain't goin' in by myself.

JAMES MORRIS:        Oh.

THAIS THOMPSON:        Fuck them.  They can't yank me if I go in by myself anyway.

JAMES MORRIS:        Yeah.

THAIS THOMPSON:        Cause I ain't stupid.


June 6, 2006 (Clip 1) [The day before Thompson's grand jury appearance on June 7, 2006.]

JAMES MORRIS:        Hello?

THAIS THOMPSON:        Hello?

JAMES MORRIS:        Yeah.

THAIS THOMPSON:        Yeah?

JAMES MORRIS:        What's wrong?

THAIS THOMPSON:        Nothin'.  I was just sittin' here readin' somethin'. .

JAMES MORRIS:        You just readin' something?

THAIS THOMPSON:        Yeah.
JAMES MORRIS:        What you reading?

THAIS THOMPSON:        Seein' what time we gotta be up there and shit tomorrow.

JAMES MORRIS:        Oh.  Going over your notes?

THAIS THOMPSON:        Uh?

JAMES MORRIS:        Goin' over your notes?

THAIS THOMPSON:        I ain't goin' over no notes, cause I ain't got nothin' much to say. . .

JAMES MORRIS:        [LAUGHS]

THAIS THOMPSON:          . . . and I ain't got nothin' to say them mother fuckers.  Don't piss me off, man. .

JAMES MORRIS:     You crazy man [TALKING OVER EACH OTHER]


June 7, 2006 (Clip 1) [After her grand jury appearance earlier that day.]

THAIS THOMPSON:          I gotta go back the twenty-first.

JAMES MORRIS:     For what [U/I]?

THAIS THOMPSON:          Uh?

JAMES MORRIS:     For what?

THAIS THOMPSON:          To finish.

JAMES MORRIS:     To finish sayin' no to everything?  What y'all have, what did they ask you?

THAIS THOMPSON:          I mean, it's some questions I could answer, but most of 'em, if I don't 'em, I don't 'em. . . so I just took the Fifth on 'em, so.

* * * *

JAMES MORRIS:     Yeah.  So what?  So what were, one of the questions they asked you?

THAIS THOMPSON:          I can't hear you.  Talk up.

JAMES MORRIS:     I said which one of the questions they ask you?

THAIS THOMPSON:          All kinds of shit.  [MAKES NOISE] About when they raided here, and shit that say they took out the house that wouldn't on my damn list; they got kind of pissed off, but we ain't, but like I told 'em, I I don't know what you're talkin' about because if it's not on my list, as far as I know they didn't take it.

JAMES MORRIS:     Yeah.  Oh, they. . .

THAIS THOMPSON:          You know what I'm sayin'. . . it it, you know. . .

JAMES MORRIS:     Oh, say they sayin' that the po. . . oh, so the police fucked up somewhere?

THAIS THOMPSON:          I don't know what the fuck they tryin'. . . nah, they they tryin' to

14

get, is this you, is such and such you or is this yours or is that yours?  Where, where this come from, cause that's not on my list. . .you know what I'm sayin'?

JAMES MORRIS:      Yeah.

THAIS THOMPSON:        Askin' me where different shit was in the house and um, and and why did you have that much money and this, that and the other. . . and you know?  The same old bullshit. . .

JAMES MORRIS:      He asked you, oh that same Prosecutor asked you. . .

THAIS THOMPSON:        Yeah.

JAMES MORRIS:      . . .how much, why you have that much money. . .

THAIS THOMPSON:        Yeah.

JAMES MORRIS:      Oh, sayin' that, that's stupid. . .

THAIS THOMPSON:        Well, I thought it wasn't yours. . . [U/I] I didn't tell you that.

JAMES MORRIS:      [LAUGHS]. . .

THAIS THOMPSON:        [U/I] Morris said it was his. . . I said well I don't know why he said that.

JAMES MORRIS:      Yeah.

THAIS THOMPSON:        Well, that's what he told the A-T-F officers; I said, did he really?

JAMES MORRIS:      I ain't said no shit like that.

* * * *

JAMES MORRIS:      Yeah.  They crazy, man, fuck it, man. . . .so what they said about the vehicle?

THAIS THOMPSON:        Uh, nothin'.  Ask me, "Did you know there was four hundred ninety-nine grams of ah ah cocaine in there?"  I said, "Not until you said it on April eleventh. First I heard of it."

JAMES MORRIS:      Yeah?

THAIS THOMPSON:        There was ah, two thousand some odd dollars in there.  "Did you

15

know that was in there?"  "No, I didn't."

JAMES MORRIS:        Um hmm.

THAIS THOMPSON:            "First, 'fore you said it, I that day, I didn't know."  "Wasn't on my list."

JAMES MORRIS:        Yeah.

THAIS THOMPSON:            Then got mad cause I said shit wasn't on my list.  I know what the fuck was on my list.

JAMES MORRIS:        Exactly.

THAIS THOMPSON:            I got it!

JAMES MORRIS:        Yeah.

THAIS THOMPSON:            I know what they didn't put the fuck there. . .!

JAMES MORRIS:        Right.

THAIS THOMPSON:            Shit, ain't my fault if y'all said y'all took this!  It, it it, wasn't here when I was here!

JAMES MORRIS:        Yeah, it wouldn't on the list.  Why, you didn't. .

