

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

*712*

UNITED STATES OF AMERICA  )  No. 05-CR-440-1

**FILED**

) FEB 14 2008

v.      MICHA...
By J...

ALTON COLES, et al,   )

Defendants.   )   Philadelphia, PA
)   January 17, 2008
)   9:31 a.m.


TRANSCRIPT OF TESTIMONY OF BRANDON HARRISON AND LOUIS WEIERS
BEFORE HONORABLE R. BARCLAY SURRICK
UNITED STATES DISTRICT COURT JUDGE


APPEARANCES:


For the Government:     MICHAEL J. BRESNICK, ESQUIRE
RICHARD A. LLORET, ESQUIRE
U.S. Attorney's Office
615 Chestnut Street
Suite 1250
Philadelphia, PA  19106


For the Defendant      CHRISTOPHER D. WARREN, ESQUIRE
Alton Coles:         Law Office of Christopher Warren
1500 Walnut Street
Philadelphia, PA  19102


For the Defendant      JACK J. McMAHON, JR., ESQUIRE
Timothy Baukman:     Law Office of Jack McMahon
1500 Walnut Street, Suite 900
Philadelphia, PA  19102


For the Defendant      LAURENCE HARMELIN, ESQUIRE
Monique Pullins:     P.O. Box 3574
Westchester, PA 19381



APPEARANCES:                (continued)


For the Defendant         RONALD A. SMITH, ESQUIRE
Asya Richardson:          Ronald A. Smith and Associates
                          1617 JFK Boulevard, Suite 1240
                          Philadelphia, PA  19103


For the Defendant         PAUL J. HETZNECKER, ESQUIRE
Thais Thompson:           1420 Walnut Street, Ste 911
                          Philadelphia, PA  19102


For the Defendant         RONALD THOMPSON, ESQUIRE
James Morris:             3002 Lincoln Drive
                          Suite J
                          Marlton, NJ  08053


                          WAYNE POWELL, ESQUIRE
                          811 Church Road
                          101 Parragon Building
                          Cherry Hill, NJ  08002


Audio Operator:           INNA GOLDSHTEYN


Transcribed by:           DIANA DOMAN TRANSCRIBING
                          P.O. Box 129
                          Gibbsboro, New Jersey  08026-129
                          PHONE:  (856)435-7172
                          FAX:    (856) 435-7124
                          Email:  dianadoman@Comcast.net


Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Brandon Harrison | 11 (Llo) | 164 (McM) | 235 (Llo) | |
| | | 191 (War) | | |
| | | 230 (Har) | | |
| | | 231 (Smi) | | |
| | | 233 (Het) | | |
| Louis J. Weiers | 237 (Bre) | | | |

| EXHIBITS: | | IDENT. | EVID. |
|---|---|---|---|
| For the Government | | | |
| G-1001 | Map of Philadelphia showing search warrant locations | 18 | 18 |
| G-1002 | Map of Philadelphia and surrounding Counties of search warrant locations | 22 | 21 |
| G-93 | Photograph of 5 North Burden Hill | 27 | 31 |
| G-93A | Photograph of 5 North Burden Hill | 28 | 31 |
| G-93B | Photograph of 5 North Burden Hill | 28 | 31 |
| G-93C | Ariel photograph of Burden Hill | 29 | 31 |
| G-13 | Photograph of front door or E. Essex | 30 | 31 |
| G-14 | Photograph of street leading to Essex | 31 | 31 |
| G-15 | Photograph of alley leading to Essex | 31 | 31 |
| G-16 | Photograph of rear of 339 Essex | 33 | 31 |
| G-525DDDD | 12-ton hydraulic press (Essex) | 37 | 37 |
| G-525DD | Bag of small plastic bags | 42 | 42 |
| G-525QQ | Face masks (Essex) | 47 | 47 |

| | EXHIBITS: Continued | | IDENT. | EVID. |
|---|---|---|---|---|
| 1 | | | | |
| 2 | G-525RR | Protective goggles  (Essex) | 50 | 46 |
| 3 | G-525PP | Razors, lighter, pens, clippers | 51 | 46 |
| 4 | G-525II | Spray bottle  (Essex) | 52 | 47 |
| 5 | G-525UU | Bag with white powdery residue (Essex) | 53 | 48 |
| 6 | G-525-10 | Photograph of cabinet where bag was | 53 | 48 |
| 7 | | chemicals were recovered from | | |
| 8 | G-525FF | Ohaus digital scale  (Essex) | 55 | 55 |
| 9 | G-525-11 | Photograph of kitchen cabinets (Essex) | 55 | 56 |
| 10 | G-525EE | Tanita digital scale (Essex) | 57 | 58 |
| 11 | G-525MM | Chemicals found in cabinet (Essex) | 59 | 59 |
| 12 | G-525NN | Chemicals found in cabinet (Essex) | 59 | 59 |
| 13 | G-525OO | Chemicals found in cabinet (Essex) | 59 | 59 |
| 14 | G-525TT | Acetone and procaine  (Essex) | 60 | 60 |
| 15 | G-525GG | Bowls and knife from kitchen (Essex) | 60 | 63 |
| 16 | G-525JJ | Baking soda from kitchen (Essex) | 61 | 61 |
| 17 | G-525KK | Spray bottle from kitchen (Essex) | 61 | 61 |
| 18 | G-525LL | Procaine from kitchen (Essex) | 61 | 61 |
| 19 | G-525-13 | Photograph of stove at 339 Essex | 62 | 62 |
| 20 | G-525CCCC | Deer Park water jug (Essex) | 63 | 63 |
| 21 | G-525S | Stretch wrap tape (Essex) | 64 | 64 |
| 22 | G-525T | Tape dispenser (Essex) | 64 | 64 |
| 23 | G-525KKK | Photograph of bags, procaine, wrappers | 65 | 65 |
| 24 | G-525JJJ | Photograph of trash bag with wrappers | 66 | 67 |
| 25 | G-525NNN | Photograph of trash bag and contents | 67 | 68 |

| | EXHIBITS: Continued | IDENT. | EVID. |
|---|---|---|---|
| 1 | | | |
| 2 | G-525III    Photograph of trash bag and contents | 69 | 70 |
| 3 | G-525LLL    Photograph of wrappers from trash | 70 | 71 |
| 4 | G-525P    Mossberg 500, 12-gauge shotgun (Essex) | 71 | 72 |
| 5 | G-525DDD    Ruger Mini-14 rifle (Essex) | 73 | 73 |
| 6 | G-525EEE    Hi-Point Model 995 rifle (Essex) | 74 | 75 |
| 7 | G-525D    Intratec Tec-DC9 handgun (Essex) | 76 | 77 |
| 8 | G-525A    Leinad semi-automatic handgun (Essex) | 78 | 78 |
| 9 | G-525C    Gun box (Essex) | 80 | 83 |
| 10 | G-525E    Feg 9JK-9HP semi-auto handgun (Essex) | 81 | 81 |
| 11 | G-525N    Magazine (Essex) | 82 | 82 |
| 12 | G-525O    Magazine (Essex) | 82 | 82 |
| 13 | G-525L    Magazine for Feg handgun (Essex) | 82 | 83 |
| 14 | G-525HH    Manual press from kitchen (Essex) | 83 | 83 |
| 15 | G-525B    Bag of nine millimeter bullets (Essex) | 86 | 87 |
| 16 | G-522FFF    Nine millimeter rounds from Hi-Point | 88 | 89 |
| 17 | G-525F    Two nine millimeter rounds (Essex) | 89 | 90 |
| 18 | G-525J    Nine millimeter rounds (Essex) | 90 | 90 |
| 19 | G-525G    Assorted ammunition | 91 | 92 |
| 20 | G-525-1    Photograph of drawer showing | 91 | 92 |
| 21 | ammunition | | |
| 22 | G-525-2    Photograph of dresser drawer | 93 | 94 |
| 23 | G-525Q    12-gauge shotgun shells (Essex) | 95 | 95 |
| 24 | G-525GGG    Box of ammunition (Essex) | 96 | 96 |
| 25 | G-525RRR    Box of gloves, tape, bags, foil | 98 | 99 |

| | EXHIBITS: Continued | IDENT. | EVID. |
|---|---|---|---|
| 1 | | | |
| 2 | G-525XXX  Glass pot with white residue (Essex) | 102 | 102 |
| 3 | G-525WWW  Pan and bowl with white residue | 103 | 103 |
| 4 | G-525AAAA Various Ziploc bags (Essex) | 102 | 104 |
| 5 | G-525YYY  Bowl, candle, lighter (Essex) | 104 | 104 |
| 6 | G-525ZZZ1 Wooden bowl (Essex) | 105 | 105 |
| 7 | G-525ZZZ2 Metal bowl (Essex) | 105 | 106 |
| 8 | G-525VVV  Black plate and spoon (Essex) | 106 | 106 |
| 9 | G-525TTT  Pan with residue (Essex) | 106 | 107 |
| 10 | G-525UUU  Farberware food slicer (Essex) | 107 | 107 |
| 11 | G-525SSS  Two plastic drawers (Essex) | 108 | 108 |
| 12 | G-525BBBB Black bag and contents (Essex) | 108 | 109 |
| 13 | G-526V    Photograph of Century safe (Essex) | 109 | 110 |
| 14 | G-526W    Photograph of Century safe (Essex) | 109 | 110 |
| 15 | G-526X    Photograph of firearms in safe (Essex) | 112 | 113 |
| 16 | G-526F    Wesson 357 Magnum (Essex) | 113 | 114 |
| 17 | G-526J    Davis Industries Derringer (Essex) | 114 | 115 |
| 18 | G-526Y    Fourth firearm from safe (Essex) | 115 | 116 |
| 19 | G-526E    Smith and Wesson SW9M (Essex) | 116 | 116 |
| 20 | G-526AA   Photograph of contents of second safe | 117 | 117 |
| 21 | G-526L    Photograph of compacted product | 118 | 118 |
| 22 | G-526A    Box from safe (Essex) | 119 | 119 |
| 23 | G-526N    Bag of product from safe (Essex) | 120 | 120 |
| 24 | G-526O    Bag of product from safe (Essex) | 120 | 120 |
| 25 | G-526P    Bag of product from safe (Essex) | 120 | 120 |

| EXHIBITS: Continued | | IDENT. | EVID. |
|---|---|---|---|
| G-526Z | Photograph of top shelf of safe | 120 | 120 |
| G-526U1 | Still photos of Timothy Baukman | 122 | 122 |
| G-526T1 | Front of business card in safe | 123 | 124 |
| G-526T2 | Back of business card in safe | 123 | 124 |
| G-526S | Pink phone message from safe (Essex) | 126 | 126 |
| G-526G | 357 Magnum hollow point rounds | 126 | 127 |
| G-526K | Round of ammunition from Derringer | 127 | 128 |
| G-526I | Ammunition from Luger (Essex) | 128 | 129 |
| G-526U | Videotape from safe (Essex) | 129 | 129 |
| G-526I1 | Magazine for nine millimeter | 129 | 130 |
| G-526R | Leather gun case (Essex) | 130 | 130 |
| G-525OOO | Contents of trash bag (Essex) | 131 | 131 |
| G-103 | Photograph of Suffolk Manor Apartments | 139 | 140 |
| G-103B | Photograph of 1400 block of Clearview | 143 | 144 |
| G-103D | Photograph of alley at 1416 Clearview | 145 | 145 |
| G-95 | Photograph of 118 South 46th Street | 148 | 149 |
| G-911A | Trash bags discarded by Mr. Coles | 156 | 156 |
| G-525-5 | Photograph of the safe from the first bedroom on the left | 161 | 161 |
| G-525-6 | Photograph of three handguns, gun box | 161 | 161 |
| G-525-21 | Photograph of hydraulic press | 161 | 161 |
| G-525-24 | Photograph of the safe in the second bedroom on the right | 161 | 161 |

| | EXHIBITS: Continued | IDENT. | EVID. |
|---|---|---|---|
| G-525-25 | Photograph of the long guns and | 161 | 161 |
| G-525U-W | Mail addressed to Tauheed Baukman | 162 | 164 |
| | at 339 East Essex Avenue | | |
| G-525X-Z | Mail addressed to Tauheed Baukman | 163 | 164 |
| | at 339 East Essex Avenue | | |
| G-525HHH | Red notebook (tally sheets) | 163 | 164 |
| G-525AA | Photograph of an individual | 164 | 164 |
| | found at 339 East Essex | | |
| G-520ZZ | Photograph of bag of money found | 246 | 246 |
| | in shed at Burden Hill | | |
| G-520DD | Luggage tag dated May 5, 2002 | 249 | 249 |
| G-520EE | Courtyard Marriott hotel card | 250 | 256 |
| G-520DD2 | Continental Airlines transfer ticket | 251 | 256 |
| G-520EEE | Photograph of Smith and Wesson | 253 | 253 |
| G-520RR | Photograph of Smith and Wesson | 254 | 254 |
| | Model CS-9 | | |
| G-520JJJ | Seven rounds of nine millimeter | 255 | 256 |
| | ammunition | | |
| G-520SS | Box of Winchester nine millimeter | 255 | 256 |
| | ammunition | | |
| 520III | Six rounds of assorted nine | 256 | |
| | millimeter ammunition | | |
| 520CCC | U.S. currency recovered from the | 258 | 261 |
| | attic | | |

| | EXHIBITS: Continued | | IDENT. | EVID. |
|---|---|---|---|---|
| 520BBB | Photo of currency in a black bag | | 263 | 264 |
| 520CC | Wrapping material recovered from basement | | 265 | 266 |
| 520YY | Photo of U.S. currency in blue plastic bag | | 266 | 267 |
| 520XX | Photograph of a pair of blue jeans | | 268 | 268 |
| 520UU | Photograph of cash in the bags from 5 North Burden Hill Road | | 269 | 269 |
| 520T3 | Photograph of all the cash removed from the bags | | 270 | 270 |
| 520AAA | Photo of digital scale and cell phone | | 271 | 272 |
| 520X | Digital scale recovered from the kitchen | | 272 | 272 |
| 520VV | Photograph of cell phones recovered from the kitchen | | 272 | 272 |
| 520QQ | Box of PMC 50 Centerfire pistol cartridges .40 caliber | | 273 | 275 |
| 520Z | DeLaRue money counting machine | | 274 | 274 |
| 520WW | Photograph of money counting machine and box | | 275 | 275 |
| 520AA | Box of rubber bands | | 276 | 276 |
| 520U | Four boxes of Glad cling wrap | | 276 | |
| 520V | Four rolls of gray duct tape | | 277 | |

| | EXHIBITS: Continued | IDENT. | EVID. |
|---|---|---|---|
| 520HHH | Photograph of rubber bands, cling wrap and duct tape | 277 | 277 |
| 520FFF | Photograph of work station in basement | 278 | |
| 520W | Bag of Hefty garbage bags, 40 count | 279 | 280 |
| G-520Y | Container for a Boost phone | 280 | 281 |

1          THE COURT:  Good morning.  Have a seat.  Counsel,

2     let's make arrangements to get things accomplished so that we

3     can get started at 9:15 so the jury isn't sitting, all right?

4          MR. LLORET:  Understood.

5          (Jury enters the courtroom, 9:33 a.m.)

6          THE COURT:  All right, have a seat, ladies and

7     gentlemen.  All right, Mr. Lloret, your first witness.

8          MR. LLORET:  Thank you, Your Honor.  The Government

9     calls --

10         (Pause in proceedings.)

11         THE COURT:  All right, go ahead, Mr. Lloret.

12         MR. LLORET:  Thank you, Your Honor.  The Government

13    calls Brandon Harrison, Special Agent Brandon Harrison.

14         COURTROOM DEPUTY:  Please raise your right hand.

15         BRANDON HARRISON, GOVERNMENT'S WITNESS, SWORN

16         COURTROOM DEPUTY:  Please state your full name for

17    the Court's record, please.

18         THE WITNESS:  Brandon Harrison.  The last name is

19    spelled H-A-R-R-I-S-O-N.

20         THE COURT:  Go ahead, Mr. Lloret.

21         MR. LLORET:  Thank you, Your Honor.

22                      DIRECT EXAMINATION

23    BY MR. LLORET:

24    Q    Mr. Harrison, you work with the ATF, is that right?

25    A    Yes, that's correct.

1    Q    And what's your position there?

2    A    I'm a special agent.

3    Q    And how long have you been a special agent?

4    A    Since July of 2001.

5    Q    As a special agent, what do your duties generally include?

6    A    I'm a part of H.I.D.A., which is High Intensity Drug

7    Trafficking Area.  Under that umbrella, I am part of the

8    Violent Drug Gang Task Force.  Our duties -- our duties are to

9    investigate long-term violent drug gangs.

10   Q    Now before you were with ATF -- and that was 2001, is that

11   right?

12   A    That's correct.

13   Q    Were you with any other law enforcement agency?

14   A    Yes.  I served two years with the Secret Service,

15   Uniformed Division.

16   Q    And before that, where did you serve the Government?

17   A    I served eight years in the Marine Corp, the United States

18   Marine Corp.

19   Q    And what did you do in the Marine Corp?

20   A    I served six years as a reconnaissance scout and two years

21   as a military police on an SRT team.  My actual job was a

22   forward observer.

23   Q    What's a forward observer?

24   A    In the field -- military police -- you have a forward

25   observer who will actually be pushed out in front of that

1  unit, and our job is to do reconnaissance on the enemy

2  territory or locate the enemy to make sure they can't sneak up

3  on our groups.

4  Q   Now, during your tenure as a Federal law enforcement

5  agent, particularly with ATF, have you done a number of search

6  warrants involving drugs and guns?

7  A   Yes, I have.

8  Q   And by done, I mean you've actually executed them, you've

9  gone in and done the searches?

10  A   Yes, I have.

11  Q   Okay.  Have you also prepared affidavits that supported

12  getting a warrant for a search warrant?

13  A   Yes.

14  Q   Okay.  Now, were you involved in the investigation of

15  Alton Coles and other people?

16  A   Yes, I was.

17  Q   All right.  And particularly, do you recall when the

18  investigation got active, so to speak, when it really began to

19  become active?

20  A   2004.

21  Q   And what was involved in that activity and what sort of

22  things did you all do?

23  A   We had interviews of cooperating sources, cooperating

24  witnesses.  We participated in surveillances on numerous

25  targets that related to this investigation.

Harrison - Direct (Llo)                    14

1    Q    And when you say surveillances, what do you mean by that?

2    A    Actually putting eyeballs or ourselves on the streets to

3    watch the targets of this investigation -- fixed and mobile.

4    Q    Now, come late 2004, did the investigation get a little

5    more intense?

6    A    Yes, it did.

7    Q    What was going on in late 2004, early 2005?

8    A    We were preparing to go on a Title III, which is a wiretap

9    on Alton Coles.

10   Q    And just so the jury understands, a Title III is the name

11   of the statute, as I understand it, is that right?

12   A    Yes, that's correct.

13   Q    Okay, the statute the authorizes the wiretap?

14   A    Correct.

15   Q    All right.  And in terms of the investigation at that

16   point, what sort of activities were you engaged in, was it the

17   same sort of thing, was it more intense or what were you

18   doing?

19   A    Yeah, it was much more intense.  We actually -- once we

20   flipped the switch, which is starting to listen to the phone

21   calls, we had numerous jobs.

22   Q    And what were some of those jobs that you had to do while

23   you were on the wire interception?

24   A    My primary role was surveillance, which was mostly street

25   work, again conducting surveillance on the targets of this

1  investigation but I also participated as a wiring monitor

2  where you would actually sit behind the computer and actually

3  listen to the live telephone calls that Alton Coles

4  participated in.

5  Q    The wire was on, at the start, one of the telephones of

6  Mr. Coles, is that right?

7  A    That's correct.

8  Q    And then another phone came up and that was also tapped?

9  A    Yes.  Once we identified he had a second cell phone, we

10 went on a wiretap on that phone also.

11 Q    Now, can you describe for the jurors, in terms of

12 surveillance, how does that all work?  I mean, is there any

13 coordination between what's going on in the wire and what's

14 going on in the field in surveillance?

15 A    Yes, there's a lot of coordination.  The wire room, or the

16 base, what we use sometimes as a -- as a code would be base,

17 would receive a live phone call.  Upon receiving that phone

18 call, they would decide whether or not to dispatch

19 surveillance, meaning fixed units or mobile units or even

20 sometimes people on foot.

21       It was pretty much coordinated by the wire room

22 though, on what the surveillance units would do.

23 Q    And you duties consisted for the most part in surveillance

24 out on the street, is that right?

25 A    Yes, that's correct.

1    Q    Okay.  When you say fixed and mobile surveillance, what

2    would those terms mean?

3    A    Fixed would actually be stationary, whether a vehicle or

4    in a quasi gutter, in a trash can, in a van that's not moving,

5    in a car that's not moving or an abandoned house, anyplace

6    that we would actually remain.

7             Mobile surveillance would be a coordination of

8    several vehicles or even foot units, depending on how far our

9    surveillance was going to partake.

10   Q    Can you tell us approximately when the wire began and when

11   approximately when it went down?

12   A    May of '05 and I believe it ended August 10th of 2005.

13   Q    And who was the lead agent who was supervising the wire?

14   A    Special Agent Mike Ricko.

15   Q    Now, the agents in your group, were they all or for the

16   most part involved in doing surveillances and so forth and

17   supporting that wire while it was up and running?

18   A    Yes.  We were completely dedicated to this investigation.

19   Q    If you could identify some of the agents that were

20   involved and, you know, I don't need you to identify all of

21   them, but some of the central players that the jury will be

22   hearing about.

23   A    Anthony Tropea was our senior special agent, he kind of

24   ran the show.  Mike Ricko was the case agent along with John

25   Bowman, who's sitting at the table.  We also had Charles

Harrison - Direct (Llo)                                    17

1    Doerrer, myself, and we actually needed to borrow several

2    agents from another group to -- just to make sure we had

3    enough manpower to operate the wire, that being Jenna Pollock

4    (phonetic) and Chris Hedges.

5    Q    All right.  And there are some police officers that

6    assisted in this and are also assigned to your group, is that

7    right?

8    A    That's correct.

9    Q    And who are they?

10   A    William Kelly is a detective with the Philadelphia Police

11   Department and Brian Monaghan, who was a narcotics officer

12   with the Philadelphia Police Department.

13   Q    Now, you mentioned that the end date of the wire was

14   approximately what -- August 10th of 2005?

15   A    Correct.

16   Q    All right.  What, if anything, happened that day to end

17   the wire?

18   A    We executed 23 simultaneous search warrants.

19   Q    And where were these various search warrants executed, and

20   you don't have to give the specific addresses, but if you

21   recall?

22   A    We had numerous in Philadelphia, in New Jersey -- Southern

23   New Jersey.

24   Q    Now, I want to look at --

25        MR. LLORET:  And, Your Honor, if I may approach the

1  witness for a moment?

2              THE COURT:  Yes.

3              MR. LLORET:  Thank you.

4  BY MR. LLORET:

5  Q   Sir, I want you to take a look at -- and let me show this

6  to counsel first.

7              (Pause in proceedings.)

8              MR. LLORET:  Your Honor, I don't see any objection.

9  I will move the admission of Government 1001, which is a map

10  of Philadelphia with some addresses on it.

11             MR. WARREN:  Without objection, sir.

12             THE COURT:  Okay.  You have it marked as what?

13             MR. LLORET:  1001, Your Honor.

14  BY MR. LLORET:

15  Q   Now, Agent, what are you looking at right now, the Exhibit

16  1001?

17  A   This is a map of several search warrants -- some of the

18  search warrants that we executed on that date and locations

19  related to this investigation.

20  Q   And this -- the outline or the gray area on the map is

21  what?

22  A   That's a map of Philadelphia.

23  Q   Okay.  And there are various -- we call then banners with

24  addresses in them on that map, is that right?

25  A   That's correct.

1  Q    Okay.  And do they supply the addresses of some of the

2  locations or all of the locations within Philadelphia that

3  were searched?

4  A    Yes, they do.

5  Q    Okay.  And, Agent, just for the record, if you could go

6  through and identify the various locations that were searched.

7  By the way, I see a red dot there at 601 Market Street.  What

8  is that?

9  A    That's the Federal Courthouse.

10  Q    Is that where we are now?

11  A    That's where we are today.

12  Q    Okay.  If you could, just sort of start at the top and go

13  either clockwise or counter-clockwise in some order around and

14  identify the various locations in Philadelphia searched.

15  A    Your Honor, may I stand up there?

16         THE COURT:  Yes indeed, you may step down.

17         MR. LLORET:  Thank you, Your Honor.

18         THE WITNESS:  Sorry, I was having a hard problem

19  seeing it.  This one here is 8436 Michener Street, here is

20  5704 Camac.

21  BY MR. LLORET:

22  Q    And that's got an arrow pointing to the location -- the

23  approximate location, is that right?

24  A    Correct.  These are located up in North Philly.

25  Q    Each of the banners that are on the map there have a

1  pointer that goes towards the property, is that right?

2  A    Correct.

3  Q    Okay.

4  A    In an approximate area.

5  Q    Right.

6  A    1416 West Clearview Street, Apartment F520; 2967 West

7  School House Lane; 605 North 66th Street; 957 North 66th

8  Street; 5856 Cedar Avenue.  These two are next to each other,

9  116 and 118 South 46th Street.  601 Market Street, again, is

10  where we are today, the Federal Courthouse; 4523 Springfield

11  Avenue; 2030 South Cecil Street; and on the same block, 2024

12  South Cecil Street.

13          This one -- these are located in Southwest

14  Philadelphia -- 7128 Upland Avenue; 7040 Greenway Avenue; 5534

15  and 5536 Paschall Avenue; and I believe I mentioned 5856 Cedar

16  Avenue already.

17  Q    Now, Agent, I know that you're probably energetic but did

18  you search all of those locations?

19  A    No, I did not.

20  Q    Okay.  You -- there were a number of agents involved, is

21  that right?

22  A    Yes, several hundred.

23  Q    Okay.  Now, if you could, you can return to the stand, if

24  you would.  On August 10th of 2005, approximately what time

25  were these search warrants executed, as they say?

1    A    6:00 a.m. -- in the morning.

2    Q    What were you doing in the hours that led up to that

3    execution of the search warrants?

4    A    Previous to that, I was at 117 Dillon's Lane, which is

5    located in Mullica Hill, New Jersey, which is not located on

6    this map.

7    Q    All right.

8            MR. LLORET:  Your Honor, if I may take the second

9    map we have here, I'll show it to counsel.  Your Honor, this

10   is marked 1002 and it's a map of Philadelphia and the

11   surrounding area, both in New Jersey and in Pennsylvania.

12           MR. WARREN:  Can I see it?  Thank you.

13           MR. LLORET:  And, Your Honor, again, I don't know of

14   any objection.

15           MR. WARREN:  No objection.

16           MR. McMAHON:  No objection, sir.

17           THE COURT:  All right.  It may be admitted.

18   BY MR. LLORET:

19   Q    Agent, I guess you're going to have to crane your neck

20   again.

21           MR. LLORET:  Your Honor, if the witness can step

22   down.  Sorry.

23           THE COURT:  Yes, indeed.

24           MR. LLORET:  I had him back in the stand there.  Can

25   you see?

Harrison - Direct (Llo)                                                22

1    BY MR. LLORET:

2    Q    Now, Agent, can you tell us what we're looking at in

3    Exhibit 1002?

4    A    Again, this is the map that we just looked at, the

5    Philadelphia area.   These are the surrounding counties and

6    States that search warrants were in and targets were also

7    related to.

8    Q    Now, could you go -- there's various banners outside of

9    Philadelphia on this map, number 1002 -- can you describe for

10   us the locations that were searched outside of Philadelphia

11   that day?

12   A    Yes.   304 East 23rd Street, Apartment C11, which is in

13   Chester, Pennsylvania; this is the one I just mentioned that I

14   was at, 117 Dillon's Lane, Mullica Hill, New Jersey, this is

15   Gloucester County, New Jersey; 292 Mannington Yorktown Road,

16   which is in Woodstown, New Jersey; and here you have 5 North

17   Burden Hill Road, which is in Salem, New Jersey.

18   Q    All right and up in Chester County, is there a location

19   there?

20   A    I'm sorry.   316 South Matlock Street, which is in West

21   Chester, Pennsylvania.

22   Q    And these, again, are locations that were searched as well

23   on the morning of August 10th, 2005, correct?

24   A    That's correct, yes.

25   Q    All right.   I think now you can safely take the stand

1    again, Agent.  Thank you.  Now, that morning you mentioned

2    that prior to 6:00 a.m. you were doing surveillance out at the

3    Mullica Hill location in Gloucester County, is that right?

4    A    That's correct.

5    Q    And the address there is 117 Dillon's Lane?

6    A    Yes, sir.  That's correct.

7    Q    How long were you out there doing surveillance?

8    A    Approximately 24 hours.

9    Q    All right.  And who were you surveilling there?

10   A    Alton Coles.

11   Q    Can you identify Mr. Coles?

12   A    He's sitting with the orange shirt and the black hat on.

13           MR. WARREN:  We'll stipulate to the identification,

14   Your Honor.

15           MR. LLORET:  Thank you, Your Honor.

16   BY MR. LLORET:

17   Q    Where did you see Mr. Coles that night and early morning,

18   if at all?

19   A    Mostly at night, we saw him at 117 Dillon's Lane, which

20   was in New Jersey.

21   Q    And at approximately 2:00 or 3:00 in the morning, did you

22   have him located there at the house?

23   A    Yes, we did.

24   Q    Had you seen him go in the house?

25   A    Yes, we did.

1    Q    Okay.  And had not seen him come back out of the house, is

2    that right?

3    A    No, we did not.  We saw lights on in the house so we

4    figured he stayed inside.

5    Q    All right.  And lights were on even at the early morning

6    hours of 2:00 or 3:00 in the morning?

7    A    Yes.

8    Q    Okay.  At approximately 6:00 in the morning, what took

9    place?

10   A    We joined a team for the execution of the search warrant,

11   myself and Agent Pollock were actually in the woods and an

12   abandoned house trying to maintain eyeballs on this, which is

13   observing this location.

14   Q    Now --

15   A    So as the team approached, we jumped in with the team.

16   Q    Now, is this location -- what is it, a city, a housing

17   complex, a rural location?

18   A    It's a semi-rural area.

19   Q    All right.

20   A    They're individual homes with pretty decent sized lots.

21   Q    Now, at 6:00 a.m., the search got executed, you went into

22   the house, is that right?

23   A    Yes.  That's correct.

24   Q    Who did you find in the house, do you recall?

25   A    Alton Coles.

1  Q    All right.  And was there anybody else in the house, do

2  you recall?

3  A    Yes, Asya Richardson --

4  Q    All right.

5  A    -- and I believe two kids.

6  Q    Okay.  Now, what, if anything, was your involvement in

7  searching the house?  Did you conduct a search of the house?

8  A    No, I didn't participate in the search.  My job, as

9  instructed by the case agents, was to immediately proceed to

10  339 East Essex.

11  Q    And did you then go to 339 Essex?

12  A    As soon as the house was secured, we left the area --

13  Q    All right.

14  A    -- and proceeded to Essex.

15              MR. LLORET:  Now, Your Honor, if we could put number

16  13 -- Government's Exhibit 13 -- actually, Your Honor, I'll

17  stop for a second and ask, before we get to that --

18  BY MR. LLORET:

19  Q    -- Agent, did you have occasion prior to that night to do

20  surveillance at any other locations in New Jersey?

21  A    Yes, we did.

22  Q    And what were those locations?

23  A    5 North Burden Hill.

24  Q    All right.  And is that the location down there far to

25  the --

1    A    Your Honor?

2              THE COURT:  Yes, indeed.

3              THE WITNESS:   This one down here.

4    BY MR. LLORET:

5    Q    It's far to the bottom of the map --

6    A    Correct.

7    Q    -- that we're looking at, number 1002, is that right?

8    A    Yes.  That's correct.

9              MR. LLORET:  And, Your Honor, I'm going to show some

10   pictures to counsel.  They're pictures of Burden Hill Road.

11             (Pause in proceedings.)

12   BY MR. LLORET:

13   Q    While counsel is reviewing the photographs, Agent, what

14   did your duties consist of in terms of surveillance at Burden

15   Hill Road?

16   A    Our main objective was to identify the occupants of the

17   house or who was coming and going, and also the layout of the

18   house, because this was in a very rural area so it was very

19   difficult to get to without being detected.

20   Q    Did you see any occupants of the house at any time during

21   your surveillances?

22   A    Yes, we did.

23   Q    And who did you see?

24   A    We saw -- over there, J. Morris.

25   Q    All right.

1          MR. LLORET:  And, Your Honor, may the record reflect

2    that the Agent is identifying the defendant, James Morris.

3          THE COURT:  The record shall so reflect.

4    BY MR. LLORET:

5    Q   Agent, I'd like you to take a look at number 93.

6          MR. LLORET:  And, Your Honor, I believe there's no

7    objection to this.

8          MR. WARREN:  There are no objections to the

9    photograph.

10          THE COURT:  All right.

11          MR. LLORET:  Your Honor, then I will just for

12    speed's sake, move the admission of 93, 93A, 93B, and 93C, all

13    of which are pictures from various angles of the Burden Hill

14    location.

15          MR. WARREN:  Again, no objection, Your Honor.

16          THE COURT:  They may be admitted.

17          MR. LLORET:  Thank you, Your Honor.

18    BY MR. LLORET:

19    Q   Agent, can you tell us what you're looking at in number

20    93?

21    A   That's the picture of the front of 5 North Burden Hill,

22    which is in New Jersey.

23          MR. LLORET:  And, Agent Horay, if we could put that

24    on the screen for everyone.

25    BY MR. LLORET:

1    Q    So we're looking at what you're looking at, is that right,

2    Agent, on the screen?

3    A    That's correct.

4    Q    All right.  And that's a picture of Burden Hill Road.

5    A    All right.

6           MR. LLORET:  And we could then look at number 93A

7    and Agent Horay, if you could put that up on the screen since

8    that's been admitted.

9    BY MR. LLORET:

10   Q    And, Agent, what is this that we're looking at in 93A?

11   A    That's the rear of the property.

12   Q    All right.  And obviously, that's taken from up above

13   somewhere?

14   A    Correct.

15   Q    Okay.

16          MR. LLORET:  And if we can look at number 93B.

17   BY MR. LLORET:

18   Q    And what is number 93B, Agent?

19   A    Again, this the rear of the property.  It's just that they

20   shot that zoomed out a little bit farther.

21   Q    All right.

22          MR. LLORET:  And then finally, number 93C.

23   BY MR. LLORET:

24   Q    Again, Agent, what are we looking at in 93C?

25   A    This is an ariel shot of the intersection and several

1   other of the neighboring homes.

2   Q    This is an intersection near the property at Burden Hill

3   Road?

4   A    Yes.  Correct.

5   Q    Can you locate for us, I'm not sure I know where Burden

6   Hill is on this particular screen here.

7   A    I believe it's the one right over here.  Can I use the

8   monitor?

9   Q    Certainly, you can.

10  A    The jury's monitor?

11           THE COURT:  Go right ahead.

12           MR. LLORET:  And pointing at the upper right-hand

13  corner, so to speak of, the picture that's number 93C, is that

14  right?

15           THE WITNESS:  That's correct.

16  BY MR. LLORET:

17  Q    All right.  Okay.  Agent, let's resume.  We'll talk about

18  did you actually search Burden Hill Road that day?

19  A    No, I did not.

20  Q    Okay.  You went over to the location at 339 Essex Lane

21  after you were done at Dillon's Road, is that right?

22  A    Yes, sir.  That's correct.

23  Q    And I'd like to show counsel a picture now, number 13.

24           MR. LLORET:  Your Honor, I detect no objection to

25  this picture going into evidence.

1          THE COURT:  Any objection?

2          MR. WARREN:  None.

3          MR. McMAHON:  No.

4          THE COURT:  It may be admitted.

5          MR. LLORET:  Thank you.

6    BY MR. LLORET:

7    Q    Agent --

8          MR. LLORET:  And if Agent Horay could put number 13

9    up on the screen.

10   BY MR. LLORET:

11   Q    -- what are we looking at in number 13, Agent?

12   A    The front door of 339 East Essex Avenue.

13   Q    And you went there that morning, is that right, after you

14   were done at Dillon's Lane?

15   A    That's correct.

16   Q    What did you do there as Essex?

17   A    My duties here were to search this location after the

18   warrant was served.

19   Q    And did you search the location?

20   A    Yes, I did --

21   Q    Okay.  This is --

22   A    -- upon completion of the search warrant --

23   Q    Okay.

24   A    -- of the entry.

25   Q    Did you and Agent Pollack go over there?

1   A    Yes, we did.

2   Q    Okay.

3              MR. LLORET:  Your Honor, I have a few other pictures

4   of Essex, number 14, 15, and 16.  And, Your Honor, I move the

5   admission of 14, 15, and 16.

6              MR. WARREN:  No objection.

7              THE COURT:  No objection?  They will be admitted.

8   BY MR. LLORET:

9   Q    Agent, can you tell us --

10             MR. LLORET:  -- and Agent Horay, if you could put

11  number 14 up on the screen.

12  BY MR. LLORET:

13  Q    Agent, what are we looking at in number 14?

14  A    This is a picture taken from the street leading -- it's

15  actually one way but it's leading towards Essex -- and if you

16  see the Do Not Enter sign -- can everybody see that -- just to

17  the immediate left, if you can move the mouse just to the

18  left, that's Essex.  That's 339 Essex.

19  Q    All right.

20             MR. LLORET:  And if we could look at number 15 now

21  on the screen.

22  BY MR. LLORET:

23  Q    Agent, could you describe what we're looking at here and

24  the point of view from which the picture is taken?

25  A    This is a shot coming up the alleyway, which goes behind

1    339 Essex.  And if you reference that One Way sign here,

2    that's actually the back of the Do Not Enter sign in the other

3    photo, just to give you a reference point.

4              MR. LLORET:  Agent Horay, if we could put both 15

5    and 14 on the screen so we can see what Agent Harrison is

6    talking about.

7    BY MR. LLORET:

8    Q    Okay, Agent, if you could just direct the pointer so the

9    jurors can see what you're talking about with that One Way

10   sign.

11   A    That's the back side of the Do Not Enter sign and if you

12   go down to Exhibit 14, you'll see the front side of it, just

13   to give you reference.

