UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA )      No.  05-CR-440-1
                         )
                         )      **FILED**
                         )
            v.           )      FEB 1 4 2008
                         )
ALTON COLES, et al,      )      MICHAEL E. KUNZ
                         )      By
         Defendants.     )      Philadelphia, PA
                         )      February 4, 2008
                         )      9:31 a.m.


TRANSCRIPT OF TESTIMONY OF MICHAEL R. CURTIS
BEFORE HONORABLE R. BARCLAY SURRICK
UNITED STATES DISTRICT COURT JUDGE


APPEARANCES:


For the Government:          MICHAEL J. BRESNICK, ESQUIRE
                             RICHARD A. LLORET, ESQUIRE
                             U.S. Attorney's Office
                             615 Chestnut Street
                             Suite 1250
                             Philadelphia, PA  19106


For the Defendant            CHRISTOPHER D. WARREN, ESQUIRE
Alton Coles:                 Law Office of Christopher Warren
                             1500 Walnut Street
                             Philadelphia, PA  19102


For the Defendant            JACK J. McMAHON, JR., ESQUIRE
Timothy Baukman:             Law Office of Jack McMahon
                             1500 Walnut Street, Suite 900
                             Philadelphia, PA  19102


For the Defendant            LAURENCE HARMELIN, ESQUIRE
Monique Pullins:             P.O. Box 3574
                             Westchester, PA 19381



APPEARANCES:                    (continued)


For the Defendant             RONALD A. SMITH, ESQUIRE
Asya Richardson:              Ronald A. Smith and Associates
                              1617 JFK Boulevard, Suite 1240
                              Philadelphia, PA  19103


For the Defendant             PAUL J. HETZNECKER, ESQUIRE
Thais Thompson:               1420 Walnut Street, Ste 911
                              Philadelphia, PA  19102


For the Defendant             RONALD THOMPSON, ESQUIRE
James Morris:                 3002 Lincoln Drive
                              Suite J
                              Marlton, NJ  08053


                              WAYNE POWELL, ESQUIRE
                              811 Church Road
                              101 Parragon Building
                              Cherry Hill, NJ  08002


Audio Operator:               INNA GOLDSHTEYN

Transcribed by:               DIANA DOMAN TRANSCRIBING
                              P.O. Box 129
                              Gibbsboro, New Jersey  08026-129
                              PHONE:   (856)435-7172
                              FAX:     (856) 435-7124
                              Email:   dianadoman@Comcast.net


Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Michael R. Curtis | 4 (Llo) | 14 (McM) | 20 (Llo) | 20 (Mcm) |
| | | | 22 (Llo) | |

| EXHIBITS: | | IDENT. | EVID. |
|---|---|---|---|
| For the Government | | | |
| G-503QQ    Firearm | | 5 | |
| G-503QQ-2  Set of four pictures of firearm | | 9 | 10 |

Curtis - Direct (Llo)                        4

1              (Following is the requested testimony of Michael R.

2    Curtis, 4:12 p.m.)

3              MR. LLORET:  Your Honor, the Government calls

4    Michael Curtis.

5              COURTROOM DEPUTY:  Please raise your right hand.

6              MICHAEL R. CURTIS, GOVERNMENT'S WITNESS, SWORN

7              COURTROOM DEPUTY:  Please state your full name and

8    spell your last name for the record.

9              THE WITNESS:  Michael R. Curtis, that's C-U-R-T-I-S.

10             MR. LLORET:  Thank you, Your Honor.

11                          DIRECT EXAMINATION

12   BY MR. LLORET:

13   Q    Mr. Curtis, what is your job?  Where do you work?

14   A    Your Honor, I'm a Firearms Enforcement Officer with the

15   Bureau of Alcohol Tobacco Firearms and Explosives, commonly

16   referred to as ATF.

17   Q    And where do you work?

18   A    I work in Martisburg, West Virginia.

19   Q    What do you do?

20   A    My primary -- my job is I provide technical assistance to

21   ATF agents, along with other Federal agents and law

22   enforcement on firearms identification, markings, design, to

23   help them in the implementation of the Gun Control Act and the

24   National Firearms Act.

25   Q    Okay.

1    A    My primary duty is to evaluate evidence, evidence that is

2    seized in the field and is submitted to Firearms Technology.

3    It is my job to evaluate it, test it, and make a

4    classification, either under the Gun Control Act or the

5    National Firearms Act.

6    Q    Now, did you have occasion to make an examination of a

7    firearm some time ago at the request of Agent Michael Ricko?

