UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

*801*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | 05-CR-00440-RBS-1 |
| | ) | |
| vs. | ) | FILED |
| | ) | 1. 2008 |
| ALTON COLES, et. al, | ) | Philadelphia, PA |
| | ) | February 6, 2008 |
| Defendant. | ) | 9:35 a.m. |

TRANSCRIPT OF PORTION OF TRIAL
BEFORE THE HONORABLE R. BARCLAY SURRICK
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:        MICHAEL J. BRESNICK, ESQUIRE
                          UNITED STATES ATTORNEY'S OFFICE
                          615 Chestnut Street, Ste. 1250
                          Philadelphia, PA  19106

For the Defendant:        CHRISTOPHER D. WARREN, ESQUIRE
                          1500 Walnut Street, Ste. 1500
                          Philadelphia, PA  19102

For the Defendant         JACK J. McMAHON, JR., ESQUIRE
Timothy Baukman:          Law Office of Jack McMahon
                          1500 Walnut Street, Suite 900
                          Philadelphia, Pennsylvania 19102

For the Defendant         LAURENCE HARMELIN, ESQUIRE
Monique Pullins:          P.O. Box 3574
                          Westchester, Pennsylvania 19381

For the Defendant         RONALD A. SMITH, ESQUIRE
Asya Richardson:          Ronald A. Smith and Associates
                          1617 JFK Boulevard, Suite 1240
                          Philadelphia, Pennsylvania 19103

For the Defendant         PAUL J. HETZNECKER, ESQUIRE
Thais Thompson:           1420 Walnut Street, Ste 911
                          Philadelphia, Pennsylvania 19102

(Appearances Continued)


For the Defendant          RONALD THOMPSON, ESQUIRE
James Morris:              3002 Lincoln Drive
                          Suite J
                          Marlton, New Jersey 08053

                          WAYNE POWELL, ESQUIRE
                          811 Church Road
                          101 Parragon Building
                          Cherry Hill, New Jersey 08002

Audio Operator:           (Not listed)

Transcribed by:           DIANA DOMAN TRANSCRIBING
                          P.O. Box 129
                          Gibbsboro, New Jersey  08026-0129
                          Office:   (856) 435-7172
                          Fax:      (856) 435-7124
                          E-mail:   dianadoman@comcast.net


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

<u>I N D E X</u>

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS | THE COURT |
|---|---|---|---|---|---|
| Desmond Faison | | 4(war) | 43 | | |
| | | 44(war) | | | |
| | | 45(har) | | | |

Faison - Cross (War)                                                4

1          THE COURT:  We're ready to proceed at this juncture.

2    Mr. Warren, are you ready?

3          MR. WARREN:  I am ready, Judge.

4          THE COURT:  And, Mr. Faison, you are still under

5    oath.  You understand that?

6          THE WITNESS:  Yes, I understand.

7          THE COURT:  All right.

8                     CROSS-EXAMINATION

9    BY MR. WARREN:

10   Q    All right.  Mr. Faison, when we left off yesterday, we

11   were talking about your connection in Chicago, Joe, do you

12   remember that?

13   A    Yes, I remember.

14   Q    Isn't it true, sir, that you actually got -- or tried to

15   get Alton to give you money to buy cocaine from your

16   connection in Chicago?

17   A    No, that's not true.

18   Q    It never happened?

19   A    Never happened.

20   Q    Okay.  Well, let me ask you this, this fellow Ron Walker,

21   you remember him?

22   A    Yes, sure.

23   Q    Okay.  Now, let's say 2000, 2001, 2002, Alton had two

24   girlfriends, didn't he?

25   A    I'm not sure.

1  Q    Laraine Baker, do you know that name?

2  A    I know the name, yes.

3  Q    She lives on Holbrook Street?

4  A    That's correct.

5  Q    That was one of his girlfriend's?

6  A    I know it's his kid's mother.  I'm not sure if it was his

7  girlfriend.

8  Q    Okay.  Kristina Latney, you know her?

9  A    I know of her.

10  Q    That was one of his girlfriends?

11  A    I would assume so.

12  Q    You would assume so?

13  A    Yeah.

14  Q    You didn't know?

15  A    I'm not sure if that's his girlfriend.

16  Q    Okay.  Well, sir, isn't it a fact that he got angry with

17  Ron because he thought that Ron had told Kristina about

18  Laraine?

19  A    At a certain point, yes, that's correct.

20  Q    Okay.  So that was the problem he had with Ron.  He

21  believed that Ron had told one girl about the other one,

22  right?

23  A    At -- at another point, yes.  That was the second reason

24  he got upset with Ron.

25  Q    Yeah.  It was 2001-2002, around in there, right?

1    A    I'm not sure exactly when that was but that situation

2    occurred.

3    Q    Was Craig Linder still alive?

4    A    I'm not sure.

5    Q    You're not sure?  Craig Linder died in 2002, right?

6    A    That's correct.

7    Q    All right.  And after Craig Linder died, that's when you

8    started going up to see this fellow Joe, right?

9    A    Yeah, sometime after that.

10    Q    All right.  Okay.  And you also told us on direct

11    examination about how you used cut.  Do you remember that?

12    A    That's correct.

13    Q    Okay.  You used cut, right?

14    A    No.

15    Q    No?  You didn't used to -- when you were getting 4-and-a-

16    half ounce quantities, you didn't used to cut the quantities

17    you got to stretch it out?

18    A    No, I cooked it.

19    Q    You never used -- you know what cut is, right?

20    A    That's -- yes, I know what it is.

21    Q    Okay.  Cut is a product that you put in the cocaine to

22    increase the quantity of cocaine, right?

23    A    That's correct.

24    Q    All right.  It's also used to re-rock cocaine, isn't it?

25    A    Yeah, that's correct.

Faison - Cross (War)                                            7

1    Q    Now, you told us on direct examination that you had seen

2    people re-rock cocaine, you remember that?

3    A    Yeah, that's correct.

4    Q    Where did you see that at?

5    A    I've seen people do it.

6    Q    Where at?

7    A    Within the Paschall Housing Project.

8    Q    Okay.  What did you see?

9    A    I seen a situation where he used different additives in

10   -- within the cocaine -- different additives to add to the

11   cocaine to stretch it.

12   Q    By additives, you mean cut, right?

13   A    Correct.

14   Q    Okay.  Well, how do they actually re-rock it?  What do

15   they use?

