UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,   :   Criminal Action 05-440
                            :
                            :   Philadelphia, PA
                            :   February 8, 2008
        v.                  :   9:30 a.m.
                            :
ALTON COLES, et al.,        :
                            :   FILED
        Defendant.          :
--------------------------- :
                                APR 21 2008

                                MICHAEL E. KUNZ, Clerk
                                By_____ Dep. Clerk

TRANSCRIPT OF TESTIMONY OF RAYMOND ARMSTRONG
BEFORE THE HONORABLE R. BARCLAY SURRICK
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For Government:         MICHAEL J. BRESNICK, ESQ.
                       RICHARD A. LLORET, ESQ.
                       U.S. Attorney's Office
                       615 Chestnut Street, Suite 1250
                       Philadelphia, PA  19106-4476


For the Defendant      CHRISTOPHER D. WARREN, ESQ.
Alton Coles:           1500 Walnut Street
                       Suite 1500
                       Philadelphia, PA  19102


For the Defendant      JACK J. MCMAHON, JR., ESQ.
Timothy Baukman        Law Office of Jack McMahon
                       1500 Walnut Street, Suite 900
                       Philadelphia, PA  19102


For the Defendant      LAURENCE HARMELIN, ESQ.
Monique Pullins:       P.O. Box 3574
                       Westchester, PA  19381




2

APPEARANCES:                (Continued)

For the Defendant          RONALD A. SMITH, ESQ.
Asya Richardson:           Ronald A. Smith and Associates
                           1617 JFK Boulevard, Suite 1240
                           Philadelphia, PA  19103


For the Defendant          PAUL J. HETZNECKER, ESQ.
Thais Thompson             1420 Walnut Street, Suite 911
                           Philadelphia, PA  19102


For the Defendant          RONALD THOMPSON, ESQ.
James Morris:              3002 Lincoln Drive, Suite J
                           Marlton, NJ  08053

                           WAYNE POWELL, ESQ.
                           811 Church Road
                           101 Parragon Building
                           Cherry Hill, NJ  08002


Audio Operator:            Mark Rafferty


Transcribed by:            DIANA DOMAN TRANSCRIBING
                           P.O. Box 129
                           Gibbsboro, New Jersey  08026-0129
                           (856) 435-7172
                           FAX:  (856)  435-7124
                           EMAIL:  dianadoman@comcast.net


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

## I N D E X

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| FOR THE GOVERNMENT | | | | |
| RAYMOND ARMSTRONG | 4 | 57 (War) | 115 | 117 (McM) |
| | | 81 (McM) | | |
| | | 101 (Pow) | | |
| | | 105 (Smi) | | |
| | | 111 (Het) | | |

| EXHIBITS | | IDENT | EVID |
|---|---|---|---|
| G-750E | Chart | | 11 |
| G-750C | Chart | | 19 |

Armstrong - Direct                                              4

1          (The following is excerpted portion of proceeding;

2          testimony of Gary Armstrong, at 9:30:06 a.m.;

3                          jury present)

4               GARY ARMSTRONG, PREVIOUSLY SWORN

5                  CONTINUED DIRECT EXAMINATION

6    BY MR. LLORET:

7    Q.   Agent Armstrong, yesterday we were discussing some of the

8    last deposits that occurred in or about July 28th and 29th of

9    2005 with regard to the Dillion's Lane transactions.   Do you

10   recall that?

11   A.   Yes, I do.

12   Q.   Now you mentioned that you had prepared a summary of

13   those last few deposits on the 28th and the 29th, and is that

14   a document that was tab number 750A?

15          MR. LLORET:   And if we could show that to the

16   witness.

17   A.   I have it, yes, that's correct.

18   Q.   Okay.

19          MR. LLORET:   Thank you, ma'am.   And Ms. Horay, if we

20   could show Exhibit number 750A on the screen.

21   Q.   Agent, is this the summary that you were speaking of?

22   A.   Yes, it is.

23          MR. LLORET:   Now, Your Honor, that has been

24   previously stipulated into evidence, and we can show it to the

25   jury.

Armstrong - Direct                                5

1            THE COURT:  You can show it to the jury if counsel

2       have agreed.

3            MR. WARREN:  That's correct.

4            THE COURT:  Go ahead.

5            MR. LLORET:  Thank you, Your Honor.

6       BY MR. LLORET:

7       Q.   Mr. Armstrong, if you could -- and Agent Horay -- I'm

8       sorry, Agent Armstrong, if you could just tell us briefly,

9       what was your methodology in preparing this chart?

10      A.   I would review the bank documents, specifically the

11      deposit slips or other records that banks maintain of

12      deposits, determined, determined what kind of deposits they

13      were, what account they went into, and then further determine

14      where the location of the branches that the actual deposit

15      took place was.

16      Q.   All right.

17            MR. LLORET:  And Agent Horay, if we could blow the

18      written portion of the chart up so that we could take a look

19      at it.

20      Q.   And Agent Armstrong, could you just go through these with

21      us and tell us what information you gleaned from the records

22      with respect to each of the deposits?

23      A.   Yes.  I looked at a deposit on 7/28 at 3:24 at the

24      Citizens Bank at 2497 Aramingo Avenue in Philadelphia, and a

25      deposit of $9700 was placed into the Take Down Limited account

Armstrong - Direct                                6

1    at Citizens.

2        On July 29th, at 12:08 p.m., at the PNC Bank located at

3    401 West Haver Road in Philadelphia, a 98 -- excuse me --

4    $9800 deposit was placed into the account of Asya Richardson

5    and Alton Coles.

6        Also on that day, 7/29, at 1:12 at the Citizens Bank, at

7    2900 Island Avenue in Philadelphia, there was a $9,140 cash

8    deposit into the Take Down Limited account at Citizens, at

9    Citizens Bank.

10       That same day, the 29th at 1:48, approximately a half-

11   hour later, there was a currency deposit into the Citizens

12   Bank account at 2900 Island Avenue in Philadelphia of $9200

13   into the account of Alton Coles.

14       Again the same day, the 29th, at 3:33, there was a

15   deposit into the -- taking place at the PNC branch at 104

16   North White Horse Pike, Stratford, New Jersey of $9200 and

17   that deposit was placed into the account of Asya Richardson

18   and Alton Coles.

19       And also -- and that's an error on the chart, it says

20   9/29, that should be 7/29/05, same day as all the other

21   deposits.

22       At 4:01 p.m., at the Wachovia -- the Wachovia branch at 9

23   South White Horse Pike in Stratford, New Jersey, a $6,160

24   deposit was placed into the account of Naseem Coles.  And that

25   last deposit of $6,160, those were actually two deposits, one

Armstrong - Direct                                                    7

1    very large in terms of the total deposit of $5900 and one of

2    $160 or something.   They happened right after each other in

3    time so I just combined them for the purposes of this chart.

4    Q.    And referring back --

5          MR. LLORET:   Agent Horay, if we could put number

6    750D back on the screen.

7    Q.    Referring back to that last item you mentioned, is that

8    on the lower right hand part of this particular chart?

9    A.    That's correct.   The two, the two deposits being made

10   into that Wachovia account on this chart just appear as one

11   deposit.

12   Q.    And when you're saying this chart, you're referring to

13   number 750A?

14   A.    Yes, that's correct, I'm sorry.

15         MR. LLORET:   Agent Horay, if we could just blow up

16   briefly that Wachovia item on the bottom right.

17   Q.    Those two deposits there were accumulated by you in

18   making the summary chart, 750A, the last item?

19   A.    That's correct.

20         MR. LLORET:   If we could go back to 750A for just a

21   moment now.   And if we could blow up the written portion

22   again.

23   Q.    Agent, just for the benefit of those of us that don't

24   necessarily know the geography of Philadelphia and its

25   immediate environment that well, can you give us a brief idea

Armstrong - Direct                                    8

1    of where the various addresses are of these particular banks?

2    A.    Yes. The Aramingo Avenue branch is in the Fishtown

3    section of Philadelphia which would be somewhat north of

4    Center City and east towards the Delaware River.

5         401 West Haver Road is in the Olney section, Olney-Logan

6    section of the city.  That would be -- that's also lowest

7    Northeast, lower Northeast part geographically speaking of the

8    city.  The largest major intersection there would be Broad and

9    Olney, about approximately a half mile away from there.

10   Q.    Is Broad and Olney near the 1400 block of Clearview?

11   A.    No.  Clearview I believe -- I'm not totally sure of the

12   top of my head where Clearview is but I believe it's south.

13   Q.    I see.  Okay, and then the next item is the 2900 Island

14   Avenue?

15   A.    Yes.  2900 Island Avenue is in the southwest portion of

16   the city.

17   Q.    All right.  And obviously the New Jersey items appear to

18   be in the town called Stratford?

19   A.    That's correct.

20   Q.    And do you know approximately where Stratford is?

21   A.    Yes.  Stratford is in South Jersey, kind of in the Berlin

22   area, basically. Major intersections that I would consider

23   would be the intersection of Routes 73 and 30 which is Berlin,

24   but that's -- that's kind of about it.

25   Q.    All right.

Armstrong - Direct                                    9

1   A.    And that also is close to the location where settlement

2   took place.

3   Q.    I see, okay.  Now, Agent, with respect to these

4   transactions and those depicted on this particular chart, in

5   your experience, and based only on your experience, are these

6   significant with respect to structuring?

7   A.    Yes, they are significant in respect to structuring.

8   They are consistent with structuring activity.

9   Q.    All right.  And why is that?

10  A.    There are multiple -- multiple cash deposits being made

11  in a single day, accumulating over $10,000.  There are

12  multiple deposits into the same bank account on the same day,

13  accumulating over $10,000.  There is the use of -- there's the

14  use of three different banks, utilizing five different branch

15  locations of those banks.  The amounts -- the amounts of the

16  deposits are also consistent with structuring.  Most of the

17  deposits are just under the currency reporting requirement

18  amount.

19  Q.    Which is?

20  A.    Which is $10,000.

21  Q.    All right.  Now, with respect to your experience in terms

22  of -- let's set aside structuring for a moment and turn to

23  money laundering generally, are these deposits significant

24  based on your experience?

25  A.    Yes, they are.

Armstrong – Direct                                10

1    Q.    And how so?

2    A.    In terms of money laundering, if we're dealing with funds

3    which are gotten illegally, which were gained illegally, there

4    -- there -- the filing of a currency transaction report would

5    be -- would be a red flag on the individual file -- on the

6    individual who made the deposits.

7    Q.    Is it in your experience common to find money laundering

8    schemes that utilize structuring as part of the process?

9    A.    Yes, it is.

10   Q.    All right.  And are the items that you've investigated in

11   the past, are some of them or many of them familiar to you and

12   reminiscent of this particular set of transactions?

13   A.    Yes, it is, and they are.

14   Q.    All right.  Okay.  Let me just turn to another

15   transaction.  Sir, did you have occasion with respect to your

16   investigation to examine documents that related to a -- an

17   event at the Spectrum?

18   A.    Yes, I did.

19   Q.    What steps did you take, if you can tell us briefly, and

20   what were you looking at?

21   A.    Steps I took reviewed the -- reviewed the documents that

22   were obtained in the search warrant.  I had a preexisting

23   knowledge that there was an event before I -- at the Spectrum,

24   before I saw any of the documents.  Subpoenaed -- subpoenaed

25   the Spectrum, subpoenaed various companies that I found were

Armstrong - Direct                            11

1    associated and provided some service to that event, and

2    located what I believe are most or if not all of the records

3    that are associated with it.

4    Q.    All right.  Did you prepare a summary chart with respect

5    to that particular event?

6    A.    Yes, I did.

7    Q.    And is that chart number 750E?  And consulting your book,

8    do I have the right chart, 750E?

9    A.    Yes.

10   Q.    All right.

11          MR. LLORET:  Your Honor, this again has been

12   stipulated into evidence, but Agent Horay, if you can show us

13   number 750E.

14          MR. WARREN:  That's correct, sir.

15          THE COURT:  All right.  It may be admitted and shown

16   to the jury.

17          (Exhibit 750E admitted into evidence)

18   BY MR. LLORET:

19   Q.    Agent, if you can just give us an overview of this chart,

20   what was your -- what does it do, sort of generally speaking,

21   so we can understand the flow of the chart, and then we'll go

22   into the particulars?

23   A.    Okay.  And I should say the Spectrum event was in terms

24   of my investigation, or what I was looking at, extremely

25   significant and relevant, given that it took place in April of

Armstrong - Direct                    12

1   2002, approximately the time that Take Down was born, for lack

2   of a better term.

3   Q.   Can you tell us, did part of your documents that you

4   reviewed, did you have occasion to look at certificates of

5   incorporation with respect to Take Down?

6   A.   Certificates of incorporation, the opening documents for

7   the various Take Down bank accounts.  Many of them were opened

8   right in and around this time.

9   Q.   And with respect to the certificate of incorporation, did

10  that happen at or about this time, or slightly before April

11  5th of 2002?

12  A.   Slightly before.

13  Q.   Okay.  Within a matter of months or was it a year?

14  A.   A matter of months.  It may have been January of '02, if

15  not December of '01.

16  Q.   All right.  Can you tell us first sort of the methodology

17  of the chart, what's shown first, what's shown second, and

18  then we'll go through the detail?

19  A.   Yes.  The chart is, is divided into two major sections,

20  labeled revenue and expenses.  Revenue is the funds that were

21  received from the concert. The expenses are things -- are

22  exactly that, expenses, costs associated with putting the

23  concert on.  And those are just netted against each other to

24  see what the concert actually did, whether it made a profit,

25  whether it ran at a loss.

Armstrong - Direct                                    13

1    Q.    All right.  Can you tell us first the revenue figures?

2         MR. LLORET:  And Agent Horay, if we can blow up the

3    top of the document now where it's -- that's fine.

4    Q.    Okay, Agent, if you can explain to us, what's depicted on

5    the chart and what's the basis of the items that are on the

6    chart?

7    A.    Yes.  Under the revenue section, these are the concert

8    proceeds, and it details two Spectrum checks that were issued

9    relative to this concert, both in an identical amount,

10   $71,221.99.  One check was issued to Take Down, the second

11   check was issued to Get That Dough, which was Take Down's 50-

12   percent partner in this concert.  Get That Dough is the

13   company of Michelle Brown.

14   Q.    All right.  So these two checks are totaled then by you?

15   A.    Yes.  They total to $142,443.98.

16   Q.    And this is from information received from the Spectrum?

17   A.    Yes, that's correct, from the -- from Spectrum records,

18   from also records received in -- records seized in the search

19   warrant.

20   Q.    Okay.  And particularly, you looked in some detail at

21   records seized during the search warrant of the Springfield

22   Avenue location?

23   A.    Yes.

24   Q.    Okay, as well as others, but that was the particular

25   interest to you, is that right?

Armstrong - Direct                              14

1    A.    That's correct.

2    Q.    Why were those documents of particular interest to you?

3    A.    Going in, I didn't realize they would be, but the

4    Springfield Avenue address, which was generally referred to as

5    the studio, that is where the majority of the business records

6    were found.

7    Q.    All right.  Then going down the chart --

8            MR. LLORET:  And Agent, Horay if you can --

9    Q.    -- you then list expenses, is that right?

10   A.    I then list expenses, and sort of categorize them

11   roughly.

12           MR. LLORET:  And Agent Horay, if you can go back to

13   the -- there we go.  Okay, that's fine, thank you.

14   Q.    And Agent Armstrong, you were explaining, go ahead.

15   A.    No, I'm sorry.

16   Q.    Now, the expenses listed -- if you could just sort of go

17   through these expenses and give us an idea where you derived

18   these figures from, what sort of documents you were examining

19   and where you got the documents from.

20   A.    Sure.  The legal fees that are noted, this was gleaned

21   from documents obtained in the search warrant.

22   Q.    At Springfield?

23   A.    At Springfield.

24   Q.    All right.

25   A.    The deposits to Spectrum -- and those are funds that the

Armstrong - Direct                                    15

1    Spectrum -- Spectrum had to have in hand or demanded to have

2    before they would allow the concert to proceed.  And that was

3    gleaned from Spectrum documents, search warrant documents, as

4    well as bank subpoenaed documents.

5    Q.    All right.  The equipment rentals information?

6    A.    The equipment rentals, the Armonds information, is from

7    search warrant documents that was found at Springfield.

8          Quintessence Multimedia documents were from -- were those

9    -- that figure is derived from documents found at Springfield,

10   as well as business records of Quintessence Multimedia.

11         The advertising section, South Street Embroidery, those

12   documents came from the search warrant at Springfield.

13         WPHL-TV 17 came both from Springfield search warrant

14   documents and business records of WPHL.

15         WUSL-FM, which is Power 99, those are documents that were

16   seized in the search warrant.  Power 99 documents as well as

17   documents maintained by the account executive who was in

18   charge of the Take Down account.

19         WPHI documents, those were again search warrant documents

20   as well as the business records of WPHI.

