UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,    )    05-CR-00440-RBS-1
                             )
                             )
    vs.                      )
                             )
ALTON COLES, et. al,         )    (Volume II)
                             )    Philadelphia, PA
                             )    February 6, 2008
        Defendant.           )

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE R. BARCLAY SURRICK
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:         MICHAEL J. BRESNICK, ESQUIRE
                            RICHARD A. LLORET, ESQUIRE
                            UNITED STATES ATTORNEY'S OFFICE
                            615 Chestnut Street, Ste. 1250
                            Philadelphia, PA  19106

For the Defendant           CHRISTOPHER D. WARREN, ESQUIRE
Alton Coles:                Law Office of Christopher Warren
                            1500 Walnut Street
                            Philadelphia, PA  19102

For the Defendant           JACK J. McMAHON, JR., ESQUIRE
Timothy Baukman:            Law Office of Jack McMahon
                            1500 Walnut Street, Suite 900
                            Philadelphia, PA  19102

For the Defendant           LAURENCE HARMELIN, ESQUIRE
Monique Pullins:            P.O. Box 3574
                            Westchester, PA  19381

For the Defendant           RONALD A. SMITH, ESQUIRE
Asya Richardson:            Ronald A. Smith & Associates
                            1617 JFK Boulevard, Suite 1240
                            Philadelphia, PA  19103

For the Defendant           PAUL J. HETZNECKER, ESQUIRE
Thais Thompson:             1420 Walnut Street, Suite 911
                            Philadelphia, PA  19102




2

(APPEARANCES CONTINUED)

For the Defendant          RONALD THOMPSON, ESQUIRE
James Morris:              3002 Lincoln Drive, Suite J
                           Marlton, NJ  08053


                           WAYNE POWELL, ESQUIRE
                           811 Church Road
                           101 Parragon Building
                           Cherry Hill, NJ  08002

Audio Operator:            INNA GOLDSHTEYN/MARK RAFFERTY


Transcribed by:            DIANA DOMAN TRANSCRIBING
                           P.O. Box 129
                           Gibbsboro, New Jersey  08026-0129
                           Office:   (856) 435-7172
                           Fax:      (856) 435-7124
                           E-mail:   dianadoman@comcast.net


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

3

```
 1                        I N D E X

 2   WITNESSES:        DIRECT      CROSS      REDIRECT     RECROSS     THE COURT

 3   Carol Bartolomeo 5(Bre)    16(Het)

 4   Reba Whiteman    17(Llo)    27(Smi)

 5   Tyler Davis      47(Llo)    56(War)

 6   Derek Valgroa    62(Llo)

 7   Toby Llamb       79(Llo)    83(Tho)

 8   James Finnegan   70(Bre)    76(War)

 9   John Bowman      85(Bre)    97(Het)

10

11   EXHIBITS:                                  IDENT.      EVID.

12   505(A)      (Travel Permission Document)                68

13   505(B)      (Driver's License - Dante Tucker)           68

14   505(C)      (Driver's License - Dante Tucker)           68

15   505(E)      (Zahere Pesta (phonetic) - Driver's license) 68

16   505(F)      (Photograph)                                 68

17   505(G)      (Letter)                                     68

18   505(H)      (Envelope)                                   68

19   505(I)      (Photo ID)                                   68

20   505(J)      (Envelope)                                   68

21   505(K)      (Birth Certificate)                          68

22   505(L-1)    (Residential Lease)                          68

23   505(M)      (Certificate of Insurance - Buick)           68

24   505(N)      (Financial Statement)                        68

25   505(O)      (AR Inquiry Detail)                          68
```

4

| | (EXHIBITS CONTINUED) | IDENTI. | EVID. |
|---|---|---|---|
| 1 | | | |
| 2 | | | |
| 3 | 505(P)     (Property Title) | | 68 |
| 4 | 505(Q)     (Photograph) | | 68 |
| 5 | 505(R)     (Western Union Form) | | 68 |
| 6 | 505(S) through | | 68 |
| 7 | 505(Z)     (Photographs) | | 68 |
| 8 | 505(AA)    (Photograph) | | 68 |
| 9 | 505(BB)    (Financial Statement) | | 68 |
| 10 | 505(FF)    (Glock Firearm) | | 68 |
| 11 | 505(GG)    (Ammunition) | | 69 |
| 12 | 601        (Delaware Federal Credit | | 89 |
| 13 |            Union Document) | | |
| 14 | 602        (Copy of check) | | 92 |
| 15 | 603        (Surveillance Footage) | | 94 |
| 16 | 604        (Deposit Slip) | | 96 |
| 17 | 605        (Letter) | | 8 |
| 18 | 605(A)     (Envelope) | | 9 |
| 19 | 605(B)     (Photocopy of Driver's License) | | 15 |
| 20 | 801(A-3)   (Smith & Wesson Handgun) | | 75 |
| 21 | 825(B)     (Leather Phonebook) | | 54 |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

Bartolomeo - Direct (Bre)                                5

1              MR. BRESNICK:  Your Honor -- yes, Your Honor, the

2    Government calls Carol Bartolomeo.

3              (Pause in proceedings)

4              COURTROOM DEPUTY:  Please raise your right hand.

5              CAROL BARTOLOMEO, GOVERNMENT'S WITNESS, SWORN

6              COURTROOM DEPUTY:  Please state your full name and

7    spell your last name.

8              THE WITNESS:  Carol Bartolomeo, B-A-R-T-O-L-O-M-E-O.

9              MR. BRESNICK:  May I proceed, Judge?

10             THE COURT:  Yes.

11                        DIRECT EXAMINATION

12   BY MR. BRESNICK:

13   Q     Good morning, ma'am.

14   A     Good morning.

15   Q     Could you please tell the jury where you work?

16   A     I work for an attorney by the name of Dennis Cogan.

17   Q     Okay.  And what do you do for Mr. Cogan?

18   A     I'm a legal secretary and office manager.

19   Q     All right.  What type of legal work does Mr. Cogan do?

20   A     Criminal defense and civil rights.

21   Q     All right.

22             SPEAKER:  Judge, I'm sorry, we can't hear the

23   witness.

24   BY MR. BRESNICK:

25   Q     Speak into the microphone a little bit.

Bartolomeo - Direct (Bre)                    6

1    A    Okay.

2              THE COURT:  Yes, would you speak up.

3              THE WITNESS:  Is that better?

4              THE COURT:  Yes.

5              THE WITNESS:  Thank you.

6    BY MR. BRESNICK:

7    Q    Thank you, ma'am.  Ma'am, please tell the jury just what

8    some of your duties and responsibilities are as a secretary to

9    Mr. Cogan?

10   A    I do all of the legal work; I do the bookkeeping; I

11   interact with clients.

12   Q    Now, you say bookkeeping.  Does part of that

13   responsibility include receiving payments for clients of Mr.

14   Cogan?

15   A    Yes, it does.

16   Q    And what form can the payments to the clients did Mr.

17   Cogan take?

18   A    Cash, checks, certified checks.

19   Q    Okay.  Either -- either one, right?

20   A    Yeah.

21   Q    It was one or the other?

22   A    Uh-hmm.

23   Q    Excuse me.  Ma'am, pardon me, if you receive a payment by

24   cash, is there anything that you do in particular with that?

25   A    I do.  After depositing the cash into the attorney

Bartolomeo - Direct (Bre)                                7

1    account, I prepare what's called an 8300 form if the cash

2    payment is in excess of $10,000.

3    Q    Okay.  If it is not in excess of $10,000, do you fill out

4    this form?

5    A    No, it's not required by IRS.

6    Q    Okay.  And did -- I'm sorry if you said it already.  What

7    was the name of this form that --

8    A    8300.

9    Q    All right.  Ma'am, I'm going to show you --

10        MR. BRESNICK:  For the witness only, please.

11   BY MR. BRESNICK:

12   Q    -- 605.

13        MR. BRESNICK:  And could you blow that up, please.

14   The whole -- the whole document, please.  Well, that's not

15   going to work.  Let me --

16        Your Honor, may I approach the witness?

17        THE COURT:  Yes.

18   BY MR. BRESNICK:

19   Q    Ma'am, I'm showing you Government's Exhibit 605.  Could

20   you please take a look at that and tell me if you recognize or

21   can identify it?

22   A    Yes.  Yes, it's a letter I prepared.

23   Q    And to whom is the letter addresses?

24   A    Richard Lloret, Assistant US Attorney.

25   Q    What is the date on that letter?

Bartolomeo - Direct (Bre)                                    8

1    A    May 22, 2006.

2         MR. BRESNICK:  All right.  Your Honor, I move for

3    the admission of Government 605, as well.

4         SPEAKER:  No objection.

5         THE COURT:  It may be admitted.

6         (Exhibit 605 marked into evidence)

7         MR. BRESNICK:  And, Agent Horay, if you can just

8    blow up the top portion of this document.

9    BY MR. BRESNICK:

10   Q    Do you see that on the screen now?

11   A    Yes.

12   Q    And this is on the letter -- is the letter that you

13   referred to?

14   A    Yes.

15   Q    All right.  And this is on the letterhead from your

16   office; is that correct?

17   A    That's correct.

18   Q    And just please read what it says, the top line.

19   A    Cogan, Petrone & Associates, Attorneys at Law.

20   Q    All right.  And the date there, May 22?

21   A    May 22, 2006.

22   Q    Very well.

23        MR. BRESNICK:  And if you could scroll down, Agent

24   Horay, so we can see the text of the letter.

25   BY MR. BRESNICK:

Bartolomeo - Direct (Bre)                                    9

1   Q    Ma'am, could you just read -- it's a very short letter.

2   Could you read what you wrote to Mr. Lloret?

3   A    As you requested in your faxed letter dated May 22, 2006,

4   attached are copies of the two 8300 forms filed with the

5   Internal Revenue Service on April 3rd and April 11, 2006.

6   Q    Okay.  You can stop there, ma'am.  Now, I see a signature

7   there.  Is that your signature?

8   A    It is.

9   Q    Ma'am, did you attach to this letter two 8300 forms that

10  you referred to?

11  A    I did.

12  Q    Ma'am, I'm now showing you Government's Exhibit 605(A).

13  Could you please look at that and tell me if you recognize it?

14  A    I do.

15  Q    What is that?

16  A    It's an 8300 form that prepared.

17  Q    Is this one of the 8300 forms that you referred to in the

18  letter to Mr. Lloret?

19  A    Yes, it is.  It's the one dated April 11, 2006.

20         MR. BRESNICK:  Your Honor, I move for the admission

21  of Government 605(A) as well.

22         SPEAKER:  No objection.

23         THE COURT:  It may be admitted.

24         (Exhibit 605(A) marked into evidence)

25         MR. BRESNICK:  And if you could just blow that up,

Bartolomeo - Direct (Bre)                                    10

1   Agent Horay, the top portion of it, so we get a better look at

2   it.

3   BY MR. BRESNICK:

4   Q    All right.  Ma'am, can you see it on the screen?

5   A    Yes.

6   Q    And this is the 8300 form you referred to?

7   A    Yes, it is.

8   Q    For whom did you -- is it -- by the way, there's

9   handwriting on this form.  Do you see that?

10  A    Yes.

11  Q    Whose handwriting is that?

12  A    It's my handwriting.

13  Q    And why did you prepare this form?

14  A    Because I received a cash payment in excess of $10,000.

15  Q    For whom did you receive this cash payment in excess of

16  $10,000?

17  A    Thais Thompson.

18  Q    All right.  And if you look at the -- the document, the

19  8300 form, Government 605(A), there's a -- a block number 3

20  and block number 4.  And you can look at the hard copy if

21  you're having trouble seeing the screen.

22       MR. BRESNICK:  And you can go back to the previous

23  portion.  Thank you.

24  BY MR. BRESNICK:

25  Q    Do you see that -- what's written there?

                    Bartolomeo - Direct (Bre)                    11

1   A    Yes.

2   Q    Okay.  And what is that?

3   A    Number 3, it says, last name:  Thompson; number 4, first

4   name:  Thais.

5   Q    Could you spell that first name, please?

6   A    T-H-A-I-S.

7   Q    All right.  And what is the address for Ms. Thompson?

8   A    It looks like 400 -- it's a little blurred here.

9   Q    All right.

10  A    -- Alloway Aldine Road, Elmer, New Jersey 08318.

11  Q    And in block number 13, is there an indication of the

12  occupation of Ms. Thompson?

13  A    Trucking business.

14  Q    Now, ma'am, did you get this information on your own, or

15  was this provided to you by this -- this Ms. Thompson?

16  A    Ms. Thompson provided me with this information.

17  Q    And did she tell you for what purpose she was -- by the

18  way, how much cash did she give you on this day?

19  A    $25,000.

20  Q    And did she tell you what the purpose of the cash payment

21  was?

22  A    It was a payment toward the attorney fee for Alton Coles.

23  Q    At this time, ma'am, was Dennis Cogan representing Alton

24  Coles?

25  A    Yes, he was.

Bartolomeo - Direct (Bre)                              12

1        MR. BRESNICK:  All right.  If we could scroll down a

2    little bit.

3    BY MR. BRESNICK:

4    Q    And do you see part two of the document?

5    A    Yes.

6    Q    And next to part 2, it says in -- in type -- in type,

7    what does it say there, ma'am?

8    A    "Individual last name."

9    Q    No, in -- right next to part 2 in type?

10   A    Oh, "The person on whose behalf this transaction was

11   conducted."

12   Q    All right.  And in block 16 and 17, does indicate for

13   whom the transaction was conducted?

14   A    Yes, it was Alton Coles.

15   Q    All right.  And the address there, ma'am?

16   A    117 Dillons Lane, Mullica Hill, New Jersey.

17   Q    And in block 22, does it give indication for the

18   occupation of Mr. Coles?

19   A    Events and concert promoter.

20   Q    All right.  And, again, this information was provided to

21   you by Ms. Thompson?

22   A    I don't know who provided that information.  It -- we

23   could have had that information in the file from Mr. Coles

24   himself.

25   Q    Very well.  Thank you.

Bartolomeo - Direct (Bre)                          13

1          MR. BRESNICK:  And if you could scroll down again,

2    please.

3    BY MR. BRESNICK:

4    Q    Now, in part 3, does it indicate when you received this

5    cash?

6    A    Yes.  April 7, 2006.

7    Q    All right.  And block 29 indicates the amount that you

8    received, correct?

9    A    Correct.

10   Q    And that's how much again?

11   A    $25,000.

12   Q    All right.  And if you look below that, in block 32, it

13   says, "Amount of cash received."  Do you see that?