THAIS THOMPSON:            So, what the fuck. . .

JAMES MORRIS:        Yeah.

THAIS THOMPSON:            . . . shit, all I know, um, somethin' about some forty caliber bullets out the, out the drawer of the table in the dining room.

JAMES MORRIS:        Um hmm.

THAIS THOMPSON:            They wouldn't there before. . .

JAMES MORRIS:        Yeah.

THAIS THOMPSON:            And that, you know?  And furthermore, they didn't put where they took nothin' from. . .

JAMES MORRIS:        Right.

THAIS THOMPSON:          You know what I'm sayin'?

JAMES MORRIS:      Yeah.

THAIS THOMPSON:          And I wasn't told where they took nothin' from because they kept puttin' me out the hosue.

JAMES MORRIS:      Yeah.  So, what relevance that got to do with anything?

THAIS THOMPSON:          I don't know.  But you file your taxes; why didn't you file taxes on the money. . .  "I hadn't got to it."  "Your grandfather died two years ago and you ah. . ."  "Hey, I ain't doin' it now; you got it."

JAMES MORRIS:      Yeah.

THAIS THOMPSON:          What the fuck.

JAMES MORRIS:      See what I'm sayin', you try to make somethin' mine that ain't mine.

THAIS THOMPSON:          I'm just sayin' it's a bunch o' bullshit. . .

JAMES MORRIS:      Yeah.

THAIS THOMPSON:          . . .and they gettin' my nerves and I tell you what, I hope that this is the—after next week, then call me back. . .

JAMES MORRIS:      And all the dumb shit, did we live there and all of that dumb-ass shit.

THAIS THOMPSON:          "Well, um, how often did he stay there and who who was some of the people; give the names of some of the people who stayed at your house."  I ain't givin' you the names of fuckin' minors. . .

JAMES MORRIS:      [LAUGHS]

* * * *

JAMES MORRIS:      Hmm hmm.  Who was your law, you ain't have no lawyer with you?

THAIS THOMPSON:          Yeah, um, Rodney Ray.

JAMES MORRIS:      Oh, okay.  So, you was allowed to walk out and talk to him, though, right? [SOUND OF CLICK ON LINE]

THAIS THOMPSON:          Yeah, I I walked out once.

17

JAMES MORRIS:     Oh.

THAIS THOMPSON:          . . after, you try to get smart and shit. . . you know what I mean?  I ain't got time for that bitch. . .

JAMES MORRIS:     Oh.

THAIS THOMPSON:          Y'all called me here. . .

JAMES MORRIS:     Well you know that's how they play when they ain't got it right.  You know what I mean?

THAIS THOMPSON:          Leave me the fuck alone.  Shit, y'all know so much then do what you gotta do with what you know, shit!

From the transcripts of these calls it is wholly obvious that Thompson was not interested in proving truthful testimony to the grand jury and, in turn, that Morris did not want her to either.  His repeated questions about what the prosecutors asked in the grand jury, and curiousness as to whether Thompson pleaded "the Fifth" or was granted "immunity" expressed a desire for Thompson to protect him during her testimony.  The vitriol and contempt in which Thompson held the federal agents and the prosecutors investigating this case are highly relevant and not unduly prejudicial.

For these reasons, the defendant's motion should be denied.

Respectfully submitted,

PATRICK L. MEEHAN
*United States Attorney*


/s/ Michael J.  Bresnick

MICHAEL J. BRESNICK
RICHARD A.  LLORET
*Assistant United States Attorneys*

## <u>CERTIFICATE OF SERVICE</u>

I certify that a copy of the foregoing Response by the United States was served on counsel, below, by email or by regular mail, on the date indicated below.

Christopher D. Warren
1500 Walnut Avenue
Suite 1500
Philadelphia, PA 19102
Ph: (215) 546-3750
Fax: (215) 546-8779
email: Christopherduffwarren@hotmail.com
      Counsel for Alton Coles (1)

Jack McMahon
1500 Walnut Street
Suite 900
Philadelphia, PA 19102
Fax: (215) 985-4416
Phone: (215) 985-4443
Email: mcmahonlaw.@hotmail.com
      Counsel for Timothy Baukman (8)

Paul J. Hetznecker, Esq.
Hetznecker & Meehan
1420 Walnut Street, Suite 911
Philadelphia, PA 19102
Phone: 215-893-9640
Fax: 215-893-0255
      Counsel for Thais Y. Thompson (22)

Ronald B. Thompson, Esq.
3002 Lincoln Drive, Suite J
Marlton, NJ 08053
Phone: (856) 797-5785
Fax: (856) 797-5786
Fax: (856) 597-4200
Email: ronaldbthompson@lawyer.com
      Co-Counsel for James Morris (13)

Wayne Powell, Esq.
811 Church Road
101 Tarragon Building
Cherry Hill, NJ 08002
Phone: (856) 488-0004
Fax: (856) 486-7244
      Co-Counsel for James Morris (13)
Laurence Harmelin
P.O. Box 3574
West Chester, Pa 19381
Tel. & Fax:  610-429-1330
      Counsel for Monique Pullins (12)

/s/ Michael J. Bresnick_____
MICHAEL J. BRESNICK
ASSISTANT U.S. ATTORNEY