14   Q    All right.  So Number 15 --

15             MR. LLORET:  -- and we can put the full view of 15

16   on the screen.  Thank you.

17   BY MR. LLORET:

18   Q    In number 15, we're actually sort of at the curb or

19   something close to the house looking away from the house?

20   A    Looking away, that's correct.

21   Q    All right.

22             MR. LLORET:  And number 16, if we could put that on

23   the screen.

24   BY MR. LLORET:

25   Q    And what is number 16, Agent?

1    A    This is a picture of the rear of the location of 339

2    Essex.  You can see the two garages in that picture.

3    Q    Now, this location --

4         MR. LLORET:  -- and we can go back to number 13,

5    Agent Horay.  If we can -- okay.

6    BY MR. LLORET:

7    Q    -- this location, Agent, was that one house, a single

8    family residence, or was it divided up?  Do you know?

9    A    It was divided in two, A and B.

10   Q    All right.  And which unit did you search?

11   A    Apartment B, which was the upstairs.

12   Q    And with respect to the garages downstairs, were they also

13   differentiated?

14   A    It was a mutual garage.  The same door went to the garage

15   but there was two sides --

16   Q    Two sides.

17   A    -- two different garages.

18   Q    And were they marked, the two sides?

19   A    Not in the garage, no, they were not.

20   Q    Okay.  Did you also search in the garage part B?

21   A    Yes.  There was a bin downstairs which was just prior to

22   the garage --

23   Q    Okay.  And that --

24   A    -- in the basement -- almost in the basement and then you

25   would go through the basement and into the garage.

1   Q    And I'm sorry, was that marked or not?

2   A    Yes, they were marked A and B.

3   Q    All right, to correspond to the apartment?

4   A    Correct.

5   Q    Thank you.  Now, once you got there you did a search of

6   that place, is that right?

7   A    That's correct.

8   Q    Can you generally describe the location, just sort of

9   physically, what did the apartment look like?  Was this

10  apartment up or down or to one side or to the other?  Just

11  give us an idea of the layout.

12  A    As you enter the front door here in the picture, which is

13  the white door of Exhibit 13, immediately to your right would

14  be the doorway to Apartment A and then you would actually go

15  up a set of steps to Apartment B.  There was also a second

16  door which was the same layout as Apartment B, next to the

17  steps.  If you were to open that door, you would go into the

18  basement.

19  Q    Now, when you -- you went upstairs and searched Apartment

20  B, is that right?

21  A    That's correct.

22  Q    And when you went into Apartment B, what's the sort of

23  general layout as you go into Apartment B there?

24  A    If you were coming through the front door, you would enter

25  the living room.  Off to your right was a little bit more of

1   the living room and then it kind of comes around to a kitchen,

2   which is halfway exposed and half is not because of the wall.

3   If you would go to your left, which would be north or left as

4   you're walking in, there's two bedrooms and there's only a

5   little like door that separates the two bedroom.

6            One bedroom is off to the left, one is to the right.

7   Across from that is the actual bathroom, so there was three

8   rooms including the bathroom -- there was two bedrooms and a

9   bathroom, a living room and a kitchen.

10  Q    All right.  And I take it you searched all of those

11  locations, all those rooms in the house, is that right?

12  A    Yes, we did.

13  Q    In the living room, what sort of items did you see in the

14  living room?  Were there any pieces of furniture or things of

15  that nature?

16  A    Just a couch, maybe a coffee table and a TV.

17  Q    And in the first bedroom which was to your left looking

18  from the living room, is that right -- correct?

19  A    That's correct, off to the left -- west -- west side,

20  yeah.

21  Q    I should say correct instead of right.  All right.  That

22  bedroom to your left, was there anything in there that you

23  recall?

24  A    Just a bed and a dresser, and there was a safe.

25  Q    Where was the safe?

Harrison - Direct (Llo)                    36

1    A    The safe was actually located inside of a closet.

2    Q    All right.  And then going to the second bedroom which was

3    on your right, can you describe what, if anything, was in that

4    bedroom generally?

5    A    Just a red hydraulic press, and also a safe was in the

6    kitchen -- I mean in the closet.  I'm sorry.

7    Q    And in the kitchen, can you generally describe what sort

8    furniture, if any, you found in the kitchen?

9    A    There was just a  table and a trash can.  That's it.

10   Q    Now, there's a red item behind that map, is that right?

11   A    Yes.

12   Q    Okay.  What is that?

13   A    That's the hydraulic press that was found --

14   Q    Okay.

15   A    -- in the second bedroom.

16            MR. LLORET:  Let's do this.  Let me take this out of

17   the way.  Your Honor, can we just put this here?

18            THE COURT:  Yes, indeed.

19            MR. LLORET:  And, Agent, I'll -- thank you.  Your

20   Honor, can the Agent stand down here for a few minutes while

21   we talk about this item?

22            THE COURT:  He certainly may.

23            MR. LLORET:  All right.

24   BY MR. LLORET:

25   Q    Agent, what it this red item and what is it marked?  Up

1    here we have the exhibit number.

2    A    525DDDD -- four Ds  Four Ds.

3    Q    And what is it?

4    A    This is a 12-ton hydraulic press.

5    Q    And you found that there at Essex Lane?

6    A    That's correct, in the second bedroom

7              MR. LLORET:  Your Honor, I move the admission of

8    525DDDD.

9              THE COURT:  Any objection?

10             MR. WARREN:  No.

11             MR. McMAHON:  No objection.

12             THE COURT:  It may be admitted.

13   BY MR. LLORET:

14   Q    What is that press, sir?  What does it do?

15   A    If you actually assemble it, this press will actually

16   raise here -- anything you put underneath this is going to

17   exert 12 tons of pressure so to compress it just by simply

18   using this and this will bring this down and these plates here

19   to stabilize whatever's underneath so it actually compresses

20   whatever's -- 12 tons of pressure are going to come out of

21   this hydraulic press.

22   Q    And what, if anything, did you find in the apartment that

23   would explain the appearance of this press?

24   A    Crack, coke, drugs.

25   Q    Can you describe for us what use, if any, this press has

1  with respect to cocaine or crack?

2  A   It's used to actually compress the bricks for

3  concealability and portability.  And actually, just to give

4  you a quick example, the brick would be about that size, a

5  brick of cocaine made of a thousand grams.

6          MR. WARREN:  Excuse me, I can't see.  He's --

7          THE WITNESS:  Sure.

8          MR. LLORET:  Holding up a -- a black weight that's

9  used with a hydraulic press right now.

10         THE WITNESS:  Weight plates, correct.

11  BY MR. LLORET:

12  Q   Okay.  And tell us, if you would, what's done with the

13  press to the cocaine.

14  A   Once you get the product, and you can either do it pre-

15  wrap or post-wrap, but you'll actually operate this hydraulic

16  press which will keep compacting the drugs and to make them

17  smaller and more compacted.

18  Q   And this was in the second bedroom on the right?

19  A   Yes, that's correct.

20  Q   Okay.  There were a number of items in the kitchen, is

21  that correct?

22  A   Yes.

23  Q   And can you describe generally what was found in the

24  kitchen?  Just a general description.

25  A   A large amount of drug cooking supplies such as pots, pans

1    that were laced with a white powdery substance, an enormous

2    amount of trash bags, Ziploc bags and wrappings which are used

3    to transport or sell narcotics.

4    Q    Now, before --

5    A    There was also masks and latex gloves.

6    Q    Okay.  And what -- what, if any, significance did the

7    masks or latex gloves have to you?

8    A    They're used to protect the individual making or packaging

9    an actual drug product, being coke or crack.  It just keeps

10   the product from getting in your face or your eyes or your

11   hands.

12   Q    Now, before you went through the apartment and searched it

13   thoroughly, did you have a K-9 go through?

14   A    Yes, we did.

15   Q    And do you recall who the K-9 was?

16   A    I believe it was Officer Thomas Tockas (phonetic) from the

17   Delaware County Criminal Investigator Division.

18   Q    And have you done these walkthroughs with K-9 officers

19   before with their dogs?

20   A    Yes, many times.

21   Q    And what's the point of having a dog walk through the

22   apartment -- a canine -- a canine dog, that's just great -- a

23   narcotics dog?

24   A    A narcotics dog will go through a property before we

25   commence to searching.  They actually help locate certain

Harrison - Direct (Llo)                                    40

1   types of narcotics that that dog was trained to sniff out, so

2   to speak.  It actually smells for a certain type of smell.

3   Q    And did you accompany this dog and this handler in going

4   through the apartment?

5   A    Yes, I did.

6   Q    Did the dog alert to any of the locations in the

7   apartment?

8   A    Almost the entire house but specifically the living room

9   and the two bedrooms and the kitchen.

10  Q    Okay.  And now, with respect to that red press that's in

11  front of us, the hydraulic press, did the dog alert to that,

12  or no?

13  A    He alerted not only to the press, but to the flooring area

14  that was around the press.

15  Q    Can you describe for us, Agent, when you went in there the

16  condition of the floor, if there was anything unusual about it

17  that you noticed?

18  A    There was a lot of white powder -- almost like sprayed

19  across some parts of the carpet in the living room, and also

20  around here, there was also some white powder.

21  Q    All right.  And was there white powder also in the air?

22  A    Yes.

23  Q    Okay.  And when you were walking around did the powder

24  come up or was it laying --

25  A    It was -- yeah, it was coming up.  You could actually see

1   it coming up.  If somebody stepped on the carpet too hard or

2   kicked the carpet, you could see the powder come up.

3   Q    Now, let's start to go through --

4            MR. LLORET:  -- and if I could have exhibit -- you

5   can take -- well, you know, we'd better push this back or move

6   it around.

7            MR. WARREN:  Judge, maybe I missed it.  Has that

8   been offered and admitted into evidence?  This?

9            MR. LLORET:  Yes.

10           MR. WARREN:  Okay.

11           THE COURT:  The press?

12           MR. WARREN:  The press, yes.

13           THE COURT:  It was, a few minutes ago, without

14  objection.

15           MR. WARREN:  Well, I didn't have an objection.  I

16  just wanted to make sure --

17           THE COURT:  All right.

18  BY MR. LLORET:

19  Q    Agent, if you can --

20           MR. LLORET:  -- well, you know what, let me have

21  exhibit number 525DD -- double D.  Your Honor, 525DD is a bag

22  filled with small plastic bags.  Your Honor, I move the

23  admission of 525DD.

24           MR. WARREN:  No objection.

25           MR. McMAHON:  No.

1  BY MR. LLORET:

2  Q    Agent, can you tell us what's in 525 double D?

3  A    These are small Ziploc bags.  You can all see that?  Is

4  this too far for you?

5          MR. LLORET:  Your Honor, if --

6          THE WITNESS:  They're -- they're just little small

7  packaging (inaudible 10 09 10) and you just -- you can put

8  narcotics inside and actually zip it up.

9  BY MR. LLORET:

10  Q    Agent, maybe you can take a seat and open up that bag

11  that's 525 double D.  I don't know if that's readily opened or

12  not.

13  A    That's actually two attached to each other.

14  Q    And can you give us for the record the approximate size of

15  those small blue packets that you're holding up?  Are they --

16  are they an inch square or less?

17  A    Maybe even less.

18  Q    All right.

19  A    An inch at the most.

20  Q    Are these Ziploc, these little tiny packets?

21  A    Yes, they are Ziploc.

22  Q    Are they familiar to you, Agent?

23  A    Yes.

24  Q    What, in your experience, are they used for?

25  A    I've only seen them used to distribute crack cocaine or

Harrison - Direct (Llo)                                     43

1    small amounts of coke.

2              MR. WARREN:  Judge, I'm going to have to object at

3    this particular point.  We've let him go on but this is really

4    extra testimony.

5              THE COURT:  There has been no objections made to

6    this point, Counsel, but I think that objection is well taken.

7              MR. LLORET:  Your Honor, if I may establish that the

8    Agent has the experience necessary to testify to that.

9              THE COURT:  If you establish that then --

10             MR. LLORET:  Very well.

11             THE COURT:  -- we'll let him testify.

12             MR. LLORET:  Thank you, Your Honor.

13   BY MR. LLORET:

14   Q    Agent, have you received training in the identification of

15   narcotics and narcotics paraphernalia?

16   A    Yes, I have.

17   Q    And what is that type of training that you received?

18   A    We received training in the academy.  I've been through

19   numerous police academies, the Secret Service, and Uniformed

20   Division actually operates the streets of D.C., so we do have

21   narcotics experience.  I also went through the D.C. Police

22   Academy.

23             I left a week before I graduated to take this job.

24   Also, through ATF we have numerous courses and it's just a

25   constant ongoing learning experience, working nothing but

1   narcotics and ATF.

2   Q   With respect to your experience, have you recovered on

3   numerous instances baggies of this nature?

4   A   Hundreds of times.

5   Q   All right.  Have you also interviewed people who are users

6   of narcotics and people who are distributors of narcotics for

7   the purpose of getting information from them?

8   A   Yes.

9   Q   Have they also described to you this type of packaging as

10  used in the distribution of cocaine and cocaine base?

11  A   Yes.

12  Q   Okay.

13          MR. LLORET:  Your Honor, I move to qualify this

14  Agent as an expert on the limited issue of narcotics

15  paraphernalia.

16          MR. WARREN:  I don't have any voir dire questions,

17  Judge.

18          THE COURT:  Any objection?

19          MR. WARREN:  No.

20          MR. McMAHON:  No.

21          THE COURT:  You may so testify.  Go ahead, Mr.

22  Lloret.

23          MR. LLORET:  Thank you, Your Honor.

24  BY MR. LLORET:

25  Q   Agent Harrison, with respect to these packets, are you

1    familiar with their use?

2    A    Yes.

3    Q    Okay.  And what is their use, if, from your experience --

4    A    The only use I've ever seen these for is to package small

5    amounts of crack cocaine or cocaine, and possibly weed, but

6    you're not going to get too much in there so mostly crack or

7    coke.

8    Q    And when you say weed, what are you talking about?

9    A    Marijuana.

10   Q    All right.  And you said cocaine and crack cocaine.

11   What's the basic difference?

12   A    Cocaine is more pure.  Crack cocaine is actually a product

13   of cocaine.  They take a large amount of cocaine and you can

14   cut it up to help spread your profits so you add certain stuff

15   -- you add certain items to it which will spread your

16   product --

17   Q    And --

18   A    -- the product being the crack cocaine.

19   Q    Okay.

20           MR. WARREN:  Are we expanding the field of expertise

21   that the Agent is being offered in now, Judge?

22           MR. LLORET:  No, Your Honor.  If necessary, I'll

23   retract that.  I'm just -- we'll stick to paraphernalia.

24   BY MR. LLORET:

25   Q    Agent, with respect to the --

1              THE COURT:  The objection is sustained.

2              MR. LLORET:  Thank you, Your Honor.

3              THE COURT:  The testimony just given is stricken.

4    BY MR. LLORET:

5    Q    Agent --

6              THE COURT:  The jury is cautioned to disregard it.

7    BY MR. LLORET:

8    Q    Agent, with respect to the other items that are in the

9    packet or the package, are you familiar with them?

10   A    The other items being -- it's just full of Ziploc bags.

11   Q    Of the same nature as the one you pulled out?

12   A    Same size, just different colors, I believe all the same

13   size, numerous colors.

14   Q    All right.  And if you can put them back in.  Can you tell

15   us where these packets were found in the apartment?

16   A    These were found in the kitchen of 339 Essex, Apartment B.

17   Q    All right.

18             MR. LLORET:  And let me get number 525 double Q.

19             Agent, have you got those?  I'll just take those.

20             Your Honor, I'm showing Counsel 525 double Q which

21   are a couple of face masks.

22             Your Honor, I move the admission of 525 double Q.

23             MR. WARREN:  No objection.

24   BY MR. LLORET:

25   Q    Agent, can you tell us --

1          THE COURT:  It may be admitted.  Counsel, why don't

2     you have the witness identify it before we admit it.

3          MR. LLORET:  Certainly.

4     BY MR. LLORET:

5     Q    Agent, what are you looking at in number 525 double Q?

6     A    These are dust masks, almost a protective mask.

7     Q    And are you familiar with them?

8     A    Yes.

9     Q    And why are you familiar with them?

10    A    These were used if you were even going to be handling

11    large amounts of crack or cocaine or the chemicals used to

12    make the crack cocaine base.

13         MR. WARREN:  Judge, same objection.  This isn't

14    paraphernalia he's talking about here.  Now he's talking

15    about --

16         THE COURT:  Counsel, let's go to sidebar.

17         (Sidebar discussion as follows:)

18         THE COURT:  Mr. Lloret, you're asking these

19    egregious questions that go to his expertise and yet you don't

20    -- evidently you want to qualify him as an expert.  He

21    identified a press and talked about that.  There wasn't any

22    objection but I want to find out exactly where you think

23    you're going with this.

24         MR. LLORET:  Well, Your Honor, I can certainly

25    qualify him but I don't have to.  What I'll do is I'll just

1  ask him about the items that were found and why he recovered

2  them.   I guess I can do that.

3           THE COURT:   You certainly can ask him what he found.

4           MR. LLORET:   Sure.

5           THE COURT:   There's no question about that but when

6  you get into --

7           MR. LLORET:   I'll just ask him --

8           THE COURT:   -- his area --

9           MR. LLORET:   Yeah.

10          THE COURT:   -- of expertise you're going to have to

11 qualify him.

12          MR. LLORET:   That's fine.   I -- Your Honor, my --

13          MR. WARREN:   Your Honor, generally there's a problem

14 with his being offered as an expert anyway.   There's a notice

15 issue and so forth.

16          MR. McMAHON:   He's never been identified, Judge, as

17 a potential expert witness so I think that there's a problem

18 with qualifying the witness as he's on the witness stand as a

19 potential expert.

20          MR. WARREN:   I'm not so much concerned about the

21 notice issue.   I mean, I kind of let it pass because 339 Essex

22 Street isn't really my particular problem but --

23          THE COURT:   Well, that may be but it's a problem for

24 somebody.

25          MR. McMAHON:   Right.

1          MR. LLORET:  Your Honor, I'll just go through --

2          THE COURT:  Just go through the things you found and

3  leave it at that.

4          MR. LLORET:  Sure.

5          THE COURT:  If you have another expert that's going

6  to come in, fine.

7          MR. LLORET:  We'll put him on.

8          THE COURT:  He can identify it for the record.

9          MR. LLORET:  Sure.  Okay.

10          (Sidebar discussion concluded.)

11  BY MR. LLORET:

12  Q    By the way, Agent, I think I -- you mentioned when you

13  were back at Dillon's Lane that you saw Alton Coles and Asya

14  Richardson, is that right?

15  A    That's correct.

16  Q    Is Asya Richardson here today?

17  A    Yes, she is.

18  Q    Can you identify her?

19  A    She's sitting in the middle with the white shirt.

20          MR. LLORET:  And, Your Honor, let the record reflect

21  the Agent is identifying the defendant Asya Richardson.

22          THE COURT:  The record shall so reflect.

23          MR. LLORET:  Okay.

24  BY MR. LLORET:

25  Q    Agent, you're looking at number 525 double Q, is that

1    right?

2    A    That's correct.

3    Q    And what are they?

4    A    They're two protective masks.

5    Q    Of the type worn about your face --

6    A    Yes.

7    Q    -- or over your mouth?

8    A    Over your mouth and nose area.

9    Q    And where were they found?

10   A    These were found in 339 East Essex, Apartment B.

11   Q    And do you recall where in the apartment?

12   A    I believe these were found on the table, the kitchen

13   table.

14   Q    All right.

15        MR. LLORET:  Your Honor, I'll have the witness

16   identify number 525 double R and then I'll show them to

17   Counsel.

18   BY MR. LLORET:

19   Q    What is 525 double R, Agent?

20   A    It's a set of protective goggles

21   Q    All right.

22   A    -- again, to cover your eye area.

23        MR. LLORET:  Now let me show those to Counsel.

24        Your Honor, I move the admission of 525 double R.

25        MR. WARREN:  Without objection, sir.

1          THE COURT:  It may be admitted.

2    BY MR. LLORET:

3    Q    And, Agent, did you recover these also from the location?

4    A    Yes.  These were also on the table in the kitchen.

5    Q    All right.  And these are goggles.  Can you take them out?

6    And can you -- is this the type of goggle you put over your

7    eyes?

8    A    Yes, to protect yourself.

9    Q    All right.

10          MR. LLORET:  Let me have that one and let me have

11   525 double P.

12   BY MR. LLORET:

13   Q    Agent, what's in 525 double P?

14   A    Quite a few razor blades.  There's a cigarette lighter and

15   several pens, just ballpoint pens inside the packaging and toe

16   nail clippers.

17   Q    All right.  And do you recall whether these were recovered

18   at Essex Lane as well?

19   A    I believe they were in the kitchen.

20          MR. LLORET:  Your Honor, I'm going to show these to

21   Counsel but at that point I'll move them into admission.

22          Your Honor, I move the admission of 525 double P.

23          THE COURT:  It may be admitted.

24   BY MR. LLORET:

25   Q    And, Agent, if you could take those out, at least one of

1    them out so the jury can see.  All right.  And there's a

2    lighter in there as well?

3    A    Yes, that's correct.

4    Q    And do you recall where these were recovered?

5    A    These were recovered in the kitchen.

6    Q    Okay.

7              MR. LLORET:  And if I can have number 525H.

8              Your Honor, I mistook the exhibit number.  It's 525

9    double I.

10   BY MR. LLORET:

11   Q    Agent, can you tell is what is 525 double I?  And maybe

12   you can take it out of the wrapping.

13   A    It's a spray bottle.  Do you want me -- this is wet.  I

14   don't want to --

15             MR. LLORET:  And, Your Honor, let me show Counsel

16   and then I'll move the admission.

17             THE COURT:  Where was that found, Counsel?

18   BY MR. LLORET:

19   Q    Agent, can you tell us where this was found?

20   A    It was recovered in the kitchen.

21             MR. LLORET:  Your Honor, I move the admission of 525

22   double I.

23             MR. WARREN:  Without objection, sir.

24             THE COURT:  It may be admitted.

25             (Pause in proceedings.)

1              MR. LLORET:  I'll take 525 double U.

2     BY MR. LLORET:

3     Q    And, Agent, can you tell us what 525 double U is?

4     A    It's a bag with a white powdery substance.

5     Q    And where was that recovered?

6     A    This was recovered in the kitchen.

7     Q    Okay.  And I'll show you the Government's Exhibit 525-10

8     as well.  Can you tell us what that is?

9     A    This is a picture of the kitchen cupboard and in here you

10    can see the white powder which is located in that bag --

11    Q    All right.

12    A    -- in the -- in the knotted bag in the cabinet.

13             MR. LLORET:  I'll show these to Counsel, 525UU and

14    525-10.

15             (Pause in proceedings.)

16    BY MR. LLORET:

17    Q    And, Agent, if you could just hold up 525UU for the jury

18    so that they can see it.  There's what appears to be an

19    evidence bag on it.

20             MR. LLORET:  And, Your Honor, I move the admission

21    of 525UU and 525-10.

22             MR. WARREN:  I have no objection.

23             THE COURT:  It may be admitted.

24    BY MR. LLORET:

25    Q    Agent, 525UU is the bag -- evidence bag which contains a

1   smaller bag of white powdery substance?

2   A   That's correct.

3   Q   All right.  And 525-10 is a photograph?

4   A   As we found it, that's correct.

5   Q   Okay.

6   A   This is actually after the lab.

7   Q   All right.

8        MR. LLORET:  Agent Horay, could you show the jury

9   number 525-10?

10  BY MR. LLORET:

11  Q   Agent Harrison, what are we looking at in number 525-10?

12  A   That's a picture of a kitchen cabinet located inside the

13  kitchen of 339 East Essex, and if you look to the bottom right

14  of that Ziploc bag with the raspberries on them -- if you keep

15  going down farther -- right there is this -- this bag.

16  Actually in the back is the clear plastic bag.  It was knotted

17  up.

18  Q   So the -- and the white powder that's in number 525 double

19  U, is that where you found it?

20  A   Yes.

21  Q   Okay.

22        MR. LLORET:  And I'd like to have 525 double F.

23  BY MR. LLORET:

24  Q   Agent, can you tell me, what is number 525 double F?

25  A   This is a digital scale for weight.

1    Q    You can take it out and take a look at it if you need to.

2    A    It's a digital scale -- an Ohaus, with a powdery substance

3    completely covering this entire scale.

4            MR. LLORET:  And, Your Honor, I'll show that to

5    Counsel.

6            Your Honor, I move the admission of 525 double F.

7            THE COURT:  Where was that found?

8            THE WITNESS:  That was in the kitchen.

9            THE COURT:  Any objection?

10           MR. WARREN:  I have no objection.

11           THE COURT:  It may be admitted.

12   BY MR. LLORET:

13   Q    Do you recall where in the kitchen that was found, Agent?

14   A    If I can refer to my notes, I can give you the exact

15   location.

16   Q    That's -- that's okay.  It was found generally in the

17   kitchen?

18   A    Yes.

19   Q    All right.  I want to show you another picture, number

20   525-11 and ask you what's in that picture first for

21   identification purposes and then I'll show it to Counsel.

22   A    This is another picture of the cabinet -- kitchen cabinets

23   inside of Essex.

24   Q    And what's depicted briefly in that picture?

25   A    You'll see several types of chemicals, and on the top

1    shelf, there is a manual press, which is similar to the

2    hydraulic press but you actually have got to use your hand.

3    You turn the lever.

4    Q    All right.

5              MR. LLORET:  Your Honor, I'll show these to Counsel.

6              I move the admission of 525-11.

7              MR. WARREN:  Your Honor, I have no objection.

8              THE COURT:  With no objection, it may be admitted.

9              MR. LLORET:  And if we could show the jury number

10   525-11.

11   BY MR. LLORET:

12   Q    Agent, we're looking at number 525-11 now, is that

13   correct?

14   A    That's correct.

15   Q    And where is the hand press that you indicated --

16   A    On the second shelf, you can see the top part of it where

17   the actual lever is --

18   Q    All right.

19   A    -- and you can see the sides.  That's it right there,

20   where the mouse pointer is.

21   Q    Okay.  And looking down on the bottom --

22              MR. LLORET:  Well, go ahead and blow that up --

23   BY MR. LLORET:

24   Q    -- this is the -- we're looking at a blowup of the hand

25   press that you discussed?

1    A    Yes.

2    Q    Okay.

3    A    That's just part of it, the top part.

4    Q    All right.

5            MR. LLORET:  We can look at the overall picture now

6    again.

7    BY MR. LLORET:

8    Q    On the bottom shelf, there's a box on the right-hand side,

9    is that right?

10   A    Yes.

11   Q    And what is that box or what was it?

12   A    It was baking soda, Arm and Hammer Baking Soda.

13   Q    And also to the left is a bottle -- a white bottle, all

14   the way to the left of the cabinet.  Yeah, there we go, the

15   pointer's on it now.  Can you tell us what that is?

16   A    Inositol powder.

17   Q    And did you recover that -- those two items as well?

18   A    Yes, we did.

19   Q    All right.

20           MR. LLORET:  And I'd like to look at number 525

21   double E.

22   BY MR. LLORET:

23   Q    And 525 double E, Agent, what is that?

24   A    It's another digital scale.

25   Q    And did find that that day?

1    A    This was also recovered in the kitchen.

2    Q    All right.

3    A    This one's a Tanita brand.  Tanita makes this.

4    Q    All right.

5    A    It's covered in powder.

6              MR. LLORET:  Your Honor, I'll show that to Counsel.

7              Your Honor, I move the admission of 525 double E.

8              MR. WARREN:  I have no objection, Judge.

9              THE COURT:  No objection, it may be admitted.

10   BY MR. LLORET:

11   Q    Agent Harrison, can you look at the Tanita scale there --

12   no, I'm sorry, that's the Ohaus scale.

13   A    This one's Tanita.

14   Q    Okay.  And can you tell us, what's the weight limit on

15   that scale?

16   A    1,000 grams.

17   Q    All right.  Is that also known as a kilogram?

18   A    Kilogram or a brick.

19   Q    Okay.

20             MR. LLORET:  Now, let's look at number 525 double M

21   -- M as in Mary.

22             Your Honor, I have three bottles.  If I may, I'll

23   just identify them and show them to Counsel and then show it

24   to the -- the three are marked 525 double M - Mike; 525 double

25   N - November; and 525 double O -- Oscar.  I'll show them to

1    Counsel now.  There are three bottles of various substances.

2    BY MR. LLORET:

3    Q    Agent, can you identify these three exhibits, what they

4    are, and tell us where you found them?

5    A    There's the inositol powder and the B blend.  You can

6    actually see part of the B blend in the picture, just to the

7    right of the white bottle.

8    Q    And that's looking at picture number 52511?

9    A    Correct.

10   Q    All right.

11   A    This is the kitchen cabinet area.

12   Q    All right.  And you've got three exhibits in front of you,

13   is that correct?

14   A    That's correct.

15   Q    All right.  Did you find those in the kitchen?

16   A    Yes, all in the cabinet.

17          MR. LLORET:  And I move the admission of those three

18   exhibits, Your Honor; 525 double M, double N, and double O.

19          MR. WARREN:  I have no objection, sir.

20          MR. McMAHON:  No objection.

21          THE COURT:  No objection.  It may be admitted.

22          MR. LLORET:  525 double T.  Your Honor, these are

23   additional items; a bottle of acetone and a bottle of procaine

24   and I've marked them 525 double T.  I'll show them to Counsel

25   now.

1  BY MR. LLORET:

2  Q   Agent, looking at number 525 double T, can you tell us

3  what they are and where you found them?

4  A   Pure acetone is the one of the left, and this is procaine

5  HCl, the larger bottle on your right.  These were also

6  recovered out of the kitchen cabinet.

7          MR. LLORET:  I move the admission of 525 double T,

8  Your Honor.

9          MR. WARREN:  Again, I have no objection.

10          MR. McMAHON:  No objection.

11          THE COURT:  They may be admitted.

12  BY MR. LLORET:

13  Q   Agent, we're going to look at number 525 double G.

14          MR. LLORET:  Now, these are a couple of bowls, Your

15  Honor, and a knife and I've marked them collectively 525

16  double G.  I'll show them to Counsel.

17  BY MR. LLORET:

18  Q   And, Agent, can you tell us what they are and where you

19  found them?

20  A   It's just two bowls that were recovered on the kitchen

21  counter that are both laced with a white powdery substance.

22  Q   Okay.

23  A   And then there's also a knife --

24  Q   And --

25  A   -- which has white powder on it.

1   Q   All right.   Okay.   And you found those in the kitchen as

2   well, is that correct?

3   A   Yes.

4   Q   All right.   And you can put those back in the bag now.

5           MR. LLORET:   I'd like to take number 525 double J.

6   We have three exhibits, Your Honor, in a bag; 525 double J

7   which is a box of baking soda; 525 double K which is a spray

8   bottle; 525 double L which is another bottle or jar of

9   procaine.   I'll show them to Counsel.

10  BY MR. LLORET:

11  Q   Agent, can you look at these, tell us what they are and

12  tell us where you found them.

13  A   There's a baking soda box, there's another spray bottle

14  and a bottle of procaine HCI, also recovered from the kitchen

15  area, specifically the cabinet.

16  Q   All right.

17          MR. LLORET:   Now moving the admission of those three

18  exhibits, Your Honor; double J, double L, and double K -- 525

19  double J, double L, and double K.

20          MR. WARREN:   I have no objection.

21          THE COURT:   It may be admitted.

22          (Pause in proceedings.)

23          MR. LLORET:   And, Agent Horay, if we can just see on

24  our screen without the jurors seeing it just yet number 525 I

25  believe it's double G.   I think I misstated the exhibit

Harrison - Direct (Llo)                                      62

1    number.  The one I want to see is 525-13.

2    BY MR. LLORET:

3    Q    All right, Agent, what is 525-13?  Just identify what

4    we're looking at.

5    A    That's the kitchen stove located inside 339 Essex, along

6    with a pot and a -- or a wooden bowl and a pan.

7    Q    Okay.

8            MR. LLORET:  And, Your Honor, I move the admission

9    of 525-13.

10           MR. WARREN:  I don't have object.

11           THE COURT:  It may be admitted.

12           MR. LLORET:  If we can display that to the jury.

13   You got it working.  Okay.  Well, don't speak so fast.

14   BY MR. LLORET:

15   Q    All right, Agent, looking at this picture, 525-13, can you

16   describe for the jury where we are?  Is this in the apartment?

17   A    This is in the kitchen, correct.

18   Q    All right.  And what are we looking at?

19   A    You're looking at a glass pan or a glass cooking piece of

20   Tupperware and then there's a wooden pot just to the left, a

21   wooden bowl.  And off to the right, you're going to have

22   sandwich bags, the clear plastic sandwich bags and you can see

23   the powdery substance.

24           MR. LLORET:  The item that we previously looked at,

25   number 525 double G, Your Honor, if I did not move the

1    admission of that, I would do so now.

2              THE COURT:  I believe that it was moved but it may

3    be admitted.

4              MR. LLORET:  Thank you, Your Honor.

5    BY MR. LLORET:

6    Q    Agent, looking at the stove top, is the wooden bowl that's

7    in number 525 double G in that picture, 525-13?

8    A    Yes, that's one of two.

9    Q    Okay.

10             MR. LLORET:  I want to look at 525 triple C.  I'll

11   show it to Counsel.  It's a milk jug or a water jug marked 525

12   it looks like it's 525 quadruple C.

13   BY MR. LLORET:

14   Q    Agent, can you tell us what 525 quadruple C is?

15   A    It's a Deer Park water jug.  It's got white powder all

16   over it --

17   Q    Where did you --

18   A    -- or a substance over it.

19   Q    Where did you find that?

20   A    This was also recovered in the kitchen.

21             MR. LLORET:  Move the admission of 525 quadruple I

22   think it's quadruple C.

23             MR. WARREN:  I don't object.

24             THE COURT:  It may be admitted.

25             MR. LLORET:  And, Your Honor, I'll show the Agent --

1    well, I'll show Counsel 525S and 525T.  525S is some stretch

2    wrap tape and 525T is a dispenser.

3    BY MR. LLORET:

4    Q   Agent, I'll ask you to look at 525S and 525T and tell us

5    what they are and where you found them.

6    A   This is Scotch packing tape, along with the tape

7    dispenser, and these two are stretch wrap.  And these were

8    also found inside 339 Essex.

9    Q   Do you recall where they were found?

10   A   I believe these were in the kitchen.

11           MR. LLORET:  Move the admission of 525S and 525T.

12           MR. WARREN:  No objection.

13           THE COURT:  It will be admitted.

14   BY MR. LLORET:

15   Q   Now, Agent, we've been talking about the kitchen for some

16   time here, is that right, most of these item?

17   A   Yes, sir.

18   Q   All right.  Did you -- you objection searched other

19   locations in the house, is that right?

20   A   Yes, we did.

21   Q   Okay.  I'd like to show you before we get off too far,

22   number 525 triple K, I believe it's a picture.

23           MR. LLORET:  And we'll show that just to the Agent

24   but not to the jury at this point and I'll show that to

25   Counsel as well.

1          Your Honor, it's a picture of some plastic bags.

2   BY MR. LLORET:

3   Q    Agent, looking at number 525 triple K, what is that?

4   A    This is a picture of again, Ziploc plastic bags, the small

5   Ziploc plastic bags, a bottle of procaine HCI, and several

6   already used kilo wrappers.

7   Q    And does that depict items that were found there at the

8   location at 339 Essex?

9   A    Yes, it does.

10  Q    In particular, I'm looking at number 525 double D which

11  was previously admitted.  Do you recognize 525 double D?

12  A    Yes.

13  Q    What is 525 double D and how, if at all, does it relate to

14  the picture in 525 triple K?

15  A    These were the Ziploc bags found in the kitchen which are

16  depicted in this picture.

17  Q    All right.

18          MR. LLORET:  Move the admission of 525 triple K,

19  Your Honor, the picture of baggies and procaine.

20          MR. WARREN:  No objection.

21          THE COURT:  It may be admitted.

22  BY MR. LLORET:

23  Q    Now, I'd like to just talk a little bit before we leave he

24  kitchen, you also found some items in the kitchen --

25  additional items.  Can you describe for us, did you look in

1    the trash that was in the kitchen?

2    A   Yes, we did.

3    Q   What, if anything, did you find there?

4    A   On the trash can, we found a large black trash bag which

5    contained empty kilo wrappers.

6    Q   And did you have occasion to count those kilo wrappers?

7    A   Yes, I did.

8    Q   And how many were there?

9    A   I believe there was 36 in one and 11 in the other --

10   Q   When you say --

11   A   -- the other being the second bag that we recovered.

12   Q   Okay.  I'd like to look at some pictures, first of all.

13           MR. LLORET:  And just show them to the Agent at

14   first -- number 525 triple J.

15   BY MR. LLORET:

16   Q   This is a picture of a green plastic bag, is that correct,

17   Agent?

18   A   That's correct.

19   Q   What are we looking at in 525 triple J?

20   A   This is the trash bag that was taken out of Essex Street.

21   Q   All right.  Out of the kitchen?

22   A   Yes.

23   Q   Okay.

24           MR. LLORET:  And, Your Honor, I move the admission

25   of 525 triple J.

1              MR. WARREN:  No objection.

2              THE COURT:  It may be admitted.

3    BY MR. LLORET:

4    Q    And, Agent, what are we looking at there?

5    A    Inside here would contain the empty kilogram wrappers,

6    which is what is used to package.  That's just one of two of

7    the trash bags.

8    Q    All right.

9              MR. LLORET:  And let's look at number 525 triple N,

10   just the Agent, not the jury.  It's a picture of items spread

11   out on the table.

12   BY MR. LLORET:

13   Q    Agent, what are you looking at in number 525 triple N?

14   A    This is the bag with all the contents inside the bag

15   removed.  This is at our office --

16   Q    All right.

17   A    -- like the previous picture was at our office on the

18   table.

19   Q    All right.  And this -- were these recovered at the

20   location at Essex Lane?

21   A    Yes, out of the trash bag in the kitchen.

22   Q    All right.

23             MR. LLORET:  Your Honor, I'd move the admission of

24   525 triple N.