8    A    Yes, sir, I believe so.

9    Q    Okay.  Let me show you a firearm that's been marked

10   Government's Exhibit 503 double Q.  Can you tell us if you had

11   occasion to examine that firearm?

12   A    Yes, sir.  It has my signature.

13   Q    All right.  And let me just ask, how long have you been

14   examining firearms and rendering opinions about firearms?

15   A    I worked for ATF for approximately seven years but I've

16   worked in firearms for over 30 years.

17   Q    What was the purpose of your examination of this

18   particular firearm that's before you?

19   A    To make a determination whether it had been modified to

20   fire automatically as a machine gun.

21   Q    All right.  What definition of a machine gun are you

22   working with when you make that examination?

23   A    The definition under the National Firearms Act, which is

24   26 USC 5845(b).

25   Q    Can you tell us what that definition is?

Curtis - Direct (Llo)                                      6

1   A    Yes, sir.  Do you want me to read it --

2   Q    Yes.

3   A    -- do you want me to say it?

4   Q    Why don't you tell us what it is?  You can read it.

5   A    Okay.  The definition under the National Firearms Act 26

6   USC Section 5845(b) defines machine gun as, "Any weapon which

7   shoots, is designed to shoot, or can be readily restored to

8   shoot, automatically more than one shot without manual

9   reloading by a single function of the trigger."

10          "The terms shall also include the frame or receiver

11  of any such weapon, any part or any combination of parts

12  designed and intended for use in converting a weapon into a

13  machine gun and any combination of parts from which a machine

14  gun can be assembled, if such parts are in the possession or

15  under the control of that person."

16  Q    Now, with respect to the gun that's been identified as

17  503QQ, what was it that you did to examine that firearm?

18  A    Well, when I initially received it, I did a function test

19  to determine if it cycled as designed as a semi-automatic

20  firearm.  I can't perform it here with this -- this tie in it,

21  but basically when I initially looked at it, I picked it up,

22  cycled it, pulled the trigger, then I held the trigger back as

23  I cycled it and as I released it, the hammer fell and it

24  shouldn't have done that.

25          So it indicated to me that something on the inside

Curtis - Direct (Llo)

1  of this particular firearm has been modified.

2  Q    What does it mean that the hammer fell?  What is the --

3  A    What I mean by that is that the hammer traveled forward

4  and struck the firing pin or the back of the bolt.

5  Q    If you could just explain to the jury, what does the --

6  what's the function of a hammer in a firearm?  What does it

7  do?

8  A    The hammer provides the force to the firing pin to

9  detonate the primer of the actual cartridge.

10  Q    Okay.  And that's an internal part in the weapon?

11  A    Yes, sir.

12  Q    All right.  So the hammer fell forward and what did you do

13  then after you had made that initial determination?

14  A    Well, after I performed a function test, I took it inside

15  the test facility there at Firearms Technology branch and

16  performed an actual live test firing.

17  Q    And how did you go about doing that?  Tell us what

18  happened.

19  A    When I initially went in, I loaded a magazine with three

20  rounds and I inserted the magazine, cycled the bolt back to

21  load it.  When I squeezed the trigger, the firearm fired one

22  time.  As I went to release it, I noticed that it didn't

23  reset.  There's a sound when -- because this hammer has two

24  hooks and it has a sear plate and you can hear it when it

25  resets from one engagement to the other, and I noticed it

Curtis - Direct (Llo)

1  didn't do that.

2          So, I cleared the gun, like I said, as I previously

3  tested it, I could tell that when you cycle and release the

4  trigger, the hammer would follow.  So I loaded three rounds,

5  inserted it, pulled the trigger to the rear, cycled it, and

6  then released the trigger.  When I released the trigger, this

7  particular firearm fired the three rounds that I had loaded

8  into the magazine automatically.

9  Q   Now that's -- so you just had your finger on the trigger

10  once and it fired three rounds?

11  A   Yes, sir.  I had had the trigger to the rear and cycled it

12  and loaded it and when I released the trigger, it fired three

13  rounds automatically.

14  Q   Now, can you explain to the jury, did you examine the

15  firearm to determine how that happened?

16  A   After I came back in, sir, after my test firing, I

17  performed six different test fires on it, you know, and the

18  second one, it actually when I inserted, loaded and squeezed

19  the trigger to the rear, it fired three rounds automatically

20  that time.  And then the next time, it fired one round and

21  then it stopped after that.