16   A    The cut.

17   Q    Okay.  But then they recompress it back into kilogram

18   form, right?

19   A    Correct.

20   Q    How do they recompress it?

21   A    With -- there's different ways to do it.  I seen a way

22   where he used some bricks and put pressure on them.

23   Q    Okay.  Ordinary bricks, stone bricks, right?

24   A    Hard -- yes, stone bricks.

25   Q    All right.  So what you do is you open up a kilogram

Faison - Cross (War)                                          8

1    cocaine, correct?

2    A    That's correct.

3    Q    You pull some of the cocaine out, correct?

4    A    That's correct.

5    Q    You put cut into the cocaine, right?

6    A    That's correct.

7    Q    You then wet it down, correct?

8    A    That's correct.

9    Q    And then you recompress it using bricks is what you saw,

10   right?

11   A    That's what I saw.

12   Q    All right.  But it's your testimony you never did that?

13   A    No, I never did that.

14   Q    You never did that to stretch your product?

15   A    No, I never did that.

16   Q    Did you ever obtain cut from him?

17   A    No, I didn't.

18   Q    So you weren't obtaining cut from Hakiem Johnson on July

19   7, 2005?  That's not what was happening?

20   A    No, that's not what was happening.

21   Q    Okay.  Now, you know he was filming a movie in the summer

22   of 2005, right?

23   A    Oh, was he?

24   Q    You didn't know?

25   A    No, I didn't know that.

Faison - Cross (War)                                             9

1    Q    Okay.  What about "New Jack City, The Next Generation,"

2    did you ever see that?

3    A    Yeah, I seen it.

4    Q    Okay.  You know he did that movie, right?

5    A    That's correct.

6    Q    You also attended some of the parties he hosted, did you

7    not?

8    A    A couple I did, yes.

9    Q    At the Palmer Social Club?

10   A    I've been up there, yes.

11   Q    Okay.  8th Street Lounge?

12   A    No, I -- I didn't attend one at 8th Street.

13   Q    Okay.  When did you attend the -- when did you attend the

14   parties at Palmer's?

15   A    It was on regular nights, social nights.

16   Q    Okay.  What year, do you remember?

17   A    No, not -- not exactly.

18   Q    Okay.  Was it after Craig Linder died?

19   A    Yeah, it was after that.

20   Q    So it would have been after 2002, right?

21   A    That's correct.

22   Q    Hundreds of people are at these parties, right?

23   A    Yeah, that's correct.

24   Q    And they paid cover charges to get in there, right?

25   A    That's correct.

Faison - Cross (War)                                                     10

1   Q    Did you have to pay a cover charge?

2   A    No.  There was times that you paid the bodyguards, times

3   you didn't.

4   Q    Okay.  Were there times when you paid the bodyguard?

5   A    There was a time I may have, yes.

6   Q    Okay.  How much you pay him?

7   A    It depends on how many people I was with.

8   Q    All right.  Well, do you recall an occasion in which you

9   paid money to get into one of these parties?

10  A    Yes.

11  Q    How much money did you pay to get into the parties?

12  A    It could have been upwards to close to 100, depending on

13  how many people I had with me.

14  Q    It could have been upwards to 100 bucks depending on how

15  many people you had with you?

16  A    Correct.

17  Q    Okay.  All right.  Let me ask you this.  You keep talking

18  about his bodyguard, you remember that?  You just used that

19  term.

20  A    I didn't just use the term, no.

21  Q    Okay.  Well, you just -- strike that.  You used the term

22  a moment ago, his bodyguard, right?

23  A    Not a moment ago, neither.

24  Q    All right.  Did you say -- strike that.  All right.  Did

25  you say that you gave money to an individual who was at the

1    door of the Palmer's Social Club?

2    A    I said that, yes, I did.

3    Q    Okay.  Who was this individual?

4    A    It was one of the guards outside.

5    Q    One of the guards outside?

6    A    Correct.

7    Q    Okay.  When you say guard, what do you mean by guard?

8    A    A guy that pats you down and makes sure you enter the

9    club without weapons.

10   Q    Okay.  This isn't a bodyguard for Alton, right?

11   A    No, I never said that.

12   Q    Okay.  So as far as you know, he didn't have any

13   bodyguards?

14   A    I didn't say that neither.

15   Q    Okay.  All right.  Well, did he have bodyguards?

16   A    Yes.

17   Q    Who was his bodyguard?

18   A    Mack.

19   Q    Okay.  Now, why do you say Mack was a bodyguard?

20   A    Because Mack was the one that was with him every day and

21   Mack actually was the one that pretty much made sure Ace was

22   all right on a daily basis.

23   Q    Okay.  Did Ace ever call him a bodyguard?

24   A    No, I never heard him use that term.

25   Q    Okay.  Are you assuming that Mack was a bodyguard because

Faison - Cross (War)                                           12

1    he was with Alton?

2    A    No, I wouldn't say that neither.

3    Q    Okay.  Well, what makes you say, then, that he was

4    Alton's bodyguard?

5    A    Because it was -- it was a situation where one day Ace

6    came over to 58th and Woodland Avenue, which is a breakfast

7    joint.  And they actually had to close the place down for Ace

8    to eat while his -- his protection -- I'll say his protection

9    -- stood outside.

10   Q    Okay.  And his protection -- I'm sorry, they had to close

11   down what?

12   A    It was a little breakfast spot.

13   Q    The Southern Inn?

14   A    Yes, that's correct.

15   Q    So they closed down the entire Southern Inn?

16   A    Yes, they did.

17   Q    Just so Alton could eat there?

18   A    Yes.  Yes, they did.

19   Q    All right.  And you say he had guards there?

20   A    His protection.

21   Q    Okay.  Well, what did his protection consist of?

22   A    At that point it was two people.

23   Q    Who were the people?

24   A    Mack and another guy.

25   Q    Did you know the other guy?

1    A    No, I didn't.

2    Q    Did you see these people with guns?

3    A    No, I didn't see them with a gun.

4    Q    Did you see Alton with a gun?

5    A    No, I didn't see him with a gun.

6    Q    All right.  But because they were there, you assumed or

7    believed that this was protection?

8    A    I mean, to close down a restaurant for -- for one person

9    to eat.

10   Q    How often did this happen, closing down the restaurant

11   for one person to eat?