21   Q.    Generally speaking, in terms of examining expenses and

22   examining documents taken from the Springfield location, was

23   it relatively easy to access these documents or were they in

24   the state of disarray or can you characterize that at all?

25   A.    They were in a state of disarray.  They were not -- they

Armstrong - Direct                           16

1   were not filed, they were not indexed.  They were just -- they

2   were just -- it would appear when I saw them, there seemed to

3   be no order, no function to them.

4   Q.    But obviously you received them from Agent Ricko at the

5   ATF?

6   A.    That's correct.

7   Q.    After they had been taken?

8   A.    Right.

9   Q.    Okay.  With respect to the various, appear to be TV or

10  radio stations, we're talking about advertising, and I think

11  everyone can understand that.  Do you have -- was there any

12  indication in the documents about South Street Embroidery and

13  what the effect of that was, what was going on there?

14  A.    South Street Embroidery was -- was for posters, charts,

15  fliers, things of that nature.

16  Q.    And these were all devoted to the particular event of

17  April 5th, 2002?

18  A.    Yes.  When I was reviewing all the documents and looking

19  for Spectrum related documents, I only included as expenses

20  those documents which clearly either stated for -- you know

21  for Hip-Hop Explosion or for Spectrum, or for which I had

22  other documents in hand that allowed me to know that this was

23  for the Spectrum.  There were many other expenses, many -- a

24  whole lot of -- much other money being spent at this time from

25  documents we received from Springfield that could not

Armstrong - Direct                              17

1    specifically attach to the Spectrum event so I did not include

2    that.

3    Q.    I see.  Now, with respect to the performers items, if you

4    could go through those and identify what your methodology was

5    with respect to them?

6    A.    Yes.  The performers, WUSL-FM personalities -- that is

7    again Power 99 and those were -- those were Power 99 people

8    who were there to facilitate the concert, and that was -- that

9    was what Power 99 charged them for that.  That comes -- that

10   comes from search warrant documents as well as -- as well as

11   retained records of the account executive at Power 99.

12        Dream 2 Dancers (phonetic), those were documents that

13   were seized at the search warrant at Springfield.

14        Little Mo was one of the performers at the concert.  That

15   information comes from, comes from Power 99 account executive

16   documents.  Also documents of this performer's booking agent,

17   Big Bloc Entertainment where these records were obtained.

18        Sharissa is similar to Little Mo.  Again, Power 99

19   account executive documents, documents of Big Bloc

20   Entertainment who also is the booking agent for Sharissa.  And

21   these documents were contracts.

22   Q.    I see.

23   A.    The Beanie Sigel et al. is again a contract for the

24   performance of Beanie Sigel and four or five others.  And that

25   again was in the form of a contract, a contract maintained by

Armstrong - Direct                                    18

1    the Power 99 account executive, as well as there were -- as

2    well as information found in the search warrant.

3    Q.    Now if we can go back to the charge in total, the total

4    revenues, Agent, that you found were how much?

5              MR. LLORET:    And if we could box that.    Thank you.

6    A.    That's 142,443.98.

7    Q.    And the total expenses figure?

8    A.    Is not actually totaled.

9    Q.    I see.

10   A.    They're totaled by category.

11   Q.    I see.    Well, if you could go through the categories and

12   then give us the bottom line so to speak?

13   A.    Sure.    The legal fee expenses $6,301.30, the deposits to

14   the Spectrum $57,576.50, equipment rentals $21,760,

15   advertising $16,425, and performers $63,500.    Netting out that

16   shows a loss of 23,118.82 when the concern -- and again, that

17   was -- the concert was of interest to me because among other

18   things, all the expenses happened before any revenue.    All

19   these expenses were made before Take Down received their

20   check.    They received their check after the concert, so all of

21   these expenses are roughly -- of approximately $165,000, were

22   not made with any funds that were generated by Take Down.

23   Q.    I see.    Now, did you also have occasion, Agent, to

24   examine records that pertain to the sale of DVD's and CD's in

25   connection with your investigation?

Armstrong - Direct                          19

1   A.    Yes, I did.

2   Q.    And did you prepare a chart with regard to that?

3   A.    Yes, I did.

4   Q.    Is that number 750C, do I have that correct?

5   A.    Yes.

6         MR. LLORET:  Okay, and if we could, Agent Horay, put

7   on number 750C.  Again, Your Honor, by stipulation.

8         MR. WARREN:  Correct, Judge.

9         (Exhibit 750C admitted into evidence)

10  BY MR. LLORET:

11  Q.    And Agent Armstrong, are we looking now on the screen at

12  chart number 750C?

13  A.    Yes, we are.

14  Q.    Okay.  First, can you tell us your methodology in making

15  this chart?

16  A.    Yes.  Initially just reviewing search warrant documents,

17  finding some information concerning -- concerning DVD's, the

18  making of DVD's, CD's, DVD's, using that as a starting point,

19  looking for -- looking for further information.  Was able to

20  locate several companies which had been involved in that,

21  subpoenaed those documents from those companies which on

22  occasion led to additional records and additional companies

23  being subpoenaed.

24      I also did an internet search for the various names of

25  the CD's and the DVD's that I was aware that Take Down had

Armstrong - Direct                                    20

1    produced.   Received some hits on the internet and subpoenaed

2    those companies and received their documents relative to their

3    dealings with the Take Down Records.

4    Q.    Okay.   Just stepping back for a moment, Agent, you

5    examined the Spectrum episode, you've examined also the sales

6    of DVD's and CD's.   What was your purpose in making these

7    examinations of expenses and income of the business?

8    A.    Well, specifically looking at the business expenses, I

9    was looking to determine what the viability of this business

10   is, whether it is a business that is making money or if it's a

11   business that is losing money, and if it's losing money, where

12   in fact is the money coming from that's being used.

13   Q.    And from an investigatory standpoint, why was that of

14   interest to you to determine whether it was a viable business

15   on its own right?

16   A.    Within the context of the investigation, and in the

17   context of -- in a money laundering context, the use of a

18   business to put money into a place -- money gained illegally

19   into a business, is very common. The intent is to make it

20   appear that all these funds are legitimate business proceeds.

21   Q.    Now, Agent, obviously, and we've said this before, but

22   this is based on your experience?

23   A.    Based on my experience, yes.

24   Q.    Okay.   And so from your standpoint, why was it

25   significant to examine the profitability or not of this

1   business?

2   A.    Well, to just give an example, a hypothetical example.

3   If there's a business which is suspected to be involved in

4   money laundering activity, and there are -- there is a million

5   dollars in currency deposits into that business, and on -- and

6   in looking at the business we determine that the actual

7   business activity, the thing that the business is supposed to

8   be doing only generates $100,000 in deposits for that year or

9   an income for that year, then there is in this example

10  $900,000 of unsourced money.  And we would then look to tempt

11  to find where that unsourced money came from.  In the context

12  of a drug money laundering investigation, we're looking to see

13  -- to see who put that money into the business.

14  Q.    All right.  Let's then look again -- this chart is for

15  the purposes of examining the revenue and expenses from sales

16  of DVD's and CD's, is that right?

17  A.    That's correct.

18  Q.    Okay.  If you can tell us, going through the chart from

19  top to bottom, what's the first general area or identified

20  area of revenue?

21  A.    That is the first area of -- the chart is again basically

22  a two-part chart, revenue and expenses.  The revenues are

23  broken down by category, just what seemed to me to be somewhat

24  logical categories of funds that were coming in to Take Down.

25  Q.    These were drawn from what sources generally?  And I

Armstrong - Direct                                    22

1   think you've given some idea so we don't need to be long about

2   it, but.

3   A.    Yes, well, the chart is broken down into -- the sections

4   are broken down into actually where the information came from.

5   This --

6   Q.    All right, I think -- thank you.

7          So going from the advances part, what is that?

8   A.    Advances -- Ruffnation Films is a business which entered

9   into an agreement with Take Down to market the Menace DVD.

10  And as part of that agreement, they paid Take Down a $12,500

11  advance against future earnings.  And that is that $12,500

12  there.

13  Q.    All right.  And then going down the list, Take Down

14  documents from search warrant.  Is that -- these are documents

15  that you found or that you reviewed that were taken during the

16  search warrant?

17  A.    That's correct.

18  Q.    Okay.

19  A.    The first document, consignment list, and that's how it's

20  titled on the document, is a listing of various people, record

21  stores which had taken, which had taken either DVD's, CD's or

22  vinyl records on consignment from Take Down.

23         The second item on that list, consignment sheet, is a

24  different piece of paper which is entitled consignment sheet

25  which says -- which is the same thing.  It shows various

Armstrong - Direct                                23

1   people and businesses which received DVD's, CD's from Take

2   Down, and it details what number of DVD's, CD's were sent on

3   consignment and at what cost Take Down would get if they were

4   sold.

5   Q.   Let me ask you, were you able to determine whether these

6   things were sold -- they're sent out on consignment, is that

7   right, based on the document?

8   A.   Yes, they're sent on consignment.  At some point there is

9   some information about whether or not these documents -- any

10  of these items became sold.  But for just -- but it's not

11  complete.

12      What I did on this chart is I took everything that went

13  out on consignment and just assumed it was sold.

14  Q.   Okay.  Going down then to the next item, there's a Hub-

15  Servall Inc. album list?

16  A.   Yes, this is again -- and that is the title of the

17  document that I looked at, Streets Inc. album list, and it

18  lists a series of -- I believe this one is typically

19  individuals and dollar amounts from the album list, and that's

20  the figure that it adds up to.

21      Vinyl/CD sales, there was a document entitled sales.

22  Actually I believe it was specifically paid sales.  And from

23  that document I took that figure.  There were several entries

24  on that figure, again, businesses -- businesses, individuals

25  with dollar figures.  I added them up and that's what they

Armstrong - Direct                                24

came to.  There was an item labeled -- I shortened it here to

DVD log, but the actual document, I believe, said something

similar to consignment sales, DVD logs, something along those

lines.

And adding up everything that was out on assignment and

just assuming that everything was sold and Take Down was

actually paid, that's the figure that it would come up -- that

it would come to.

Q.   All right, and the next category is called "distributor's

records" and then in parens "subpoena".  If you could just

outline for us what your findings were there?

A.   Yes.  These were -- these are companies which distribute

CD's and DVD's.   They were subpoenaed for their records and -

- these were some of the internet hits and some of the

information that came off of the internet.  And the records of

those companies were subpoenaed, they responded, and those

were the figures that were associated with their dealings with

Take Down.

Q.   All right.  And then finally an item called "bank records

subpoena", what is that?

A.   Yes.  I reviewed -- we subpoenaed bank records, all the

known bank records of Take Down as well as various other

individuals who were under investigation or who were of

interest.  I reviewed -- in reviewing the deposit slips for

these bank accounts, when I came across something which was

Armstrong - Direct                                    25

1   noted as -- which was noted as for record sales or DVD sales

2   or it appeared to me that that's what it could be for, for

3   instance, an item from the Record Bar, item from Jazz Sound, I

4   would assume that those were business -- business income from

5   Take Down from DVD and CD sales that was consistent with items

6   from the consignment list and the consignment sheet, and those

7   were the dollar amounts that I found from that source.  And

8   then I just total up all those revenues.

9   Q.    Okay.  And did you total up all of the revenues  that you

10  were able to find?

11  A.    Yes.

12  Q.    And what was the total?

13  A.    It was $29,939.50.

14  Q.    All right.  Now if we could turn to the expenses portion

15  of the chart which is below --

16          MR. LLORET:  And Agent Horay, if you could just

17  leave that level of magnification and we'll just go down the

18  chart.  Thank you.

19  Q.    And Agent Armstrong, if you could just -- I don't think

20  we have to go through it in quite the level of detail that

21  we've been going through, but can you tell us generally the

22  various categories and the items in the categories that you

23  found in your review of the various records?

24  A.    Sure.  The first category is studio rental. The first

25  item is Sigma Sound Studio.  Obviously there's a large fee

1    that was charged by Sigma Sound.  Take Down was paying those

2    folks weekly for significant amount of time.  The -- Sigma

3    Sound is out of business so we were unable to contact them or

4    to obtain any records.

5         The dollar figure is taken from search warrant documents

6    which show that amount being paid to Sigma Sound for studio

7    rental.

8         Mike Forte -- again, these are, that was a bank record

9    subpoena, and that check was marked studio rental.

10        The same with -- and I'm sorry, this name was really hard

11   to read.  It comes from deposits, these were checks from this

12   individual, and Abdul Hazaid Hasan (phonetic) for $2,000,

13   again marked studio rental.  And the Manta School of Boxing

14   (phonetic), checks were made payable to them noted for --

15   noted for studio rental.

16   Q.   All right.  Go ahead.

17   A.   The production costs.  Ghetto Newsreel, that was a

18   company that was formed and involved in the making of the

19   scratching and surviving project, and I have the bank records

20   of Ghetto Newsreel, I have the bank records of Take Down

21   showing -- showing money going to Ghetto Newsreel for this

22   project, and that is the -- the $44,500 is the total of funds

23   that went to the Ghetto Newsreel account from Take Down,

24   either in the form of bank checks, money orders, -- let me

25   take that back.  There were no money orders in this section

Armstrong - Direct                                  27

1    but there were some cashier's checks.  And I reviewed the

2    checks going out from Ghetto Newsreel and found them to be

3    consistent with the making and production -- production of

4    videos.

5         Same thing for Ghetto City Productions which was a

6    company which was -- and the bank account was opened right

7    before money started coming in via checks from Take Down.  And

8    it was noted for a hood party.  And the checks going out from

9    that account are consistent with the making and production of

10   a video or -- and the total checks that went -- the total

11   amount that went into that account was $19,300.

12        There was also some search warrant evidence that I

13   reviewed with indicated that the budget for the hood party was

14   $19,300.

15        Next, Todd Wolf, Todd Wolf was an employee of Take Down,

16   a consultant of Take Down, I've heard it various ways.  He was

17   involved in the production of -- in the production of videos.

18   He was involved with Menace.  And this was another project,

19   the delinquents project for which he was paid.  The record

20   shows that he was paid $5,000 -- of I have checks or documents

21   showing that $5,000 was paid.  The contract with Wolf actually

22   calls for the payment of 26,000, but since I only could

23   confirm the five, that's all that's there.

24        Menace.  The Menace figure is from search warrant

25   documents that were taken from Springfield.  And that rough

1    figure, that figure was roughly corroborated in a taped

2    conversation between Alton Coles and Timothy Baukman.

3    Q.    All right.  Now going down to the CD/DVD purchase and

4    duplication section, can you describe for us what your

5    findings were there?

6    A.    Yes.  These are companies which are involved in that

7    business.  You can purchase CD's, DVD's from them, they will

8    duplicate for you and all of that sort of end of the business.

9        Absolute Disc, and this is involved with New Jack City,

10   they received that amount, those amount of funds from Take

11   Down for their services for New Jack City.

12       Discmakers, again a business involved in purchasing and

13   duplication of the same thing.  Those were funds that were

14   paid to Discmakers.  That was received via subpoena from the

15   records received from the Discmakers company.  There were also

16   search warrant records.

17       Hub-Servall, same thing, search warrant records, records

18   received from the company.

19       Rainbo Records, again, same thing, records received from

20   the company, search warrant records.

21       Media Concepts, I believe that was -- that was I believe

22   just the search warrant records.

23       The advertising category, these are all search warrant

24   records, records which indicated payment for, and noted as

25   such for advertising for production or for -- or noting the

Armstrong - Direct                              29

1    project, and those were the amounts that I saw relative to

2    that.

3        I totaled those expenses were $193,493.21 and just -- and

4    in netting the revenue with expenses, it comes to a loss of

5    167,530 -- 553 dollars and 71 cents.

6    Q.    Now with respect to the last two charts that we looked

7    at, the Spectrum episode, the Take Down DVD's and CD's

8    episodes, are those figures significant to you in terms of

9    your evaluation of whether the use of the business was

10   consistent with money laundering?

11   A.    Yes, it is.

12   Q.    And why is it significant to you, based on your

13   experience?

14   A.    Based on my experience, specifically a company which

15   starts from zero, no investors, the individuals involved in it

16   have no record of any legitimate income, spending -- spending

17   and losing large sums of money which is -- which is unsourced,

18   where the money is coming from that they are spending is an

19   open question, it's not being generated by the business.

20   Q.    I see.  Now did you also attempt to examine after hours

21   social events that were -- there was some indication in the

22   records that these had occurred?

23   A.    Yes, I did.

24   Q.    What was the state of the records with respect to those

25   items, if you can tell us?  And I note, there is no chart for

1  them, is that correct?

2  A.    There is no chart for them.

3  Q.    And if you can tell us what your findings were very

4  briefly.