14   A    Yes.

15   Q    And item A says, "US currency," you see that?

16   A    Yes, I do.

17   Q    And next to that you wrote 25,000; is that correct?

18   A    Yes, it is.

19   Q    Now, next to that, it looks -- to the right, it looks

20   like in parentheses it says, "Amount in $100 bills or higher."

21   Do you see that?

22   A    Yes.

23   Q    And what did you write next to that?

24   A    $3,900.

25   Q    All right.  And were those 39 $100 bills that you

Bartolomeo - Direct (Bre)                                14

1    received?

2    A    Yes, it was.

3    Q    All right.  And on item number 34, which is the lower

4    right of the screen that we're looking at now, does it state

5    what the description -- let's see, "Description of property or

6    service shown."  Do you see that, ma'am?

7    A    Yes, I do.

8    Q    And what's written there?

9    A    "Attorney services."

10   Q    All right.  And -- may I have this, please?

11   A    Sure.

12   Q    All right.  And if you look at item number 42, there's a

13   signature there.  Do you see that?

14   A    Yes, I do.

15   Q    And whose signature is that?

16   A    Dennis Cogan.

17   Q    Okay.  When did he sign it?

18   A    April 12, 2006.

19   Q    Now, does that say April 12 or April 11th?

20   A    I'm sorry, April 11th.

21   Q    Okay.  Is that the day that you filed that with the

22   Internal Revenue Service?

23   A    Yes, it is.

24   Q    All right.  Ma'am, I'm showing you now Government 605(B).

25   Do you recognize that?

Bartolomeo - Direct (Bre)                                 15

1    A    Yes, I do.

2    Q    And what is that?

3    A    It's a photocopy of the driver's license of Ms. Thompson.

4    I asked her for her driver's license in order to complete the

5    8300 form.  I took a photocopy, and then in handwriting,

6    looking right at the original driver's license, I wrote down

7    the exact numbers and her name and address as it appeared on

8    the license.

9              MR. BRESNICK:  Your Honor, I move for the admission

10   of 605(B).

11             SPEAKER:  No objection.

12             THE COURT:  It may be admitted.

13             (Exhibit 605(B) marked into evidence)

14   BY MR. BRESNICK:

15   Q    And are we looking at this on the screen now, ma'am?

16   A    Yes.

17             MR. BRESNICK:  Agent, could you blow up just the top

18   half that has a -- yeah, there you go.

19   BY MR. BRESNICK:

20   Q    And is that a copy of the license that was provided to

21   you that day?

22   A    Yes, it is.

23   Q    And in whose name is that driver's license?

24   A    Thais Y. Thompson.

25   Q    Okay.  And, again, the first name is spelled what?

Bartolomeo - Cross (Het)                               16

1    A    T-H-A-I-S.

2    Q    All right.  And why did you --

3              MR. BRESNICK:  And if you could scroll down, Agent

4    Horay.

5    BY MR. BRESNICK:

6    Q    Why did you include the handwriting beneath it?

7    A    Because -- in case the photocopy was not clear enough for

8    the numbers, I wanted to write down the numbers while I was

9    looking at the original driver's license, so there was no

10   question.

11   Q    Okay.  And, again, could you please state for the record

12   the name and address that you wrote down?

13   A    Thais Y. Thompson, 411 Alloway Aldine Road, Elmer, New

14   Jersey 08318.

15   Q    All right.  Thank you, ma'am.

16             MR. BRESNICK:  Your Honor, I have no more questions.

17             MR. HETZNECKER:  May I, Your Honor?

18             THE COURT:  Yes.

19             MR. HETZNECKER:  Thank you.

20                        CROSS-EXAMINATION

21   BY MR. HETZNECKER:

22   Q    Just briefly.  Good morning.

23   A    Good morning.

24   Q    Do you recall the date that the money was actually

25   brought in?

1    A    It's on the form, A --

2    Q    It was before the 11th, though, is that fair to say?

3    A    I believe so.

4    Q    All right.  And, as far as you know, she was simply

5    running an errand for another person?

6    A    I have no idea.

7         MR. HETZNECKER:  No further questions.  Thank you.

8         THE WITNESS:  Thank you.

9         THE COURT:  Anything further counsel?

10        SPEAKER:  No, thank you.

11        SPEAKER:  No, Your Honor.

12        SPEAKER:  No, Your Honor.

13        THE COURT:  You may step down.

14        MR. LLORET:  Your Honor, the Government calls Reba

15   Braidon (phonetic).

16        (Pause in proceedings)

17        COURTROOM DEPUTY:  Please raise your right hand.

18        REBA WHITEMAN, GOVERNMENT'S WITNESS, SWORN

19        COURTROOM DEPUTY:  Please state your full name and

20   spell your last name.

21        THE WITNESS:  Reba Braidon Whiteman, W-H-I-T-E-M-A-

22   N.

23                    DIRECT EXAMINATION

24   BY MR. LLORET:

25   Q    Ma'am, who do you work for?

1    A    I work for Chase Home Lending, which is a consumer

2    mortgage subsidiary of Retail Financial Services, which is

3    part of JP Morgan Chase.

4    Q    All right.  And is that affiliated with Chase Bank, NA?

5    A    Yes, it is.

6    Q    What's the relationship between Chase Bank, NA and your -

7    - the entity that you work for, Chase Home Lending?

8    A    The Chase Home Lending entity is a subsidiary of the

9    bank.

10   Q    All right.  Are the deposits of the bank insured by the

11   FDIC, the Federal Deposit Insurance Corporation?

12   A    Yes, it is.

13   Q    And have they been since at least 2005?

14   A    Yes.

15   Q    And -- and well prior to that; is that right?

16   A    Yes.  To the best of my knowledge, yes.

17   Q    Okay.  Now, at the -- what do you do for Chase Home

18   Lending?

19   A    I manage a group of underwriters.

20   Q    And what is an underwriter?  What does an underwriter do?

21   A    An underwriter will evaluate information submitted in a

22   loan package, to determine if the risk is acceptable to the

23   mortgage company and ultimately the investor on the loan.

24   Q    I see.  Now, have you had a chance to review the Chase

25   file that was produced concerning a matter involving an

Whiteman - Direct (Llo)                                         19

1    individual named Asya Richardson?

2    A    Yes, briefly.

3    Q    Okay.  I just want to put -- is this the file that you

4    reviewed?

5    A    Yes, it is.

6    Q    Okay.  I just wanted to ask you about certain things in

7    the file.  By the way, Chase Bank and Chase Home Lending, do

8    you all do business in just one state, or do you do business

9    in multiple states?

10   A    Multiple states.

11   Q    All right.  And have been for a number of years; is that

12   right?

13   A    I've been with Chase Mortgage for 26 years.  And, so for

14   at least that long, yes.

15   Q    Thank you, ma'am.  Now, I wanted to ask you a few things.

16   First of all, are you familiar with a -- the -- well, let me

17   just show you a few documents, first.  Are you familiar with

18   this document which is marked number 712(A), generally?

19   A    Yes.  This is a standard loan application form.

20   Q    And just so we're clear, ma'am, you're actually a manager

21   of underwriters; is that right?

22   A    Yes, I am.

23   Q    And do your job duties include essentially making sure

24   that policies of the bank are followed by underwriters?

25   A    That's correct.

1  Q    Okay.  Did you actually have a hand in actually

2  underwriting this particular loan?

3  A    No, I did not.

4  Q    Okay.  And I just want to ask you a few questions

5  generally about loans and the bank.  What type of loan was

6  this, can you let us know?

7  A    What do you mean by type of loan?

8          MR. SMITH:  Objection, Your Honor.  I don't believe

9  she's the best -- she's not the best evidence, Your Honor.

10  And I don't believe that she's the appropriate witness to

11  testify to this, Your Honor, unless she's the specific

12  underwriter.

13          MR. LLORET:  Your Honor, the best evidence rule

14  applies to documents.  This is a witness who's in charge of

15  policy.

16          THE COURT:  That's true, we -- you --

17          MR. SMITH:  Well, then it's a hearsay objection,

18  Your Honor.

19          THE COURT:  You may establish the fact that she --

20  her job, the fact that these are business records, I think you

21  can establish what you need to establish, Mr. Lloret.

22          MR. LLORET:  Your Honor, I note that these records

23  have been stipulated to as business records, but I'll be glad

24  to establish her basis.

25          THE COURT:  Counsel, there is a stipulation that

1    these are business records --

2              MR. SMITH:  Yes -- yes, Your Honor, I --

3              THE COURT:  -- records kept in the normal course of

4    business.

5              MR. SMITH:  Most certain, Your Honor.

6              THE COURT:  Excuse me?

7              MR. SMITH:  Yes, they are, Your Honor.  But I --

8    once again, my objection still stands as to this witness,

9    unless she is the specific underwriter who may or may not have

10   approved the mortgage package in question here, Your Honor.

11   That's my objection, Your Honor.

12             MR. LLORET:  Your Honor, this witness is -- may I

13   approach, Your Honor, at sidebar?

14             THE COURT:  Yes, indeed.

15             MR. LLORET:  Perhaps we should best do it there.

16             (Sidebar discussion begins)

17             MR. LLORET:  Your Honor, this witness is simply here

18   to elicit the bank standards and whether or not this was a

19   significant issue for the bank.  She's in the best position to

20   speak for the bank, contradicting Mr. Smith's position that

21   only the underwriter who actually took the loan.  This is a

22   witness who actually knows what the policies of the bank are.

23   I mean, if Mr. Smith wants us to call the person who was

24   directly involved in the loan, we could have, but this was --

25             THE COURT:  Well, tell -- tell me exactly what you

Whiteman - Direct (Llo)                                    22

1   intend to elicit from this witness.

2          MR. LLORET:  The only things that I intend to elicit

3   from the witness are the type of loan involved and whether

4   under the bank's underwriting policies the stated income is a

5   significant issue for the bank.  The contention all along has

6   been that stated income is perhaps not significant or

7   insignificant under their policies.  It is significant on this

8   type of loan.

9          MR. SMITH:  Your Honor, I don't know what the

10  specific underwriters used or he did utilized in approving the

11  Mullica Hill transaction.  I mean, this witness can be great

12  to testify as to what the standard procedure is, but I don't

13  know what factors the specific underwriter or underwriters

14  utilized.  That's why I feel you need to testify in this

15  matter.

16         THE COURT:  This -- this is a -- the supervisor of

17  the underwriters at the bank, and you're asking do -- what the

18  standards are for the bank?

19         MR. LLORET:  Yes, Your Honor.

20         THE COURT:  The objection is overruled.

21         MR. LLORET:  Thank you.

22         (Sidebar discussion ends)

23         MR. LLORET:  Thank you, Your Honor.

24  BY MR. LLORET:

25  Q    Ma'am, are you familiar with a stated income loan?

1    A    Yes.

2    Q    And are you familiar with the bank's policies and

3    procedures with regard to the underwriting on a stated income

4    loan?

5    A    Yes, I am.

6    Q    And with regard to the approval of a stated income loan?

7    A    Yes.

8    Q    Now, ma'am, on a stated income loan, what, basically,

9    does that mean for the bank?

10   A    That means that we verify employment but we do not

11   actually verify the income that is stated on the application.

12   Q    All right.  And let me ask you this.  With respect to the

13   income, is the -- is the borrower still required to state the

14   income on a stated income loan?

15   A    Yes, all the information on the application should be

16   accurately stated.

17   Q    Does the bank rely on the statement of income by the

18   borrower as -- in terms of underwriting and --

19           MR. SMITH:  Objection, Your Honor, leading.

20   BY MR. LLORET:

21   Q    Does the bank rely on that or not rely on that?

22   A    Yes, we do.

23   Q    You do rely on that?

24   A    Yes, absolutely.  It's key information.

25   Q    Okay.

1          MR. LLORET:  A couple more documents, Your Honor, I

2     believe we're done.  Actually, one, Your Honor.

3     BY MR. LLORET:

4     Q    Ma'am, this is document number 712(B)(sic).

5          MR. LLORET:  And, again, Your Honor, this is part of

6     the pack we handed you, previously stipulated to.  If I can

7     look at this.  712(D), Delta.  My apologies.  Thank you.

8     That's it.

9     BY MR. LLORET:

10    Q    Ma'am, just looking at number 712(D), are you familiar

11    with that document or that type of document?

12    A    Yes, I am.

13         MR. LLORET:  And, again, Your Honor, this is drawn

14    from documents that have been stipulated in as business

15    records.  I move -- well, I don't need to move the admission,

16    but I will ask that this be publish to the jury.  Can we blow

17    this up, Ms. Horay.

18    BY MR. LLORET:

19    Q    Ma'am, what is this document?

20    A    It's a borrower's certification and authorization.

21    They're certifying that they've completed a loan application

22    and that they're certifying that the information is true and

23    complete; they understand that -- that the application allows

24    us -- or this certification allows us to verify information on

25    the application.

Whiteman - Direct (Llo)                                          25

1    Q     I see.

2              MR. LLORET:   The first paragraph of this, if we

3    could blow that up.

4    BY MR. LLORET:

5    Q     And can you read that for us?

6    A     "I/we, have applied for a mortgage loan from Chase.   In

7    applying for the loan, I/we completed a loan application

8    containing various information on the purpose of the loan, the

9    amount and source of the down payment, employment and income

10   information and assets and liabilities.   I/we certify that all

11   of the information is true an complete.   I/we made no

12   misrepresentation in the loan application or other documents,

13   nor did I or we omit any pertinent information."

14             MR. LLORET:   And if we could blow the document up.

15   BY MR. LLORET:

16   Q     There's a signature at the bottom, ma'am.   Are you able

17   to read that?

18   A     Yes.   "Asya M. Richardson."

19   Q     This document, is that collected at some point in the

20   loan process, or do you know when that's usually collected?

21   A     I'm sorry, I don't know that for sure.

22   Q     Okay.   And you don't actually do the settlement of these

23   documents, do you?

24   A     No.

25   Q     Of the title?   Okay.   The document that we just showed

Whiteman - Direct (Llo)                    26

1   you, 712(A), are you familiar with when that's collected in

2   the process?  Or, again, is that left up to the people in the

3   field?

4   A    This -- this is completed at time of application, and

5   then a final typed application is signed at time of closing.

6            MR. LLORET:  Thank you, ma'am, I have nothing --

7   well, if I may consult, Your Honor, for just a moment?

8            THE COURT:  Yes.

9            (Pause in proceedings)

10           MR. LLORET:  Ma'am, if we could turn to the -- Ms.

11  Horay, to 712(D), Delta, again.  And if we could blow up the

12  last paragraph and the signature.  That's it.

13  BY MS. LLORET:

14  Q    Ma'am, if you could read that last typed paragraph before

15  the signature for us?