25             MR. WARREN:  No objection.

1              THE COURT:  It may be admitted.

2   BY MR. LLORET:

3   Q    Now, Agent, looking at these items, there's some items in

4   the front.  Is that the same nature -- and I'm looking at if I

5   can show the Agent -- yeah, right in the front there -- can

6   you tell us what those items are?

7   A    Those are used latex gloves --

8   Q    All right.

9   A    -- along with the two bags to the right, were also full of

10  used gloves.

11  Q    The common garden variety you slip on your hands?

12  A    Yes.

13  Q    Okay.  And the item -- I just picked one of the blue

14  items.  Are those the kilo wrappers you're talking about?

15  A    Yes.  I lost it.

16             MR. LLORET:  All right, we lost it on the screen.

17  Can we have 525 triple N back?  Okay.

18  BY MR. LLORET:

19  Q    And is that one of the kilo wrappers?

20  A    Yes.  They've already been opened.

21  Q    Okay.  And they were found that way, already opened?

22  A    Correct.

23  Q    In the trash bag?

24  A    That's correct.

25  Q    In the kitchen?

Harrison - Direct (Llo)                                   69

1    A    In the kitchen.

2    Q    Okay.

3              MR. LLORET:  And we can go back to the full picture.

4    BY MR. LLORET:

5    Q    There's a variety of different colors.  Are they all kilo

6    wrappers?

7    A    Yes, they are.

8    Q    Okay.

9              MR. LLORET:  And let's look at 525 triple I.

10   BY MR. LLORET:

11   Q    And can you tell us what 525 triple I is?

12   A    That's the second trash bag that was taken from Essex

13   Street or Essex Avenue, which was also recovered from the

14   kitchen.

15   Q    And were there items found inside that bag as well?

16   A    Yes.  Again, there were empty kilo wrappers.  You can see

17   the box of --

18             MR. WARREN:  Judge, I object to the use of the term

19   kilo wrappers.

20             THE COURT:  Objection sustained.

21   BY MR. LLORET:

22   Q    There were empty wrappers found?

23   A    Empty wrappers, correct.

24   Q    And anything else found in there?

25   A    There was an empty box of latex gloves.  There was other

1    items and if you -- the one bag, you can kind of see

2    protruding out of the top.  Oh, they don't have it yet.

3    Q    All right.

4    A    There's latex gloves sticking out.

5    Q    This bag that you're looking at was found in the kitchen,

6    is that right?

7    A    That's correct.

8            MR. LLORET:  Your Honor, move the admission of 525

9    triple I.

10           MR. WARREN:  No objection.

11           THE COURT:  It may be admitted.

12   BY MR. LLORET:

13   Q    And, Agent, there's a red box in there.  Can you tell us

14   what that was?

15   A    I believe it's an empty box of gloves -- oh, I'm sorry,

16   that's sandwich bags.  This is an empty box of sandwich bags.

17   Q    All right.

18           MR. LLORET:  And we can look at 525 L, double -- or

19   triple L with the Agent -- Agent only.

20   BY MR. LLORET:

21   Q    And once we get that up there agent, I'll ask you.

22           MR. LLORET:  I'll show that to Counsel.

23   BY MR. LLORET:

24   Q    Agent, what are we looking at in 525 triple L?

25   A    It's numerous wrappers that were recovered out of the

1    black bag.

2    Q    All right.  And that was in the kitchen?

3    A    Yes.

4    Q    Okay.  At Essex Lane, correct?

5    A    Correct.

6           MR. LLORET:  Your Honor, I move the admission of 525

7    triple L.

8           MR. WARREN:  No objection.

9           THE COURT:  It may be admitted.

10          MR. LLORET:  Pardon me for one moment, Your Honor.

11          (Pause in proceedings.)

12   BY MR. LLORET:

13   Q    Now, I'd like to turn, Agent, to number -- and I'll give

14   you number 525P.

15          MR. LLORET:  I'll show it to Counsel first, Your

16   Honor.  It's a shotgun, Exhibit 525P.

17   BY MR. LLORET:

18   Q    Agent, I'll ask you to identify number 525P.

19   A    It's a Mossberg 590 -- I'm sorry, Mossberg 500 12-gauge

20   shotgun.

21   Q    And if you could describe -- is that made safe, by the

22   way?

23   A    I just checked.  It's made safe.

24   Q    Okay.  Did you find that gun at Essex?

25   A    Yes, I did.

1   Q    Where did you find it?

2   A    This was hanging in the closet -- if I could stand up,

3   Your Honor -- actually off of a nail in the closet of the

4   second bedroom inside Essex, which was where the hydraulic

5   press was located.  For reference, the bedroom.

6   Q    All right.

7            MR. LLORET:  Move the admission of 525P, Your Honor.

8            MR. WARREN:  No objection.

9            THE COURT:  It may be admitted.

10  BY MR. LLORET:

11  Q    Sir, did you also find rounds of shotgun shells in the

12  apartment that would fit that gun?

13  A    Yes, we found 12-gauge ammunition.

14  Q    Now, looking at that weapon, that has no stock to it, is

15  that correct?

16  A    That's correct.

17  Q    Pistol grip?

18  A    Just simply a pistol grip.

19  Q    Okay.  It still operates as a shotgun, I take it?

20  A    Yes.

21  Q    All right.

22           MR. LLORET:  525 triple D, Your Honor, is a rifle.

23  BY MR. LLORET:

24  Q    And, Agent Harrison, if you could tell us, 525 triple D,

25  what is that?

1   A    It's a Ruger Mini-14.

2   Q    What's a Mini-14?

3   A    It's just the model.  It's a .223 caliber.  It's a rifle,

4   semi-automatic rifle.

5   Q    All right.  And did you find that at Essex?

6   A    Yes, we did.

7   Q    And are you familiar with that type of weapon?

8   A    Yes.

9   Q    Did you used to use a .223 in the Marine Corp?

10  A    It's the same caliber we used in our rifles in the Marine

11  Corp.

12  Q    All right.

13         MR. LLORET:  Your Honor, I move the admission of 525

14  -- what is the last exhibits on that?

15         THE WITNESS:  Triple D.  525 triple D.

16         MR. LLORET:  525 --

17         MR. WARREN:  No objection.

18  BY MR. LLORET:

19  Q    Agent --

20         THE COURT:  If there's no objection, it may be

21  admitted.

22         MR. LLORET:  Thank you, Your Honor.

23         MR. WARREN:  I have no objection to the admission of

24  the exhibit.  I might have an objection to this next question.

25  Let's see what it is.

1    BY MR. LLORET:

2    Q    And, Agent, where did you find that?

3              MR. WARREN:  I don't.

4              MR. LLORET:  Thank you.

5              THE WITNESS:  This was recovered in the basement of

6    339 East Essex, specifically the bin that was marked B.   In

7    the basement I described earlier, there was two bins, one was

8    A and one was B.   This one was recovered from bin B.

9    BY MR. LLORET:

10   Q    All right.  Was there ammunition found as well at the

11   location that fit this rifle?

12   A    Yes, ammunition and also magazines.

13   Q    What's a magazine?

14   A    A magazine is simply a container, a box, that will hold

15   the ammunition to feed into that rifle.

16   Q    And does the magazine fit in here, this hole in the bottom

17   of the gun?

18   A    Yes.  Correct.

19   Q    Okay.

20             MR. LLORET:  525 triple E, Your Honor, and I'm

21   showing it to Counsel and I'll give it to the Agent.  It's

22   another rifle.

23   BY MR. LLORET:

24   Q    Sir, can you identify 525 triple E?

25   A    This is a Hi-Point, Model 995.  This is a nine millimeter

1    rifle.  It also has a laser site on it.

2           MR. LLORET:  Your Honor, move the admission of 525

3    triple E.

4           MR. WARREN:  No objection.

5           THE COURT:  It may be admitted.

6    BY MR. LLORET:

7    Q    Agent, where did you find this?

8    A    This one was also recovered in the bin along with the

9    Ruger Mini-14, bin B for 339 Essex --

10   Q    Can you --

11   A    -- the downstairs basement.

12   Q    Well, first of all, that gun, again, as with the other

13   firearms, has been made safe, is that correct?

14   A    That's correct.

15   Q    Okay.  And can you demonstrate for us the use of that

16   laser site or sighting device?

17   A    You have the iron sites on the weapon.  This one, there

18   actually aren't any sites, the sites have been removed.  So

19   what you would have to use to site this weapon accurately is a

20   laser site, which is simply that red dot.

21          If it's sited in correctly, wherever that red dot

22   is, the bullet will impact.  It's just a matter of pushing

23   this button, the laser comes on and you pull the trigger.

24   Q    And did you used to use this type of site in the Marine

25   Corp?

1    A    Yeah.  We had laser sites issued to us in the Marine Corp

2    on our M-16s, our M-4s.

3    Q    And just showing the red dot against the back wall here

4    away from the jury, is that right?

5    A    Can everybody see that?

6    Q    Okay.

7              MR. LLORET:  525B.  Your Honor, 525D is handgun and

8    I'll show it to the witness.  I'll show it to Counsel.

9    BY MR. LLORET:

10   Q    Agent, what is 525D?

11   A    Oh, that's an Intratec, Tec-DC9.  Dc9 is the model.  It's

12   a nine millimeter with an obliterated serial number.

13   Q    And did you find that at the location?

14   A    Yes, we did.

15   Q    And where did you find it, do you recall?

16   A    This was found in the upstairs first bedroom, the one with

17   the bed and the dresser.

18   Q    This is the bedroom sort of to the left, as you described

19   it before?

20   A    Correct.

21   Q    All right.

22   A    It would be the west -- the west bedroom.

23   Q    That bedroom has a bed in it and a dresser?

24   A    Correct.

25   Q    Okay.

Harrison - Direct (Llo)                                    77

1           MR. LLORET:  Move the admission of 525D, Your Honor.

2           MR. WARREN:  No objection.

3           THE COURT:  It will be admitted.

4    BY MR. LLORET:

5    Q    You mentioned it has an obliterated serial number, is that

6    right, Agent?

7    A    That's correct.

8    Q    What's the purpose of a serial number on a gun?

9    A    In my experience, if you -- oh, the serial number?

10   Q    Yeah.

11   A    It's to actually trace the gun.  The original purchaser

12   would have to -- would be issued a number, which the serial

13   number would be on here.  It's a way for us to trace this

14   firearm.

15   Q    All right.  When you say obliterated, what does -- I mean,

16   is it stamped, is it scratched or can you tell?

17   A    It looks like it's just been scratched off.

18   Q    Okay.

19   A    It's generically scratched off.

20   Q    Now, showing the jury, what's that thing on the barrel of

21   the weapon?  It surrounds the barrel, so to speak.

22   A    This is simply a heat shield.  As you're firing the weapon

23   in rapid fire, if you're firing a lot of rounds quickly, this

24   barrel will heat up really fast.  This is simply so you don't

25   touch the barrel because you see how you have to hold this

1    one.  Your finger could slip and hit the barrel, and there's

2    also a shredded mark up here.  You can actually screw

3    something like an additional silencer or something on.

4    Q    So it's got a threaded barrel at the end?

5    A    Correct.

6    Q    All right.

7    A    Which is encased by the heat shield.  I don't know if they

8    can see that.

9         MR. LLORET:  525A.  I'll show it to Counsel and I'll

10   show it to the witness.

11   BY MR. LLORET:

12   Q    Agent, what is 525A?

13   A    This is a Leinad pistol.  It's the model -- it's a PM-11.

14   Again, it's a nine millimeter semi-automatic pistol.

15   Q    And can you tell us, did you find that at the location?

16   A    Yes.  This was also recovered at 339 Essex.

17   Q    And do you recall where it was found?

18   A    Again, in the first bedroom, along with the previous

19   firearm.

20        MR. LLORET:  Move the admission of 525A, Your Honor.

21        MR. WARREN:  No objection.

22   BY MR. LLORET:

23   Q    Agent, this is --

24        THE COURT:  It may be admitted.

25        MR. LLORET:  I'm sorry, Your Honor.

1  BY MR. LLORET:

2  Q   Agent, this is a nine millimeter as well?

3  A   Yes, sir.  That's correct.

4  Q   Nine millimeter refers to what?

5  A   That's the caliber of the ammunition that is used and

6  that's simply a nine millimeter.

7  Q   Did you find nine millimeter ammunition in -- on location?

8  A   Yes, we found numerous nine millimeter rounds of

9  ammunition.

10 Q   Do you recall approximately how many rounds of nine

11 millimeter ammunition you found?

12 A   If I can refer to my notes, I can give you more of a --

13 Q   Certainly.

14 A   -- more accurate number.

15 Q   Will the notes refresh your recollection, sir?

16 A   Yes.

17 Q   Thank you.

18 A   Inside that, there was actually 32 found inside that

19 magazine that's attached to the weapon.

20 Q   Is the -- that's also -- magazine also called the clip

21 sometimes?

22 A   Clip, correct.

23 Q   Okay.  That's 32 rounds down inside there?

24 A   Yes.  That's correct.

25 Q   Is that clip detachable?

Harrison - Direct (Llo)                    80

1   A    Yes.

2   Q    Can you detach that as the gun is presently constituted or

3   do you have to --

4   A    No, it's not coming out.

5   Q    Okay.  I'll show you number 525C.  What is 525C?

6   A    It's the gun box that was recovered out of 339 Essex,

7   specifically the first bedroom which contained that firearm.

8   Q    And referring -- when you say that firearm, you're

9   referring to the one we just looked at, number 525A?

10  A    Yes, sir.  That's correct.

11  Q    Same -- found in the same bedroom?

12  A    Yes.  Correct.

13  Q    Okay.

14       MR. LLORET:  Your Honor, I move the admission of

15  525C.

16       MR. WARREN:  No objection.

17       THE COURT:  It may be admitted.

18  BY MR. LLORET:

19  Q    What is 525C, Agent?

20  A    Just a gun box, a simple container to -- maybe that was

21  sold with it or was bought separately to contain the firearm.

22       MR. LLORET:  If we have 525E.  And I'm showing 525E

23  to Counsel and I'll show it to the witness.

24  BY MR. LLORET:

25  Q    Agent, what is 525E?

1   A    It's a -- the manufacturer is Feg.  It's a model 9JK-

2   9HP, nine millimeter semi-automatic handgun.

3              MR. LLORET:  And, Your Honor, I move the admission

4   of --

5   BY MR. LLORET:

6   Q    Oh, let me ask you, where did you find that?

7   A    Oh, this was recovered also inside Essex.

8   Q    All right.

9              MR. LLORET:  Your Honor, I move the admission of

10  525E.

11             MR. WARREN:  No objection.

12             THE COURT:  It may be admitted.

13  BY MR. LLORET:

14  Q    And, Agent, I saw you just popping the magazine, is that

15  right?

16  A    Yes.

17  Q    Could you just show the jury so they know, how does the

18  magazine come out?

19  A    If you hit the magazine release, which this one has, the

20  magazine will come out.  You simply take another one in, place

21  it in and you can -- you have a fresh set of rounds.

22  Q    Okay.

23             MR. LLORET:  We can look at 525O and N.

24  BY MR. LLORET:

25  Q    Tell us what 525O and N are, Agent.

1   A    These are the magazines or what we've been referring to as

2   clips.   These actually contain the ammunition that goes into

3   the firearm.

4   Q    And did you find those at Essex?

5   A    Yes, I did.

6   Q    Can you recall where you found them at Essex?

7   A    The upstairs bedroom, bedroom number one.

8   Q    That's the bedroom on the left that you referred to?

9   A    Yes.

10  Q    And, Agent, I'm going to show you --

11          MR. LLORET:   I move the admission of 525N and 525O,

12  Your Honor.

13          THE COURT:   Without objection, it may be admitted.

14  BY MR. LLORET:

15  Q    And, Agent, we have another item marked 525L.   Can you

16  tell us what 525L is?   And I'll show it to Counsel.

17  A    It's a separate magazine.

18          MR. LLORET:   I'll show it to Counsel, 525L.

19  BY MR. LLORET:

20  Q    And can you tell whether -- well, first tell me, did you

21  find 525L at Essex?

22  A    Yes, I did.

23          MR. LLORET:   And, Your Honor, I move the admission

24  of 525L.

25

1          MR. WARREN:  No objection.

2          THE COURT:  It may be admitted.

3   BY MR. LLORET:

4   Q    Agent, does 525L fit into a weapon that you've previously

5   talked to us about?

6   A    Yes.  It fits into 525E.

7   Q    And was 525L found separately from 525E?

8   A    Yes, it was.

9   Q    All right.

10          MR. LLORET:  Holding up 525 double H, Your Honor,

11   the metal box, and I'll show it to the Agent.

12   BY MR. LLORET:

13   Q    Agent, what is 525HH?

14   A    This is the manual press that I described that I described

15   that was recovered out of the kitchen at 339.

16   Q    If you can take that out.  Here's the part that was

17   depicted in the picture that you guys saw previously.  Here's

18   the other piece, again, with white powdery residue.

19          MR. LLORET:  And, Your Honor, I move the admission

20   of that exhibit.  Agent, I believe it's marked 525L?

21          THE WITNESS:  HH.

22          MR. LLORET:  Double H.  Thank you, Your Honor.

23          MR. WARREN:  No objection.

24          THE COURT:  It may be admitted.

25          MR. LLORET:  If we could show the Agent picture

1  number 525-11, which has been previously admitted, and we'll

2  show the jury the picture as well.  It's been previously

3  admitted.

4  BY MR. LLORET:

5  Q  Now, Agent, the press -- well, the metal box, 525 double H

6  and the sort of screw top thing that you've got, if you could

7  -- do you know how this fits together and all?

8  A   Yeah.

9  Q   Okay.  If you could show the jury how those items fit

10  together.

11  A   The product or whatever you wanted to press would be

12  placed in here first.  This would go on top --

13  Q   Referring to a plate top of some sort that goes --

14  A   A metal plate --

15  Q   All right.

16  A   -- with a hole here which will match up to that when you

17  screw it down.  If there was something in here, this would

18  actually stay, however, there's not so it's not going to.  You

19  place this on top, this plate, as I mentioned earlier, would

20  actually be higher.  It would simply screw down and that plate

21  will lower, which will press or compact whatever product is in

22  here.

23  Q   And looking at 525-11, the picture on the screen, that

24  screw top, is that the item that's found on the top shelf in

25  the kitchen cabinet?

Harrison - Direct (Llo)                                85

1    A    Yes.  Yes, sir, it is.

2    Q    All right.  The -- I just want to get back to these two

3    magazines.  Agent, looking at these magazines, number 525N and

4    525O, do they fit into any of the long rifles or long guns

5    that we have here?

6    A    These should be .223 caliber so one of them should fit in

7    that Mini-14.

8    Q    I'm looking at 525 triple D.  Is this the Mini-14 you

9    mentioned?

10   A    Yes, sir.  That's correct.

11   Q    Okay.  Right now, there's a red tag going through the

12   firearm, 525 triple D is that?

13   A    Triple D, correct.

14   Q    That red tag, does that go through the area where the

15   magazine would fit?

16   A    Yes.  It goes through the magazine well.

17   Q    The magazine -- as the gun's presently situated, the

18   magazine is not going to fit in there, is that right?

19   A    No, it won't.

20   Q    And not to be too -- well, not to be -- there's no red tag

21   on it when you found it, is that right?

22   A    That's correct, there was no red tag.

23   Q    Were the magazines in the gun or is there a magazine in

24   the gun or was it out of the gun, or do you remember?

25   A    This was out of the gun.

1    Q    Okay.  But that magazine fits in that gun?

2    A    Yes, sir.

3    Q    Okay.  And the other -- and when I say that magazine,

4    looking at 525N as well as 525O, is that right?

5    A    That's correct.

6    Q    Okay.

7    A    They're both .223 caliber.

8    Q    All right.

9              MR. LLORET:  525B, Your Honor, is a bag of assorted

10   bullets.  I'll show the witness.

11   BY MR. LLORET:

12   Q    Agent, can you look at 525B and tell me what's in that?

13   A    It's nine millimeter rounds.

14   Q    Okay.  And did you find these nine millimeter rounds at

15   Essex?

16   A    Yes, sir, I did.  These were found in the gun box.

17   There's more in there.  Do you want me to dump them all?

18   Q    Well, if you can just show the jury -- if you can just

19   show the jurors and describe what type of rounds you found.

20   A    These are nine millimeter rounds.

21             MR. LLORET:  Holding up a nine millimeter round now.

22             And, Your Honor, I move the admission of 525B,

23   collectively, the bag of bullets.

24             MR. WARREN:  No objection.

25             THE COURT:  It may be admitted.

Harrison - Direct (Llo)                                    87

1   BY MR. LLORET:

2   Q   Agent, you mentioned you found these in a gun box?

3   A   Yes, sir.  That's correct.

4   Q   Is this the gun box that you found them in, 525C?

5   A   Yes, sir.  These were loaded in the magazine --

6   Q   All right.

7   A   -- that was recovered from the gun box.

8   Q   All right.  And those are all nine millimeter rounds?

9   A   Yes, sir.  Every one is a nine millimeter.

10  Q   All right.  Were there any nine millimeter guns that you

11  found at the location?

12  A   There were several, including a rifle.

13  Q   All right, first of all, 525 triple E, those nine

14  millimeter rounds, is -- 525 triple E is what?

15  A   This is the Hi-Point nine millimeter rifle.  It will shoot

16  the handgun caliber's ammunition out of a rifle.

17  Q   And the bullets that were in 525 -- well --

18          THE COURT:  B.

19  BY MR. LLORET:

20  Q   -- B are also -- will fit in the gun that you have in your

21  hands?

22  A   Yes.

23  Q   Okay.  525 D is what?

24  A   It's also a nine millimeter.  This one here is the Tec-9

25  with the heat shield that we described earlier.  The magazine

Harrison - Direct (Llo)                                    88

1    will go in here and this would shoot nine millimeter.

2    Q    Do those bullets found in 525B fit in that gun?

3    A    Yes, they will.

4    Q    And 525A, what is that gun?

5    A    This is the Leinad M-11.  Again, it's a nine millimeter.

6    Q    And the bullets found in 525B will -- do they fit in that

7    gun as well?

8    A    Yes, they will.

9    Q    Okay.

10           MR. LLORET:  Your Honor, I'm cognizant of the time.

11   I will simply rely on Your Honor to say whenever a break is

12   appropriate.  I'll proceed with the Agent.

13           THE COURT:  We'll go for a few more minutes, Mr.

14   Lloret.

15           MR. LLORET:  Thank you, Your Honor.

16           I'd like to look at number 525 triple F. And again,

17   another bag of bullets, Your Honor.  I'll show it to Counsel,

18   the bag, and I'll show the Agent the bag.

19   BY MR. LLORET:

20   Q    Can you tell us, Agent, what is in 525 triple F?

21   A    Again, these are nine millimeter rounds.

22   Q    All right.  Were they found in the same location as the

23   other nine millimeter rounds we looked at in 525B or in a

24   different location?

25   A    These were actually loaded in the Hi-Point --

Harrison - Direct (Llo)                                    89

1    Q    When you say the Hi-Point --

2    A    -- which was the nine millimeter rifle.

3    Q    And you identified that as 525 triple E, is that correct?

4    A    That's correct.

5    Q    All right.  Were these in a magazine or were they --

6    A    Yes, in a magazine.

7            MR. LLORET:  Your Honor, I move the admission of 525

8    triple F.

9            MR. WARREN:  No objection.

10           THE COURT:  It will be admitted.

11           MR. LLORET:  525F, Your Honor, is a bag containing a

12   couple of rounds of ammunition.

13   BY MR. LLORET:

14   Q    I'll show it to the Agent and ask the Agent what that is.

15   A    It's two more nine millimeter rounds.

16   Q    All right.  Do you recall did you find those at Essex?

17   A    Yeah.  They were recovered from the dresser in one of the

18   magazines, the spare magazines.

19   Q    All right.  And that's the bedroom on the left, so to

20   speak?

21   A    That's correct, the first bedroom --

22   Q    All right.

23   A    -- with the bed.

24           MR. LLORET:  Your Honor, I move the admission of

25   525FFF -- triple F.

1          MR. WARREN:  No objection.

2          MR. LLORET:  No, I'm sorry, 525 single F.

3          THE COURT:  That's single F.

4          MR. WARREN:  No objection.

5          THE COURT:  It may be admitted.

6          MR. LLORET:  And, Your Honor, I have an exhibit

7    marked 525J.  It's a bag of, again, a set of bullets and I

8    will just display the bag to Counsel but I'll give it to the

9    Agent.

10   BY MR. LLORET:

11   Q    What is 525J, Agent?

12   A    Again, it's nine millimeter rounds, approximately 20 in

13   this bag and they were recovered in the dresser of the left or

14   first bedroom.

15         MR. LLORET:  Your Honor, I move the admission of

16   525J.

17         MR. WARREN:  No objection.

18         THE COURT:  It will be admitted.

19   BY MR. LLORET:

20   Q    Agent, if you could just put those back.  There are all

21   nine millimeter?

22   A    Yes, sir.

23         MR. LLORET:  I'm going to show 525G is an evidence

24   bag with multiple boxes of ammunition in it, Your Honor.  I'll

25   show it to Counsel and I'll show it to the Agent.

Harrison - Direct (Llo)                                      91

1    BY MR. LLORET:

2    Q    Agent, what's in 525G?

3    A    It's an assortment of ammunition.

4    Q    And did you find that at Essex Lane?

5    A    Yes, sir.  These were recovered from the first bedroom,

6    second floor and it's various calibers.

7    Q    And that's the bedroom on the left, so to speak?

8    A    Yes.

9                MR. LLORET:  Your Honor, if the Agent could -- or

10   Agent Horay could show picture number 525-1 to the Agent only,

11   not to the jury.

12   BY MR. LLORET:

13   Q    What is in picture 525-1, Agent?

14   A    This is a picture of the top dresser drawer, which was

15   location in the first bedroom at Essex.  You also see the

16   ammunition that's recovered in this bag and you see one of the

17   magazines or clips that we showed earlier, the bigger one, the

18   .223 round.

19   Q    Okay.

20               MR. LLORET:  Your Honor, I move the admission of

21   both 525G and 525-1.

22               MR. WARREN:  I have no objection.

23               THE COURT:  It may be admitted.

24               MR. LLORET:  And we can display that picture to the

25   jury.

BY MR. LLORET:

Q    This is the dresser drawer found in the first bedroom, the bedroom to the left?

A    Yes, sir.

Q    And various boxes of ammunition in there?

A    Yes, sir, with letters and other stuff, other items.

Q    All right.  And it looks like a magazine you found in there?

A    That's the magazine in the middle, the large capacity magazine --

Q    All right.

A    -- that was in the middle.

Q    Can you describe the ammunition or some of the ammunition found in 525?

A    You have 357 high velocity -- 357 Magnum high velocity, there's a jacket -- it's soft points.  You also have a nine millimeter automatic metal jacket, you have a 32 automatic with a metal case.  That's what the bullet is actually in, a metal case.  And then you have nine millimeter -- Federal (inaudible - federal? 11 12 07) premium nine millimeter, which are jacketed hollow point, meaning the bullet is actually hollow itself.

        And then you have a box -- which I can't see this one -- another box of nine millimeter Plus-P, which stands for plus powder.  It's actually a little bit higher of a charge so

1    the bullet will come out faster.

2    Q    And you found -- did you find guns that matched that

3    ammunition?  We've already discussed the nine millimeter --

4    A    Well, there was also a 40 -- I'm sorry, I skipped the 40

5    Smith and Wesson, which was in there.

6    Q    Okay.

7    A    We found firearms that matched several of these, but not

8    all.

9              MR. LLORET:  I'd like to show the Agent now picture

10   number 525-2, the Agent only.

11   BY MR. LLORET:

12   Q    Agent, what are you looking at in 525-2?

13   A    This is the dresser drawer, located in Essex Street.

14   Q    Same dresser --

15   A    It's Avenue, I'm sorry.

16   Q    Is this the same dresser or a different drawer or --

17   A    This is the same dresser.  What you're see here is this

18   cloth that's on top, that's actually covering the other stuff.

19   Q    I see.

20   A    Immediately to the left is one of the firearms that were

21   recovered.

22   Q    All right.

23              MR. LLORET:  Your Honor, I move the admission of

24   525-2.

25              MR. WARREN:  No objection.

1              THE COURT:  It may be admitted.

2    BY MR. LLORET:

3    Q   And is the jury now looking at the same picture you are,

4    Agent?

5    A   Yes, they are.  That's the picture that was taken prior to

6    the other one because we removed that cloth --

7    Q   All right.

8    A   -- which revealed all the ammunition.

9              MR. LLORET:  And if we can go back to 525-1, just to

10   show what the Agent's saying.

11   BY MR. LLORET:

12   Q   Now the cloth is removed in 525-1?

13   A   That's correct, the cloth and the firearm were removed.

14   Q   And we can see various boxes of ammunition.

15   A   That's correct.

16   Q   All right.

17             MR. LLORET:  I'd like to look at 525Q.  Your Honor,

18   525Q is a bag containing a couple of shotgun rounds.  I'll

19   show it to -- the bag to Counsel and the Agent.  It's 525Q.

20   BY MR. LLORET:

21   Q   Agent, what's 525Q?

22   A   These are two 12-gauge shotgun rounds which were location

23   in the second bedroom, the one with the hydraulic press and

24   the shotgun that the Prosecutor has in his hand.

25   Q   And I'm holding number 525P, and this is the pistol grip

1    shotgun?

2    A    Yes, sir.

3    Q    The shotgun shells were found in the same bedroom as the

4    pistol grip shotgun?

5    A    Yes, sir.  The second bedroom as the press.

6    Q    Thank you.

7              MR. LLORET:  I move the admission of 525Q, the bag

8    with the two shotgun shells.

9              MR. WARREN:  No objection.

10             THE COURT:  It may be admitted.

11             MR. WARREN:  Thank you, Your Honor.

12   BY MR. LLORET:

13   Q    These two shells, Agent, are what gauge or caliber?

14   A    They're 12-gauge.

15   Q    And this gun?

16   A    That's a 12-gauge shotgun.

17   Q    All right.

18             MR. LLORET:  I'm holding 525 triple G, Your Honor.

19   It's a bag containing a box or several boxes of ammunition.

20   I'll show this bag to Counsel and I'll show it to the Agent as

21   well.

22   BY MR. LLORET:

23   Q    525 triple G -- can you open that and tell us what that

24   is?

25   A    Again, we have a box of nine millimeter, and additional

1   box of 556 or 223 rounds.  It's just military or civilian

2   terms.  This one will fit in the Ruger Mini-14 rifle.

3   Q    I'm holding up number 525 triple D.  Is this the firearm

4   you're talking about that the 223 ammunition fits in?

5   A    Yes.  Both of these boxes will fit -- the ammunition in

6   both of these boxes will fit in that firearm.

7   Q    Okay.

8   A    And we have an additional nine millimeter box.

9   Q    And if you could put those back in.

10          MR. LLORET:  And, Your Honor, I move the admission

11  of 525 triple G.

12          MR. WARREN:  No objection.

13          THE COURT:  It may be admitted.

14          Mr. Lloret, it may be a good time to recess at this

15  point.  Ladies and gentlemen, it's 11:15, you've been sitting

16  for a while.  Go out and relax.  We'll bring you back in ten

17  minutes.  Recess.

18          COURTROOM DEPUTY:  All rise.

19          (Recess taken, 11:17 a.m. until 11:31 a.m.)

20          MR. BRESNICK:  I have an issue I would like to raise

21  with the Court, if I may, before you bring the jury out.  My

22  agents inform me that an individual has been coming in and out

23  of the courtroom -- his name is Anwar Berryman (phonetic),

24  also known as Bugsy -- there's a possibility that he might be

25  a defense witness.  If that's the case, I'd just ask that he

Harrison - Direct (Llo)                    97

1    be sequestered from the courtroom.

2              THE COURT:  Is he going to be a defense witness?

3              MR. McMAHON:  I don't even know who he is.

4              MR. WARREN:  I know who he is, Judge.  I don't

5    anticipate him being called as a defense witness but out of an

6    abundance of caution, I'm going to sequester him out of the

7    courtroom because I don't know, frankly, what's going to

8    happen.

9              THE COURT:  All right.  He may be sequestered.

10             MR. BRESNICK:  Thank you, Your Honor.

11             MR. WARREN:  If I could have just a second to tell

12   him that.

13             THE COURT:  Yes, indeed.

14             (Pause in proceedings.)

15             MR. WARREN:  All right, objection we've requested

16   it.  Judge, mutual sequestration would be requested, as well,

17   for the Government's witnesses as well.

18             THE COURT:  Excuse me?

19             MR. WARREN:  I said we would request sequestration

20   again for the Government's witnesses as well.

21             MR. BRESNICK:  Yeah --

22

23             THE COURT:  The Government witnesses should be

24   sequestered also.

25             MR. BRESNICK:  Of course, Your Honor, with the

1    exception of case agents, Agent Bowman will be a witness --

2              THE COURT:  Yes, indeed.

3              MR. BRESNICK:  -- but otherwise, yes, Your Honor.

4              COURTROOM DEPUTY:  Please rise.

5              (Jury enters the courtroom, 11:32 a.m.)

6              THE COURT:  All right, have a seat, ladies and

7    gentlemen.  Okay, Mr. Lloret.

8              MR. LLORET: Thank you, Your Honor.

9              Your Honor, we have a box marked collectively 525

10   triple R and, Your Honor, it's a box full of plastic bags and

11   other items.  Frankly, Your Honor, we got tired of marking

12   them individually.  I'll just show the Court the exhibit.

13             MR. WARREN:  That's fine.

14   BY MR. LLORET:

15   Q    Agent, I'm showing you Exhibit Number 525 triple R, is

16   that correct?

17   A    Yes, sir.

18   Q    What is it?

19   A    These are numerous types of bags -- Ziploc bags, sandwich

20   bags and latex gloves, aluminum foil and scotch tape.

21   Q    Can you hold up that tape again?  That's a type of --

22   A    Packaging tape.

23   Q    -- packaging tape that we saw previously, is that right?

24   I'm looking at number 525T.  Is that packing tape something

25   that fits on 525T, the tape dispenser?

1   A    Yes, it appears to be the same exact model or manufacturer

2   of tape.

3   Q    Just that -- that whole box has been marked as an exhibit,

4   is that correct?

5   A    Yes, sir.

6   Q    Can you tell us where all of those items were taken from?

7   A    These were all taken from the kitchen area from --

8   Q    All right.

9   A    -- of Essex.

10  Q    Okay.  Let's get that back in there.

11          MR. LLORET:  Your Honor, I move the admission of 525

12  triple R, the box of material taken from the kitchen.

13          MR. WARREN:  No objection.

14          THE COURT:  No objection, it may be admitted.

15  BY MR. LLORET:

16  Q    And, Mr. Harrison, just so we can do this fairly rapidly,

17  I think, but if you'd just go through the separate items and

18  just give a brief description of what's in the box.

19  A    There's two boxes of latex powder-free gloves --

20  Q    Approximately quantity in those boxes?

21  A    I believe there are -- the box says 100 count.  They've

22  both been opened so I'm not sure of the exact amount inside.

23  Here we have different -- here's another box of latex gloves.

24  This one's another 100 count.  This one's unopened.  Here's

25  another box of latex 100 count gloves unopened.  And then we

1    have large trash bags which are black.

2           Here we have more storage bags like to Ziploc bags

3    -- the zip-it-up bags, the smaller versions and the bigger

4    versions, a gallon size and the sandwich size.

5    Q    Agent, as we're going through this, let me just ask you

6    was there a refrigerator in there?

7    A    Yes, sir, there was.

8    Q    Did you find items like food packed away in the

9    refrigerator and freezer?

10   A    No, sir.

11   Q    No meatloaf or anything like that in the freezer?

12   A    No, sir.

13   Q    Okay.

14   A    Again, there's more sandwich size bags and along with

15   another box of 100 count latex gloves.  Here you have four

16   boxes -- or three boxes of sandwich bags, another box of the

17   large trash begs --

18   Q    Agent, did you find any bread -- like loaves of bread and

19   peanut butter and jelly or anything, do you remember?

20   A    No, sir.  Here's a big roll of aluminum foil.  And the

21   last two is another bag of sandwich bags, another roll of

22   aluminum foil, and the quart size bags.  Several thousand bags

23   you're probably looking at in this box.

24   Q    All right.  Agent, if you could pack those items back in.

25   Do we have the tape as well, the packing tape?  Agent, while

Harrison - Direct (Llo)                    101

1    you're busy packing those things away and we'll leave those

2    for Agent Bowman to push back down.

3              And number 525 double J, which has previously been

4    marked in as baking soda, is that right?

5    A    Yes, sir.

6    Q    Did you find any pancake mix or any cake mix in the

7    kitchen?

8    A    No, sir, no baking items.

9    Q    Any item you would use baking soda for in cooking?

10   A    No, sir.

11             MR. LLORET:   And, Your Honor, we have a box that

12   contains a number of pots, pans, and so forth that were found

13   and we'll go through them one by one, Your Honor, with the

14   witness but I'll show them to Counsel first and hope we can

15   expedite this.

16   BY MR. LLORET:

17   Q    Agent, these items are marked individually inside the box,

18   is that correct?

19   A    That's correct.

20   Q    All right.  Let me take out number 525 triple X and can

21   you tell us what that is?

22   A    It's a glassware pot.  This was recovered from the stove.

23   It was in the picture that we saw earlier.

24   Q    All right.

25             MR. LLORET:   Your Honor, I move the admission of 525

1    triple X.

2                THE WITNESS:  It was covered in a white powdery

3    substance.

4                MR. WARREN:  No objection.

5                THE COURT:  It may be admitted.

6                MR. LLORET:  Your Honor, I'd ask permission to pass

7    that to the jury.  It would be within the plastic bag as they

8    pass it.

9                THE COURT:  You want the jurors to -- why don't you

10   just take it, Mr. Lloret --

11               MR. LLORET:  Take it?

12               THE COURT:  -- and show it to the jurors down the

13   line.

14               MR. LLORET:  Very well.  Thank you, Your Honor.

15   I'll do that now.

16               (Pause in proceedings.)

17   BY MR. LLORET:

18   Q    Agent, can you take the next item out and identify it by

19   exhibit number?