22          In the remaining two tests, it fired from releasing

23  the trigger from the rear automatically all three rounds each

24  time.  After that, then I took -- went in and took the gun

25  apart to examine the internal components to see exactly what

Curtis - Direct (Llo)                    9

1    had been -- had been modified.

2    Q    Now, did you take some pictures to assist in your

3    explanation of your examination of the firearm?

4    A    Yes, sir, I do.

5              MR. LLORET:    And may I approach, Your Honor?

6              THE COURT:    Yes.

7    BY MR. LLORET:

8    Q    Mr. Curtis, is that picture that's marked 503QQ-2 a

9    picture that you took?

10   A    Yes, sir, it is.

11   Q    It's actually a set of four pictures, is that right?

12   A    Yes, sir.

13   Q    What do those pictures concern?

14   A    It just basically shows the firearm, the marking on the

15   rear, the bottom left-hand corner here -- like I said, this is

16   the firearm, these are the markings, that's the serial number

17   and what this one here depicts is I -- we have a firearms

18   reference collection with approximately 8,000 firearms which

19   we have weapons just like this in our collection.

20              I pulled one out and I compared it to the -- to this

21   weapon here.    If you notice on the top, it says, "This

22   hammer," which is the FTB weapon, "is 360-thousandths" -- is

23   the distance in this gap from this hook to this hook.    This

24   particular firearm, which is Government's Exhibit 503 -- is

25   that QQ?

1   A    Yes.

2   Q    The gap from that hook to that hook on this particular

3   firearm is 400-thousandths.   So that means that hook has been

4   -- this hook here has been reduced in length.

5            MR. LLORET:   Your Honor, I move the admission of

6   503QQ-2, which is the set of photographs.

7            MR. McMAHON:   No objection.

8            MR. LLORET:   And, Your Honor, I've made some copies

9   or had some copies made.   I'd like to pass them out to the

10  jurors.   They can probably see a little easier.

11           THE COURT:   All right.

12           MR. LLORET:   Thank you.

13                        (Pause.)

14  BY MR. LLORET:

15  Q    And, Mr. Curtis, do you have an extra copy up there for

16  you?

17  A    Yes, sir.   Well, if you need that one, that's fine, sir.

18  Q    Thank you.

19           THE COURT:   Have you given Counsel a copy?

20           MR. LLORET:   Yes, Your Honor.   I provided a copy to

21  Mr. McMahon but let me -- let me give this original to him.

22           MR. McMAHON:   I've seen it, Judge.   I've seen it.

23  Thank you.

24  BY MR. LLORET:

25  Q    Now, Mr. Curtis, looking at this picture, I notice in the

1    bottom right-hand picture, there's an exhibit number.  It's

2    036.  What was that exhibit number?

3    A    That is the exhibit number that was on the evidence

4    transmittal form, this right here.  That's an ATF exhibit

5    number --

6    Q    All right.

7    A    -- which is located in the top right-hand corner.

8    Q    And that corresponds -- obviously, that's your exhibit

9    number.  The Court exhibit number is the 503QQ that the --

10   A    Yes, sir.  That's correct.

11   Q    Okay.  Would it be possible for you to show us on that

12   weapon itself what's depicted in this photograph?

13   A    Yes, sir.  It will take me a second here.

14            MR. LLORET:  With the Court's permission.

15            THE WITNESS:  Is that all right, sir?

16            THE COURT:  Yes, indeed.

17            THE WITNESS:  Yes, sir.  It's kind of hard -- can I

18   stand up, sir?

19            THE COURT:  Why don't you step down and show it,

20   yes.

21            THE WITNESS:  As you can see from your picture here,

22   what I'm referring to is this part here, that's a hook and

23   that's a hook.  This weapon's primarily designed that when

24   you -- this is in the cocked position, which is captured by

25   this bar right here on this side and on this side.  So what

Curtis - Direct (Llo)                    12

1    happens is when you work the bolt it initially cocks it here

2    on this front lower hook.  When you squeeze the trigger, the

3    hammer goes forward, strikes the firing pin --

4              MR. McMAHON:  Can we see?  This is -- we're not

5    seeing any of this.

6              THE COURT:  You may certainly move over there and

7    take a look, Mr. McMahon.