12   A    I can only recall one occasion, and that's for him.

13   Q    Okay.  Did you meet him there more than once?

14   A    I've met him outside there before.

15   Q    Did they ever close it down again?

16   A    I only remember one occasion.

17   Q    Okay.  And you met him there multiple times?

18   A    I've met him there before, yes.

19   Q    Okay.  Well, how many times did you meet him there?

20   A    I can't recall exactly how many.  It was numerous times I

21   met him outside of there.

22   Q    Numerous time?

23   A    Yes.

24   Q    Okay.  You also knew that he made CDs, right?

25   A    That's correct.

Faison - Cross (War)                                    14

1    Q    You've actually listened to these CDs, right?

2    A    No, I can't recall listening to them.

3    Q    You never listened to any of his CD's?

4    A    No.

5    Q    Do you know any of his artists?

6    A    No, not directly, no.

7    Q    Nino Brown?

8    A    Yeah, I've met him.

9    Q    Okay.  Was he one of the artists?

10   A    Yes, he -- yes, he was one of the artists.

11   Q    Bugsy, you know him?

12   A    I've -- I've heard of him, yes.

13   Q    He's a rapper?

14   A    Yeah, I've heard of him.

15   Q    Snake, heard of him?

16   A    I've heard of him.

17   Q    Another rapper, right?

18   A    That's correct.

19   Q    A guy named Freeway, heard of him?

20   A    Yeah, I've heard of him.

21   Q    Rapper, right?

22   A    That's correct.

23   Q    Heard of any others?

24   A    I've heard of ton of -- tons of rappers.

25   Q    Okay.  Tons of rappers associated with Alton Coles?

1    A    No, just rappers.  You asked me about rappers in general.

2    Q    I'm sorry?

3    A    You asked me have I heard of any rappers.  Yes, I've --

4    I've heard of tons of rappers.

5    Q    Okay.  I'm asking you the rappers that you associated or

6    thought to be associated with Takedown Records.

7    A    Do -- have I heard of any?  What's your question?

8    Q    Yeah, who are they?

9    A    The names you just named.

10   Q    Any others?

11   A    Not off the top of my head, no, I can't recall.

12   Q    Do you know that Takedown Records sold CDs?

13   A    Yeah, I'm sure he sold CDs for rappers.

14   Q    Well, how do you know that?

15   A    I said, I'm sure -- I said, I'm sure he's -- he sold CDs.

16   Q    Well, what makes you so sure?

17   A    Because Takedown Records was a label -- is a record

18   label.

19   Q    Hosted parties, correct?

20   A    Correct.

21   Q    Made movies, correct?

22   A    That's correct.

23   Q    But you don't think they were making a movie in the

24   summer of 2005?

25   A    I'm not sure --

1          MR. LLORET:  Objection, asked and answered.

2          MR. WARREN:  I'll withdraw the question.

3          THE COURT:  Objection sustained.

4          MR. WARREN:  I'll withdraw the question.

5    BY MR. WARREN:

6    Q    Let me ask you this.  All right.  Can't you make a lot

7    more money in the entertainment industry than you can in the

8    dope industry?

9          MR. LLORET:  Objection, Your Honor, basis.

10         THE COURT:  Sustained.

11         MR. WARREN:  All right.

12   BY MR. WARREN:

13   Q    Well, let's do it this way.  You claim that very early

14   on, shortly after you started dealing with my client, you were

15   supplied with kilogram quantities of cocaine, right?

16   A    That's correct.

17   Q    And you told us some averages.  Do you remember that?

18   A    Yes, I remember that.

19   Q    Three kilograms a month that you earmarked for

20   distribution at Paschall?

21   A    That's correct.

22   Q    Three kilos.  Then you obtained another two kilograms a

23   week for high-level cocaine dealers that you also got product

24   for, right?

25   A    That's correct.

1  Q    So that's two kilos a week times four.  That would be

2  eight kilos a month, right?

3  A    That's correct.

4  Q    And then you also told us that you would get another one

5  kilogram a week for some of your street managers, Tyrk McGeth,

6  Sean Simpson, Anwar Linder; is that right?

7  A    For people they associated they set up with us, correct.

8  That's correct.

9  Q    So that's one kilogram a week times four would be four

10 kilograms a month, right?

11 A    That's correct.

12 Q    You gave us varying prices, right, anywhere from 21,500

13 to 22,000?

14 A    That's -- yes, for a single purchase of a kilo.

15 Q    Okay.  All right.  Well, my math is bad so I'm going to

16 use 20,000.  Would that be a fair price for a kilogram of

17 cocaine?

18 A    It depends on the bulk amount.

19 Q    Okay.  Well, you tell me, how much were you buying it

20 for?

21 A    Because I would buy three in bulk, it would be around --

22 it would be about 21, 21.5, maybe.

23 Q    Okay.  So let's say 21,000 is an average price for these

24 kilos that you're buying?

25 A    For the three, that's correct.

1    Q    Okay.  21-K, that would be 63,000?

2    A    Uh-huh.

3    Q    What about the eight kilos?  What price are you getting

4    for those?

5    A    Because it wouldn't be all in -- he charged me different

6    numbers.

7    Q    Well, you tell me, what was the number that you were

8    paying?

9    A    The maximum 22,500 --

10    Q    Okay.

11    A    -- per kilo.

12    Q    All right.  Well, let's say 22,000 times 8 is what?

13    A    176.  I'm sorry.  Yeah, 176, something like that.

14    Q    166?  166,000?

15    A    I said 176.

16    Q    All right.  176.  What about the other four kilos?

17    A    It's about the same number.

18    Q    The same number, 22,000?

19    A    That's correct.

20    Q    Okay.  Times 4 would be 88,000?

21    A    88.

22    Q    Over a quarter of a million dollars a month, right?

23    A    That's correct.

24    Q    How much is that a year?

25    A    I would need a calculator.  Off the top of my head, I'm

1    not sure.

2    Q    Well, if it was ten months, it would be 2.5 million

3    bucks, right?

4    A    That's correct.

5    Q    So let's say about 2.5 million in ten months and another

6    500,000, that's $3 million a month?  I'm sorry, are you here?

7    A    That's correct.

8    Q    And you started doing this within six months of the time

9    period that you claim to have started getting product from my

10   client, correct?