5  A.    Briefly, the state of those records were sketchy I would

6  say.  There are times when there are records which are

7  relatively complete for a specific period of time relating to

8  the parties. There are times when it's very incomplete.  And

9  that basically is where -- we do have some records from some

10 categories at certain times.  We have Power 99 advertising

11 records for periods of time.  We do have entry records for --

12 and most of these events took place at the Palmer's After Hour

13 Club.  We do have for certain periods of time the entry

14 records associated with how many people actually went through

15 the door on any given Friday night of Take Down.

16     And we do have -- we have a lot but it's sketchy.  We

17 certainly don't have anywhere near complete records.

18 Q.    Okay.  With respect to those sketchy records that you

19 were able to look at, did anything in those records cause you

20 to believe that that situation was inconsistent with what you

21 were seeing on the DVD's and the Spectrum episode?

22 A.    I wouldn't say inconsistent.  Given the state of the

23 records, it's clear to me at times, at times there are parties

24 that lost money, at times there are parties that made money.

25 Overall, for -- overall, it seemed to be -- it seemed to be --

Armstrong - Direct                    31

1   it's certainly not a huge loss like this.  It seems that --

2   what I see is it was breaking even.  There are times when they

3   obviously made some money.  There are times when they

4   obviously lost money.

5        And also, some of the records that I did receive, some of

6   the records we have, show -- indicate that Take Down is not

7   the only person involved in these parties.  Specifically,

8   Michelle Brown was a co-partner in the Palmers parties for at

9   least several years.  And so as part of that, whenever Take

10  Down -- when they would make money from the parties, whenever

11  there was money from the parties being made, half of it goes

12  to Michelle Brown.

13  Q.   But bottom line is, in terms of doing a sort of more

14  comprehensive chart, you just are unable to do it because

15  these records were just too sketchy?

16  A.   That's correct.

17  Q.   Okay.  Let's turn to some other analyses that you've

18  done.  Did you have occasion to examine payments by Timothy

19  Baukman in connection with various items?

20  A.   Yes, I did.

21  Q.   Can you tell us generally what those items were and what

22  you did in examining Timothy Baukman's expenses?

23  A.   Yes.  Well, specifically looked at three items; purchase

24  of the Jaguar, the rental of his residency apartment on

25  Schoolhouse Lane, and the rental of the Essex Lane stash

Armstrong - Direct                                32

1   house.

2   Q.    Okay.  Did you prepare some charts with respect to these

3   items to summarize your findings on the various expenses?

4   A.    Yes, I did.

5   Q.    Okay.  Can you tell us which chart should we start with

6   in looking at?

7   A.    I would start with chart number 704B.

8   Q.    Well, we'll do that then.

9         MR. LLORET:  704B, Agent Horay.  And again, Your

10  Honor, by stipulation.

11        MR. WARREN:  That's correct, Your Honor.

12        THE COURT:  All right.

13  BY MR. LLORET:

14  Q.    Now, Agent, this rather sparse looking chart is prepared

15  by you, is that correct?

16  A.    Yes, it's a sparse looking chart prepared by me.

17  Q.    Okay.  And what was your methodology and what does the

18  chart reveal?

19  A.    These -- the information from this chart was taken from

20  subpoenaed bank documents of Wachovia Bank.  The account in

21  question is the account in the name of Tauheed Baukman.  And

22  the chart shows yearly deposits.  The deposits for the year

23  are accumulated into one total for the year. And it's listed

24  by year, by the total amount of the yearly deposits, how much

25  of that amount is cashed and how much is what I call other.

Armstrong - Direct                                    33

1    And those are just totaled at the bottom and basically

2    what it comes out to is that during that time period of 2001

3    to 2005, there were $202,263.43 in total deposits.  Of that

4    amount, $155,115 was cash, that is currency, and $47,148.43

5    was other.  And that other is -- the vast majority of that are

6    checks.

7    There is another chart which is 704A which actually shows

8    each and every deposit, you know, which is multi pages and is

9    not all that interesting.  But it was interesting to me

10   because I really wanted to see and I was interested in seeing

11   what those other deposits were.

12   MR. LLORET:  Your Honor, just for completeness, and

13   we won't go through it, but if we could show 704A, which has

14   also been introduced by stipulation.  And we'll just show the

15   first page.

16   BY MR. LLORET:

17   Q.   Agent, this is a multi-page chart that is in evidence

18   that you prepared, is that right?

19   A.   That's correct.

20   Q.   And just if you could give us an idea, you don't need to

21   go through line items but just basically what does this chart

22   show?

23   A.   This chart is a more detailed version of the first chart

24   we were looking at.  It was again drawn from the Wachovia

25   records of Tauheed Baukman and it shows the deposits into the

Armstrong - Direct                                    34

1  account, and it's -- and it shows date of deposit, amount of

2  deposit, the amount of the deposit that was currency and the

3  amount of the deposit that was other.

4  Q.    And the other column, on this chart, does that give more

5  detail about the composition of the various other items in the

6  chart 704B?

7  A.    Yes, it does.  There's actually another column, the payor

8  column.  And that is the source of the other.  That is -- for

9  instance, we see two Metro Auto Sales checks.  And that's what

10  those were in the amounts and those were deposited into the

11  account.

12  Q.    Okay. So going back to 740 -- or 704B, basic --

13  A.    Sure, and if I could just --

14  Q.    Certainly.

15  A.    In looking at it, just seeing what the other deposits

16  were, there were -- there were three checks from Metro Auto

17  Sales, checks from Take Down.  There was one check which was a

18  -- which was noted as a reimbursement for expenses for the

19  hood party.  There was a third party check, there was an

20  insurance check from what was noted as the Jaguar claim.  That

21  was basically all of the other.

22  Q.    All right.  And perhaps what we'll do is talk about some

23  of the other charts showing what went out of the account, and

24  then we'll talk about the significance of these various

25  transactions.

Armstrong - Direct                          35

1    Shall we turn to number 704C --

2         MR. LLORET:  Which again by stipulation, Your Honor,

3    this is a chart that deals with --

4    Q.    Well, Agent, let me ask you.  What does this chart deal

5    with, 704C?

6    A.    704C is a chart which shows, and it's drawn from the same

7    Wachovia Bank account records that we just saw the deposit,

8    the deposit records of, that same Wachovia account in the name

9    of Tauheed Baukman.  And this chart shows payments that were

10   made to Charter One, which is an auto finance company, for --

11   and these payments were made for the loan on the Jaguar that

12   was purchased at Metro Auto.

13   Q.    And I see the sort of monthly payments appears.  What was

14   your methodology there, did you just -- well, tell us how you

15   came upon these items and what was your criteria for putting

16   these items in?

17   A.    Well, these are all checks.  These are all from the

18   subpoenaed documents. These are checks, cancelled checks that

19   were made payable to Charter One.  The chart lists the date,

20   and I put the date of the check, not the date of clearance,

21   the check number, the amount of the check, and at the end of

22   it they total to 19,000 -- excuse me -- they total to

23   $16,947.20.

24   Q.    Now these checks, were they checks from whom to whom, if

25   you can tell us?

Armstrong - Direct                              36

1    A.   Well, these are -- to look at the check, the check would

2    appear -- would be from Tauheed Baukman to Charter One for

3    payment of the loan on the Jaguar in the name of Antoinette

4    Williams.

5    Q.   All right.   The name though is Tauheed Baukman?

6    A.   Tauheed Baukman, yes.

7    Q.   Okay.   Just parenthetically, Agent, what significance, if

8    any, did the use of an account in the name of Tauheed Baukman

9    and checks in the name of Tauheed Baukman have to you in your

10   experience?

11   A.   Opening of bank accounts in straw party names is

12   extremely common.   Again, generally if you have an individual

13   who is involved in illegal activity, has no legal income, they

14   should not have -- they should not have any money, they --

15   just looking at them on the surface, they had no legal income,

16   they shouldn't have a bank account that has this amount of

17   funds through it, they shouldn't have a Jaguar and be able to

18   pay a loan.

19              MR. WARREN:   Objection, Your Honor.

20              THE COURT:   Objection sustained.

21   BY MR. LLORET:

22   Q.   And Agent, looking at number 704D, can you tell us what

23   that is?

24   A.   This is a similar chart, and it's drawn from the Wachovia

25   account of Tauheed Baukman, same account that we have been --

Armstrong - Direct                                37

1    that I was speaking of prior.  And these were checks made

2    payable to Century 21 Real Estate, for the -- and the purpose

3    of the checks was for the rental of 349-B Essex Avenue.

4    Q.    All right.  Again, Agent, with respect to your

5    methodology, what checks did you include in this?

6    A.    Only included those checks that I -- that we obtained

7    from the bank that I saw. That I could look at, review,

8    payable to Century 21.  Almost all these checks were marked

9    with, in the memo section, either 339 Essex, rental Essex,

10   something similar to that.

11   Q.    All right.  Who were these checks -- or what was the name

12   of the signature on these checks?

13   A.    Tauheed Baukman.

14   Q.    All right.  And again, the total of the checks paid on

15   account of 339 Essex Avenue was how much?

16   A.    $16,150.

17   Q.    And the date on these checks, was this the date of the

18   check or the date of clearance?

19   A.    It would be the date of the check.

20   Q.    Okay.  And then let's look at --

21            MR. LLORET:  And Your Honor, 704D again is included

22   by stipulation of the parties.

23            MR. WARREN:  Correct, Your Honor.

24   Q.    Agent, let's look at 704E.  And can you tell us what 704E

25   is?

Armstrong - Direct                               38

1    A.    704E is a chart, is a chart showing payments made.

2    Again, we're talking about the same Wachovia account in the

3    name of Tauheed Baukman. These were checks that were made

4    payable and actually sent and negotiated to Eastview Realty

5    (phonetic) which is the realty company which manages the

6    Schoolhouse Lane apartments.

7    Q.    And is this during roughly the same period as the

8    payments for the Essex apartment?

9    A.    Yes, that's correct.

10   Q.    And does it at least in part comprehend the period during

11   which the Jaguar was being paid?

12   A.    Yes, it does.

13   Q.    If you can look back, just to reference on 704C, and we

14   don't need to turn to it on the screen, but Agent, can you

15   tell us the sort of begin date and end date of the Jaguar loan

16   payments?

17   A.    Yes.  Begin date March 11th of '02, end date November

18   18th of '04.

19   Q.    All right.  And then looking at 704D, we don't have to

20   turn to it on the screen, can you tell us the begin date and

21   the end date of the Essex Avenue rentals?

22   A.    Begin date 9/17/02, end date 7/6/05.

23   Q.    All right.  And then looking at chart 704E which is the

24   one before us, can you tell us the begin date and end date of

25   payments on the Schoolhouse Lane apartment?

Armstrong - Direct                                    39

1    A.    Begin date 10/30/02, end date 5/17/05.

2    Q.    The total paid for the apartment at Schoolhouse Lane?

3    A.    $42,265.63.

4    Q.    And with respect to the name on the account, who was it?

5    A.    Tauheed Baukman.

6    Q.    And the checks that you saw, who was the name on the

7    checks?

8    A.    Was signed by Tauheed Baukman, signed in the name of

9    Tauheed Baukman.

10   Q.    Okay.  We talked yesterday about the significance of

11   efforts to hide ownership, also to hide sourcing and so forth.

12   Do you have any opinion with respect to, based on your

13   experience, this type, is it consistent with an effort to hide

14   ownership?

15   A.    Yes, it is --

16              MR. WARREN:  Objection, Your Honor.

17              THE COURT:  Basis?

18              MR. WARREN:  That's the ultimate issue.

19              THE COURT:  The objection to that question is

20   overruled.

21              MR. LLORET:  Thank you.

22   BY MR. LLORET:

23   Q.    Agent, you understood my question, was whether it's

24   consistent with an effort to hide ownership?

25   A.    Yes, it is consistent.

Armstrong - Direct                                    40

1    If I can just say one thing about these charts?

2    Q.    Yes, sir.

3         THE COURT:  No, just a moment.  You answer the

4    questions.

5         MR. LLORET:  Certainly.

6    Q.    Agent, with respect to the charts, are there any other

7    comments that you have that bear on the testimony that you've

8    just given?

9    A.    Yes.  I just wanted to note in the charts, and frankly

10   this was noted at the grand jury so in case it comes up again

11   I would just want to address it.  There are what appear to be,

12   within the three charts, and you can't see it unless you see

13   all three charts at the same time, duplicate check numbers.

14   That is, and I happen to know that check 1041 is one of them.

15   There's a check 1041 payable to Eastview Realty, and there's a

16   check 1041 payable to I believe Charter One as well.

17        Those -- that is correct.  There are duplicate check

18   numbers that were actually used here.  That was my only point,

19   that that part is not an error.

20   Q.    You went back and actually looked at them?

21   A.    Yes.

22   Q.    And compared them and determined that there was a 1041

23   that was payable to one entity and a 1041 payable to another?

24   A.    Yes, that's correct.

25   Q.    Okay, thank you.

Armstrong - Direct                                      41

1    Now, Agent, there are also some cars that were purchased

2    from Metro Auto Sales that involve Kristina Latney, is that

3    correct?

4    A.    That's correct.

5    Q.    And did you examine those transactions as well?

6    A.    Yes, I did.

7    Q.    Turning perhaps to number 701F --

8        MR. LLORET:  Which by stipulation, Your Honor, is a

9    summary chart.

10        MR. WARREN:  Correct, Your Honor.

11        THE COURT:  All right.

12        MR. LLORET:  We can show the jury that.

13   BY MR. LLORET:

14   Q.    Agent, what is 701F?

15   A.    701F is a summary chart of -- showing deposits into the

16   Kristina Latney bank account at Commerce Bank.

17   Q.    All right.  And what's the start date and end date of the

18   period that's depicted on the chart?

19   A.    Start date is August 2nd of '01 and the end date is June

20   27th of '05.

21   Q.    All right.  What is the methodology of the chart?  What

22   information does it provide us with?

23   A.    The chart provides -- provides information relative to

24   the deposits into that account.  It shows the date of the

25   deposit, the total amount of the deposit, how much of that

Armstrong - Direct                                    42

1   amount is -- was cash, how much of it was other than cash, and

2   those deposits are then just -- and the end accumulated and

3   totaled.

4   Q.   Okay.  Can you tell us -- and let's look down at the

5   totals on the bottom --

6        MR. LLORET:  If we can box that up a little bit.

7   Q.   Agent, you totaled up the various columns.  And going

8   across, the first item is the total deposits column, is that

9   correct?

10  A.   That's correct.  That's the total amount of deposits into

11  the account in that time period, and that was $66,190.

12  Q.   And then the next column is the cash amount?

13  A.   Yes, that's the amount in cash.

14  Q.   All right.  And then the last column -- what is that

15  amount?

16  A.   The cash amount is $55,270.  The other amount is $9,920.

17  Q.   All right.  What significance, if any, do these items

18  have in your experience to the issue of whether this account

19  was consistent with money laundering?

20  A.   Currency into the account, given Ms. Latney's -- which

21  was shown in the investigation, her financials, her financial

22  status, there was, as far as Ms. Latney was concerned, no

23  legitimate source of the money going into this account, and

24  the fact that it was in fact is significant into the

25  investigation, as well.

Armstrong - Direct                              43

1   Q.    Does the fact that the -- well, let's just turn to the

2   next chart and I'll ask the question a little differently.

3   The next chart we'd like to look at is number 701G.

4          MR. LLORET:  If I can show that to the agent.  Thank

5   you.

6   Q.    Agent, do you have number 701G before you?

7   A.    Yes, I do.

8   Q.    All right.  And what is 701G?

9   A.    701G is a chart showing, showing again automatic debits

10  being made out of the Kristina Latney Commerce Bank account.

11  And the debits were in payment for a loan on a 2001 Mercedes

12  Benz.

13         This is the Commerce -- this Commerce account was set up

14  at the time of the purchase of the Mercedes and it -- by set

15  up I mean opened.  And it was opened specifically such that --

16  such that automatic debits would be made from it into the loan

17  which was also held by Commerce.

18  Q.    All right.  What's the start date and the end date on

19  this particular chart?

20  A.    The start date is 8/3 -- August 3rd of '01.  The end date

21  is June 6th of '05.

22  Q.    And the total paid?

23  A.    Is $31,409.51.

24  Q.    And that regards the Mercedes that was purchased from

25  Metro Auto Sales?

Armstrong - Direct                                    44

1    A.    That's correct,

2              MR. LLORET:    And if we can turn to chart 701H, and

3    again, Your Honor, by stipulation of the parties.

4              MR. WARREN:    That's correct, Your Honor.

5              THE COURT:    All right.

6    BY MR. LLORET:

7    Q.    Agent, what is 701H?

8    A.    701H is another summary chart showing automatic debits

9    from the same Kristina Latney Commerce Bank account that we've

10   -- that I've been speaking of, and these are automatic debits

11   that were made in payment of a loan on a 2002 Cadillac

12   Escalade.

13   Q.    All right.

14   A.    And that is the Escalade that was purchased at Metro Auto

15   Sales.

16   Q.    All right.  And the begin date on that transaction and

17   the end date?