16  A    Okay.  "I/we fully understand" --

17  Q    Let me give the original of that exhibit.

18  A    Thank you.  "I/we fully understand that it is a Federal

19  crime punishable by fine or imprisonment or both to knowingly

20  make any false statements when applying for this mortgage as

21  applicable under the provision of Title 19 United States Code,

22  Section 1014."

23  Q    Ma'am, I note that the -- on this document, the total

24  amount that's indicated for income is approximately $9,500 a

25  month.  Can you see that?

Whiteman - Cross (Smi)                                    27

1    A    Yes.

2    Q    Had the borrowers income -- and I'll ask you to assume

3    that if the borrower's income were nothing, would that be a

4    significant issue for the underwriters, in terms of the bank's

5    policy in approving or not approving this loan?

6    A    Yes, income is -- is always a key factor in approving a

7    loan --

8    Q    Thank you --

9    A    -- or making a decision on a loan.

10   Q    Thank you, ma'am.

11        MR. LLORET:  I have nothing further, Your Honor.

12        MR. SMITH:  Can you keep that one paragraph up

13   there.  Thank you.

14                    CROSS-EXAMINATION

15   BY MR. SMITH:

16   Q    Is that Ms. Whiteman?

17   A    Yes.

18   Q    Good morning.  The -- what is that last sentence, the

19   word after -- it says "or both to" -- what's that word right

20   there?  The first line.  I'm having trouble reading the fine

21   print from here.

22   A    Well, I'm having trouble reading the fine print from

23   here.  If I could see --

24   Q    Okay.  I figured as much.  Thank you.

25   A    -- see the document.

Whiteman - Cross (Smi)                                    28

1   Q     Would you agree with me that it says "knowingly"?

2   A     Can --

3   Q     Let me show you the doc --

4         MR. SMITH:  Your Honor, may I approach the witness?

5         THE COURT:  Yes.

6   BY MR. SMITH:

7   Q     Can you read the fine print there, please?

8   A     It does say --

9   Q     Take your time.

10  A     It does say "to knowingly make any false statements on

11  a" --

12  Q     Knowing, is that correct?  (No audible response)   Okay.

13  Is there a date on that document?

14        MR. SMITH:  And you could blow that up -- that

15  portion.   Thank you.

16        THE WITNESS:  July 29, 2005.

17  BY MR. SMITH:

18  Q     Okay.  And that was the date of settlement, is that

19  correct, based upon your knowledge of this transaction?

20  A     Yes.

21  Q     Do you have your file with you?

22  A     No, I don't.

23  Q     You -- were you instructed to bring your file?

24  A     No, I wasn't.

25  Q     So you're basically testifying -- did you review any

1    documents this morning?

2    A    I reviewed the file that was presented, yes.

3    Q    To you by the -- by the Government; is that correct?

4    A    Correct.

5    Q    And you were told not to bring any of your documents,

6    correct?

7    A    We were not subpoenaed for documents.

8    Q    Just to bring yourself, basically --

9    A    Correct.

10   Q    -- and take a look at their documents?  Okay.  Now, I

11   think you were shown 712 --

12             MR. SMITH:  Could we show 712(A).  Thank you very

13   much.

14   BY MR. SMITH:

15   Q    Can you see 712(A)?

16   A    Yes.

17   Q    Okay.  You can borrow my glasses if you'd like.  It

18   indicates how many employers on there?

19   A    There are three employers disclosed.

20   Q    Okay.  Three employers.  Now, would you agree with me

21   that this information -- was this information, by the way,

22   prepared by you?  When I say you, I'm talking about by Chase,

23   this document?

24   A    Was the application --

25   Q    Yes.

Whiteman - Cross (Smi)                                   30

1    A    -- prepared by Chase?  I don't know.  It could have been

2    prepared by the broker.

3    Q    And who -- do you know who the broker was in this matter?

4    A    I do not recall without actually looking at the document.

5    Q    If it was told -- told you it was Pike Creek Mortgage

6    Services, would that help you?

7    A    Yes.

8    Q    Okay.  And you've done business -- when I say you, I'm,

9    once again, referring to Chase.  But Chase has done business

10   with Pike Creek before; isn't that correct?

11   A    I'm sorry, I really don't know that.

12   Q    Have you ever heard of Pike Creek Mortgage?

13   A    No, I haven't.

14   Q    Haven't heard of them?  Do you know -- who was the broker

15   in this matter?

16   A    No, I'm sorry, I don't.

17   Q    You have no knowledge of who the broker was?

18        MR. LLORET:  Objection, Your Honor, asked and

19   answered.

20        MR. SMITH:  Well, it's cross, Your Honor

21        THE COURT:  She answered your question, Mr. --

22        MR. SMITH:  Okay.  Thank you, Your Honor.

23   BY MR. SMITH:

24   Q    So you don't know who the broker was, you don't know who

25   prepared this document; is that correct?

1    A    I know I didn't prepare the document.

2    Q    Okay.  Do you have any -- before you looked at the

3    documents provided to you this morning by the Government, did

4    you have any personal knowledge of this transaction of this

5    file?

6    A    Very limited, only from being made aware that I would

7    have to appear and give testimony.  And I looked at some

8    electronic documents --

9    Q    Did you know who the specific --

10   A    -- briefly --

11   Q    I'm sorry.

12   A    -- briefly scanned them.

13   Q    That would be at your home office?

14   A    Yes.

15   Q    Did you know who the specific underwriter was who was

16   assigned to this file?

17   A    I do not know the underwriter.  I saw the underwriter's

18   name on the document.

19   Q    Is that underwriter still with Chase.

20   A    I do not know.

21   Q    Are there different departments or buildings where people

22   in your -- who are under your supervision work?

23   A    The underwriters that I currently supervise are in Tampa,

24   Florida.

25   Q    And -- and where is your office located?

1    A    Tampa, Florida.

2    Q    So you -- you've come up here from Tampa, Florida; is

3    that correct?

4    A    Yes, I did.

5    Q    The one who you -- the people who you supervise, are they

6    the same people who you supervised back in 2005?

7    A    Basically, it is the same group.  There have been some

8    changes in the staffing.

9    Q    Okay.  And, once again, I'll ask you a question, I'm not

10   sure if you gave this answer.  Do you know if the person who -

11   - who approved this -- did you approve this package, or did

12   somebody else approve it?

13   A    Someone else approved it.

14   Q    Do you know who the person who approved this package was

15   back in 2005?

16   A    Again, I -- I saw the name on the documents, but, no, I -

17   - I don't recall and I do not know if that person is still

18   with Chase.

19   Q    How -- do you know how you were selected to come up here

20   to testify?  Do you have any personal knowledge as to that?

21   A    Just based on my knowledge of underwriting.

22   Q    Okay.  But not based upon knowledge of this transaction,

23   correct?

24   A    Correct.

25   Q    When you looked at document 712(A) -- and can you take a

Whiteman - Cross (Smi)                                33

1    look at that, please.  And you -- do you see where it says,

2    "Bank of America" down there?

3    A    Yes.

4    Q    Okay.  And it lists a address for Bank of America?

5    A    Correct.

6    Q    And it also indicates, I guess, seven months working at

7    Bank of America?

8    A    Correct.

9    Q    And it also indicates no income; is that correct?

10   A    Not in that section on the application.

11   Q    Well, on the application it indicates no income.  Would

12   that be accurate?

13         MR. SMITH:  Can you blow that up, please, on 712(A),

14   the section with Bank of America.  Thank you very much.

15   BY MR. SMITH:

16   Q    It says, "Years employed in this line of work?"  It says

17   -- it says, "Zero," is that correct?

18   A    That's correct.

19   Q    Okay.  Is there any indication of how much income it

20   would be for that -- for that business?

21   A    Not on this page of the application.

22   Q    Not at all, is that correct?

23   A    Not on the front page of the application.

24   Q    Were you shown a document -- and I guess it would be --

25   I'm going to show you DR-2.

Whiteman - Cross (Smi)                                    34

1          MR. SMITH:  Your Honor, may I approach the witness

2    with DR-2?

3          THE COURT:  Yes.

4    BY MR. SMITH:

5    Q    Okay.  Can you take a look at this document.  Have you

6    ever seen a document like that before?

7    A    Yes, this is the standard mortgage form.

8    Q    Okay.  And would you agree with me that the indication of

9    where income is to be posted, it's been X'd out?

10   A    Yes.

11   Q    Okay.  Is that standard, also?

12   A    For a stated income, yes.

13   Q    Okay.  And there's no income listed in there whatsoever;

14   is that correct?

15   A    That's correct.

16   Q    I'm going to show you another document which I believe is

17   DR-1.  Have you ever seen anything like that before?

18          MR. SMITH:  And can that be -- what is it, 710?

19          MR. LLORET:  I'm not sure what that is.  I'd have

20   to --

21          MR. SMITH:  The financing information.

22          MR. LLORET:  I'll check.  I'll see.

23   BY MR. SMITH:

24   Q    Can you take a look at that document?

25   A    I'm not familiar with this.  It appears to be specific to

                    Whiteman - Cross (Smi)                    35

1   Ryan Homes.

2   Q    And you knew this was a Ryan's Home project; is that

3   correct?

4   A    Once I looked at the loan file and saw the sales

5   contract.

6   Q    And does it list an income there for Ms. Richardson

7   there?

8            MR. LLORET:  Mr. Smith.

9            MR. SMITH:  Yes, sir?

10           MR. LLORET:  I think we have it on the screen,

11  710(A).  You can --

12           MR. SMITH:  Yes, thank you very much.

13           710(A), could that be shown.

14           MR. LLORET:  Is that the document?

15           MR. SMITH:  Yes.  Thank you.

16  BY MR. SMITH:

17  Q    Does it list an income for Ms. Richardson?

18  A    Yes.

19  Q    And how much does it list?  It would be on the right-hand

20  side of the sheet.

21  A    Right.  There's actually two incomes here.  There's --

22  Q    Well, I'm talking about the one referring to Ms.

23  Richardson.

24  A    Okay.  22,800.

25  Q    Okay.  Does it list a name of an employer?

1    A    Bank of America.

2    Q    Bank of -- okay.  And is that signed by Ms. Richardson,

3    with her name down at the bottom?

4    A    It appears to be signed by her, but the signature looks

5    different than the signature on this document.

6    Q    I'm sorry, the signature looks different than which

7    document?

8    A    This certification authorization document.

9    Q    Oh, okay.  Thank you.  Now -- so it appears to be, what,

10   two different signatures on those two documents shown to you?

11   A    In my opinion.  But I'm not a handwriting expert.

12   Q    I understand.  But as a layperson, you're telling me that

13   appears to be two different signatures?

14   A    Yes.

15   Q    Thank you.  And does it also list an income for Mr. Alton

16   Coles on the left-hand side?

17   A    Yes.

18   Q    And how much income is listed for Mr. Coles?

19   A    100,000 annual.

20   Q    All right.  Now, let me ask you this question.  Based

21   upon your expertise in the area, how much money would it have

22   taken for you to approve this home as indicated on those

23   documents that you have there before you and the ones that you

24   reviewed this morning?

25   A    To approve a loan amount?

1    Q    Yeah, on a stated income.

2    A    It would depend on their other debts.

3    Q    Well, let's assume that the debts are -- are listed as --

4    are indicated there on that sheet that you've seen.

5              MR. LLORET:  Which sheet, Your Honor?

6              MR. SMITH:  710.

7              MR. LLORET:  710(A)?

8              MR. SMITH:  7 -- I apologize, 710(A).

9              THE WITNESS:  It's really very difficult to tell how

10   much income that you would --

11   BY MR. SMITH:

12   Q    Well, let -- let me give you a hypothetical.  If the

13   income for Ms. Richardson was indicated by whomever as being

14   $100,000 per year, with very little liabilities in terms of

15   outstanding debt, for a house with extras and options and

16   everything else put in it, being about 466,000, would you have

17   approved the loan?

18   A    With an income over --

19   Q    Over $100,000 --

20   A    -- 100,000?

21   Q    Actually, $114,000 per year, as provided by whomever,

22   would you have approved the loan?

23   A    In all likelihood, yes.

24   Q    Okay.  So if that income had been provided to you by the

25   broker -- because you didn't do the investigation, am I

1   correct -- to her income?

2   A    Correct.

3   Q    But if that information had been provided to you by the

4   broker, who, in this case, was Pike Creek Mortgage Services,

5   and one of their programs, would you have -- you would have

6   most likely have approved that?

7   A    Yes.

8   Q    And, in fact, it was approved in this case; isn't that

9   correct?

10  A    That is correct.

11  Q    Okay.

12          MR. SMITH:  No further questions.  Thank you.

13          THE COURT:  Counsel, anything further?

14          SPEAKER:  No, thank you.

15          SPEAKER:  No questions, Your Honor.

16          SPEAKER:  Nothing further, Your Honor.

17          THE COURT:  Mr. Lloret?

18          MR. LLORET:  Your Honor, I note the time.  If you

19  want --

20          THE COURT:  Yes, we're going to take a recess, Mr.

21  Lloret.

22          It's almost 11:00, ladies.  Go out, relax, we'll

23  bring you back in ten minutes.

24          (Jury out)

25          (Brief recess)

1              (Jury in)

2              THE COURT:  All right.  Mr. Lloret?

3              MR. LLORET:  Yes, Your Honor, several matters.  And

4    we just wanted to address the Court and I think counsel for

5    defense also want to.  But I wanted to just advise the Court

6    of our situation.  Right now, we have three, I think, shorter

7    witnesses that will take in the area of a half an hour, I

8    think, accumulated.

9              We would then -- our plan was to start with the

10   various tapes.  And I understand from Mr. Finney that a ruling

11   on the Grand Jury transcripts won't be forthcoming today but

12   that perhaps a ruling on the prison tapes may be, the FDC

13   calls.  Our -- our next order in the ordinary order would be

14   to start with that segment of the -- the case, which would be

15   the FDC tapes and then the Grand Jury transcripts.

16             We do have experts.  I would say that they are

17   likely to be relatively short in terms of expert testimony.

18   My hope was to have those experts in at the end of the case.

19   We have one witness who's flying back today named Kim

20   Broadbeck.  She's the settlement clerk that actually did the

21   settlement with Asya Richardson.  And my hope was to get all

22   of my fact witnesses in before I had to start with the

23   experts.  Obviously, if the Court directs, we can start with -

24   - at least Mr. Armstrong is here today.

25             I -- in short, I don't believe that we -- if we do

Colloquy                                        40

1    what I would say is optimal from my standpoint, which is put

2    the experts on tomorrow and we can put all of them on

3    tomorrow, I'm pretty confident, then we'll have to start with

4    Mr. Armstrong today.  And that may not take us to the end of

5    the day.  It may.