20   A    525WWW -- triple W.

21   Q    What is it, Agent?

22   A    Again, it's a pan and another plastic bowl.  They're all

23   covered, again, in the white substance.

24   Q    Did you find any food in these item?

25   A    No, I did not.  I just found a fast food trash bag in one

1   of the trash cans.

2   Q   Okay.  And you can replace those in the plastic bag.

3          MR. LLORET:  And, Your Honor, I move the admission

4   of 525 triple W.

5          MR. WARREN:  No objection.

6          THE COURT:  It may be admitted.

7   BY MR. LLORET:

8   Q   Agent, when you're done with that one, can you pull out

9   the next item?

10  A   Your Honor, can I stand up?

11         THE COURT:  You certainly may.

12         THE WITNESS:  Thank you.

13  BY MR. LLORET:

14  Q   What's the next item by exhibit number, Agent?

15  A   525 -- four As, quadruple A.

16  Q   And what is 525 quadruple A?

17  A   It's two Ziploc bags, it's one -- it's two, one larger one

18  and one smaller one --

19  Q   And --

20  A   -- covered in a white powdery substance.  You can actually

21  hear it still in there.

22  Q   All right.

23         MR. LLORET:  And, Your Honor, I move the admission

24  of --

25  BY MR. LLORET:

Harrison - Direct (Llo)                                                104

1    Q    And where were they found, sir?

2    A    These were also recovered in the kitchen.

3              MR. LLORET:  Your Honor, I move the admission of 525

4    quadruple A.

5              MR. WARREN:  No objection.

6              THE COURT:  It may be admitted.

7              THE WITNESS:  525 triple Y.

8    BY MR. LLORET:

9    Q    And what is 525 triple Y?

10   A    It's a candle inside of a bowl with a lighter.  Along the

11   bowl, you actually see an off-white crusty substance around

12   the outside of the bowl.

13   Q    And where was that found?

14   A    This was found in the kitchen.

15             MR. LLORET:  Your Honor, I move the admission of 525

16   triple Y.

17             MR. WARREN:  No objection.

18             THE COURT:  It may be admitted.

19             THE WITNESS:  525 triple Z.

20   BY MR. LLORET:

21   Q    Yes, what is that?

22   A    One of two on the exhibit number.  This is the second bowl

23   that was depicted in the picture we saw earlier.  There was

24   two wooden bowls on the stove top.  This is number two.

25   Q    And what's the exhibit number again, sir?

Harrison - Direct (Llo)                                    105

1    A    525 triple Z, one of two.

2              MR. LLORET:  And, Your Honor, I move the admission

3    of 525 triple Z.

4              MR. WARREN:  No objection.

5              THE COURT:  It may be admitted.

6    BY MR. LLORET:

7    Q    What's the next item you have there?

8    A    This is 525 triple Z, this is two of two.

9    Q    And what is that?

10   A    It's a large aluminum or metal bowl.

11   Q    And where did you --

12   A    This was also recovered in the kitchen.

13   Q    Okay.

14   A    It's also got some of the off-white chunky or crusty

15   substance on it -- caked to it.

16   Q    And any of these items that we've just been discussing,

17   these various utensils -- pots, pans and so forth, bowls, did

18   any of them have food in it?

19   A    No, they did not.

20   Q    Okay.  What was the exhibit?

21             MR. LLORET:  525 triple Z, the second item, the

22   second bowl, Your Honor, I move the admission.

23             THE WITNESS:  Two of two.

24             MR. WARREN:  No objection.

25             THE COURT:  It may be admitted.

1  BY MR. LLORET:

2  Q   What's next, sir?

3  A   525 triple V -- V as in Victor.  It's a black plate with

4  white powdery residue and there's also a spoon that was

5  located on top of it when we discovered it, which also has the

6  white powdery substance on both sides.

7  Q   And any food on that plate?

8  A   No, there was not.

9  Q   Okay.

10         MR. LLORET:  I move the admission of 525 triple V.

11         MR. WARREN:  Without objection, sir, and I think

12  we've established there was no food in the place.

13         MR. LLORET:  Your Honor --

14         THE COURT:  It may be admitted.

15  BY MR. LLORET:

16  Q   What's the next item, sir?

17  A   525 triple T -- T as in Tango.

18  Q   And what is that, sir?

19  A   It's a pan with a -- again, the off-white chunky substance

20  or crusty substance on it.

21         MR. LLORET:  And, Your Honor, I move the admission

22  of -- the exhibit number, sir, if you can tell us?  525 --

23         MR. WARREN:  No objection.

24         THE COURT:  It may be admitted.  All of these were

25  found in the kitchen?

Harrison - Direct (Llo)                                     107

1              THE WITNESS:  Yes, Your Honor, all of these were

2   found in the kitchen.

3              MR. LLORET:  That was 525 triple T.

4   BY MR. LLORET:

5   Q    And what are you looking at now, sir?

6   A    525 I believe it's triple U.

7   Q    What is it?

8   A    It's Farberware brand slicer, so to speak, to slice food.

9              MR. LLORET:  And move the --

10  BY MR. LLORET:

11  Q    And where was that found?

12  A    This was also found in the kitchen.

13             MR. LLORET:  Your Honor, I move the admission of 525

14  triple U.

15             MR. WARREN:  No objection.

16             THE COURT:  It may be admitted.

17             THE WITNESS:  This also has the off-white crusty

18  substance on it.

19             MR. LLORET:  I see.

20  BY MR. LLORET:

21  Q    The next item, sir?

22

23  A    525 triple S.  These are both 525 triple S.

24  Q    There's two items.

25  A    One is one, one is two.

1    Q    Okay.  What are they?

2    A    They appear to be plastic drawers that were recovered from

3    the kitchen with a -- again, a white powdery substance.

4    Q    All right.

5              MR. LLORET:  I move the admission of 525 triple S.

6              MR. WARREN:  No objection.

7              MR. LLORET:  Two items.

8              THE COURT:  It may be admitted.

9              THE WITNESS:  And 525 quadruple B or four Bs.

10             MR. LLORET:  And I'll take the balance of this stuff

11   back.

12             (Pause in proceedings.)

13   BY MR. LLORET:

14   Q    What's the last item there, 525 quadruple B?

15   A    Yes, that's correct.

16   Q    What is that?

17   A    This was found actually contained in this bag near the

18   trash can of the kitchen.

19   Q    And you're holding up a -- it's sort of a --

20   A    Just a black shopping bag.

21   Q    Okay.

22   A    Inside of that you have more Ziploc or storage bags.  You

23   have the white -- the clear plastic that's been used for

24   wrapping, then numerous used and unused gloves.  Actually,

25   they've all been used.  Again, you have a little bit larger

1    size Ziploc bags, the small Ziplocs.

2    Q    And where did you find these?

3    A    This was also in the kitchen, adjacent to the trash can,

4    and then you have two Q Tips that are used.

5    Q    Okay, well you can put those back.

6          MR. LLORET:   I move the admission of 525 quadruple

7    B, Your Honor.

8          MR. WARREN:   No objection.

9          THE COURT:   It may be admitted.

10         MR. LLORET:   Now, if we can put number -- picture

11   number 526V -- V as in Victor -- on the screen for the Agent

12   but not for the jury at this point, and I'll take 525

13   quadruple B here.

14   BY MR. LLORET:

15   Q    Agent, can you tell us what you're looking at on the

16   screen, please?

17   A    That's a Century safe.  It's one of two that were

18   recovered from 339 Essex.

19   Q    And do you recall where this safe was recovered from?

20   A    I believe they were identical safes, so I'd have to see

21   the serial numbers.

22   Q    All right.

23         MR. LLORET:   If we can show number 526W to the

24   Agent.

25   BY MR. LLORET:

1    Q    Does that refresh your recollection, sir?

2    A    Can I reference my notes or my report?

3    Q    Certainly, if that refreshes your recollection.

4    A    219 was found -- the last three, I'm sorry -- or the

5    actual serial number is AD945219 -- this was located in the

6    second bedroom, the one with the hydraulic press and the

7    shotgun.

8    Q    Okay, the bedroom to the right?

9    A    Yes, sir.

10   Q    All right.

11          MR. LLORET:  Your Honor, I move the admission of

12   526V -- Victor and 526W -- Whiskey.

13          MR. WARREN:  No objection.

14          THE COURT:  It may be admitted.

15          MR. LLORET:  If we could show 526V -- Victor to the

16   jury.

17   BY MR. LLORET:

18   Q    This safe was the one found in the second bedroom, the one

19   on the right?

20   A    Yes, sir, correct.

21   Q    That's found -- what location within the bedroom?

22   A    That was located in the closet.

23   Q    And what, if anything else, was in the closet with that

24   safe?

25   A    The shotgun and the two rounds of ammunition --

```
 1   Q    The shotgun --

 2   A    -- the two 12-gauge rounds.

 3   Q    The shotgun being number 525P?

 4   A    Yes, sir.  It was hanging on a nail that was hammered into

 5   the wall --

 6   Q    This is --

 7   A    -- above the safe.

 8   Q    Just above the safe?

 9   A    Correct.

10   Q    Next to the safe is somebody holding what appears to be a

11   ruler, is that right?

12   A    Yes, sir.

13   Q    Can you describe the approximate dimension of the safe?

14   A    Approximately 18 inches -- 18 inches tall.

15   Q    All right.

16              MR. LLORET:  And 526W which has been admitted, can

17   we show that to the jury?

18   BY MR. LLORET:

19   Q    And this is a close up of the serial number of that safe?

20   A    Yes, sir.  That's correct.

21   Q    Okay.  Now, this is in the closet.  Did you have occasion

22   to open the safe?

23   A    Yes, sir, we did.

24   Q    Did you open the safe there at the scene or someplace

25   else?
```

1    A    It was opened at the office.

2    Q    All right.  And what, if anything, did you find in the

3    safe?

4    A    I believe in this one we recovered four firearms.  There

5    was indicia, or letters, and there was a videotape.

6    Q    All right.

7    A    There was I believe cocaine or crack, and we also found a

8    business card.

9    Q    All right.  I want to show you number 525X.

10        MR. LLORET:  Show it to the Agent only, not to the

11   jury.

12   BY MR. LLORET:

13   Q    And what -- Agent, in 526X, what are you looking at?

14   A    I'm looking at three firearms, three pistols that are

15   located inside that safe along with a large chunk of a white

16   substance located in the back of the safe.

17   Q    And this is the same safe you were discussing -- one in

18   the second bedroom?

19   A    Yes, sir.

20   Q    All right.  How close was the safe to that red press that

21   we previously marked?

22   A    Approximately three feet.  The safe -- the red press was

23   just outside the closet to the left.  As you're facing the

24   closet, it's immediately to the left.

25   Q    And the press is marked 525 quadruple D, for the record.

1                    Your Honor, I move the admission of 526X -- X-ray.

2                    MR. WARREN:  No objection.

3                    THE COURT:  It may be admitted.

4                    MR. LLORET:  If we could show that to the jury.

5          BY MR. LLORET:

6          Q    Agent, was this picture of what you found inside the safe

7          when you opened it?

8          A    Yes, sir.

9          Q    You opened it when, the next day?

10         A    I believe so.

11         Q    Okay.  There's some firearms in there.  I think we have

12         those -- number 526F, Your Honor.  Showing to Counsel.

13         BY MR. LLORET:

14         Q    Agent, can you identify number 526F?

15         A    It's a 357 Magnum -- I'm sorry, it's a Wesson Arms -- 357

16         Magnum.  It's a revolver.

17         Q    And did you find any -- well, let me first say where did

18         you find that gun?

19         A    This was in the safe that we recovered from the second

20         bedroom.

21         Q    Can you give me the exhibit number again?

22         A    526F as in foxtrot.

23                   MR. LLORET:  Your Honor, I move the admission of

24         526F.

25                   MR. WARREN:  No objection.

Harrison - Direct (Llo)                                          114

1           THE COURT:  It may be admitted.

2   BY MR. LLORET:

3   Q    And, sir, I'm going to show you 526H --

4   A    This is a Luger 22 caliber semi-automatic pistol along

5   with the magazine or clip, as some people refer to it, that

6   fits this weapon.

7   Q    And where was that found?

8   A    This was also found in the safe.

9           MR. LLORET:  Your Honor, I move the admission of

10  that firearm.

11          MR. WARREN:  No objection.

12          THE COURT:  It may be admitted.

13  BY MR. LLORET:

14  Q    And, Agent, I'm showing you number 526J and ask you what

15  that is.

16  A    This is a 22 caliber Davis Industries Derringer.  It's a

17  two-shot, highly concealable pistol.  You would -- if this

18  wasn't here, you could simply close it.  That's as big as it

19  is and it fires two 22 caliber rounds.

20  Q    And where was that found?

21  A    This was also recovered from the safe, second bedroom.

22          MR. LLORET:  Your Honor, I move the admission of

23  526J.

24          MR. WARREN:  No objection.

25          THE COURT:  It may be admitted.

1   BY MR. LLORET:

2   Q    Agent, elsewhere in the apartment, did you find ammunition

3   for these weapons?

4   A    Yes, we did.  This one actually was loaded with one -- I

5   believe one 22 caliber --

6   Q    All right.

7   A    -- and we did recover another 22 caliber.  The 357 Magnum,

8   we actually recovered the larger bag I showed you earlier that

9   was wrapped.  There was 357 Magnum ammunition for that --

10  Q    All right.

11  A    -- which will fit in this weapon.

12          MR. LLORET:  I'd like to show the Agent 526Y, the

13  Agent only, not the jury.

14  BY MR. LLORET:

15  Q    And, Agent, can you identify what you're looking at in

16  526Y?

17  A    That's a fourth firearm that was recovered from the safe.

18  It's actually on top of a shelf.  After the bottom part of the

19  safe, there's two shelves.  This was taken off of the second

20  shelf.

21  Q    Same safe in the back bedroom?

22  A    Yes, sir, same safe.

23  Q    All right.

24          MR. LLORET:  I move the admission of 526Y, Your

25  Honor.

1          MR. WARREN:  No objection, sir.

2          THE COURT:  It may be admitted.

3          MR. LLORET:  Your Honor, I have a gun marked 526E

4     and I'm going to display it to Counsel and show it to the

5     Agent.

6     BY MR. LLORET:

7     Q    Agent, what is that?

8     A    This here is a Smith and Wesson SW, nine millimeter.  SW9M

9     is the model.  It's a nine millimeter semi-automatic handgun.

10    Q    And where was that found?

11    A    This was found on the shelf, the second shelf of the safe

12    in the second bedroom or the bedroom on the right.

13    Q    All right.  Is that the same gun that we're looking at in

14    526Y, the picture?

15    A    Yes, sir.

16    Q    All right.

17          MR. LLORET:  I move the admission of 526E -- echo.

18          MR. WARREN:  No objection.

19          THE COURT:  It may be admitted.

20          MR. LLORET:  Can you take this back?  Thank you.

21    BY MR. LLORET:

22    Q    And number 526E -- echo, did you find ammunition in the

23    apartment that fit that gun?

24    A    Yes, we found a lot of rounds for the nine millimeter.

25    Q    Agent, let's take a look at number 526 double A.

1        MR. LLORET:  We'll show that to the Agent but not to

2    the jury.

3    BY MR. LLORET:

4    Q    Agent, what are you looking at in 526 double A?

5    A    This is a picture of everything that was recovered from

6    that second safe.  It's actually spread out on the floor just

7    in front of our safe.  There's four firearms, three bags of

8    narcotics, there's the videotape, six live rounds of 357

9    Magnum that was recovered from the firearm, a business card

10   and a receipt --

11   Q    All right.

12        MR. LLORET:  Your Honor, move --

13        THE WITNESS:  -- and my -- my knee.  My knee is also

14   in the picture.

15        MR. LLORET:  Your knee is in the picture?

16        THE WITNESS:  Thank you, Agent.

17        I move the admission of 526 double A.

18        MR. WARREN:  No objection.

19        THE COURT:  It may be admitted.

20   BY MR. LLORET:

21   Q    Now, Agent, I want to show you 526L.

22        MR. LLORET:  Your Honor, it's a white powdery

23   substance.

24   BY MR. LLORET:

25   Q    And I'll show it to the Agent and ask the Agent if he can

1    identify it.

2    A    Yes, sir.

3    Q    What is --

4    A    This is the larger chunk here.  The pressed or compacted

5    chunk here is the bag in the middle, the large Ziploc bag in

6    the middle.

7    Q    And you're referring when you say in the middle to the

8    picture marked --

9    A    The middle of the picture, correct.

10   Q    And that's the picture marked Government's Exhibit 526

11   double A?

12   A    Yes, sir.

13   Q    Okay.

14   A    And then there's a smaller bag that was recovered off to

15   the right, which is this one here --

16   Q    All right.

17   A    -- of powder.

18          MR. LLORET:  Your Honor, I move the admission of

19   526L.

20          MR. WARREN:  No objection.

21          THE COURT:  It may be admitted.

22          MR. LLORET:  Your Honor, I have a box marked 526A --

23   alpha.

24   BY MR. LLORET:

25   Q    Agent, can you tell us what that is?

1    A    This box was recovered from the safe in the first bedroom.

2    It's not the one in the second bedroom.

3    Q    All right.  So this was found in the other safe?

4    A    That's correct.

5    Q    Okay.  And was there stuff found in the box?

6    A    There was two empty Ziploc bags -- the larger size, all

7    covered in white powdery residue.  Also, the Nike box is also

8    white powdery residue.

9    Q    All right.

10            MR. LLORET:  Your Honor, I move the admission of

11    526H.

12            MR. WARREN:  No objection.

13            THE COURT:  It may be admitted.

14            MR. LLORET:  Oh, I'm sorry.  I misspoke, Your Honor.

15    It's 526 --

16            THE COURT:  A.

17            MR. LLORET:  -- A -- alpha.  Thank you.

18    BY MR. LLORET:

19    Q    Agent, I have an evidence bag with three -- there appears

20    to be three items in it.  I will identify the numbers.  The

21    numbers on the items are 526N, O, and P.  That's 526N, O, and

22    P. I'll ask the Agent if he can identify these items.

23    A    These are the bags to the left and right of that larger

24    brick.

25    Q    Okay.

1    A    This is from the first safe -- I'm sorry, the first safe

2    we looked at --

3    Q    All right.

4              MR. LLORET:   Your Honor, I move the admission --

5              THE WITNESS:   -- which is depicted in this picture.

6              MR. LLORET:   All right.   I move the admission of

7    526N, O, and P.

8              MR. WARREN:   No objection.

9              THE COURT:   It may be admitted.

10             MR. LLORET:   And let's show the Agent number 5 --

11   picture 526Z -- zebra.

12   BY MR. LLORET:

13   Q    Agent, can you identify what's depicted in 526Z?

14   A    That's the top shelf of the safe, which has the videotape,

15   numerous chunky substances which are like off-white color, a

16   business card, and a receipt.   And there's also a Ziploc bag

17   in the back that we had mentioned earlier, the small Ziploc

18   bags with actually a substance inside of that.

19   Q    Okay.

20             MR. LLORET:   And, Your Honor, I move the admission

21   of 526Z.

22             MR. WARREN:   No objection.

23             THE COURT:   It may be admitted.

24             MR. LLORET:   And if we can display that to the jury.

25   BY MR. LLORET:

1   Q   Now, if we can go -- did you, Agent, have occasion to

2   inspect the videotape?

3   A   Yes, sir, several times.

4   Q   All right.  Did you cause a still picture to be made of

5   one of the individuals depicted on the tape?

6   A   Yes, I did.

7   Q   Okay.  And is that marked -- let me show you this, 526U1

8   -- 526U1 --

9            MR. WARREN:  Can I see it?

10           MR. LLORET:  Certainly.  I need to ask him if this

11   is it and I'll show Counsel.

12           THE WITNESS:  Yes, sir, this is it.

13           MR. LLORET:  Okay.

14           (Pause in proceedings.)

15           MR. WARREN:  Thank you.

16   BY MR. LLORET:

17   Q   Did you recognize one of the individuals who was on that

18   tape?

19   A   Yes, I did.

20   Q   And who was that individual?

21   A   The defendant, Tim Baukman --

22   Q   Could you --

23   A   -- who's seated --

24   Q   -- identify him?

25   A   -- in the yellow shirt.

Harrison - Direct (Llo)                                     122

1    Q    And is Mr. Baukman depicted in that picture or set of

2    pictures that's been marked 525U -- could you read the exhibit

3    number?

4    A    526UI or is that 1?

5    Q    I think we're going to call it 526U1.  And, sir, who's

6    depicted in that?

7    A    Timothy Baukman.  There's six pictures -- six still

8    pictures taken from that video of Timothy Baukman.

9              MR. LLORET:  Your Honor, I move the admission of

10   526U1.

11             MR. WARREN:  No objection.

12             THE COURT:  It may be admitted.

13   BY MR. LLORET:

14   Q    And, Agent, without getting into the details, did the

15   video appear to be a professional production or of a personal

16   nature?

17   A    A personal nature.

18   Q    All right.

19             MR. LLORET:  Now, if we could go back to 526 and if

20   we could -- can we have that on the screen, 526UI or U1?

21             Your Honor, if I could, I'll just show this --

22             THE COURT:  Yes, indeed.

23             MR. LLORET:  I think there's a little technical

24   glitch.  This is -- I'm displaying to the jury number 526U1,

25   a still picture taken from the video.  Now, if we could go

Harrison - Direct (Llo)                                    123

1    back to 526V -- Victor.

2    BY MR. LLORET:

3    Q    These items we've been talking about were all found in the

4    safe in the back bedroom?

5    A    Yes, sir, the second bedroom safe, the one with the

6    hydraulic press.

7    Q    I'm sorry.  And you mentioned also that you found some --

8         MR. LLORET:  -- and I think this is in 526 double A,

9    if we could show that picture -- 526 double A.

10   BY MR. LLORET:

11   Q  All right.  You mentioned also a card that you found, is

12   that right?

13   A    That's correct.

14   Q    All right.  I want to show you what's been marked on it's

15   front, 526T1, and on its back, 526T2 and ask you if you

16   recognize that.

17   A    Yes, I do.

18   Q    And what is 526T2, the back of the item?

19   A    The back?

20   Q    Yeah.

21   A    It's a receipt -- a handwritten receipt.

22   Q    All right.  Without getting into it, what's on the front

23   of 526 -- it would be T1, I believe?

24   A    Correct.  It's Jack McMahon's business card, Attorney at

25   Law.  Tim Baukman's lawyer.

1    Q    Tim Baukman's lawyer here today?

2    A    He's seated to the --

3    Q    Okay.

4    A    -- to the right of him, my left, with his hand in the air.

5              MR. LLORET:  And move the introduction or move the

6    admission of 526T1 and 2, front and back of the business card.

7              MR. McMAHON:  I don't have no objection.

8              MR. WARREN:  No objection.

9              THE COURT:  It may be admitted.

10   BY MR. LLORET:

11   Q    Now, Mr. Harrison, could you read what's on the back of

12   the card that's our 526T2?

13   A    Yes, sir.  "Received 1,500 from Tim Baukman for Dante

14   Scott (phonetic)."  The date is 5-1-02 and I'm not sure of the

15   signature but --

16   Q    All right.

17   A    -- it's -- something -- P-A-D-D-E-N, is the last name.

18   Q    Padden?

19   A    Padden.

20   Q    Very well.  And we're looking now at 526T2 --

21              MR. LLORET:  -- if we can show that -- yeah.

22   BY MR. LLORET:

23   Q    And that's what you've just been reading, sir?

24   A    Yes, sir.

25   Q    All right.  Again, that was found in that safe and we'll

Harrison - Direct (Llo)                                125

1    look back at 526 double A.

2    A    That's correct.

3    Q    And just looking on that screen, the items found in the

4    safe, can you point out the card?

5    A    Can the jury see the videotape?  If you move it around --

6    Q    Yeah.

7    A    -- to the right, the next one down is the business card.

8         MR. LLORET:  Why don't we blow up the video and --

9    yeah, that's fine.

10   By MR. LLORET:

11   Q    Okay, and the next one down is the card that's just been

12   marked?

13   A    Correct.  On the bottom of the screen is the business

14   card.

15   Q    All right.  And then above that is the videotape from

16   which we took the stills?

17   A    That's the personal videotape, correct.

18   Q    Okay.

19        MR. LLORET:  We can go back to the main screen here.

20   There's another item below those two items.  Can we zero in on

21   that?

22   BY MR. LLORET:

23   Q    What was that, sir?

24   A    It was a receipt.

25   Q    And I'll show you 526S.

1          MR. LLORET:  526S, Your Honor, is a pink -- what

2    appears to be a telephone slip.

3    BY MR. LLORET:

4    Q   Agent, I'll ask you if you recognize that.

5    A   Yes, I do.  This is the receipt that was removed from the

6    safe.

7          MR. LLORET:  Your Honor, I move the admission of

8    526S.

9          MR. McMAHON:  It's not a receipt.  It's a phone

10   message.  It's not a receipt.  I mean, I have no objection to

11   it being admitted but it's not a receipt.

12         THE COURT:  Well --

13         MR. LLORET:  We'll just call it a pink piece of

14   paper, Your Honor, 526S.

15         MR. McMAHON:  It's a telephone pad message.

16         THE COURT:  All right.  It may be admitted.  There's

17   no objection.

18         MR. LLORET:  Thank you, Your Honor.

19   BY MR. LLORET:

20   Q   I'm holding up what's been marked 546G, which is some more

21   ammunition, and I'll ask the Agent, do you recognize this

22   546G?

23   A   These are 357 Magnum rounds.  They're hollow points.

24   These were recovered from the 5 -- the 357 revolver that was

25   taken out of that safe.

Harrison - Direct (Llo)                    127

1   Q   And I'm look --

2   A   We had six.

3   Q   Okay.  And I'm looking at 526 double A, the picture on the

4   screen.  Are those bullets depicted in that picture?

5   A   Yes, they are.  They're laid out immediately to the left

6   of that firearm.

7   Q   All right.

8          MR. LLORET:  Your Honor, I move the admission of

9   526G.

10         MR. WARREN:  No objection.

11         THE COURT:  It may be admitted.

12         MR. LLORET:  And I have an evidence bag with one

13   round of ammunition at 526K.  I'll show it to the Agent and

14   ask him if he can open it and identify it.

15         THE WITNESS:  It's one 22 long-rifle round of

16   ammunition.  This was recovered from the Derringer that was

17   inside the safe.

18   BY MR. LLORET:

19   Q   That Derringer is depicted in the picture, 526 double A,

20   is that correct?

21   A   Yes, sir.  The one closest to the safe, the smaller one.

22   Q   All right.

23         MR. LLORET:  And I move the admission of 526K, Your

24   Honor.

25         MR. WARREN:  No objection.

1           THE COURT:  It may be admitted.

2    BY MR. LLORET:

3    Q    What do you have in front of you now, Agent?  What's the

4    exhibit number?

5    A    526I -- India.

6    Q    And can you hold it up so Counsel can see it.  It's an

7    evidence bag, is that correct?

8    A    Yes.

9    Q    Agent, can you just hold it up so Counsel can just see

10   briefly?  And that's 526I?

11   A    Yes, that's correct.

12   Q    An evidence bag?  And what does it contain?

13   A    There's 11 22 long-rifle rounds of ammunition.

14   Q    And where did you recover them?

15   A    These were recovered loaded in the Luger, the black -- the

16   black and wooden firearm off to the right.  The one with the

17   magazine laying over the pistol grip.

18   Q    And you're referring to picture 526 double A?

19   A    Yes, that's correct.

20   Q    Okay.

21           MR. LLORET:  Your Honor, I move the admission of

22   526J.

23           MR. WARREN:  No objection, sir.

24           THE COURT:  It may be admitted.  That was I, was it

25   not?

1          MR. LLORET:  You are correct, Your Honor, it was

2    526I.

3    BY MR. LLORET:

4    Q   Mr. Harrison, I'm going to show you what's been marked

5    526U -- a videotape and ask you if you can identify that.

6    A    526U -- it's the videotape that was recovered out of the

7    safe and the casing, again, has that off-white crusty

8    substance on the casing or the carrying case for the

9    videotape.

10   Q   And is that depicted in 526 double A, the picture?

11   A   Yes.  This is directly above Jack McMahon's business card,

12   off to the left.  Well, you guys -- you pointed out the

13   business card earlier.

14          MR. LLORET:  Your Honor, I move the admission of

15   526U.

16          THE COURT:  It may be admitted.

17          MR. LLORET:  And 525I1 (sic) is a magazine.

18   BY MR. LLORET:

19   Q   Agent, I'll ask you if you can identify 526I1.

20   A   Yes.  It's a magazine for a nine millimeter.

21   Q   And did you recover that at Essex?

22   A   Yes, this was at Essex.

23   Q   Do you recall where?

24   A   I believe it was the -- in the first bedroom, near the

25   dresser.

1    Q    All right.  To the left?  The bedroom to the left?

2    A    The left bedroom, the first bedroom.

3            MR. LLORET:  Your Honor, I move the admission of

4    526I1.

5            MR. WARREN:  No objection, sir.

6            THE COURT:  It may be admitted.

7    BY MR. LLORET:

8    Q    And 526R -- can you tell us what that is?  Show it to

9    Counsel, if you would, Agent.  What is that?

10   A    It's a leather gun case.

11   Q    And where did you find that?

12   A    Well, if I could refer to my notes, I could refresh my

13   recollection.

14   Q    Certainly.

15   A    This was also recovered inside the first safe.  The one in

16   the second bedroom, that's the hydraulic press.

17   Q    Okay.

18           MR. LLORET:  Your Honor, I move the admission of

19   526R.

20           MR. WARREN:  No objection.

21           THE COURT:  It may be admitted.

22   BY MR. LLORET:

23   Q    What is this, Agent?

24   A    That's a firearm case or a gun case for a handgun.

25           MR. LLORET:  I'd like to show the Agent picture

Harrison - Direct (Llo)                                        131

1   number 526 triple O.  We'll wait until it comes up on the

2   screen.

3   BY MR. LLORET:

4   Q   And, Agent, can you tell us, what's 525 triple O?

5   A   This is a picture of one of the trash bags that was

6   recovered from the kitchen inside of Essex.  It's actually

7   laid out on a plastic -- we laid out plastic.  This is laid

8   out on one of our tables in the office.

9           MR. LLORET:  Your Honor, I move the admission of 525

10  triple O.

11          MR. WARREN:  No objection.

12          THE COURT:  It may be admitted.

13          MR. LLORET:  And we can display that to the jury.

14  BY MR. LLORET:

15  Q   Agent, this is what was found in one of the trash cans --

16  or trash bags?

17  A   Yes, that's correct.

18  Q   All right.  And in the kitchen, is that correct?

19  A   Yes, sir.

20  Q   And I want to show you number 525 triple C1, which is a

21  box containing various plastic items -- trash bag and

22  contents.  Agent, I'm going to ask you to take a look inside

23  525C or it's triple C1.

24  A   Your Honor, may I stand up?

25          THE COURT:  Yes, indeed.

1          THE WITNESS:  Again, that's one of the trash bags

2     that was recovered from Essex inside the kitchen, directly

3     underneath the table.

4     BY MR. LLORET:

5     Q    And what is inside that bag right now?

6     A    These are the wrappers that were contained inside trash

7     bag.

8     Q    These are the actual wrappers that you referred to

9     previously?

10    A    Yes, correct.

11    Q    Okay.  Did they have any type of substance on them at the

12    time you found them?

13    A    Yes.  They were covered in a white powdery substance.

14    Some was off-white, some was white.  It's used it as taping --

15    the cellophane tape and here are the blue -- the blue bottoms

16    that are put in the picture.

17    Q    If you would, could you pull out one of those -- any one

18    of them really -- and just describe the various substances and

19    particularly the type of wrapping that's found on the one that

20    you picked out, which happens to be blue in color.

21    A    You have the blue -- the two blue parts is what will hold

22    it together.  Again, you're going to have that clear plastic

23    and on the outside, you're going to have the Scotch tape wrap

24    to actually help hold it together.

25    Q    If you could take out another one, and we'll stop at two,

1    I think -- a brown one.

2    A    Here's a brown one.

3    Q    All right.  And what's on the inside?

4    A    Some kind of wrapping with almost like a grease substance.

5    Q    And on the outside, what's the substance on the outside?

6    I mean, just a description.

7    A    This is just tape --

8    Q    Okay.

9    A    -- for -- packaging tape.

10    Q    I'm just curious, I think I noticed some triangular cuts

11    on one of them.  Do you -- can you find one?  I don't know if

12    I'm right.

13              (Pause in proceedings.)

14    BY MR. LLORET:

15    Q    If you could just display it for the jury.  What are you

16    -- what are we looking at right now as you're displaying it to

17    the jury?

18    A    It's the top part of a wrapper of one of these.  You would

19    actually put two of these together and the substance would be

20    inside.

21    Q    And --

22    A    It's got a triangle cut here from the top.

23    Q    All right.  I think we can put those wrappers away.

24              (Pause in proceedings.)

25    BY MR. LLORET:

1  Q    There's a couple of other plastic bags in here.  Can you

2  tell us what they are?  Display it to the jury and describe

3  what they're looking at.

4  A    Here's a clear plastic wrapping that you can see was

5  wrapped to the wrappers.  This is pulling that.  There's two

6  bags in that.  This bag is full of that plus a little bit of

7  tape.

8  Q    And again, these were found in one of the trash bags found

9  in the kitchen?

10  A    These were found in this trash bag, correct --

11  Q    Okay.

12  A    -- inside the kitchen.

13  Q    All right.  And we have another bag of similar nature?

14  A    Yes.  Same type of clear plastic wrapping.

15  Q    Is there any type of substance that you're encountering on

16  those various items?

17  A    Yeah, it's all white powdery substance.  You have a Ziploc

18  bag and again, you have bits and pieces of tape and the tape

19  has the white powder actually stuck to it.

20  Q    All right.  We can put that away.  If you can put that

21  back in the box and I'll take that back.

22         And another similar box -- these are some items

23  marked collectively --

24         MR. LLORET:  -- Your Honor, these are marked

25  collectively 525 triple -- or double W to 525 triple A.  I'll

Harrison - Direct (Llo)                                            135

1    display the box to the Agent and we'll identify them

2    individually then I'll show them to Counsel.

3    BY MR. LLORET:

4    Q    And you've got a box there.  What's in the box?

5    A    Again, it's that -- the wrapper, same size.  This is the

6    clear part that stay to the -- the darker parts.

7    Q    Is there any type of substance on the wrappers that you're

8    looking at right now?

9    A    Yeah, it's covered in the white powdery substance.

10   Q    All right.  And you can put that bag away.

11            You can display that bag there to the jury, also

12   found in the box.

13   A    Yes, this was found in the trash bag.  Again, you have the

14   tops and bottoms of the wrappers.

15   Q    And again, did you encounter any type of substance on

16   them?

17   A    They're all laced with that white powdery substance.

18   Q    All right.  And you can put those items back and let's

19   take a look at the next bag here.  Another bag found in here.

20            MR. LLORET:  Your Honor, can I stay up here?  I

21   think we can move this a little faster.

22            THE COURT:  Yes.

23            MR. LLORET:  Thank you.

24            THE WITNESS:  Again, you have the wrapping -- you

25   have the wrapping, the clear plastic wrapping that's used to

1   contain the product.  This bag's full of that plus I think

2   there's two Ziploc bags -- the large sandwich bags.

3   BY MR. LLORET:

4   Q   And are you encountering any type of substance on those

5   plastic wrappers and bags?

6   A   Yeah, they're all covered in white powdery substance.

7   Q   The next bag found in that box, can you tell us what's in

8   there?

9   A   This is aluminum foil.  If you noticed, some of the ones

10  that remained intact actually had an aluminum foil backing --

11  the one in the middle if you guys can see that.  I can take it

12  out.

13  Q   Yeah, if you could.

14  A   The outside tape will be the Scotch tape.  The inside

15  would be an aluminum foil coating.

16  Q   It is aluminum foil?

17  A   Yes.

18  Q   Okay.  The next item encountered in the box, if you could

19  pick out the first one in there.  Just tell us what's in that

20  bag there.

21  A   Again, it's the tops and bottoms to the wrappers.  This

22  one would be a top with the triangle cut out of it and it's

23  got the -- the grease -- the grease substance on the outside.

24  Q   All right, you can put that one back.  And if we can take

25  a look at this bag pulled out of the box, do you know what's

Harrison - Direct (Llo)                     137

1    in there?

2    A    Again, you have the tops and bottoms to the wrappers.

3    Here you have the tape or the clear plastic wrap, along with

4    the wrap.

5    Q    And again --

6    A    They're all covered in white powdery substance.

7    Q    Okay.

8    A    And the tops -- the thicker part, the brown or blue have

9    the grease packaging material.

10   Q    And finally, Agent -- if you'll go ahead and seal that --

11   the last item we encounter in the box is what?

12   A    This is the trash bag that it was found in.

13   Q    Something else in there?

14   A    It's another black trash bag.

15   Q    Okay.  Were these items all found in the kitchen?

16   A    Yes, sir, all found in this trash bag inside the kitchen.

17   Q    All right.  Well, let's put all this stuff back in the

18   box.

19                (Pause in proceedings.)

20                MR. LLORET:  Thank you, Agent.

21                Your Honor, I'm aware of the Court's schedule.  I

22   have a few more things to talk with -- to the Agent, perhaps

23   15 minutes to a half hour.  I don't know if Your Honor wants

24   me to go ahead or we should take a break.  I think we can do

25   it either way, whatever Your Honor's pleasure.

1          THE COURT:  Let's move through it and then we'll

2    recess.

3          MR. LLORET:  Thank you, Your Honor.

4    BY MR. LLORET:

5    Q   Agent, in addition to your activity at Essex Lane -- at

6    Essex Avenue -- and by the way, where was Essex Avenue, just

7    physically?  Was that within the boundaries of Philadelphia or

8    outside or --

9    A   No, it's just outside.

10   Q   Okay.

11         MR. LLORET:  Do you still have that map?

12   BY MR. LLORET:

13   Q   If you can just identify where Essex was.

14   A   339 East Essex, Lansdowne, Pennsylvania.

15   Q   According to the map marked 1002, and if you could turn

16   that map and point it out to the Court and to the Counsel,

17   where you're pointing.

18         All right, that's just outside the western boundary

19   of Philadelphia?