8              MR. McMAHON:  Thank you.

9              MR. LLORET:  Your Honor, I'll take the position down

10   here, if that's okay.  Mr. McMahon can get the better --

11             THE WITNESS:  So as I said, it captures on the lower

12   hook.  The front of this is a transfer bar here.  Well, when

13   you squeeze it -- when you squeeze it right there, then the

14   hammer will go forward and it will strike the firing pin which

15   drives the firing pin tip into the primer and detonates the

16   round.

17             Well, during the cycle of operation, the bolt is

18   going to push this bolt.  Now, I've got the trigger to the

19   rear, just like I fired it.  The bolt is going to push this

20   hammer back and it's going to capture on this upper hook.  But

21   the problem is, when that's open -- now watch -- see how it

22   just went?  And what happens is see there's so little

23   engagement that the force of the bolt and when it feeds a

24   round into the chamber, the force of the bolt jerks it off,

25   just from the motion -- the momentum of it and that's what

1    allows it to keep firing automatically.

2           It just temporarily catches and that force allows it

3    to follow the bolt home or just right behind it and causes it

4    to continue to discharge until either you run it out of

5    ammunition or you release the trigger, one of the two.

6    Q    Now, Mr. Curtis, this function, this -- the fact that the

7    bolt will now actually jerk the firing pin down and trigger

8    the weapon automatically, is that a result of, in your

9    opinion, the widening of the gap that we see in the picture?

10   A    Yes, sir, because if the -- if that hadn't been done, then

11   it would have caught on the upper hook and as you release the

12   trigger, then the upper hook will transfer the engagement.   In

13   other words, as that sear plate goes forward, then the

14   engagement is transferred to that lower hook.

15          Well if that gap is the proper length, it will

16   engage the front -- the lower surface before the back

17   completely releases.   So, by that being shortened, then it

18   allows it to go forward before it can actually engage the

19   front hook or the lower hook.

20   Q    If the gap is only a .360, does the weapon fire as semi-

21   automatic or as an automatic?

22   A    If the gap is 360, it will fire as a semi-automatic.

23   That's the way it's designed to.

24   Q    Okay.   So when that little hook comes back, it will

25   actually catch and hold.

1    A    And hold and it will continue to hold until you release

2    the trigger and then it will transfer to the front without

3    allowing the hammer to follow, as I just demonstrated this one

4    does.

5    Q    Now, are you familiar -- is the gap widened to .40, is

6    that something that the manufacturer does?

7    A    No, sir.

8    Q    Okay.  Have you had experience examining firearms that

9    have had this gap widened before?

10   A    Yes, sir.

11   Q    Is that something that's familiar to you?

12   A    Yes, sir.

13   Q    Okay.  You've seen that on more than one occasion?

14   A    Yes, sir.

15   Q    All right.

16        MR. LLORET:  Your Honor, I have nothing further from

17   the witness.

18        THE COURT:  Are there any questions?

19        MR. McMAHON:  Yeah, just a couple, Your Honor.

20                     CROSS-EXAMINATION

21   BY MR. MCMAHON:

22   Q    First of all, did you thoroughly examine this firearm?

23   Did you -- did you examine it to see if it had been recently

24   fired at all prior to your obtaining it?

25   A    No, sir, because when it was initially sent to me, it was

1   discovered at the lab -- they were test firing it there, when

2   it actually doubled on them or fired automatically on them.

3   That's when it was forwarded to me for evaluation as an NFA

4   weapon.

5   Q    Okay.  So you -- it would be silly for you to look at it

6   since  --

7   A    It had been fired prior to it arriving to me, sir.

8   Q    By the Government --

9   A    Yes.

10  Q    -- by Government agents.

11  A    Well, whoever.  You know, I know it happened during when

12  it was in our control.

13  Q    Right.

14  A    I can't testify that it had been fired or not prior to

15  that.

16  Q    Before it got to you though, it was in -- in other ATF

17  hands, is that correct?

18  A    Yes, sir.

19  Q    Okay.  Now, and being an expert as you are, are there ways

20  for those people -- I mean, just to enlighten me to the fact,

21  for those people, can they tell whether it had been recently

22  fired or not, that type of weapon?

23  A    If they do a test.  It was at the Ammendale Lab.  They can

24  tell if it had been fired prior to --

25  Q    Right.  They can tell that and they could do -- there's

Curtis - Cross (Mcm)                                    16

1    tests that can be done to do that, is that correct?