11   A    It was -- yeah, it was a little while after, yeah.

12   Q    You were selling $3 million worth of cocaine a year?

13   A    Those are the numbers.

14   Q    Is that what you were selling?

15   A    I never sat down and did the numbers but that's pretty

16   accurate.

17   Q    That's pretty accurate.  Tell the jury where you were

18   living when you got arrested?

19   A    In Chester.

20   Q    Chester?

21   A    That's correct.

22   Q    In what?

23   A    In an apartment.

24   Q    An apartment.  How big was this apartment?

25   A    Two bedroom.

Faison - Cross (War)                                    20

1  Q    Two-bedroom apartment.  You were living with your

2  girlfriend?

3  A    That's correct.

4  Q    How much did you pay rent on this apartment?

5  A    750 a month.

6  Q    $750 a month.  What were you driving?

7  A    I had two cars.

8  Q    One was a 1991 Oldsmobile, wasn't it?

9  A    That's not correct.

10  Q    Okay.

11  A    That's after I -- I got it after the seven months that I

12  was out, yes.  But around the time it was an Oldsmobile

13  Aurora.

14  Q    It's an Oldsmobile what?

15  A    Aurora.

16  Q    What year was this Oldsmobile?

17  A    '02, I believe.

18  Q    A 2002 Oldsmobile, right?

19  A    That's correct.

20  Q    You say you had another car?

21  A    I had a truck.

22  Q    What year was this truck?

23  A    It was 2006.

24  Q    2006.  What kind of truck was it?

25  A    A Lincoln Mark LT.

1    Q    2006 Lincoln.  How much did you pay for the Oldsmobile?

2    A    I can't recall that.

3    Q    How much did you pay for the Lincoln?

4    A    I can't recall that.

5    Q    Did you buy it for cash?

6    A    The Oldsmobile, yes.

7    Q    You just don't remember how much you paid?

8    A    I just don't remember exactly how much.

9    Q    Do you remember when you bought it?

10   A    No, not exactly.

11   Q    What about the Lincoln, did you pay cash or pay -- buy

12   that for cash?

13   A    No, I didn't buy that for cash.

14   Q    Finance it, right?

15   A    Yeah, someone financed it for me.

16   Q    How much did you put down?

17   A    I don't recall exactly how much I put down.

18   Q    What were your car payments?

19   A    Close to 600 a month.

20   Q    600 a month.  So you had the 750 a month that you paid

21   the rent, right?

22   A    That's correct.

23   Q    600 a month that you paid for the Lincoln?

24   A    That's correct.

25   Q    Any other large expenses that you paid on a monthly

1   basis?

2   A    Quite a few.

3   Q    Like what?

4   A    I had my own apartment.

5   Q    You had your own apartment?

6   A    That's correct.

7   Q    All right.  Where was this apartment at?

8   A    It was in Yeadon.

9   Q    In Yeadon?

10  A    That' correct.

11  Q    Okay.  And how when did you get that apartment?

12  A    I had it for a few years.

13  Q    One bedroom?  Two bedroom?

14  A    It was a single bedroom.

15  Q    One-bedroom apartment.  How much did you pay for your

16  one-bedroom apartment in Yeadon?

17  A    Maybe 5-something a month.

18  Q    5-something a month.  What were your other expenses?

19  A    I had my mom's expenses.

20  Q    What were your mom's expenses?

21  A    Her rent.

22  Q    Was what?

23  A    Excuse me?

24  Q    What was your mom's rent?

25  A    600 and some odd dollars a month.

1    Q    600 a month.

2    A    Gas -- gas, electric, so forth and so on, water.

3    Q    Utilities?

4    A    All the utilities, correct.

5    Q    Okay.  Gas for the cars?

6    A    No, gas for the --

7    Q    Oh, that's part of the utilities?

8    A    Yeah, that's part of the utilities, correct.

9    Q    Okay.  Where was all the money that you made from dealing

10   cocaine?

11   A    It was around.

12   Q    Around where?

13   A    I had it.

14   Q    Had it where?

15   A    In different places.

16   Q    What places?

17   A    My place, my mom's place, the place they came to.

18   Q    Well, how much money did you store at your mom's place?

19   A    I'm not sure of the amount.

20   Q    How much money did you store at your place in Yeadon?

21   A    I'm not sure of the amount.

22   Q    Is it still there?

23   A    No, it's no longer there.

24   Q    Where'd it go?

25   A    It's possibly been spent.

1   Q    Possibly been spent?

2   A    It's possibly.  I've been down two years.

3   Q    Your place in Yeadon --

4   A    That's correct.

5   Q    -- where'd that money go?

6   A    To my brother.

7   Q    Two of your brothers?

8   A    That's correct.  My brother.

9   Q    Your brother Sherod?

10  A    Sherod's in jail.

11  Q    Sherod -- I'm sorry?

12  A    Sherod is in jail.

13  Q    Which brother did you give the money to that you had

14  hidden in Yeadon?

15  A    LaMar.

16  Q    LaMar.  How much did you give LaMar?

17  A    I don't know exact -- the exact amount.

18  Q    You don't know the exact amount?

19  A    No, I don't.

20  Q    All right.  Well, how much do you think you made off this

21  $3 million a year enterprise?

22  A    I couldn't even put it in figures.

23  Q    Couldn't even put it in figures?

24  A    No, I couldn't.

25  Q    Didn't own any houses?

1    A    No, I didn't.

2    Q    You didn't drive any Bentleys?

3    A    No, I didn't.

4    Q    You didn't give your girlfriends cars?

5    A    Yes, I did.

6    Q    You did?  Which car did you -- what car did you give to

7    your girlfriend?

8    A    She had a Dodge Intrepid, a newer model.

9    Q    She had a Dodge Intrepid?

10   A    Yes.

11   Q    What year was that?

12   A    It was a newer model.  I'm not sure of the exact year.

13   Q    You bought her an Intrepid.  You paid cash for that?

14   A    Yes.

15   Q    How much?

16   A    I'm not sure.

17   Q    Not sure.

18              THE COURT:  Mr. Warren.

19              MR. WARREN:  Yes, sir.

20              THE COURT:  There's no need for you to repeat every

21   answer.

22              MR. WARREN:  I will -- I'm sorry, Judge, I will try

23   not to do that.