18   A.    6/25/02 is the begin date, the end date is 6/27/05.

19   Q.    And the total paid for the Cadillac?

20   A.    The total is $23,603.29.

21   Q.    Now, sir, with respect to the last two charts we've

22   shown, we've got 31,000 for the Mercedes, 23,6 for the

23   Cadillac, and we saw the chart before that, 701F, total of

24   approximately $66,190 deposited to the account.  Does the --

25   do those various figures, the deposits versus the expenses, do

Armstrong - Direct                    45

1   they have any significance to you in your experience with

2   respect to the issue of whether these transactions were

3   consistent with money laundering?

4   A.    Yes, they are in my experience consistent with money

5   laundering.  Almost all of the funds that went into this

6   account were used in the payment of those two auto loans.

7   Q.    And based on your experience, and perhaps giving an

8   illustration from your experience, why is that significant?

9   A.    It's significant -- in my experience, the use of bank

10  accounts for any given purpose, the only money that goes into

11  the account is money that is then going to come out relatively

12  quickly and will be used for whatever purpose it was going to

13  be used for. But the deposits, the money in, will basically

14  roughly equal the money out.  There will be no accumulation of

15  funds.

16  Q.    All right.  Now, couple of secondary issues.  Did you

17  also examine tax records concerning Alton Coles during the

18  period, and Take Down Records as well, and Naseem Coles as

19  well and Timothy Baukman and Tauheed Baukman for various

20  periods of time pertinent to the investigation?

21  A.    Yes, I did.

22  Q.    Did you determine what the tax status of Alton Coles was,

23  whether taxes had been filed during various periods of time

24  during this investigation?

25  A.    Yes, I did.

Armstrong - Direct                                    46

1   Q.   Can you tell us about that information that you derived?

2   A.   Yes, I believe -- and if I could just refer to the actual

3   documents?

4   Q.   Okay.

5   A.   I'll wait till I see it.

6   Q.   Certainly.  Is this the book that you prepared?

7   A.   Yes.

8   Q.   All right, and if you could just refer --

9         MR. LLORET:  And again, Your Honor, these are marked

10  as exhibits and stipulated in.

11  Q.   But Agent, if you would tell us, what's the first exhibit

12  you have before you?

13        MR. WARREN:  They're agreed to, Your Honor.

14        MR. LLORET:  Thank you.

15        THE COURT:  All right.

16  A.   First document is, and this is an IRS generated document,

17  it's entitled "certification of lack of record".

18  Q.   What is that?

19        THE COURT:  Is that marked as an exhibit or is the

20  entire book marked?

21  Q.   Agent, is the entire book marked and then also is the --

22  are the individual exhibits marked?

23  A.   The book is marked as 737, the individual exhibits are

24  individually marked as A, B, C.

25        THE COURT:  Okay, as you go through them, would you

1    identify what you're referring to?

2             THE WITNESS:  Yes, Your Honor.

3             THE COURT:  All right.

4    BY MR. LLORET:

5    Q.   Looking at I guess 737A, is that the certificate of lack

6    of filing or lack of record?

7    A.   Yes, that's correct.

8    Q.   And that relates to whom?

9    A.   Alton Coles.

10   Q.   And for what period?

11   A.   2000, 2001, 2002, and 2003.

12   Q.   All right, so what does that record mean in IRS lingo?

13   A.   There's no tax return filed.

14   Q.   Okay.  Looking at the exhibit marked 737B within the

15   notebook, can you tell us what that is?

16   A.   This is an IRS document noting third-party payments for

17   Alton Coles during this period of time.

18   Q.   And what did that document reveal?

19   A.   It's only revealing for the year 2000, Mr. Coles received

20   $3 in interest from First Union National Bank, now Wachovia

21   Bank.

22   Q.   And what period of time does that document cover?

23   A.   That document covers the year 2000.

24   Q.   All right.  And what are third-party payments, just so we

25   understand?

A.    Well, third-party records are records which are -- which
are generated by third parties and sent both to -- both to --
in this case it's a bank, and the document we're talking about
is a 1099.  And that document would be sent both to the
account holder and to the Internal Revenue Service.  And the
IRS takes all of these records that they receive, combines
them for the appropriate tax year and compares them with
what's filed on the tax return.

Q.    Okay.  Looking at 737C, what is that document?

A.    That is a -- this is a document concerning Naseem Coles,
and it's a certification of lack of record.

Q.    And what does that certification reveal?

A.    There is no tax return filed for the years 2000, 2001,
2002 and 2003.

Q.    All right.  There is a document marked 737D. What is that
document?

A.    737D are again an IRS report of third-party documents
that were received relating to Naseem Coles.

Q.    And what does that document reveal?

A.    The first page of this document relates to the -- to the
2001 year, and it's showing that First Union Bank reported to
the IRS $167 in interest income to Naseem Coles.

Q.    All right.  Just for a moment, Agent, you checked Naseem
Coles, is that right?

A.    Yes.

Armstrong - Direct                                           49

1    Q.    Do Naseem Coles and Alton Coles have two different Social

2    Security numbers?

3    A.    Yes, they do.

4    Q.    There was some suggestion during questioning in another

5    context about the possibility of improving one's credit by

6    utilizing the identity of one's child or some such, or another

7    person and then using that device to improve one's credit. Do

8    you have experience examining credit histories and determining

9    credit histories as part of your investigatory experience?

10   A.    Yes, I review credit histories.

11   Q.    Okay. And what is your experience with respect to that

12   particular device?  Have you experience with that being

13   possible to do to improve one's credit by using one's child?

14   A.    No, that will do just the opposite to the child.  It will

15   destroy the child's credit.

16   Q.    Okay.  If we can look at 737E, what is that document?

17   A.    737E is again the certification of lack of record, which

18   is to say no tax return filed, for Timothy Baukman for the

19   year 2000, 2001, 2002, and 2003.

20   Q.    All right.  And what is 737F?

21   A.    737F is a certification of lack of record, no tax return

22   filed for Tauheed Baukman.

23   Q.    And for what period of time?

24   A.    And that would be for 2000, 2001, 2002 and 2003.

25   Q.    And next, what is 737G?

Armstrong - Direct                               50

1  A.    G is again that IRS internal document that I referred to

2  which shows reports of third-party payments that were reported

3  by third parties for monies received by Tauheed Baukman by

4  that third party.

5  Q.    And what did your review determine?

6  A.    This document shows the report by First Union Bank of $14

7  in interest for the year 2001, interest generated from an

8  account in the name of Tauheed Baukman.

9  Q.    And the document 737H, what is that?

10 A.    737H is the tax return of Kristina Latney for the year

11 2000.

12 Q.    And what does that reveal?

13 A.    It shows $755.86 in total income.

14 Q.    And that's for the 2000 tax year?

15 A.    Yes.   That's correct.

16 Q.    Okay. And net, 737I, what is that?

17 A.    737I is a copy of the filed 2001 tax return of Kristina

18 Latney.

19 Q.    And what if anything does that show?

20 A.    It shows a total income of $3,738.

21 Q.    All right.   I'm looking at number 737J, can you tell us

22 what that document is?

23 A.    737J is a certification of lack of record, a no record of

24 filing for Kristina Latney for the years 2002 and 2003.

25 Q.    And 737K, what does that show?   What is it and what does

Armstrong - Direct                                    51

1    it show?

2    A.    K is -- K is a computer generated print of a tax return

3    of Kristina Latney for the year -- this is a computer

4    generated return for the year 2001 for which we also have the

5    actual tax return.

6    Q.    Okay, so it's duplicative really?

7    A.    Yes, it is.

8    Q.    And the same information, all right.  Now, Agent, I also

9    wanted to ask you, with respect to the Spectrum, if you could

10   just, under the possibility that some of us are not familiar,

11   what type of business activity does the Spectrum engage is?

12   A.    The Spectrum is an arena. It's a very large arena located

13   in South Philadelphia.  I believe its capacity is for -- I

14   know for basketball its capacity is close to 20,000.  It was

15   for years the home of the Philadelphia 76ers, the Philadelphia

16   Flyers.  It was the major indoor venue in the city.

17   Q.    And with respect to the event, the Hip Hop Explosion

18   event in 2002, did the contracts and the various documents

19   that you examined reveal that various acts and so forth were

20   coming from out of state to that Hip Hop Explosion?

21         MR. WARREN:  Your Honor, if this will expedite

22   matters, we will stipulate that it had an effect on interstate

23   commerce, if that's what Mr. Lloret is looking for.

24         MR. LLORET:  Thank you, Your Honor.

25         THE COURT:  All right.

Armstrong - Direct                    52

BY MR. LLORET:

Q.   Now, Agent, just a few more records and I believe we're
going to be done.  I'd like to show you some tax documents of
some other individuals ta have been --

        MR. LLORET:  Again, Your Honor, these have been
relayed to counsel and I don't think we have any concerns
about it.

        MR. WARREN:  That's correct, Your Honor.

        THE COURT:  They've all been stipulated?

        MR. HETZNECKER:  They are, Your Honor. I have one
question of Mr. Lloret.

        MR. LLORET:  Certainly.  These involve other
individuals.

                    (Pause)

        MR. LLORET:  Thank you, Your Honor.  Thank you, Mr.
Hetznecker.

BY MR. LLORET:

Q.   First, Agent, I wanted to show you a set of tax returns
or a set of information received from the IRS, I should say,
with regard to Mr. Morris.  And I hand these to you --

        MR. LLORET:  And we can do the same methodology,
Your Honor, if the Court pleases.  I'll just refer to the
exhibit and ask the agent if these had been -- these are
without objection, as I understand it.

        MR. HETZNECKER:  That is correct.

Armstrong - Direct                                   53

1          THE COURT:  All right, they're been stipulated.  Go

2     ahead.

3     BY MR. LLORET:

4     Q.    Agent, looking at item number, Exhibit number 760A, can

5     you tell us what that is and what it reveals?

6     A.    Yes, it's an IRS certification of lack of record for

7     James Morris concerning the -- concerning no tax return filed

8     for the years 2000 and 2001.

9     Q.    All right. And looking at number 760B, what is it and

10    what does it reveal?

11    A.    It is a certified copy, IRS certified copy of the 2002

12    tax return filed by James C. Morris.

13    Q.    And that's the form 1040, is that right?

14    A.    Yes, that's correct.

15    Q.    Okay, and what does that reveal as to the income?

16    A.    Total income is $903.

17    Q.    All right.  And next, turning to Exhibit number 760C,

18    what is that and what does it reveal about income?

19    A.    760C is a certified copy of the 2003 1040 tax return

20    filed by James C. Morris.

21    Q.    All right.  And what does that reveal about Mr. Morris's

22    income?

23    A.    Total income $8,530.

24    Q.    All right.  And next is Exhibit number 760D.  What is

25    that and what does it reveal about income?

Armstrong - Direct                                        54

A.    760D is the 2000 -- is a certified copy of the 2004

individual tax return form 1040 for James C. Morris.

Q.    And what does that reveal as to Mr. Morris's reported

income?

A.    Total income is $9,577.

Q.    And looking at number 760E, what is that document?

A.    760E is a certified copy of the 2005 individual tax

return filed by James C. Morris.

Q.    And what does that document reveal about Mr. Morris's

report income?

A.    Total income is $1,629.

Q.    Very well.  Turning next to a set of documents that

relate to defendant Thais Thompson.

        MR. LLORET:  And Your Honor, we'll do the same

methodology with these.

        THE COURT:  These have been stipulated also?

        MR. HETZNECKER:  They are, Your Honor.

        THE COURT:  All right.

BY MR. LLORET:

Q.    Agent, looking first at Exhibit 761A, what is that?

A.    761A is a IRS certification of lack of record, a no tax

return filed by Thais Y. Thompson for the year 2005.

Q.    And what does that document reveal with Ms. Thompson's

income or stated income?

A.    Nothing.  There's no return filed.

Armstrong - Direct                                    55

1   Q.    I'm sorry, I apologize.  It's a lack of record.  I'm

2   asleep at the switch here.

3         761B, what is that document?

4   A.    Let me backtrack, I was just reading what was the top

5   document you gave me which is actually marked 761F.

6   Q.    I apologize.

7   A.    So it's --

8             MR. LLORET:  Your Honor, if we can then correct the

9   record --

10            THE COURT:  The lack of record is 761F, is that what

11  you're saying?

12            THE WITNESS:  Correct.

13            THE COURT:  And that's for the year 2005?

14            THE WITNESS:  Yes.

15            THE COURT:  All right.

16            MR. LLORET:  Thank you, Agent.

17            THE COURT:  Go ahead, Mr. Lloret.

18  BY MR. LLORET:

19  Q.    761A.

20  A.    761A is a certified copy of the 2000 tax return for Thais

21  Thompson.

22  Q.    And what does that document reveal about her income?

23  A.    Total income is $8,751.

24  Q.    All right.  Looking now at 761B, what is it and what does

25  it reveal about income?

Armstrong - Direct                                        56

1    A.    761B is a certified copy of the tax return filed by Thais

2    Thompson for the year 2001, and it shows total income of

3    $5,828.

4    Q.    Very well.  Next is 761C, can you tell us what that

5    document is and what it reveals about income?

6    A.    761C is a certified copy of the 2002 tax return,

7    individual tax return filed by Thais Y. Thompson, and it shows

8    a total income of $10,474.

9    Q.    And turning to 761D, what is that document and what does

10   it reveal about income?

11   A.    761D is a IRS certified copy of the 2003 individual tax

12   return filed by Thais Y. Thompson, and it shows total income

13   of $21,618.

14   Q.    And now finally 761E, what is that document?

15   A.    761E is a certified copy of the 2004 1040 filed by Thais

16   Y. Thompson.  It shows a total income of $19,896.

17   Q.    Very well.

18              MR. LLORET:  Your Honor, if I may just take a

19   moment.

20              THE COURT:  Yes.

21                          (Pause)

22              MR. LLORET:  Counsel informs me I'm done, Your

23   Honor, so I'm done, thank you.

24              THE COURT:  All right.  Mr. Warren.

25              MR. WARREN:  Thank you, Judge.

Armstrong -Cross (War)                    57

1                        CROSS-EXAMINATION

2    BY MR. WARREN:

3    Q.    Good morning, Agent Armstrong, how are you doing?

4    A.    Good morning, sir, I'm fine.

5    Q.    You and I have met before, correct?

6    A.    Correct.

7    Q.    All right.  The chart, we don't need to put it up, but

8    this was the chart -- did you put this chart together or did

9    somebody else?

10   A.    It was put together at my direction.

11   Q.    Okay.  All right, this is the chart that you prepared and

12   you basically described for the jury that talks about how the

13   money that was used to purchase Dillion's Lane was transferred

14   out of accounts, so on and so forth, right?

15   A.    Correct.

16   Q.    All right.  And the significance of some of these

17   amounts, like this one here, 9200, 9800 on 7/29/05 is that

18   they're less than $10,000, right?

19   A.    Correct.

20   Q.    And what happens is if you put more than 10,000 in cash

21   into a bank, the bank files paperwork that tells the IRS who

22   put the money in, correct?

23   A.    Yes.

24   Q.    And that the amount was over $10,000, right?

25   A.    It reports the amount, yes.

Armstrong -Cross (War)                    58

1   Q.   So the idea of structuring is to prevent the bank from

2   filing that document with the IRS, correct?

3   A.   That's correct.

4   Q.   So the IRS doesn't know you have the cash, right?

5   A.   Correct.

6   Q.   Your chart, however, does not identify anywhere where the

7   money came from, does it?

8   A.   Where the currency came from that was used to deposit

9   into the bank?

10  Q.   Yes.  It doesn't say where that money came from, does it?

11  A.   That's correct.

12  Q.   All right.  So it doesn't identify the source of the

13  money, right?

14  A.   That's correct.

15  Q.   All right.  Now if we could look at -- I'm going to turn

16  to the Spring Hip-Hop Explosion, okay?

17          MR. WARREN:  Agent Horay, would it be possible to

18  put 750E up on the screen?

19  Q.   All right, now, this -- you prepared this document,

20  right?

21  A.   Yes, that's correct.

22  Q.   Can you see it?

23  A.   No.

24          MR. WARREN:  Can we turn the screen --

25          THE COURT:  Why don't you give him the document

Armstrong -Cross (War)                              59

1    itself.

2                MR. WARREN:  May I approach?

3                THE COURT:  Yes.

4                THE WITNESS:  Thank you.

5    BY MR. WARREN:

6    Q.    All right, now you prepared this document, right?

7    A.    Yes, I did.

8    Q.    And is it correct that you based this document on records

9    that you guys seized when you searched the studio on

10   Springfield Avenue?

11   A.    Partly, yes.

12   Q.    Partly. Some of the -- for example, the revenue, the

13   Spectrum checks, you didn't find copies of those at

14   Springfield, did you?

15   A.    One of them I did, the one that was made payable to Take

16   Down.

17   Q.    Okay.

18   A.    Excuse me.  There was a photocopy of the check attached

19   to a deposit slip.