6            My request would be is that the Court consider

7    putting on what we have for the -- in terms of fact witnesses

8    for the rest of the day, complete that, and then reserve our

9    expert witnesses to start tomorrow.  We'll have one fact

10   witness.  That's this Kim Broadbeck person.  It should take

11   about 15 minutes.  And then I'll start with Mr. Armstrong, Mr.

12   Marano and Mr. Tropea.

13           I know counsel for defense had some requests, too,

14   in terms of their scheduling, because we are finishing.  That

15   will be my last witness.

16           THE COURT:  The eight week trial --

17           MR. LLORET:  Well, Your Honor --

18           THE COURT:  -- was considerably shorter.

19           MR. LLORET:  Well, Your Honor, I think there's --

20   there's a lot of credit for that.  I think the Court's kept

21   its foot on the gas pedal.  It think defense counsel had been

22   very, very concise on -- on cross, compared to big trials I've

23   had before with multiple defense counsel.  And we've, with the

24   help of defense counsel, eliminated about 50 witnesses in

25   terms of stipulations.  So it -- it's -- here we are.

1          THE COURT:  All right.

2          MR. WARREN:  My problem was, Judge, is expected the

3     Government to take up the week or -- because that's at least

4     what I was thinking last week.  They're not telling me that

5     they're getting ready to rest possibly as early as tomorrow or

6     even today if we didn't take the afternoon off.

7          MR. LLORET:  Well, no, I think our one witness --

8     our one expert's not -- really not available until tomorrow.

9     So we'll at least have that.  And we'll have a fact witness

10    that -- that won't be here.  She's coming back from vacation

11    tonight.

12         MR. WARREN:  And my -- my client intends to testify.

13    He just got out of the hole and I need to spend some time

14    preparing him.  So, like I said, I didn't expect him to be up

15    and running with the defense case by, you know, Thursday of

16    this week.  I thought we'd at least have this week.  So it

17    sort of accelerated my schedule as well.  So I'd like a little

18    time to catch my breath, so to speak, and spend some time with

19    my client outside of a plexiglass booth.

20         THE COURT:  Well, if we hear testimony until

21    lunchtime and then recess for the day, that will give you an

22    opportunity to spend time with your client if you need to

23    spend time here, so that you don't have the problem of

24    communicating at the FDC, you may do it.

25         MR. WARREN:  What I've been told by Mr. Lloret is he

Colloquy                                    42

1    is -- and I've actually confirmed by my client, he is now out

2    of the hole, so meeting with him and having a contact visit is

3    not going to be a problem.  So I can certainly do that this

4    afternoon.  All right.  And that would be my request and my

5    expectation as well.

6              THE COURT:  All right.  Counsel, any -- anyone else

7    have anything they want to say?

8              MR. HARMELIN:  Sure, I mean, if we're going to do

9    this now rather than in chambers, I would like to be heard, if

10   that's --

11             THE COURT:  Go ahead.

12             MR. HARMELIN:  -- acceptable with the Court.  Much

13   like the Court, I've been planning for months for an eight

14   week trial.  I found out, I guess, last Friday that it's

15   probably going to be a three-and-three-quarter week trial.  I

16   have a number or character witnesses that I want to call.

17   I've got a -- I mean, once I realized what the lay of the land

18   probably was Friday, I've spent all weekend on the phone.  And

19   I just would prefer not to start the defense case until

20   Monday.  I need time.

21             THE COURT:  I'm not going to simply recess until

22   next Monday.  That makes very little sense.  We will give you

23   the opportunity, you're going to have the rest of the day

24   today to work on it.  We will hear testimony tomorrow, but

25   that should not take the whole day, based upon what Mr. Lloret

Colloquy                                    43

1    has said.  That will give you additional time.  And then we

2    can move into the defense.  You don't have to put on your

3    defense first.

4              MR. HARMELIN:  Well, I'm familiar with the concept

5    of houses of cards collapse, and, Your Honor, you just never

6    know what's going to happen in a trial.

7              THE COURT:  Well, that's -- we've found that out.

8              Any other --

9              MR. HETZNECKER:  Yeah, I was just simply going to

10   join with Mr. Harmelin in a request to begin the case on

11   Monday.  But -- because of the -- I understand the Court's

12   schedule and your concerns about the schedule.  The concern I

13   have is it just -- my understanding was based on the

14   Government's representation was that they were probably going

15   to end Friday at -- at the earliest.  This is what I was told

16   earlier in the week.  Now, obviously, it went very quickly and

17   I certainly don't fault the Government.

18             I would just ask for a little leeway, if we could

19   have some time to put together our defense and start Monday.

20   That would be my request.  I join in the request made by other

21   counsel.

22             THE COURT:  All right.  Well, it's my desire to --

23   to move the matter along, if it can possibly be done.  I will

24   -- we will bring the jury back and hear the rest of the

25   testimony this morning, recess for the day, and I will then

Colloquy                                    44

1    discuss with you in detail why it might be necessary to move

2    this matter further beyond Friday.

3              MR. HETZNECK:  Very well.  Okay.

4              MR. SMITH:  That would have been my request, too,

5    Your Honor.

6              THE COURT:  All right.

7              MR. SMITH:  Thank you.

8              MR. LLORET:  Your Honor, in -- our intention is,

9    after these few short witnesses, to begin with the prison

10   taped calls.  I think that's correct?

11             MR. BRESNICK:  Yes, Your Honor, the Government was

12   expecting to play, depending on your order, of course, the

13   prison calls between James Morris and Thais Thompson.  I was

14   just informed, I'm not sure if there's an issue or not.  But

15   rather than get these calls in through a representative of the

16   FDC, who would come in and testify that every prisoner who is

17   in there signs a form stating that he agrees to have the phone

18   calls recorded.  And as well as a big sign on every phone bank

19   saying your phone calls may be recorded.

20             Again, I was to avoid having that witness and avoid

21   any reference to Mr. Morris being in prison.  I was going to

22   just have the agent put on the phone calls.  And I understood

23   that I had a stipulation from Mr. Thompson that the phone

24   calls were probably recorded, that he consent -- there was a

25   consent to the recording.  Now Mr. Thompson tells me that

Colloquy                                          45

1    might not be so and I might need to call a witness from the

2    FDC.  And I -- I just want to address this on the record.

3          MR. THOMPSON:  Your Honor, I'd say perhaps Mr.

4    Bresnick misunderstood.  I do have an objection.  I think it's

5    objectionable.  I understood Mr. Hetznecker had filed a

6    motion, and I simply indicated to Mr. Bresnick that I was

7    going to join him in a motion concerning the admissibility.

8    It's not necessary, I don't believe, to call any expert of --

9    concerning the admissibility, but for other reasons, I don't

10   believe those recordings are admissible.

11         THE COURT:  For other reasons?

12         MR. THOMPSON:  Other reasons.  Well, one would be a

13   403 objection.

14         THE COURT:  All right.  So -- but in talking about

15   whether or not Mr. Bresnick needs to call someone from FDC to

16   talk about --

17         MR. THOMPSON:  No, that's not necessary.

18         THE COURT:  -- the consent, you've agreed that they

19   were consented to?

20         MR. THOMPSON:  I -- I do agree to that, Your Honor.

21         THE COURT:  All right.

22         MR. THOMPSON:  But for other reasons they may not be

23   admissible and I'd like to be heard on that.

24         THE COURT:  All right.  Counsel, with regard to the

25   prison tapes, I've reviewed that matter.  I find that there is

Colloquy                                    46

1    one clip, one tape, one conversation that is very probative in

2    this matter.   That deals with the depositing of a check by Ms.

3    Thompson into Mr. Morris' account.   I think that that -- that

4    tape is probative, relevant evidence, and I will permit that

5    tape to be played.

6            With regard to the other tapes, I am satisfied that

7    at this juncture, based upon the present state of the record,

8    that the probative value of those other tapes is -- is minimal

9    compared to the risk of unfair prejudice.   So I will -- I am

10   precluding those tapes at this juncture.   If some evidence is

11   presented during the course of this trial that makes those

12   other tapes more probative, I will revisit the issue.   But at

13   this juncture, I'm satisfied that under a 403 analysis, that

14   they should not be played.

15           MR. BRESNICK:   Your Honor, with respect to that

16   ruling, you referred to one tape.   There are, in fact, two

17   tapes.   There's one on April 17 and then there's one on April

18   18.   It's a very short clip, where Mr. Morris says, "Did you

19   deposit the check?"   And Ms. Thompson says --

20           THE COURT:   Yes, you are correct --

21           MR. BRESNICK:   Okay.

22           THE COURT:   -- Mr. -- Mr. Bresnick.

23           MR. BRESNICK:   Okay.

24           THE COURT:   That -- that evidence is certainly

25   probative and you may present that.

1          MR. BRESNICK:  Thank you.

2          THE COURT:  All right.

3          Okay.  Mr. Finney.

4          MR. BRESNICK:  That won't take much time then, Your

5     Honor.  And the trial gets shorter.

6          (Pause in proceedings)

7          COURTROOM DEPUTY:  Please rise.

8          THE COURT:  Okay.  Have a seat, ladies and

9     gentlemen.

10         Mr. Lloret.

11         MR. LLORET:  Yes, Your Honor, the Government calls

12    Detective David Tyler.

13         (Pause in proceedings)

14         COURTROOM DEPUTY:  Please raise your right hand.

15         DAVE TYLER, GOVERNMENT'S WITNESS, SWORN

16         COURTROOM DEPUTY:  Please state your full name,

17    spell your last name for the record.

18         THE WITNESS:  Dave Tyler, T-Y-L-E-R.

19                     DIRECT EXAMINATION

20    BY MR. LLORET:

21    Q    Mr. Tyler, where do you work?

22    A    I'm employed by the City of Chester Police Department.

23    Q    And what is your position?

24    A    I'm a police officer assigned with the narcotics unit.

25    Q    And have you been working there for some period of time?

Tyler - Direct (Llo)                                    48

1    A    Yes.  I've been a police officer for 18-and-a-half years.

2    I've been assigned with the narcotics unit for 13-and-a-half

3    years.  And for the past four-and-a-half years, I've been

4    assigned with the FBI out of Newtown Square, Delaware County,

5    Pennsylvania.

6    Q    All right.  Back in 1998, did you do an investigation

7    that culminated in a search or some episode at a barbershop?

8    A    Yes, I did.

9    Q    Can you tell us when that was?

10   A    September -- I don't know the exact day.  It was in

11   September of 1998.  And the location was 2820 West Third

12   Street, Outlines Barbershop, in the city of Chester.

13   Q    All right.  Now I have a couple of items, and I'll ask,

14   would referring to a report generated at the time refresh your

15   recollection?

16   A    Yes, it would, sir.

17   Q    Okay.  Let me show you two documents.  They've been

18   previously supplied to counsel.  They're number 825(A) and

19   826.  And what is 825(A), just for identification?

20   A    This is --

21   Q    What is 825(A)?

22   A    This is paperwork, criminal complaint and a report that I

23   had made up.

24   Q    Okay.  Does that refresh your recollection as to the date

25   and time of the -- of the investigation?

Tyler - Direct (Llo)                                    49

1   A    Well, this other reflects it.  It's September 30, 1998.

2   Q    And what is the exhibit number on that report that

3   refreshes your recollection?

4   A    826.

5   Q    All right.  So the date was what?

6   A    September 30, 1998.  It was a Wednesday night.

7   Q    Can you tell us the circumstances what you did that

8   evening?

9   A    Myself and along with other units -- members of the

10  narcotics unit had a search warrant for the barbershop located

11  at 2820 West Third Street in city of Chester.  I was the

12  affiant of that warrant.  We went to that location at

13  approximately 1900 hours, which is 7:00 p.m. and executed a

14  warrant.

15  Q    And who did you find there?  What individuals?

16  A    Jervis Pringle, a James Haines (phonetic) and there was

17  two other customers, along with Alton Coles was also in the

18  barbershop.

19  Q    Was Alton Coles somebody that you were familiar with?

20  A    Not at that time.

21  Q    Did you become familiar with him later?

22  A    Yes.

23  Q    Okay.  Did -- was there any episode that happened after?

24  And at the time, did you seize any drugs or anything of that

25  nature?

Tyler - Direct (Llo)                                    50

1    A    There was no drugs seized.  There was two quarter-ounce

2    bags of white powder suspected narcotic but tested negative.

3    Q    Okay.  And from whom were they seized?

4    A    It was from a size 9 black boot that was found inside the

5    barbershop.

6    Q    All right.  Did anything else happen of note that

7    evening?

8    A    Yes.  Also seized was some US currency, a few cell phones

9    taken from Mr. Coles, who is seated at counsel table.

10             THE COURT:  Your Honor --

11   BY MR. LLORET:

12   Q    Do you see Mr. Coles here today, Mr. Tyler?

13   A    Yes, seated next to Mr. Jacobs.

14   Q    Okay.

15             MR. WARREN:  Stipulate to the identification.

16             MR. LLORET:  All right.

17   BY MR. LLORET:

18   Q    And, Mr. Tyler, was there any other investigation that

19   evening?  Did you have any conversations or anything of that

20   nature?

21   A    Yes.  While I was on location filling out the inventory

22   sheet, which is a report of all the items taken out of the

23   barbershop that evening, the phone -- the cell phone that was

24   taken from Mr. Coles rang.  I had picked up the phone and said

25   hello, and a conversation engaged with another subject on the

Tyler - Direct (Llo)                                    51

1    other -- on the other end.

2    Q    Did that person identify themselves?

3    A    Yes.

4            MR. WARREN:  Objection.  He's about to testify as to

5    something said on a telephone to this man.  It's got to be

6    hearsay.

7            MR. LLORET:  Well, Your Honor, when the officer

8    indicates who it was that -- we'll do that first.  And that's

9    what my question was.

10           THE COURT:  Please do.

11           MR. LLORET:  Certainly.

12   BY MR. LLORET:

13   Q    Did the person at the other end of the phone identify

14   themselves?

15   A    Yes, sir.

16   Q    What name did they use?

17   A    Hakiem.

18           MR. LLORET:  All right.  Your Honor, I move to go

19   forward?

20           THE COURT:  You may go forward.

21           MR. LLORET:  Thank you.

22   BY MR. LLORET:

23   Q    Detect -- or is it detective or officer, I'm sorry?

24   A    Officer Tyler.

25   Q    Okay.  Officer, did you talk to this individual?

Tyler - Direct (Llo)                                    52

1    A    Yes, I did.

2    Q    Did you record what the individual said to you?

3    A    Yes, I did.

4    Q    Where did you record that?

5    A    In my police report.

6    Q    Okay.  Do you presently -- are you presently able to give

7    us a verbatim rendition of what was said?