20   A   Just a mile or a few miles.

21   Q   Okay.  Now, in addition to your --

22         MR. LLORET:  -- excuse me, Your Honor, I want to

23   pull this out --

24   BY MR. LLORET:

25   Q   -- in addition to your activities at Essex Avenue that

1    day, August the 10th of 2005, did you also have occasion to do

2    surveillance at various other locations --

3    A    Yes, I did.

4    Q    -- during the course of the investigation?

5    A    Numerous locations.

6    Q    All right.

7            MR. LLORET:  And particularly, I want to show the

8    Agent a picture of number 103, without showing the jury the

9    picture.

10   BY MR. LLORET:

11   Q    And, Agent, do you recognize what's depicted in number

12   103?

13   A    Yes, I do.

14   Q    What is that?

15   A    This is the apartment that located on the 1400 block of

16   Clearview, and specifically the Suffolk Manor Apartments.

17   Q    And did you conduct surveillance there?

18   A    Yes, we did.

19   Q    On more than one occasion?

20   A    Yes.

21   Q    Did you yourself conduct surveillance there?

22   A    Yes, myself along with the other agents participating in

23   the wire.

24   Q    All right.

25            MR. LLORET:  I move the admission of number 103.

1          MR. WARREN:  No objection.

2          THE COURT:  It may be admitted.

3    BY MR. LLORET:

4    Q   Specifically, Agent, if you could, I want to put this map

5    which we marked number 1001 up on the easel here for a moment,

6    and just if you could --

7          MR. LLORET:  Your Honor, if the Agent could step

8    down and just identify where that is on the map.  We're

9    looking at a screen and picture, but I'd also like him to

10   point it out on the map.

11         THE WITNESS:  1416 West Clearview Street.  It's

12   located up in North Philly.

13   BY MR. LLORET:

14   Q   And you're pointing to the banner that also has an arrow

15   pointing to an approximate location?

16   A   Correct.  It's just west of Broad Street.

17   Q   In North Philadelphia?

18   A   North Philadelphia.

19   Q   All right.  Now, Agent, if you could describe for the

20   jurors, direct your attention specifically to June 16th of

21   2005.  Do you undertake a surveillance -- go out there and

22   watch what was going on?

23   A   Yes, we did.

24   Q   And what, if anything, did you see?

25   A   On June 16th -- if I could reference my notes I could get

Harrison - Direct (Llo)                                    141

1    a better --

2    Q    Certainly, if they'll --

3    A    -- time frame.

4    Q    -- if they'll refresh your recollection.

5    A    On 16th at approximately 9:25 or early evening, myself and

6    Agent Bowman, along with Brian Monaghan initiated a

7    surveillance of that area.

8    Q    And what, if anything, did you see that day?

9    A    We saw a Dodge Magnum parked on the -- I believe it was

10   the east side of the street of the 1400 block of Clearview,

11   and that tag, if I can reference it, I can give you a tag.

12   Q    Sure.

13   A    FVC-5430.

14   Q    All right --

15   A    Foxtrot, Victor, Charlie -- 54, 30, 0.

16   Q    All right.  And looking at the picture, number 103, is

17   that Clearview that we're looking at, that street that we're

18   looking down on?

19   A    Yes, it is.

20   Q    Okay.  And the apartment complex that we're looking at,

21   that's 1416 West Clearview Street?

22   A    Yes, it is.

23   Q    Okay.  This Dodge Magnum, was that familiar to you?

24   A    Yes, it was.

25   Q    Why was it familiar to you?

1    A    It was the car controlled and operated or leased by Alton

2    Coles, the defendant.

3    Q    All right.  And what else did you see, if anything, that

4    day while you were doing your surveillance out there?

5    A    During our surveillance, we saw a dark colored or maroon

6    colored Mazda 626 also drive on that block and park his

7    vehicle.

8    Q    By the way, why were you out there that day?  Were you in

9    response -- were you responding to something?

10   A    Yes.  We were responding to a live -- a live call that was

11   being heard by the wire room -- again, the base, the dispatch

12   of surveillance.

13   Q    So they --

14   A    Per the base instructions, they dispatched myself and

15   Agent Bowman to that area.

16   Q    And who were you looking for?

17   A    Alton Coles and Amine Wiggins (phonetic).

18   Q    All right.  What, if anything, did you see as the Mazda

19   626 pulled up?

20   A    We saw Amine Wiggins park his vehicle on the 1400 block of

21   Clearview Street.  He proceeded to his trunk where he got a

22   shopping bag out, just a -- like a middle size shopping bag,

23   and then he proceeded into the western alley of the Suffolk

24   Manor, and just to reference, the western alley would be to

25   the left of that screen -- I'm sorry, the eastern alley would

1    be to the left of that screen.

2    Q    Did he go into the eastern alley or the western alley?

3    A    He went into the eastern alley.

4    Q    All right.  I'd like to show you pictures -- number 103B.

5            MR. LLORET:  Show it to the Agent but not to the --

6    not to the jury.

7    BY MR. LLORET:

8    Q    Looking at 103B, what is that, Agent?

9    A    This is a picture taken from Broad Street, which is about

10   a half a block east of that location, looking down the 1400

11   block of Clearview, actually facing west.

12   Q    Can we see the alley that you referenced in this picture,

13   or no?

14   A    Yes, you can, you can see the alley entrance.

15   Q    Can you direct the pointer on the screen to the location

16   where we can see the alley --

17   A    If you were to just come straight down --

18   Q    -- with the pointer?

19   A    -- where the iron gate is, that's it right there.

20   Q    Okay.  So the iron gate marks the spot?

21   A    You would walk from here, from where that pointer is,

22   south, which would be left, as the picture faces.

23   Q    So if you're walking down towards that location, you turn

24   left and walk down that alley?

25   A    Correct, and you would be in the alley.

1    Q    All right.  And that's the alley adjacent to 1416 West

2    Clearview Street?

3    A    Yes, the eastern alley, correct.

4    Q    I see.  The -- let me show the --

5            MR. LLORET:  -- and I move the admission of 103B,

6    Your Honor.

7            MR. WARREN:  No objection.

8            THE COURT:  It may be admitted.

9            THE WITNESS:  You can see the pointer.

10           MR. LLORET:  And we can -- okay, the jury can see

11   the pointer.

12   BY MR. LLORET:

13   Q    That's -- is -- is the pointer on the iron gate that you

14   mentioned?

15   A    Yes, sir.  That's correct.

16   Q    And the iron gate marks where the alley entrance is?

17   A    Yes.

18   Q    Okay.  Is the alley obstructed by the iron gate or is the

19   iron gate next to the alley?

20   A    It's on the eastern side.  You can actually drive a car --

21   Q    Oh, into the alley?

22   A    -- around behind.  It's that big.

23   Q    Oh.  I'll show you -- but not the jury -- number 103D and

24   ask you if you recognize it.

25   A    That's the picture of the alley, correct.

1    Q    That's the picture of the alley?

2              MR. LLORET:  Your Honor, I move the admission of

3    103D.

4              MR. WARREN:  No objection, sir.

5              THE COURT:  It may be admitted.

6    BY MR. LLORET:

7    Q    And looking at it, we see an iron fence there, Agent.  Is

8    that the same iron fence you just talked about?

9    A    Yes, sir.  Closer to where the Government exhibit is is

10   where the pointer was earlier.

11   Q    Okay.  And that --

12   A    Right about there.

13   Q    And that's the alley that runs by the apartment complex?

14   A    Yes.  And you can see the side entrance to the east side

15   of that building.

16   Q    Now, getting back to what you saw on June 16th, 2005, you

17   saw a Mazda pull up, is that right?

18   A    That's correct.

19   Q    And someone got out of the Mazda.  Did you recognize that

20   person?

21   A    It was Amine Wiggins (phonetic).

22             MR. LLORET:  If we could show picture number 512N --

23   Nancy to the Agent only.

24   BY MR. LLORET:

25   Q    And do you recognize that picture, sir?

1    A    Yes, sir.

2    Q    Who is in that picture?

3    A    That's Amine Wiggins (phonetic).

4    Q    All right.  And was he familiar to you at that time?  Had

5    you seen him previously?

6    A    Yes.

7    Q    And conducted surveillances previously?

8    A    Yes, sir.

9    Q    All right.

10           MR. LLORET:  Your Honor, I move the admission of

11   512N - November.

12           MR. WARREN:  We don't object to the admission of the

13   exhibit.  We don't concede it's Amine Wiggins.

14           MR. LLORET:  We'll move the admission of 512N.

15           THE COURT:  It is admitted.

16   BY MR. LLORET:

17   Q    And, sir, did you know this person at this point in time?

18   A    Yes.

19   Q    Did you see an individuals getting out of the Mazda and

20   did he appear to you to be this individual?

21   A    Yes, he did.

22   Q    Okay.  And what happened once he got out of the Mazda?

23   A    He proceeded to the eastern alley, which is where we lost

24   surveillance of him.  We couldn't see if he went into the door

25   or not.

1    Q    All right.  Did he ever reappear?

2    A    Yes.  He came out of the house -- out of the apartment

3    complex later using that same alley.

4         MR. LLORET:  And we'll turn back to 103D -- dog.  BY

5    MR. LLORET:

6    Q    And this is the alley that you saw him coming back out of?

7    A    Yes, sir.  That's correct.

8    Q    And what happened then?

9    A    Then he got back into the Mazda 626 and left the area.

10   Q    And did you continue to surveil him?  Did you follow him?

11   A    Yes, we did.

12   Q    Did you drive and actually visually follow him?

13   A    Mostly visually but we did -- there were certain instances

14   where we couldn't stay -- remain eye contact because we had to

15   back off.

16   Q    Okay.

17   A    But we basically paced him from there to his final

18   destination.

19   Q    All right.  And when did you cut off your surveillance,

20   your following him?  At what point?

21   A    When he reached the 100 block of South 46th Street.

22   Q    Of South 46th Street in Philadelphia?

23   A    Yes, sir.

24   Q    Now, are there any locations there that are familiar to

25   you?

1   A    Yes, they are.

2   Q    What locations are they?

3   A    116 and 118.

4   Q    And can you briefly describe for us what is at 118 South

5   46th Street and what's at 116 South 46th Street?

6   A    116 was a location that we were familiar with through a

7   target known as Adrian McKenzie.   118 was where Amine Wiggins

8   resides.

9   Q    All right.

10          MR. LLORET: If we can show a picture to the Agent

11   only, number 95?

12   BY MR. LLORET:

13   Q    And what's that a picture of, Agent?

14   A    That's 118 South 46th Street.

15   Q    All right.   And if you could step down for just a moment

16   and looking at the exhibit marked 1001, identify where 116 and

17   118 South 46th Street are.

18          And you're pointing at the banner and there's an

19   arrow that points to a general location?

20   A    That's correct.

21   Q    And the banner says 116 and 118 South 46th Street?

22   A    Yes.   That's correct.

23   Q    Okay.   Those two -- those two addresses, are they next

24   door to each other?

25   A    Yes, they are.

1  Q    Okay.  And looking at number 95, that's 118 South 46th,

2  correct?

3  A    Correct.

4         MR. LLORET:  I move the admission of number 95, Your

5  Honor.

6         MR. WARREN:  No objection.

7         THE COURT:  It may be admitted.

8  BY MR. LLORET:

9  Q    Now, sir, this was a location familiar to you.  Was this

10 -- when you referred to cutting off your following Mr.

11 Wiggins, was this at the 100 block?

12 A    Yes, myself and Agent Bowman terminated at the 100 block

13 of South 46th Street.

14 Q    Did you actually follow sort of right behind him, park

15 behind him and watch him go in or anything?

16 A    I did not myself.

17 Q    Okay.  So you just drove on past or something once he was

18 at the 100 block?

19 A    Correct.

20 Q    Did he turn into the 100 block?

21 A    He parked on the 100 block.

22 Q    Okay.  And got out of his car?

23 A    We continued.

24 Q    I see.  Did you see him get out of the car or no?

25 A    No, sir, I did not.

1  Q    All right.  But once he parked, you just continued,

2  correct?

3  A    Yes, correct.

4  Q    All right.  Did any other agents continue to surveil him

5  at that time?

6  A    Yes.

7  Q    And without getting into what they did, could you identify

8  the agent that continued to surveil him after you left?

9  A    It was Philadelphia Police Officer Brian Monaghan.

10  Q    All right.  Now, I want to also go and just to reiterate,

11  this was on June 16th of 2005, this surveillance that you

12  conducted?

13  A    Yes, correct.

14  Q    Okay.  I want to go back in time to 5-29 -- May 26th of

15  2005 and ask, did you see Alton Coles that day?

16  A    Yes, we did.

17  Q    Where did you see him?

18  A    On the 1400 block of Clearview Street.

19         MR. LLORET:  And if we could go back to number 103

20  -- well actually, let's go to 103B.  It's been previously

21  admitted.

22  BY MR. LLORET:

23  Q    On this street that we're looking at in 103B?

24  A    That's correct.

25  Q    Okay.  And what, if anything, did you see Mr. Coles doing

Harrison - Direct (Llo)                              151

1    that day?

2    A    Him and another unidentified male were observed on that

3    block where Alton Coles was observed wearing an orange shirt

4    -- an orange-striped tee shirt.

5    Q    All right.  And then the following day, on May the 30th of

6    2005, did you -- were you out on surveillance that day?

7    A    Yes, I was.

8    Q    Did you go to Clearview at all that day -- 5-30 of 2005?

9    A    Yes, we did.

10   Q    And what, if anything, did you see?

11   A    Again, we saw Alton Coles wearing the same orange shirt on

12   the 1400 block of Clearview.

13   Q    And you're talking about the defendant, Alton Coles, who's

14   seated here today?

15   A    Correct.

16   Q    All right.  What, if anything, did you see Mr. Coles

17   doing?

18   A    We saw him leaving the F or the 1400 block of Clearview

19   eastern alley and he walked west -- or east on this block,

20   which is towards where the picture was taken.  He had two

21   black -- or two white trash bags in his hand.  As he

22   approached Broad Street, which is where the picture was taken

23   from, we actually saw Alton Coles, the defendant, discard

24   those two trash bags in or on top of another trash bag that

25   was already sitting out there.

1   Q    And do you recall approximately what time it was that you

2   saw these things happen?

3   A    It was early -- late evening, anywhere around 8:00, 9:00.

4   Q    All right.

5   A    But I'd have to check my notes for a reference.

6   Q    Well, that's okay.  It was dark out?

7   A    Yes, sir.

8   Q    Did you -- were you able to identify Mr. Coles?

9   A    Yes, I was.

10  Q    Had you seen him before?

11  A    Yes.

12  Q    All right.  What, if anything, did you do -- or first of

13  all, let's -- Mr. Coles came down the street.  Where was he

14  coming from as he walked down the street?

15  A    He came from the alley, the eastern alley of Clearview.

16  Q    All right.  Again, marked by that iron gate in the picture

17  that we're looking at in 103B?

18  A    Yes, sir.

19  Q    And was he walking towards the -- say the vantage point

20  from which the picture's taken?

21  A    Yes, he was.

22  Q    All right.  Which is taken from across the street on Broad

23  Street, is that correct?

24  A    That's correct.

25  Q    Was he walking on the left-hand side as we're looking at

1    that picture, 103B?

2    A    Just where the pointer is, correct.

3    Q    Okay.

4    A    The southern side.

5    Q    And he dropped some bags.  Can you tell us approximately

6    where he dropped the bags?

7    A    Just to the left of that Lincoln Continental, the silver

8    car.

9    Q    Now, that Lincoln --

10   A    There was a -- there was several large black trash bags

11   there.  He actually placed the white trash bags on top of

12   those.

13   Q    Is the pointer pointing to the approximate location where

14   he dropped the bags?

15   A    Yes, it is.

16   Q    Okay.  After he dropped the bags, what, if anything, did

17   he do?

18   A    He got into his vehicle and left.

19   Q    What vehicle was he driving, do you recall?

20   A    I can check my notes.  I don't recall exactly.

21   Q    If you would.

22   A    The silver Lincoln Towncar.

23   Q    Had you ever seen that car before?

24   A    Yes, several times.

25   Q    Was there another car that day that -- that was familiar

1    to you?

2    A    Yes, there was.

3    Q    What was that car?

4    A    It was the silver Cadillac that was driven by Dante

5    Tucker.

6    Q    All right.  And were there any other cars that were there

7    that day?

8    A    No.

9    Q    All right.  Now, what did you -- or I should say, there

10   were cars parked on the street but no cars that were

11   immediately familiar to you?

12   A    That's correct.

13   Q    Okay.  Now, what, if anything, did you do after Mr. Coles

14   -- you walked away?

15   A    Yes, I did.

16   Q    What did Mr. Coles do, first of all, did he turn back into

17   the alley?

18   A    He got into a vehicle and left the area.

19   Q    Oh, okay.  And what did you do?

20   A    As soon as Mr. Coles -- as soon as the defendant Coles and

21   Dante Tucker left the area, I got out of my surveillance

22   location and grabbed the two white trash bags that he

23   discarded on the street.

24   Q    Did you see Dante Tucker there?

25   A    Yes, we did.

Harrison - Direct (Llo)                                          155

1   Q    And where did you see Dante Tucker?

2   A    He was talking to Alton Coles, the defendant, inside of

3   his vehicle.

4   Q    All right.  Dante Tucker was seated in what car?

5   A    The Cadillac.

6   Q    And is that the car that Alton Coles jumped in?

7   A    No, Coles drove his own car.

8   Q    I see.  You picked up those items in the trash bag, is

9   that right?

10  A    Yes, sir.

11  Q    What did you find in the trash bag?  I assume you didn't

12  search through it -- the trash bag, right then and there?

13  A    No, we did not.

14  Q    Just grabbed it and ran?

15  A    Correct.

16  Q    Okay.  Did you search it later?

17  A    Yes, we did.

18  Q    What did you find?

19  A    We recovered three wrappers.

20  Q    All right.

21  A    I think there was a set of latex gloves.

22  Q    I'm going to show you number 911A.

23          MR. LLORET:  First I'll show it to Counsel.

24  BY MR. LLORET:

25  Q    What's 911A?

Harrison - Direct (Llo)                                      156

1   A    These are the trash bags that were recovered from that

2   day.

3   Q    And what was in the trash bags?

4   A    Again, the same type of wrappers with the aluminum foil

5   and the packaging material.

6   Q    When you say the same type of wrappers, the same type of

7   rappers as what?

8   A    That were recovered out of Essex -- 339 Essex.

9   Q    All right.

10              MR. LLORET:  Your Honor, I move the admission of

11  911A.

12              MR. WARREN:  No objection, Judge.

13              THE COURT:  It may be admitted.

14  BY MR. LLORET:

15  Q    And, Agent Harrison, how many of those wrappers did you

16  find in that trash bag?

17  A    Three.

18              MR. LLORET:  Your Honor, if I may have just a

19  moment.

20              THE COURT:  Yes, indeed.

21              (Pause in proceedings.)

22  BY MR. LLORET:

23  Q    Agent, are you familiar with anyone who lives in that

24  apartment building that we're looking at?

25  A    Yes.

Harrison - Direct (Llo)                    157

1    Q    Who lives there that you know?

2    A    Monique Pullins.

3    Q    And can you identify her?

4    A    Yes.

5    Q    Could you identify her now?

6    A    She's all the way to the left wearing a pink and yellow

7    and brownish sweater.

8            MR. LLORET:  Your Honor, let the record reflect the

9    Agent is identifying the defendant Monique Pullins.

10           THE COURT:  It shall so reflect.

11   BY MR. LLORET:

12   Q    Agent, number 911A, the trash bag with the -- with the

13   wrappers in it, did you -- and those also had the latex gloves

14   in it?

15   A    Correct.

16   Q    Were those familiar to you as well as similar to any other

17   gloves you found during your investigation?

18   A    Also recovered at Essex, correct.

19   Q    The wrappers, did they have any type of -- of substance on

20   them?

21   A    They had a white powdery substance.

22   Q    Okay.  And they were submitted for testing?

23   A    Correct.

24   Q    All right.  As were the wrappers from Essex, is that

25   correct?

Colloquy                                    158

1    A    Yes, sir.

2    Q    When you were out on that surveillance on May 30th of 2005

3    at Clearview, were you with anybody else?

4    A    On May 30th -- yes, Agent Charles Doerrer.

5    Q    And he is -- he also works with you?  He's a special agent

6    at ATF?

7    A    Yes, he is.

8    Q    Okay.

9              MR. LLORET:  I think we're done, Your Honor.  I have

10   nothing further from this witness.

11             THE COURT:  All right.  Ladies and gentlemen, it's

12   quarter of 1:00, we'll recess at this point for lunch.  We'll

13   give you an hour for lunch.  Relax.

14             Don't discuss the case with anyone, don't discuss

15   the case among yourselves and we'll be back here at quarter of

16   2:00, okay?  Recess.

17             COURTROOM DEPUTY:  All rise.

18             (Luncheon recess taken, 12:48 p.m. to 2:29 p.m.)

19                    AFTERNOON SESSION

20                       (2:29 p.m.)

21             MR. LLORET:  At Your Honor's request, I've talked to

22   Mr. McMahon and Mr. Warren and all counsel.  I have one -- I

23   have five pieces of documentary evidence that I overlooked.

24   I'd like to put them on with Mr. Harrison before he's crossed

25   if I may also, a few pictures of firearms.  I want to get

Colloquy                                            159

1    those in because we don't want to give firearms to the jury

2    when they go back.

3            THE COURT:  All right.

4            MR. LLORET:  Thank you.

5            MR. WARREN:  No objection, Judge.

6            THE COURT:  All right.

7            MR. McMAHON:  Judge, in -- as to a stipulation, the

8    pictures are reflective -- instead of going through all of the

9    pictures, that's fine with me also, that the pictures are

10   reflective of all the items here and that they can be moved

11   into evidence so that -- at a later point --

12           MR. LLORET:  I'll just --

13           MR. McMAHON:  -- I don't think there's any problem

14   with that.

15           MR. LLORET:  -- then, Your Honor, I'll just describe

16   them for the record.

17           THE COURT:  Just describe it.

18           MR. LLORET:  Yeah.

19           THE COURT:  It's stipulated.  There's no need to go

20   through a long --

21           MR. LLORET:  Sure.

22           THE COURT:  -- process.

23           MR. McMAHON:  Right, that's fine.

24           MR. LLORET:  I think one of the pictures is of the

25   other safe that Agent Harrison mentioned in the first -- I'll

Colloquy                                      160

1    just describe it for the record --

2              THE COURT:  All right.  Counsel --

3              MR. LLORET:  -- all the pictures and move them.

4              THE COURT:  -- counsel has agreed.

5              MR. LLORET:  Thank you, Your Honor.  And the bills,

6    I have one, two, three, four, five, six pieces so --

7              (The jury enters the courtroom at 2:31 p.m.)

8              THE COURT:  Have a seat, ladies and gentlemen.

9              Ladies and gentlemen, before we get started, you

10   have been subjected to some delays during the course of these

11   proceedings already, and I want to indicate to you that,

12   without getting into a discussion about it, the reason for the

13   delay has been -- the delays that we've experienced so far has

14   been resolved, and we're going to try and move through this

15   matter with dispatch with as few delays as possible.  So, Mr.

16   Lloret.

17             MR. LLORET:  Thank you, Your Honor.  A few

18   additional items.

19             Your Honor, counsel has been gracious, and I just

20   wanted to advise the Court that there's a stipulation as to

21   certain photographs that are reflective of items that have

22   been previously mentioned or shown to the jury in this case,

23   and I'll just read them, Your Honor, and it's stipulated that

24   they'll go in.

25             Exhibit 525-5 is the safe from the first bedroom on

Harrison - Direct (Llo)                               161

1    the left.  The second bedroom was shown to the jury

2    previously.

3           Number 525-6 are three handguns and a gun box that

4    have been previously shown to the jury.

5           525-21 is a picture, a photograph of that hydraulic

6    press.

7           525-24 is a picture of the safe in the second

8    bedroom on the right along with the shotgun hanging over it.

9           And 525-25 are some of the long guns and ammunition

10   that have been previously put into evidence.  Your Honor, I

11   understand all counsel stipulate that they can go in without

12   further ado.

13           MR. WARREN:  Correct, Your Honor.

14           THE COURT:  All right.  They're admitted.

15           MR. LLORET:  And, Your Honor, I also have certain

16   pieces of documentary exhibits that I'll just show -- and I've

17   shown to counsel -- but I'll show them to the witness and ask

18   him to identify them and advise whether he recovered them at

19   the scene.

20           THE COURT:  All right.

21           MR. LLORET:  And if I may stand up here, Your Honor,

22   I think I can move through this --

23           THE COURT:  Yes, indeed.

24           MR. LLORET:  -- with dispatch.

25   BY MR. LLORET:

1    Q    Agent, looking at 525U, what is that?

2    A    That's a PECO power bill.

3    Q    And directed to whom?

4    A    Tauheed Baukman.

5    Q    And what's the address?

6    A    339 East Essex Avenue, second floor.

7              MR. LLORET:  And, Your Honor, I'll move these all in

8    at the end when I get through them.

9    BY MR. LLORET:

10   Q    525V, sir, what is that?

11   A    Again, it's a power bill.

12   Q    And to whom is it directed?

13   A    It's addressed to Tauheed Baukman at 339 East Essex

14   Avenue, second floor, Lansdowne, Pennsylvania.

15   Q    All right.  And Number 525W, what's that?

16   A    That's a third power bill.

17   Q    And --

18   A    Again addressed to Tauheed Baukman, 339 East Essex Avenue,

19   second floor.

20   Q    All right.  And Number 525X, what's that?

21   A    Aqua Pennsylvania.  It's a bill from Aqua Pennsylvania,

22   again addressed to Tauheed Baukman, 339 East Essex Avenue.

23   This one's Apartment B, Lansdowne, Pennsylvania.

24   Q    And, sir, 525Y, what's that?

25   A    It's a Security Watch, Incorporated, from Havertown,

1   Pennsylvania.  It's addressed to Tauheed Baukman, 339 East

2   Essex Avenue, Lansdowne, Pennsylvania, and it's dated July

3   15th of '05, I believe, 2005.

4   Q   And what is -- and that's 525Y.  Okay.  525Z, sir, what's

5   that?

6   A   It's a United States Postal Service, just a slip saying

7   they missed you, addressed to Tauheed Baukman, 339 East Essex

8   Avenue, B, they checked here a letter as in they were sending

9   a letter.

10  Q   All right.

11  A   And the date on that is July 21st of 2005.

12  Q   And 525H or triple H, what's that?

13  A   It's a red notebook.  We like to refer as tally sheets.

14  These are called tally sheets.

15  Q   Well, let's -- did you find all of these items that we

16  just referred to at 339 East Essex --

17  A   Yes, sir.

18  Q   -- on the day in question, August 10th of 2005?

19  A   Yes, sir.

20  Q   One final thing, there's a picture, is this individual

21  known to you?  Well, first, what's the exhibit number on that?

22  A   525AA.

23  Q   Did you find that picture at East Essex?

24  A   Yes, we did.

25  Q   Okay.

1          MR. LLORET:  Your Honor, I move the introduction of

2    those last items of documentary evidence.

3          MR. McMAHON:  Can we just see them, Judge?

4          MR. LLORET:  Certainly.

5          THE COURT:  Yes, indeed.

6          MR. McMAHON:  That's all.  I just needed to see

7    them.

8          THE COURT:  Show them to counsel, Mr. --

9          MR. LLORET:  Certainly, Your Honor.

10         (Pause in proceedings.)

11         MR. LLORET:  And with that, Your Honor, I'll move

12   the admission of 525U, 525V, 525W, 525X, 525Y, 525Z, 525AA,

13   and 525HHH.

14         THE COURT:  May be admitted.

15         MR. LLORET:  Thank you, Your Honor.  I have nothing

16   further.

17         MR. WARREN:  Your Honor, with the Court's

18   permission, I believe Mr. McMahon will proceed first and I

19   will follow him if that's okay.

20         THE COURT:  That's fine.  Go ahead, Mr. McMahon.

21         MR. McMAHON:  Thank you, Your Honor.

22                    CROSS-EXAMINATION

23   BY MR. McMAHON:

24   Q    Good afternoon, Agent Hanson, right?

25   A    Harrison, with two R's, correct.

1   Q    Harrison, Harrison, I apologize.

2   A    Good morning -- good afternoon.

3   Q    Good morning.

4          Now, you indicated that your investigation -- you

5   became -- this became active in 2004, is that correct?

6   A    The wire -- the investigation?

7   Q    No, the investigation into this situation we're here with,

8   it became --

9   A    Correct, 2004.

10  Q    And did you become involved in it then?

11  A    To a smaller degree, correct.  I wasn't the case agent,

12  but I was involved.

13  Q    Well, what was your involvement in the beginning, back

14  in --

15  A    To assist the case agent with interviews or surveillance

16  or gather intelligence.

17  Q    Okay.  And so that was from my understanding some time in

18  August of '04.  Does that sound right?

19  A    I believe so.

20  Q    And we've heard now that the -- all these raids took place

21  in August of '05, okay, is that correct?

22  A    Yes, sir.

23  Q    So we're talking about an investigation that went on for a

24  year, correct?

25  A    Yes, sir.

Harrison (McM)

Q    And were you assigned to this for the entire year?

A    Not permanently.  I was partially assigned to assist the case agent, but we also had other investigations going on at that time until the wire commenced.

Q    Until -- until May of 2005?

A    Correct.

Q    But it was an active investigation by various agencies within the Federal Government during that period of time, is that correct?

A    Yes.

Q    And some of the things that were done in 2004 were surveillances, right?

A    Yes, limited.

Q    Huh?

A    Limited surveillances, but, yes.

Q    Interviews?

A    Correct.

Q    Well, when you say limited, what do you mean by limited?

A    We didn't have the luxury of a -- live time intelligence of where some of our targets were, so limited is in terms of can we find them or not.  It's kind of fishing in the dark at that point.

Q    Okay.  And that was done for a number of months, correct?

A    Correct.

Q    Okay.  And when -- when you do surveillance with the

Harrison (McM)

1    Federal Government, we've heard the term surveillance, and I

2    know that obviously means putting your eyes and looking at

3    people, but I also am aware from prior experience that

4    surveillance often takes the form of not just your eyes but

5    photographs, is that correct?

6    A    In some instances, correct.

7    Q    And in some instances, it takes the form of videotapes,

8    correct?

9    A    Yes, sir.

10   Q    Okay.  And you've done that before, have you not?

11   A    Yes.

12   Q    Showing suspects coming out of locations, going into

13   locations, carrying items in, not carrying items out.  That's

14   -- that's not anything unusual to be done in the course of a

15   Government surveillance, is that correct?

16   A    It depends on the surveillance circumstance, that's

17   correct.

18   Q    Okay.

19   A    It may or may not be done.

20   Q    It may or may not be done, but it -- it's certainly not

21   something strange to the Federal Government to do that type of

22   surveillance, is it?

23   A    No.

24   Q    Okay.  And in this particular case, and you've talked to

25   the jury here today on many questions by Mr. Lloret regarding

Harrison - Cross (MoM)

surveillance that you did, okay, and I know you can only speak

to what you did, so that's all I'm going to ask you about.

In the surveillance that you did over the course of

a year, okay, and I know it started more limited and then,

obviously, got more intense, but during that year period of

time, in all the surveillances you did, and they weren't all

just Essex Avenue. They were various locations, correct?

A  Yes, sir, over -- covered over three states.

Q  And did you do some at all of those places maybe?

A  Possibly.

Q  Okay. And what I would like to ask you is, in the course

of that year and all those various locations, how many people

did you work with in surveillance?

A  Sometimes myself; sometimes two or three others maybe.

Q  But when I say work in surveillance, that would be at one

particular target or one particular person that you may be

following. Would there be other agents doing other things,

surveilling other people at that same time?

A  Yes. Due to our limited resources and -- we can't conduct

surveillance 24 hours a day. We would actually --

Q  Oh, I understand that, I understand that.

A  -- we would participate in certain surveillances,

sometimes solo --

Q  Right.

A  -- by yourself; sometimes with other agents or other

Harrison - Cross (McM)                               169

1    agents accompanying you.

2    Q    Okay.  Now, during the year of surveillance that you

3    undertook, how many photographs did you take in the course of

4    your year-long Government surveillance in connection with this

5    case?

6    A    How many photographs?

7    Q    Yeah, yeah.

8    A    Oh, probably no photographs.

9    Q    No photographs at all?

10   A    No.

11   Q    Okay.  In the course of your surveillance over a year, how

12   many videotapes did you take?

13   A    Several videotapes.

14   Q    Okay.  Of which locations did you take?

15   A    I don't have it offhand, I don't know the exact locations.

16   Q    Well, how about --

17   A    Some related to the charts.

18   Q    Okay.  Well, was Essex Avenue one of the places that were

19   videotaped?

20   A    I believe we have a videotape on one particular occasion.

21   Q    On one particular --

22   A    One incidence of Essex, correct.

23   Q    Okay.  And do you know when that was?

24   A    No, I do not.

25   Q    Did you take it?

Harrison - Cross (McM)                          170

1    A    No, I did not.

2    Q    Okay.  So my question to you, though, I think, was -- were

3    you there when it was taken?

4    A    I don't recall.  I don't believe I was at that time.

5    Q    Well, my question to you was what you did, and my question

6    is, did you take any videotapes of any location --

7    A    No, I did not.

8    Q    -- in your surveillance?

9    A    Not -- not at Essex.

10   Q    Well, any location --

11   A    Yes.

12   Q    -- did you?

13   A    Yes, other locations, yes.

14   Q    Okay.  And you did not use a camera to take any

15   photographs of any of these locations of people coming in or

16   out, did you?

17   A    No, I did not.

18   Q    Okay.  And did you take any photographs of Essex?

19   A    Photographs?

20   Q    Photographs of Essex in a surveillance mode.  I know we

21   saw pictures of it, of a house, and we saw various diagrams of

22   where it is and whatnot and numerous pictures of that.  What

23   I'm talking about is surveillance photographs.

24   A    I did not -- I was probably on foot mostly around Essex.

25   I was actually on foot --

1  Q    Okay.

2  A    -- when I did surveillance there, so I would not be able

3  to take video or photographs.

4  Q    Okay.  Now, how many times did you observe my client, Tim

5  Baukman, in all your surveillances at Essex Avenue?

6  A    I personally did not.

7  Q    Zero?

8  A    Surveillance wasn't conducted 24 hours, but I --

9  Q    Listen to my question.  I'm not --

10  A    -- I personally did not.

11  Q    -- listen to my question to you, and my question is you.

12  You talked about surveillance, and I'm only speaking about --

13  and I preface my questions to you -- I know there's a lot of

14  other people, and if they have other people that -- they'll

15  come forward.  I'm talking about you.

16          MR. LLORET:  Objection, Your Honor.  The witness

17  answered he personally did not.

18          MR. McMAHON:  Well, let me finish the question,

19  because he --

20          THE COURT:  Ask the question, Mr. --

21          MR. McMAHON:  Okay.

22  BY MR. McMAHON:

23  Q    The question is, did you ever observe in any of your

24  surveillance of Essex Avenue, did you ever observe my client,

25  Timothy Baukman, at that location?

Harrison - Cross (McM)                                    172

1    A    I personally did not, no.

2    Q    Okay.  How many times did you go to Essex Avenue in

3    surveillance?

4    A    I don't have an exact number, but I -- I imagine we were

5    there 20, 30 times.  That's just a guess.

6    Q    And -- and when of those 20 or 30 times, working backwards

7    from the date of the raid of August the 10th, were they in

8    close proximity to that?

9    A    Within a month or two.

10   Q    Within a month or two?

11   A    And they were limited times, only for a few minutes at a

12   time.

13   Q    Okay.  And in that month or two, in 20 to 30 times of

14   surveillance of this location, Essex Avenue, the defendant,

15   Timothy Baukman, was never seen by you, correct?

16   A    Correct.

17   Q    Okay.  Would these surveillances go at different times of

18   the day and night, sometimes in the morning, sometimes

19   afternoon and sometimes at night, correct?

20   A    Depending on the calls, correct.

21   Q    Right.  And so what you're saying, during that period of

22   time when the surveillance was a bit more intense, it was

23   responding to various phone calls, correct?

24   A    Correct.

25   Q    And you may get dispatched by the -- by the -- the room

Harrison - Cross (McM)                                        173

1   that was doing the monitoring, correct?

2   A    Correct.  We were dispatched from 2nd and Chestnut, so we

3   had a little bit of a drive to get out there.

4   Q    Okay.  But that would be in response to something that

5   they were monitoring about phone calls, correct?

6   A    Correct.

7   Q    And that would account for possibly 20 of the 30 times

8   that you went to Essex Avenue, correct?

9   A    Not all, but some.

10  Q    A lot of them, right?

11  A    Some.

12  Q    And in responding to those phone calls that the main

13  control center, so to speak, was sending you out on, in

14  responding to those phone calls, never in response to any of

15  those phone calls did you see Tim Baukman, did you?

16  A    I personally did not.

17  Q    Okay.  Now, taking away Essex Avenue for just a second

18  since we have all the different spots all over the Delaware

19  Valley, so to speak, how many times did you surveil Tim

20  Baukman at any of those other locations?

21  A    School House Lane, 2967 School House Lane.

22  Q    Okay.  And that's where he lived, right?

23  A    Correct.

24  Q    Okay.  Okay.  And how many times did you see him there?

25  A    Just a handful.  I don't have the exact number.

Harrison - Cross (McM)                                      174

1    Q    A handful.  Okay.  And do we have any photographs or

2    pictures of that?

3    A    I do not.

4    Q    Okay.  So you saw him a couple times, maybe a handful of

5    times, at the place where he lived, and that's the extent of

6    your surveillance of Timothy Baukman, correct?

7    A    Of my surveillance --

8    Q    Yeah.

9    A    -- yes, sir.

10   Q    Okay.  And so out of all these locations that -- that Mr.

11   Lloret referred to on the two charts, the first one which is

12   the chart of just Philadelphia, which has one, two, three,

13   four, five, six, seven, eight, nine -- I think 14 different

14   locations, and then this one that adds different locations in

15   the surrounding area, the only places that -- that you

16   observed Timothy Baukman was the one location out of all

17   those, and that is School House Lane where he lived, right?