2    A    Yes, sir.

3    Q    Okay.  Now, if I'm correct then, when it -- the right

4    space is 360, correct, the legitimate --

5    A    Yes, sir, approximately 360.

6    Q    Then it fires fully automatic when you pull the --

7    A    When it's at 360, it only files semi-automatic.

8    Q    It only fires semi-automatic.

9    A    Yes, sir.

10   Q    Oh, okay.  So then it would be -- would it be a machine

11   gun at that time, when it's 360?

12   A    No, sir.

13   Q    So it's designed to be 360, correct?

14   A    That hammer, the way the manufacturer designed it, is

15   approximately -- that gap is approximately 360-thousandths and

16   it is designed to fire semi-automatic at that gap.

17   Q    Okay.  So that gun -- this gun that you had there --

18               MR. McMAHON:  -- if I may approach, Your Honor?

19               THE COURT:  Yes.

20   BY MR. McMAHON:

21   Q    This gun, when it's made by the manufacturer, okay --

22   A    Yes, sir.

23   Q    -- and distributed as a regular gun, without any

24   alterations, it's designed to be a semi-automatic gun.

25   A    That's correct.

1    Q    So if I was purchasing it at a store, I would be

2    purchasing a semi-automatic gun, correct?

3    A    That is correct.

4    Q    It would -- when I was -- if I was purchasing it at a

5    store, I wouldn't be purchasing it, at least in my mind, as a

6    "machine gun," would I?

7    A    I would assume not, sir.

8    Q    Okay.  So and you didn't know that, in fact, it was not

9    what it had been designed for, that is a semi-automatic gun,

10   until such time as you opened it up and you had the expertise

11   to know and the measurements to know that this was --

12   A    When I performed my function test, I knew it would fire

13   automatically just from that from prior experience.

14   Q    Correct.  But as far as that, but your -- it took your

15   expertise or your skills and your experience to determine

16   that, in fact, what it was designed for, that is not to be a

17   machine gun, had somehow been changed to make it possible to

18   be -- fit under the definition of a machine gun, is that fair

19   to say?

20   A    Yes, sir.  My training is what --

21   Q    Right.

22   A    -- allowed me to determine that.

23   Q    And so the average person not knowing the difference

24   between .360 and .40 and semi-automatic probably wouldn't know

25   that, is that correct?

Curtis - Cross (Mcm)                                              18

1    A    The average person -- probably not, sir.

2    Q    Okay.  And these types of guns, can they be bought in a

3    store?

4    A    These here, sir?

5    Q    Yes.

6    A    Not any longer.  This manufacturer is no longer in

7    business.

8    Q    Oh, but when they were manufactured as a semi-automatic,

9    non-machine gun, they were sold in a store, correct?

10   A    Yes, sir --

11   Q    Okay.

12   A    -- through -- sold through an FFL.

13   Q    Okay.  Now, this changing of the width of that, how does

14   that go about?  Do you have to go purchase another one of

15   those little hooks that's wider or do you --

16   A    No, sir.

17   Q    -- spread it out in some fashion manually?

18   A    No, you have to remove metal.

19   Q    Oh, so you'd have to have some sort of --

20   A    A file.

21   Q    -- a file.  So you'd have to file it down and 40-

22   hundredths of a -- 40-thousandths, whatever that number is.

23   A    Yes, sir, 40-thousandths.

24   Q    You'd have to file that down 40-thousandths and then to

25   make it somewhat of a machine gun-type situation, correct?

1  A    You would have to file it to open up the gap to cause it,

2  yes, sir, on this particular firearm to fire automatically.

3  Q    And you have to open up the gun to see that, to do all

4  that, right?

5  A    Yes, sir.  You'd have to do it after you disassemble it.

6  Q    And you would have to know, of course, that that filing

7  would even do that.  You would have to have that knowledge,

8  right?

9  A    Well, if you open it up and start cutting on that, you

10  have some knowledge of what's going to happen.

11  Q    Right, right.  And that's -- and you have that knowledge,

12  right?

13  A    Yes, sir.

14  Q    But as you said, the average person probably doesn't.

15  A    The average person that doesn't handle firearms probably

16  doesn't.

17  Q    Right.  Okay.  Thank you, sir.

18        MR. McMAHON:   I have no other questions for this

19  witness.