24   BY MR. WARREN:

25   Q    You did not have a record company, correct?

1    A    Not at all.

2    Q    You did not make CDs, right?

3    A    Not at all.

4    Q    You did not make movies, right?

5    A    Not at all.

6    Q    And you did not host any parties, right?

7    A    I've hosted parties before.

8    Q    At Palmer's Social Club?

9    A    No, not at all.

10   Q    8th Street Lounge?

11   A    No.

12   Q    When you say hosted parties, these are private parties at

13   someplace that you lived at, right?

14   A    No.

15   Q    Well, tell me about the parties you've hosted?

16   A    They was local parties at bars and at -- I've held a

17   party at 3801.

18   Q    Did you do it on a weekly basis?

19   A    No, it wasn't a weekly basis.

20   Q    Make a lot of money in cash hosting these parties?

21   A    I made some money, yes.

22   Q    Well, how much did you make?

23   A    I'm not sure.

24   Q    You also told us on direct examination that you used code

25   for cocaine.  Do you remember that?

Faison - Cross (War)                                    27

1    A    That's correct.

2    Q    Biscuit, correct?

3    A    One was biscuit, yes, sir.

4    Q    And a biscuit was what?

5    A    That's 4-and-a-half.  4-and-a-biscuit, I said.

6    Q    4-and-a-biscuit?

7    A    That's correct.

8    Q    Is code for 4-and-a-half, what, ounces of powder cocaine?

9    A    Cocaine, crack, whichever one you --

10   Q    Hickey?

11   A    That stands for a half or -- whichever, depending on the

12   person that's buying it.  It could be a half ounce, it could

13   be a half a brick.

14   Q    Onion?

15   A    That's an ounce of cocaine or crack.

16   Q    Nina?

17   A    That's nine ounces of cocaine or crack.

18   Q    Squirrel?

19   A    That's a quarter ounce of cocaine or crack.

20   Q    Did you use these terms or code words when you were

21   speaking with my client on the phone?

22   A    No, I don't recall using them.

23   Q    No, didn't use them, did you?

24   A    I don't recall that.

25   Q    Yet these are the code words you use when you try to get

1    cocaine, right?

2    A    That's correct.   No, that's the code words that's used.

3    That was commonly used with drug dealers.

4    Q    What code words did you use?

5    A    I didn't really use codes on the phone because I would

6    ask to meet up with him.

7    Q    Didn't use code at all?

8    A    I didn't -- no, I didn't use codes.

9    Q    Okay.   So the only calls between you and my client would

10   be you trying to meet up with him?

11   A    Yeah, I would assume so.

12   Q    I'm sorry?

13   A    I would assume so.

14   Q    Well, have you listened to the tapes?

15   A    I've listened to a couple of the calls, yes.

16   Q    Calls between you and Alton, right?

17   A    That's correct.

18   Q    On those calls, it is essentially you trying to meet up

19   with Alton, right?

20   A    Not all of them.   I heard another call.

21   Q    I'm sorry?

22   A    I said, not all the calls was like that.

23   Q    All right.   The calls that you've listened to --

24   A    Correct.

25   Q    -- involve you trying to meet up with Alton, right?

1   A   Or him trying to meet up with me.

2   Q   Or him trying to meet up with you?

3   A   That's two of the calls I've heard, yes.

4   Q   Okay.  How many other calls have you heard?

5   A   I've heard a call with him on the phone.

6   Q   I'm talking about calls between you and Alton.  How many

7   other calls have you heard between you and Alton?

8   A   Oh, not many, no.

9   Q   Not many.  Did you go over with him -- go over those

10  calls with the Government?

11  A   I've heard the calls.

12  Q   Did you go over those calls with the Government?

13  A   I've heard the calls while in the presence of the

14  Government.

15  Q   In the presence of the Government?

16  A   Yes, I have.

17  Q   When you were sitting down preparing for your testimony?

18  A   No, that's incorrect.

19  Q   Okay.  Well, tell me then how -- about how it came to

20  pass that you were meeting with the Government listening to

21  tapes?

22  A   It was during a proffer session.

23  Q   You entered a proffer session.  These proffer sessions,

24  when did they start?

25  A   I'm not sure of the exact date.

1    Q    Do you remember a big newspaper article coming out about

2    Alton last fall, around November 2007?

3    A    Yeah, I've heard about it.

4    Q    Have you seen it?

5    A    Yeah, I've seen it on the block, yes.

6    Q    Okay.  When you say on the block, you mean you've seen it

7    over at the Federal Detention Center, right?

8    A    Yes, correct.

9    Q    And it was after you saw those newspaper articles, that's

10   when you started meeting with the Government, wasn't it?

11   A    That's incorrect.

12   Q    Didn't you meet with the Government first on November 22,

13   2007?

14   A    I'm not sure of the exact date, but it's possible, yes.

15   I'm not sure of the exact date.

16   Q    And you met with Special Agent Tropea?

17   A    I've met with him, yes.

18   Q    Okay.  Well, that was the first agent that you met with,

19   right?

20   A    I'm not sure how many agents was in the room when I met,

21   but I've -- I've met with the agents, yes.

22   Q    Okay.  And that wasn't in November, last November?

23   A    Like I said, I don't recall the very first session I met

24   with them.

25   Q    Well, was it a year ago?

1    A    No, it wasn't -- it wasn't a year ago, no.

2    Q    Okay.  It was a couple months ago, wasn't it?

3    A    It was months ago, yes.

4    Q    You just made the decision to cooperate in this case

5    within a matter of months, right?

6    A    I've made the decision to -- yes, to own up to what I

7    did, yes.

8    Q    Okay.  And that's been within a matter of months, hasn't

9    it?

10   A    That's correct.

11   Q    Until November of last year, you were going to trial,

12   right?

13   A    Yes, I was thinking about -- yes.

14   Q    And then the newspaper article came out, isn't that what

15   happened?

16   A    That's not what happened.

17   Q    That's not what happened.  All right.  How much time did

18   you spend with the Government in these proffer sessions?

19   A    I wasn't documenting time.  I'm not sure.

20   Q    Well, was it more than an hour?

21   A    That's possible.

22   Q    More than two hours?

23   A    Again, I wasn't documenting the time.

24   Q    Meet with them more than once?

25   A    Yes, I've met with them more than once.

1    Q    More than twice?

2    A    Yes.

3    Q    More than three times?

4    A    Yes.

5    Q    More than four times?

6    A    Yes.

7    Q    More than five times?

8    A    After that, I'm not sure.

9    Q    All within the last few months, right?

10   A    Was it in the last few months?  Yes.

11   Q    Okay.  Sir, isn't it a fact that you decided to cooperate

12   because you got mad at him for bringing attention to you;

13   isn't that what happened?