20   Q.    Okay.  And I think you told us also you subpoenaed some

21   documents, is that right?

22   A.    Yes, I subpoenaed the Spectrum.

23   Q.    Okay.  Now did I hear you correctly, were the records in

24   not that good of shape, did you tell us that on direct

25   examination?

Armstrong -Cross (War)                                    60

1   A.   I did not say not that good of shape.  I said they were

2   not -- they were not filed, indexed as you would -- as I would

3   expect coming from a business.

4   Q.   Were you actually present when they searched Springfield

5   Avenue?

6   A.   No, I was not.

7   Q.   Do you know where they found the records?

8   A.   Within Springfield?

9   Q.   Yes.

10  A.   No, I do not.

11  Q.   Do you know whether or not they were put together or

12  scattered all over the place or what their status was when

13  they went in there?

14  A.   No.

15  Q.   How were the documents given to you?  Just in a big pile?

16  A.   They were placed in boxes with evidence tags.

17  Q.   Okay.  And were the boxes in any particular order?  Just

18  boxes of documents that you had to sift through?

19  A.   That's a fair description.

20  Q.   And these documents, did they cover a particular time

21  period?

22  A.   I would say that the time period was -- was -- well,

23  certainly going backwards.  It covered the current time period

24  which was '05 and there were records going back to '02.

25  Q.   Right.

Armstrong -Cross (War)                    61

1    A.    So --

2    Q.    So you had various scattered records which spanned the

3    time period of 2002 to 2005, right?

4    A.    Yes.

5    Q.    All right.  Now, Springfield Avenue was not the only

6    place that Take Down Records had an office, was it?

7    A.    Used as a recording studio, I know that they used the

8    Sigma Sound Studios as well.

9    Q.    Okay.  Well, were there other addresses that you know of

10   in which Take Down Records had an office?

11   A.    I'm sorry, Mr. Warren.  I just don't know if they had an

12   office.  I know that they rented space at Sigma Sound.  I

13   don't know if they had an office there or if they just rented

14   studio space there.

15   Q.    Okay.  Do you know whether or not Mr. Coles used any of

16   the other properties that we've heard about in this case to

17   run Take Down Records?

18   A.    No, I do not.

19   Q.    You do not, okay.  Do you know when it was they moved

20   into the Springfield Avenue address?

21   A.    No, I don't.

22   Q.    Do you know whether or not they had to move from some

23   place else?

24   A.    I'm sorry?

25   Q.    Do you know whether or not they moved from somewhere else

1    before they got to Springfield?

2    A.    In terms of recording studio or in terms of office?

3    Q.    Office, business records we're talking about.

4    A.    Okay, in terms of office, no, I do not know.

5    Q.    Okay.  Now, let me ask you a couple things about the

6    expenses, and then I want to talk about something else.

7        Down -- one of the big line items for expenses is the

8    money that was supposedly paid to the performers, right, down

9    at the bottom?

10   A.    Yes.

11             MR. WARREN:  Agent Horay, can we blow that up.

12   Q.    All right.  Now, I think you told us on direct

13   examination that some of these figures here you got from the

14   actual contracts themselves, right?

15   A.    Yes.

16   Q.    Okay.  Was Little Mo, the $8,000 that was supposedly paid

17   to Little Mo, did that come from the contract?

18   A.    Yes.

19   Q.    Okay.  And the contract was -- was that a Take Down

20   Records contract?

21   A.    No, it was a Big Bloc Entertainment contract.

22   Q.    Big Bloc Entertainment contract.  And the contract itself

23   said Little Mo was supposed to be paid 8,000?

24   A.    Contract called for the payment of 8,000 payment of a

25   deposit up front at the signing of the contract and called for

Armstrong -Cross (War)                    63

1   the payment of various expenses, plane fare, hotel rooms, that

2   kind of stuff.

3   Q.   Okay.  Did you find any checks or documents which show

4   exactly how much was paid to Little Mo?

5   A.   I believe I did see a handwritten note of, for receipt of

6   a deposit.

7   Q.   How much was that?

8   A.   I believe it was a thousand dollars.

9   Q.   A thousand.  So you've got a document which indicates

10  handwritten that a thousand dollars was paid to Little Mo?

11  A.   Yes, that's right.

12  Q.   Anything else which any amounts that were actually paid

13  to the artists?

14  A.   No.

15  Q.   Okay, same question with respect to Sharissa, did you

16  base that $8,000 amount on the fact that the contract said

17  Sharissa was supposed to get $8,000?

18  A.   Yes, and the terms of the contract.

19  Q.   Okay.  Did you actually see any checks or any documents

20  that showed you how much was actually paid to Sharissa?

21  A.   The answer is no, but just to go back on just one part of

22  the contracts.  The contract specifically states that if

23  they're not paid before their performance they won't be there.

24  And for -- from all of our information they were there, so.

25  Q.   Well, did you see any checks coming from Take Down

Armstrong -Cross (War)                    64

1    Records payable to Sharissa in the amount of $8,000?

2    A.    No.

3    Q.    Do you know how these people were paid?

4    A.    Do I know? No, I don't know.

5    Q.    Do you know whether or not they were paid in cash at the

6    show?

7    A.    I do not know.

8    Q.    Do you know whether or not they may have taken a discount

9    to get paid in cash?

10   A.    Whether they took an additional -- actually, the contract

11   calls to paid for in  cash so they would not have taken a

12   discount.

13   Q.    Okay.  And you know that because you've spoken with

14   Sharissa, right?

15   A.    I know that because I read the contract.

16   Q.    Have y spoken with Sharissa?

17   A.    No.

18   Q.    Spoken with Little Mo?

19   A.    No.

20   Q.    Beanie Sigel, the $45,000 fee there, okay, again you're

21   basing it on the contract?

22   A.    Yes, that's correct.

23   Q.    Any documents which would reflect payment in that amount

24   to Mr. Sigel?

25   A.    There's a document showing a receipt, a receipt showing a

Armstrong -Cross (War)                              65

1  receipt of I believe $10,000 deposit.

2  Q.    $10,000 deposit?  Any other written documents which

3  evidence payment to Mr. Sigel?

4  A.    No.

5  Q.    Okay.  Did his contract also call to be paid in cash?

6  A.    Yes, I believe it did.

7  Q.    Okay.  Now if we could look at -- by the way, the

8  deposits to the Spectrum, a big line --

9         MR. WARREN:  Could we blow that up, please, Agent

10  Horay.

11  Q.    All right, now, the deposits to the Spectrum, the big

12  line item here is $47,576.50, right?

13  A.    That's correct.

14  Q.    All right.  Who actually paid that?  Was it Get That

15  Dough or Take Down Records?

16  A.    It came from a Get That Dough check.

17  Q.    Okay.  Get That Dough being, was that Melissa Brown --

18  oh, I'm sorry, Michelle Brown?

19  A.    Yes, that's correct.

20  Q.    Beanie Sigel's mom?

21  A.    Correct.

22  Q.    Okay.  And her company, Get That Dough, was the one that

23  cut the $47,000 check, right?

24  A.    That's correct.

25  Q.    But it was still, and I don't mean to mislead anybody,

Armstrong -Cross (War)                66

1  you're showing the total revenues made by Get That Dough and

2  Take Down Records, right?

3  A.    That's correct.

4  Q.    So that's why you included the money that was paid,

5  47,000 by Get That Dough, as part of the expense, right?

6  A.    In addition, I reviewed a contract between Take Down and

7  Get That Dough where it detailed the relationship, detailed

8  that revenue and expenses would be shared equally 50/50, and

9  the records are extremely consistent with that.

10 Q.    Okay.  Well, did you see any checks coming from Take Down

11 Records that were applied to this deposit?

12 A.    The $10,000 came originally from Take Down, it was given

13 to -- it was given to Scott Griffith (phonetic) who then, who

14 then -- who took in the $10,000 and forwarded $10,000 to the

15 Spectrum.

16 Q.    Okay, other than that $10,000 deposit check, did you see

17 any other checks that came from Take Down Records that were

18 applied to this deposit?

19 A.    No.

20 Q.    If we could look at -- by the way, this chart is based on

21 documents that you reviewed, is it not?

22 A.    Yes, that's correct.

23 Q.    It doesn't reflect any money they may have made in cash,

24 does it?

25 A.    I'm sorry, where would they have made money in cash?

Armstrong -Cross (War)                    67

1    Q.    Look at Ech 429.  See that?

2    A.    Yes.

3    Q.    What's that?

4    A.    It's a Spring Hip Hop all access pass.

5    Q.    All access pass.  Do you know whether or not these were

6    sold?

7    A.    I don't know if they were sold.  I know it would be a

8    violation of the lease with the Spectrum.

9    Q.    Okay.

10   A.    I know they were given out as give-aways by the radio

11   station.  I know the radio station took some as part of their

12   process.

13   Q.    Do you know whether or not these items were sold by Alton

14   Coles and the people at Take Down Records?

15   A.    No, I do not.

16   Q.    Do you know how much, if any, they would have been sold

17   for?

18   A.    No.

19   Q.    Do you know how many people, if any, they might have sold

20   them to?

21   A.    No, I don't.

22   Q.    Do you know what an after party is?

23   A.    Yes, I do.

24   Q.    What's that?

25   A.    An after party -- oh, an official after party is a party

Armstrong -Cross (War)                    68

1    after an event wherein one of the -- one or more of the

2    performers who were involved in the event appears at a

3    specific location for a period of time.

4    Q.    Do you know whether or not there was an after party

5    following the event at the Spectrum?

6    A.    Yeah, I believe there was.

7    Q.    Do you know how much it cost to get in the after party?

8    A.    $20.

9    Q.    Do you know how many people showed up for that?

10   A.    How many people showed up?  No.

11   Q.    Do you know whether or not they paid cash to get into the

12   after party?

13   A.    I don't know but I can answer that and say yeah, they

14   paid cash.

15   Q.    Okay, is any cash revenue from the after party reflected

16   on your chart?

17   A.    Well, if I wanted to get into the cash revenue I'd have

18   to get into the expenses associated with the after party.

19   Q.    Well, what were they?

20   A.    $6500 to rent the -- I'm sorry -- the Venue, which was a

21   night club on Delaware Avenue.

22   Q.    Which was what, what night club?

23   A.    Evolutions.

24   Q.    Evolutions.  How big is Evolutions?

25   A.    I've never been in there.

Armstrong -Cross (War)                    69

1  Q.    Okay.  How did you know that they spent $6500 to rent it?

2  A.    Contract.

3  Q.    Okay.  So it was $6500 to rent Evolutions.  What other

4  expenses?

5  A.    There was $5,000 in advertising from Power 99.

6  Q.    Okay, any other expenses that you know of?

7  A.    There are expenses that in the course of the

8  investigation and beginning to understand what an after party

9  is and how it works, there are other expenses associated with

10  putting on the after party; door counters, people, other

11  people involved, you have to pay disc jockeys, that sort of

12  thing.

13  Q.    Do you know for a fact they had to pay disc jockeys at

14  this after party?

15  A.    At this after party?  No, I don't know that.

16  Q.    Do you know for a fact they had to pay people at the door

17  of this after party?

18  A.    I would say that if there's somebody collecting money for

19  Take Down at the door, they're being paid.

20  Q.    Okay, do you know that for a fact?

21  A.    No, I don't know that for a fact.

22  Q.    And you have no idea how many people showed up?

23  A.    That's correct.

24  Q.    All right.  Let's talk about -- talk about Government

25  Exhibit 750C, please.  All right, and this is --

Armstrong -Cross (War)                                    70

1      MR. WARREN:  Could we blow up the, Agent Horay, the

2   top part which deals with revenue?

3   Q.    All right, now, this is a chart that you prepared which

4   compares the revenues and expenses for Take Down Records,

5   right?

6   A.    Yes.

7   Q.    Is this the same --

8   A.    Excuse me.  I'm sorry, Mr. Warren.  That's the revenue

9   expenses associated with the production of these DVD's and

10  CD's.  Take Down had very many more expenses than are listed

11  here.

12  Q.    Fair enough.  With respect to the DVD's and the CD's,

13  these documents span the same time period as the ones you told

14  us about earlier?

15  A.    Yes, that's correct.

16  Q.    So this is basically -- you're putting this together

17  based on in part documents that were in the boxes that were

18  handed to you after they searched Springfield Avenue, right?

19  A.    In part, yes.

20  Q.    Okay.  And some of the stuff you're subpoenaing actually

21  -- and a subpoena is a written piece of paper which directs

22  some third party to give documents to you guys, the

23  Government, right?

24  A.    Correct.

25  Q.    And so you send subpoenas out and they send stuff back to

Armstrong -Cross (War)                                  71

1    you, right?

2    A.    Yes, that's correct.

3    Q.    Okay.  Now on a -- on the Take Down documents, it says

4    parenthetically search warrant, doesn't it?

5    A.    Yes.

6    Q.    Okay.  So at least -- and this deals with the DVD sales

7    and the CD sales, right?

8    A.    Yes.

9    Q.    So these figures are based on -- is it basically five

10   documents that you found in the search warrant that this entry

11   is based on?

12   A.    Yes and no.  And I say yes and no because for instance,

13   the consignment list which is an actual list, a piece of

14   paper, that was -- there was also as part of that list or in

15   an envelope where that piece of paper was, a whole listing of

16   individual record stores who had taken -- that also appear on

17   the list.  So there were -- so if a consignment list listed 15

18   different entries, there were within an envelope pieces of

19   paper, receipts from those entities.

20        So, in the sense that if that's one list, yes, you could

21   also call it 16 pieces of paper.

22   Q.    Okay, the consignment list was 16 pieces of paper?

23   A.    Well, the list was one piece of paper but it had other

24   pieces of paper that went into making the list obviously.

25   Q.    Okay, the consignment sheet, how many pieces of paper was

1    this?

2    A.    The sheet itself is one piece of paper.  It was prepared

3    by somebody, not by myself.

4    Q.    Was it handwritten?

5    A.    Yes, it was.

6    Q.    Okay.  The Streets Inc. album list, what was that?

7    A.    That was a -- that was again a handwritten piece of

8    paper.

9    Q.    A handwritten piece of paper?

10   A.    Yes.

11   Q.    One sheet of paper?

12   A.    Yes.

13   Q.    DVD log, what was this?

14   A.    That was a typewritten page.

15   Q.    Single page?

16   A.    Single page.

17   Q.    All right.  When you looked at the stuff that was seized

18   from Springfield Avenue, did you see any CD's in there?

19   A.    I don't remember.  I did see some either videos -- either

20   CD's, videos, from some parts of the search warrant.  I can't

21   place them.

22   Q.    Okay.  Do you know what a mixed tape is?

23   A.    Sort of.

24   Q.    Tell me what your understanding is?

25          MR. LLORET:  Objection, Your Honor.

Armstrong -Cross (War)                              73

1           THE COURT:  Sustained.

2    Q.    Did you see any records in there which indicated sales of

3    mixed tapes?

4    A.    Records?  Document records?

5    Q.    Yes, handwritten, anything.

6    A.    With -- coming out of Springfield?

7    Q.    Yes.

8    A.    No, not that I can recall.

9    Q.    Compilation albums, same question, did you see any

10   records reflecting sales of a compilation album?

11   A.    From Springfield?

12   Q.    Right.

13   A.    I believe that they're not noted as such but looking down

14   to some of those purchase and duplication costs, some of those

15   businesses did specifically mark that kind of stuff, what it

16   was from.

17   Q.    Okay, but I'm talking about documents, handwritten,

18   typewritten, of whatever type which reflected sales of a

19   compilation album.

20   A.    That specifically noted a compilation album?

21   Q.    Yes.

22   A.    No.

23   Q.    Okay.  See where it says vinyl CD sales?

24   A.    Mmhmm.

25   Q.    Fourth line down, right?

Armstrong -Cross (War)                    74

1    A.    Yes.

2    Q.    According to this document, Take Down Records for the

3    time period that you had the records for, made $738 on CD

4    sales.  Is that what this chart reflects?

5    A.    That is listed as sales, yes, they may or may not have

6    sold some of those things which went out on consignment as

7    well.

8    Q.    Okay.  Are there any documents in there which reflected

9    sales of CD's on the street?

10   A.    That specifically say albums went on the street to

11   individual A who's selling them on the corner?

12   Q.    Mmhmm.

13   A.    No.

14   Q.    Okay, same thing with respect to the movie New Jack City:

15   Next Generation, any documents which might have reflected

16   sales of that video on the street?

17   A.    Again, under those same terms, no.

18   Q.    You also talked about advertising for Power 99, and you

19   said you did not include that -- or did you include that in

20   the expenses?

21   A.    In this chart?

22   Q.    Yes.

23   A.    No.

24   Q.    Okay.  How much -- do you recall how much they paid in

25   advertising to Power 99?

Armstrong -Cross (War)                    75

1    A.    For what time period?

2    Q.    For whatever time period you looked at.

3    A.    Well, going specifically from the Power 99 records, which

4    were for '04 and '05, or that portion of '05 which is

5    relevant, there's just close to $200,000.