8    A    Pretty much.

9    Q    Okay.  Did you make a verbatim rendition in your report?

10   A    Yes, sir.

11          MR. LLORET:  Your Honor, under the rule of past

12   recollection recorded, I'd ask that the witness simply read

13   his rendition from the report.

14          MR. WARREN:  Okay.  Can I see that report?

15          MR. LLORET:  Certainly.  It was provided previously.

16          (Pause in proceedings)

17          THE COURT:  All right.  Mr. Lloret.

18          MR. LLORET:  Thank you, Your Honor.

19   BY MR. LLORET:

20   Q    Officer, if you could -- you've prepared a verbatim

21   rendition of what you heard and said on that phone call?

22   A    That's correct.

23   Q    That's in your police report?

24   A    Yes, it is.

25   Q    Would you please read to the jury just the conversation

Tyler – Direct (Llo)                                    53

1   as you recorded it?

2   A    Okay.  I have caller:  "Is this James?"  I answered,

3   "Yeah."  The caller says, "This is Hakiem.  Where is Ace?"  I

4   stated, "He stepped out."  The caller says, "Okay.  I got a

5   quarter ounce sale for him at Woody's (phonetic)."  I answer,

6   "Okay.  Call him later."  And that was the conversation.

7   Q    Okay.  Now, going forward in time, did you recently have

8   occasion to encounter Mr. Jervis Pringle again?

9   A    Yes.

10  Q    Okay.  And where was that?

11  A    At his residence in the city of Chester, located at 500

12  East 24th Street, Apartment B-1.

13  Q    And at the time, did you arrest Mr. Pringle?

14  A    Yes.

15  Q    Okay.  Did you see some property from Mr. Pringle at the

16  time?

17  A    Yes.

18  Q    And I want to show you what's been marked number 825(B)

19  and ask you, what's that?

20  A    This is a small leather phonebook that was seized from

21  Mr. Pringle at that residence that evening.

22  Q    And there are some items inside that loose contained in

23  that?

24  A    Yes, a -- a photograph and several pieces of paper that

25  has phone numbers and contact numbers for different

Tyler - Direct (Llo)                                              54

1    individuals.

2    Q    All right.  Was that seized from Mr. Pringle's person or

3    was that in the room or how did that come in?

4    A    That was in the rear bedroom.

5    Q    Okay.

6          MR. LLORET:  Your Honor, I move the admission of

7    825(B).

8          MR. WARREN:  No objection, Judge.

9          THE COURT:  It may be admitted.

10          (Exhibit 825(B) marked into evidence)

11   BY MR. LLORET:

12   Q    And, sir, can you turn to -- I believe it's the U-V

13   section of the phonebook.  There's margin reference in there,

14   isn't there?

15   A    Yes.

16   Q    Okay.  If you could turn to the U-V section, there's a --

17   some entries under T and U and V?

18   A    Yes.

19   Q    Let me see if I've got the right location with you.  I'll

20   direct you to the right one.  I'm looking for the page that I

21   think --

22   A    Okay.  Yes, right here.

23   Q    You have that.  Okay.  Are there entries on that section?

24   A    Yes, there is.

25   Q    Okay.  I think we're on the -- to move through here.

Tyler - Direct (Llo)                                            55

1    Okay.  We just passed it.  That's it.  Okay.  Sir, what's the

2    entry there?

3    A    First line's "Take Down Records" with the phone number of

4    (215) 569-1010.  And the address of 4523 Springfield Avenue in

5    Philadelphia, Pennsylvania 19143.

6    Q    And then there's another entry; is that right?

7    A    Yes.

8    Q    Is there a -- a third entry as well?

9    A    Yes.

10   Q    What is that entry?

11   A    The third entry is Tim.

12   Q    Okay.  What's the telephone number, if any?

13   A    (215) 783-5769.

14   Q    Okay.  And now if we can turn back, I believe it's to the

15   second page of that little book.  Okay.  Do you see an entry

16   on the right-hand side there?

17   A    I do.

18   Q    And what is that entry?

19   A    Ace.

20   Q    And what are the telephone numbers?

21   A    There's three separate numbers.  (267) 784-3964, second

22   number (856) 769-8663, and a third number is (302)369-3627.

23   And it provides the address of 292 Mannington and York Road,

24   Woodstown, New Jersey.

25   Q    All right.

Tyler - Cross (War)                                      56

1          MR. LLORET:  Thank you, Your Honor.  I have nothing

2    further.

3          MR. WARREN:  May I, Your Honor?

4          THE COURT:  Mr. Warren?

5                    CROSS-EXAMINATION

6    BY MR. WARREN:

7    Q    Is it officer?

8    A    Yes, sir.

9    Q    Tyler, correct?

10   A    Yes, sir.

11   Q    Okay.  I don't think we've met.  My name is Christopher

12   Warren.  How you doing?

13   A    Great.

14   Q    Okay.  Now, this was a barbershop that you went to,

15   right?

16   A    Yes, it was.

17   Q    Okay.  And my client was there working as a barber,

18   right?

19   A    Yes.

20   Q    Okay.  Now, he's also there with an individual named

21   James Haines (phonetic); is that correct?

22   A    Correct.

23   Q    Do you remember whether or not Mr. Haines had any

24   nicknames?

25   A    Yes.

Tyler - Cross (War)                                   57

1    Q    And it was Deuce, wasn't it?

2    A    Correct.

3    Q     And his nickname was Ace, right?

4    A    Yes.

5    Q    Okay.  So we had Ace and Deuce, right?

6    A    Correct.

7    Q    Now, when you went in there, I think you told us on

8    direct examination that you seized two tied baggies containing

9    a white powder; is that right?

10   A    Correct.

11   Q    All right.  And were these two separate baggies?

12   A    Each weighed about a half ounce?

13   A    I believe it was a quarter ounce.

14              MR. WARREN:  Okay.  May I approach, Your Honor?

15              THE COURT:  Yes.

16   BY MR. WARREN:

17   Q    Oh, I'm sorry, you're right, each bag was a quarter

18   ounce, right?

19   A    Yes.  The total weight was a half ounce.

20   Q    All right.  Now, these two tied baggies contained a white

21   powder, right?

22   A    Correct.

23   Q    All right.  It looked just like cocaine, right?

24   A    Correct.

25   Q    All right.  And each little baggie is quarter ounce

1    quantities, right?

2    A    Yes.

3    Q    Okay.  And they were found in a black boot?

4    A    Yes.

5    Q    All right.  And you guys sent those bags out actually to

6    be tested at the Pennsylvania State Police Lab, right?

7    A    Correct.

8    Q    Because you thought they were cocaine, right?

9    A    I field tested them and got a negative response.  I sent

10   them out to the lab for a further analysis for possible

11   cocaine.

12   Q    Yeah, to see whether or not it was drugs, correct?

13   A    Yes, correct.

14   Q    Okay.  These quarter ounce quantities, right?

15   A    Yes.

16   Q    All right.  And you got a report back from them, didn't

17   you?

18   A    Yes, I did.

19   Q    All right.  And by field test, by the way, you -- tell

20   the jury what a field test is.

21   A    A field test is a -- you take a small quantity of the

22   powder or the substance and you test that small quantity that

23   you retrieved to see if it's a positive reaction for the

24   controlled substance.

25   Q    Okay.  And this one came back negative, right?

1   A    Correct.

2   Q    And then you sent it out to the lab, right?

3   A    Yes.

4   Q    And they sent you a report back, correct?

5   A    Yes.

6   Q    And this report indicated that there were no controlled

7   substances, right?

8   A    Correct?

9   Q    And that it was boric acid, right?

10  A    Yes.

11  Q    A cutting agent, right?

12  A    Yes.

13  Q    All right.  Now, this conversation with Hakiem -- oh, by

14  the way, had you ever spoken with this Hakiem before?

15  A    No, sir.

16  Q    Okay.  Do you know who it was?  Did you know who it was

17  at the time?

18  A    Just from him saying Hakiem, that's it.

19  Q    Okay.  All right.  And what you basically did -- by the

20  way, when you said "recorded it," did you mean that you just

21  wrote down the conversation, right?

22  A    Yes.

23  Q    You didn't record it with a tape-recording device or

24  anything like that, right?

25  A    No, sir.

Tyler - Cross (War)                                60

1    Q    Okay.  And, again, this happened, what, ten years ago?

2    A    Just about.

3    Q    1998, right?

4    A    Yes, sir.

5    Q    And the call was actually for -- I think the caller said,

6    "Is this James," right?

7    A    Correct.

8    Q    Okay.  And one of the fellows you arrested was James

9    Haines, right?

10   A    Correct.

11   Q    Okay.  And you said, "Yeah," correct?

12   A    Yes.

13   Q    Okay.  And then the caller said, "This is Hakiem.  Where

14   is Ace," right?

15   A    Yes.

16   Q    Okay.  Nickname you knew for my client, right?

17   A    Yes.

18   Q    Okay.  You say, "He stepped out," correct?

19   A    Correct.

20   Q    Okay.  And then the caller says, "Okay.  I got a quarter

21   ounce sale for him at Woody's," right?

22   A    Yes.

23   Q    Okay.  And then you said, "Okay.  Call him later," right?

24   A    Yes.

25   Q    Okay.  Now, the quantity of cut you seized was a quarter

Tyler - Cross (Smi)                                    61

1  ounce, was it?

2  A    Yes.

3  Q    Two quarter ounce quantities of cut, right?

4  A    Correct.

5        MR. WARREN:  Thank you.  I have nothing further.

6        SPEAKER:  I have no questions.

7        SPEAKER:  No questions.

8        SPEAKER:  No questions, Your Honor.

9        MR. SMITH:  Your Honor, I just have one or two

10  questions.  May I do it from here, Your Honor?

11        THE COURT:  Yes.

12                   CROSS-EXAMINATION

13  BY MR. SMITH:

14  Q    Now, Officer, this phonebook that you seized, what year

15  was this, sir?

16  A    That was last -- January of last year, of '07.

17  Q    Of '07?

18  A    The phonebook, yes.

19  Q    Okay.  Because I think you were talking about something

20  which occurred back in 1998?

21  A    Yes.

22  Q    But the phonebook was from 2007?

23  A    Correct.

24        MR. SMITH:  That's it.  Thank you.

25        SPEAKER:  No questions, Your Honor.

Valgroa - Direct (Llo)                                          62

1              THE COURT:  You may step down.

2              THE WITNESS:  Thank you, Your Honor.

3              MR. LLORET:  Your Honor, the Government calls

4    Special Agent Valgroa.

5              (Pause in proceedings)

6              COURTROOM DEPUTY:  Please raise your right hand.

7              DEREK KEITH VALGROA, GOVERNMENT'S WITNESS, SWORN

8              COURTROOM DEPUTY:  Please state your full name and

9    spell your last name for the record.

10             THE WITNESS:  My name is Derek Keith Valgroa.  It's

11   D-E-R-E-K, K-E-I-T-H, V as in Victor, A-L-G-R-O-A.

12                       DIRECT EXAMINATION

13   BY MR. LLORET:

14   Q    Mr. Valgroa, what do you do for a living?

15   A    I'm employed as a special agent with the Bureau of

16   Alcohol, Tobacco, Firearms and Explosives.

17   Q    And where do you work?

18   A    I work here in Philadelphia.

19   Q    All right.  Were you part of a execution of some search

20   warrants on August 10, 2005?

21   A    Yes, I was.

22   Q    And what location were you at, do you recall?

23   A    Yes.  I was at the location 957 66th Street in

24   Philadelphia.

25   Q    And did you know whose location that was, what the

1    individual identified with that location was?

2    A    Yes.

3    Q    And who was that?

4    A    Dante Tucker.

5    Q    As part of the search team, did you seize various

6    documents?

7    A    Yes, among other things, yes.

8    Q    And some physical evidence that is different from

9    documents as well?

10   A    Correct.

11   Q    Okay.

12           MR. LLORET:  Your Honor, I think we've been through

13   a lot of these.  I'm just going to, if the counsel permit,

14   just go through the documents one after the other, indicating

15   what they are, and then ask the witness at the end if these

16   are documents he seized at that location.

17           THE COURT:  Is there any problem with that, counsel?

18           MR. WARREN:  None whatsoever, Judge.

19           SPEAKER:  No, Your Honor.

20           SPEAKER:  No, Your Honor.

21           THE COURT:  All right.

22   BY MR. LLORET:

23   Q    And, Agent, what I'll do is just ask you if I've got it

24   right.  I'm going to go through these documents one by one but

25   in fairly rapid order.  This is 505(A).  It's a travel

Valgroa - Direct (Llo)                                        64

1    permission document; is that right?

2    A    Correct.

3    Q    And this is Government's 505(C).  This is a Pennsylvania

4    driver's license in the name of Dante Tucker; is that right?

5    A    Yes, it is.

6    Q    Okay.  505(B) is a Pennsylvania commercial driver's

7    license in the name of Dante Tucker; is that right?

8    A    That's correct.

9    Q    505(E) is a Pennsylvania driver's license in the name of

10   Zahere Pesta (phonetic); is that correct?

11   A    Yes, it is.

12   Q    And 505(F) is a picture of two individuals, a male and

13   female, and a third individual seated; is that right?

14   A    That's correct.

15   Q    505(G) is a piece of correspondence to an individual.  It

16   appears to be Dante Tucker, and from an individual that

17   appears to be Teddy Baukman; is that correct?

18   A    Yes, it is.

19   Q    505(H) is a piece of an envelope, and it's directed to an

20   individual that appears to be Tay Tucker, T-A-Y Tucker, from

21   an individual that appears to be Randal Austin; is that

22   correct?

23   A    That's correct.

24   Q    505(I) is an identification -- a picture identification

25   with the name Dontey Tucker on it; is that correct?

Valgroa - Direct (Llo)                          65

1   A    Yes, it is.

2   Q    505(J) is another envelope to an individual named Tay

3   Tucker from an individual named Randal Austin; is that

4   correct?

5   A    That's correct.

6   Q    505(K) is a certification of birth in the county of

7   Philadelphia.   The name is Dontey Tyrone Tucker, D-O-N-T-E-Y,

8   Tyrone, T-Y-R-O-N-E, Tucker; is that correct?

9   A    That's correct.

10  Q    505 -- it just looks like (L1) is a -- a residential

11  lease form between a Vincent Botta, B-O-T-T-A, and Dontey

12  Tucker; is that correct?

13  A    That's correct.

14  Q    505(M) as in Mary, appears to be a Pennsylvania

15  certificate of insurance for a 2000 Buick Regal.   And the name

16  on this Shyna Bradley (phonetic); is that correct?

17  A    That's correct.

18  Q    505(N), November, is what appears to be a banking or

19  other financial statement with the name Shyna Bradley on it;

20  is that correct?