18   A    That's not correct.

19   Q    Where did you see him?

20   A    We saw him at Spring -- the address on Springfield.

21   Q    Which is the studio, right?

22   A    Correct.

23   Q    Okay.

24   A    We've seen him at a gas station --

25   Q    No, no, no.  I want you to just refrain from --

1   A    I was just answering the question that you asked.

2   Q    -- no, I'm going to just rephrase.  I don't want "we".  If

3   it's you, that's fine.  You can --

4   A    I -- I saw him.

5   Q    Okay.  And you saw him where else?

6   A    We also -- I also saw him at a gas station --

7   Q    Okay.

8   A    -- down in Southwest Philadelphia, several other

9   locations.

10  Q    Which ones?

11  A    May I reference the chart?

12  Q    Sure, yeah.  That's -- that's what it's for.

13  A    I'll just give you approximate location since it's not a

14  detailed -- there's a gas station here.  I believe it's around

15  70th Street (phonetic).  I'm not sure of the exact street

16  where we saw him meeting with Alton Coles.

17  Q    Okay.

18  A    And that also is Springfield Avenue, and that would be the

19  limited role of my surveillance.

20  Q    Okay.  And I take it you made reports of that?

21  A    Yes.

22  Q    Okay.  Now, you indicated that in the search of Essex

23  Avenue, the first time that this was gone into or entered into

24  by law enforcement was on August the 10th of 2005, is that

25  correct?

1    A   That's correct.

2    Q   Okay.  And when you went in and did that search, there was

3    no one home at that time, there was no one -- no human beings

4    inside the premises, is that fair to say?

5    A   At that time, nobody was home.

6    Q   Okay.  And when you went into the premises, as you've

7    indicated, there's two bedrooms, one bath, a living room,

8    right?

9    A   And a kitchen.

10   Q   And there was a big screen TV in there, was there not?

11   A   Yes.

12   Q   Okay.  There was a DVD player in there also?

13   A   I don't recall if there was a DVD player.

14   Q   Okay.  But there was a big screen TV, a couch, and a

15   coffee table in the living room, right?

16   A   Correct.

17   Q   Bedroom, there was a bedroom -- a bed, a dresser and safes

18   in each of the rooms, correct?

19   A   Correct.

20   Q   Okay.  And in the kitchen, there was a table and trash

21   can, correct?

22   A   Correct.

23   Q   All right.  Now, you indicated that you confiscated -- you

24   saw a whole litany of things that were mentioned here today

25   that were found inside that location.  Now, after you took

1   these items, okay, after you seized these items and I take it

2   that you -- when you seized them as the Government, you seize

3   them in a proper way to keep them, as best you can, pristine

4   evidentiary-wise, is that correct?

5   A    Pristine as in --

6   Q    Well, I mean --

7   A    -- we have to move it.  Is that what you mean?

8   Q    Well, you have to move it, but you don't -- I mean, you

9   put them into bags and whatnot, correct?

10  A    Right, right.

11  Q    Okay.  You don't just take them and throw them in your

12  pocket, right?

13  A    No.

14  Q    All right.  There's many -- there are evidence bags,

15  right?

16  A    There's plastic bags that we used.

17  Q    And were used -- and you put them in there, right?

18  A    Yes.

19  Q    Okay.  And did you use gloves when you were doing this?

20  A    Yes.

21  Q    Okay.  And so -- and did all the other agents use gloves

22  in doing this?

23  A    Yes, especially with the substance that's floating around,

24  definitely.

25  Q    Sure, sure.  And these items were placed into the bags,

Harrison - Cross (McM)                                        178

1    and they were taken out of Essex Avenue, correct?

2    A    Yes.

3    Q    And when they leave Essex Avenue, where do they go?

4    A    They go back to our office at 2nd and Chestnut Street.

5    Q    And what's the office -- of who?

6    A    The Bureau of Alcohol, Tobacco, Firearms and Explosives.

7    Q    Okay.  And now they get there, and where do they go after

8    that?

9    A    They're turned over to the case agent.

10   Q    The case agent.  Okay.  And that would be who?

11   A    Mike Ricko.

12   Q    Mike Ricko.  And who does he work -- ATF also?

13   A    Yes.

14   Q    Okay.

15   A    He's the case agent for this case, Bureau of Alcohol,

16   Tobacco, Firearms and Explosives.

17   Q    Okay.  Now, obviously, we saw numerous firearms.  We saw

18   them in a safe, various things we saw here, scales, various

19   things, packaging, packages and whatnot.  Were they -- and you

20   talked about a powdery substance on lots of them, and let's

21   start off with say the bags.  Were they forensically tested in

22   any fashion?

23   A    No, they were not, other than a Chem Lab report from DEA

24   or --

25   Q    A Chem Lab report as to the powdery substance?

1    A    -- or a narcotics field officer would actually field test

2    the substance that was recovered.

3    Q    Okay.  Well, when I say forensically tested, let's -- just

4    so the ladies and gentlemen of the jury are clear what I mean,

5    forensically tested would be, given to other agencies within

6    the Federal Government for scientific analysis, is that

7    correct?  That's possible, correct?

8    A    Is that your definition, is that what you're --

9    Q    Yeah, for --

10   A    -- that was your forensically tested?

11   Q    -- for analysis forensically of various other forensic

12   services that the FBI, the ATF and the United States

13   Government possesses, correct?

14   A    I don't understand the question.

15   Q    All right.  Well, for example, there are -- the FBI and

16   the Federal Government has the availability of fingerprint

17   analysis, is that correct?

18   A    Correct.

19   Q    Okay.  They have a lab, right?

20   A    Correct.

21   Q    Fingerprint analysis is done many times, correct?

22   A    Yes, correct.

23   Q    Okay.  And we had many items that -- that the Government

24   here is attributing to certain people, right?  These items

25   were presumably possessed by someone, correct?

Harrison - Cross (McM)                              180

1    A    Yes.

2    Q    Okay.  And my question to you is, is when they were seized

3    in the way that we already talked about, were they sent to the

4    FBI fingerprint lab, for instance, for analysis to determine

5    whether perhaps Tim Baukman's fingerprints were on any of the

6    maybe hundreds of items we have here?

7    A    No, there wouldn't have been a need to, but, no, I don't

8    believe they were.

9    Q    Well, let me ask you a question.  You say there wouldn't

10   be a need to.  That's not the question I asked you.  Did you

11   do that?

12   A    I personally did not.

13   Q    Okay.

14   A    I'm not the case agent.

15   Q    Were you aware of whether that was done or not?

16   A    I'm not aware of it, but I don't believe it was.

17   Q    You don't believe it was.  Okay.  As to any of the items

18   that were supposedly taken from that situation, is that

19   correct?

20   A    No.

21   Q    Okay.

22            THE COURT:  Is that -- is that correct?  No.

23            THE WITNESS:  That's correct, no, they were not.

24   BY MR. McMAHON:

25   Q    How about the safe?  The safe, was that -- you know,

1    obviously someone has to -- there was items inside the safe,

2    right?

3    A    That came back to Tim Baukman, yes.

4              MR. McMAHON:  Your Honor, if you would ask the

5    witness --

6              THE COURT:  Simply answer the questions.  Do you

7    understand?

8              THE WITNESS:  Yes, there were items inside.

9    BY MR. McMAHON:

10   Q    That was my question, wasn't it?

11   A    Yes.

12   Q    So why did you feel compelled to throw that in there?

13             THE COURT:  Mr. -- Mr. McMahon --

14             MR. McMAHON:  I understand, Your Honor.

15             THE COURT:  -- ask your next question.

16             MR. McMAHON:  I will.

17   BY MR. McMAHON:

18   Q    Well, there's a safe and there are items inside of it, so

19   somebody obviously had to open that safe and put items into

20   it, correct?

21   A    Correct.

22   Q    Okay.  Now, and there were two safes with items inside of

23   them, correct?

24   A    Yes.

25   Q    All right.  Now, did anybody within the FBI, United States

1   Government, attempt to determine whether -- or any

2   fingerprints to open that up of people that have been using

3   that on a daily basis possibly?

4   A    I don't believe so.

5   Q    Okay.  So no -- was any forensic crime lab people brought

6   into Essex Avenue to do any type of investigation inside there

7   such as fingerprinting, DNA, anything of the sort?

8   A    Forensics, no.

9   Q    So nothing -- nothing was done as far as hair fibers,

10  analysis of anything in there to show who was in there or who

11  had been in there, is that correct?

12  A    No, there was not.

13  Q    Now, you've indicated that there was a surveillance that

14  you talked about at 1400 Clearfield.

15  A    Clearview -- that's Clearview.

16  Q    Clearview.  Was my client ever seen by you at Clearview?

17  A    Not by me, no.

18  Q    Okay.  Now, you indicated that there was a card of mine in

19  that safe, is that correct?

20  A    That's correct.

21  Q    And may I see that?  Is that --

22           MR. McMAHON:  If we could put it on the screen, that

23  would be better, if that could be done.

24           (Pause in proceedings.)

25           MR. McMAHON:  Thank you.

Harrison - Cross (McM)                                183

1    BY MR. McMAHON:

2    Q    Now, that's the front that has a -- my identifying

3    information on it, is that correct?

4    A    Yes, correct.

5            MR. McMAHON:  And let's flip it over to whatever

6    that number is on the -- on the back side.  T2 if you don't

7    mind.  Okay.

8    BY MR. McMAHON:

9    Q    And there's some handwriting on the back of there and it

10   indicates received 1,500 from Tim Baukman for Dante Scott.  Do

11   you know who Dante Scott is?

12   A    No, I do not.

13   Q    Okay.  And but the date on this -- now, this search was in

14   August of '05, correct?

15   A    August 10th, '05, that's correct.

16   Q    Okay.  And this card that is dated by a person by the name

17   of Padden (phonetic) or it appears to be Padden, is dated 5-1-

18   2002, over three years before this search, is that correct?

19   A    That's what it says, correct.

20   Q    And so you have no idea how long that card had even -- had

21   been in there?

22   A    Some time since --

23   Q    2002, right?

24   A    -- through 2005, correct --

25   Q    Right.

1    A    -- it was placed inside.

2    Q    And whether it was placed in there 5-2 of 2002, you just

3    don't know, correct?

4    A    Correct.

5    Q    Okay.  And the --

6              (Pause in proceedings.)

7    BY MR. McMAHON:

8    Q    These have been -- were marked by Mr. Lloret after the

9    luncheon break as 525U, V, W, X, Y and Z.  These were PECO

10   bills -- one, two, three PECO bills, and these PECO bills were

11   made out to Tauheed Baukman, correct?

12   A    Correct.

13   Q    Now, three of them in a row -- none of them have been

14   opened, is that correct?

15   A    That's correct.

16   Q    Okay.  So these bills were in the premises but they had

17   never been opened or dealt with at least as far as you could

18   see, correct?

19   A    That's correct.

20   Q    And there's another bill from Aqua which is a water

21   department -- water to Tauheed Baukman, and that's never been

22   opened either, is that correct?

23   A    That's correct.

24   Q    And Security Watch dated July of '05 on the postmark.

25   That also has never been opened.  None of these things were

Harrison - Cross (McM)                                     185

1    opened at all, is that correct?

2    A    Correct.

3    Q    And it appears -- at least the Security Watch is July

4    15th.  The Aqua is July 22nd, all -- both of '05, and the PECO

5    we can't tell because they don't have a postmark there -- with

6    PECO's logo on them, so -- and then we also have 525Z which is

7    a Postal Service memo that appears that on 7-21 of '05, a

8    piece of mail was brought to that location for Tauheed

9    Baukman, but no one was there to pick it up, because they left

10   this slip, correct?

11   A    That's probably what happened.

12   Q    Okay.  And do you know whether this -- and this date is

13   July 21st, and you searched on August the 10th, over two weeks

14   later, and this item was still there and hadn't been redeemed

15   for the piece of mail that it was, is that correct?

16   A    It hadn't been redeemed, correct.

17   Q    Right.  So it was -- from the time it was left at that

18   location, 7-21, it had not been taken to where it's -- the

19   directions are, the Lansdowne Post Office, to go to, correct?

20   A    Had not been taken --

21   Q    Right.

22   A    -- yeah, that's correct.

23   Q    So the mail hadn't been opened that you found, and the

24   letter that was left there or attempted to be left there, was

25   not picked up from that location, is that correct?

1    A    I'm sorry, had -- was --

2    Q    The mail had not been opened --

3    A    -- the mail been picked up?

4    Q    -- that you recovered, and the letter that had been

5    attempted to be delivered some two weeks prior had not, at

6    least as far as this receipt goes, not been picked up either,

7    is that correct?

8    A    That would be correct.

9    Q    Okay.  Now, the videotape that you picked up pictures of

10   Mr. Baukman on, did that -- that was a homemade videotape,

11   correct?

12   A    Yes, homemade.

13   Q    Okay.  And did that have any date on it at all as to when

14   that was made?

15   A    No, it did not.

16   Q    Okay.  So you don't know when in the course of the time

17   inside Essex Avenue that was made?

18   A    No, I do not.

19   Q    Could you tell where the location was that the tape was

20   made?  Could you tell that it was inside Essex Avenue or

21   somewhere else?

22   A    I could not tell.

23   Q    Okay.  Now, the red book which you referred to, where was

24   that exactly?

25   A    If I could refer to my notes --

Harrison - Cross (McM)                           187

1    Q    Yeah, sure, yeah, yeah --

2    A    -- I'd give you the exact location.

3    Q    -- definitely.

4              THE COURT:  What's the exhibit number?

5              MR. McMAHON:  This would be Exhibit 525HHH.

6              (Pause in proceedings.)

7              THE WITNESS:  That was taken from the bedroom.

8    BY MR. McMAHON:

9    Q    Where in the bedroom?

10   A    On top of the dresser.

11   Q    On top of the dresser.  Okay.  And the part that you

12   referred to as --

13   A    I'm sorry, the first bedroom, to be more specific for you,

14   the first bedroom --

15   Q    Okay.

16   A    -- which was the one on the left.

17   Q    Okay.  And in referring to --

18             MR. McMAHON:  May I approach, Your Honor?

19             THE COURT:  Yes.

20   BY MR. McMAHON:

21   Q    You refer to tally work or something to that effect as

22   reflected in the first one, two, three pages, is that correct?

23   A    That's correct.

24   Q    Okay.  And there's writing here with cross-outs as to

25   numbers, correct?

Harrison - Cross (McM)                    188

1    A    Correct.

2    Q    And they give initials to possibly indicate who the

3    persons are, correct?

4    A    That's correct.

5    Q    Okay.  And that's on the second page, and it's on the

6    third page, is that correct?

7    A    Correct.  Again, they're crossed out and readjusted,

8    correct.

9    Q    Okay.  And do you know whose handwriting this is?

10   A    Oh, no, I do not.

11   Q    Well, has the FBI or the Federal Government attempted to

12   ascertain through handwriting exemplars or something whose

13   writing this is or who was doing the tally work so that we

14   could know that or this jury could know that?

15   A    No.

16   Q    Okay.  And there's writing on the back of it, some sort of

17   -- some sort of -- I don't know, some sort of writing.  Do you

18   know whose writing that is?

19   A    No, I do not.

20   Q    And was that examined by anyone within the Federal

21   Government?  You do have handwriting people within the Federal

22   Government, do you not?

23   A    Yes.

24   Q    Okay.  And this is handwriting, is it not?

25   A    That's correct.

1    Q    Okay.  And it's certainly somewhat important who wrote

2    this, is it not?

3    A    Correct.

4    Q    Okay.  Yet nothing's been done to try to ascertain that

5    for the ladies and gentlemen of the jury, correct?

6    A    There was no need to, correct.

7    Q    Oh, there was no need to.  Sure.  Why would that be

8    important?

9            MR. LLORET:  Objection, Your Honor.  Is that a

10   question?

11           THE COURT:  Sustained.

12   BY MR. McMAHON:

13   Q    Now, when you say there was no food in the refrigerator,

14   was there food in any of the cabinets or anywhere in there?

15   A    Off the top of my head, I believe there was a bottle of

16   syrup.

17   Q    That was it?

18   A    That was it.

19   Q    Okay.

20   A    Off the top of my head, I'm not certain --

21   Q    Okay.

22   A    -- but at the most --

23   Q    Did there appear to be any clothes anywhere in there?

24   A    No.

25   Q    No, no boxes of clothes, no -- nothing of any clothing

1    there at all?

2    A    No, there was not.

3    Q    Okay.  The electric was working, though, right?

4    A    Yes.

5    Q    And there was furniture and a big screen TV, correct?

6    A    There was one couch and a TV.

7    Q    Okay.  Did the bed have bedding on it?

8    A    I believe it had a sheet.

9    Q    Okay.

10   A    I don't recall a pillow.

11   Q    Did you take pictures of that bedroom?

12   A    I believe so.

13   Q    Okay.  And once you left the location, that is, your

14   searchers and your assistants that you had in searching that

15   location, did anybody from the Federal Government go back to

16   that location for any further analysis or tests or anything to

17   your knowledge?

18   A    Just for an interview, not for analysis.

19   Q    Okay.  Nothing -- no forensic tests were done after you

20   left, is that correct, to your knowledge today?

21   A    To the best of my knowledge, no.

22   Q    Okay.

23              MR. McMAHON:  One second, Your Honor.

24              (Pause in proceedings.)

25              MR. McMAHON:  I have no other questions, Your Honor.

1    Thank you very much.

2                    THE COURT:  Mr. Warren.

3                    MR. WARREN:  Thank you, Judge.

4                        CROSS-EXAMINATION

5    BY MR. WARREN:

6    Q    Good afternoon, Agent Harrison.  How are you doing?

7    A    Good afternoon, sir.

8    Q    All right.  I'd like to pick up a little bit where Mr.

9    McMahon left off.  I think you told us in response to one of

10   his questions that the investigation began in August of 2004?

11   A    To my recollection -- or my participation, yes.

12   Q    Your -- your participation began in August of 2004.  Do

13   you know whether or not it began early --

14   A    I believe it was --

15   Q    -- as it involved my client?

16   A    -- ongoing.

17   Q    Ongoing.  Do you know when it began with respect to my

18   client?

19   A    Approximately 2002.

20   Q    2002.  Okay.  So by 2005, that had been three years that

21   it had been ongoing?

22   A    I wouldn't say full-time ongoing, but it was -- we have

23   known about Alton Coles for approximately a few years before.

24   Q    All right.  And you told us on direct examination that

25   some of the sources of that information involved interviewing

1    cooperating sources, is that right?

2    A    Yes.

3    Q    Now, cooperating sources are also referred to as

4    informants, are they not?

5    A    Depends.

6    Q    Depends.  Well, an ATF informant was interviewed in this

7    case, wasn't he?

8    A    Yes.

9    Q    Okay.  And an informant is somebody who provides

10   information to a Federal agency sometimes if he's in trouble,

11   right?

12   A    Sometimes if they're not, correct.

13   Q    Or in exchange for money, correct?

14   A    Correct.

15   Q    Okay.  So these are individuals who could be paid by the

16   Federal Government in exchange for information, correct?

17   A    Not paid as salary; they will be paid subsistence to help

18   them operate while they are acting under our control.

19   Q    Right.  So they get money in exchange for helping out the

20   Federal Government, right?

21   A    They get money to cover their expenses while they're

22   operating under our control, correct.

23   Q    Maybe it was --

24   A    That's correct.

25   Q    -- maybe it was the way -- they get money from the Federal

1    Government for helping the Federal Government, right?

2    A    To pay for their expenses, yes.

3    Q    Okay.  All right.  Sometimes individuals become informants

4    because they're in trouble, correct?

5    A    That can be the case.

6    Q    And what they're looking for there is help with their own

7    criminal troubles, right?

8    A    May or may not be; it's up to each individual.

9    Q    Okay.  Let me try it again.  Sometimes these individuals

10   are in criminal trouble, are they not?

11   A    Yes.

12   Q    And they agree to help the Federal Government because they

13   want to get out of criminal trouble, right?

14   A    They're not going to get out of trouble, but they will

15   cooperate with the Government.

16   Q    And they want the Government's help with respect to their

17   criminal trouble, right?

18   A    Correct.

19   Q    All right.  So we have individuals who receive money.  I

20   understand it's just for subsistence, but we have individuals

21   who receive money for providing information, right?

22   A    Correct.

23   Q    And individuals who are looking to help themselves because

24   they are in criminal trouble, correct?

25   A    Co-defendants, correct.

```
 1  Q   Co-defendants.  As well as informants, right?

 2  A   Informants, correct.

 3  Q   Okay.  All right.  Now, you primarily testified about the

 4  events on August 10th, 2005, did you not?

 5  A   Yes.

 6  Q   All right.  And you told us, at least at the beginning,

 7  that initially you had surveillance of my client's house in

 8  Mullica Hill, New Jersey, right?

 9  A   Yes.

10  Q   Okay.  What time did you begin surveilling -- when I say

11  surveilling -- what time did you begin watching my client's

12  house?

13  A   We begin watching -- myself and Agent Pollock who was my

14  partner at the time -- begin probably early in the morning the

15  day prior --

16  Q   Okay.

17  A   -- on August 9th.  I don't have an exact time.

18  Q   All right.  Okay.  In the morning, August 9th?

19  A   Mid -- early morning, afternoon, I'm not sure of the exact

20  time.

21  Q   All right.  Well, how long were you there?

22  A   Approximately 15 to 20 hours.

23  Q   All right.  You were there for 15 to 20 hours?

24  A   Yes.

25  Q   All right.  Did you actually see him come into the house
```

1    in Mullica Hill?

2    A    At night, yes, we did.

3    Q    All right.  What time at night did you see him come home?

4    A    I don't recall the exact time.

5    Q    All right.  Well, was it before midnight, after midnight,

6    do you have any idea?

7    A    It was before midnight.

8    Q    Okay.  How long before midnight?

9    A    I don't recall --

10   Q    All right.

11   A    -- the exact amount.  It was -- it was dark when he --

12   when they showed up.

13   Q    It was dark when he showed up.  All right.  And this was

14   in the summertime?

15   A    Yes.

16   Q    All right.  And it gets dark in the summertime some time

17   around 9:00, is that right?

18   A    Approximately.

19   Q    So it certainly would have been after 9:00 p.m. on the

20   night of August 9th, 2005?

21   A    Correct.

22   Q    All right.  Do you know where he was at before then?

23   A    No, I do not.

24   Q    All right.  He went into the house, right?

25   A    Yes.

1   Q    And you said you saw lights on at least until what, 2:00,

2   3:00 in the morning?

3   A    Around 3:00 in the morning.

4   Q    Okay.  Were these lights on all night or did you see them

5   go on?

6   A    They were on all night.

7   Q    Okay.

8   A    I saw them go off around 3:00 in the morning.

9   Q    You saw them go off around 3:00 in the morning?

10  A    Yes.

11  Q    All right.  They were on all night?

12  A    Mostly.

13  Q    Okay.  From the point it got dark till around what, 9:00,

14  they were on?

15  A    The point it got dark until 9:00.

16  Q    I'm sorry.  From the point on August 9th where it got

17  dark, were the lights in the house on?

18  A    In one room or another, there was some kind of activity, a

19  light, TV or room.

20  Q    All right.  And you say you saw the lights go off around

21  3:00 in the morning?

22  A    All the lights went off around 3:00 in the morning.

23  Q    All right.  All the lights went off around 3:00 in the

24  morning.  Now, you also told us that in addition to my client,

25  Asya Richardson was there?

1    A    Yes, sir.

2    Q    There were two kids.  How old were these kids?

3    A    I don't recall.  I didn't have interaction with the kids.

4    Q    Okay.  All right.  But he certainly didn't leave the place

5    that night, right?

6    A    I don't believe so.

7    Q    All right.

8    A    Not under my watch.

9    Q    Okay.  You spent a great deal of time talking about

10   weapons and other items that were found at 339 Essex Avenue,

11   right?

12   A    Yes.  That's what was recovered at Essex.

13   Q    All right.  Now, let me ask you this.  Some of these

14   weapons, I understand they had obliterated serial numbers,

15   right?

16   A    I believe one did.

17   Q    One did?

18   A    Just one.

19   Q    Did the other weapons have serial numbers?

20   A    Most -- yeah, they -- they should have a serial number.

21   Q    Okay.  And the purpose of a serial number I think you told

22   us is so that you can do a check and see who the gun is

23   registered to, is that right?

24   A    The initial purchaser.

25   Q    Right.

1   A    Correct.

2   Q    Was that done with respect to these weapons on which there

3   were serial numbers?

4   A    I believe they were.  I didn't do it myself.

5   Q    Okay.  Do you know who they came back registered to?

6   A    Again, I didn't do the records check, so I don't know.

7   Q    Okay.  All right.  And all of these weapons, save one, had

8   serial numbers on them?

9   A    Except the one that was scratched.

10  Q    Okay.  Except the one that was obliterated?

11  A    Obliterated.

12  Q    Okay.  And which one was that one?

13  A    I believe it was the TEC-9 or the M-11, I'm not sure which

14  one.

15  Q    Okay.  Do you know whether or not anybody ever checked the

16  registration on the guns that they could check it on?

17  A    Again, I didn't -- I didn't do it.

18  Q    Okay.  Do you know whether or not somebody in the Federal

19  Government did that?

20  A    I'm sure there was a check done.  I just don't know who.

21  Q    Okay.  Okay.  Now, all this stuff that was found here in

22  Essex Avenue, that was August 10th, 2005, right?

23  A    Yes.

24  Q    All right.  Do you know how long all of this stuff had

25  been inside 339 Essex Avenue prior to August 10th, 2005?

1   A   No, I do not.

2   Q   Do you know who put it there?

3   A   I can safely say --

4   Q   Well, I'm asking you, do you personally know who put the

5   stuff in there?

6   A   No, I do not, not personally.

7   Q   Okay.  You have no idea personally who put the guns in

8   there, right?

9   A   No.

10  Q   You have no idea personally who put all of these other

11  items that you identified on direct examination into the

12  apartment there, do you?

13  A   I never saw a specific item brought in on that table --

14  Q   Okay.

15  A   -- not the firearms, correct.

16  Q   Right.  So in short, for all you know -- for all you know

17  -- the stuff could have been put there on August 9th, 2005,

18  right?

19  A   Possibly.

20  Q   Right.  You certainly can't tell us that the stuff was

21  there on July 26th, 2005, right?

22  A   No, I cannot.

23  Q   All right.  Now, you also testified about some

24  surveillance you did on Clearview Street.  Do you remember

25  that?

Harrison - Cross (War)                                    200

1    A    Yes.

2    Q    And I think the first date you spoke of was June 16th,

3    2005?

4    A    Yes.

5    Q    Well, let me ask you this.  You surveilled Essex Avenue?

6    A    Essex Avenue?

7    Q    Yes.

8    A    Yes.

9    Q    And I think you told Mr. McMahon you did that about 20 or

10   30 times, is that right?

11   A    Approximate number, correct.

12   Q    Okay.  Did you ever see my client at Essex Avenue?

13   A    I did not.

14   Q    Okay.  Let me ask you this.  All right.  Turning back to

15   the Clearview Street address, on June 16th, I think you told

16   us you observed a silver Dodge Magnum, is that right?

17   A    Yes.

18   Q    And there's no mystery here.  You prepare what are called

19   surveillance reports, right?

20   A    Yes.

21   Q    All right.  So what happens is, you go out and you and a

22   fellow agent will surveil or watch a particular location,

23   right?

24   A    Yes.

25   Q    And then at some point in time -- are you making

Harrison - Cross (War)                                     201

1    handwritten notes as you're watching what's happening?

2    A    Sometimes we are; sometimes we're driving and we don't.

3    Q    Okay.  But at a later point in time, do you either dictate

4    or cause to be prepared a formal typewritten report?

5    A    On most occasions, yes.

6    Q    Okay.  And those in turn -- and then you get an

7    opportunity to take a look at them, review them, right?

8    A    Yes.

9    Q    Okay.  And, in fact, there is a surveillance report for

10   the surveillance that took place on June 16th, 2005, isn't

11   there?

12   A    Yes.

13   Q    Okay.  In that report, it makes reference to a silver

14   Dodge Magnum bearing Pennsylvania tag F as in Frank, V as in

15   Victor, C as in Charlie, 5430.  Does that refresh your

16   recollection?

17   A    If I can reference my report?

18   Q    Sure, take a look at it, please.  I'm referring to

19   paragraph one.

20   A    That's correct.

21   Q    All right.  Now, you told us on direct examination in

22   response to one of Mr. Lloret's questions, that that car was

23   either leased or controlled by Alton Coles.  Do you remember

24   that?

25   A    Yes.

1    Q    Who's that car registered to?

2    A    I don't have that information.

3    Q    Okay.  Well, do you know whether or not it's registered to

4    Mr. Coles?

5    A    I don't know.  The case agent would know.

6    Q    Okay.  Well, when you say it was leased or controlled by

7    Alton Coles, is that information that you developed yourself?

8    A    Every time I saw Alton Coles, he was in that vehicle --

9    Q    Wasn't he in a Lincoln?

10   A    -- or next to the vehicle.  That was prior to this one.

11   Q    Okay.  So when you say every time you saw him, he was in

12   that Magnum?

13   A    Not every time I saw him.  Most of the times when he was

14   driving a car, it would have been a Dodge Magnum.

15   Q    Okay.  Did you see any other people driving that car?

16   A    The Magnum?

17   Q    Yeah.

18   A    No, I did not.

19   Q    Okay.  So that's why you said that it was controlled by

20   him?

21   A    Yes.

22   Q    Okay.  Even if you don't know if it's leased by him or

23   owned by him, you saw him driving the car, right?

24   A    On numerous occasions, yes.

25   Q    All right.  And that's the reason for your statement on

1    direct examination?

2    A    Correct.

3    Q    Okay.  I was just trying to figure out how you -- how you

4    said that.

5              MR. WARREN:   Could we have a look at 512N, please.

6    BY MR. WARREN:

7    Q    All right.  Do you remember this photograph?

8    A    Yes.

9    Q    Now, you told us that this was the individual you saw in

10   the area of the Clearview Street on, what, June 16th, 2005,

11   that was the guy?

12   A    It's a -- it resembles him, yes.

13   Q    Well, is that the guy or not?

14   A    It's a picture that resembles him very similar -- these

15   guys are very similar.

16   Q    These guys are very similar?

17   A    This is -- this is very similar to the picture that I

18   observed the defendant, which was at the time two and a half

19   years ago.

20   Q    All right.  Well, I'm just asking you --

21   A    And that was Ahmen Wiggins (phonetic).

22   Q    All right.  Well, you told Mr. Lloret on direct

23   examination that this was a picture of my client's brother,

24   didn't you?

25   A    Yes.

1    Q    Okay.  And then you said this was the individual that you

2    saw coming out of the Clearview Street location on June 16th,

3    2005.  That's what you told us, right?

4    A    This is a picture -- very similar.

5    Q    Is it the guy or not?

6    A    That's what I said, but it's -- it's a picture that is

7    very similar.

8    Q    Okay.  Are you telling me that you don't know whether or

9    not this is the guy you actually saw coming out of the

10   Clearview Street area?

11   A    This is a picture that's very similar, but I don't believe

12   that is Ahmen Wiggins.

13   Q    Oh, so this is not Ahmen Wiggins?

14   A    This is a picture that's very similar, and if you look at

15   the pictures we had, it's very similar to this picture --

16   Q    Okay.

17   A    -- during our surveillance, which was Ahmen Wiggins back

18   in 2005.

19   Q    All right.  All right.  Just -- this photograph, 512N, is

20   not the guy you saw coming out of the Clearview Street

21   location on June 16th, 2005?

22   A    Looking at it now, I don't believe this is actually the

23   picture.

24   Q    It's not the guy, right?

25   A    Correct.

1    Q    Somebody else, right?

2    A    I believe so.

3    Q    So you made a mistake, right?

4    A    It looks very similar, but I believe I made a mistake on

5    this picture.

6    Q    Okay.  So you made a mistake, right?

7    A    Correct.

8    Q    Okay.  All right.  Have you ever heard of a guy named D.J.

9    Chiz, C-H-I-Z?

10   A    No, I have not.

11   Q    Okay.  Who do you think this is a picture of now?

12   A    I'm sure you're going to tell me, but I don't know who

13   that is.

14   Q    Well, I'm asking you.  You're the witness, not me.

15   A    I don't --

16   Q    Do you have any idea who that's a photograph of?

17   A    No, I do not.

18   Q    Okay.

19   A    It's very similar to Ahmen Wiggins, but it's not him.

20   Q    All right.  All right.  Let's go to -- oh, let me ask you

21   this.  On June 16th, 2005, you saw the Dodge Magnum that you

22   saw my client driving earlier, right?

23   A    Yes.

24   Q    But you didn't actually see him, did you?

25   A    On June of -- June 16th?

Harrison - Cross (War)                    206

1    Q    June 16th, 2005, did you actually see him?

2    A    No, I did not.

3    Q    All right.  Let's turn to -- oh, by the way, on June 16th,

4    2005, you actually videotaped this, didn't you?

5    A    I myself did not videotape, I don't believe.  Let me --

6    Q    Look at paragraph two.

7    A    -- check the reports.

8    Q    Third line.

9    A    Yes, I did videotape this one.

10   Q    "At this time, Agent Harrison initiated videotape

11   surveillance," right?

12   A    Correct.

13   Q    Okay.  Tell us how you did that.

14   A    I had a videotape recorder videotaping, along with my

15   partner, John Bowman.

16   Q    All right.  Did you always have that videotape recorder

17   with you?

18   A    Not at all times, no.

19   Q    Okay.  How would you decide when to take the videotape

20   recorder and when to not take it?

21   A    If you were able to get a good picture, one; weather

22   conditions, if it was nighttime or if it was daytime; if we

23   were in a position to be compromised, if somebody saw us

24   videotaping out the window or through the front window or

25   through the side windows, which are tinted, it sometimes makes

1    it difficult to videotape.

2    Q    All right.  Well --

3    A    If we were moving, if we were stationary, I mean, there's

4    numerous reasons.

5    Q    Okay.  Well, let's start with this time.  Daytime or

6    nighttime, was this videotape recorded at daytime or

7    nighttime?

8    A    This was nighttime.

9    Q    9:35 p.m., so it's dark, right?

10    A    Correct.

11    Q    And you were at least able to videotape whatever it was

12    you were looking at that night on June 16th, 2005, right?

13    A    Correct.

14    Q    All right.  My original question was, is, did you always

15    have this videotape recorder with you when you were

16    surveilling Clearview Street?

17    A    No, I did not.

18    Q    Okay.  My next question was, is, what would make you

19    decide whether or not to take it with you?

20    A    If it was available, for one, I would take it.

21    Q    All right.

22    A    There might be another surveillance car.  We don't have

23    cameras per agent.  It could be another surveillance car.

24    Q    Okay.  All right.  Well, if we could go to May 29th, 2005.

25    That was the second thing you talked about, right, second

1    surveillance on direct examination of Clearview Street, right?

2    A    Yes, that's correct.

3    Q    All right.  Now, a couple questions about this Clearview

4    Street address.  Many times on direct examination you referred

5    to people going in and out of an alley, right?

6    A    Yes.

7    Q    Did you actually see what apartment, if any, anybody was

8    going into?

9    A    They were going to Apartment 520, but I did not see, no.

10   Q    My question was very simple.  Did you see them go into any

11   particular apartment?

12   A    No, I did not.

13   Q    Okay.  Then why did you feel compelled to tell us that

14   they were going to Apartment 520?

15   A    That's where they were going.

16            MR. LLORET:  Objection.  Relevance, Your Honor.

17            THE COURT:  The objection's overruled.

18   BY MR. WARREN:

19   Q    Why did you feel compelled to tell us that?

20   A    That's where they were going.

21   Q    I asked you what you saw, didn't I?

22   A    Yes.

23   Q    And you didn't see anybody go into any apartment, did you?

24   A    No, I did not.

25   Q    Yet you felt compelled to volunteer that information,

1    didn't you?

2    A    It's part of the report.

3    Q    Part of the report?  Show me --

4    A    Part of our knowledge of the investigation.

5    Q    -- show me in the report where it says what apartment they

6    went into.

7    A    It's part of our knowledge of the investigation.

8    Q    You just told me it was in the report.  Show me in the

9    report where it says what apartment they went into.

10   A    Well, the 1400 block of the Clearview, Building F.  We

11   know where they were going.

12   Q    Show me in the report where it says what apartment they

13   were going into.

14   A    It doesn't say specifically.  It says the 1400 block of

15   Clearview, Building F.

16   Q    The reason it doesn't say that is because you never saw

17   any apartment that they were going into, right?

18   A    No, I didn't see the -- the exact apartment, no.

19   Q    As far as you know -- well, strike that.

20            All right.  So you don't know if they were going

21   into any apartment, do you?

22   A    No, I don't.

23   Q    And you see -- again on June -- I think we're on May 25th

24   -- or 29, 2005, right?

25   A    Correct.

1   Q   And you see, I believe, an unidentified male wearing a

2   white T-shirt talking on a telephone, right?

3   A   Yes.

4   Q   And you then see that individual go into Building F,

5   right?

6   A   That's correct.

7   Q   All right.  Now, do you see him go into the alley?

8   A   Here he went into the building.

9   Q   Okay.

10  A   On this part of the report, this individual, unidentified

11  male --

12  Q   Okay.

13  A   -- went into the building.

14  Q   All right.

15          MR. WARREN:  Could we get the video or the picture

16  up that shows that alley?

17          (Pause in proceedings.)

18  BY MR. WARREN:

19  Q   Could you take a look at 103, please?  All right.  Now,

20  that's an overhead shot, right?

21  A   Yes, sir.

22  Q   All right.  Now, okay, that's the alley right there.  Now,

23  what's immediately to the right by that fence?  Is that

24  Building F?

25  A   That would be Building F.

Harrison - Cross (War)                              211

1    Q    Okay.  And did you take this particular photograph?

2    A    No, I did not.

3    Q    All right.  Now, would this be a fair -- this photograph

4    fairly depict at least what you were looking at on May 29th,

5    2005, when you were surveilling this location?

6    A    No, it is not.

7              MR. LLORET:  And, Your Honor, just so the record

8    reflects, we're looking at 103D.