20        THE COURT:   Any other questions?

21        MR. WARREN:   No, thank you, Your Honor.

22        MR. HETZNECKER:   None, Your Honor.

23        MR. SMITH:   No questions, Your Honor.

24        THE COURT:   Mr. Lloret?

25        MR. LLORET:   Briefly.

1                          REDIRECT EXAMINATION

2      BY MR. LLORET:

3      Q    Mr. Curtis, just to be clear, when you pulled the trigger

4      on that weapon and did the function test to see if it -- how

5      it operated, was it obvious to you then that it was a machine

6      gun?

7      A    When I did my function test, I knew then it had been

8      modified, yes, sir, and it was more than likely it was going

9      to fire full-auto.

10     Q    And that just meant you pulled the trigger on it?

11     A    That was by pulling the trigger and cycling the bolt and

12     knowing that it didn't set the way it was supposed to.

13     Q    And it kept shooting bullets.

14     A    Yes, sir.

15     Q    All right.

16              MR. LLORET:  Nothing further, Your Honor.

17              MR. McMAHON:  May I?

18              THE COURT:  Go ahead.

19                         RECROSS-EXAMINATION

20     BY MR. MCMAHON:

21     Q    Sir, what you're saying to me then is that you were able

22     to determine that by -- and in fact, a couple of the times you

23     shot it, it only did -- it shot as a semi-automatic weapon,

24     correct?

25     A    Well, it just shot one round.

Curtis - Recross (Mcm)

1  Q   Right.

2  A   It didn't shoot as a semi-automatic because it would

3  engage properly.

4  Q   Okay.

5  A   It's just the bolt or the hammer followed the bolt home

6  and it took the inertia away so it didn't discharge.

7  Q   So one of the times it shot or functioned not as a machine

8  gun, one of the times you fired it, correct?

9  A   Yes, sir, it did.

10  Q   Okay.  And Mr. Lloret just asked you, well, when you

11  pulled the trigger, it fired repeatedly, although it was

12  designed not to do that, when you pulled the trigger, you

13  learned -- that was some information that gave you that you

14  learned that it was a machine gun-type function, correct?

15  A   As I -- if I understood his -- when he asked me when I

16  knew and when I initially knew that it had been modified is

17  before I test fired it --

18  Q   Right.

19  A   -- and that's when I performed a function test.

20  Q   So if you bought that in a store or got it from somebody,

21  as you look at it, it's a semi-automatic, non-machine gun, and

22  unless you fired it, you probably would never know that, in

23  fact, it was a machine gun, right, under that definition, is

24  that fair to say?

25  A   Say that again?  If you bought --

1  Q    In other words, you buy that --

2  A    -- if you bought that as a --

3  Q    -- or given it to you or it's a Christmas present or

4  whatever --

5  A    Right.

6  Q    -- and it's designed to be a semi-automatic gun, as we've

7  already gone over, okay, and you put it in your closet and it

8  sat there, okay, unless you took it out and either did the

9  filing yourself or if the filing had already been done, took

10 it out and fired it yourself, you wouldn't have any idea that

11 it was a machine gun.  It would just be a semi-automatic that

12 was given to you, right?

13 A    That's a fair statement.

14 Q    Thank you.

15         THE COURT:  Anything further?

16         MR. McMAHON:  No more, no more.

17                    REDIRECT EXAMINATION

18 BY MR. LLORET:

19 Q    Did that gun -- did that gun fit the definition of machine

20 gun under the Act?

21 A    Yes, sir, it did.

22 Q    Thank you.

23         MR. LLORET:  Nothing further, Your Honor.

24         THE COURT:  Okay.  So the record is clear, Mr.

25 Curtis has testified as an expert.  There was no

1    objection --

2            MR. McMAHON:  Right, that's correct.  We talked

3    about that ahead of time.

4            THE COURT:  -- and I assume that was one of your

5    stipulations.

6            MR. McMAHON:  And, Judge, I -- we talked about that

7    ahead of time.  We just -- we agree he's an expert in that

8    field.

9            THE COURT:  All right.

10           MR. WARREN:  No objection and I agree to his

11   expertise, Your Honor.

12           THE COURT:  All right.  Okay, you may step down.

13           THE WITNESS:  Thank you, sir.  You have a good

14   evening.

15           THE COURT:  You too.

16           (The requested portion of the testimony of Michael

17   R. Curtis ends at 4:35 p.m.)

18                            *  *  *

19

20

21

22

23

24

25

# C E R T I F I C A T I O N

I, Diane Gallagher, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

*Diane Gallagher*                    February 13, 2008

DIANE GALLAGHER

DIANA DOMAN TRANSCRIBING