14   A    No, that's not correct.

15   Q    That's not -- that's not correct?  By the way, remember

16   how you told us that you saw that kilogram that you had to

17   break up with a hammer?

18   A    Yes, I remember that.

19   Q    And you claimed that you telephoned Alton and told him

20   that you were having problems breaking it up, right?

21   A    That I had problems with it, that's correct.

22   Q    Okay.  Well, what did you tell him on the phone?

23   A    I told him it wasn't right.

24   Q    Told him it wasn't right?

25   A    That was it, yes.

1   Q    And that was in July 2005?

2   A    I'm not sure exactly when that was.

3   Q    All right.  Well, do you remember the time that you claim

4   to have gotten a half kilogram from Hakiem?

5   A    Yes, I remember that, yes.

6   Q    Okay.  The conversation was supposedly shortly before

7   that, wasn't it?

8   A    Which conversation, I'm sorry?

9   Q    What's that?

10  A    Which conversation?

11  Q    The one where you said that there were problems or

12  whatever it was you said, problems with the kilogram of

13  cocaine that he supposedly supplied you.

14  A    I had problems with that prior to talking with Ace about

15  -- Ace and him talking to his uncle, yes.

16  Q    Well, I'm just trying to figure out when that

17  conversation was, according to you.

18  A    It was before I got the half kilo from Hack.  Yes, it was

19  before that.

20  Q    Shortly before that?

21  A    I'm not sure exactly how long it was.

22  Q    Not sure?

23  A    No.

24          MR. WARREN:  The Court's indulge.

25          (Pause in proceedings)

Faison - Cross (War)                34

1    BY MR. WARREN:

2    Q    How much money were you paying Joe for the kilograms of

3    cocaine?  How much did he charge you?

4    A    About 18 -- 18,000 or 19.

5    Q    You'd get cocaine from Joe for 18,000 a kilogram, right?

6    A    That's about right.

7    Q    But you preferred to pay Alton 21 and 22,000; is that

8    what you're telling us?

9    A    Yes, that's what I'm telling you.

10             MR. WARREN:  I have nothing further, Your Honor.

11             THE COURT:  Mr. McMahon?

12             MR. McMAHON:  I have no questions of this witness.

13             SPEAKER:  No questions, Judge.

14             MR. HARMELIN:  If I may, Your Honor?

15             THE COURT:  Yes.

16                        CROSS-EXAMINATION

17   BY MR. HARMELIN:

18   Q    Good morning, Mr. Faison.  How are you doing?

19   A    Good morning.

20   Q    Good.  During the time that you have been incarcerated

21   over at the Federal Detention Center, is it fair to say you've

22   had plenty of time on your hands?

23   A    That's fair to say.

24   Q    Is it fair to say that you're intimately familiar with

25   this, the indictment?

1    A    Sure, that's fair to say.

2    Q    Okay.  Have you studied not only your charges but others?

3    A    I've studied the indictment, yes, I have.

4    Q    Okay.  I'm not trying to trick you, but are you kind of

5    conversant in its contents?

6              MR. LLORET:  Objection, Your Honor.

7              THE COURT:  Sustained.

8    BY MR. HARMELIN:

9    Q    You told the agents about Anwar Linder and Lynette

10   Simpson and Sean Simpson helping you in your drug selling

11   business, right?

12   A    That's correct.

13   Q    Okay.  And you specifically told the agents that Anwar,

14   Sean and Lynette Simpson were selling drugs at Paschall Homes

15   with which you supplied them, correct?

16   A    That's correct.

17   Q    Okay.  And you are familiar enough with this indictment

18   to know that Lynette Simpson's in it, right?

19   A    That's correct.

20   Q    But Sean Simpson's not in it, is he?

21   A    No, he's not in it.

22   Q    But you certainly told the agents that he was selling

23   dope for you, right?

24   A    I told them that, yes.

25   Q    Okay.

1          MR. HARMELIN:  Agent Horay, would it be possible to

2   get Exhibit 504 on the screen, please?

3          SPEAKER:  504?

4          MR. HARMELIN:  Is it a picture?  I believe it's a

5   photograph, yes.

6          SPEAKER:  That's a report.

7          MR. HARMELIN:  Oh, maybe it's 504(a), a photograph

8   of Kristina Latney's house.  No, that wouldn't be it either.

9   Okay.  Never mind.  We'll try something different.  How about

10  806, please.

11  BY MR. HARMELIN:

12  Q    Is it up on your monitor?

13  A    Yes, it's up.

14  Q    Okay.  And what is that house?

15  A    That's Laraine's house.

16  Q    Okay.  And did you say that you met with Alton Coles and

17  Mar there?

18  A    Yes, I've met them there.

19  Q    More than once?

20  A    No, I didn't say more than once.

21  Q    Once?

22  A    I've met with Ace there more -- more than once, but it

23  was one instance when Mar was there.

24  Q    Oh, okay.  Forgetting the one instance when Mar was

25  there, but I think you told us yesterday that that's when you

1    felt uncomfortable about Mar and you went out to your car to

2    get the gun, right?

3    A    That's correct.

4    Q    Okay.  And then when you came back in, you did whatever

5    business, I think you testified to, with Ace and you left?

6    A    That's correct.

7    Q    What was the nature of the business that you did with Ace

8    that day?

9    A    It was to purchase.

10   Q    Purchase drugs?

11   A    Yes.

12   Q    And pay him for it?

13   A    And pay him for it, correct.

14   Q    And you say, aside from that one time when Mar was there,

15   there were other times you met Ace there?

16   A    That's correct.

17   Q    And what did you do the other times you met Ace there?

18   A    Business then.

19   Q    Same kind of business?

20   A    Same kind of business, yes.

21   Q    Okay.  And that -- was that business transacted inside of

22   that house depicted in photograph 806?