6    Q.    $200,000.  And these are advertisements for the parties,

7    right?

8    A.    Yes, mostly.

9    Q.    So they're spending 200,000 to advertise for the parties,

10   right?

11   A.    Correct.

12   Q.    But you told us on direct examination that you didn't

13   have sufficient documentation to determine how much money they

14   made from the parties, right?

15   A.    No, I didn't say that.

16   Q.    You didn't say -- I'm sorry, you said it was sketchy,

17   those were your words, right?

18   A.    I used sketchy, but what I also said is they're not

19   complete.  There are times when we have very good records

20   where I can make a determination, I believe in my opinion.

21   There are other times where the records are very limited and I

22   can say I don't know.  I would have to interpolate.

23   Q.    You're referring to records from Take Down, correct?

24   A.    No, no.

25   Q.    Didn't you guys subpoena records from the guy who runs

Armstrong -Cross (War)                                    76

1   the Palmer Social Club?

2   A.    Yes, we did.

3   Q.    William Weiss, right?

4   A.    Yes.

5   Q.    And he produced what are called treasury reports, right?

6   A.    Yes.

7   Q.    And those treasury reports actually give you a basis to

8   at least figure out how many people were showing up at these

9   parties, right?

10  A.    Well, based on the Palmer's records that you're talking

11  about, the figures -- and that includes the time period 2002

12  up until the beginning of 2003, they consistently noted -- and

13  I should explain the records.

14        There were a series of contracts signed between Take Down

15  and Palmer's, and they were typically a four-week period.  And

16  each one of these contracts noted the expected number of

17  people who were expected to attend, and it was 400.

18  Q.    The contracts noted the expected number of people who

19  were supposed to attend or the treasury reports reflected the

20  money that Palmer's had been paid?

21  A.    The treasury reports reflect the rent received from Take

22  Down.

23  Q.    Right.  So, you -- based on those records -- well, let me

24  do it this way.  How much rent would Take Down have to pay

25  Palmer's to host a party?

Armstrong -Cross (War)                                    77

1   A.   Depends when.  If you want to speak of a time when we

2   actually have very good records which is a six-week period

3   starting just after the, just after the Spectrum concert, they

4   were paying -- they were paying Palmer's $4,000 a week, they

5   were paying Power 99 $3500 a week.  They had a Power 99

6   personality there who they were paying $400 a week.

7   Q.   Did you --

8   A.   Based also on the Palmer's records, there were three disc

9   jockeys who had to be paid.

10  Q.   Did you get records, treasury reports from Palmer's for

11  each month between April 2002 and September 2005?

12  A.   I'm not sure of the time frame.

13  Q.   You're not sure of the time frame?

14  A.   Right.  We did receive some treasury reports which noted

15  what's noted on the reports as other income.

16  Q.   Yes.  These treasury reports, basically Palmer's a social

17  club, right?

18  A.   Yes.

19  Q.   And the treasury report is simply a document that the

20  treasurer prepared to show the other people how much money

21  they were making, right?

22  A.   How much money's coming in, right.

23  Q.   And the actual deal between Palmer's and Take Down, rent

24  would be paid based on how many people showed up, right?

25  A.   That is in a handwritten note in the documents, yes.

Armstrong -Cross (War)                               78

1   Q.    Okay.  And, if there were 600 people or less, Palmer's

2   got $2,000, right?

3   A.    Correct.

4   Q.    And the treasury report would then reflect $2,000 in

5   income, right?

6   A.    Correct.

7   Q.    So you could look at the treasury report and figure how

8   many people showed up for that particular month, right?

9   A.    Assuming the report is correct.

10  Q.    Do you have any reason to doubt its accuracy?

11  A.    Yes.

12  Q.    Okay, what's that?

13  A.    The -- I know of an unrelated ongoing grand jury

14  investigation concerning people at Palmer's.

15  Q.    All right.  Well, you think they're understating the

16  amount of money they made?

17          MR. WARREN:  I'll skip this, Judge.  I won't go into

18  unrelated ongoing grand jury investigations.

19          THE COURT:  Move on.

20  Q.    All right, well, 600 people or less, $2,000, right?

21  A.    That's correct.

22  Q.    Between 600 and 799 people, the rent down right, 1500

23  bucks?

24  A.    Correct.

25  Q.    And if there were more than 800 people there was no rent,

Armstrong -Cross (War)                    79

1    right?

2    A.    That's correct.

3    Q.    All right.  And this deal went on for over three years,

4    didn't it?

5    A.    I believe so, yes.

6    Q.    And on a consistent basis they go between four and six

7    hundred people to show up on these parties weekly, didn't

8    they?

9    A.    Well, you're asking me where that number comes from?

10   Q.    I'm just asking you based on your investigation, you

11   subpoenaed the records, you looked at the treasury reports,

12   didn't you?

13   A.    That's not coming from the records.  I know where the

14   figure's coming from if you'd like to tell you, I'd be glad to

15   tell you. That's what Weiss told us.

16   Q.    Okay.  You looked at the treasury records, didn't you?

17   A.    Yes.

18   Q.    You had them all for that three-year time period, right?

19   A.    Yes.

20   Q.    Okay.  What did they reflect?

21   A.    They reflect frankly -- I don't believe there was ever,

22   it ever went over 800 in terms of there was never -- there was

23   never no payment.  The majority of the time was 2,000, a

24   smaller amount, smaller number of time it was 1500.

25   Q.    Okay.  Which means if it's 2,000, that means how many

Armstrong -Cross (War)                    80

1    people had to show up to the party, between 400 and 600,

2    right?

3    A.    That would be for rent.  There's also the advertising

4    which is a similar amount, it's another 2,000.

5    Q.    Do the treasury reports reflect the amount spent on

6    advertising?

7    A.    No, they do not.

8    Q.    Do the treasury reports reflect the amount spent on disc

9    jockeys?

10   A.    No, they do not.

11   Q.    All right.  Those would be the Power 99 records for

12   advertising that you're referring to?

13   A.    Yes.

14   Q.    Okay.  And what records did you look at to determine what

15   they paid disc jockeys?

16   A.    What records?

17   Q.    Yes.

18   A.    There were some Power 99 records which note when there

19   was a Power 99 disc jockey there.

20   Q.    Was there a Power 99 disc jockey there all the time?

21   A.    No.

22   Q.    All right.  701F.  Now this is just a chart of deposits

23   going into a bank account for Kristina Latney, right?

24   A.    Yes, that's correct.

25   Q.    701G just reflects amounts paid out of that same account?

Armstrong - Cross (McM)                    81

1    A.    Correct.

2    Q.    701H, amounts paid out of that same account?

3    A.    Correct.

4    Q.    Amounts paid to make the monthly payment for a Mercedes,

5    correct?

6    A.    Yes, 701G.

7    Q.    Amounts paid to make the monthly payment for a 2002

8    Escalade, right?

9    A.    Correct.

10   Q.    All right.  So these deposits are consistent with

11   somebody making the monthly payments on two cars, right?

12   A.    Yes, that's exactly what they are.

13             MR. WARREN:  Court's indulgence.

14                              (Pause)

15             MR. WARREN:  Nothing further.

16             THE COURT:  Okay, ladies and gentlemen, it's 11:15.

17   We're going to take a brief recess, go out and relax for ten

18   minutes, we'll bring you back in ten minutes.

19                   (Off the record at 11:15 a.m.)

20             (On the record at 11:30 a.m.; jury present)

21             THE CLERK:  Please rise.

22             THE COURT:  Okay, have a seat.  Mr. McMahon.

23                        CROSS-EXAMINATION

24   BY MR. McMAHON:

25   Q.    Good morning, Agent.

Armstrong - Cross (McM)                    82

1    A.    Good morning, sir.

2    Q.    And this is your testimony then regarding your economic

3    analysis of Take Down Records and the charts and the whatnot

4    that you're prepared.  And correct me if I'm wrong, and I'm

5    sure you will, and that is that the record -- this wasn't like

6    going into IBM where the records are all crystal clear and all

7    the expenditures and they had accountants doing them and you

8    could review the records in a pretty rational way, is that

9    fair to say?

10   A.    The records were not up to IBM standards, right.

11   Q.    Right.  They were -- you had to like piece them together,

12   find something here, find something there, a contract here,

13   and through your expertise and skill you were able to put

14   together as best you could the document that we've seen here

15   today, correct?

16   A.    Correct.

17   Q.    But you would agree with me then that the record keeping

18   process and whatnot of Take Down Records was not the best?

19   A.    Not the best, not the worst.

20   Q.    Okay.  Did it appear to you that -- as if there was any -

21   - in Take Down Records, any outside accounting, like an

22   accounting firm or accounting business that kept the ledgers

23   and books and whatnot that many businesses do, was there any

24   recordation of that?

25   A.    No, I believe Donald Brown was brought in to do that, but

Armstrong - Cross (McM)                    83

1    that didn't pan out, so no, I didn't see any other indication.

2    Q.    Okay, so it appeared to be done internally by the fellows

3    that did Take Down Records, correct?

4    A.    Yes.

5    Q.    And as you said, it was record keeping that was in a

6    little bit of a disarray, correct?

7    A.    Correct.

8    Q.    Okay.  Now, and the records that -- and the charts that

9    you prepared were, as best you could put in together that

10   disarray, correct?

11          THE COURT:  Mr. McMahon, you've already asked that

12   question.

13          MR. MC MAHON:  Okay, fine, Your Honor.

14   BY MR. MC MAHON:

15   Q.    Now, in looking at my client, Mr. Baukman, you prepared

16   various charts in relationship to him.  And you looked at one,

17   704B, do you have them up there with you?

18   A.    Yes, I do.

19   Q.    704B, 704C, D, and E all deal with charts and analyses

20   that you did regarding Mr. Baukman, correct?

21   A.    Correct.

22   Q.    Okay.  And in looking at -- first of all, let's look at

23   704B.

24          MR. MC MAHON:  And if we could have that on the

25   screen at the time.

1  Q.    And this 704B is your chart that indicates an analysis of

2  the Wachovia Bank account with the bank account as listed

3  there, correct?

4  A.    Correct.

5  Q.    And you did it for years 201 through 205 after the --

6  well, you did it through 201 through 205, correct?

7  A.    Yes, the account was opened in 201, actually did it from

8  the beginning of the account.

9  Q.    Okay.  And my understanding is the name on this is

10  Tauheed Baukman, correct?

11  A.    Correct.

12  Q.    And the address that was given as to the address on the

13  account is in fact the address where my client lived, correct?

14  A.    I'm sorry, Mr. McMahon, I don't remember, the address on

15  from the account.  There are records in the courtroom that I

16  can look at.

17         MR. MC MAHON:  We can get to that, Your Honor, I'll

18  get back to that, not to interrupt.

19         THE COURT:  All right.

20  BY MR. MC MAHON:

21  Q.    But there was an address associated with that account,

22  correct?

23  A.    Correct.

24  Q.    You need an address to open up a bank account, correct,

25  or most of the times, but in this case it had one, correct?

Armstrong - Cross (McM)                                85

1    A.    It had an address.

2    Q.    And the name was Baukman, which is my client's last name

3    but obviously the name that was used as his first name is not

4    his first name, and in fact through the course of

5    investigation it appears to be his son's name, correct?

6    A.    Correct.

7    Q.    Okay.  Now, and this was the only bank account that you

8    analyzed in regard to Mr. Baukman, is that correct?

9    A.    Yes, that's correct.

10   Q.    Okay.  And all the records that you talk about are

11   reflective out of that one account, that is the payments in

12   and the payments out of that account, is that fair to say?

13   A.    Yes, it is.

14   Q.    All right.  Now you said yesterday -- and when you were

15   looking at the big chart, the one with Mr. Coles which is the

16   750D, you made a statement yesterday when we saw cash and

17   whatnot you wouldn't put -- in this particular one --

18          MR. MC MAHON:  If you can pull that one up, 750D.

19   Q.    There was the Citizens Bank with Alton Coles, the one

20   that's his personal account, correct?

21   A.    Correct.

22   Q.    And that's the one with his picture on it, right?

23   A.    Yes.

24   Q.    And one of the things you said yesterday was that

25   deposits of monies like this would go into the Take Down

1    Limited and be transferred to his personal account, the cash

2    monies wouldn't be given directly into his account, correct?

3    A.    Except for those three deposits at the bottom of the

4    thing but --

5    Q.    At the bottom, but you said --

6    A.    Outside of that, correct.

7    Q.    And yesterday when Mr. Lloret was asking you questions,

8    one of the things you said on your direct examination

9    yesterday is that in this type of work based on your

10   experience, cash payments into a direct personal account when

11   there's money laundering going on, they just don't do that,

12   correct?

13   A.    No, that's not correct.  I didn't say they just don't do

14   that.  I said it's inherently more suspicious.

15   Q.    Okay.  Inherently more suspicious to deposit cash into

16   your personal account, correct?

17   A.    Correct.

18   Q.    And in fact, that's what you made some of your opinions

19   on yesterday that money was put into a company, which is Take

20   Down, and then checks were moved out of Take Down into a

21   personal account, correct?

22   A.    Correct.

23   Q.    Therefore, the cash that may have been put into Take Down

24   gets transferred into a personal account, and it might not

25   look like cash, it maybe look like business account checks,

Armstrong - Cross (McM)                                      87

1    correct?

2    A.    Yes, that's correct.

3    Q.    Okay.  And that's what you were saying yesterday, right?

4    Whereas if all that cash is put into a private account, a

5    personal account, it may raise a suspicion, correct?

6    A.    Yes, that's correct.

7    Q.    Okay.  Now, let's look at Mr. Baukman, and we go back to

8    704B if we don't mind.

9           MR. MC MAHON:  And if we could blow up that so that

10   it could be seen a little bit better.

11   Q.    704B is a summary, is it not, that you prepared of an

12   analysis of that one bank account that's on the top, correct?

13   A.    Correct.  There's summary deposits by year.

14   Q.    Yes, that's what I meant, right, summary deposits.  Now,

15   this is a personal account, correct?

16   A.    Yes, it is.

17   Q.    That's what we were talking about here with Mr. Coles,

18   that was a personal account, right?  The one that's listed on

19   your chart as account 610433-826, that was a personal account?

20   A.    That's a personal account, this is a personal account of

21   somebody who's not the person making the transaction.  There's

22   difference.

23   Q.    This is not a corporate account, this is not a business

24   account.  This is a individual's account, correct?

25   A.    Correct.

Armstrong - Cross (McM)                    88

1  Q.   With the name Baukman and the address that he lived at,

2  correct?

3  A.   The name Baukman and the address --

4  Q.   We'll get to that.

5  A.   But it went to an address where he had access, sure.

6  Q.   So what I'm saying to you is this was a personal account,

7  right?

8  A.   Yes, it was a personal account.

9  Q.   It was not a business account?

10 A.   Correct.

11 Q.   And this business account, in looking at this business

12 account in your summary, and -- not business account, personal

13 account, in a summary, we had, over the four years you

14 analyzed it, $155,115 of cash put into a personal account,

15 right?

16 A.   Correct.

17 Q.   Now that didn't take from Take Down Records, did it?

18 A.   Did it flow through Take Down Records?

19 Q.   No, I mean --

20 A.   No --

21         THE COURT:   Mr. McMahon, let him answer the

22 question.

23         MR. MC MAHON:   I hadn't finished the question, Your

24 Honor.  I understand.

25         THE COURT:   Rephrase your question and start over.

Armstrong - Cross (McM)                    89

1          MR. MC MAHON:  I will do that.

2    BY MR. MC MAHON:

3    Q.    Into Mr. Coles's account, or this account here, money

4    came through Take Down that got into his personal account,

5    correct?

6    A.    That's correct.

7    Q.    Okay.  Now, in this situation with Mr. Baukman in this

8    account, money didn't come -- well, there's a couple, but

9    mostly this cash came directly into that account.  It didn't

10   come through Take Down, it didn't have that process that you

11   displayed here coming into Mr. Baukman's account, did it?

12   A.    No, that's correct.

13   Q.    Okay.  And when we look at the cash amount, you did this

14   analysis for five years.  So we have five years of cash being

15   deposited into that account at 155,000 and some change, so

16   that's about an average over the five years of approximately

17   $30,000 a year cash going into that account, is that fair to

18   say?

19   A.    If you consider over the five-year period -- I mean over

20   the whole period but there's very little in '01 so I really

21   wouldn't even include it in the average --

22   Q.    Well, if I'm not mistaken, that's why it's called

23   average, okay?