21  A    That's correct.

22  Q    505(O) for Oscar, is a -- a typewritten document.   It

23  says, "AR inquiry detail," and the name Shyna Bradley and an

24  address appears on that; is that correct?

25  A    505(P) is a Commonwealth of Pennsylvania certificate of

1    title with the name Shelly Tucker on it, 219 North Peach

2    Street in Philadelphia; is that correct?

3    A    That's correct.

4    Q    505(Q) is a picture of a male and a female, and the male

5    is in an orange garb; is that correct?

6              MR. LLORET:  And, Your Honor, that's been previously

7    admitted.

8              THE WITNESS:  That's correct.

9    BY MR. LLORET:

10   Q    505(R) is a Western Union form in the amount, apparently,

11   of $100.  And that's -- it appears to be -- the name on it is

12   Randal Austin, an inmate name.  That's 505(R); is that

13   correct?

14   A    That's correct.

15   Q    505(S) is a picture of two individuals in front of what

16   appears to be a Chevrolet?

17   A    Correct.

18   Q    505(T) is a picture of an individual in what appears to

19   be a gray car or SUV?

20   A    That's correct.

21   Q    505(U) is a picture of a male and a female.  The male is

22   in a rust colored jacket; is that correct?

23   A    That's correct.

24   Q    505(V) is a group picture of a number of individuals; is

25   that right?

Valgroa - Direct (Llo)                              67

1    A    Yes.

2    Q    505(W), another picture of a group of individuals; is

3    that correct?

4    A    Yes.

5    Q    505(X), another picture of three individuals in front of

6    a car; is that right?

7    A    Yes.

8    Q    505(Y), another picture of two individuals in front of

9    what appears to be a white car, correct?

10   A    Correct.

11   Q    505(Z), a picture of two individuals seated on some

12   orange cushions?

13   A    Correct.

14   Q    505(AA) is a picture of -- apparent family picture of a

15   male, female and two small children?

16   A    Yes.

17   Q    And 505(BB) is a financial statement of some type from

18   Beverly Health and Rehabilitation Services, Inc.; is that

19   correct?

20   A    Yes.

21         MR. LLORET:   Your Honor, I move the admission of

22   these documents.

23         MR. WARREN:   Without objection, Judge.

24         THE COURT:   They may be admitted.

25         (Exhibits 505(A) through 505(K), 505(L-1), 505(M)

Valgroa - Direct (Llo)                                        68

1   through 505(Z), 505(AA) and 505(BB) marked into evidence)

2   BY MR. LLORET:

3   Q    Did you also seize a couple of other items at this

4   location; is that correct?

5   A    That's correct.

6   Q    And I'm going to show you what's been marked 505(FF) and

7   ask you is that something that you recognize?

8   A    Yes, I do recognize it.

9   Q    What is it?

10  A    It's a -- a Glock firearm that was seized at the premises

11  where we served the search warrant.

12        MR. LLORET:    Okay.    Your Honor, I move for the

13  admission of 505(FF).

14        MR. WARREN:    Without objection, Judge.

15        THE COURT:    It may be admitted.

16        (Exhibit 505(FF) marked into evidence)

17  BY MR. LLORET:

18  Q    And, Agent, finally, could you tell us, 505(GG), what is

19  that?

20  A    This item is 9-millimeter ammunition that was seized

21  along with the previously mentioned firearm.

22  Q    This firearm that we just marked 505(FF)?

23  A    Correct.

24  Q    Was it in the firearm at the time, or was it with it, or

25  do you remember?

Valgroa - Direct (Llo)                                    69

1    A     It was in the -- the magazine was loaded, and I believe

2    it was in the firearm.

3    Q     Okay.

4              MR. LLORET:  I move the admission of 505(GG).

5              MR. WARREN:  No objection, Judge.

6              THE COURT:  It may be admitted.

7              (Exhibit 505(GG) marked into evidence)

8              MR. LLORET:  If I may check, Your Honor.  Nothing

9    further, Your Honor.  Thank you.

10             MR. WARREN:  I have no questions.  Thank you, Judge.

11             SPEAKER:  No questions.

12             SPEAKER:  No questions.

13             SPEAKER:  No questions.

14             SPEAKER:  None, Your Honor.

15             SPEAKER:  No questions, Your Honor.

16             THE COURT:  You may step down.

17             MR. BRESNICK:  Your Honor, the Government calls

18   James Finnegan.

19             (Pause in proceedings)

20             COURTROOM DEPUTY:  Please raise your right hand.

21             JAMES FINNEGAN, GOVERNMENT'S WITNESS, SWORN

22             COURTROOM DEPUTY:  Please state your full name and

23   spell your last name for the record.

24             THE WITNESS:  The last name is Finnegan, FINNEGAN,

25   first name, James.

Finnegan - Direct (Bre)                                    70

<u>DIRECT EXAMINATION</u>

1
2          MR. BRESNICK:  Your Honor, may I proceed?

3          THE COURT:  Yes.

4   BY MR. BRESNICK:

5   Q     Good afternoon, sir.

6   A     Good afternoon.

7   Q     Could you please tell the jury where you work?

8   A     Currently work for CSX Railroad Police Department out of

9   Baltimore/D.C. area.

10  Q     How long have you been working in that position, sir?

11  A     Approximately two years.

12  Q     And before that, what were you doing?

13  A     I worked for the City of Philadelphia, Philadelphia

14  Police Department.

15  Q     And how long were you working for the Philadelphia Police

16  Department?

17  A     About four years.

18  Q     Sir, were you on duty with the Philadelphia Police

19  Department on October 24, 2004?

20  A     That's correct, yes.

21  Q     And you were an officer there; is that correct?

22  A     That's correct.

23  Q     Sir -- and were you on duty around 2:45 a.m. that -- that

24  morning?

25  A     Yes, I was.

1    Q    Did you make an arrest that night, sir?

2    A    Yes, I did.

3    Q    And where were you located?

4    A    For the arrest, it was about 700 and Spring Garden

5    Street, just north of Spring Garden on 7th Street.

6    Q    Well, let me -- let me back up a little bit and tell the

7    jury what you did, what happened to cause you to make an

8    arrest?

9    A    Well, I was assigned to the nightclub detail, which is in

10   the area of 6th and Spring Garden.  It's a high-crime area,

11   and so they -- what they would do is put more officers out on

12   the street at that time to handle the volume of calls that

13   would come out.  At that time, we received a call around 2:25

14   in the morning.  About four black males driving in a Bentley,

15   a dark colored green or blue Bentley.

16          And at that time, myself and my partner who usually

17   work together, he was standing a few -- maybe about a half a

18   block ahead of me.  We -- he -- he went to stop the -- the

19   vehicle stopped, the blue Bentley stopped --

20   Q    Well, what was it, sir, specifically about this -- the

21   black men in a Bentley?  Was there any reason why you needed

22   to make a stop?

23   A    Yeah, well, we had received information that there was a

24   gun in the vehicle.

25   Q    Okay.  And so continue, please.

Finnegan - Direct (Bre)                                72

A     Okay.  At that time, the vehicle was stopped by a couple
other officers in my presence.  Immediately after the stop,
four black males exited the car.  One stayed with the vehicles
and three others took off on foot.

Q     And did you do anything in response to that, sir?

A     Yes, I did.  I -- I chased one of the males that were
running from the vehicle.  He was later identified as Naseem
Coles.  He was running from the vehicle west on Spring Garden
Street, towards 7th.

Q     Okay.  And how long did you chase him for, sir?

A     Approximately a block.  I couldn't give you a time.  I
just -- I know it was pretty quick.

Q     Okay.  Sir, did you see if this individual was carrying a
gun?

A     Not until we made the right on 7th Street and started
running north on 7th Street.  He went -- from about me to you,
we went to tackle the male, and he pulled the gun out at that
time, facing us.  And we -- we tried to effect the arrest at
that time.

Q     Well, could you describe the gun, sir?

A     Yeah, it was a silver and black handgun.  I was pretty
familiar with it, a Smith and Wesson.  Several other police
departments in Philadelphia -- example, SEPTA Police and
Temple Police were carrying that weapon at the time, and we
were familiar with it because we went -- in the academy the

1    guys had it.

2    Q    Approximately how far away from you was -- and, by the

3    way, you ultimately identified him as -- by what name?

4    A    Naseem -- Naseem Coles.

5    Q    Is that a name that he provided to you, sir?

6    A    Yes, it was.

7    Q    All right.  How far away from you was Mr. Coles when he

8    pulled the gun out?

9    A    I was pretty much right in front of him about to take him

10   down, try to effect the arrest there.

11   Q    All right.  And you say -- and did you effect arrest, as

12   you say?

13   A    It took us a few -- few minutes, and several other

14   officers were coming up behind us.  It -- it was a pretty good

15   struggle, probably like two minute struggle fighting on the

16   ground to get him arrested.

17   Q    And did you see Mr. Coles do anything with the gun while

18   you were struggling with him?

19   A    Yes, at that time, he -- well, he pulled the gun out of

20   his waistband and threw it over the fence, which was just next

21   to us.

22   Q    There was a fence just to the side where you were?

23   A    Yeah, and it's usually -- I can't remember -- it's a

24   housing development there for lower income people, and they --

25   you know, he threw it right over that fence into a grassy

1  field that was there next to that --

2  Q    Were you ultimately able to control Mr. Coles?

3  A    Yes.

4  Q    And did somebody go and retrieve the gun that Mr. Coles

5  had tossed?

6  A    Yeah, my partner, Officer Chism (phonetic).

7  Q    Okay.  And did you see him go?

8  A    Yes, I did.

9  Q    And did he come back with something?

10  A    Yeah, he came back with the same weapon that was pulled

11  on us by Naseem Coles.

12  Q    All right.  And when you arrested Mr. Coles, did he give

13  an indication or tell you where he lived?

14  A    Like 5800 Cedar Avenue.  In that area, 5860, I believe.

15  Q    All right.  If you looked at your police report, would

16  that be able to refresh your recollection --

17  A    Yes, it would.

18  Q    -- as to a specific address?

19  A    Uh-hmm.

20         MR. BRESNICK:  Your Honor, may I approach?

21         THE COURT:  Yes.

22  BY MR. BRESNICK:

23  Q    Sir, I'm handing you the police report.  And looking at

24  that, does that refresh your recollection as to the address

25  Mr. Coles provided to you?

Finnegan - Direct (Bre)                    75

1    A    Yes, it does.  It's actually 5856 Cedar in Philadelphia,

2    19121.

3    Q    Sir, did Mr. Coles state what his employment was?

4    A    He said he was a construction worker at the time.

5    Q    All right.  Sir, I'm handing you Government's Exhibit

6    801(A-3).  Please tell me if you recognize that?

7    A    Yes, I do.

8    Q    What is that?

9    A    It's a Smith and Wesson, a handgun, a automatic 9-

10   millimeter.  It's the same one recovered that night.

11   Q    From -- that Mr. Coles had tossed?

12   A    Yes, it is.

13   Q    Very well.

14          MR. BRESNICK:  Your Honor, may a I have one moment?

15          THE COURT:  Yes.

16          (Pause in proceedings)

17          MR. BRESNICK:  No more questions, Your Honor.  I

18   move for the admission of the gun, Your Honor, if I haven't

19   done that.

20          MR. WARREN:  Without objection.

21          THE COURT:  801(A-3) is admitted.

22          (Exhibits 801(A-3) marked into evidence)

23          MR. WARREN:  May I proceed, sir?

24          THE COURT:  Yes.

25                    CROSS-EXAMINATION

Finnegan - Cross (War)                                    76

1    BY MR. WARREN:

2    Q     Good afternoon, Officer.  How you doing?

3    A     Pretty good, sir.  Yourself?

4    Q     I'm doing okay.  You and I have met before, have we not?

5    A     Yes, we have.

6    Q     All right.  Nice to see you again.

7    A     You, too.

8    Q     You told us on direct examination that you were on

9    nightclub detail that evening, correct?

10   A     That is correct.

11   Q     And this incident where you arrested my client was at

12   2:45 a.m.?

13   A     2 -- it was in between 2:35 and 2:45.

14   Q     After 2:00 a.m., right?

15   A     Yes, that's correct.

16   Q     After these nightclubs had closed?

17   A     Yeah.  They usually let out around 2:00.

18   Q     2:00?

19   A     Uh-hmm.

20   Q     And I think you went to the area of, where was it, 700

21   Spring Garden?

22   A     In between -- it's about 600 block is where -- where the

23   club is.

24   Q     Right.  Isn't the Palmer Social Club in that area?

25   A     That's correct.

Finnegan - Cross (War)                          77

1    Q    8th Street Lounge is in that area?

2    A    They're all in that general area, all the nightclubs.

3    Q    Right, all within that same general area, right?

4    A    That's correct.

5    Q    You wouldn't happen to remember what day of the week this

6    occurred on, would you?

7    A    No, I do not.

8    Q    Okay.  Fair enough.  Now, after you arrested my client,

9    did you guys search him?

10   A    Yes.

11   Q    Find any drugs?

12   A    No.

13   Q    Okay.  Did he have any cash on him?

14   A    I don't recall if he --

15   Q    Don't' remember?

16   A    -- did, no.

17   Q    The Bentley, did you guys end up searching the Bentley?

18   A    Not -- I did not, no.

19   Q    You did not?

20   A    No.

21   Q    Do you know whether or not it was searched?

22   A    Not to my recollection.

23   Q    Okay.  By the way, did you know my client was involved in

24   the music business at that time?

25   A    No, not at all.

1   Q     No?

2                 MR. WARREN:  Okay.  Thank you.

3                 THE WITNESS:  Yep.

4                 SPEAKER:  No questions.

5                 SPEAKER:  No questions, Your Honor.

6                 SPEAKER:  No questions, Your Honor.

7                 SPEAKER:  None, Your Honor.

8                 MR. BRESNICK:  Nothing else, Your Honor.

9                 THE COURT:  Anything further?

10                MR. BRESNICK:  No.

11                THE COURT:  You may step down.

12                THE WITNESS:  Thanks, Your Honor.

13                MR. LLORET:  Your Honor, the Government calls Toby

14   Lamb.

15                (Pause in proceedings)

16                MR. LLORET:  Your Honor, may the agent take that

17   firearm?

18                THE COURT:  Yes, indeed.

19                MR. LLORET:  Thank you.

20                COURTROOM DEPUTY:  Please raise your right hand.

21                TOBY LAMB, GOVERNMENT'S WITNESS, SWORN

22                COURTROOM DEPUTY:  Please state your full name and

23   spell your last name for the record.

24                THE WITNESS:  Toby Lynn Lamb, Lamb, like L-A-M-B.

25                THE COURT:  Have a seat, Mr. Lamb, and speak into

Lamb - Direct (Llo)                                    79

1    the microphone.