9              THE WITNESS:  That's the wrong photo, I believe.

10             THE COURT:  103D, yes.

11             MR. WARREN:  Okay.

12   BY MR. WARREN:

13   Q    So at least on 103D where you can see the entrance to

14   Building F, that was not your vantage point on May 29th, 2005?

15   A    That's the alley entrance, not the front door entrance.

16   Q    Okay.  Well, where were you standing on May 29th, 2005?

17   A    We were actually -- if you go to the overhead photo, I can

18   show you exactly.

19   Q    Great.

20             MR. WARREN:  Well, let's go to the overhead photo,

21   please.

22             MR. LLORET:  That's 103, Your Honor.

23   BY MR. WARREN:

24   Q    All right.  Show me --

25   A    Just -- see where the white van is, where the cursor is

1    now?

2    Q    All right.

3    A    On the other side of the road where this white or red car

4    is, we'd have been somewhere in that proximity for this

5    surveillance.

6    Q    Okay.  Now, take the arrow and point to me where Building

7    F is.

8    A    If you were to go straight or go up and to the left --

9    Q    Okay.  Right there.

10   A    -- that's Building F.  And if you follow the sidewalk in,

11   you will go to the front door.

12   Q    Okay.  Now, there's a walkway there, right?

13   A    Yes, sir.

14   Q    Is there a way to get to that back street that's on the

15   left?

16   A    The alley street?

17   Q    Yeah.

18   A    You're talking about the one with -- the other fellow?

19   Q    Yeah.

20   A    You can just drive up that.

21   Q    Okay.  Well, is there a way to get out of the building and

22   get on that alley?

23   A    Through the side entrance which you showed previously,

24   correct.

25   Q    Okay.  All right.  Now, you see, I think, what is it, an

1    unidentified male wearing a white T-shirt get out of the

2    automobile?

3    A    Yes, that's correct.

4    Q    You have no idea who this guy is?

5    A    No, sir.

6    Q    And he walks into Building F?

7    A    Yes.

8    Q    And you don't know what apartment he walked into?

9    A    No, I do not.

10   Q    All right.  Then you say at 9:17 p.m. you see my client,

11   Alton, come out -- well, you say you see him wearing an orange

12   shirt in the company of somebody you believe to be Dante

13   Tucker, is that right?

14   A    That's correct.

15   Q    And the same unidentified male that you saw go into

16   Building F, is that right?

17   A    Yes, that's correct.

18   Q    All right.  Where did you see them at?

19   A    Exiting the -- the door.

20   Q    Exiting the door.

21   A    Of F building.

22   Q    On 103 -- is it A -- the door to Building F that we just

23   saw on the previous photograph?

24   A    Yes.

25   Q    All right.

1   A    No, I'm sorry, this -- this one here would be the front

2   door, coming out of here, the one that we're looking at here.

3   Q    All right.  Well, could you put the arrow exactly where it

4   is so I can know what you're talking about?

5   A    Right there.

6   Q    Okay.  Now, that's the front entrance, is that right?

7   A    Yes, sir.

8   Q    Okay.  And can you move the arrow -- that would be over to

9   your right, and there's a -- a road that separates it looks

10  like the building from the next building over, the alleyway

11  there?

12  A    That's the eastern alley, correct.

13  Q    Okay.  And we know that there's a back exit through there,

14  right?

15  A    There's an alley entrance, that's correct.

16  Q    Okay.  And that alley goes clear through to the other

17  street, doesn't it?

18  A    Yes.

19  Q    Okay.  All right.  And then at this particular point, my

20  client gets into a Lincoln, is that right?

21  A    Yes, sir.

22  Q    Okay.  And that's got license number G as in George, B as

23  in Bill, V as in Victor, 1786?

24  A    Yes.

25  Q    All right.  And that's a silver Lincoln, that's what he's

1    driving, right?

2    A    Correct.

3    Q    All right.  And were you guys ever able to identify who

4    this third guy was?

5    A    No, we were not.

6    Q    All right.  And then you followed him, right?

7    A    Yes, we did.

8    Q    And they went to Rhythms Nightclub, right?

9    A    Correct.

10   Q    All right.

11   A    My surveillance would have remained there, though.  I

12   actually didn't follow him to the location.

13   Q    Oh, you didn't do that?

14   A    No, I did not.

15   Q    Okay.  All right.  Fair enough.  So you don't actually

16   know personally where he went to, right?

17   A    Per the agents, is what I was told.

18   Q    I understand.

19   A    But I personally do not know.

20   Q    Okay.  You personally do not know.

21   A    I didn't observe.

22   Q    All right.  Now, May 30th, 2005, now, this is surveillance

23   that's being done by yourself and I think it's -- is it

24   Special Agent -- is it Doerrer?

25   A    Yes.

1   Q    D-O-E-R-R-E-R, is that right?

2   A    That's correct.

3   Q    All right.  Now, once again, you see the silver-colored

4   Lincoln Town Car, correct?

5   A    Correct.

6   Q    And it's parked in the east alley that you've shown us,

7   right?

8   A    Immediately next to the east -- immediately on Clearview,

9   immediately to the east -- to the east of that east alley.

10  Q    All right.  Parked immediately to the east of the alley of

11  the Suffolk Manor Apartments, right?

12  A    Correct.

13  Q    Okay.  On the south side of the street, right?

14  A    Yes, which would be Clearview.

15  Q    All right.  Now, you also say that you observed a dark-

16  colored Mazda, is that right?

17  A    Yes.

18  Q    Were you able to identify who that car was registered to?

19  A    At that time, I don't believe so.

20  Q    Okay.  You didn't know.  Do you know now?

21  A    Who it was registered to?

22  Q    Yeah.

23  A    I do not.

24  Q    Okay.  Do you know whether or not that information was

25  ever obtained?

Harrison - Cross (War)                          217

1    A    I believe it was.

2    Q    Okay.  But not by yourself, right?

3    A    I didn't obtain it, that's correct.

4    Q    Okay.  All right.  Now, at about 7:46 p.m. -- by the way,

5    are you and your -- Agent Doerrer, are you guys surveilling

6    from the same location you showed me a minute ago across the

7    street from the front entrance to Building F?

8    A    No, we're not.

9    Q    Okay.  Where are you guys this time?

10   A    On Broad Street.

11   Q    Okay.  Could you stick the arrow where Broad Street is.

12   A    It would be to the left of the photo.  It's actually

13   outside of the photo.

14   Q    Okay.  It's actually outside of the photo, right?

15   A    Yes.

16   Q    All right.  So you can't see the back exit to Building F,

17   is that right?

18   A    From where we were, no, we could not.

19   Q    Can't see the front entrance to Building F, is that right?

20   A    Just the entrance to that eastern alley --

21   Q    Okay.

22   A    -- that's all we could see.

23   Q    All you can see if people coming in and out of the alley,

24   right?

25   A    The front door.  We didn't see anybody come in or out of

1    the eastern alley except Alton Coles, correct.

2    Q    Okay.  Well, I'm just trying to figure out what it is you

3    guys can see from where you're at.  You're telling me you're

4    on Broad Street and Broad Street's not even depicted on

5    photograph -- Exhibit Number 103, is that right?

6    A    Maybe 30 feet to the left -- to the east or to the left of

7    that photo.

8    Q    Okay.  My left or your left?

9    A    Left of the photo.

10   Q    Okay.  So --

11   A    Closer to the pointer, if you were to go about 30 more

12   feet, you would be on Broad Street.

13   Q    Okay.  All right.  So it's really -- it's literally off

14   the screen here.  We can't see wherever it was you and Agent

15   Doerrer were -- I guess you guys were parked in a vehicle, is

16   that right?

17   A    Yes.

18   Q    Were you stationary?

19   A    Yes.

20   Q    Okay.  Did you have the video camera that night?

21   A    I can check the report.  I don't know if I -- I don't

22   believe I did.

23   Q    Okay.  Do you know why it was you didn't have it that

24   night?

25   A    No, I don't recall.

Harrison - Cross (War)                    219

1    Q    All right.  And just -- just so I'm clear, you're on Broad

2    Street.  Can you actually see who goes into the front door of

3    Building F?

4    A    Where we were parked, we would not be able to see the

5    door.  We could see who walked up on the sidewalk.

6    Q    Down that little walkway, that sidewalk, right?

7    A    Yes, sir.

8    Q    Okay.  And you could see them coming out of the alley,

9    right?

10   A    Just the entrance, that's correct.

11   Q    Just the entrance --

12   A    The entrance to the alley.

13   Q    Right.  I'm talking about you can't see them coming out of

14   the back door of the building or anything like that, right?

15   A    You asked alley -- alley -- door or alley?

16   Q    No.  I'm talking about the alley, the roadway there.

17   A    I can see who were -- who would show up in or out of that

18   alley --

19   Q    Right.

20   A    -- roadway, not the door.

21   Q    Right.  But you don't know specifically where it is

22   they're coming from, right?

23   A    Correct.

24   Q    All right.  And, once again, my client is in the company

25   of an unidentified male, is that right?

Harrison - Cross (War)                           220

1    A    Yes.

2    Q    So that's a guy you didn't know who he was, right?

3    A    It's a different guy.  I don't believe it was the same

4    unidentified male.

5    Q    Okay.  Different from the previous night, May 29th, right?

6    A    Correct.

7    Q    All right.  And this time he's at the corner of 15th and

8    Chew Street?

9    A    That's correct.

10   Q    Where is Chew Street on photograph -- Exhibit 103?

11   A    Chew Street would be towards the exhibit number on the

12   other end.

13   Q    Okay.  So that's way down on the other side of the block

14   from where you guys are -- I guess, what are you, inside a

15   car, are you parked?

16   A    Yes.

17   Q    All right.  So that's way down at the other end of the

18   block, right?

19   A    Yes.

20   Q    All right.  So he's on the opposite end of where Building

21   F is, right?

22   A    When -- correct, when he walked down, correct.

23   Q    All right.  Well, when you say he walked down, what do you

24   mean he walked down?

25   A    They walked the sidewalk towards Chew Street.

1   Q   Okay.  Well, where did they come out of?

2   A   I don't recall.

3   Q   You don't recall?

4   A   No, I don't.

5   Q   All right.  So you don't know if they came out of the

6   alley behind Building F?

7   A   No, I do not.

8   Q   Okay.  And you don't know if they came from across the

9   street?

10  A   No.  I just remember seeing him on that sidewalk.

11  Q   All right.  So you don't know where he was before he got

12  there, right?

13  A   No, I do not.

14  Q   You don't know who the guy is that he was with, right?

15  A   No, I do not.

16  Q   All right.  And then they walked up to a guy who's sitting

17  in a blue Chevy Corsica, is that right?

18  A   Yes.

19  Q   And you don't know who that guy is, right?

20  A   No, I do not.

21  Q   All right.  So my client and -- I'm going to call him guy

22  number one, unidentified guy number one, get into the blue

23  Corsica, is that right?

24  A   Yes.

25  Q   Okay.  And they sit there for a little while, right?

1    A    Yes.

2    Q    Okay.  And then at least according -- and you've got a

3    surveillance report for this one, right?

4    A    It's right here, correct.

5    Q    Right.  So it's right there in front of you.  All right?

6    So is I misstate something, I'm sure you'll point it out,

7    okay?

8          Then you see him get out of the Corsica with this

9    unidentified guy number one, right?

10   A    Correct.

11   Q    And they walk east on Chew Street toward the alley located

12   on the southeast side of Suffolk Manor Apartments, right?

13   A    Correct.

14   Q    So what they do is, they go from the corner that's at the

15   far right-hand side of the picture and they start walking back

16   towards you and Agent Doerrer, right?

17   A    We had actually driven down Clearview when he was walking.

18   Q    Okay.

19   A    That's how we were able to move our fixed location to a

20   mobile surveillance.

21   Q    Okay.  So you actually drove, I guess, on the photograph

22   from left to right down Clearview Street which is right there,

23   right?

24   A    Which would be the intersection of 15th and Clearview, and

25   then Chew Street would be the next one down.

1   Q    Okay.  And are they walking back towards you?

2   A    They walked up the alley.  It wasn't towards us.

3   Q    They walked -- help me out here.  Use the pointer to show

4   me what you mean.

5   A    They walked -- there's an -- the alley behind Clearview?

6   Q    Hm-hmm.

7   A    If you were to go -- bring the arrow up to the top of the

8   building --

9   Q    Right.

10  A    -- come down right there, there's actually a driveway

11  which goes from one side of the Clearview Apartments to the

12  other.  You can't see it in this photo.

13  Q    All right.

14  A    But separates this apartment complex from the row homes

15  behind it.

16  Q    All right.  So they went -- show me again.  They went on

17  the -- the back street?

18  A    Correct.

19  Q    Okay.  And just show me and the arrow where they went.  So

20  they walked --

21  A    Just like that.  That's where we terminated surveillance.

22  We couldn't continue in that alley.

23  Q    All right.  So you didn't see where they walked to after

24  you terminated surveillance, right?

25  A    No, I did not.

1  Q    All right.  You didn't see what building they went into,

2  did you?

3  A    No, I did not.

4  Q    All right.  You didn't even see if they went into a

5  building, did you?

6  A    No, I did not.

7  Q    All right.  And you guys stayed there for a little while?

8  A    We relocated and then returned to that area, correct.

9  Q    Okay.  Where did you guys relocate to?  Where were you at?

10  A    We left -- after we drove -- we drove by to park, to set

11  up surveillance with -- Alton Coles was meeting with the

12  individual in that vehicle.  After we left, we may have gone

13  to eat or to the bathroom, I don't know exactly where we went.

14  And then we went back to Broad Street to set up surveillance.

15  Q    Okay.  You may have left the area, is that what you're

16  telling me?

17  A    Yes.

18  Q    So how long would you have left the area?

19  A    The report -- maybe an hour or two.

20  Q    So you left for an hour or two?

21  A    7:46, we returned 8:00-ish, 9:30 -- 8:30, I mean.

22  Q    Okay.  So you were gone 45 minutes to an hour?

23  A    That's an approximate again.  It was a year ago.  I don't

24  know where we took our break.  I don't know -- I don't recall

25  that.

Harrison - Cross (War)                                          225

1    Q    All right.  Well, the point is you weren't doing constant

2    surveillance on this particular night, right?

3    A    No, not on --

4    Q    So you don't know --

5    A    -- not at this time, no.

6    Q    Okay.  So you don't know who came and went?

7    A    No, I do not.

8    Q    All right.  You don't know who, if anybody, Mr. Coles

9    might have met with?

10   A    After we left, I don't know.

11   Q    Okay.  And then you returned -- what time did you tell us?

12   A    Some time 9:00-ish, I'm guessing 8:30 or 9:00.  I don't

13   recall the exact time.

14   Q    All right.  The point is, you have no idea what happened

15   at that particular location during the time period you guys

16   were gone, right?

17   A    No.

18   Q    And you weren't gone five minutes; you were gone at least

19   for an hour?

20   A    Guessing.

21   Q    Okay.  Well, try not to guess.  How long?

22   A    It's over two and a half years ago.  I don't know how long

23   I took a break on this date.

24   Q    Okay.  All right.  Well, anyway when you come back, where

25   is it that you guys set up surveillance?

1  A    Again, on Broad Street --

2  Q    All right.

3  A    -- which was the original location before we moved on this

4  -- on the prior surveillance.

5  Q    Okay.  And that's the part on the left-hand side of the

6  photograph that's not actually depicted on Exhibit 103, right?

7  A    Approximately 30 to 40 feet out of there, that's correct.

8  Q    All right.  So you see my client coming out of the alley,

9  right?

10  A    Yes.

11  Q    Did you actually see him come out of Building F?

12  A    No, I did not.

13  Q    All right.  So you don't know where he came out of, right?

14  A    No, I do not.

15  Q    Okay.  And you don't know what, if anything, he'd been

16  doing prior to the time when you guys were away having dinner,

17  taking your break or whatever it was, right?

18  A    We were dispatched to return because of a phone call from

19  the wire room.

20  Q    I understand.

21  A    So I don't know --

22  Q    But my question is --

23  A    -- I don't know what he was doing during our --

24  Q    Break.

25  A    -- yeah.

1    Q    You don't know what he was doing, right?

2    A    No.

3    Q    All right.  So he comes out of that alleyway with two

4    white plastic bags in his hand?

5    A    Yes.

6    Q    Okay.  You don't know where he got those plastic bags?

7    A    No.

8    Q    You don't know if somebody might have given them to him?

9    A    I don't know.

10   Q    You don't know if he might have gotten them out of

11   somebody else's car, like a Corsica, for example?

12   A    No.  We were just going off the phone calls.

13   Q    Okay.  Well, the point is, you have no idea where he got

14   those bags from, do you?

15   A    No.

16   Q    All right.  And he was in the company of somebody else,

17   wasn't he?

18   A    At this time, yes.

19   Q    All right.

20   A    No, at this time, he was -- I believe he was by himself

21   when he came out of the alley.

22   Q    Paragraph five.

23   A    Let me double check.  Yes, he was with another

24   unidentified male.

25   Q    Another unidentified male?

1    A    Correct.

2    Q    Is it the same unidentified male that he was with before

3    or somebody else?

4    A    A different one because we wrote another --

5    Q    Okay.  Different unidentified male?

6    A    Correct.

7    Q    Okay.  You don't know whether or not these bags belong to

8    this other different unidentified male, and he was simply

9    throwing the stuff away, do you?

10   A    They were in his hands and he threw them away, but I don't

11   know how he got them.

12   Q    Right, right.  You don't know, correct?

13   A    All I know is he -- I saw him throw them away.  I don't

14   know where he got them.

15   Q    But how he got them or who he might have got them from or

16   where he might have got them, you have no idea, do you?

17   A    No idea, no.

18   Q    All right.  Now, there were two of them, right?

19   A    Yes.

20   Q    And you opened up one of them, and I think that's where we

21   got the Government exhibit that had the wrappers in it, right?

22   A    There was approximately three, I believe.

23   Q    I understand.  That was found in one of the bags?

24   A    Yes, along with the gloves, latex gloves.

25   Q    Gotcha.  Thank you for adding that.  What about the other

1    trash bag, what was in that?

2    A    I believe it was actually trash.

3    Q    Actually trash?

4    A    Yeah.  I don't think there was anything in there, other

5    than some fast food wrappers, I believe.

6    Q    Some what?

7    A    I think it was a fast food wrapper.

8    Q    Fast food wrappers, regular trash, right?

9    A    Yes.

10    Q    Okay.

11              MR. WARREN:  The Court's indulgence.

12    BY MR. WARREN:

13    Q    The same question that Mr. McMahon had.  Exhibit 911A, I

14    think is -- I don't need to see it.  Exhibit 911A were the

15    wrappers and the gloves and the stuff you found in one of the

16    trash bags, okay?  Do you know whether or not any of those

17    items were ever submitted for fingerprint analysis or anything

18    along those lines?

19    A    I don't believe so.

20    Q    All right.

21              MR. WARREN:  Court's indulgence.

22              THE COURT:  Yes.

23              (Pause in proceedings.)

24              MR. WARREN:  No further questions.  Thank you, sir.

25              THE COURT:  Counsel.

1            MR. THOMPSON:  We have no questions for this

2    witness.

3            THE COURT:  Mr. Harmelin?

4                    CROSS-EXAMINATION

5    BY MR. HARMELIN:

6    Q    Good afternoon, Agent Harrison.  I'm Larry Harmelin.  How

7    are you doing?

8    A    Good afternoon.

9    Q    Good.  So you would do surveillance from time to time over

10   a two-year period of time at various locations, correct?

11   A    A two-year period?  No.

12   Q    A one-year period of time.

13   A    One-year period, correct.

14   Q    My mistake.  And you would either videotape or take

15   photographs, depending on whether the equipment was available.

16   If the equipment was available, you would take videotapes

17   photographs of what you were surveilling if the opportunity

18   was good, if something happened that you wanted to capture

19   photographically or videographically --

20   A    Not always.

21   Q    -- and the weather conditions were good?

22   A    Not always, but if we could take a video, we would.

23   Q    Okay.  So if something was happening and you had the video

24   camera or you had a digital camera, you wouldn't just say,

25   well, how about if I don't take a picture today even though

Harrison - Cross (Smi)                              231

1    something good is happening?

2    A    If I had a camera, I would make an attempt.

3    Q    Okay.  And if you had a video camera and the weather --

4    A    Depending on the -- again, the lighting conditions and the

5    possibility of being detected.  There's a lot of factors that

6    come in whether -- whether I would not videotape somebody.

7    Q    Is it fair to say that it's easier to not be detected in

8    the nighttime hours?

9    A    It's easier, a little bit.

10   Q    Okay.

11   A    It's also harder to videotape.

12   Q    I understand.  So the videotapes that you took that have

13   been preserved represent the best that you could capture,

14   correct?

15   A    Correct.

16   Q    Thank you.

17            MR. HARMELIN:  That's all.

18            THE COURT:  Counsel.

19                      CROSS-EXAMINATION

20   BY MR. SMITH:

21   Q    Good afternoon, Agent.

22   A    Good afternoon.

23   Q    Just a few questions, sir.  I think you indicated at the

24   beginning of the direct examination that the first time you

25   observed Asya Richardson I believe was at Mullica Hill?

1    A    Yes.  The first time I observed, yes.

2    Q    The first time you observed her.  And that's when you made

3    entrance or you were about to make entrance into the Dillon

4    Avenue or Dillon Street property?

5    A    Correct.

6    Q    And did you ever make entrance into that property?

7    A    I was part of the search warrant/arrest team, correct.

8    Q    Okay.  But did you go into the property?

9    A    I did make an entry.

10   Q    All right.  And when you went into the property, I think

11   you indicated that there was two children there?

12   A    I believe -- I never made it past the foyer, because

13   that's where we arrested Alton Coles.

14   Q    In fact, if I --

15   A    I know there was two children -- I believe there was two

16   children upstairs.  I never encountered them.

17   Q    Okay.  In fact, if I told you there were three children,

18   you would have no reason to disagreement with --

19   A    I -- I don't recall.

20   Q    All right.  And when you -- and what time was this when

21   you made entrance, sir?

22   A    Approximately 6:00 a.m.

23   Q    And my client was attired -- did you see my client?

24   A    No, I did not.  Well, I saw her coming down the street I

25   believe after we were handcuffing --

1    Q    And she was attired in sleepwear, would that be an

2    accurate statement?

3    A    Yes, that's correct.

4    Q    And then how long were you in the property, sir?

5    A    Just a matter of minutes, enough time to put the handcuffs

6    on Alton Coles and then we had to go to Essex Avenue.

7    Q    Okay.  And --

8    A    So just a matter of ten minutes.

9    Q    -- who's we?

10   A    Myself and Agent Pollock, my partner.

11   Q    Okay.  And the two of you left the address at that point

12   in time?

13   A    Yes, we left together.

14   Q    And everything you know about my client is what you've

15   already told us today.  Would that be accurate?

16   A    That's all I know, correct.

17   Q    All that you know.  That's it.  Thank you very much.

18   A    Thank you.

19           THE COURT:  Mr. Hetznecker.

20           MR. HETZNECKER:  Thank you.

21                   CROSS-EXAMINATION

22   BY MR. HETZNECKER:

23   Q    Good afternoon, Agent Harrison.

24   A    Good afternoon.

25   Q    This is not the first time you've testified, is it?

1    A    No, it's not.

2    Q    How many times would you say you've testified before?

3    A    In Federal Court?

4    Q    In Federal Court.

5    A    Approximately 20 or 30.

6            MR. HETZNECKER:  And could we have 512N up on the

7    screen again?

8    BY MR. HETZNECKER:

9    Q    512N is a picture of an individual you identified about

10   four and a half hours ago as Ahmen Wiggins, correct?

11   A    I believed that was Ahmen Wiggins at the time, correct.

12   Q    This morning you identified him as Ahmen Wiggins, correct?

13   A    Correct.  The picture is similar, correct.

14   Q    And -- I'm sorry?

15   A    Yes, correct.

16   Q    And you did so under oath, correct?

17   A    Correct.

18   Q    And you had seen that photograph before you testified,

19   correct?

20   A    Just once briefly.

21   Q    Briefly with -- in preparation with Mr. Lloret?

22   A    I believe so.

23   Q    He showed you the photograph; you identified it, correct?

24   A    Correct.

25   Q    And then you came in here and this morning identified the

1  same photograph as Ahmen Wiggins, correct?

2  A    Correct.

3  Q    You didn't do that with the intent to deceive anybody, did

4  you?

5  A    I made a mistake.   It's --

6  Q    Listen to the question.

7  A    -- the photo is similar.

8  Q    You did not do that with the intent to deceive anybody,

9  did you?

10  A    No, I did not.

11  Q    No.   You made a mistake, correct?

12  A    Correct.

13  Q    And four hours later when Mr. Warren asked you

14  specifically about the photograph and whether or not that was

15  Ahmen Wiggins, you then said, I made a mistaken under oath,

16  it's not Ahmen Wiggins, correct?

17  A    Correct.

18  Q    You made a mistake, right?

19  A    I made a mistake.

20          MR. HETZNECKER:   No further questions.   Thank you.

21          THE COURT:   Counsel, any redirect?

22          MR. LLORET:   Thank you, Your Honor.

23                    REDIRECT EXAMINATION

24  BY MR. LLORET:

25  Q    Agent --

1          MR. LLORET:  Let me have 103C, I believe.  No, 103B.

2     Yeah.

3     BY MR. LLORET:

4     Q    Agent, is this a view of the block on Clearview?

5     A    Yes, it is.

6     Q    What's the vantage point from which the picture is taken?

7     A    This is where we were when we were conducting surveillance

8     on Broad Street.

9     Q    Okay.  So when we were talking about the time that you saw

10    Mr. Coles with the bags in his hand, was this the approximate

11    location you were at?

12    A    Yes, it was.

13    Q    Okay.  And let me just ask a general question about

14    surveillance.  When you're out on these surveillances, do you

15    typically stay put for a long time on surveillance or do you

16    come and go or how did it usually work?

17    A    We typically come and go.  It's very hard to stay put.

18    Q    Why is it hard to stay put in one place for a long time

19    when you --

20    A    Our number one goal is not to be detected, so if we stay

21    put and you see an individual inside of a vehicle sitting

22    there for too long, they're going to figure something out --

23    somebody's watching something --

24    Q    What's --

25    A    -- so we can't stay put.

1    Q    -- what's the problem with staying there too long?   What

2    -- and getting identified or made as they say?

3    A    It could jeopardize our covert investigation.

4    Q    All right.

5              MR. LLORET:  Nothing further, Your Honor.

6              MR. WARREN:  I have nothing based on that, sir.

7              MR. McMAHON:  Nothing, Your Honor.

8              MR. SMITH:  No questions.

9              MR. HARMELIN:  No questions.

10             THE COURT:  You may step down.

11             THE WITNESS:  Thank you.

12             MR. BRESNICK:  Your Honor, the Government calls

13   Special Agent Lou Weiers.

14             THE COURT:  All right.

15             LOUIS J. WEIERS, GOVERNMENT'S WITNESS, SWORN

16             COURTROOM DEPUTY:  State your full name and spell

17   your last name for the record.

18             THE WITNESS:  Louis J. Weiers.  The last name is

19   spelled W-E-I-E-R-S.

20                     DIRECT EXAMINATION

21   BY MR. BRESNICK:

22   Q    I apologize for mispronouncing your last name, Agent.

23   A    That's all right.

24   Q    Agent, could you please introduce yourself to the jury,

25   tell them where you work and what you do generally.

1    A    As I stated, my name's Lou Weiers.  I'm from the

2    Pittsburgh field office of the Bureau of Alcohol, Tobacco,

3    Firearms and Explosives.  My duties are currently the

4    supervisor of a Firearms Enforcement Group.  Prior to that, I

5    was a special agent in a specialized group dealing with arson

6    and explosives.  I've been with ATF for about 17 years so far.

7    Q    And you're in the Pittsburgh field office you say?

8    A    I am.

9    Q    How long have you been a supervisor there?

10   A    Three years come April.

11   Q    Before you were working with ATF, did you have any other

12   job or employment in law enforcement?

13   A    Many odd jobs, but I was a probation officer, an intensive

14   drug and alcohol probation officer for Clarion County,

15   Pennsylvania.

16   Q    Agent, you weren't involved in the investigation of Alton

17   Coles and others leading up to 2005, were you?

18   A    No, sir.

19   Q    But were you called upon to execute a search on August 10,

20   2005?

21   A    Yes, I was.

22   Q    And what property were you assigned to, sir?

23   A    5 North Burden Hill in Quinton, New Jersey.

24   Q    All right.  And what was your role there that day, what

25   were you doing there?

1    A    I was assigned as the on-scene commander for that

2    particular site for the execution of a search warrant.

3    Q    What is an on-scene commander?  What does that mean?

4    A    Basically, I'm responsible for the overall operation to

5    ensure that all units and all aspects of the operation are

6    conducted properly.

7    Q    While you were there, Agent, you're the on-scene

8    commander, are you receiving instructions from anyone else?

9    A    I am.  I'm coordinating with a command center, which for

10   this particular operation was the ATF office in Philadelphia,

11   Pennsylvania.

12   Q    All right.  And was there a search team leader there as

13   well that day?

14   A    Yes, there was.

15   Q    And who was that?

16   A    Ms. Kim Thompson with the DEA.

17   Q    All right.  Agent, did you ultimately make entry into that

18   -- that house?

19   A    Yes.

20   Q    And what time was that approximately?

21   A    Approximately 6:00 a.m. we initiated the operation which

22   the tactical entry was made by the ATF Special Response Team.

23   Q    You use the phrase Special Response Team.  Could you

24   explain to the jury generally what a Special Response Team is?

25   A    It's a specialized team, basically a SWAT team drawn upon

1    from different offices of ATF.  Usually they're regional such

2    as a northeast team, a southwest team.  I believe we have a

3    midwest team and a west team.  These agents are used when we

4    have a high risk entry and/or the manpower needed for a

5    particular operation exceeds that of the local field office.

6    Q    Approximately how many agents, Special Response Team

7    agents did you have there that day with you?

8    A    I believe 12 to 14 SRT members.

9    Q    All right.  And you were responsible for deploying them in

10   the search?

11   A    Yes, sir.

12   Q    And you made entry at 6:00 a.m., you say?

13   A    Yes, sir.

14   Q    Did you knock and announce before entering the property?

15   A    Yes, they did.

16   Q    Do you recall if there was any response at the door?

17   A    I believe a Ms. Thompson came to the door.

18   Q    All right.  And entry ultimately was made?

19   A    It was.

20   Q    All right.  And did you enter with everyone else when they

21   -- when they all entered the property?

22   A    I did not.  I didn't make my personal entry into the

23   residence until the tactical aspect of the operation was

24   complete, basically that the house was secure and safe.

25   Q    Is that referred to as a protective sweep?

1    A    It is.

2    Q    And just explain to the jury the purpose of a protective

3    sweep, what that is.

4    A    Basically to identify or at least secure any occupants

5    that might be in the house and any other potential risk that

6    might be there for the follow-up investigative team.

7    Q    All right.  Now, how long did it take before the sweep was

8    complete?

9    A    I'd say the sweep, probably about 15 minutes.  I mean,

10   commonly what's done is they make an initial sweep and then

11   they make a secondary sweep to ensure they didn't miss

12   anything.

13   Q    All right.  And while you're outside, are you in touch

14   with the people who are in the property?

15   A    Both -- we're monitoring the radio traffic with the team

16   which is inside as well as coordinating with the command

17   center in Philadelphia.

18   Q    And ultimately you -- you heard that the sweep was

19   finished, the house was secure and you made entry, is that

20   right?

21   A    That is correct.

22   Q    All right.  When you first entered the property, what did

23   you see?

24   A    I saw a female occupant, Ms. Thompson, at the residence.

25   There was two children.  And Mr. Morris, James Morris, was

Weiers - Direct (Bre)                                      242

1   also in the main compartment of the building.

2   Q    Okay.  And was anybody in the house handcuffed at the

3   time?

4   A    I believe Mr. Morris had been secured at that point.

5   Q    Okay.  How about Ms. Thompson, do you recall?

6   A    No, she was not.

7   Q    And the kids?

8   A    The kids were not handcuffed.

9   Q    All right.  Where were they taken, do you recall?

10  A    We placed Ms. Thompson and the two children in one New

11  Jersey State Police vehicle and Mr. Morris in another State

12  Police vehicle.

13  Q    All right.  And at the time, after everyone was secured,

14  the house was secure and defendants Thompson and Morris were

15  separated, what did you do next?  What happened next in the

16  house?

17  A    We began to search, and the first phase of the search was

18  to remove all personnel from the residence and deploy the

19  narcotics detection canine, which was, I believe, a Jersey law

20  enforcement officer on a DEA Task Force with -- I think her

21  dog was named Cosmo.

22  Q    Okay.  And the purpose of -- the general purpose of the

23  canine, the narcotics trained canine is to do what?

24  A    Kind of narrow the field or at least give us indications

25  of where potential narcotics might be stored or hidden.

1    Q    Okay.  And you didn't accompany that dog, did you?

2    A    I did not.

3    Q    All right.  And by the way, did you see a car in the

4    driveway of the residence when you approached the property?

5    A    Actually two vehicles.

6    Q    What did you see there?

7    A    There was a Chevy Suburban and a Ford -- I believe it was

8    an Expedition.

9    Q    And the Chevy Suburban, do you recall the plates on that?

10   A    I think it was MRP32M as in Mike.

11   Q    Okay.  Are they New Jersey plates?

12   A    They were.

13   Q    All right.  And then did you -- after the canine completed

14   its dog search, dog sniff, whatever you want to call it, did

15   you then deploy your team members to execute the search in the

16   property?

17   A    We do.  We utilized the Special Response Team's personnel

18   to begin searching the property, basically a few agents per

19   room and for the exterior of the residence also.

20   Q    So you kind of spread out the team.  Some agents were in

21   some rooms; other agents were in others?

22   A    That's correct.

23   Q    Did you have a staging area within the house?

24   A    We secured -- I think we were working out of the kitchen

25   area.  Basically cleaned off the table, and that was kind of a

1    central point or a hub of operations for the search.

2    Q    As items were found and recovered, what happened to them?

3    What was done with those pieces of evidence?

4    A    They'd have been kind of collected in a center part of the

5    room, photographed and then bagged and tagged in some

6    methodical manner, room by room.

7    Q    All right.  Agent, I'd like to now call up -- it's

8    previously been admitted.

9         MR. BRESNICK:  Agent Horay, could you put on the

10   screen for everyone to see 93C as in Charlie?

11   BY MR. BRESNICK:

12   Q    Do you see the exhibit on your screen, sir?

13   A    I do.

14   Q    Could you tell the jury again what it is that you see

15   there?

16   A    This is an overhead shot of the location near the

17   residence in which we searched.  Towards the -- I guess it

18   would be the left-hand top corner is a large open field.  If

19   you continue left to right on the screen, the residence with

20   -- it's kind of got a bluish top, would have been the

21   residence that we searched.

22   Q    All right.  The -- do you see the arrow on the screen

23   there?

24   A    Yes, sir.

25   Q    Is that the house that you searched?

Weiers - Direct (Bre)                                    245

1    A    It is.

2    Q    All right.

3              MR. BRESNICK:  And I guess we can just go down, we

4    can -- go down to 93A, alpha, for a moment.

5    BY MR. BRESNICK:

6    Q    And what is that, sir?

7    A    This is 5 North Burden Hill Road, the subject of the

8    search warrant, basically an overhead shot depicting the -- a

9    view of the house up close with two vehicles in the driveway.

10   Q    Okay.  Was there anything in the back -- I'm not sure that

11   you can see it in this picture, Agent, but was there anything

12   in the back of the house that you searched?

13   A    I believe there was a car with some kind of a tarp on it,

14   as well as an out building, a small shed.

15   Q    A shed you say?

16   A    Yes, sir.

17   Q    Just -- can you see it in this picture?

18   A    You cannot.

19   Q    Where is it generally, if you were to use this picture as

20   a reference, a frame -- frame of reference, where would we go

21   to find out where the shed is?

22   A    Somewhat in the left corner, being at the -- sort of the

23   7:00 position.

24   Q    Okay.  Some -- somewhere around the trees, where the trees

25   are?

1    A    Yes, sir.

2    Q    All right.  Was that shed searched as well?

3    A    It was.

4    Q    Were items recovered from that shed?

5    A    There were.

6          MR. BRESNICK:  Could you show just for the agent

7    520ZZ.

8          MR. HETZNECKER:  Objection unless this agent was

9    present when it was recovered, Your Honor.

10   BY MR. BRESNICK:

11   Q    Can you tell -- were you -- did you see the item in this

12   picture, sir?

13   A    Yes, I did.  I saw it in that condition that it was in

14   right there.

15         MR. BRESNICK:  Move for its admission, Your Honor.

16         MR. HETZNECKER:  I'm sorry.  There needs to be a

17   predicate question.  That condition doesn't appear -- we need

18   a foundation for that.  Did this officer, this agent, see it

19   there when it was recovered?  That's all I'm asking.  If he

20   is, I withdraw the objection.

21   BY MR. BRESNICK:

22   Q    Agent, did you see what's depicted in this picture in that

23   condition in that shed when you searched the property that

24   day?

25   A    I was.  The SRT team that was searching that shed made me

1   or notified me that an item had been found in there.  I went

2   over to the shed and saw that bag with that other bag of money

3   in the shed.

4           MR. BRESNICK:  Okay.  Your Honor, I move for the

5   admission of 520ZZ.

6           MR. HETZNECKER:  No objection.

7           THE COURT:  It may be admitted.

8           MR. BRESNICK:  All right.  Let's show it to the jury

9   please.

10  BY MR. BRESNICK:

11  Q   Now, could you describe for the jury exactly what's in

12  this picture, sir?

13  A   It's a blue piece of luggage.  You can see the luggage

14  tags on it.  And inside that particular piece of luggage is a

15  plastic black bag with a quantity of cash in it, U.S.

16  currency.

17  Q   Did you -- were you able to tell how much -- was that --

18  everything in that bag, was that cash?

19  A   In the black bag, yes.

20  Q   Okay.  And the black bag within the blue suitcase, is that

21  right?

22  A   That is correct.

23  Q   All right.  And were you able to count the amount of cash

24  that was in that bag at that particular moment?

25  A   Not at that time.

Weiers - Direct (Bre)                                    248

1   Q    All right.  In fact, you found cash at other locations in

2   the property, is that right?