23   A    That's correct.

24   Q    And that's Laraine's house?

25   A    That's Laraine's house.

```
 1    Q    Okay.  Did you tell the agents that you had bought drugs

 2    from Ace in that house on several occasions?

 3    A    Yes, I did.

 4    Q    Is there a charge in this indictment against Laraine for

 5    maintaining a drug storage facility?

 6              MR. LLORET:  Objection, Your Honor.

 7              THE COURT:  Objection sustained.

 8              MR. HARMELIN:  Could I have Exhibit 507, please.

 9              SPEAKER:  That's also a report.

10              MR. HARMELIN:  Oh, okay.

11              (Pause in proceedings)

12    BY MR. HARMELIN:

13    Q    Did you -- do you recognize that photograph?

14    A    Yes.

15    Q    Did you testify yesterday that you met with Alton Coles

16    at that house where Kristina lived?

17    A    That's correct.

18    Q    Was that for business?

19    A    That was for business.

20    Q    Okay.  And you know that Kristina Latney is in here for

21    money laundering, right?

22    A    Yes, she's in there, yes.

23    Q    But she's not in here for maintaining a stash house,

24    right?

25              MR. LLORET:  Objection, Your Honor.
```

1          THE COURT:  Objection sustained.

2     BY MR. HARMELIN:

3     Q     You went to Hack's house several times, correct?

4     A     That's correct.

5     Q     Okay.  And that was to do business, right?

6     A     That's correct.

7     Q     Drug kind of business, right?

8     A     Drug business, yes.

9     Q     Okay.  And you know that Hack's in the indictment right?

10    A     That's correct.

11    Q     And you also know that there's no charge for him having a

12    stash house, right?

13    A     I'm not sure of that.

14    Q     Okay.  You started selling drugs when you were 13 years

15    old?

16    A     That's correct.

17    Q     Was that about 1991?

18    A     Dating back around that time maybe.

19    Q     Okay.  And you continued to sell to addicts and other

20    drug dealers for about 14 years, does that sound right?

21    A     Yeah, that's about correct.

22    Q     Okay.  And for those 14 years of selling cocaine powder

23    or crack, whenever you needed more drugs, you picked up a cell

24    phone and you called somebody and said I need more, right, or

25    something along those lines, I need to meet you?

1    A    More or less.

2    Q    And this is something you would do several times a month,

3    right?

4    A    More or less.

5    Q    You mean more or less than several times a month?

6    A    That's correct.

7    Q    Okay.  And this was the pattern for 14 years, right?

8    A    Pretty much, yes.

9    Q    Okay.  Can we agree that you used your telephone to

10   facilitate your role in this drug conspiracy on hundreds of

11   occasions?  Do you know what facilitate means?  I'll ask it a

12   different way.

13   A    You could explain it.

14   Q    Sure.  Facilitate means to make something easier, to move

15   something along, to help in it.

16   A    It's possible, yes.

17   Q    Okay.  So can we agree that you used your phone on

18   hundreds of occasions to help your drug business to re-up?

19   A    Yeah, we could agree on that.

20   Q    Okay.  And I think yesterday you said that you kept

21   calling Ace to get your money back when sometime that you felt

22   you had been burned?

23   A    No, I never said he burned me.

24   Q    Something about the re-rock --

25   A    Right.

1    Q    -- and you wanted to get your money back, right?

2    A    Correct.

3    Q    And you called him repeatedly about that, right?

4    A    Yeah, that's correct.

5    Q    Okay.  And that was to get either a different batch of

6    drugs or to get money back for the drugs that you were unhappy

7    with, right?

8    A    That's correct.

9    Q    Okay.  And we can agree that you were using your phone

10   for that purpose, right?

11   A    That's correct.

12   Q    And that had to do with your drug business, right?

13   A    That's correct.

14   Q    Okay.  And you told the agents about that, right?

15   A    That's correct.

16   Q    Okay.  So they knew that you used your cell phone

17   hundreds of times for your drug business, right, because you

18   told them?

19   A    I told them.

20   Q    Right?

21   A    I told them I've used my phone, yes.

22   Q    Okay.  And in spite of the fact that you admitted to them

23   that you had used your cell phone on hundreds of occasions to

24   help in your drug business, you were not charged in this

25   indictment with using --

1              MR. LLORET:  Objection, Your Honor.  Objection.

2              THE COURT:   The objection to that is overruled.

3              MR. LLORET:  Very well, Your Honor.

4    BY MR. HARMELIN:

5    Q    You can answer the question, sir.

6    A    Was I charged in the indictment with facilitating?

7    Q    Using a telephone --

8    A    To facilitate --

9    Q    -- to facilitate your drug business?

10   A    No, I wasn't charged with that.

11   Q    You weren't charged with that at all, right?

12   A    No, I wasn't.

13   Q    Okay.  And you certainly were not required to plead

14   guilty to that charge because you weren't charged with it,

15   right?

16   A    That's correct.

17   Q    Okay.

18              MR. HARMELIN:  Thank you for your time, sir.

19              THE WITNESS:  All right.

20              SPEAKER:  No questions, Your Honor.

21              SPEAKER:  No questions, Your Honor.

22              THE COURT:  Any redirect, counsel?

23              MR. LLORET:  Yes, Your Honor.

24                        REDIRECT EXAMINATION

25   BY MR. LLORET:

1   Q     Mr. Faison, the 3 million that Mr. -- Mr. Warren talked

2   about, was that all pure profit, or did you have expenses?

3   A     Oh, that was expenses.

4   Q     About how much did you make when you sold a brick of

5   cocaine?

6   A     It could be different amounts of profit, but it wasn't a

7   huge amount of profit when you sold one solid brick of

8   cocaine.

9   Q     So do you remember approximately how much you would make

10  if you just took a brick of cocaine and sold it as --

11  A     And resold it, probably a quick $2,000.

12  Q     All right.  And the bricks that you sold to the Paschall

13  Homes projects, did you have other people under you --

14  A     Yes.

15  Q     -- that were selling.

16  A     That's correct.

17  Q     Okay.  Were they also making money on this?

18  A     That's correct.

19  Q     Okay.  Again, was that pure profit when you would turn

20  the three bricks around and break them up and sell them?

21  A     I would profit from it, yes.

22  Q     All right.  And Mr. Harmelin questioned you about

23  information you gave.  You gave the information to the agents

24  in the last few months; is that right?

25  A     In the last few months, yes, I have.

Faison - Recross (War)                                    44

1  Q     All right.  And when were you indicted?

2  A     A couple years ago.

3  Q     Okay.

4            MR. LLORET:  Nothing further, Your Honor.

5            MR. HARMELIN:  May I, Your Honor?

6            MR. WARREN:  Very briefly --

7            MR. HARMELIN:  Go ahead, Mr. Warren.

8            MR. WARREN:  Thank you.

9                    RECROSS-EXAMINATION

10 BY MR. WARREN:

11 Q     You didn't make a lot of money selling kilos of cocaine;

12 is that what you're telling us?