24   A.    Sure.

25   Q.    That's what I'm saying to you, right, an average, right?

Armstrong - Cross (McM)                    90

1    A.    I understand.

2              MR. LLORET:  Objection.  Is that a question, Your

3    Honor?

4              MR. MC MAHON:  Well, my question was --

5              THE COURT:  Mr. McMahon, just ask questions.

6              MR. MC MAHON:  Well, Judge, I mean I asked a

7    question --

8              THE COURT:  Mr. McMahon, just ask questions.

9              MR. MC MAHON:  Well, I'm going to ask it again.

10             THE COURT:  Mr. McMahon, come to sidebar.

11        (The following discussion was held at sidebar:)

12             THE COURT:  Mr. McMahon, you better knock it off.

13             MR. MC MAHON:  Judge --

14             THE COURT:  Do you hear me?

15             MR. MC MAHON:  I hear what you're saying but I want

16   to put something on the record here.  I ask him a question and

17   he proceeds to give an answer and I'm not allowed to go back

18   at him with that?

19             THE COURT:  Mr. McMahon, you will not give him a

20   chance to do anything.  The questions go on and on and on, and

21   when he tries to answer them, you keep --

22             MR. MC MAHON:  When I ask a question --

23             THE COURT:  Mr. McMahon --

24             MR. MC MAHON:  -- and he says, gives the answer that

25   he gives, that's not an accurate answer.

Armstrong - Cross (McM)                    91

1          THE COURT:  You now have a question, you've been

2    around here long enough --

3          MR. MC MAHON:  I know that, Judge.

4          THE COURT:  Okay.

5                    (End of sidebar discussion)

6    BY MR. MC MAHON:

7    Q.    Now, you would agree with me that there's an average of

8    approximately $30,000, is that fair to say, over the five

9    years?

10   A.    Yes, I'm just doing the math.  Yes.

11   Q.    Okay.  And Take Down was started when, as far as your

12   knowledge?  I think you said December 1st of '01 it was

13   incorporated, correct?

14   A.    I didn't give an exact date.  I said it started -- it

15   began in early '02, perhaps as early as like December of '01,

16   when it was incorporated.

17   Q.    And looking at the bank account records of Mr. Baukman as

18   they reflect here, when Take Down started '01, '02, as you

19   indicate in the first year in that account there's only $6,000

20   totally put into that account, correct?

21   A.    That's correct.

22   Q.    And then we have Take Down is started at some point in

23   time in there, and I don't know the exact date, then the

24   income of Mr. Baukman, as far as deposited into that account,

25   begins to go up shortly after Take Down is started, is that

Armstrong - Cross (McM)                                    92

1    correct?

2    A.    There are more deposits in '02.

3    Q.    Right. And then as Take Down continues on, from 202 to

4    203, the total deposits then again increases almost $30,000,

5    correct?

6    A.    Yes, from '02 to '03 there's approximately 30,000 more in

7    deposits.  From '03 to '04 it's kind of about the same.

8    Q.    Yes, that's what I said, '03 and then to '04 it goes up

9    just a little bit, just about a thousand dollars or so,

10   correct?

11   A.    Correct.

12   Q.    Okay.  So after Take Down was formulated, Mr. Baukman's

13   account proceeded to get more deposits over the time that Take

14   Down was in operation, is that fair to say?

15   A.    Yes, that's fair to say.

16   Q.    Okay.  Now, you indicated that one of the things that you

17   tend to see in your expertise is that money, when there's

18   money laundering, will go in and that exact amount will

19   generally just go out, for some expense?  For example, if I'm

20   buying a house or something and I'm going to put -- I put

21   $20,000 in of illegal money and then I write a check for

22   $20,000 out, right?

23   A.    I said basically, I said there's no accumulation of funds

24   in the account.  Pretty much what goes in tends to come out,

25   over a reasonable period of time.

Armstrong - Cross (McM)                      93

1    Q.    Okay.  All right.  So there's on accumulation of funds,

2    okay.  Let's take for example the year 2003, okay?  2003, we

3    have a total amount of 67,131, and most of it, the bulk of

4    it's cash, 63,9, right?

5    A.    Correct.

6    Q.    Now, you also look at 704C, D and E, these were the three

7    charts that you prepared.  Okay?

8    A.    Mmhmm.

9    Q.    As far as monies going out, you said there's no

10   accumulation in money laundering generally speaking.  Now, if

11   you look at these, the Jaguar for example.  The Jaguar's 580

12   to 600 depending upon what month, maybe late fees or whatever,

13   but let's just figure 600 for argument's sake, okay?

14   A.    Okay.

15   Q.    Okay.  Now 600 times 12 would be $7200 a year, correct?

16   A.    Correct.

17   Q.    And he had that car in the year 2003, that's what I'm

18   referring to, okay?

19   A.    That's correct.

20   Q.    Okay.  So then you have the -- that's one chart that you

21   have.  Then you have the chart of $500 for Essex Avenue, $500,

22   so that's about $6,000, correct?

23   A.    Correct.

24   Q.    Over 12 months, right?

25   A.    Yes.

Armstrong - Cross (McM)                    94

1    Q.    And then you have the payments on the Jaguar, which is,

2    varies too, but using 1800 which I did as kind of just a

3    general reference there, that comes out to about -- or I'm not

4    talking about the Jaguar, I'm talking about Schoolhouse Lane.

5    Schoolhouse Lane is around 1800, in that area, give or take,

6    correct?

7    A.    Correct.

8    Q.    Okay.  That comes out to about 21,600, okay.  Now, and

9    that's the checks that you marked for, for 203 and 204 and you

10   talked about money goes in and money goes out and there's no

11   accumulation when there's money laundering.  Well, if you take

12   21,6 and 7200 and 6,000, you get about $34,800 of chart money

13   that you say went out, correct?

14   A.    Correct, I'll assume the math.

15   Q.    Now if you look for that year, then 200 and 2003, $67,000

16   was put into that account, right?

17   A.    Correct.

18   Q.    Okay.  So that's 30 -- of the monies that you said went

19   out, that you reflected on as part of the money laundering, it

20   was $33,000 that is not reflected on the charts that you said

21   went out, right?

22   A.    Correct, roughly.

23   Q.    That would be what, accumulation of some money into that

24   account?

25   A.    No.

Armstrong - Cross (McM)                               95

1    Q.    It wouldn't?

2    A.    No.

3    Q.    Why not?

4    A.    The money was being used for things other than these

5    three items.

6    Q.    Okay, they were used for other things, right?

7    A.    Yes.

8    Q.    So money went out for those three things but there was

9    other monies left in there, correct?

10   A.    That's correct, that was used for other things, yes.

11   Q.    Right.  Do you know what those things were?

12   A.    No, I can look but in my review they didn't strike me as

13   anything other than average, normal kind of stuff.

14   Q.    Normal everyday stuff?

15   A.    Yeah.

16   Q.    But what I'm saying to you is, the money that was

17   deposited there wasn't just solely for those three things,

18   correct?

19   A.    That's correct.

20   Q.    Okay.  And the same could be true for 204 also, when

21   there's the similar analysis could be made there also,

22   correct?

23   A.    Yeah, I believe that's correct.

24   Q.    Okay.  And these checks were checks that -- on these

25   charts were checks that you were able to obtain merely by

Armstrong - Cross (McM)                                    96

1   subpoenaing the records, correct?

2   A.    Correct.

3   Q.    Okay.  And if we look at the year of -- over the course

4   of and total amount of money over a five-year period of time,

5   on the average of the money that was deposited into my

6   client's account, Mr. Baukman, or in the name Tauheed Baukman,

7   is 202,000 divided by five or somewhere about $40,000 a year

8   as being put into this account, correct?  On an average.

9   A.    Correct.

10  Q.    Okay. And now, when the raid was made in August 10th and

11  you got involved at that point in time, you then started to

12  look into these records, correct?

13  A.    Correct.

14  Q.    And did you have opportunity to look at my client's, this

15  account at the time of the raid, how much money he had?

16  A.    At the time of the raid did I have --

17  Q.    Or shortly thereafter, after you got involved.

18  A.    Did I have the records of this account at the time of the

19  raid, is that your question?

20  Q.    Or after, you got involved later.  Did you determine --

21  let's make it a more simple question.  Did you determine

22  later, after you got involved in the case, did you determine

23  how much money as of the time of the raid my client had in

24  that Wachovia Bank account?

25  A.    I never -- I never looked at that.  It's there, it's in

Armstrong - Cross (McM)                        97

1   the records.  I can -- but I never noted on August 10th how

2   much money was in the account.

3   Q.    Okay.  But did you have those records from August the

4   10th on?

5   A.    Did I obtain them from the bank?  I'm sorry, I'm not sure

6   of the question.

7   Q.    Did you obtain the records of that bank account for

8   August, September, October, November, December?

9   A.    Yes.

10  Q.    Okay.

11  A.    Let me backtrack.  At some point, the subpoena was cut

12  off, the time frame on the subpoena was cut off.  It would

13  have been -- it would have been generally in that time frame.

14  So at some point there are no -- I do not have records of that

15  account from certainly not now --

16  Q.    I understand that.

17  A.    At some point the records supplied were cut off.

18  Q.    Okay.  I'm only really concerned about from August,

19  September, October, that relevant period of time after the

20  raids, okay?

21  A.    And that I'm not totally sure where the records cut off.

22  Q.    Okay, all right.  So you don't know, either from your own

23  record -- looking at the records, that in fact at that time my

24  client's account was in overdraft status?

25  A.    No, I don't know that.

Armstrong - Cross (McM)                    98

1   Q.    All right.  Now, as far as money being used for other

2   things, we obviously see there was a surplus other than the

3   checks that you indicated here, correct, in your analysis

4   reflected by the Government, correct?

5   A.    Correct, yes.

6   Q.    And were there checks written for various things on that

7   account?

8   A.    It's my recollection.

9   Q.    Yes.  And there were also -- did you determine that in

10  fact there was a debit card used like a check card that's used

11  off of that account, were you able to see that from the

12  records, that many of the purchases such as maybe an airline

13  ticket or anything was used as a debit card?

14  A.    I don't remember, Mr. McMahon.

15  Q.    And as you sit there today, you don't recall what those

16  other expenditures were that would, you know, in those two

17  years, 203, 204, would be in the area of 33, $34,000, you

18  wouldn't know?

19  A.    That's correct.

20  Q.    You don't know, okay.  Now, did you ever, in this

21  particular case, you were asked a question that putting the

22  name in your son's name or Tauheed Baukman doesn't help you at

23  all, do you remember that line of questioning with regards to

24  credit or credit; is that what you remember testifying about?

25  A.    Yes.

Armstrong - Cross (McM)                                    99

1    Q.    Okay.  Well, in this particular case, when my client was
2    arrested, did you know that he had a wallet?
3    A.    No, I don't know.  I could assume that he had a wallet.
4    Q.    Did you check in your analysis, economic analysis of Mr.
5    Baukman, did you check whether he had any credit cards in his
6    name, not Tauheed Baukman, Timothy Baukman?
7    A.    I reviewed the search warrant documents.  That's
8    typically something that gets photocopied or taken.  And I
9    have no recollection of seeing any.
10   Q.    What, you have no recollection of what?
11   A.    Of seeing either photocopies of credit cards or actual
12   credit cards from -- in Mr. Baukman's name?
13   Q.    You're not saying it didn't exist.  You just don't recall
14   seeing it, is that fair to say?
15   A.    That's what I'm saying.
16   Q.    Well, let me ask you this.  As far as obtaining credit,
17   if the credit card or whatnot is obtained in the name of
18   Tauheed Baukman, okay, with that Social Security number which
19   is his child's, okay, and a credit card is issued in that
20   name.  It's obviously not Tim Baukman's name, it's his name
21   son, Tauheed Baukman's name, correct?
22   A.    Correct.
23   Q.    Okay.  And a credit card comes in that name.  And after
24   awhile in that credit card, in the credit card business, you
25   can add another person onto that account, can you not, say

Armstrong - Cross (McM)                    100

1  look, another authorized purchaser, correct?

2  A.    That's correct.

3  Q.    So Tauheed Baukman can get a credit card based on that

4  Social Security number, and then later on Timothy Baukman

5  could add his name as an authorized purchaser on that credit

6  card and get a credit card in his name, Timothy Baukman,

7  correct?

8  A.    As a sub-account of the primary account holder, yes.

9  Q.    Right.

10  A.    I mean that's --

11  Q.    That could be done, right?

12  A.    It can be done.  It doesn't do much for your credit.

13  Q.    Well, it would get him credit, would it not?  He would

14  have a credit card --

15  A.    He would --

16  Q.    Wait.  Can I --

17         THE COURT:  Yes, indeed.

18         THE WITNESS:  I'm sorry.

19  Q.    He would then have a credit card in his wallet if he did

20  this with his name, Timothy Baukman, giving him credit under

21  Visa or MasterCard or whatever that credit card was, is that

22  correct?

23  A.    Yes, that's correct.

24  Q.    Okay.  Now you indicated as to Take Down Records, any

25  consignment, you looked at consignments of these CD's out into

Armstrong - Cross (Pow)                                101

1    the Philadelphia area, correct?

2    A.    I looked at the records that were seized from Take Down,

3    and that's where the consignment -- the records associated

4    with the consignment came from.

5    Q.    Are you aware of any, in your analysis of the records,

6    were there any consignments into the Bronx, New York, or even

7    down into Baltimore, Maryland or anything of the sort?

8    A.    The majority of them were local.  There were some which

9    didn't strike me on the face of it that they weren't familiar

10   to me.  I don't know where they were from.

11   Q.    Okay.  Okay.

12          MR. MC MAHON:  Thank you, Your Honor.  I have no

13   other questions.

14          MR. POWELL:  Just a few, Judge, if I might.

15          THE COURT:  All right.

16                    CROSS-EXAMINATION

17   BY MR. POWELL:

18   Q.    Good morning, sir.

19   A.    Good morning.

20   Q.    Do you still have the Exhibits 760B through E with you

21   there at the --

22   A.    No, I don't.

23   Q.    Okay.

24          MR. POWELL:  May I approach for just a moment,

25   Judge?

Armstrong - Cross (Pow)                102

1         THE COURT:  Yes, indeed.

2    Q.    I'm going to show you copy of these documents, Government

3    Exhibit 760B through E.

4    A.    Thank you.

5    Q.    Are those copies of the tax returns for James Morris?

6    A.    Yes, 2002, 3, 4, and 5.

7    Q.    Okay.  760E, is that the 2005 return?

8    A.    Yes, it is.

9    Q.    Okay.  Let me ask you generally about the returns in

10   general.  That document that you have in front of you is a

11   1040 form, is that correct?

12   A.    Correct.

13   Q.    And that's the standardized form that individuals are

14   required to file each year to indicate to the Government their

15   earnings for the  year?

16   A.    Correct.

17   Q.    For purposes of having the Government determine whether

18   or not there's any tax liability or if there is something that

19   should be returned to persons who have overpaid the required

20   amount of taxes?

21   A.    That's correct.

22   Q.    Okay.  Now that appears to be a two-page document

23   generally other than any schedules which would otherwise be

24   attached to it?

25   A.    Yes, in the original it's actually one page on both

1    sides, yes.

2    Q.    On the back of the original form of the second form of

3    the copy that you have there, at the bottom there's a place

4    for the person who is the individual who is named on the form

5    to sign, is that correct?

6    A.    Correct.

7    Q.    And above the signature there also appears a

8    certification, is that accurate?

9    A.    That's accurate.

10    Q.    And the certification basically provides that the person

11    who is the taxpayer certifies that the information contained

12    on the form is true to the best of his knowledge and

13    information subject to the penalties of perjury if he

14    willfully misrepresents that information, correct?

15    A.    That's correct.

16    Q.    Now, included on that form besides the financial

17    information is other demographic information, correct?

18    A.    Demographic information?

19    Q.    Sure.  Name, rank and serial number type information.

20    A.    Sure.

21    Q.    And the individual, the taxpayer, also under the same

22    penalties of perjury is required to make sure that that

23    information is accurate, is he not?

24    A.    If it's filled in under the jurat as part of that

25    section, yes.

1    Q.    Okay.  On the front of that document that you're looking

2    at now is the address for Mr. Morris, is that correct?

3    A.    Yes, that's correct.

4    Q.    And his address on the 2005, which is the return prepared

5    on April 14th, 2006, is 302 East Broadway, correct?

6    A.    That's the address.

7    Q.    And consistently, for all of the returns that you have

8    for Mr. Morris from 2002 through 2005, his address is always

9    302 East Broadway, Salem, New Jersey, is that correct?

10   A.    That's the mailing address, yes.

11   Q.    Well, that's the address that he's required if he resides

12   at that address to report to the Internal Revenue Service,

13   isn't it?

14   A.    No, that's not true.

15   Q.    Okay.  Can you tell me then why there's a space there on

16   the document for an address and why it's required that one

17   certified that the information on the document is accurate?

18   A.    That's a mailing address.  People use post office boxes

19   for their mailing address with the IRS.  That -- that's not an

20   indicator.  I guess your question was residence.  That's just

21   a mailing address.  That's all it is.

22   Q.    Okay, I got you, that's fine.  That's not a P.O. Box

23   address, is it?