2                        DIRECT EXAMINATION

3    BY MR. LLORET:

4    Q    Good afternoon, Mr. Lamb.  How -- my name is Rich Lloret.

5    What job do you have?  Where do you work?

6    A    I'm a business agent for Laborers Local 199 in Delaware.

7    Q    Is that a union?

8    A    Yes, it is.

9    Q    What type of workers does that union involve?

10   A    Construction work.

11   Q    All right.  Are you -- when you say you're the business

12   agent, what does that involve?

13   A    My job as an agent is to dispatch our members to -- to

14   contractors that are signatory with us.  My job is also to

15   negotiate contracts when our contracts is up with our

16   signatory contractors.  My job is also to settle disputes with

17   our members, with contractors out on the job site.

18   Q    And how long have you been the business agent?

19   A    I've been an agent for 15 months.

20   Q    All right.  And before that, were you a member of Local

21   199 in some other capacity?

22   A    Yes.

23   Q    And what was that?

24   A    I was the apprentice coordinator for the state of

25   Delaware for four years before that.

1    Q    All right.  Do you keep records on the assignments and

2    the dispatches -- does the Union, I should say, keep records

3    of the assignments and dispatches of its members?

4    A    Yes.

5    Q    Did you search your records with respect to an individual

6    named James C. Morris?

7    A    Yes.

8    Q    And can you tell us what you found in terms of whether

9    Mr. Morris was a member of the Union or had been a member of

10   the Union?

11   A    Yes, he had been a member of the Union.

12   Q    Did you -- were you able to determine from your records

13   when he was a member of the Union?

14   A    Yes, I did.

15   Q    All right.  Can you --

16   A    I think he started in, I think, 1999.

17   Q    All right.  Did you also -- can you tell us what

18   residence location your records indicated Mr. Morris resided

19   at?

20   A    Let's see what we have.  Yeah, 302 East Broadway Street,

21   Salem, New Jersey.

22   Q    All right.  Now, with respect to Mr. -- Mr. Morris, did

23   your records indicate how often he had been dispatched or the

24   days he had worked for the Union or with the Union on a Union

25   assignment during 2005?

Lamb - Direct (Llo)                                    81

A    What -- what we had was two -- we had two assignments.
One -- the last one was October 13, '05.

Q    And how -- how many days was that assignment, can you
tell?

A    That, I'm not sure.  All our records show is when we
dispatch a member.  It doesn't show how many days that member
worked with that contractor.

Q    Okay.  So the last dispatch was October 13, 2005?

A    Yes.

Q    And the one before that, can you tell us when that was?

A    It was September 10, 2004.

Q    And, again, you can't tell from your record how long he
worked with that assignment; is that right?

A    That's correct.

Q    Okay.  And then the one before that, can you tell us what
that was?

A    All our records show is these two assignments.

Q    From 2005 and 2004?

A    Yes.

Q    All right.  And that's -- are there any assignments in
2006?

A    Our records doesn't show any in 2006.

Q    All right.  Sir, does -- do you records also -- and I
want to show you a document that you had previously sent.  Can
you tell us what this document is?

Lamb - Direct (Llo)                                          82

A    This is the -- this is probably the 4-and-a-half by 8-
inch card.  Every -- when a member is -- pays their Union
dues, we'll put the receipt number, we put the amount that the
member pays, we put the date that the member paid his dues and
what month that they're paying for.

Q    And does that record reveal what days or months or years
Mr. Morris paid Union dues for?

A    This is '04 and '05, but I also have a card where -- with
'06 and '07, also.

Q    Can you tell us what Union dues were paid in '04 and '05
and then in '06?

A    In '04, looking at this record, he -- he paid in August
-- August of '04 and -- to November of '04.  And then in '05,
he paid from February until October of '05.  Let's see, in
2006, he paid from April -- actually, he paid from April to
December, and then he paid -- in '07, he paid from January
until June.

Q    All right.

        MR. LLORET:  Thank you, Your Honor.  I have nothing
further.

        MR. WARREN:  I have nothing.  Thank you, Judge.

        THE COURT:  Counsel, any additional questions?

                    CROSS-EXAMINATION

BY MR. THOMPSON:

Q    Mr. Lamb?

Lamb - Cross (Tho)                                    83

1    A    Yes.

2    Q    How are you doing?

3    A    Just fine.

4    Q    Okay.  You've been a business agent for the Labor Union

5    for how long?

6    A    About 15 months.

7    Q    Okay.  And the records you have, do they reflect what the

8    rate of pay was for James Morris?

9    A    No, that would have to -- we'd have to look through our

10   -- find our Collective Bargaining Agreements for those years.

11   Q    Okay.  First of all, I want to ask you, what's the name

12   of your union?

13   A    The Laborer's Union.

14   Q    Okay.  Does Mr. Morris' membership in that union preclude

15   his also being a member of another union?

16   A    No.

17   Q    Okay.  Now, you have records that reflect that he was

18   dispatched in September of '04?

19   A    Yes.

20   Q    But your records don't reflect when that job ended?

21   A    No.

22   Q    Now, when did he -- was he next dispatched after that?

23   A    I think it was October of '05.

24   Q    Okay.  October of '05.  So you don't have anything that

25   would dispute a claim that he was dispatched in September '04

1   and the job ended in October of '05?  You don't have anything

2   that disputes that, do you?

3   A     No.

4   Q     Okay.  And where was he next dispatched?

5   A     That -- we just have those two in our records.

6   Q     Okay.  But as far as you know, he was dispatched and

7   worked all the way up until he was dispatched again, nothing

8   to refute that?

9   A     Nothing to refute that.

10           MR. THOMPSON:  I don't have anything further, Your

11  Honor.  Thank you.

12           THE COURT:  Nothing further?

13           SPEAKER:  No questions, Your Honor.

14           SPEAKER:  None, Your Honor.

15           SPEAKER:  None, Your Honor.

16           THE COURT:  You may step down.

17           MR. BRESNICK:  Your Honor, the Government calls John

18  Bowman -- Special Agent Bowman back to the stand.

19           (Pause in proceedings)

20           THE COURT:  Mr. Bowman, you've been sworn and you're

21  still under oath.

22           THE WITNESS:  Yes, Your Honor.

23                    DIRECT EXAMINATION

24  BY MR. BRESNICK:

25  Q     Good afternoon, sir.

Bowman - Direct (Bre)                                    85

1   A    Good afternoon.

2   Q    Sir, during the course of the investigation, your

3   investigation in this case, did you come into possession of

4   additional recordings of phone conversations between people,

5   other than that which you acquired during the Title III

6   interception?

7   A    Yes.

8   Q    And who were the two individuals that you had recorded

9   conversations of?

10  A    Thais Thomas (sic) and James Morris, among others.

11  Q    Now, sir, could you identify Ms. Thompson, please?  Do

12  you see her here in Court?

13  A    Sure.  She's seated right over there in the white shirt.

14       SPEAKER:  Judge, I'll stipulate to the

15  identification.

16       THE COURT:  All right.

17       MR. BRESNICK:  Thank you, Your Honor.

18  BY MR. BRESNICK:

19  Q    And, Agent, are those recordings contained in

20  Government's Exhibit 04-17-2006-2 on the one hand, and 04-18-

21  2006-4 on the other?

22  A    Yes, they are.

23       MR. HETZNECKER:  Judge, may I see you at sidebar

24  briefly?

25       THE COURT:  Yes.

Bowman - Direct (Bre)                    86

1    (Sidebar discussion begins)

2         MR. HETZNECKER:  I just need a clarification on Your

3    Honor's ruling regarding concept of each of these clips.  My

4    understanding is the Government's proffering evidence with

5    respect to Grand Jury testimony regarding the bank --

6         MR. BRESNICK:  No, no --

7         THE COURT:  No, these are -- these are phone calls.

8         MR. HETZNECKER:  No, no, I know.  I know.  But --

9    but the -- they're proffering that the -- the Grand Jury

10   testimony regarding whether it was a bank or -- you know, did

11   James Morris have a bank account, is going to be contradicting

12   part of this conversation that she has with James Morris,

13   indicating that he's asking her to deposit something in the

14   credit union, am I correct?

15        MR. BRESNICK:  Yeah, the conversation speaks for

16   itself.  He asked her to deposit something in her credit

17   union.

18        MR. HETZNECKER:  Right.  I have no problem with Your

19   Honor's ruling.  The problem with it is in the course of each

20   of these clips, there's references to her taking the Fifth

21   Amendment --

22        SPEAKER:  No, not at all.

23        MR. HETZNECKER:  All right.  Well, I'm looking at

24   the wrong clip then.

25        MR. BRESNICK:  Apparently.

1                MR. HETZNECKER:  I apologize.

2                MR. BRESNICK:  These are the two right here.

3                MR. HETZNECKER:  Oh, the 17th and the 18th.

4                THE COURT:  The ones that I received only I hear

5        directed straight to the conversation related to the deposit

6        it into the bank --

7                MR. HETZNECKER:  I apologize.

8                THE COURT:  -- in Delaware.

9                MR. HETZNECKER:  Because I'm looking at the -- the

10       Government's submission that was faxed over.  So I apologize.

11       These are the two clips then?

12               MR. BRESNICK:  This is it.

13               MR. HETZNECKER:  That's fine.  Okay.  I apologize.

14               THE COURT:  All right.

15               MR. HETZNECKER:  That was my mistake.

16               (Sidebar discussion ends)

17               MR. HETZNECKER:  Thank you, Your Honor.

18       BY MR. BRESNICK:

19       Q    Agent, are the -- to be clear, was there a phone

20       conversation that was recorded on April 17, 2006?

21       A    Yes.

22       Q    And that's contained in Government's Exhibit 04-17-2006-

23       2; is that correct?

24       A    That's correct.

25       Q    All right.

1        MR. BRESNICK:  Your Honor, I request to play that

2   conversation now, please.

3        SPEAKER:  No objection.

4        THE COURT:  It may be played.

5        MR. BRESNICK:  And the transcript will appear on the

6   screen.

7        (Recorded telephone call played at this time)

8   BY MR. BRESNICK:

9   Q    And, Agent, there was a call on April 18, 2006; is that

10  correct?

11  A    That's right.

12       MR. BRESNICK:  And, Your Honor, at this point I

13  request to play Government's Exhibit 04-18-2006-4.

14       SPEAKER:  No objection.

15       THE COURT:  You may play it.

16       (Recorded telephone call played at this time)

17  BY MR. BRESNICK:

18  Q    All right.  Agent, during the course of your

19  investigation, did you come to learn whether or not Mr. Morris

20  had an account at a credit union?

21  A    I did.

22       MR. BRESNICK:  Your Honor, may I approach the

23  witness?

24       THE COURT:  Yes.

25  BY MR. BRESNICK:

Bowman - Direct (Bre)                    89

1    Q    Agent, I'm handing you Government's Exhibit 601.  Do you

2    recognize that?

3    A    Yes, it's a Delaware Federal Credit Union document.

4    Q    And did you obtain this during the course of your

5    investigation?

6    A    Yes.

7    Q    And in whose name is the document?

8    A    The primary owner of the account is James Morris.

9          MR. BRESNICK:  All right.  Your Honor, I move for

10   the admission at this time of Government's 601.

11         SPEAKER:  I have no objection, Your Honor.

12         THE COURT:  It may be admitted.

13         (Exhibit 601 marked into evidence)

14   BY MR. BRESNICK:

15   Q    All right.  If we could look at the screen now.

16         MR. BRESNICK:  And, Agent Horay, could you just blow

17   up that top half of the screen.  And a little -- a little bit

18   down to the -- right there.  Thanks.

19   BY MR. BRESNICK:

20   Q    All right.  Sir, if you could read -- it gives the name

21   under primary owner.  Please read that again.

22   A    James C. Morris.

23   Q    And does it give an address for him on the next line?

24   A    Yes, 302 East Broadway, Salem, New Jersey.

25   Q    All right.  And what is the home phone number listed

1    there?

2    A    (856) 935-3165.

3    Q    All right.  Does it list an employer for him?

4    A    Yes, Local 199.

5    Q    All right.  Does it list a salary that he earns?

6    A    Yes, $700 a week.

7    Q    Okay.  And then underneath that, is there a source of

8    additional income?

9    A    Yes.

10   Q    What does that say?

11   A    A rental property.

12   Q    And what's the amount next to that, sir?

13   A    $700 a month.

14   Q    All right.

15        MR. BRESNICK:  If you could turn to the next page of

16   this document, please.  And just blow up the top portion of

17   that.

18   BY MR. BRESNICK:

19   Q    And is there a signature there that you see?

20   A    Yes.

21   Q    And what's the signature?

22   A    James C. Morris, dated December 18, 2002.

23   Q    All right.  Okay.  Then, if you could turn two more

24   pages, what do you see there, sir?

25        MR. BRESNICK:  If you could blow up the top of that,

Bowman - Direct (Bre)                                    91

1    please?

2              THE WITNESS:  It's a copy of a New Jersey driver's

3    license.

4    BY MR. BRESNICK:

5    Q    All right.  The picture looks fuzzy.  Is there a name

6    next to it?

7    A    Yes, James C. Morris.

8    Q    And the address?

9    A    302 East Broadway, Salem, New Jersey.

10   Q    Okay.  And the next page, please?

11   A    It's another copy of a driver's license.  And below that

12   is a membership card to the Laborers International Union.

13   Q    All right.  In whose name?

14   A    J. Morris.

15   Q    Very well.  Now, sir, I'm handing you Government's

16   Exhibit 602.  Do you recognize that?

17   A    Yes, it's a copy of a -- a check.

18   Q    All right.  And from looking at it, can you tell who

19   endorsed that check?

20   A    James Morris.

21             MR. BRESNICK:  All right.  Your Honor, I move for

22   the admission of Government's 602.

23             SPEAKER:  No objection.

24             THE COURT:  No objection, it may be admitted.

25             SPEAKER:  No objection.

1       (Exhibit 602 marked into evidence)

2           MR. BRESNICK:  Could you blow up the first -- the

3    top part of that document for the check.

4    BY MR. BRESNICK:

5    Q     And, again, it's hard to see.  Who was the check made

6    payable to?

7    A     Leasha Lewis (sic).

8    Q     All right.  Does that say Latisha Lewis (phonetic)?

9    A     Yeah, Latisha Lewis.  I'm sorry, Latisha N. Lewis.

10   Q     All right.  And do you know how much the check is payable

11   for, if you can read that?

12   A     $2,783.69.

13   Q     And what's the date of the check?

14   A     3/16/2006.  March 16, 2006.

15          MR. BRESNICK:  All right.  And could we scroll down

16   please and -- and take a look at the --

17   BY MR. BRESNICK:

18   Q     And what are we looking at on the screen there, sir?

19   A     That's the back of the check, where it shows it's

20   endorsed by James C. Morris.