3   A    Throughout the property, yes.

4   Q    Okay.  Now, tell me, on this suitcase, I see there are --

5   it looks like there are tags on the suitcase, is that correct?

6   A    That's correct.

7   Q    And what were those, sir?

8   A    They seemed to be the tags which you, you know, once you

9   check into an airport, you know, the baggage transfer tags.

10  Q    Now, the -- were you able to tell the denominations of the

11  cash that was in the bag that we see in the picture?

12  A    From this photo or --

13  Q    Not from the photo, sir, but when you were there, when you

14  seized the property?

15  A    Yes, they were denominations of high, you know, twenties,

16  fifties, hundreds.

17  Q    Okay.  And how were they packaged?

18  A    They were packaged in bundles, and those bundles were

19  secured by rubber bands around denominations such as 1,000,

20  $5,000 bundles, making a $5,000 pack in different

21  denominations.  It could be a $10,000 pack with 1,000, you

22  know, increments inside that total bundle.

23  Q    All right.

24       MR. BRESNICK:  Your Honor, may I approach the

25  witness?

Weiers - Direct (Bre)                                         249

1              THE COURT:  Yes.

2    BY MR. BRESNICK:

3    Q    I'm showing you what's been marked as 520DD.  Could you

4    identify that, please?

5    A    Exhibit 520DD is the baggage tag from the item depicted in

6    item -- or Exhibit 520ZZ.  It's a transfer tag noting the date

7    of May the 5th, 2002, with the -- with Philadelphia,

8    Pennsylvania, noted on it as well as CLE in the name of James

9    Morris.

10   Q    All right.  Can you tell if that's from Philadelphia to --

11   CLE, is that Cleveland, do you know?  Do you have any idea?

12   A    I've flown to Cleveland, and I know CLE to be a Cleveland

13   designation.  I don't know if that's the only place CLE stands

14   for.

15   Q    Okay.  Can you tell if that's from Philly to CLE or from

16   CLE to Philly?  Can you tell from that tag?

17   A    I don't know.

18   Q    All right.

19              MR. BRESNICK:  Your Honor, I move for the admission

20   of 520DD.

21              MR. HETZNECKER:  No objection.

22              THE COURT:  It may be admitted.

23   BY MR. BRESNICK:

24   Q    I'm showing you now 520 double E.  Can you tell us what

25   that is?

Weiers - Direct (Bre)                                    250

1   A    520 double E is a Courtyard Marriott hotel card which was

2   removed from the item depicted in Government Exhibit 520ZZ.

3   Q    Which item within the picture, Agent, was it recovered

4   from?

5   A    From the suitcase, sir.

6   Q    From the suitcase.  And can you tell -- it's from

7   Courtyard Marriott, is that what you said?

8   A    Correct, at the Monterey Airport.

9   Q    Monterey.  And, actually, if you could, what is the

10  specific wording on that card with respect to Monterey?

11  A    It's noted Courtyard Marriott, Monterey Airport on the

12  front with a picture of a hotel and on the rear, it has

13  reservations, Monterey, with an international code, 8186255064

14  and also a toll free number.

15  Q    Actually, Agent, if you look at it again, does it say

16  airport or something else?

17          MR. BRESNICK:  If I may approach, Your Honor?

18          THE COURT:  Yes.

19  BY MR. BRESNICK:

20  Q    Oh, I apologize.  Could you look at the card -- is this

21  the card in which this came, Agent?

22  A    Correct.

23  Q    Okay.  What does it say there, sir?

24  A    It says Monterey -- I'm not exactly -- how to pronounce

25  this.  It looks like --

1    Q    Why don't you spell it, sir?

2    A    A-E-R-O-P-U-E-R-T-O with a designation 520 which says your

3    room number is.

4    Q    Okay.  Do you think that could be pronounced aeropuerto?

5    A    That would be pretty close, but I didn't want to go that

6    far.

7    Q    That's fine, sir.  I'm sorry.  I apologize.  All right.

8    Now, I'm showing you now Government Exhibit 520DD2.

9             MR. BRESNICK:  And, Your Honor, can I show the

10   jurors these exhibits that have been admitted already?  May

11   they have a chance to see them?

12            THE COURT:  The ones that have been admitted --

13            MR. BRESNICK:  The ones that have been admitted.

14            THE COURT:  -- you may certainly show them to the

15   jury, yes.

16            MR. BRESNICK:  Yes.  Thank you.  I'm showing you

17   now Government 520DD as well as 520EE and the casing that it

18   came in.

19            (Pause in proceedings.)

20   BY MR. BRESNICK:

21   Q    And now you're looking at, Agent, 520DD2?

22   A    Yes, sir.

23   Q    And what is that, Agent?

24   A    A Continental Airlines transfer with the designation CLE

25   on it.  It appears to be the transfer ticket and this was

1  taken off of the piece of luggage recovered from the shed.

2  Q    All right.  Now, in addition to what was recovered from

3  the shed, were any items recovered from the house?

4  A    Yes, sir.

5  Q    And in particular -- well, why don't you tell us in

6  general terms what was recovered from the -- what was

7  recovered from the house and we'll get to more specific later.

8  A    There were numerous packages of U.S. currency recovered

9  throughout the house, specifically from the bedrooms, the

10  basement, I believe out of a man's pair of pants and also in

11  the basement, sort of a work station.  There was also a

12  firearm recovered from the house, a digital scale and

13  packaging material from the basement area.

14  Q    All right.  Now, from the bedroom upstairs, the master

15  bedroom, what was recovered from that room?

16  A    Specifically, the firearm, a Smith and Wesson nine

17  millimeter, the -- there was some U.S. currency from there,

18  documents, as well a container of nine millimeter

19  ammunition.

20  Q    And where was the firearm recovered from, sir?

21  A    From a black purse located on the floor near the master

22  bed.

23          MR. BRESNICK:  All right.  Could we show to the

24  witness only 520 triple E?

25  BY MR. BRESNICK:

Weiers - Direct (Bre)                                           253

1    Q    And what do you see in that picture, Agent?

2    A    The Smith and Wesson I referenced is in the center of the

3    bed, the U.S. currency, the black purse, a cell phone.  It

4    looks like a black wallet off to the right-hand side and the

5    documents I referenced to the very top of the picture.

6    Q    Now, those are -- well, are those all the items that were

7    recovered from the master bedroom?

8    A    Yes.  They would -- as I mentioned before, they would have

9    been placed on the bed.  Those are all the items recovered

10   from that particular room prior to them being collected and

11   formally tagged and referenced.

12            MR. BRESNICK:  Your Honor, I move for the admission

13   of 520 triple E.

14            MR. HETZNECKER:  No objection.

15            THE COURT:  It may be admitted.

16   BY MR. BRESNICK:

17   Q    Now, if we look at the picture here -- just again just

18   show the jury -- you see a handgun there.  Is that the handgun

19   in the middle of the picture?

20   A    It is.

21   Q    That's the Smith and Wesson you referred to?

22   A    It is.

23   Q    And how many -- was that gun loaded, sir?

24   A    It was with one round and six in the magazine which is to

25   the bottom of the handgun.

1    Q    And one round -- where was the one round?

2    A    It was in the chamber of the firearm.

3    Q    What does it mean when a round is in the chamber of the

4    firearm?

5    A    Basically that the firearm is in a condition ready to be

6    fired.

7    Q    And I guess we see there the purse as well, as well as

8    some cash, is that correct?

9    A    That's correct.

10    Q    All right.  How much cash was that, do you recall?

11    A    I don't know the specific amount, not as much as what was

12    in the shed.

13    Q    All right.  Agent, I'm showing you 520RR, take a look at

14    that.

15    A    Yes, sir.  Exhibit 520RR is a Smith and Wesson, model C as

16    in Charlie, S as in Sam, 9, depicting a serial number of E as

17    in Edward, KY2026.

18    Q    And, Agent, I'm handing up now --

19            MR. BRESNICK:  Your Honor, I move the admission of

20    520RR.

21            MR. HETZNECKER:  No objection.

22            THE COURT:  It may be admitted.

23    BY MR. BRESNICK:

24    Q    And I'm showing 520JJJ.  Would you please tell the jury

25    what that is?

1  A   Government Exhibit 520JJJ is seven rounds of nine

2  millimeter ammunition.

3  Q   And, Agent, if you haven't done it already, could you

4  please hold up for the jury the gun that was recovered, so

5  they could get a look at it.

6          All right.  Thank you, sir.  And could you empty the

7  packet of the ammunition just so we could get a look at the

8  ammo.  Just hold up one round so they can see it.  It's a nine

9  millimeter round, sir?

10 A   It is.

11 Q   Okay.  And this is the ammunition recovered from the gun?

12 A   It is.

13 Q   In addition to that -- to that handgun and the rounds of

14 ammunition, were any other rounds of ammunition recovered from

15 the bedroom?

16 A   Yes.  There was a box of nine millimeter ammunition, I

17 believe a box of 100.

18 Q   Agent, I'm showing you Government's 520SS, Government

19 Exhibit -- could you look inside and do you recognize anything

20 in there?

21 A   Yes, sir, a box of Winchester nine millimeter Luger 100

22 round value pack of ammunition recovered from the bedroom.

23 Q   Okay.  Does that appear to have been opened, sir, or is

24 that a full box?

25 A   This is a full box.

1   Q    Okay.  And that was recovered from the bedroom?

2   A    It was.

3             MR. BRESNICK:  I move for the admission of 520SS,

4   Judge.

5             MR. HETZNECKER:  No objection.

6             THE COURT:  It may be admitted.

7             MR. BRESNICK:  And in case I haven't done it, the

8   admission of 520DD2.

9             THE COURT:  That's the Continental Airline transfer?

10            MR. BRESNICK:  Yes, Judge.

11            MR. HETZNECKER:  No objection.

12            THE COURT:  It may be admitted.

13            MR. BRESNICK:  And 520JJJ.

14            MR. HETZNECKER:  No objection.

15            THE COURT:  It may be admitted.

16            MR. BRESNICK:  Thanks, Judge.

17  BY MR. BRESNICK:

18  Q    All right.  Agent, I'm now handing you up 520III.  Do you

19  recognize anything in there?

20  A    520 triple I is six rounds of assorted -- well, actually,

21  it's nine millimeter caliber ammunition.

22  Q    Was that found in the bedroom as well, Agent?

23  A    It was.

24  Q    And where -- that wasn't found in the gun.  Where was it

25  found?

1   A    I think they were just laying around in the bedroom.

2   Q    Just loose rounds in the bedroom?

3   A    I don't know the specific location, but this is -- they

4   were recovered from there.

5            MR. HETZNECKER:  Objection.  Move to strike.

6   Speculation.

7            THE COURT:  Where were they found?  I didn't hear

8   your answer.

9            THE WITNESS:  These items would have been found in

10  the bedroom, but the specific location, I don't know.

11           THE COURT:  You don't know the specific location in

12  the bedroom.  Are you objecting to that, counsel?

13           MR. HETZNECKER:  No, that part I'm not, Your Honor.

14           MR. BRESNICK:  That's fine, Judge.

15  BY MR. BRESNICK:

16  Q    All right.  Other than the items that we've discussed

17  here, anything else of evidentiary value recovered from the

18  bedroom that you recall?

19  A    I believe there was a cell phone, but nothing specific.

20  Q    In addition to the bedroom, the master -- was that the

21  master bedroom, sir?

22  A    It would have been.

23  Q    Okay.  In addition to that bedroom, any other rooms in

24  which evidence was recovered?

25  A    There was a children's bedroom in which there was a

1    quantity of U.S. currency recovered.

2    Q    Agent, was there an attic?

3    A    There was.

4    Q    Where was the attic?

5    A    Above the main living compartment of the -- of the

6    residence.

7    Q    All right.  Could we show for the agent 520 triple C,

8    please.  What are you looking at in that picture, Agent?

9    A    I'm looking at a picture of U.S. currency recovered from

10   the attic area.

11   Q    And is that the condition in which it was in when -- when

12   it was recovered?

13   A    It would have been.

14        MR. HETZNECKER:  Objection again unless this agent

15   was present when it was recovered.

16        THE COURT:  Lay the foundation.

17   BY MR. BRESNICK:

18   Q    Well, did you go up into the attic yourself, Agent?

19   A    I did not.

20   Q    Were you present by the attic when evidence was recovered

21   and taken down from the attic?

22   A    I was.  The items were recovered by the SRT search team

23   who handed it down from the attic, and I was standing there

24   when it came down.

25   Q    You were standing there when these items were brought

1    down?

2    A    Yes, sir.

3            MR. HETZNECKER:  Judge, again, I would move to

4    strike his initial answer which was a question regarding this

5    photograph and where the items were found.  He wasn't present

6    where they were found.  Move to strike.

7            THE COURT:  That -- that objection is sustained.

8    BY MR. BRESNICK:

9    Q    Well, you were standing -- where was the attic?  It was --

10    it was above the ceiling, is that right?

11    A    Yes, sir.

12    Q    Okay.  And -- well, explain how it was.  Explain to the

13    jury how you could enter the attic from -- what would you have

14    to do to get to the attic from where you were standing?

15            MR. HETZNECKER:  Objection.  Speculation.  He did

16    not enter the attic.  The question was whether or not --

17            THE COURT:  Just --

18            MR. HETZNECKER:  -- these items were found as they

19    are pictured in the photograph, and he wasn't present.

20            THE COURT:  That is --

21            MR. HETZNECKER:  Move to strike.

22            THE COURT:  -- that was the initial question, but

23    this is another question.  Go ahead, Mr. Bresnick.

24    BY MR. BRESNICK:

25    Q    You were -- where were you?  You were outside the bedroom,

Weiers - Direct (Bre)                                          260

1   is that correct?

2   A    I was underneath the hole which is the access to the attic

3   when the currency came down -- or these items came down.

4   Q    All right.  And agents -- you saw agents in the attic?

5   A    Yes.

6   Q    You saw agents come out of the attic?

7   A    Yes.

8   Q    When the agents came out of the attic, were they holding

9   anything?

10  A    They were, these bags recovered from the attic.

11  Q    Agents were holding the bags that are referred to or shown

12  in picture 520CCC?

13  A    Right.  This -- I believe an additional bag also came down

14  not depicted in this picture.

15  Q    Did you see the agents take a picture?

16  A    We sent the camera up to the agents.

17  Q    So they could take a picture?

18         MR. HETZNECKER:  Objection.  Nonresponsive to the

19  question.

20         THE COURT:  The objection's overruled.

21  BY MR. BRESNICK:

22  Q    The agents took a picture of what was in the attic?

23  A    Yes, sir, they did.

24  Q    You gave them the camera?

25  A    Not me personally.  I directed a camera to be provided to

Weiers - Direct (Bre)                                    261

1    them.

2    Q    And you saw that camera provided to them?

3    A    It was.

4    Q    All right.

5              MR. BRESNICK:  Your Honor, I move for the admission

6    of 520CCC.

7              MR. HETZNECKER:  Objection.  Same basis as before,

8    Your Honor.

9              THE COURT:  Overruled.

10              MR. BRESNICK:  Can we show 520 triple C to the jury,

11    please?

12    BY MR. BRESNICK:

13    Q    So, Agent, is this -- what are we looking at?

14    A    We're looking at a white plastic and a brown paper bag

15    filled with U.S. currency in the attic section of the

16    residence that was searched laying on some insulation between

17    the rafters.

18    Q    And you said that there was another bag that came out of

19    the attic as well?

20    A    I believe there was a black bag that came down with it,

21    another black plastic bag.

22              MR. HETZNECKER:  Objection.  Speculation.  He

23    believes that another black bag came down, Your Honor.

24              MR. BRESNICK:  If this is not the proper, we can do

25    this through another agent.

1          THE COURT:  Do you have a black bag that was handed

2    down from the attic?

3          MR. BRESNICK:  Well, may I ask the witness one

4    question, Judge?

5          THE COURT:  The objection that was just made is

6    sustained.  Go ahead.

7    BY MR. BRESNICK:

8    Q    Did you see a black bag recovered from the attic?

9    A    Yes.

10   Q    All right.  In addition to what's pictured in 520 triple

11   C?

12   A    Yes.

13   Q    All right.  Now, these bags that we're looking at in 520

14   triple C, as well as the black bag -- did the black bag have

15   money in it as well?

16   A    It did.

17   Q    In addition to the -- what we're looking at in 520 triple

18   C?

19   A    Yes, sir.

20   Q    All right.  And what quantities of cash were in these

21   bags?

22   A    I couldn't give you the denominations but a large

23   quantity.

24   Q    All right.  Were they banded the same way as the others?

25   A    They were.

1   Q    Were they packaged in large denominations like the others?

2   A    They were.

3   Q    About how many -- were they in bundles or just in -- I

4   guess they were in bundles you said, right?

5   A    Stacks, smaller bundles wrapped into larger stacks.

6   Q    Okay.  And about how many stacks would you say?

7   A    Like I said, some were in $5,000 stacks; some were in

8   10,000.  It -- it varied.

9   Q    And about how many bundles?

10  A    I don't recall the specific bag -- how many bundles were

11  in it.

12  Q    All right.  Was there a basement to the property, Agent?

13  A    Yes, there was.

14  Q    And was anything recovered from the basement?

15  A    Yes, there was.

16          MR. BRESNICK:  Could we show just for the agent 520

17  triple B?

18  BY MR. BRESNICK:

19  Q    What are you looking at there, Agent?

20  A    U.S. currency in a black -- I can't exactly read the

21  writing on the bag, you know, beside some cellophane wrappers

22  and another black bag.

23  Q    And did you see these bags --

24  A    Yes, sir.

25  Q    -- in the basement?

1    A    Yes, sir.

2    Q    Were they in this condition, sir?

3    A    Yes, sir.

4           MR. BRESNICK:  I move for the admission of 520

5    triple B.

6           MR. HETZNECKER:  No objection.

7           THE COURT:  It may be admitted.

8           MR. BRESNICK:  Show it to the jury, please.

9    BY MR. BRESNICK:

10   Q    So, Agent, we see one bag that's open and another bag that

11   looks like it's closed in the picture, is that right?

12   A    Yes, sir.

13   Q    And the bag that's open, appears to have -- what does it

14   have in it?

15   A    Stacks of U.S. currency.

16   Q    All right.  Are these stacked in the same manner as the

17   other stacks that you referred to earlier?

18   A    They were consistent with the other bags of U.S. currency

19   recovered.

20   Q    All right.  And did the bag that's closed in this picture

21   have cash in it as well?

22   A    It did.

23   Q    And, again, were these large denominations?

24   A    Yes, sir.

25   Q    Where in the basement were these bags?

1    A    They were in a -- in one of the corners behind sort of

2    like a -- it was a couch or a loveseat.

3    Q    In the corner of the basement behind a loveseat?

4    A    Yes, sir.

5    Q    All right.  And next to the cash, can you see anything in

6    this picture that's next to the cash?

7    A    Yes, to the left-hand side on the picture is some

8    cellophane wrapping material.

9    Q    All right.  Agent, I'm handing you 520 double C.  Could

10   you please take a look at it and identify it?

11   A    Yes, sir.  This was the wrapping material recovered from

12   the basement near the U.S. currency.

13   Q    Was it found in that trash bag or was that bag something

14   separate?

15   A    The bag was kind of laying underneath the two black bags.

16   I think you can see a little bit of it sticking out at the

17   bottom of the -- right near the sticker for the 520 triple B.

18   Q    And is there anything on the exterior of the trash bag?

19   A    A piece of duct tape.

20   Q    Hold it up for the jury to see, a little bit, yeah, okay.

21   What color is that duct tape?

22   A    Gray.

23   Q    Okay.  And the bag is black?

24   A    It is, sir.

25   Q    All right.  Agent, why did you recover that cellophane?

1    A    Well, we believed that there was a potential that this

2    could be --

3                 MR. HETZNECKER:  Objection.

4                 THE COURT:  Objection sustained.

5                 MR. BRESNICK:  All right.  Your Honor, I move for

6    the admission of 520 double C.

7                 MR. HETZNECKER:  No objection.

8                 THE COURT:  It may be admitted.

9    BY MR. BRESNICK:

10   Q    And was there a children's room in the house, Agent?

11   A    A children's bedroom, yes.

12   Q    Did you recover anything in the bedroom, the children's

13   bedroom?

14   A    Yes, sir, U.S. currency in a bag.

15                MR. BRESNICK:  Could we show 520 double YY just to

16   the witness, please.

17   BY MR. BRESNICK:

18   Q    Tell the jury what you're -- tell the Judge what you're

19   looking at here.

20   A    520YY is a picture of U.S. currency in what appears to be

21   a blue plastic bag with white interior.

22   Q    And is that the condition that it was found in when you

23   searched the property that day?

24   A    Yes, sir.

25                MR. BRESNICK:  Move to --

1          MR. HETZNECKER:  Objection unless he was present

2    when it was recovered.

3    BY MR. BRESNICK:

4    Q    Did you see the bag in that position, Agent?

5    A    The bag was in the position when I saw it.

6          MR. BRESNICK:  Move for the admission of 520YY.

7          MR. HETZNECKER:  No objection.

8          THE COURT:  It may be admitted.

9          MR. BRESNICK:  Show it to the jury, please.

10   BY MR. BRESNICK:

11   Q    So -- let me just see, is that a blue bag, Agent?  I

12   guess --

13   A    A blue exterior with a white interior.

14   Q    Okay.  And there was a large amount of cash inside that

15   bag?

16   A    Yes, sir.

17   Q    Was it bundled in the same manner and fashion as the other

18   bundles of cash that you saw in the other locations?

19   A    Yes, it was.

20   Q    Do you know how much money was in that bag of cash?

21   A    I have no idea, sir.

22   Q    What else -- what else is in that picture, Agent?  What's

23   near that bag of cash?

24   A    There appears to be a blue box with New Balance shoes, a

25   Spiderman box in the upper right-hand corner of it, and some

1    -- it's hard to tell what else is in there, maybe some

2    clothing to the left.

3    Q    Did you see children's clothing there as well, Agent?

4    A    To the left, yes.

5    Q    All right.

6    A    Maybe a pair of underwear.

7          MR. HETZNECKER:  Objection to Mr. Bresnick's

8    suggestion to the agent --

9          THE COURT:  Sustained.

10         MR. BRESNICK:  All right.  Let's see 520 double X

11   just for the witness.

12   BY MR. BRESNICK:

13   Q    And what are we looking at here, Agent?

14   A    A picture of a pair of blue jeans with some U.S. currency

15   laying on top of it.

16   Q    And where was that found?

17   A    In the living room of the residence.

18   Q    Was that cash laying on the couch at the time or had it

19   been inside the pant's pockets?

20   A    It was taken out of the pant's pocket.

21   Q    Okay.

22         MR. BRESNICK:  I move the admission of 520 double X.

23         MR. HETZNECKER:  No objection.

24         THE COURT:  It may be admitted.

25   BY MR. BRESNICK:

1   Q    So, again, that was found in the living room of the

2   property, is that correct, Agent?

3   A    Yes, sir.

4   Q    Agent, when you finished accumulating all the bags of cash

5   that you found at this property, what did you do with it?

6   A    We took it to the Philadelphia Field Division and then

7   subsequently took it to a bank to be counted.

8         MR. BRESNICK:   Could I show for the witness 520UU --

9   just for the witness.

10  BY MR. BRESNICK:

11  Q    What do you see here, Agent?

12  A    This would be all the cash recovered from the residence at

13  the ATF field office placed up on a table where we took a

14  photo.

15        MR. BRESNICK:   Move for the admission of 520UU,

16  Judge.

17        MR. HETZNECKER:   No objection.

18        THE COURT:   It may be admitted.

19  BY MR. BRESNICK:

20  Q    And this represents all the cash that you took from the

21  property, is that right?

22  A    I can't tell if the photograph is capturing all of the

23  cash, I mean, but it's looking like it's a picture of a good

24  quantity of it.

25  Q    How many bags do you see in that picture?

1    A    It looks like 11 bags, 11 total bags with different sizes.

2    Q    With cash, Agent?

3    A    Yes.

4          MR. BRESNICK:   Could we show the witness 520T3?

5    BY MR. BRESNICK:

6    Q    And what's that, Agent?

7    A    That would be all of the U.S. currency removed from the

8    bags we just looked at in the prior exhibit.

9          MR. BRESNICK:   Move for the admission of 520T3,

10   Judge.

11         MR. HETZNECKER:   No objection.

12         THE COURT:   It may be admitted.

13   BY MR. BRESNICK:

14   Q    And, again, we're looking at a picture of all the cash

15   that was recovered from 5 North Burden Hill Road, Quinton, New

16   Jersey?

17   A    That's correct.

18   Q    So you didn't count that by hand, did you, Agent?

19   A    No, sir.

20   Q    All right.   And you said you took it to a -- took it to a

21   bank?

22   A    Yes, sir.

23   Q    And did you get a final count of the amount of money taken

24   from the house?

25   A    Yes, we did.

Weiers - Direct (Bre)                          271

1   Q    How much was that, Agent?

2   A    I believe it was $561,000 and change.

3   Q    And change?

4   A    It was close to --

5   Q    All right.  Agent, did you -- did you search the kitchen

6   of the property?

7   A    Yes, sir.

8   Q    Did you find anything there?

9   A    Yes, sir.

10  Q    What did you find?

11  A    There was a black digital scale on the counter of the

12  kitchen as well as a couple cell phones.

13           MR. BRESNICK:  I'd like to show for the witness 520

14  triple A.

15  BY MR. BRESNICK:

16  Q    What do you see there, Agent?

17  A    The black digital scale that I just spoke of and a cell

18  phone in the right-hand corner of the countertop with some

19  other household items.

20  Q    It looks like a box of Sucretes there or something there?

21  A    Yes, sir, and maybe a bottle of -- I can't really say.

22  It's a brown bottle of something.

23           MR. BRESNICK:  I move for the admission of 520

24  triple A.

25           MR. HETZNECKER:  No objection.

1             THE COURT:  It may be admitted.

2   BY MR. BRESNICK:

3   Q    Just if you could direct the jury to where the digital

4   scale is located?

5   A    The digital scale is basically in the center of the

6   picture where the white arrow is, that being the base of the

7   scale, the top of the scale or the cover above that arrow.

8   Q    I'm handing you now Government's 520X.  Do you recognize

9   that?

10  A    Yes, sir.  This is the scale depicted in the photograph.

11  Q    The scale that was recovered from the kitchen?

12  A    Yes, sir.

13            MR. BRESNICK:  Move for the admission of 520X,

14  Judge.

15            MR. HETZNECKER:  No objection.

16            THE COURT:  It may be admitted.

17            MR. BRESNICK:  And could we show for the witness

18  520VV.

19  BY MR. BRESNICK:

20  Q    What do you see here, Agent?

21  A    Two cell phones, one being on a charger and one not on a

22  charger, some oven mitts, Lifesavers, and it appears to be the

23  corner of a microwave oven.

24            MR. BRESNICK:  Move for the admission of 520VV.

25            MR. HETZNECKER:  No objection.

1           THE COURT:  It may be admitted.

2   BY MR. BRESNICK:

3   Q    Do we see there the two cell phones that you described?

4   A    Yes, sir.

5   Q    What did you do with the cell phones that day?

6   A    We recovered -- or we took one of the cell phones and I

7   believe the cell phone depicted in the picture was returned to

8   Mr. Morris.

9   Q    Agent, was there a dining room in that house?

10  A    Yes, sir.

11  Q    Did you recover anything from that room?

12  A    Yes, sir.

13  Q    What did you recover there?

14  A    I believe a -- well, we recovered a box of .40 caliber

15  ammunition.  We may have recovered -- I think there was a

16  small quantity of U.S. currency out of that area also.

17  Q    All right.  Agent, I'm handing you now 520QQ, see if you

18  recognize that?

19  A    520QQ is a box of PMC 50 Centerfire pistol cartridges, .40

20  caliber.

21  Q    That's .40 caliber ammunition?

22  A    Yes, sir.

23  Q    Okay.  And how many rounds are in that, sir?

24  A    25 rounds.

25  Q    Where was that recovered from in the dining room?

1    A    There was a drawer to the table, sort of where you put

2    your silverware, and it was recovered within that drawer.

3    Q    The drawer to the dining room table?

4    A    Yes, sir.

5    Q    Okay.  Did you see any silverware in there?

6    A    Excuse me, sir?

7    Q    Did you see any silverware in there?

8    A    I don't recall any silverware.

9    Q    All right.  Agent, I'm now handing you 520Z, zebra.  Do

10   you recognize that?

11   A    Yes, sir, I do.

12   Q    And what is that?

13   A    It's a DeLaRue money counting machine.

14   Q    Where was that recovered?

15   A    It was recovered behind a loveseat in the dining room area

16   where the ammunition was recovered.

17   Q    Where the .40 caliber ammunition was recovered?

18   A    Yes, sir.

19   Q    The ammunition was recovered from a drawer, though, inside

20   the table, right?

21   A    Correct.  This was recovered behind a seating -- a couch.

22             MR. BRESNICK:  Move for the admission of 520Z.

23             MR. HETZNECKER:  No objection.

24             THE COURT:  It may be admitted.

25             MR. BRESNICK:  Could we look at 520WW, please, just

1    for the witness.

2    BY MR. BRESNICK:

3    Q    What do you see there?

4    A    The money counting machine and the box in which it was

5    recovered.

6    Q    Is that the location in which it was recovered as well?

7    A    Yes, sir.

8    Q    Okay.

9           MR. BRESNICK:  Move for the admission of 520WW.

10          MR. HETZNECKER:  No objection.

11          THE COURT:  It may be admitted.

12          MR. BRESNICK:  Show it to the jury.

13   BY MR. BRESNICK:

14   Q    So that was in the dining room, is that right?

15   A    Yes, sir.

16   Q    Okay.  Not in the living room?

17   A    A separate room from the living room, yes.

18   Q    A separate room.  And it was in that box in the corner

19   when it was recovered?

20   A    Correct.

21          MR. BRESNICK:  Your Honor, in case I haven't done

22   so, I move for the admission of 520QQ, the box of .40 caliber

23   ammunition.

24          MR. HETZNECKER:  No objection.

25          THE COURT:  It may be admitted.

1    BY MR. BRESNICK:

2    Q    Agent, I'm now handing you 520AA.  Do you recognize that?

3    A    Yes, sir, I do.

4    Q    What is that?

5    A    It's a bag of rubber bands recovered from the basement

6    area of the residence.

7    Q    Do you recall where in the basement that was recovered?

8    A    It was near -- there was a work station in the basement.

9    It was near there.

10           MR. BRESNICK:  Move for the admission of 520AA.

11           MR. HETZNECKER:  No objection.

12           THE COURT:  It may be admitted.

13    BY MR. BRESNICK:

14    Q    I'm handing you a box -- 520U, it contains several other

15    items in it.  Could you describe that for the jury?

16    A    Yes.  There are four boxes, one not opened of Glad cling

17    wrap.

18    Q    Four boxes of Glad cling wrap, is that what you said?

19    A    Correct, three opened, one not opened.

20    Q    Three opened, one unopened.  And was this recovered

21    anywhere near the rubber bands?

22    A    It was recovered with the -- with the rubber bands.

23    Q    It was found with the rubber bands?

24    A    Yes.

25    Q    I'm handing you now 520V as in Victor.  Was that recovered

1   in the basement as well?

2   A    Yes, sir, along with the cling wrap, the rubber bands,

3   these are one, two, three, four rolls of gray duct tape.

4   Q    Four rolls of gray duct tape?

5   A    Correct.

6   Q    Could we show for the witness 520 triple H?  What do you

7   see there, Agent?

8   A    The items which we just went over in the basement area of

9   the residence.

10  Q    Is that the location in which they were found?

11  A    No.  They would have been pulled out from their recovered

12  location, just so -- for the photograph and placed together.

13         MR. BRESNICK:  All right.  I move for the admission

14  of 520 triple H.

15         MR. HETZNECKER:  No objection.

16         THE COURT:  It may be admitted.

17  BY MR. BRESNICK:

18  Q    So just take us through this picture, what we're looking

19  at here.

20  A    To the left side is the box of the Glad cling wrap.  To

21  the right of the cling wrap is the rubber bands and the four

22  rolls of the duct tape in Exhibits 520V --

23  Q    Now, did you --

24  A    -- 520AA and 520U.

25  Q    Now, is -- that's not the location that you found these

Weiers - Direct (Bre)                                      278

1   items, but is that the same manner in which you found them?

2   A   Same way they were packaged when recovery -- when

3   recovered.

4          MR. HETZNECKER:  Objection unless this agent

5   recovered --

6          THE COURT:  Objection sustained.

7   BY MR. BRESNICK:

8   Q   Were you in the basement -- did you see -- did you take

9   this picture?

10  A   I did not.

11  Q   Okay.  Were you there when the picture was taken?

12  A   I was not.

13  Q   Okay.  All right.

14         MR. BRESNICK:  And just for the witness, 520 triple

15  F.

16  BY MR. BRESNICK:

17  Q   What do you see there, Agent?

18  A   The work station that I had spoken about before with -- it

19  looks like a ziploc bag with a quantity of U.S. currency with

20  a 20 dollar bill on top.

21  Q   Okay.

22  A   Some extension cords.

23  Q   Okay.  Was that the same denominations of cash that you

24  saw in the other bundles of money that you talked about

25  already?

1    A    There were stacks of 20 dollar bills, yes.

2    Q    Okay.  But was it as much as in some of the other bags

3    that you saw?

4    A    No, sir.

5            MR. BRESNICK:  Move for the admission of 520 triple

6    F.

7            MR. HETZNECKER:  Again, same objection, unless he

8    was present when this was recovered and photographed, I have

9    no objection.  If he wasn't present, then I object to the --

10   BY MR. BRESNICK:

11   Q    Did you see the cash in this picture?

12           MR. HETZNECKER:  When it was recovered.

13   BY MR. BRESNICK:

14   Q    When it was recovered, Agent?

15   A    I can't recall seeing it in that position.

16   Q    Okay.

17   A    All the evidence would have been collected into the center

18   of the room or an area where it would have been photographed

19   and tagged.

20   Q    And that's the picture that we looked at earlier with all

21   the cash?  You saw -- you took a picture of all the cash that

22   was recovered from the property, right?

23   A    Yes.

24   Q    Okay.  That's fine.  And 520W.

25   A    This is a bag of Hefty garbage bags, 40 count.

Weiers - Direct (Bre)                        280

1   Q    And where was that recovered, Agent?

2   A    Also in the basement area.

3           MR. BRESNICK:  Move for the admission of 520W.

4           MR. HETZNECKER:  Same objection.  If he wasn't

5   present, then I object.  If he was present, I have no

6   objection.

7   BY MR. BRESNICK:

8   Q    Were you present when that was recovered, Agent?

9   A    When it was recovered, yes; not when it was located, if

10  that's your --

11  Q    Okay.  Well, explain the difference to the Judge.

12  A    Well, the items were located, they were brought to the

13  central portion.  I saw them in the basement when they were

14  recovered as we moved through and logged them in.

15          MR. HETZNECKER:  Then I have no objection if he was

16  present when it was recovered.

17          THE COURT:  It may be admitted.

18  BY MR. BRESNICK:

19  Q    I'm handing you now 520Y.

20  A    It's the container for a Boost phone, 520Y.

21  Q    And what's a Boost phone?  Just explain that to a jury --

22  the jury.

23  A    A pay as you use phone.  Basically, you can purchase it at

24  several different outlets where you walk in, buy it and, you

25  know, recharge it as necessary when you use up your minutes.

Weiers - Direct (Bre)                    281

1   Q    Well, how is a Boost phone different from say going to

2   Verizon and opening up an account and getting a phone with

3   them?  What's a Boost -- how is that different?

4   A    These type of phones, you just basically buy them as you

5   would a bottle of Coca Cola.  You take them to the counter and

6   you -- and you pay for it.  And as you use them, you recharge

7   them with a credit card.

8   Q    Do you have to give personal identification when you buy

9   such a phone, a Boost phone?

10  A    No, sir.

11  Q    All right.  Was that recovered from the house as well?

12  A    Yes, sir.

13  Q    Were you present when it was either located or recovered?

14  A    When it was recovered, yes.

15  Q    Okay.  And where was it recovered from?

16  A    I believe the kitchen area.

17           MR. BRESNICK:  Move for the admission of 520Y.

18           MR. SMITH:  No objection.

19           THE COURT:  It may be admitted.

20           MR. BRESNICK:  Your Honor, what's your pleasure with

21  respect to timing for today?  Did you want to end the day at

22  4:30 or just continue on?

23           THE COURT:  What is your pleasure?  How much --

24           MR. BRESNICK:  Oh, I'm happy to go on, Judge --

25           THE COURT:  -- how much longer do you intend to go?

1          MR. BRESNICK:  -- but I could go on for another --

2    you know, it might be another -- it might be another couple

3    hours with the witness.

4          THE COURT:  Well, I think probably it's a good time

5    to recess then.

6          MR. BRESNICK:  That's why I asked.

7          THE COURT:  Okay.  Just stay right there.

8          Ladies and gentlemen, it is past 4:30.  We're going

9    to recess for the day.  I'm going to ask you to be back

10   tomorrow at 9:30.  I'm going to ask counsel to all be here at

11   9:00 so that we can get started at 9:00 -- did I say 9:30?

12   No, 9:15.  I want counsel here at 9:00.  And, ladies and

13   gentlemen of the jury, if you're here at 9:15, we will begin

14   promptly.  Okay.

15         Don't talk to anybody about the case and don't do

16   any independent investigation and don't read anything about

17   this matter.  As I've cautioned you, take the matter as it's

18   presented.  All right.  Recess.

19         MR. BRESNICK:  Thank you, Your Honor.

20         (The jury leaves the courtroom at 4:34 p.m.)

21         (Proceedings concluded at 4:34 p.m.)

22                              *  *  *

23

24

25

1

2                        **C E R T I F I C A T I O N**

3

4

5            We, Diane Gallagher and Lois A. Vitarelli, court

6    approved transcribers, certify that the foregoing is a correct

7    transcript from the official electronic sound recording of the

8    proceedings in the above-entitled matter.

9

10

11                                          February 11, 2008

12   DIANE GALLAGHER

13

14

15

16   LOIS A. VITARELLI

17   DIANA DOMAN TRANSCRIBING

18

19

20

21

22

23

24

25