13 A     No, that's not --

14           MR. LLORET:  Objection, Your Honor.

15           THE COURT:  Sustained.

16 BY MR. WARREN:

17 Q     Did you make a lot of money selling kilos of cocaine?

18 A     I made a lot of money selling cocaine, yes, I did.

19 Q     Lots of money.  You made a lot more when you bought it

20 for 18,000 a kilo, right?

21 A     No, that's not correct.

22 Q     That's not true?

23 A     It took a lot more time for me to have somebody go to

24 Chicago to get it from Joe when Ace was more convenient.

25 Q     Okay.  For 18,000, right, you'd send somebody up to

1    Chicago, right?

2    A    Right.

3    Q    They'd come back down from Chicago, right?

4    A    Correct.

5    Q    And then you'd sell it for a lot more than 18,000 bucks,

6    right?

7    A    I still had to pay them, had to pay expenses for them, so

8    it still pretty much equaled out to maybe close to 20 grand

9    for the kilo after all expenses for one --

10   Q    It's still cheaper than what you claim you were paying

11   him, right?

12   A    Yeah, in a sense it's cheaper, yes.

13                MR. WARREN:  Nothing further.

14                THE COURT:  Anything further?

15                MR. HARMELIN:  May I?

16                    RECROSS-EXAMINATION

17   BY MR. HARMELIN:

18   Q    You know this is the fifth superseding indictment, right?

19   A    I can't see it from here, but if that's the one I --

20                MR. HARMELIN:  May I approach the witness, Your

21   Honor?

22                MR. LLORET:  Objection, Your Honor.

23                THE COURT:  Where are you going with this, Mr. --

24                MR. HARMELIN:  I want to ask him about how many

25   indictments there have been and how many times he's been

1    indicted.

2              MR. LLORET:  Objection, Your Honor, it's a

3    superseding indictment.

4              THE COURT:  You may approach the witness.

5              MR. HARMELIN:  Thank you.

6              THE COURT:  Overruled.

7    BY MR. HARMELIN:

8    Q    Don't we agree that this appears to be the fifth --

9    A    The fifth -- yes, that's correct.

10   Q    And you know there's been a fourth superseding indictment

11   and a third superseding indictment and a second superseding?

12   A    I would assume so.

13   Q    So you're familiar -- and you've read all of them, right?

14   A    No, I didn't read all of them.

15   Q    Well, did you check them to see how they differed?

16   A    No, I didn't have a chance to see how all the -- all of

17   them.

18   Q    Did your -- did you ask your lawyer, what's up with the

19   superseding indictment?  What's that mean?

20   A    I just checked out the one that I was on.

21   Q    Okay.  Did charges against you change through time?

22   A    No, my charges pretty much was the same from one to

23   other.

24   Q    But you understand that the purpose of a superseding

25   indictment is to add other stuff?

Faison - Recross (Har)                                    47

1    A    For different people, yes.

2    Q    Right.

3    A    Correct.

4    Q    Or perhaps for a different person to add a fifth charge

5    if there's only four and that kind of thing.

6    A    That's correct.

7    Q    Okay.  So you're familiar with the fact that they can add

8    charges --

9    A    I'm --

10   Q    -- after they've made one indictment?

11   A    That's correct.

12   Q    Okay.  And in your case, they dropped seven or eight

13   charges in order for you to cooperate, right?

14   A    I'm not sure of that.

15   Q    Well --

16        MR. HARMELIN:  May I approach?

17        THE COURT:  Yes.

18   BY MR. HARMELIN:

19   Q    Does this appear to be a guilty plea memorandum that went

20   with your guilty plea agreement?

21   A    That's --

22   Q    Or change of plea agreement?

23   A    That's correct.

24   Q    Okay.  And do you remember that you pled to four charges,

25   the 924c, the possession with the intent to deliver, the

1   delivery of over 5 grams and the conspiracy?

2   A    That's correct.

3   Q    Okay.  And then all these other counts, 18, 19, 20, 21,

4   24, 26, 27, the Government will dismiss them at the time of

5   your sentencing, right?

6   A    That's correct.

7   Q    Okay.  That's what I was talking about.

8   A    Okay.

9   Q    And do you also understand that in addition to the

10  mandatories and all that stuff, the Guidelines themselves,

11  because you were in the conspiracy for any amount of time,

12  called for something like 293 months in jail, right?

13  A    I didn't go over the Guidelines yet.

14  Q    Do you remember in the agreement that it talked about

15  what your Guideline level would be?

16  A    It's not in that agreement.  It's not in the plea

17  agreement, my Guideline level.

18  Q    Do you remember that there's an agreement that the

19  Guideline will be based on the quantities of cocaine?

20  A    Yes, I -- I recall.

21          MR. HARMELIN:  May I approach, Your Honor?

22          THE COURT:  Yes.

23  BY MR. HARMELIN:

24  Q    And you've seen this book, the Guidelines, right?

25  A    Yes, I've seen it.

1    Q    And do you recall that the conspiracy before they make

2    the adjustments about cooperating and admitting

3    responsibility, they start at 38, don't' they?

4    A    I'm looking -- I'm not sure.

5    Q    Okay.  You understand that beyond the minimums and all

6    that other stuff, anybody that's in conspiracy, including

7    you --

8    A    Correct.

9    Q    -- is looking at a heavy sentence on top of mandatories,

10   right?

11   A    Yes, I am.

12   Q    Okay.

13                MR. HARMELIN:  Thank you for your time.

14                THE COURT:  Is there anything further, counsel?

15                MR. LLORET:  Nothing from the Government, Your

16   Honor.

17                THE COURT:  You many step down.

18                (Proceedings concluded at 10:18 a.m.)

19                                ***

20

21

22

23

24

25

1                  **C E R T I F I C A T I O N**

2

3

4           I, Brenda Boulden, court approved transcriber,

5 certify that the foregoing is a correct transcript from the

6 official electronic sound recording of the proceedings in the

7 above-entitled matter.

8

9

10 _Brenda Boulden_        April 11, 2008

11 BRENDA BOULDEN

12 DIANA DOMAN TRANSCRIBING

13