24   A.    This one is not, no.

25   Q.    It's a physical address, isn't it?

1   A.   Yes, it is.

2   Q.   And a physical address consistently from 2002 through

3   2005 is 302 East Broadway, Salem, New Jersey?

4   A.   Yes, that's true.

5   Q.   And no other address?

6   A.   That's true.

7   Q.   Okay.

8        MR. POWELL:  That's all I have, Judge.

9        MR. HARMELIN:  No questions.

10                      CROSS-EXAMINATION

11  BY MR. SMITH:

12  Q.   Good morning.

13  A.   Good morning.

14  Q.   I don't have too many questions for you but I'll try to

15  keep it brief.

16       You analyzed the records for, on this chart here, I think

17  it was 750D, that's just for the year 2005, is that correct?

18  A.   I'm sorry, did I just analyze the records for 2005?

19  A.   Or did you analyze records from before then for deposits

20  and withdrawals and bank accounts?

21  A.   Yes.

22  Q.   But the records which are reflected on 750D which we put

23  on the screen, that's just for the year 2005, would that be

24  accurate?

25  A.   That time period that's noted in the chart, correct.

Armstrong - Cross (Smi)                    106

1    Q.    And this has -- basically it deals with the property on

2    117 Dillion's Lane, is that a fair statement?

3    A.    Yes. The only things that appear here are things which

4    are relevant to Dillion's Lane.

5    Q.    And you would agree with me that on the -- and I think

6    you indicated early on in your testimony that you examined not

7    hundreds but up to thousands of bank documents for your

8    investigation in this area?

9    A.    I don't think that I said that, but that would be

10   accurate.

11   Q.    Okay.  And among those documents that you examined, did

12   you examine deposit slips?

13   A.    Yes.

14   Q.    And would you agree with me the deposit slips were pretty

15   much consistent with the person who made the deposits?

16   A.    Generally, yes.

17   Q.    And who made the deposits based upon your examination?

18   A.    Which ones?

19   Q.    On any of these accounts.

20   A.    I started off -- I started off looking at the PNC Bank

21   account, so.

22   Q.    Okay.

23   A.    And if I could look at the chart that shows all of the

24   deposits just so I can differentiate between those two things.

25   Q.    Sure.

1          (Pause)

2    A.    Okay.  The first PNC deposit at the Tabor Road office,

3    the bank was not able to provide a deposit slip for that.

4    They had a -- in essence they lost it or they misfiled it.

5    They provided other documents which showed that that was a

6    cash deposit.

7    Q.    Okay.

8    A.    The second deposit --

9    Q.    Before you go further, does it show who made the deposit,

10   or you were unable to determine who made the deposit based

11   upon that part of your investigation?

12   A.    Yes, that's what I said.

13   Q.    Okay.

14   A.    The second deposit was made by Asya Richardson.

15   Q.    And how much was that for?

16   A.    9200.

17   Q.    She made that?

18   A.    Yes.

19   Q.    And that's in her name?

20   A.    Her name was written in on the deposit slip.  It appeared

21   to me to be her handwriting based on --

22   Q.    Okay.  Do you have that document with you?

23   A.    It's in the courthouse.  I mean it's in the courtroom,

24   yes.

25   Q.    Can we see that as opposed to -- is that among the

Armstrong - Cross (Smi)                                    108

1    exhibits?

2    A.    It's not scanned exhibit.  I have the physical document

3    in one of those boxes.  I could get it.

4    Q.    Okay.  And how about the deposits for Citizens Bank on

5    the far left, who made those, sir?

6    A.    The Citizens Bank deposits?

7    Q.    Yes.

8    A.    I believe they were made by Coles.

9    Q.    And how about the one next -- on both of them, is that

10   correct?

11   A.    Yes.

12   Q.    How about Wachovia, sir?

13   A.    Wachovia, the deposit slips were signed Naseem Coles.  My

14   assumption is that was Alton Coles making those deposits.

15   Q.    That's your best guess?

16   A.    Yes, that's right.

17          MR. LLORET:  Objection, Your Honor.  We're not

18   asking guesses.

19          MR. SMITH:  Well, this is cross and I can ask him

20   that, Your Honor.

21          THE COURT:  You can ask him whether he knows,

22   counsel.

23   BY MR. SMITH:

24   Q.    Do you know, sir?

25   A.    Do I -- the name was -- the name that was written in was

Armstrong - Cross (Smi)                    109

1    Naseem Coles.

2    Q.   Now you indicated also -- checked into the Metro Auto

3    Sales as part of your investigation?

4    A.   Yes.

5    Q.   And you would agree with me that there was no records and

6    no information regarding Asya Richardson, is that correct,

7    sir?

8    A.   That's correct.

9    Q.   And the tax returns, did you examine any tax returns -- I

10   think you indicated everybody's tax returns that you examined.

11   Were there other people that you haven't mentioned today?

12   A.   I'm sorry?

13   Q.   Were there other people that, other individual's tax

14   returns who are in this courtroom today examined other than

15   the ones you mentioned?

16   A.   I believe not.

17   Q.   Okay.  Did you have the opportunity during your -- by the

18   way, how long was your -- is your investigation still ongoing,

19   sir?

20   A.   My investigation in this case, no, it's not.

21   Q.   Okay.  How long did your investigation take?

22   A.   How long did it take?  I would say the investigative

23   phase of it began in December of '05 during the wiretap and

24   effectively ended at the date of the fifth superseding

25   indictment.

Armstrong - Cross (Smi)                    110

1   Q.   Okay.  And did you have the opportunity to look at any

2   videos in any of these banks as to made the deposits, whether

3   it be the PNC Bank, or Citizens Bank, to see who the actual

4   depositor was, sir?

5   A.   No, I did not.

6   Q.   That was available to you, is that correct?

7   A.   It's hit or miss.

8   Q.   Well, did you make an attempt, sir?

9   A.   No, I didn't.

10  Q.   So you don't know if it was a hit or miss, do you?

11  A.   It was a hit or miss.  I don't know if it would have been

12  a hit.

13  Q.   But you never made an attempt?

14  A.   That's correct, that's what I said.

15  Q.   Thank you.

16        MR. SMITH:  Now, just a few more questions, if you

17  give me a second, please.

18                      (Pause)

19        MR. SMITH:  That's it.  Thank you.  Thank you, Your

20  Honor.

21  BY MR. SMITH:

22  Q.   Oh, by the way, did you have the opportunity to hear the

23  wire intercepts earlier in this case?  You were sitting here

24  during --

25  A.   They were -- I heard -- no, I did not hear all of them.

Armstrong - Cross (Het)                    111

1    I heard a good number of them.

2    Q.    Did you hear the ones dealing between Asya Richardson and

3    Alton Coles?

4    A.    If they were played in one block.  I heard one block of

5    Richardson and Coles.

6    Q.    Would you agree with me, sir, that Mr. Coles pretty much

7    was in control of any and all of these accounts that have been

8    listed up here, is?

9    A.    No.

10   Q.    Oh, you wouldn't agree with that?

11   A.    No, I wouldn't.

12   Q.    Okay, thank you, sir.

13          MR. HETZNECKER:  May I, Judge?

14          THE COURT:  Yes.

15                    CROSS-EXAMINATION

16   BY MR. HETZNECKER:

17   Q.    Good afternoon, Agent.

18   A.    Good afternoon.

19   Q.    Just a few questions.  If you're looking -- I don't know

20   if you have the documents in front of you, the 760F -- A

21   through F --

22   A.    No, I do not.

23   Q.    -- 761 rather.  You don't?

24   A.    No.

25   Q.    If it's in your book, you can just reference them.

Armstrong - Cross (Het)                              112

1   A.    I'm sorry, I don't have any 760 documents.

2            MR. HETZNECKER:  May I approach the witness, Your

3   Honor?

4            THE COURT:  Yes, indeed.

5            MR. HETZNECKER:  Thank you.

6   BY MR. HETZNECKER:

7   Q.    Agent Armstrong, you had testified earlier about a number

8   of tax returns for Thais Thompson?

9   A.    Correct, yes.

10  Q.    Can I ask you a few questions?

11  A.    Sure.

12  Q.    You indicated that generally the address that's given

13  isn't necessarily the address that the person resides at, is

14  that correct?

15  A.    It's a mailing address.  Many times it is, many times it

16  isn't.

17  Q.    And often times, if an individual is using the same tax

18  preparer every year and they move, sometimes the tax preparer

19  will put the old address as a mistake on the tax return, is

20  that fair to say?

21  A.    It's something -- in something in my experience it's

22  something they ask, especially if there's a refund coming

23  because that's where the refund will go, so.

24  Q.    Well, it happens though?

25  A.    Has a mistake ever been made?  I'm sure.

Armstrong - Cross (Het)                                113

1    Q.    With respect to the tax returns in 2000 and 2001 for

2    Thais Thompson, what's the address that's given on that tax

3    return?

4          MR. LLORET:   Referring to Exhibit -- objection, Your

5    Honor.   Which exhibit?

6    Q.    I'm sorry, refer to Exhibit 760A and --

7          THE COURT:   761.

8    Q.    -- correct, 761A and 761B.   What is the address?

9    A.    The address is the same on both returns, 400 Alloway

10   Aldine Road, Elmer, New Jersey, 08318.

11   Q.    And with respect to 761D and 761E, what is the address

12   that is given on those two?

13   A.    On both these documents the address is the same, and the

14   address is 5 North Burden Hill Road, Salem, New Jersey, 08079.

15   Q.    And with respect to the incomes that were reported, each

16   of those incomes reported is accompanied by a W2 from an

17   employer, is that correct?

18   A.    This one is, yes.

19         MR. LLORET:   Referring to which exhibit?

20   Q.    And this one meaning, referring to 761D?

21   A.    Correct.

22   Q.    And that income is what in the W2 reported?

23   A.    The amount of the income is $21,608.

24   Q.    And that's what was reported on the return, is that

25   correct?

1    A.    That's correct.

2    Q.    And is it fair to say that's also true with respect to

3    761E -- if I can just have a moment to look --

4    A.    The income reported on the W2 is $19,896, and that's what

5    appears on the return.

6    Q.    And finally, it indicates on 761D, it indicates a child

7    care exemption for, what's the name?

8    A.    The name is -- I believe it's Taleem, I'll spell it --

9    T-A-L-E-E-M, hopefully that was correct -- Thompson Morris.

10   Q.    Thompson Morris?

11   A.    Yes.

12   Q.    Likewise, on 761E, exemption for, what's the name?

13   A.    Yes, same name, Taleem A. Thompson.

14   Q.    It says Thompson, not Morris, right?

15   A.    That's correct.

16   Q.    Okay.  And with respect to 761A, which would be the 2000

17   return, is there a child care exemption, and what is the name?

18   A.    There is an earned income credit taken which requires a

19   child, and the name is Taleem Thompson Morris.

20   Q.    So on two of them at least it says Thompson Morris and on

21   one of them it says Thompson, is that correct?

22   A.    Yes, the 2000 is the one, is the one Thompson Morris, and

23   -- I'm sorry --

24   Q.    And 2004 is what?

25   A.    Is Thompson.

Armstrong - Redirect                                115

1  Q.    And the 2003 says?

2  A.    Is Thompson Morris.

3          MR. HETZNECKER:  I have no further questions.  Thank

4  you.

5          THE COURT:  Mr. Lloret.

6          MR. LLORET:  Thank you, Your Honor.

7                      REDIRECT EXAMINATION

8  BY MR. LLORET:

9  Q.    Agent, you mentioned during Mr. McMahon's questioning

10  that there was a big difference in your view between the

11  Tauheed Baukman account and the Alton Coles account that's

12  depicted on 750D, Tauheed Baukman's account is depicted on the

13  chart that deals with those expenses.  What is that big

14  difference?

15  A.    The difference is in the Coles account, Alton Coles is

16  the actual account holder and his Social Security number and

17  his identifying information are on that account.  The Tauheed

18  Baukman account, the person who has control of this account is

19  not Tauheed Baukman.  It lists Tauheed Baukman's Social

20  Security number.  It's false.  It's a false account.  It's --

21  I'm sorry.

22  Q.    Okay.  And what is it about an account in a different

23  name and Social Security number that makes it effective in

24  your experience as a device to hide assets or income?

25  A.    Because that asset and that account activity does not

Armstrong - Redirect                              116

1    come back to that individual.  It comes back to somebody else.

2    Q.    All right.  And Mr. McMahon mentioned that you can

3    subpoena that account, is that correct?

4    A.    Well, yes, we can subpoena that account.

5    Q.    In your experience, is there a difference in terms of the

6    effectiveness of the device sort of before the agent has gone

7    through all the investigation and after the agent has gone

8    through all his investigation?

9    A.    Well, yes.  After the investigation is completed, there's

10   -- it's much less useful, or the records are much less useful.

11   Q.    Okay.  And finally, just in terms of the process, just so

12   we understand.  From an IRS standpoint in the totality of the

13   circumstance looking at zillions of bank accounts and so

14   forth, what is it about a different name and Social Security

15   number that makes it more or less difficult to determine

16   what's going on?

17   A.    Well, the Social Security number is the unique

18   identifier.  And that is what the Internal Revenue Service

19   uses in all of its records.  If it's a Social Security number

20   of somebody else, then obviously the IRS doesn't know what

21   that individual that we're looking at is doing.

22   Q.    Okay.  And another question about the Tauheed Baukman

23   account.  The cash that was going in, was that going in in

24   less than $10,000 amounts or -- and we talked about 30,000,

25   40,000 and 60,000 and so forth, was that how it was going in

Armstrong - Recross (McM)                              117

1    or how was it going in?

2    A.    No, it's going in in lesser amounts.

3    Q.    Were those amounts closely related to the amounts that

4    were going out on a week by week basis or were they sort of

5    lump sum deposits or can you give us an idea?

6    A.    No, the deposits were spread out throughout the year.

7    Q.    With respect to that type of deposit, is there a normal

8    CTR file for deposits of that nature that are spread out over

9    a year like that?

10   A.    No, there is not.  CTR is for a single deposit.

11          MR. LLORET:  All right.  Nothing further, Your

12   Honor, thank you.

13          MR. WARREN:  Nothing further, Judge, thank you.

14          THE COURT:  Do you have anything further?

15          MR. MC MAHON:  Just on that last question.

                    RECROSS-EXAMINATION

17   BY MR. MC MAHON:

18   Q.    Look at Government Exhibit 704A, that's what you're

19   referring to, these deposits under 10,000, do you have that in

20   front of you?

21   A.    Yes.

22   Q.    All right.  And you said these were spread out over -- we

23   have the chart, it's one, two, three, four different -- five

24   different pages of those deposits, correct?

25   A.    Yes.

Armstrong - Recross (McM)                    118

1    Q.    Okay.   And these amounts as you said, vary in the course

2    of the analysis of this account from as little as $300, right,

3    $100 on some occasions, correct?   On page 2 there's one of a

4    hundred dollars on September the 2nd, 2003, correct?

5    A.    Yes, that's correct.

6    Q.    And what's the most deposit, the highest deposit on this

7    over a four-year period of time?

8    A.    Are we speaking cash?

9    Q.    Cash, yes, that's what Mr. Lloret was referring to.

10   What's the highest amount of cash over four years that is

11   deposited with these multiple, multiple deposits of cash?

12                          (Pause)

13   A.    Mr. McMahon, I believe it's four, 4,000.

14   Q.    Four thousand.   And that's not -- that's $6,000 less than

15   the $10,000 CTR requirement, is that right?

16   A.    Yes, that's right.

17   Q.    Now, is there any days on here where there are multiple

18   deposits of cash on a particular day that would accumulate up

19   to $10,000?

20   A.    I'll look.

21            MR. LLORET:   Referring to the chart, 704A?

22            MR. MC MAHON:   Yes, same chart.

23                          (Pause)

24   A.    No, there aren't.

25   Q.    There's none, right?

Armstrong - Recross (McM)                    119

1    A.    Correct.

2    Q.    Okay. And in fact, there are no two deposits in

3    consecutive order, that one after another that would even come

4    up, that is one day and then the next deposit a following day,

5    whether it be two, three days later, that even reaches that

6    $10,000 criterion, does it?

7    A.    Without looking at it, since the largest was four, you're

8    correct.

9    Q.    Okay, thank you.

10            MR. LLORET:   Thank you, Your Honor.

11            THE COURT:   All right, you may step down.

12            THE WITNESS:   Thank you, Your Honor.

13        (This concludes the requested excerpted portion

14              of proceeding at 12:16 p.m.)

15                    * * * *

1

2

3                              **C E R T I F I C A T I O N**

4

5           I, Sandra Carbonaro, court approved transcriber,

6    certify that the foregoing is a correct transcript from the

7    official electronic sound recording of the proceedings in the

8    above-entitled matter.

9

10

11    *Sandra Carbonaro*

12    SANDRA CARBONARO

13

14    Doman Transcribing & Recording Svcs.    *04/21/08*

15    AGENCY                                   DATE

16

17

18

19