21   Q     As well as another individual; is that right?

22   A     Yes.

23   Q     And can you read that other signature?

24   A     I can't make it out.

25          MR. BRESNICK:  All right.  Could you blow up the

1    endorsement part of that check, please.

2    BY MR. BRESNICK:

3    Q    All right.  And can you see now, sir?

4    A    Latisha Lewis.

5    Q    And that's the name on top; is that right?

6    A    Yes.

7    Q    And underneath that is what?

8    A    James C. Morris.

9    Q    All right.  Now, sir, I'm handing you Goverment's Exhibit

10   603.  Do you recognize that?

11   A    Yes.

12   Q    And what is that, sir?

13   A    It's a surveillance footage from the -- the bank.

14         MR. BRESNICK:  All right.  And, Your Honor, I

15   believe there's a stipulation that these are the two people

16   who were at the bank at the time the check was deposited.

17         THE COURT:  Is that stipulate --

18         MR. HETZNECKER:  There is a stipulation, Your Honor,

19   correct.

20         THE COURT:  All right.

21         MR. BRESNICK:  And I move for the admission of 603,

22   Judge.

23         THE COURT:  It may be admitted.

24         (Exhibit 603 marked into evidence)

25   BY MR. BRESNICK:

Bowman - Direct (Bre)                                    94

1   Q    And do you recognize anybody in that picture, sir?

2   A    Yes, Thais Thompson is the one to the right, wearing the

3   white shirt.

4   Q    All right.  And I hand you now Government's Exhibit 604.

5   Do you recognize that?

6   A    Yes.  It's a bank statement.

7   Q    All right.  A bank statement -- statement for who, sir?

8   A    James Morris.

9   Q    All right.  And --

10           MR. HETZNECKER:  Objection.  Objection to the -- to

11   the statement of Officer -- of Agent Bowman.  It's not a bank

12   statement.

13   BY MR. BRESNICK:

14   Q    Well, what is it, sir?  Is it a -- is it a deposit

15   statement?

16   A    Yeah, it's a --

17           THE COURT:  Well, just -- just a moment, before we

18   go any further.  Counsel, let's go to sidebar.

19           (Sidebar discussion begins)

20           THE COURT:  Mr. Bresnick, what is it?  I don't know

21   what it is.

22           MR. BRESNICK:  Your Honor, it's -- it's a -- Mr.

23   Morris' statement from the Delaware Federal Credit Union.

24   It's Mr. Hetznecker's position that this is not a bank, it's a

25   credit union, and his -- his argument with respect to her

1  subsequent Grand Jury testimony.  So I'll just ask this in

2  another way.

3              SPEAKER:  You say it's a deposit slip?

4              THE COURT:  That's what -- a deposit slip?

5              MR. BRESNICK:  Yes.

6              THE COURT:  That's fine.

7              (Sidebar discussion ends)

8              MR. BRESNICK:  May I approach again, Your Honor?

9              THE COURT:  Yes, indeed.

10  BY MR. BRESNICK:

11  Q    Agent, is this a deposit statement for Mr. Morris'

12  account in the Federal Credit Union?

13  A    Yes, it's a form of a bank -- bank statement.  It's a

14  deposit --

15              MR. HETZNECKER:  Objection.

16              THE WITNESS:  It's a deposit --

17              THE COURT:   The objection is sustained.

18              MR. HETZNECKER:  Thank you.

19              THE WITNESS:  It's a deposit statement.

20  BY MR. BRESNICK:

21  Q    Okay.  Very well.

22              MR. BRESNICK:  Your Honor, I move for the admission

23  of 604.

24              SPEAKER:  No objection.

25              THE COURT:  It may be admitted.

Bowman - Direct (Bre)                                   96

1              (Exhibit 604 marked into evidence)

2              MR. BRESNICK:  And could you blow up the top portion

3    of that, please.

4    BY MR. BRESNICK:

5    Q    Sir, looking at this document, can you tell if there was

6    a deposit made on April 27, 2006?

7    A    Yes, there was.

8    Q    And how much?

9    A    $2,783.69.

10   Q    All right.  Sir, is that the amount of the check that we

11   looked at in Government's Exhibit 602?

12   A    Yes, it is.

13   Q    All right.

14             MR. BRESNICK:  Your Honor, I have no more questions

15   for the witness.  Well, Your Honor, one moment.

16             MR. HETZNECKER:  May I, Your Honor?

17             THE COURT:  Just -- just a moment.

18             MR. HETZNECKER:  Sure.

19             (Pause in proceedings)

20             MR. BRESNICK:  Your Honor, I have one more question.

21   I apologize.

22             THE COURT:  All right.

23   BY MR. BRESNICK:

24   Q    Sir, looking at the surveillance photograph from the

25   credit union, Government's Exhibit 603, is there a -- a date

Bowman - Cross (Het)                                    97

1    and time listed there, sir?

2    A    Yes, April 27, 2006.

3    Q    And can you tell if there's a time listed on that?

4    A    3:58 and 15 seconds, it looks like.

5    Q    That's 3:58 in the afternoon?

6    A    3:58, yeah, p.m.

7              MR. BRESNICK:  That's all, Your Honor.  Thank you.

8              THE COURT:  All right.  Mr. Hetznecker.

9                          CROSS-EXAMINATION

10   BY MR. HETZNECKER:

11   Q    You have no idea whether the date reflects the time the

12   photograph was requested, do you?

13   A    Could you ask that again?

14   Q    Yeah, you have no idea whether that date on that

15   photograph reflects the time that the photograph was actually

16   requested, do you?

17   A    The date the photograph was requested?

18   Q    Yes.

19   A    No.

20   Q    Now, in the clip that was played to the jury, my client,

21   Thais Thompson, mentions a credit union, not a bank; is that

22   correct?  Is that correct?

23   A    I believe she does mention a credit union, yes.

24   Q    And, additionally, with respect to the deposit statement,

25   it's from the Delaware Federal Credit Union, correct, Agent

1    Bowman?

2    A    Correct.

3    Q    Not a bank, correct?

4    A    Correct.

5    Q    And one more thing.  The photograph that's in front of

6    you now, the woman standing to the right of my client is

7    Latisha Lewis, correct?

8    A    I don't know.

9    Q    You don't know that?

10   A    I don't know that.

11            MR. HETZNECKER:  Okay.  I have no further questions.

12   Thank you.

13            MR. BRESNICK:  Nothing else, Your Honor.

14            THE COURT:  You may step down.

15            MR. LLORET:  Your Honor, as we mentioned previously,

16   we had some matters to take up with Your Honor.

17            THE COURT:  All right.

18            MR. HETZNECKER:  Your Honor, one -- one second.  May

19   I have a moment with Mr. Bresnick?

20            THE COURT:  Yes, indeed.

21            MR. HETZNECKER:  Thank you.

22            (Pause in proceedings)

23            MR. HETZNECKER:  Your Honor, one more thing.  There

24   is a stipulation by and between, if I could read that

25   stipulation into the record?

Colloquy                                                99

1          THE COURT:  What are we dealing with, counsel?

2          MR. LLORET:  Your Honor, this is with respect to the

3     difference between the bank and the credit union.

4          THE COURT:  All right.

5          MR. HETZNECKER:  If I could do that now, Your Honor?

6          THE COURT:  Yes, indeed.

7          MR. LLORET:  This is to avoid the Government's

8     having to call a witness from the Delaware Federal Credit

9     Union and have Mr. Hetznecker cross-examine.

10          THE COURT:  All right.

11          MR. HETZNECKER:  That is correct.  Your Honor, if I

12     may read it?

13          THE COURT:  Go ahead.

14          MR. HETZNECKER:  Thank you.

15          "Ladies and gentlemen of the jury, there's a

16     stipulation by and between the counsel, that is, Mr. Bresnick

17     and myself, that credit unions are not banks.  Banks are

18     community, regional or national for-profit business

19     corporations, governed by a Board of Directors and owned by

20     stockholders.

21          "A credit union is a non-profit corporation owned by

22     its members.  Membership is limited by common employer,

23     community affiliation or geographic location.  Deposits are

24     regarded as purchases of shares, and all earnings are paid as

25     dividends."

Colloquy                                    100

1            So stipulated, counsel?

2            MR. BRESNICK:  Yes, sir.

3            MR. HETZNECKER:  Thank you.

4            THE COURT:  All right.  Ladies and gentlemen, if a

5    witness were called by the Government, that would have been

6    the witness' testimony, everyone agrees.

7            Anything else, counsel?

8            MR. LLORET:  No, Your Honor.

9            THE COURT:  Would you ask Mr. Finney to come out,

10   please.

11           (Pause in proceedings)

12           THE COURT:  Sorry to wake you up, Mr. Finney.

13           (Pause in proceedings)

14           THE COURT:  Okay.  Ladies and gentlemen, it's 12:30.

15   I understand that your lunch has been ordered and it's going

16   to be here in a couple of minutes.  So we're going to recess

17   at this point.  Go out, relax, enjoy your lunch.  I have to

18   discuss some matters with counsel.  Okay?

19           COURTROOM DEPUTY:  Please rise.

20           (Jury excused for lunch recess)

21           THE COURT:  Okay.  As we were discussing earlier,

22   Mr. Lloret, you are -- have no additional witnesses today.

23   You have witnesses coming in tomorrow; is that correct?

24           MR. LLORET:  Yes, Your Honor.  We have one witness

25   that's on vacation.  She's just getting back.  We didn't

Colloquy                                                           101

1    expect to have her until next week.  Obviously, we moved

2    faster.  And she had told us that she was on vacation this

3    week.  We had accordingly scheduled her.  We asked her if she

4    could come back early, but that wasn't in the cards, so she'll

5    be back here tonight and she'll available for testimony

6    tomorrow morning.  I don't expect her to take too long.

7              At that point, Your Honor, our last remaining

8    witnesses are -- are going to be the expert witnesses, Mr.

9    Armstrong, Mr. -- or Detective Marano and Special Agent

10   Anthony Tropea.  We will also have some stipulations to read,

11   and I think we can make good use of this evening, both two

12   address the jury instructions and get our set in, and also to

13   make sure that exhibits are in order and we have agreements

14   with counsel as to what's actually admitted.

15             THE COURT:  All right.

16             MR. LLORET:  And I think at that point we'll be in a

17   position to rest, Your Honor.

18             THE COURT:  All right.  Counsel, you have suggested

19   that you need additional time, and it seems to me we're going

20   to let the jury have their lunch and then we'll excuse them.

21   There's nothing more that they can do today under the

22   circumstances.  This matter's moved along much more quickly

23   than anybody anticipated.  We will hear the testimony

24   tomorrow, but it sounds to me like that is not going to take

25   us beyond lunch tomorrow; is that correct?

Colloquy                                          102

1          MR. LLORET:  Your Honor, I -- I would be surprised

2     -- certainly surprised if it took all day.  It may last, you

3     know, a little past lunchtime, but I don't think we're going

4     to fill the day with it.

5          THE COURT:  All right.

6          MR. WARREN:  Judge, if I could -- I'd like to put my

7     client on Friday morning, starting Friday.

8          THE COURT:  Well, that -- that sounds good to me,

9     Mr. Warren.

10          MR. WARREN:  I think if I could have the bulk of the

11     day today, which I can, and whatever the balance of the -- is

12     tomorrow, I -- that will be -- and I expect my client to be

13     testifying for most of the day to begin with.  So I would

14     prefer to actually start my case on Friday.

15          THE COURT:  Good.  Well, that -- that solves the

16     problem, counsel.

17          MR. LLORET:  Yes, it does, Your Honor.

18          THE COURT:  Those of you who requested additional

19     time now have that additional time to get yourself ready to

20     bring your case in on Monday.

21          MR. HARMELIN:  May I inquire the Court.  Do I hear

22     the Court saying that if Mr. Coles starts on Friday and his

23     testimony only lasts till 3:00, that the rest of us will not

24     be required to start our cases at that hour?

25          MR. WARREN:  I can assure you that his testimony

Colloquy                                          103

1    will go beyond 3:00 p.m.  And if it doesn't stop by 3:00, I

2    think these fellows here might have a question or two.  And

3    we've got 300 plus conversations that somebody might want to

4    go into, so --

5           THE COURT:  I think that we probably will be here

6    for a good period of the day on Friday.  Okay?

7           MR. LLORET:  Thank you, Your Honor.

8           THE COURT:  All right.  That -- that's the schedule

9    we'll operate on under the circumstances.

10          MR. LLORET:  Very well, Your Honor.

11          THE COURT:  Now, with regard to the -- the jurors,

12   after lunch, rather than -- if you have no objection, rather

13   than keep you gentlemen around here, I will simply -- when the

14   jury is done with lunch, I will go back and excuse them and

15   tell them what the schedule is going to be --

16          MR. WARREN:  No objection, Judge.

17          THE COURT:  -- if there's no problem.  Any problem

18   with that?

19          SPEAKER:  No.

20          MR. LLORET:  No, Your Honor.

21          THE COURT:  All right.

22          MR. LLORET:  Thank you.

23          MR. BRESNICK:  And, Your Honor, if I can add, unless

24   we forget, in addition to the witnesses that Mr. Lloret

25   referred to, we do have the issue of the Grand Jury

1    transcripts that we're waiting an order of.

2              THE COURT:  We do have that, yes.  Okay?

3              MR. BRESNICK:  Very well.  And that -- that might

4    take, I don't know, a half hour, 45 minutes to read.

5              THE COURT:  Yes.

6              MR. LLORET:  Thank you, Your Honor.

7              THE COURT:  Mr. McMahon, you had some -- something?

8              MR. McMAHON:  Judge, just I have a -- a short

9    preliminary hearing in the Criminal Justice Center at 8:30

10   tomorrow morning.

11             THE COURT:  Mr. --

12             MR. McMAHON:  All I'm -- this is all I'm asking.

13             THE COURT:  Mr. McMahon, you are here.  I am not

14   going to -- we have -- I've been down this road before.  Okay?

15   You go up there and you get tied up and you don't get down

16   here --

17             MR. McMAHON:  All I'm saying -- this is all I'm

18   requesting.  And I -- and you can either -- I'm just --

19             THE COURT:  I -- the request is denied.  Okay?

20             MR. McMAHON:  I didn't even make it.

21             THE COURT:  All right.  Recess.

22             MR. McMAHON:  That's the first time my request was

23   denied before I even made it.

24             (Proceedings concluded at 12:38 p.m.)

25

# C E R T I F I C A T I O N

I, Brenda Boulden, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.


*Brenda Boulden*          May 23, 2008

BRENDA BOULDEN

DIANA DOMAN TRANSCRIBING