UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA, )    No.  05-CR-440-1
)
)
)
v.                       )    VOLUME III
)
ALTON COLES, et al,          )    Philadelphia, PA
)    February 7, 2008
Defendants.       )    9:24 a.m.

TRANSCRIPT OF TRIAL
BEFORE HONORABLE R. BARCLAY SURRICK
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Government:      MICHAEL J. BRESNICK, ESQUIRE
RICHARD A. LLORET, ESQUIRE
ASSISTANT UNITED STATES ATTORNEYS
UNITED STATES ATTORNEY'S OFFICE
615 Chestnut Street
Suite 1250
Philadelphia, PA  19106


For the Defendant       CHRISTOPHER D. WARREN, ESQUIRE
Alton Coles:            LAW OFFICE OF CHRISTOPHER WARREN
1500 Walnut Street
Philadelphia, PA  19102


For the Defendant       JACK J. McMAHON, JR., ESQUIRE
Timothy Baukman:        LAW OFFICE OF JACK McMAHON
1500 Walnut Street
Suite 900
Philadelphia, PA  19102


For the Defendant       LAURENCE HARMELIN, ESQUIRE
Monique Pullins:        300 North Pottstown Pike
Suite 210
Exton, PA 19341

APPEARANCES:                (continued)


For the Defendant          RONALD A. SMITH, ESQUIRE
Asya Richardson:           RONALD A. SMITH AND ASSOCIATES
                           1617 JFK Boulevard
                           Suite 1240
                           Philadelphia, PA  19103


For the Defendant          PAUL J. HETZNECKER, ESQUIRE
Thais Thompson:            HETZNECKER & MEEHAN
                           1420 Walnut Street
                           Suite 911
                           Philadelphia, PA  19102


For the Defendant          RONALD B. THOMPSON, ESQUIRE
James Morris:              3002 Lincoln Drive
                           Suite J
                           Marlton, NJ   08053


                           WAYNE POWELL, ESQUIRE
                           811 Church Road
                           101 Tarragon Building
                           Cherry Hill, NJ   08002


Audio Operator:            INNA GOLDSHTEYN


Transcribed by:            DIANA DOMAN TRANSCRIBING
                           P.O. Box 129
                           Gibbsboro, New Jersey  08026-129
                           PHONE:   (856)435-7172
                           FAX:     (856) 435-7124
                           Email:   dianadoman@Comcast.net



Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

<u>I N D E X</u>

| <u>WITNESSES</u>: | <u>DIRECT</u> | <u>CROSS</u> | <u>REDIRECT</u> | <u>RECROSS</u> |
|---|---|---|---|---|
| For the Government | | | | |
| Kimberly Brodbeck | 17(Llo) | 35(War) | 56(Llo) | |
| | | 40(Smi) | | |
| John Bowman | 58(Bre) | | | |
| | 126(Bre) | 129(Het) | | |
| | | 138(Tho) | | |
| | | 143(Har) | | |

| <u>ARGUMENTS</u>: | <u>PAGE NUMBER</u> |
|---|---|
| Reference:  Colloquy in regard to motions to Pages to reading of transcripts | |
| Motion to add pages 15 to 21, Tab 170 | 7 |
|    Ruling by Judge Surrick | 7 |
| Motion to add pages 23 to 31, Tab 171 | 7 |
|    Ruling by Judge Surrick | 7 |
| Motion to add pages 24 to 31, Tab 172 | 9 |
|    Ruling by Judge Surrick | 9 |
| Defense objects to pages 41 to 52, Tab 173 | 9 |
|    Ruling by Judge Surrick | 9 |
| Motion to add pages 87 to 88, Tab 175 and 176 | 10 |
|    Ruling by Judge Surrick | 10 |
| Defense objects to pages 103 and 104, Tab 177 | 10 |
|    Ruling by Judge Surrick | 10 |
| Defense objects to questions buy US attorney in regard to speaking to attorney during break Tab 178 | 11 |
|    Ruling by Judge Surrick | 11 |

INDEX, Continued                                          PAGE NUMBER

Defense objects to pages 116 to 123, Tab 180                11

    Ruling by Judge Surrick                                 11

Defense objects to page 130, Tab 181                        13

    Ruling by Judge Surrick                                 13

Defense objects to page 130, Tab 182                        13

    Ruling by Judge Surrick                                 13

Argument by Mr. Hetznecker                                  14

    Reference:  Ruling on Tab 182

    Ruling by Judge Surrick                                 16

TRANSCRIPTS READ DURING HEARING:                          PAGE NUMBER

By Mr. Bresnick and Ms. Horay

Tab 170 - G600-1                                            63

Tab 171 - G600-2                                            73

Tab 172 - G600-3                                            83

Tab 173 - G600-4                                            86

Tab 174 - G600-5                                           100

Question from Grand Juror                                  105

Tab 175 - G600-6                                           106

Tab 176 - G600-7                                           107

Tab 177 - G600-8                                           112

Tab 179 - G600-10                                          114

Tab 180 - G600-11                                          118

Tab 181 - G600-12                                          123

Tab 182 - G600-13                                          124

INDEX, Continued

| EXHIBITS: | | IDENT. | EVID. |
|---|---|---|---|
| G-713B | HUD closing statement | 17 | 19 |
| G-713 | Legacy Title file | 21 | 21 |
| G-713A | Deposit slip from closing | 25 | 25 |
| G-712D | Authorization for verification | 31 | |
| G-712B | Purchase agreement | 33 | |
| G-712C | Addendum | 33 | |
| G-712A | Residential loan application | 29 | |
| G-600 | Thais Thompson Grand Jury Transcript | 59 | 59 |
| G-600-1 thru G-600-13 | Thais Thompson Grand Jury transcript readings | 60 | 60 |

1          (The following was heard in open Court at 9:24 a.m.)

2          THE COURT:  Counsel, are we ready to proceed?

3          MR. LLORETT:  We are, Your Honor.  If I may check

4    and see if our long lost witness is outside?  She called in

5    sick.  She was on the bridge about ten minutes ago so

6    hopefully --

7          UNIDENTIFIED SPEAKER 1:  She's on the bridge?

8    Testifying is that scary?

9          THE COURT:  Before you bring the jury out, Mike, go

10   ahead and see whether she's here.

11         UNIDENTIFIED SPEAKER 1:  We'll talk her off the

12   bridge.

13         MR. LLORETT:  She was driving across the bridge.

14         UNIDENTIFIED SPEAKER 1:  She probably knew she was

15   coming to see you.  That's why she was on the bridge.

16         (Pause in proceedings.)

17         MR. LLORETT:  Excuse me, Your Honor?  Since I think

18   it's the Government's plan to get to the Grand Jury transcript

19   at some point after this first witness, did Your Honor have a

20   ruling with respect to that or did you want to let the jury

21   out later --

22         THE COURT:  I can do that.  Let's see whether the

23   witness is here.  If she's not, we'll deal with that issue.

24         MR. LLORETT:  Thank you.

25         (Pause in proceedings.)

1          COURTROOM DEPUTY:  Yes, Your Honor.

2          THE COURT:  Is she here?

3          COURTROOM DEPUTY:  Yes, Your Honor.

4          THE COURT:  Well, before we call her, let's deal

5    with the Grand Jury testimony --

6          MR. LLORETT:  Very well, Your Honor.

7          THE COURT:  -- and it will just take a couple of

8    minutes.

9          MR. LLORETT:  Okay.

10         THE COURT:  All right, counsel?  Mr. Hetznecker --

11         MR. HETZNECKER:  Yes, Your Honor.

12         THE COURT:  -- filed a motion in limine to exclude

13   certain testimony of the Grand Jury and to add certain other

14   testimony.  I'm going to go through the requests and deal with

15   them.  On Tab 170, the Government intends to play pages two

16   through ten.  Defendant wants to add pages 15 through 21.

17   Defendant contends that this puts the testimony in context.

18   The defendant's request is denied.

19         The requested portions are not necessary to put the

20   testimony that the Government's going to offer in context and

21   they're not relevant or explanatory.

22         Tab 171, the Government intends to play page 31

23   through 39.  This is testimony about where the defendant got

24   the money and how much money it was.  Defendant wants to add

25   pages 23 through 31.  This is a discussion by the Assistant

Colloquy in regard to Motions                          8

1    United States Attorney in which there was an indication that

2    drugs were found in the house.  This was a mistake.  The

3    defendant wants to add this indicating that it shows the

4    defendant Thompson's state of mind.  Defendant -- defendant's

5    request is denied.  The testimony does not explain anything or

6    put anything in context.

7              The defendant has requested page 112 be played and

8    the Government intends to play that, as I understand it, is

9    that correct?

10             MR. BRESNICK:  Your Honor, I had difficulty hearing

11   that last part.  The Government intends to play what?

12             THE COURT:  Page 112.  The Government intends to

13   play that; defendant's requested it and the Government intends

14   to play it.

15             MR. BRESNICK:  I don't believe 112 is in the

16   Government's selections, Your Honor.

17             THE COURT:  I believe in your submission you

18   indicated that you would play it.

19             MR. BRESNICK:  Then perhaps I'm mistaken, Your

20   Honor.  If you could point me to that?  I'm looking at Tab

21   179, that is page --

22             THE COURT:  We're not -- we're not --

23             MR. BRESNICK:  Oh.

24             THE COURT:  Take a look at page 112, Mr. Bresnick.

25   This was the --

1          MR. BRESNICK:  Oh, yes.  Yes, Your Honor.

2          THE COURT:  -- questions by the Grand Juror --

3          MR. BRESNICK:  Yes.

4          THE COURT:  -- about the money.

5          MR. BRESNICK:  Yes, of course.  That's fine, Your

6    Honor.

7          THE COURT:  All right.  I would indicate that the

8    motion in this case and the responses were very confusing.  It

9    took quite a while to determine just exactly where we were --

10   what sections we were dealing with.

11         All right, Tab 172, the Government intends to play

12   pages 39 through 41.  This concerns the grandfather not

13   trusting banks.  The defendant wants to add 24 to 31

14   indicating that that puts the whole testimony in context.

15   This, again, is an indication that there were drugs found in

16   the house.  The defendant's request is denied.  It's not

17   necessary for completeness.  Two different subjects.

18         Tab 173, the Government intends to play pages 41

19   through 45 and this deals with counting the money, and 45

20   through 51.  This deals with other guns in the house and with

21   ammunition and target practice.  And the Government also

22   intends to play 52 through -- 52, line eight, through line 22

23   dealing with the digital scale, and page 52, line 23, with

24   regard to Morris.

25         The defendant's request is denied or the defendant's

1  objection is denied.  The money counter, the guns, the

2  ammunition in the house, target practice, the digital scale

3  are all relevant and admissible evidence on the charges

4  against Ms. Thompson in the indictment and there's no danger

5  of unfair prejudice.

6          Tab 174, as I understand it, there's no dispute with

7  regard to that tab.

8          Tab 175 and 176, the Government intends to play

9  this, the section dealing with paying Alton Coles' lawyer and

10 specifically paying $25,000 to Coles' lawyer.  The defendant

11 has requested that pages 87 and 88 be played.  They -- the

12 defendant suggested this is necessary to show that the

13 defendant did not know Ace or Alton Coles very well.

14         The defendant's request in this regard is denied.

15 It's not necessary to put -- the requested portion is not

16 necessary to put the testimony that the Government intends to

17 offer in context or to explain that testimony.

18         Tab 177, the Government intends to play page 103,

19 line ten, through 104, line six, and this deals with the

20 defendant putting money in different locations in her house.

21 The defendant objects, says that this is not relevant to the

22 perjury charge.  That objection is overruled.  The testimony

23 is directly relevant.

24         Tab 178, the Government intends to play the

25 questions by the U.S. Attorney with regard to whether or not

1    the defendant spoke to her attorney during a break.  The

2    defendant objects that this is prejudicial and has no

3    probative value.  I agree.  The defendant's objection is

4    sustained.  That section shall not be played.

5        Tab 179, the Government intends to play page 107,

6    line one, to page 109, line 23, and this deals again with the

7    money and whether the money was held in rubber bands and what

8    the denominations of the bills were.  I'm not sure I

9    understand what the defendant's objection is to that.

10       Mr. Hetznecker, can you enlighten me?

11       MR. HETZNECKER:  Your Honor, in light of Your

12   Honor's rulings on the previous issues, I assume that the

13   Government's tab on that would be granted.  I argued that that

14   particular line of questioning had to be put in context with

15   the other questions that were asked before regarding --

16   earlier on on pages 24 to 31 -- but in light of Your Honor's

17   ruling, I understand why the Government wants to bring it in.

18       Again, I don't think that that particular line of

19   questioning is relevant to the charges -- the perjury charges.

20   I think it's -- I think it's irrelevant with respect to the

21   perjury charges because she's not charged with anything with

22   respect to how the money was packaged or the denominations of

23   the money that was recovered.

24       THE COURT:  All right, I understand your position.

25   It was not clear from the submission but your position is on

1    the record.

2            Tab 180, the Government intends to play page 116,

3    line 123, through 129, line 17.  The discussion up to page 126

4    is about kilo wrappers and then at 126 the discussion begins

5    about whether the defendant reported the money which she got

6    from her grandfather to the Internal Revenue Service.  The

7    defendant objects to the testimony with regard to the kilo

8    wrappers and the testimony with regard to the IRS.

9            I reviewed my notes on this and I'm going to sustain

10    this objection as there was no testimony with regard to kilo

11    wrappers being found in the house.  There was testimony about

12    Saran Wrap but in other parts of this case there has been

13    specific identification of kilo wrappers.  I do not believe

14    that there was any such identification in the Burden Hill

15    search so the objection is sustained.

16            And with regard to the IRS reporting, I'm going to

17    sustain that objection also.  I think that the prejudice far

18    outweighs the probative value.

19            MR. BRESNICK:  Your Honor, in this tab there is

20    additional testimony about the ammunition.  What's Your

21    Honor's ruling with respect to that?  And that is -- it looks

22    like it's starting at -- well actually the money counter, that

23    starts at page 121, line 13, and then there's the discussion

24    about the ammunition which goes through 125 --

25            THE COURT:  So 121, line 13, through --

1    MR. BRESNICK:  Yes, Your Honor, 121, line 13,

2    through page 125, line 25, or 126, line one.

3    THE COURT:  The objection to that testimony is

4    overruled, that testimony with regard to the money counter,

5    and as I've indicated already, is relevant.  I think we're at

6    Tab 181.  The Government intends to play page 130, lines two

7    through 14.  The defendant in that section is talking about

8    the money in the house being hers and not Morris's and the

9    defendant objects indicating that he believes this is a <u>Bruton</u>

10   issue.

11   The defendant's objection is overruled.  This is not

12   a <u>Bruton</u> issue.  The defendant also requests that if this is

13   going to be played that pages 18 through 21 should be read to

14   put the testimony in context.  That request is denied.  I

15   don't believe pages 18 through 21 accomplish that at all.

16   Tab 182, the Government wants to play page 130, line

17   18, through 131, line nine, having to do with the purchasing

18   of a car lot with the money.  The defendant again indicates

19   again that this is a <u>Bruton</u> issue.  The Court disagrees.  I do

20   not believe it's a <u>Bruton</u> issue.  I believe that that's

21   evidence that's admissible and I overrule the defendant's

22   objection.

23   MR. HETZNECKER:  Your Honor, may I be heard just on

24   one point --

25   THE COURT:  Go ahead.

1          MR. HETZNECKER:  -- just for the record?  I'm sorry.

2    We, throughout the trial, haven't been able to see you because

3    I've been over here.  May I step to the right?

4          THE COURT:  You certainly may.

5          MR. HETZNECKER:  I'd like to put my objection in

6    context.  This has been a difficult trial to try because

7    essentially most of the evidence has not been directly against

8    my client, Thais Thompson, and in particular, I cannot cross-

9    examine Grand Jury tapes.

10         But what I can do is put -- bring into light the

11   context of all of the questions that followed the initial

12   questioning about the drugs found at the location of 5 North

13   Burden Hill Road.  Specifically, Mr. Llorett asked my client,

14   as Your Honor knows, on page 24, "Are you aware, ma'am, that

15   there were drugs found inside your home at 5 North Burden Hill

16   Road?"  Now --

17         THE COURT:  And, Mr. Hetznecker, that was a mistake.

18   There weren't drugs found there.  There's no question about

19   that.

20         MR. HETZNECKER:  But that was never cleared up at

21   the Grand Jury.  That part of it was never cleared up.  In

22   fact, what Mr. Llorett does is he segues from questions about

23   drugs found at North Burden Hill Road in a long discussion

24   with her back and forth about I didn't know there were any

25   drugs, I saw it in a newspaper article on October 6th.

1           And then he segues into, "There were drugs found in

2    your -- in a car at that location."  Never does he say, ma'am,

3    I want to correct my misstatement, my mistake.  So the state

4    of mind of my client is absolutely critical in this case

5    because otherwise, I cannot argue in context to the jury that

6    my client's position -- what her state of mind is at the time

7    when she's asked about something that is absolutely not

8    accurate.

9           And I'm not saying that Mr. Llorett did that on

10   purpose.  In fact, I don't believe he did.  But -- but that

11   doesn't matter.  What matters is her receipt of that

12   information and how she responded throughout the course of her

13   questioning.   There are ten questions.

14           As I mentioned in my followup submission, there are

15   ten questions that follow the questions about the drugs found

16   inside the home and the drugs found inside the car at 5 North

17   Burden Hill Road and whether she was aware of that, right into

18   the segue on page 31 on the questions about the money.  His

19   framing of the question is exactly the same, "Ma'am, are you

20   aware that $559,000 was found inside your home?"  That's

21   literally six pages away.

22           It's about ten questions from the initial

23   misstatement of Mr. Llorett in the Grand Jury and I think,

24   Your Honor, for the jury to hear this perjury case and pass

25   upon whether or not she intentionally lied about a material

Colloquy in regard to Motions                    16

1    fact, without having the context, which is that there was a

2    clear misstatement by the prosecutor which was never corrected

3    about where the most critical piece of evidence in this case

4    was found, which is the half-a-kilogram of cocaine found at 5

5    North Burden Hill Road, in a car, not in the home.

6              For her to be confronted with that in the initial

7    questioning and not for the jury to hear it I think is greatly

8    prejudicial to my case.  I cannot cross-examine tapes.

9              THE COURT:  All right.

10             MR. HETZNECKER:  I'm at a grave disadvantage here.

11             THE COURT:  I understand.

12             MR. HETZNECKER:  The only way I can argue what I

13   want to argue to the jury without revealing it here now is to

14   have that put into context and pages 24 through 31 read.

15             THE COURT:  I understand your position, Mr.

16   Hetznecker.  I've ruled.  You have an exception.

17             MR. HETZNECKER:  Thank you.

18             THE COURT:  All right.  Is the Government ready to

19   go now?

20             MR. LLORETT:  Yes, Your Honor.

21             THE COURT:  All right.

22             (Jury enters the courtroom, 9:44 a.m.)

23             COURTROOM DEPUTY:  Please rise.

24             THE COURT:  Okay.  Have a seat, ladies and

25   gentlemen.  Mr. Llorett, will you call your witness?

1          MR. LLORETT:  Yes, Your Honor.  The Government calls

2    Kim Brodbeck.

3          COURTROOM DEPUTY:  Please raise your right hand.

4          KIMBERLY BRODBECK, GOVERNMENT'S WITNESS, SWORN

5          COURTROOM DEPUTY:  Please state your full name and

6    spell your last name for the record.

7          THE WITNESS:  Kimberly Brodbeck, B-R-O-D-B-E-C-K.

8          THE COURT:  Speak right into the microphone.

9          THE WITNESS:  Okay.

10          MR. LLORETT:  And you can pull that forward if it's

11   convenient.

                        DIRECT EXAMINATION

13   BY MR. LLORETT:

14   Q    Ma'am, where do you work?

15   A    Legacy Title.

16   Q    All right.  And what is Legacy Title?

17   A    A title company.

18   Q    And what does a title company do?

19   A    Conducts closings and issues title insurance.

20   Q    Closings for what kind of transactions?

21   A    Real estate purchase transactions.

22   Q    Now, were you working for Legacy Title back in 2005 and

23   specifically the end of July of 2005?

24   A    Yes.

25   Q    And I want to show you what's been marked Number 713B and

1    ask you what that is.

2    A    This is a HUD-1 Closing Statement.

3    Q    What is a HUD-1 Closing Statement?

4    A    Basically it's the finalization of the transaction.

5    Q    All right.  And the document that we're looking at on the

6    screen, is that the correct one, the first page there?  And I

7    -- this should be 713B -- Bravo.

8    A    On the screen it looks like that is the second page.  Oh,

9    there's the first page.

10    Q    That's the first page there?

11    A    Yes.

12    Q    Is that the same document that you're looking at in front

13    of you?

14    A    Yes.

15    Q    What's the date on the document you're looking at?

16    A    July 29th, 2005.

17    Q    And who are the parties to this transaction?

18    A    NVR, Inc., as the seller, Asya Richardson as the

19    purchaser.

20    Q    Do you know who NVR, Inc. is?

21    A    Yes.

22    Q    Who are they?

23    A    They are the builder, Ryan Homes.

24    Q    All right.  Just if you could describe for the jurors

25    briefly, what does a title clerk do at a settlement?  What did

1    you do at settlement?

2    A    Basically we finalized the transaction, we conduct the

3    mortgage closing, we get the documents from the lender, have

4    them signed, notarized, sent back to the lender, release the

5    proceeds of sale to the seller, collect the funds from the

6    purchaser.

7    Q    Okay.  And do you also -- eventually does your company

8    also file the records in the public record concerning the

9    property?

10   A    Yes, we record the documents and then issue the title

11   insurance.

12   Q    What real property did this particular settlement concern

13   that you're looking at?

14   A    117 Dillon's Lane in Mullica Hill.

15   Q    And that's in Gloucester County, New Jersey?

16   A    Yes, Harrison Township.

17   Q    All right.  Who was the seller -- or, who was the buyer

18   again?

19   A    Asya Richardson.

20   Q    All right.

21            MR. LLORETT:  Your Honor, I move the admission of

22   713B.

23            MR. SMITH:  No objection, Your Honor.

24            MR. WARREN:  No objection, Judge.

25            THE COURT:  It will be admitted.

1              MR. LLORETT:  And if we could just look at this

2      briefly with the jury, if we could just -- Ms. Horay, if you

3      could blow the top up so we could walk through it with the

4      Clerk.

5      BY MR. LLORETT:

6      Q    Ms. Brodbeck, the top of the form, I see your agency is on

7      the left hand side at the top, is that right?

8      A    Correct.

9      Q    And going down, it lists the borrower, is that right?

10     A    Yes.

11     Q    Who is that?

12     A    Asya Richardson.

13     Q    And it lists the seller and we've already talked about

14     that, is that right?

15     A    Yes.

16     Q    Who's the mortgage company?

17     A    Chase Bank.

18     Q    And their address and so forth is there?

19     A    Correct.

20     Q    There's a brief description of the property, is that

21     right?

22     A    Yes.

23     Q    Then your name appears, is that right --

24     A    Yes.

25     Q    -- below that?

1   A    Yes.

2   Q    Okay.  Ma'am, just preliminarily, you've looked at the

3   Legacy Title file in this, is that right?

4   A    Yes.

5   Q    Okay.  And you produced it here or Legacy Title has

6   produced it and you've reviewed it, is that right?

7   A    Correct.

8   Q    Okay.  Is this the file -- Number 713?

9   A    Yes, it is.

10          MR. LLORETT:  Your Honor, this has been previously

11  agreed to be moved into evidence by stipulation.

12          MR. SMITH:  That's correct, Judge.

13          THE COURT:  All right.  It's admitted.

14          MR. LLORETT:  Thank you, Your Honor.

15  BY MR. LLORETT:

16  Q    Now, ma'am, do you have specific recollection of this

17  settlement in particular?

18  A    Specifically, no.

19  Q    Okay.  About how many settlements do you do a year, if you

20  can tell us?

21  A    Close to a hundred.

22  Q    All right.  And this was in 2005?

23  A    Yes.

24  Q    Okay.  Anything remarkable about this settlement that

25  caused you to remember or just --

1          MR. SMITH:  Objection, Your Honor.  She testified

2    she has no specific recollection.

3          THE COURT:  She certainly did.

4          MR. LLORETT:  Certainly.

5          THE COURT:  Objection sustained.

6    BY MR. LLORETT:

7    Q    But you are familiar with the files, is that correct?

8    A    Correct.

9    Q    Okay.  And that is drawn from the Legacy Title file, that

10   HUD statement?

11   A    Yes, it is.

12   Q    Okay.  Now, if we can go down that file, can you tell us,

13   does the contract price or the sales price of the house

14   appear?

15   A    Yes, it does.

16   Q    What is it?

17   A    466,690.

18   Q    And is that at the sort of top of the columns that we are

19   seeing in front of us?

20   A    Yes, it's line 101 and 401.

21   Q    Okay.  And does the total amount of down payment, so to

22   speak, appear on this form as well?

23   A    The initial deposit is on line 201.

24   Q    And what was that?

25   A    40,000.

Brodbeck - Direct (Llo)                                    23

1   Q   And does it appear on the form anywhere when that initial

2   deposit was made or it just has the deposit itself?

3   A   It just has the deposit itself.

4   Q   Okay.  Was there any additional deposit beyond the initial

5   deposit, based on this form?

6   A   Other than what she needed at closing, no.

7   Q   Does that -- what she needed at closing, appear on the

8   form?

9   A   Yes, line 303.

10       MR. LLORETT:  If we can scroll down.

11  BY MR. LLORETT:

12   Q   You can show us line 303 -- is that further toward the

13  bottom than what we're looking at here?

14   A   Yes, down toward -- all the way down the bottom.

15   Q   Okay.  Can you point out to us line 303?

16       MR. LLORETT:  And perhaps we can blow up the bottom.

17  BY MR. LLORETT:

18   Q   Is that on the bottom left?

19   A   Bottom left.

20   Q   Okay.

21       MR. LLORETT:  If we can blow up the bottom left

22  there.

23  BY MR. LLORETT:

24   Q   All right, do you see the -- the additional monies?

25   A   Yes.  The total is the 69,334.45, which is her bottom line

1    she needed initial -- remainder of the deposit plus closing

2    costs.

3    Q    So the total deposits were $40,000 as indicated above and

4    then this figure at the bottom?

5    A    Well, the figure at the bottom also includes closing

6    costs.

7    Q    Okay.  So there's -- that's closing costs plus any

8    additional funds for the purchase of the house, is that right?

9    A    Correct.

10   Q    Okay.  And that total is 69,334.45?

11   A    Correct.

12   Q    All right.  I want to show you -- oh, by the way, looking

13   at the whole document, if we could, at the very bottom of the

14   document in front of you, is there signatures?

15   A    Yes.

16   Q    Can you tell us whose signatures appear?

17   A    The borrower, Asya Richardson and the seller, NVR, Inc.,

18   and myself.

19   Q    Who signed for NVR, Inc.?

20   A    On this particular one, Kevin Summerville (phonetic),

21   initialed by me.

22   Q    All right.  And is it your normal practice to obtain the

23   signatures of each of the individuals on this document at

24   settlement?

25   A    Yes, but the -- Kevin Summerville was not present at the

Brodbeck - Direct (Llo)                                    25

1    time of closing.  His signature was obtained by fax.

2    Q    Okay.  Now, was Ms. Richardson present at the time of

3    closing?

4    A    Yes.

5    Q    Okay.  Let's look at Number 713A and I want to show you

6    that.  Do you know what that is, 713A?

7    A    This is our deposit slip from closing.

8    Q    What is that?  What's the deposit slip represent?

9    A    Funds that the purchaser brought to closing.

10   Q    And can you tell us as we --

11            MR. LLORETT:  -- there we are, thank you, Ms. Horay.

12   Well, Your Honor, I'll move the admission of 713A and it's by

13   stipulation.

14            MR. SMITH:  Again, stipulated, Your Honor.

15            THE COURT:  Admitted.

16            MR. WARREN:  Agreed, Your Honor.

17   BY MR. LLORETT:

18   Q    Ma'am, can you tell us what the borrower deposited to the

19   settlement?  Or not the borrower -- I'm sorry -- yes, it is

20   the borrower.

21   A    It looks like $74,000 total.

22   Q    Okay.  And is there a second page to that document?  What

23   is the second page?

24   A    Copies of the checks.

25   Q    And what -- what does that mean, with the copies of the

Brodbeck - Direct (Llo)                                          26

1    checks from whom, to whom, and what are they for?

2    A    These are copies of the three checks presented at the time

3    of closing.

4    Q    Can you tell us, the top document that we're looking at on

5    the screen, what is that?

6    A    A copy of the $49,000 check.

7    Q    And who is it made payable to?

8    A    Alton Coles.

9    Q    And can you look at the back of the check which appears

10   below it and tell us who endorsed it?

11   A    Alton Coles.

12   Q    Do you know if Mr. Coles was at settlement or not?

13   A    I would not have accepted the check if he was not present

14   to endorse it.

15   Q    Okay.

16          MR. LLORETT:   Can we look at the next item?

17   BY MR. LLORETT:

18   Q    And are you looking at the same item that we're looking at

19   right now?

20   A    Yes.

21   Q    Okay.   What is that?

22   A    A copy of the -- another check issued at closing.

23   Q    And to whom is it made payable?

24   A    It's kind of hard to read.

25   Q    Okay.

1    A    Asya Richardson, but there's other language after that but

2    I can't quite read it.

3    Q    All right.

4              MR. LLORETT:    If we can go down on the screen, just

5    scroll down a little bit and move down.

6    BY MR. LLORETT:

7    Q    Is that visible to you?  Can you read that?

8    A    It looks like --

9              MR. SMITH:    Your Honor, I'll stipulate that my

10   client's name is on the check.

11             THE COURT:    All right.

12             MR. WARREN:    I'll stipulate that my client's name is

13   on there as well, Judge.

14             THE COURT:    All right.

15             MR. LLORETT:    Okay.  Thank you.

16   BY MR. LLORETT:

17   Q    Looking back, how much was that check for?

18   A    19,000.

19   Q    And looking at the endorsement, who endorsed it?

20   A    Asya Richardson and Alton Coles.

21   Q    All right.

22             MR. LLORETT:    And the final document in that set,

23   713A?

24   BY MR. LLORETT:

25   Q    Are we looking at the same thing on the screen that you're

1    looking at in front of you?

2    A    Yes.

3    Q    Okay.  What is that document?

4    A    A $6,000 check payable to Asya Richardson.

5    Q    All right.  And who is it payable from?  Who -- who's the

6    person making the payment?

7    A    The remitter?

8    Q    Yes, ma'am.

9    A    It looks like Haseen Coles -- Naseen Coles?

10            MR. LLORETT:  Can we blow that up?

11   BY MR. LLORETT:

12   Q    Can you read that --

13   A    No --

14   Q    -- or spell it for us?

15   A    N-A-S-E-E-N --

16   Q    All right.

17   A    -- Coles.

18   Q    And this is for $6,000, is that correct?

19   A    Correct.

20   Q    And who, if you look at the endorsement, who endorses the

21   check on the back?

22   A    Asya Richardson.

23   Q    All right.  Now, ma'am, I'd like you to look at Number

24   712A -- Alpha.

25            MR. LLORETT:  And again, Your Honor, by stipulation.

BY MR. LLORETT:

Q    Ma'am, do you recognize 712A -- Alpha?

A    Yes.  It's a residential loan application.

Q    What is a residential loan application?

A    It's a document the lender sends to closing with the
borrower's information.

Q    All right.  What type of information is that?

A    Basically the information provided from the borrower to
the lender at the time of the application for approval of the
loan.

Q    All right.  Is the copy that you have signed?

A    Yes.

Q    By whom is it signed?

A    Asya Richardson.

Q    And what's the date?

A    July 29th, 2005.

Q    And is this a document that is signed typically at
settlement?

A    Yes, it is.

Q    Just take a look at the copy.  If you go to the first
page, let me ask just generally, ma'am, do you explain
documents at settlement?

A    We are not attorneys, we don't typically explain the
documents, we identify the document.

Q    Okay.  And when you say identify the documents, what do

Brodbeck - Direct (Llo)                                    30

1   you typically do?

2   A    When we typically get to the loan application, we tell

3   them it's a typed of version of their initial loan application

4   provided by the lender.

5   Q    All right.  Do you instruct typically the borrower to sign

6   it or what do you do in terms of --

7           UNIDENTIFIED SPEAKER:   Objection to what she

8   typically does, Your Honor.  She has no recollection as to

9   this settlement.

10          MR. LLORETT:   Your Honor, I think her normal

11  practice is --

12          THE COURT:   Go ahead and ask the proper questions.

13          MR. LLORETT:   Thank you.

14  BY MR. LLORETT:

15  Q    Ma'am, what is your normal practice with respect to these

16  documents in terms of how you treat them at settlement and

17  what you do with them vis-a-vis the buyer?

18  A    Well, it's a requirement of the lender that all of their

19  documents be signed prior to disbursing their funds, so we

20  have to instruct the buyer or the borrower where to sign.

21  Q    I see.  Okay.

22          MR. LLORETT:   Your Honor, I'd like to show the

23  witness Number 712D.

24  BY MR. LLORETT:

25  Q    And do you recognize what 712D is?

1   A    Yes.

2   Q    What is 712D?

3   A    Basically it's an authorization from the borrower to the

4   lender for them to verify the information they supplied to

5   them.

6   Q    All right.  Is that document signed?

7   A    Yes, it is.

8   Q    By whom?

9   A    Asya Richardson.

10  Q    And when was it signed?

11  A    July 29th, 2005.

12  Q    And s this a document that is collected by you at

13  settlement?

14  A    Yes, it is.

15  Q    Again, is it your normal practice to present this to the

16  borrower for signature?

17  A    Yes, it is.

18  Q    Okay.

19       MR. LLORETT: Specifically, if we could blow up the

20  top part of this document?

21  BY MR. LLORETT:

22  Q    Again, did you explain this document or simply introduce

23  the document to the witness -- or to the -- to the individual?

24  A    I would have introduced it.

25  Q    Okay.  Is that just for the brief description of what the

1    document is?

2    A    Yes.

3    Q    Okay, and let's go down this document.  There's a space

4    marked "Certification," is that correct?

5    A    Yes.

6    Q    And then there's a space marked "Authorization," is that

7    right?

8    A    Yes.

9    Q    And then below that, signature line?

10    A    Yes.

11    Q    Okay.  And a Social Security Number?

12    A    Correct.

13    Q    And whose Social Security Number is that?

14    A    It should be the borrower's, Asya Richardson's.

15    Q    Okay.  Is that something you print or type in or the

16    lender does or the borrower or do you do that?

17    A    The lender fills that information in.

18    Q    Okay.  The lender provides you with documents for

19    signature?

20    A    Correct.

21    Q    Okay.  And then you are the person who has to collect the

22    signatures and process the loan, is that right?

23    A    Yes.

24    Q    Okay.  Ma'am, I'd also like to show you a couple of more

25    documents.  Number 712B -- do your recognize what that is?

1    A    This is the purchase agreement.

2    Q    And is that a document that you're familiar with?

3    A    Yes.

4    Q    Is that part of the settlement documents as well?

5    A    No.

6    Q    Okay.  But it is a document that you're familiar with in

7    terms of your file, is that right?

8    A    Correct.

9    Q    Okay.  And who is the signature on that particular

10   document?  Who are the signatures?

11   A    Asya Richardson and Alton Coles.

12   Q    And the date of that document?

13   A    February 20th, 2005.

14   Q    All right.  And finally, Number 712C and I'll ask you what

15   that document is.

16   A    And addendum to the purchase agreement.

17   Q    Okay.  And does that relate to 712B?

18   A    Yes, it does.

19   Q    Okay.  What's the date of 712C?

20   A    July 11th, 2005.

21          MR. LLORETT:  And if we can blow that up.

22   BY MR. LLORETT:

23   Q    Is this a document you're familiar with because it's part

24   of your file?

25   A    Yes.

Brodbeck - Direct (Llo)                                  34

1    Q    Okay.  On this closing?

2    A    Yes.

3    Q    Who were the signatures to that, the purchasers?

4    A    Asya Richardson and Alton Coles.

5              MR. LLORETT:  And if you could -- ma'am, Ms. Horay,

6    if you could just blow that up a little bit more, the language

7    in the middle, and we'll try and see if we can read that.

8    BY MR. LLORETT:

9    Q    Ma'am, can you read from your copy?  Well, it might be a

10   little easier if you can read that.  It's a brief paragraph,

11   if you can read that in for us.

12   A    "The following person is hereby deleted from the agreement

13   as an additional purchaser -- Alton Coles.  Seller shall look

14   solely to the remaining purchaser to perform all of the

15   purchaser's obligations under the agreement.  All other terms

16   and conditions of this agreement shall remain unchanged and in

17   full force and effect."

18   Q    And then below that are signatures?

19   A    Correct.

20   Q    This references a document, is that correct?

21             MR. LLORETT:  Earlier up, if we can go back up the

22   page a little bit on the screen.

23   BY MR. LLORETT:

24   Q    There's a reference to a prior document in quotes,

25   "Agreement."  Do you see that?

1    A    A purchase agreement?

2    Q    I think in the paragraph that starts "11 day of July,

3    2005, the last line.

4    A    "To a purchase agreement by and between NVR, Inc., Ryan

5    Homes, Seller, and Alton Coles, Asya Richardson collectively,

6    Purchaser, dated 2/19/05, the Agreement."

7    Q    Okay.  So that agreement -- well, the date on that was

8    2/19/05, is that right?

9    A    Yes.

10    Q    Thank you, ma'am.

11                MR. LLORETT:  If I may have a moment, Your Honor.

12                (Pause in proceedings.)

13                MR. LLORETT:  Nothing further, Your Honor.

14                THE COURT:  Cross-examine?

15                        <u>CROSS-EXAMINATION</u>

16    BY MR. WARREN:

17    Q    Good morning, ma'am.  How are you doing?

18    A    Good.  And yourself?

19    Q    I'm good.  I don't think we ever met before.  My name is

20    Christopher Warren.  I represent Alton Coles.  I have -- I

21    have just a couple of questions for you.

22                MR. WARREN:  Can we put those checks up that were

23    from my client, Alton Coles, if I can remember the exhibit

24    number --

25                MR. LLORETT:  713A.

1              MR. WARREN:  713A, please.

2     BY MR. WARREN:

3     Q    Okay.  That's the deposit slip, right?

4     A    Yes.

5     Q    Okay.  Now, these were copies of checks I take it that you

6     made at settlement?

7     A    Yes.

8     Q    And --

9     A    Well, I don't typically make copies of the checks at

10    closing unless it's required.

11    Q    Okay.  Okay.  These however were the checks that were

12    given to you at closing?

13    A    Yes.

14    Q    All right.  And they appear to be -- at least this one

15    appears to be a certified or bank check, is that right?

16    A    Yes, an official check.

17    Q    Right.  And the way you get that is you go to the bank,

18    you give them the money and then they give you a bank check,

19    right?

20    A    Yes.

21    Q    And that's what you guys -- that's what you guys require

22    at closing, right?

23    A    Yes.

24    Q    And it's in the name of Alton Coles, right?

25    A    Yes.

1   Q    And do you specifically remember -- I think you told us

2   you don't specifically remember much about this closing, is

3   that right?

4   A    Correct.

5   Q    Okay.  But you told us that it would have been your

6   practice not to have accepted the check unless he endorsed it

7   in your presence?

8   A    I wound never have accepted the check.

9   Q    Fair enough.

10            MR. WARREN:  Can we see that?  Is there another one?

11            MR. LLORETT:  The next page?  Perhaps we can turn to

12   the next page.

13            MR. WARREN:  Okay.  All right, this appears to be --

14   is there another one from Alton Coles or just one?

15            MR. LLORETT:  If there was we can go -- there we go.

16   It's on the screen now.

17            MR. WARREN:  Okay.  All right.

18   BY MR. WARREN:

19   Q    And this one was the one that was kind of hard to read,

20   wasn't it?

21   A    Yes.

22   Q    Okay.  And I think we got a stipulation that it's payable

23   to Asya Richardson and it looks like Alton Coles.  See where

24   it says "remitted" down there at the bottom?  I know it's hard

25   to tell.

Brodbeck - Cross (War)                                    38

1    A    Yeah, it's hard to read.  Yes.

2    Q    All right.  My question to you is this is a cashier's

3    check, right?

4    A    Yes.

5    Q    All right.  Where again, you go to the bank and the bank

6    gives you a check after you give them the money, right?

7    A    Correct.

8    Q    Okay.  All right.

9         MR. WARREN:  And the last one, the Naseem Coles

10   check, please?

11   BY MR. WARREN:

12   Q    Okay.  And again, it says it's a cashier's check, right?

13   A    Yes.

14   Q    Okay.  Where an individual goes to the bank and gives the

15   money and they give them a certified or a cashier's -- or,

16   that's a bank check, isn't it?

17   A    It's an official bank check, yes.

18   Q    Okay.  All right.  Thank you.

19        MR. WARREN:  And if we could look at the document

20   which deleted Mr. Coles as a purchaser on the agreement of

21   sale?  I didn't write down any of the numbers.  I'm sorry.

22   Okay, now if you could blow that up, please, Agent Horay.

23   Thank you so much.

24   BY MR. WARREN:

25   Q    Okay.  Now, this document makes reference to the initial

 1    agreement of sale, doesn't it?

 2    A    Yes, it does.

 3    Q    Okay.  And that agreement of sale appears to have been

 4    signed on what -- February 19th, 2005?

 5    A    Yes.

 6    Q    And the actual document which deletes Mr. Coles as one of

 7    the purchasers of the property, that wasn't signed until July

 8    11th, 2005, right?

 9    A    Yes.

10    Q    Several months after the agreement of sale was signed,

11    right?

12    A    Right.

13    Q    Okay.  Do you know why Mr. Coles was deleted from the

14    agreement of sale?

15    A    No, I do not.

16    Q    Okay.  And do you recall having any conversations with Mr.

17    Coles during the course of this settlement?

18    A    No.

19    Q    Okay.  Let me ask you this.  You've done this for many,

20    many years I take it, right?

21    A    Yes.

22    Q    Would it have been possible to get his name put on the

23    deed within 30 days after closing?

24    A    Would it have been possible?

25    Q    Yes.

Brodbeck - Cross (Smi)                                    40

1    A    Yes.

2    Q    How do you do that?

3    A    Go to an attorney.

4    Q    And then what?

5    A    Have a deed prepared and recorded.

6    Q    Okay.  Identifying him as one of the I guess owners of the

7    property on the deed, right?

8    A    Yes.

9    Q    Okay.  And you knew that back in 2005?

10   A    Yes.

11   Q    Okay.  At the time you did this closing, right?

12   A    Yes.

13   Q    Ma'am, thank you very much.  I don't have anything more

14   for you.

15   A    Okay.

16           MR. HETZNECKER:  No questions.

17           MR. THOMPSON:  No questions, Your Honor.

18           MR. SMITH:  No questions.

19           MR. HARMELIN:  No questions.

20                   CROSS-EXAMINATION

21   BY MR. SMITH:

22   Q    Ms. Brodbeck, good morning.

23   A    Good morning.

24   Q    Do you just do closings in New Jersey?

25   A    Yes.

1    Q    Have you ever done them in Pennsylvania?

2    A    No.

3    Q    So basically you're familiar only with the procedures set

4    forth in the State of New Jersey.  Would that be a fair

5    statement?

6    A    Yes.

7    Q    And you've been doing closings for how many years?

8    A    23 years.

9    Q    And approximately how many closings have you done?

10   A    In 23 years, I --

11   Q    Thousands?

12   A    Yes.

13   Q    Okay.  Describe the typical settlement day -- by the way,

14   I'm sorry, where was -- where did this closing take place?  Do

15   you have any recollection?

16   A    Berlin, New Jersey, in our office.

17   Q    And they would normally take place in your office,

18   correct?

19   A    Yes.

20   Q    Conference room?

21   A    Yes.

22   Q    Long table?

23   A    Yes.

24   Q    You're sitting at the head of the table?

25   A    Sometimes.

Brodbeck - Cross (Smi)                                    42

1    Q    Sometimes?

2    A    Generally.

3    Q    You're there sometimes with a laptop?

4    A    Yes.

5    Q    And you're busy filling in the figures and making sure

6    everything -- oh, by the way, do you just do new homes or do

7    you do resales, too?

8    A    Resales --

9    Q    And --

10   A    -- also.

11   Q    So you do both, correct?

12   A    Yes.

13   Q    Any difference between the resales and new homes?

14   A    Sure.

15   Q    Okay.  Tell -- tell the jury what the difference is when

16   you're dealing -- you know, if you can characterize it.

17   A    Basically it would be a difference of the house itself.

18   New homes is new construction --

19   Q    How about --

20   A    -- you're dealing with a builder.

21   Q    How about the paperwork?

22   A    Paperwork?  No.  Some documents --

23   Q    Okay.

24   A    -- but not really.

25   Q    Now, you had a file that was shown to you earlier by

1    counsel.

2    A    Yes.

3    Q    That's your file, is that correct?

4    A    Correct.

5    Q    Those are the documents that you needed in your file,

6    correct --

7    A    Yes.

8    Q    -- to complete settlement?  Are there additional

9    documents?

10   A    That were executed --

11   Q    Yes.

12   A    -- at closing?

13   Q    Yes.

14   A    Yes.

15   Q    Okay.  In fact, when you have a -- and would it be --

16   would it be a surprise that these would be the documents --

17            MR. WARREN:  -- just showing her the book that's

18   been provided to me, the documents by the Government --

19   BY MR. WARREN:

20   Q    -- that new home construction has hundreds and hundreds of

21   pages?  Would it surprise you?

22   A    At the closing?

23   Q    Through the entire process.

24   A    No, it would not surprise me.

25   Q    All right.  And a resale would be a lot less paperwork,

1    correct?

2    A    Yes.

3    Q    Now, this settlement was done on the 29th of July, is that

4    correct?

5    A    Yes.

6    Q    And you indicate you have no -- because you've done

7    thousands of settlements and this was over two years ago, you

8    have no current recollection, would that -- is that a fair

9    statement of your testimony?

10   A    Yes.

11   Q    Let me see if I can refresh your recollection a little

12   bit.  The 29th is towards the end of the month.

13   A    Yes.

14   Q    Most settlements held at the end of the month?

15   A    Yes.

16   Q    All right.  Why is that?

17   A    Less interest paid by the borrower.

18   Q    Okay.  So it's a little bit -- it behooves the borrower to

19   have the settlement towards the end of the month and that's

20   why most of them are held at the end of the month?

21   A    Yes.

22   Q    All right.  Do you remember -- does your file reflect --

23   the ones that you reviewed this morning -- that this

24   settlement was originally scheduled for July 28th?

25   A    I don't recall.

Brodbeck - Cross (Smi)                                45

1   Q    Do you recall a power outage at your office on July 28th

2   that pushed the settlement back to July 29th?  Would that ring

3   a bell?

4   A    No.

5   Q    Don't recall that?

6   A    No.

7   Q    Okay.  Do you recall how many settlements you had that

8   day, or in a typical end of the month day?

9   A    Typical end of the month day?

10  Q    Yeah.

11  A    Seven, eight.

12  Q    That's a lot of settlements, correct?

13  A    Yes.

14  Q    And those are the ones that you would have or do you --

15  are there other agents in your office who might even take one

16  and then somebody might take another and --

17  A    There are other agents but --

18  Q    All right.  But generally you would handle all of those

19  settlements on that day?

20  A    Sometimes, yes.

21  Q    Okay.  And but you don't remember this one exactly?

22  A    No.

23  Q    Do you remember this day -- and maybe I can refresh your

24  recollection a little bit -- that there was many settlements

25  that day and this was just one of them and basically there was

Brodbeck - Cross (Smi)                              46

1    a power outage, they had to be -- they all had to be pushed

2    through at the end of the month?

3                MR. LLORETT:  Objection, Your Honor.

4                THE COURT:  You just asked that question.

5                MR. SMITH:  Well, I -- I rephrased it a little bit,

6    Your Honor.

7                MR. LLORETT:  Objection, Your Honor.

8                THE COURT:  You said the same thing, counsel.

9                MR. SMITH:  Okay.

10               THE COURT:  Go ahead.

11   BY MR. SMITH:

12   Q    Do you recall the rush to move these settlements along on

13   any given day?

14               MR. LLORETT:  Objection, Your Honor.

15               THE COURT:  Sustained.

16   BY MR. SMITH:

17   Q    Do you recall the rush to move the settlements along on

18   this day?

19               MR. LLORETT:  Objection, Your Honor.

20               THE COURT:  Sustained.

21               MR. SMITH:  Thank you.

22   BY MR. SMITH:

23   Q    Now, do you recall -- I believe you indicated you don't

24   remember my client or anybody else being -- by client's the

25   young lady over there --

1          MR. LLORETT:  Objection, Your Honor.

2          MR. SMITH:  -- in the white blouse.

3          MR. LLORETT:  Counsel is testifying.

4          MR. SMITH:  Well, I -- I can introduce that to her,

5    Your Honor.

6          THE COURT:  Counsel, you can ask her whether she can

7    identify your client.

8          MR. SMITH:  All right.

9    BY MR. SMITH:

10   Q    Can you identify anybody in the courtroom who was at

11   settlement that day?

12   A    No.

13   Q    Okay.  Now, you received checks.

14         MR. SMITH:  Can those three checks be shown once

15   again in the order they were shown?  Agent Horay, I'm sorry, I

16   apologize.  It's three checks, one for -- thank you.  Now, the

17   second one has PNC on it.  Can that be shown to her?

18   BY MR. SMITH:

19   Q    Is there a date on that check?

20   A    I can't read it from this far away.

21         MR. SMITH:  Can that be focused on -- on that date,

22   up top, corner right?

23   BY MR. SMITH:

24   Q    What's -- what's that date?

25   A    It looks like August --

Brodbeck - Cross (Smi)                                    48

1    Q    August 1st?

2    A    Could be.  Can't quite make it out.  All I can make out is

3    August, 2005.

4    Q    You can make out August thought, right?

5    A    Right.

6    Q    Why would there be a check from August if a settlement was

7    in July?  Would there be any reason for that?

8    A    No.  I don't know why.

9    Q    Okay.  Normally, the checks -- you wouldn't have a check

10   that's post-dated or a cashier's check that was post-dated,

11   would that be accurate?

12   A    No, I wouldn't.  I wouldn't accept a check that was post-

13   dated.

14   Q    Okay.  But you would agree with me that that check does

15   say August.

16   A    Hm-hmm.

17   Q    And it was one of the checks which made up the monies that

18   had to be brought to settlement, would that be a fair

19   statement?

20   A    Yes.

21   Q    All right.  But you have no explanation as to why that

22   says August -- whatever?

23   A    Unless the bank made a mistake.

24   Q    All right.  Do you remember Mr. Coles bringing a personal

25   check to settlement and being told that that would not be

1  accepted and they would have to go back and bring drafts from

2  -- from the banks to cover the closing costs?

3  A    No.

4  Q    You don't remember that?

5  A    No.

6  Q    Okay.  Is that a typical thing that happens -- is that a

7  routine thing that happens at settlement when people bring

8  cash or bring a personal check and they're told they need a

9  draft?  That happens?

10  A    It happens, yes.

11  Q    Okay.  And then they're instructed that it cannot be

12  finalized at closing because they don't have the appropriate

13  amount of money that you would find acceptable to you?

14  A    Yes.

15  Q    In fact, as many times when you go to settlements, when

16  you're dealing with the payment of taxes, that there's a snafu

17  and documents have to be faxed over at the last minute so that

18  it's acceptable to you?

19  A    Acceptable to the title company?

20  Q    Yes.  When I say you, I mean the title company.

21          MR. LLORETT:  Objection, Your Honor.  Relevance.

22          THE COURT:  Objection sustained.

23          MR. SMITH:  Thank you, Your Honor.

24  BY MR. SMITH:

25  Q    Now, the -- at settlement in New Jersey, there's a lawyer

Brodbeck - Cross (Smi)                                    50

1   requirement, isn't there, for signing a -- I apologize -- for

2   signing documents?  Isn't there some type of an attorney

3   review requirement?

4   A    On the closing documents?

5   Q    Well, not on the closing documents, on the purchase of a

6   home?

7              MR. LLORETT:  Objection, Your Honor.  He's asking

8   her a legal question.

9              MR. SMITH:  I think -- she's a title clerk, I think

10  she's -- maybe she knows, maybe she doesn't know.

11             THE COURT:  Can you answer that question?

12             THE WITNESS:  On the contract of sale?

13             MR. SMITH:  Yeah.

14             THE WITNESS:  I believe there is a three-day

15  attorney review.

16             MR. SMITH:  Okay.

17  BY MR. SMITH:

18  Q    Now, you don't know on this transaction whether or not any

19  attorney was utilized for the execution of the purchase

20  agreement, would that be a fair statement?

21  A    That is.  I do not know.

22  Q    And you don't -- and would your records reflect of whether

23  or not any attorney was there for the -- the buyers on that

24  date?  Usually you take a business card from an attorney,

25  don't you?

Brodbeck - Cross (Smi)                                    51

1    A    Yes.

2    Q    Okay.

3    A    Or a bill on the HUD-1.

4    Q    I'm sorry?

5    A    Or there would be a bill on the HUD-1 if the attorney had

6    a charge.

7    Q    Now, HUD-1, that's the final sheet which has the -- all

8    the amounts indicated for taxes and down payments and

9    everything else and normally it's signed by the borrower and

10   by the seller?

11   A    Yes.

12   Q    There's a -- there's a separate side and many times when

13   an attorney's in attendance, you ask him if he has a bill for

14   his services and you add that sometimes and sometimes you

15   don't to the HUD-1?

16   A    Yes.

17           MR. LLORETT:  Objection, Your Honor.  Compound

18   question.

19           THE COURT:  Objection sustained.  Counsel, do you

20   want to get up here and testify?

21           MR. SMITH:  No, Your Honor, but I'm just trying to

22   move --

23           THE COURT:  Okay.  Well then just ask questions.

24           MR. SMITH:  Thank you, Your Honor.

25   BY MR. SMITH:

1    Q    Do you know if an attorney was present for this closing?

2    A    Based on what I looked at in my file, no.

3    Q    Okay.  Now, and the only persons who were there -- is it

4    reflected in your file who was in attendance that day besides

5    yourself?

6    A    We don't take a closing attendance sheet, no.

7    Q    You indicated that the gentleman who -- who's represented

8    of the seller was not in attendance.

9    A    Correct.

10   Q    And he had already signed some of the documents previously

11   and they were faxed over to you?

12   A    The HUD-1.

13   Q    Is that all he signed?

14   A    No, the deed.

15   Q    All right.  Was there any other documents that the seller

16   had to sign before they came to settlement?

17   A    Prior to closing?

18   Q    Yes.

19   A    The contract of sale.

20   Q    And those were already signed before the date of closing,

21   would that be accurate?

22   A    Yes.

23   Q    All right.  Just a few more questions.  The check which

24   was to cover the mortgage, the big check, who was that issued

25   from?

1    A    Chase was the lender.

2    Q    Okay.  Was anybody in attendance from Chase?

3    A    No.

4    Q    Okay.  Would it be normal practice that a represented be

5    there and not be there?

6    A    Sometimes.

7    Q    And the only thing that you're really concerned about is

8    that the appropriate monies are there, would that be accurate?

9    A    The only thing that I'm really concerned about?

10   Q    Well, I strike.  You'd be concerned that -- just that the

11   appropriate checks are there, is that correct, to cover all

12   the costs?

13   A    Appropriate funds from the lender and the appropriate

14   documents.

15   Q    And your documents, they reflected all the -- the monies

16   that were due eventually were there at settlement?

17   A    Yes.

18   Q    Okay.  Just a few more.  Now, the deed that was issued,

19   whose name was on the deed?

20   A    Asya Richardson.

21   Q    Okay.  And there was no reference to Mr. Coles, is that

22   correct?

23   A    Correct.

24   Q    All right.  Now, up until July 11th though, according to

25   the records that you've been shown, there was an indication

1    that both Mr. Coles and Ms. Richardson were going to purchase

2    the property, is that correct?

3    A    Yes.

4    Q    And it was only up until July 11th when his name was

5    deleted that there was no reference to Mr. Coles as to the

6    purchaser of the property, is that correct?

7    A    Can you repeat the question?

8    Q    Up until July 11th, there was no reference -- up until

9    July 11th, Mr. Coles and Ms. Richardson were the intended

10   purchasers of this property, is that correct?

11   A    I would have to look at the information in my file

12   provided by the builder.

13   Q    Okay.  Well, you saw the -- the signature where his name

14   was deleted, is that correct?

15   A    Correct.

16   Q    All right.  But up until that time, would it be a fair

17   statement that Mr. Coles and Ms. Richardson were going to be

18   the purchasers of that property?

19   A    I would have to look at my file.

20   Q    And you would have no information regarding whether or not

21   there was any difficulty in Mr. Coles obtaining financing?

22   A    I would not know that.

23   Q    You would not know that.  Okay.  And who shows the

24   documents to the -- that have to be signed -- to the

25   respective parties, both whether to seller or buyer?  Is that

Brodbeck - Cross (Smi)                              55

1    your job?

2    A    If there is no attorney or the lender is not present, yes,

3    that is.

4    Q    And you show the documents and they're passed along and

5    you ask basically things, can you take a look at these

6    documents and if they're appropriate, sign them, is that

7    correct?

8    A    Yes.

9    Q    How long does a settlement take?

10   A    Generally about an hour.

11   Q    And sometimes longer, sometimes shorter, depending on

12   whether there's any difficulties?

13   A    Yes.

14   Q    And you don't recall how long -- on new -- on this new --

15   by the way, you've done closings for Ryan Homes before, isn't

16   that correct?

17   A    Yes.

18   Q    How long does it take to get through the new housing

19   closings with Ryan Homes generally?

20   A    About an hour.

21   Q    Okay.  And you don't remember anything about this one

22   about the signatures or anything else like that, do you?

23   A    No.

24   Q    Thank you very much.

25   A    You're welcome.

Brodbeck - Redirect (Llo)                                    56

1          THE COURT:  Mr. Llorett?

2          MR. LLORETT:  Yes, Your Honor.

3                    REDIRECT EXAMINATION

4     BY MR. LLORETT:

5     Q    Ma'am, just a few questions.  If -- and Mr. Warren asked

6     you about somebody else getting on the deed after settlement,

7     do you remember that?

8     A    His question, yes --

9     Q    His question --

10    A    -- I remember.

11    Q    Okay.  My question to you is if someone gets put on the

12    deed after the settlement without the consent of the bank,

13    isn't that a loan violation?

14    A    Yes, it is.

15    Q    Okay.  And the second thing is, I just wanted to take a

16    look at your file here and I see in there what's called an

17    affidavit of title to mortgage property?

18    A    Yes.

19    Q    Just looking at the second page to that document, is that

20    an original signature?

21    A    Yes, it is.

22    Q    Now, whose signature is that?

23    A    Asya Richardson.

24    Q    And who is it witnessed by?

25    A    Myself.

Brodbeck - Redirect (Llo)                                              57

1    Q    And is that your original signature?

2    A    Yes, it is.

3    Q    So this is the pen and ink actual version, correct?

4    A    Yes, it is.

5    Q    All right.  And did, in fact, Asya Richardson -- did, in

6    fact, you witness Asya Richardson signing that document that

7    day, July 29th, 2005?

8    A    Yes.

9    Q    And the rest of those documents?

10            MR. SMITH:  Objection, Your Honor.  She -- she

11   already she has so specific recollection of the settlement,

12   Your Honor.

13            THE WITNESS:  I have notarized the document.

14   BY MR. LLORETT:

15   Q    Did you notarize the affidavit of title?

16   A    Yes, I did.

17   Q    Is that a settlement document?

18   A    Yes, it is.

19   Q    Did that take place at the time of settlement?

20   A    Yes, it did.

21   Q    And that's Asya Richardson's signature?

22   A    Yes, it is.

23   Q    And you're notarizing that it's signed and sworn to before

24   you on that -- that time and date?

25   A    That is correct.

1    Q    Thank you.

2               MR. LLORETT:  Nothing further, Your Honor.

3               MR. WARREN:  Nothing, Judge, thank you.

4               THE COURT:  Nothing further?

5               MR. SMITH:  No, I have no further questions.

6               THE COURT:  You may step down.

7               THE WITNESS:  Thank you.

8               (Witness leaves the witness stand.)

9               MR. BRESNICK:  Your Honor, the Government calls

10   Special Agent John Bowman back to the stand but before we do

11   that, we have some binders to pass out to the jury.

12              THE COURT:  All right.

13              (Pause in proceedings.)

14              THE COURT:  All right, Agent Bowman, you are still

15   under oath.  Do you understand that?

16              THE WITNESS:  Yes, Your Honor.

17              JOHN BOWMAN, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN,

18   RECALLED

19              THE COURT:  All right.  Mr. Bresnick?

20              MR. BRESNICK:  Thank you, Your Honor.

21                        DIRECT EXAMINATION

22   BY MR. BRESNICK:

23   Q    Good morning, sir.

24   A    Good morning.

25   Q    Sir, do you know if there came a time when Thais Thompson

1    testified before the Federal Grand Jury investigating this

2    matter?

3    A    Yes.  It was June 7th, 2006.

4              MR. BRESNICK:  May I approach, Your Honor?

5              THE COURT:  Yes.

6    BY MR. BRESNICK:

7    Q    I'm handing you Government's Exhibit 600.  Can you

8    identify what that is?

9    A    Yes.  This is the Grand Jury -- transcript of the Grand

10   Jury testimony of Thais Thompson.

11   Q    All right.

12             MR. BRESNICK:  Your Honor, I move for the admission

13   of Government Exhibit 600.

14             THE COURT:  Any objection?

15             MR. HETZNECKER:  No objection.

16             THE COURT:  It may be admitted.

17   BY MR. BRESNICK:

18   Q    And, Agent, in the book before you, do you have Book 2 up

19   there?

20   A    I don't believe so.

21             THE COURT:  Here.  Agent, here, I have the --

22             THE WITNESS:  Thank you, Your Honor.

23   BY MR. BRESNICK:

24   Q    In Tabs 170 through 182, are those selections from the

25   testimony of Ms. Thompson that was included in Government's

Bowman - Direct (Bre)                                      60

1    Exhibit 600?

2    A    Yes.

3    Q    And Tab 70 (sic) would be Government's Exhibit 600-1, Tab

4    171 is 600-2 and that goes all the way through 600-13, is that

5    correct, sir?

6    A    Yes.

7              MR. BRESNICK:  Your Honor, I move for the admission

8    of Government's Exhibits 600-1 through 600-13.

9              THE COURT:  It may be admitted.

10              MR. HETZNECKER:  No objection.

11              MR. BRESNICK:  Very well.  And, Your Honor, at this

12    time -- Your Honor --

13              JURY FOREPERSON:  We all have wrong binders.

14              THE COURT:  You have the wrong -- counsel, will you

15    check and see whether they have the right binders?

16              (Pause in proceedings.)

17              MR. BRESNICK:  Could Your Honor inquire if

18    everyone's got the right one?

19              THE COURT:  Ladies and gentlemen, take a look at

20    your binders.  Does each of you have the binders that contain

21    the Tabs 170 through 182?  If you do not, raise your hand,

22    please.

23              Okay, I think we're ready.

24              MR. BRESNICK:  Thank you, Your Honor.

25    BY MR. BRESNICK:

1    Q    Sir, do you know --

2              MR. HETZNECKER:  Your Honor, may I have a moment

3    with counsel before we begin?

4              THE COURT:  Yes, indeed.

5              (Discussion off the record.)

6              MR. HETZNECKER:  May we see Your Honor at sidebar

7    please?

8              (Sidebar discussion as follows:)

9              MR. BRESNICK:  Your Honor, there's one tab that Your

10   Honor had excluded certain portions --

11             MR. HETZNECKER:  And they're reading the tabs right

12   now.

13             MR. BRESNICK:  Well --

14             (Pause in sidebar discussion.)

15             THE COURT:  Ladies and gentlemen, do not look at the

16   binders until we tell you to, okay?

17             (Sidebar discussion continued.)

18             MR. BRESNICK:  Pardon me, Your Honor.  It's Tab 180,

19   Judge, Government's Exhibit 600-11.  When I got to that part

20   of the testimony, I was going to ask you to instruct the jury

21   to close the book and I was just going to have them --

22             THE COURT:  Well, I think that's a dangerous

23   situation, counsel.

24             MR. BRESNICK:  Do you want to just take that out?

25             THE COURT:  I think maybe we -- we're going to have

1    to take a five minute break and --

2              MR. BRESNICK:  I'm sorry, Your Honor.

3              THE COURT:  That's okay.

4              MR. BRESNICK:  Thank you.

5              THE COURT:  All right.

6              MR. HETZNECKER:  Thank you, Judge.

7              (Sidebar discussion concluded.)

8              THE COURT:  Okay, ladies and gentlemen, we're going

9    to take a five minute break.  Leave the booklets on the chair.

10   We'll bring you back in five minutes.

11             (Jury leaves the courtroom, 10:28 a.m.)

12             (Recess taken, 10:29 a.m. until 10:39 a.m.)

13             COURTROOM DEPUTY:  Please be seated.

14             THE COURT:  Okay, ladies and gentlemen, I think we

15   are ready to proceed.

16             MR. BRESNICK:  Your Honor, I would call to the stand

17   Special Agent Horay to read the answers to the Grand Jury

18   Testimony provided by Ms. Thompson.  I'll read the questions

19   and Ms. Horay will read the answers.

20             MR. HETZNECKER:  Your Honor, may I reserve the right

21   to call or to cross Agent John Bowman since he was called to

22   the stand initially?

23             THE COURT:  Yes, indeed.

24             MR. BRESNICK:  And, in fact, Your Honor, I'm going

25   to call him back to the stand once we're done with the

1      testimony.

2              MR. HETZNECKER:  That's fine.

3              THE COURT:  Ladies and gentlemen, you have the

4      transcripts.  Mr. Bresnick is going to ask the questions and

5      the Agent will give the answers and you have the transcripts

6      that you can follow along, okay?

7              MR. BRESNICK:  Thank you, Your Honor.

8              Your Honor, I'll start at Tab 170, Government's

9      Exhibit 600-1.  This is pages -- page two, line nine through

10     page ten, line eight, of the complete transcript of

11     Government's 600.

12             Good morning, Ms. Horay.

13             MS. HORAY:  Good morning.

14             THE COURT:  All right, I'm going to read the

15     questions provided in the transcripts and you just read the

16     answers provided.  Is that -- do you understand that?

17             MS. HORAY:  Yes.

18             MR. BRESNICK:  All right.

19             (Mr. Bresnick reads from transcript.)

20             MR. BRESNICK:  "Question:  Good morning, ma'am."

21             MS. HORAY:  "Good morning."

22             MR. BRESNICK:  "Question:  Could you please state

23     your name and spell it for the Court reporter?"

24             MS. HORAY:  "Thais, T-H-A-I-S as in Sam, middle

25     initial Y, last name Thompson."

1          MR. BRESNICK:  And there's a line under that, ma'am.

2          MS. HORAY:  "T-H-O-M-P-S-O-N."

3          MR. BRESNICK:  "Question:  All right.  Good morning,

4    Ms. Thompson.  You understand because you are a Grand Jury

5    witness here in a criminal proceeding -- Criminal Grand Jury

6    -- that you have taken an oath to tell the truth as to

7    everything you say here?"

8          MS. HORAY:  "Yes."

9          MR. BRESNICK:  "Question:  You understand that?  Do

10   you understand that if you don't tell the truth as to

11   everything you say that you could be prosecuted for perjury?"

12         MS. HORAY:  "Yes."

13         MR. BRESNICK:  "Question:  You understand perjury is

14   a separate Federal offense?"

15         MS. HORAY:  "Yes, I do."

16         MR. BRESNICK:  "Question:  All right.  You also

17   understand that you have a right to have an attorney here with

18   you today, is that correct?"

19         MS. HORAY:  "Yes."

20         MR. BRESNICK:  "Question:  And although your

21   attorney cannot be with you in the Grand Jury room while you

22   testify, he can wait outside and you can take a reasonable

23   break so as to ask him any question if it's necessary, do you

24   understand that?"

25         MS. HORAY:  "Yes."

1       MR. BRESNICK:  "Question:  In fact, you do have an

2   attorney with you today, is that right?"

3       MS. HORAY:  "Yes, I do."

4       MR. BRESNICK:  "Question:  What is his name?"

5       MS. HORAY:  "Rodney Ray."

6       MR. BRESNICK:  "Question:  Is his last name spelled

7   R-E-Y?"

8       MS. HORAY:  "R-A-Y."

9       MR. BRESNICK:  "Question:  R-A-Y.  And he is right

10  outside right now?"

11      MS. HORAY:  "Yes, he is."

12      MR. BRESNICK:  "Question:  All right.  You also

13  understand that you have a fifth amendment privilege not to

14  answer any question that I ask you if the truthful answer to

15  that question may tend to incriminate you" --

16      MS. HORAY:  "Yes."

17      MR. BRESNICK:  -- "do you understand that?"

18      MS. HORAY:  "Yes."

19      MR. BRESNICK:  "Question:  Do you understand that

20  anything that you do say here today could be used against you

21  in another proceeding, whether it be this Grand Jury or some

22  other Court?"

23      MS. HORAY:  "Yes."

24      MR. BRESNICK:  "Question:  All right, ma'am.  Could

25  you please tell the Grand Jury where you live?"

1          MS. HORAY:  "5 North Burden Hill Road, Salem, New

2     Jersey, 08079."

3          MR. BRESNICK:  "Question:  5 North Burden Hill

4     Road?"

5          MS. HORAY:  "Yes."

6          MR. BRESNICK:  "Question:  Which city is that in?"

7          MS. HORAY:  "Salem, New Jersey."

8          MR. BRESNICK:  "Question:  That's not in Quinton?"

9          MS. HORAY:  "No, it's Quinton Township.  My mailing

10    is technically Salem."

11         MR. BRESNICK:  "Question:  All right.  How long have

12    you lived there?"

13         MS. HORAY:  "Five years approximately."

14         MR. BRESNICK:  "Question:  Have you ever lived at

15    any other address during that time?"

16         MS. HORAY:  "Yes."

17         MR. BRESNICK:  "Question:  What other -- what other

18    addresses have you lived at?"

19         MS. HORAY:  "400 Alloway-Aldine Road, Elmer, New

20    Jersey."

21         MR. BRESNICK:  "Question:  Who lives there?"

22         MS. HORAY:  "My parents."

23         MR. BRESNICK:  "Question:  Who are they?"

24         MS. HORAY:  "Hillis Thompson (phonetic), Jr., and

25    Linda Fletcher."

1          MR. BRESNICK:   "Question:   Is -- are they both your

2    birth parents?"

3          MS. HORAY:   "Yes."

4          MR. BRESNICK:   "Question:   Hillis is your natural

5    father?"

6          MS. HORAY:   "Yes, he is."

7          MR. BRESNICK:   "Question:   Linda is your mother?"

8          MS. HORAY:   "Yes, she is."

9          MR. BRESNICK:   "Question:   On what occasions have

10   you lived at that address?"

11         MS. HORAY:   "The majority of my life, prior to

12   living where I live now."

13         MR. BRESNICK:   "Question:   All right.   Prior to your

14   living at 5 North Burden Hill Road?"

15         MS. HORAY:   "Yes, and for about two years after

16   college I lived at 11B Crest Hill Terrace (phonetic) in Salem,

17   New Jersey."

18         MR. BRESNICK:   "Question:   All right.   From about

19   January 1, 2004, how often have you lived at 400 Alloway-

20   Aldine Road?"

21         MS. HORAY:   "I haven't."

22         MR. BRESNICK:   "Question:   You haven't at all?"

23         MS. HORAY:   "No."

24         MR. BRESNICK:   "Question:   Do you spend any time

25   there at all?"

1          MS. HORAY:  "Occasionally, yes."

2          MR. BRESNICK:  "Question:  You spend some nights

3     there?"

4          MS. HORAY:  "Occasionally, yes."

5          MR. BRESNICK:  "Question:  About how often a week

6     would you spend there?"

7          MS. HORAY:  "Maybe -- maybe every three weeks.  It's

8     not very often."

9          MR. BRESNICK:  "Question:  All right.  One night

10    every three weeks, is that what you said?"

11         MS. HORAY:  "Yes."

12         MR. BRESNICK:  "Question:  Since August 10, 2005,

13    how often have you spent there?"

14         MS. HORAY:  "No more than maybe half the day.  Most

15    of the time I'm at my home."

16         MR. BRESNICK:  "Question:  At your home at 5 North

17    Burden Hill Road?"

18         MS. HORAY:  "Yes."

19         MR. BRESNICK:  "Question:  All right.  Whose home is

20    that?  Who owns that home?"

21         MS. HORAY:  "My mother owns the home, Linda

22    Fletcher."

23         MR. BRESNICK:  "Question:  Do you know when she --

24    when -- did she buy it?"

25         MS. HORAY:  "Yes, she did."

1          MR. BRESNICK:   "Question:   When was that?"

2          MS. HORAY:   "That was in 2000.   My son was born in

3    2000 so the home was actually being built prior to that, which

4    was '99 and I moved in 2002."

5          MR. BRESNICK:   "Question:   So the home was built for

6    your mother, is that right?"

7          MS. HORAY:   "Yes, it was."

8          MR. BRESNICK:   "Question:   So no one else lived at

9    that address other than you and anyone you might have lived

10   with?"

11         MS. HORAY:   "Yes."

12         MR. BRESNICK:   "Question:   Did she buy the house for

13   you?"

14         MS. HORAY:   "She bought it for her own interest but

15   being as though I was on my second child, I was the one who

16   lived there."

17         MR. BRESNICK:   "Question:   Do you know how much she

18   paid for it?"

19         MS. HORAY:   "Not right off hand.   I do not

20   remember."

21         MR. BRESNICK:   "Question:   Have you ever talked to

22   her about how much it cost?"

23         MS. HORAY:   "Probably -- probably about 150,000."

24         MR. BRESNICK:   "Question:   Did she pay for it

25   outright or mortgage?"

1          MS. HORAY:  "Mortgage."

2          MR. BRESNICK:  "Question:  Who's paying the

3    mortgage?"

4          MS. HORAY:  "She is."

5          MR. BRESNICK:  "Question:  Do you know how much she

6    pays in mortgage?"

7          MS. HORAY:  "Right now, no, I don't."

8          MR. BRESNICK:  "Question:  Do you know what bank she

9    is paying?"

10          MS. HORAY:  "No, I don't.  She refinanced so I'm not

11   sure."

12          MR. BRESNICK:  "Question:  Do the bills go to your

13   address or to hers?"

14          MS. HORAY:  "It comes to my address."

15          MR. BRESNICK:  "Question:  In Linda's name?"

16          MS. HORAY:  "Yes."

17          MR. BRESNICK:  "Question:  All right.  What do you

18   do with the bill once you get it?"

19          MS. HORAY:  "I give it to her."

20          MR. BRESNICK:  "Question:  What's the bill for?  Do

21   you recall?"

22          MS. HORAY:  "Mortgage."

23          MR. BRESNICK:  "Question:  No, how much money?"

24          MS. HORAY:  "I'm not sure."

25          MR. BRESNICK:  "Question:  Did you ever open the

1    bill or do you just give it to -- to your mother?"

2          MS. HORAY:  "Yeah, I do not open up other people's

3    mail.  I give it directly to her."

4          MR. BRESNICK:  "Question:  Have you ever paid any

5    mortgage payments or anything towards that house since you

6    lived there?"

7          MS. HORAY:  "I get monthly -- I'll give her money,

8    you know, towards the mortgage but I don't pay the whole

9    mortgage myself."

10          MR. BRESNICK:  "Question:  How much money do you

11    give your mother?"

12          MS. HORAY:  "500."

13          MR. BRESNICK:  "Question:  Is that -- has that been

14    steady, $500 every month?"

15          MS. HORAY:  "Prior to my being out of work, yes."

16          MR. BRESNICK:  "Question:  All right.  When did you

17    become out of work?"

18          MS. HORAY:  "October 6th."

19          MR. BRESNICK:  "Question:  Of what year?"

20          MS. HORAY:  "Of 2005."

21          MR. BRESNICK:  "Question:  So before October 6th,

22    2005, going back to the date that you first moved in, were you

23    paying your mother $500 a month for the mortgage?"

24          MS. HORAY:  "Yes."

25          MR. BRESNICK:  "Question:  Did anybody else pay your

1    mother any money for the mortgage?"

2            MS. HORAY:  "No."

3            MR. BRESNICK:  "Question:  So the only money that to

4    your knowledge that your mother was being helped out on for

5    the mortgage came from you?"

6            MS. HORAY:  "Yes."

7            (Reading of Tab 170 concluded.)

8            MR. BRESNICK:  If we could turn now to Tab 171,

9    Government's Exhibit 600-2, and this, Your Honor, is pages 31,

10   line five, to page 31, line ten, of the complete transcript in

11   Government 600.

12           Do you have the complete transcript in front of you,

13   ma'am --

14           MS. HORAY:  Mine is --

15           MR. BRESNICK:  -- Government's 600?

16           MS. HORAY:  Oh.  Yes.

17           MR. BRESNICK:  Could you turn to page 12, please?

18   And, Your Honor, this is not in the books that have been

19   provided to the jury.

20           THE COURT:  Yes.

21           MS. HORAY:  Okay.

22           MR. BRESNICK:  What line were we starting at, Paul?

23           MR. HETZNECKER:  14.

24           MR. BRESNICK:  14?  Could you look at line 14,

25   please --

 1          MS. HORAY:  Okay.

 2          MR. BRESNICK:  -- and I'm going to start reading the

 3  question and answer.  We're going to go from 14 to 24.  Page

 4  12, line 14.

 5              (Mr. Bresnick reads from transcript.)

 6          MR. BRESNICK:  "Question:  Who were you receiving

 7  those payments from?"

 8          MS. HORAY:  "Mr. Morris -- James Morris."

 9          MR. BRESNICK:  "Question:  James Morris was making

10  child support?"

11          MS. HORAY:  "Yes."

12          MR. BRESNICK:  "Question:  Do you have a child

13  together?"

14          MS. HORAY:  "We have two and one on the way."

15          MR. BRESNICK:  "Question:  You're pregnant now?"

16          MS. HORAY:  "Yes, I am."

17          MR. BRESNICK:  "Question:  Is that with him as

18  well?"

19          MS. HORAY:  "Yes."

20          MR. BRESNICK:  And if we can turn back to the

21  binders, Your Honor, and that's Tab 171, Government's Exhibit

22  600-2 I believe I stated.  Do you have that in front of you,

23  Agent Horay?

24          MS. HORAY:  I do.

25              (Mr. Bresnick reads from transcript.)

1              MR. BRESNICK:  "Question:  All right, ma'am, also on

2      August 10th, 2005, are you aware that agents recovered

3      $559,396 in cash from your house?"

4              MS. HORAY:  "Yes."

5              MR. BRESNICK:  "Question:  You are aware of that?"

6              MS. HORAY:  "Yes."

7              MR. BRESNICK:  "Question:  When did you become aware

8      of that?"

9              MS. HORAY:  "Well, the actual amount, they never

10     gave me a money receipt for it.  I did know it, that they

11     recovered cash money from my home, yes."

12             MR. BRESNICK:  "Question:  Was that your money?"

13             MS. HORAY:  "Yes."

14             MR. BRESNICK:  "Question:  All $559,000 in cash?"

15             MS. HORAY:  "Belonging to my family."

16             MR. BRESNICK:  "Question:  Who gave you that money?"

17             MS. HORAY:  "A lot of it was recovered from when my

18     grandfather died."

19             MR. BRESNICK:  "Question:  All right.  What's the

20     name of your grandfather?"

21             MS. HORAY:  "John Fletcher."

22             MR. BRESNICK:  "Question:  When did he die?"

23             MS. HORAY:  "February 24th, 2004.  It's been two

24     years."

25             MR. BRESNICK:  "Question:  All right.  So you're

1    saying that when your grandfather died he left a large amount

2    of money to your family, is that right?"

3            MS. HORAY:  "He left a large amount of money and

4    told me where to get it."

5            MR. BRESNICK:  "Question:  He left it -- are you

6    named in his will, is that what you're saying?"

7            MS. HORAY:  He doesn't have a will.  He never used a

8    bank."

9            MR. BRESNICK:  "Question:  How did you -- how -- how

10   was this money passed on to you?"

11           MS. HORAY:  "He told me where to recover it from."

12           MR. BRESNICK:  "Question:  Oh, before he died?"

13           MS. HORAY:  "Yes."

14           MR. BRESNICK:  "Question:  He said -- he said when I

15   die, I've got a large amount of money, I want you to have it?

16   Is that what he said?"

17           MS. HORAY:  They were specific instructions of where

18   to get this money from.

19           MR. BRESNICK:  "Question:  Who gave you those

20   instructions?"

21           MS. HORAY:  "John Fletcher, my grandfather."

22           MR. BRESNICK:  "Question:  When did he give you the

23   instructions?"

24           MS. HORAY:  "February 1st, 2004."

25           MR. BRESNICK:  "Question:  Why do you remember that

1    specific date?"

2          MS. HORAY:  "I was his caretaker prior to him

3    dying."

4          MR. BRESNICK:  "Question:  All right.  So why does

5    that date, February 1st, 2004 stick out in your mind?"

6          MS. HORAY:  "It was only a couple of weeks prior to

7    him dying."

8          MR. BRESNICK:  "Question:  So you were caring for

9    him?  Where were you caring for him?"

10          MS. HORAY:  "At his home in Salem, New Jersey."

11          MR. BRESNICK:  "Question:  Where he lived?"

12          MS. HORAY:  "333 East Broadway is where he lived --

13    where he did live."

14          MR. BRESNICK:  "Question:  So at the time, you were

15    caring for him at 333 East Broadway?"

16          MS. HORAY:  "Yes."

17          MR. BRESNICK:  "Question:  On February 1st, 2004 he

18    gave you instructions as to where to recover a large amount of

19    money when he died?"

20          MS. HORAY:  "Yes."

21          MR. BRESNICK:  "Question:  Did he tell you how much

22    money he was going to leave you?"

23          MS. HORAY:  "No, he did not."

24          MR. BRESNICK:  "Question:  What did he tell you?"

25          MS. HORAY:  "He just told me that there was money

1    for me to take care of my grandmother and to make sure that

2    she's taken care of."

3              MR. BRESNICK:  "Question:  What else did he say?"

4              MS. HORAY:  "That was it."

5              MR. BRESNICK:  "Question:  Did he tell you where to

6    recover the money?"

7              MS. HORAY:  "Not exactly."

8              MR. BRESNICK:  "Question:  What else did he say?"

9              MS. HORAY:  "He just left me different areas to

10   look."

11             MR. BRESNICK:  "Question:  Was it a scavenger hunt?"

12             MS. HORAY:  "No.  It wasn't a scavenger hunt."

13             MR. BRESNICK:  "Question:  How did you know where to

14   find the money?"

15             MS. HORAY:  "Him and I had a relationship where I

16   pretty much knew him that well and he knew me that well."

17             MR. BRESNICK:  "Question:  All right.  Well, let me

18   ask you this.  Where did you recover that money?"

19             MS. HORAY:  "From his home."

20             MR. BRESNICK:  "Question:  Where?"

21             MS. HORAY:  "In his attic."

22             MR. BRESNICK:  "Question:  Where in the attic was

23   it?"

24             MS. HORAY:  "In the corner."

25             MR. BRESNICK:  "Question:  It was in the corner in

 1    the attic?"

 2              MS. HORAY:  "In an old box."

 3              MR. BRESNICK:  "Question:  What kind of box?

 4              MS. HORAY:  "A cardboard box."

 5              MR. BRESNICK:  "Question:  A cardboard box.  Was it

 6    a shoe box?"

 7              MS. HORAY:  "No, it was not a shoe box."

 8              MR. BRESNICK:  "Question:  Was it like a banker's

 9    box?"

10              MS. HORAY:  "A cardboard box, probably like the size

11    that a small air conditioner come in."

12              MR. BRESNICK:  "Question:  All right.  Was it taped

13    up or was it -- did it have a lock on it of any kind?"

14              MS. HORAY:  "No."

15              MR. BRESNICK:  "Question:  So you're saying after he

16    died.  When after he died did you go to the attic to find this

17    money?"

18              MS. HORAY:  "Probably a few months later."

19              MR. BRESNICK:  "Question:  You waited a few months

20    to recover this money?"

21              MS. HORAY:  "Yes."

22              MR. BRESNICK:  "Question:  Why did you wait so

23    long?"

24              MS. HORAY:  "What was the point of me going to get

25    it then?"

1          MR. BRESNICK:  "Question:  Well, $559,000 is a lot

2     of money."

3          MS. HORAY:  "At that time I didn't know what was

4     there."

5          MR. BRESNICK:  "Question:  Well, what did he tell

6     you when he said he was going to leave you a lot of money?"

7          MS. HORAY:  "He didn't specifically leave it for me.

8     It was to help my family, specifically, my grandmother."

9          MR. BRESNICK:  "Question:  So why did you wait three

10    months?"

11         MS. HORAY:  "She had the insurance money.  It wasn't

12    needed at the time."

13         MR. BRESNICK:  "Question:  So when was it needed?"

14         MS. HORAY:  "It wasn't needed.  The Government took

15    it so evidently it wasn't needed."

16         MR. BRESNICK:  "Question:  Well no, ultimately you

17    recovered the money because you said you didn't take it

18    earlier because your grandmother didn't need the money,

19    right?"

20         MS. HORAY:  "Yes."

21         MR. BRESNICK:  "Question:  All right.  So ultimately

22    you got the money, right?"

23         MS. HORAY:  "Yeah, right."

24         MR. BRESNICK:  "Question:  All right.  Why did you

25    get the money then?"

1              MS. HORAY:  "To move it."

2              MR. BRESNICK:  "Question:  Why did you move it?"

3              MS. HORAY:  "Because I wanted to know where it was

4     at at all times."

5              MR. BRESNICK:  "Question:  Well, I don't understand.

6     Before you didn't even know where it was, right?"

7              MS. HORAY:  "As I said, he left me specific

8     instructions.  We know -- we know each other as well -- so

9     well as to where to recover it from."

10             MR. BRESNICK:  Agent, could you read that answer

11    again, please?

12             MS. HORAY:  Yes.

13             "As I said, he left me specifics because we know

14    each other so well as to where to recover it from."

15             MR. BRESNICK:  "Question:  Well, ma'am, you say he

16    left you specifics but you haven't provided any specifics to

17    the Grand Jury today.  What specifics did he tell you?"

18             MS. HORAY:  "I can't give you the specifics because

19    it's been over the years and being as though we knew each

20    other like we knew each other, I knew exactly where to get

21    it."

22             MR. BRESNICK:  "Question:  Well, these weren't

23    telepathic instructions, were they?"

24             MS. HORAY:  "No, they were by mouth."

25             MR. BRESNICK:  "Question:  All right.  So what did

1   he say?"

2        MS. HORAY:   "To make sure I take care of my

3   grandmother.   That's what he said."

4        MR. BRESNICK:   "Question:   He said I'm leaving you a

5   lot of money so you can take care of your grandmother?"

6        MS. HORAY:   "He didn't say a lot."

7        MR. BRESNICK:   "Question:   What did he say?"

8        MS. HORAY:   "He -- he said I'm leaving some money."

9        MR. BRESNICK:   "Question:   He said 'some money?'"

10        MS. HORAY:   "Some money. Make sure your

11   grandmother's taken care of."

12        MR. BRESNICK:   "Question:   All right.   Then you

13   waited three months to get that money to take care of your

14   grandmother?"

15        MS. HORAY:   "Yeah, because I did have a job and a

16   family."

17        MR. BRESNICK:   "Question:   Well how long did it take

18   you to recover the money when you ultimately recovered it?"

19        MS. HORAY:   "Maybe a day."

20        MR. BRESNICK:   "Question:   It took you a day to go

21   to the attic?"

22        MS. HORAY:   "To go through the boxes there, yes."

23        MR. BRESNICK:   "Question:   Oh, there were a lot of

24   boxes there?"

25        MS. HORAY:   "Yes."

1      MR. BRESNICK:  "Question:  Well you said this was in

2  the corner?"

3      MS. HORAY:  "The box I found was in the corner, but

4  yes, there were other boxes in the attic."

5      MR. BRESNICK:  "Question:  All right.  But he didn't

6  tell you the box was in the corner?"

7      MS. HORAY:  "No, he didn't."

8      MR. BRESNICK:  "Question:  You think that would be a

9  specific instruction, wouldn't you?"

10     MS. HORAY:  "I knew exactly where to go.  I went to

11 the attic."

12     MR. BRESNICK:  "Question:  All right.  Then when you

13 were in the attic, what did you do there?"

14     MS. HORAY:  "Went through boxes."

15     MR. BRESNICK:  "Question:  All right.  But you

16 didn't know where in the attic it was?"

17     MS. HORAY:  "No."

18     MR. BRESNICK:  "Question:  You finally came across

19 this box with half-a-million dollars?"

20     MS. HORAY:  "I didn't know that it was that -- I

21 didn't know that it was at that time, not until I actually

22 counted it."

23     MR. BRESNICK:  "Question:  All right.  Then you

24 finally got the box?"

25     MS. HORAY:  "And it was not a half-a-million dollars

1      because I did not give you a specific amount."

2                  (Reading of Tab 171 concluded.)

3                  MR. BRESNICK:  All right.  And if we could turn to

4      Tab 172.

5                  MR. HETZNECKER:  Your Honor, before we do that may I

6      have a moment with counsel?

7                  (Discussion off the record.)

8                  MR. HETZNECKER:  Thank you, Your Honor.

9                  MR. BRESNICK:  Tab 172, Your Honor, is Government's

10     Exhibit 600-3.  It's page 39, line 20, to page 41, line 25

11     from the complete transcript of Government's 600.

12                 Agent Horay, do you have Tab 172?

13                 MS. HORAY:  Yes, I do.

14                 (Mr. Bresnick reads from transcript.)

15                 MR. BRESNICK:  "Question:  Well then the money you

16     got and brought it back to your house, is that right?"

17                 MS. HORAY:  "Yes."

18                 MR. BRESNICK:  Actually it's, "Well then you got the

19     money and brought it back to your house, is that right?"

20                 MS. HORAY:  "Yes."

21                 MR. BRESNICK:  "Question:  What did you do with the

22     money when you brought it back?"

23                 MS. HORAY:  "Put it in my house."

24                 MR. BRESNICK:  "Question:  Where?"

25                 MS. HORAY:  "Different locations."

1          MR. BRESNICK:  "Question:  Did you have a bank

2    account?"

3          MS. HORAY:  "No, I did not.  My grandfather did not

4    trust banks and that's the way I left things."

5          MR. BRESNICK:  "Question:  But -- but did you have a

6    bank account?"

7          MS. HORAY:  "Yes, I did."

8          MR. BRESNICK:  "Question:  All right.  So why didn't

9    you deposit the money into your bank account?"

10         MS. HORAY:  "It wasn't mine to deposit."

11         MR. BRESNICK:  "Question:  Well, it was entrusted to

12   you to take care of your grandmother, right?"

13         MS. HORAY:  "Exactly."

14         MR. BRESNICK:  "Question:  All right.  So I guess

15   now it's yours, it's not your grandfather's, is it?"

16         MS. HORAY:  "It was left with a specific instruction

17   to take care of my grandmother."

18         MR. BRESNICK:  "Question:  Right.  So it's in your

19   care."

20         MS. HORAY:  "He never trusted a bank and I left it

21   at that."

22         MR. BRESNICK:  "Question:  All right."

23         MS. HORAY:  "That was one of his last wishes so

24   that's how I left it."

25         MR. BRESNICK:  "Question:  Oh, that was part of the

1    instructions too, that you not deposit the money in a bank?"

2             MS. HORAY:  "My grandfather never trusted banks and

3    that is what he always told me my entire life."

4             MR. BRESNICK:  "Question:  But you have a bank

5    account."

6             MS. HORAY:  "I have a bank account.  Of course,

7    yes."

8             MR. BRESNICK:  "Question:  You have your money in

9    your bank account?"

10            MS. HORAY:  "I have some money in my bank account."

11            MR. BRESNICK:  "Question:  So you trust banks?"

12            MS. HORAY:  "Enough to have my check deposited into

13   the bank and to pay my bills off, yes."

14            MR. BRESNICK:  "Question:  But you keep cash, large

15   sums of cash, outside the bank?"

16            MS. HORAY:  "If I have large sums of cash at times,

17   I don't have to put it in the bank.  There's no law stating I

18   have to put money in the bank."

19            MR. BRESNICK:  "Question:  All right.  So, by the

20   way, how was the cash when you found it in the box?  How --

21   how did you find it?"

22            MS. HORAY:  "In piles."

23            MR. BRESNICK:  "Question:  In piles?"

24            MS. HORAY:  "Yes."

25            MR. BRESNICK:  "Question:  Was it rubber-banded?"

1          MS. HORAY:  "Yes, it was.  My grandfather never used

2     a wallet.  He always used rubber bands."

3          (Reading of Tab 172 concluded.)

4          MR. BRESNICK:  Could you please turn now to Tab 173,

5     Government's Exhibit 600-4 and this is page 43, line six to

6     page 54, line ten of the complete transcript.

7          MR. HARMELIN:  Excuse me, counselor, which tab?

8          MR. BRESNICK:  173.

9          MR. HARMELIN:  Oh.  I don't have anything there.

10          (Pause in proceedings.)

11          MR. BRESNICK:  Are you all right now, Mr. Harmelin?

12          MR. HARMELIN:  Yes.  Thank you.

13          MR. BRESNICK:  Certainly.

14          THE COURT:  Go ahead, Mr. Bresnick.

15          MR. BRESNICK:  Thank you, Your Honor.

16          All right, ma'am, at the top of Tab 173.

17          (Mr. Bresnick reads from transcript.)

18          MR. BRESNICK:  "Question:  So when you brought it

19     back to your house, did you count the money?"

20          MS. HORAY:  "Yes, I did."

21          MR. BRESNICK:  "Question:  All right.  You didn't

22     count it in the attic?"

23          MS. HORAY:  "No, I did not."

24          MR. BRESNICK:  "Question:  All right.  How did you

25     count the money?"

1              MS. HORAY:   "With a money counter."

2              MR. BRESNICK:   "Question:   You got a money counter?"

3              MS. HORAY:   "I had a money counter."

4              MR. BRESNICK:   "Question:   You had a money counter?

5      Why did you have a money counter?"

6              MS. HORAY:   "Because it was more than I planned on

7      counting."

8              MR. BRESNICK:   "Question:   Well, so after you got

9      the money from your grandfather's attic, it was just a lot of

10     money and you didn't want to count it by hand so you bought a

11     money counter?"

12             MS. HORAY:   "Yes."

13             MR. BRESNICK:   "Question:   Where did you buy it?"

14             MS. HORAY:   "Staples."

15             MR. BRESNICK:   "Question:   How much did you pay for

16     it?"

17             MS. HORAY:   "I don't remember."

18             MR. BRESNICK:   "Question:   Approximately."

19             MS. HORAY:   "I don't remember approximately."

20             MR. BRESNICK:   "Question:   Give -- give me a guess.

21     $10?"

22             MS. HORAY:   "It was more than $10, and no, I do not

23     remember the approximate amount."

24             MR. BRESNICK:   "Question:   Well, if it was more than

25     $10, was it more than $100?"

1          MS. HORAY:  "I just stated I do not remember."

2          MR. BRESNICK:  "Question:  Well, was it more than

3     $20?"

4          MS. HORAY:  "I do not remember."

5          MR. BRESNICK:  "Question:  But you remember it was

6     more than $10?"

7          MS. HORAY:  "I remember that."

8          MR. BRESNICK:  "Question:  You don't remember that

9     it was more than $20?"

10         MS. HORAY:  "I do not remember the exact amount."

11         MR. BRESNICK:  "Question:  Which Staples did you buy

12    it at?"

13         MS. HORAY:  "I don't remember which Staples.

14    There's about three or four in my area."

15         MR. BRESNICK:  "Question:  All right.  Where are

16    they?"

17         MS. HORAY:  "One in Cumberland County, one in two --

18    one in New -- two in New Castle County and one in Deptford."

19         MR. BRESNICK:  "Question:  Where you had shopped at

20    these before?"

21         MS. HORAY:  "Yes."

22         MR. BRESNICK:  "Question:  At all three of them?"

23         MS. HORAY:  "Yes."

24         MR. BRESNICK:  "Question:  All right.  So give me

25    the addresses if you have them."

 1          MS. HORAY:  "I don't know the exact address."

 2          MR. BRESNICK:  "Question:  Well, approximately what

 3   street are they on?"

 4          MS. HORAY:  "I don't know the approximate street

 5   that they're on."

 6          MR. BRESNICK:  "Question:  So you bought the money

 7   counter.  Was anyone with you when you bought the money

 8   counter?"

 9          MS. HORAY:  "No."

10          MR. BRESNICK:  "Question:  Where did you put the

11   money counter when you brought it back to your house?"

12          MS. HORAY:  "On the side of my couch."

13          MR. BRESNICK:  "Question:  That's where you counted

14   the money that your grandfather left you?"

15          MS. HORAY:  "Yes."

16          MR. BRESNICK:  "Question:  So obviously it was a

17   significant amount of money you're saying that your

18   grandfather left you because you needed a money counter to

19   count it?"

20          MS. HORAY:  "Yes."

21          MR. BRESNICK:  "Question:  All right.  Was anyone

22   with you in the home when you bought -- when you counted the

23   money?"

24          MS. HORAY:  "No."

25          MR. BRESNICK:  "Question:  You were by yourself?"

1          MS. HORAY:   "Yes."

2          MR. BRESNICK:  "Question:  Have you used a money

3    counter since?"

4          MS. HORAY:   "No."

5          MR. BRESNICK:  "Question:  Where did you put it

6    after you counted the money?"

7          MS. HORAY:   "On the side of my couch."

8          MR. BRESNICK:  "Question:  You left it on the side

9    of your couch?"

10         MS. HORAY:   "Yes."

11         MR. BRESNICK:  "Question:  All right.  Do you own a

12   firearm?"

13         MS. HORAY:  "I did.  I did."

14         MR. BRESNICK:   "Question:  What kind?  What kind of

15   gun?"

16         MS. HORAY:   "Nine millimeter Smith and Wesson."

17         MR. BRESNICK:  "Question:  All right.  Do you recall

18   the serial number?"

19         MS. HORAY:   "No, I do not."

20         MR. BRESNICK:  "Question:  Did you buy that gun?"

21         MS. HORAY:   "Yeah, I did."

22         MR. BRESNICK:  "Question:  Where did you buy it?"

23         MS. HORAY:   "Butchs Gun World in Vineland, New

24   Jersey.  It's all stated on the copy of my gun permit that was

25   given to the agents."

1    MR. BRESNICK:  "Question:  When did you buy this?"

2    MS. HORAY:  "I think in early 2000."

3    MR. BRESNICK:  "Question:  How much did it cost?"

4    MS. HORAY:  "Probably about $495."

5    MR. BRESNICK:  "Question:  Did you pay by cash or

6    check?"

7    MS. HORAY:  "By cash."

8    MR. BRESNICK:  "Question:  Was it your own money?"

9    MS. HORAY:  "Of course it was."

10    MR. BRESNICK:  "Question:  Did anyone go with you

11    when you went to buy the -- go by the gun?"

12    MS. HORAY:  "No."

13    MR. BRESNICK:  "Question:  Why did you buy a gun?"

14    MS. HORAY:  "For the protection of me and my

15    children."

16    MR. BRESNICK:  "Question:  Why did you need

17    protection?"

18    MS. HORAY:  "I'm a single mother.  People like to

19    take advantage of people when they see them single."

20    MR. BRESNICK:  "Question:  Have you ever had any

21    trouble?  Have you ever needed a gun?"

22    MS. HORAY:  "The neighborhood was getting bad."

23    MR. BRESNICK:  "Question:  The neighborhood at 5

24    North Burden Hill Road?"

25    MS. HORAY:  "The area itself."

1          MR. BRESNICK:  "Question:  Did you keep the gun

2     loaded?"

3          MS. HORAY:  "Yes."

4          MR. BRESNICK:  "Question:  What round of ammunition

5     was it?"

6          MS. HORAY:  "Nine millimeter."

7          MR. BRESNICK:  "Question:  Did you have any other

8     kind of caliber ammunition?"

9          MS. HORAY:  "In the gun?"

10          MR. BRESNICK:  "Question:  In the house."

11          MS. HORAY:  "I don't know.  Probably."

12          MR. BRESNICK:  "Question:  Yeah, why?"

13          MS. HORAY:  "Because my grandfather used to own

14     guns."

15          MR. BRESNICK:  "Question:  Oh, he did?  Did he keep

16     guns over at your place?"

17          MS. HORAY:  "No, but when I moved most of the stuff

18     out of the house, I just have everything in the house."

19          MR. BRESNICK:  "Question:  So you're saying that you

20     took stuff from your grandfather's house to your house?"

21          MS. HORAY:  "Yes."

22          MR. BRESNICK:  "Question:  You're saying along with

23     those might have been some other caliber ammunition?"

24          MS. HORAY:  "Yes."

25          MR. BRESNICK:  "Question:  All right.  Why would you

1    keep that?"

2            MS. HORAY:  "A lot of things I never got the time to

3    go through."

4            MR. BRESNICK:  "Question:  This was February, 2004,

5    is that right?"

6            MS. HORAY:  "Yes."

7            MR. BRESNICK:  "Question:  Your house was searched

8    in August of '05?"

9            MS. HORAY:  "Yes."

10           MR. BRESNICK:  "Question:  You didn't have the time

11   to go through your grandfather's stuff in that time?"

12           MS. HORAY:  "I did work."

13           MR. BRESNICK:  "Question:  I understand that."

14           MS. HORAY:  "I did have two kids.  My kids have

15   activities and I have activities myself."

16           MR. BRESNICK:  "Question:  So a year and a half went

17   by and you still didn't go through the stuff your -- you

18   brought from your grandfather's house?"

19           MS. HORAY:  "Not everything."

20           MR. BRESNICK:  "Question:  All right.  What type of

21   guns did your grandfather have?"

22           MS. HORAY:  "I don't remember.  They were old.

23   That's all I remember."

24           MR. BRESNICK:  "Question:  You don't know what

25   caliber?"

1          MS. HORAY:   "No."

2          MR. BRESNICK:   "Question:   Were they revolvers?"

3          MS. HORAY:   "No."

4          MR. BRESNICK:   "Question:   Did he show you the

5    guns?"

6          MS. HORAY:   "I had seen them.   He didn't show them.

7    I've actually seen them."

8          MR. BRESNICK:   "Question:   Where did you see them?"

9          MS. HORAY:   "In his home when he was alive."

10         MR. BRESNICK:   "Question:   Where in his home?"

11         MS. HORAY:   "In his bedroom."

12         MR. BRESNICK:   "Question:   How many guns did he

13   have?"

14         MS. HORAY:   "Two."

15         MR. BRESNICK:   "Question:   You don't know what types

16   they were?"

17         MS. HORAY:   "No."

18         MR. BRESNICK:   "Question:   Do you know what colors

19   they were?"

20         MS. HORAY:   "Black."

21         MR. BRESNICK:   "Question:   They were both black?"

22         MS. HORAY:   "Yes."

23         MR. BRESNICK:   "Question:   Did your grandfather --

24   was your grandmother alive with him?"

25         MS. HORAY:   "Yes."

1            MR. BRESNICK:  "Question:  Is she still alive?"

2            MS. HORAY:  "Yes, she is."

3            MR. BRESNICK:  "Question:  What's her name?"

4            MS. HORAY:  "Charlotte Fletcher."

5            MR. BRESNICK:  "Question:  Where is she living now?"

6            MS. HORAY:  "Same address, 333 East Broadway."

7            MR. BRESNICK:  "Question:  So you're saying your

8    grandfather kept guns in the bedroom?"

9            MS. HORAY:  "Yes."

10           MR. BRESNICK:  "Question:  So your grandmother would

11   have seen them, right?"

12           MS. HORAY:  "I doubt it."

13           MR. BRESNICK:  "Question:  Well, where did you see

14   the guns?"

15           MS. HORAY:  "In his armoire, where he kept his

16   clothes at."

17           MR. BRESNICK:  "Question: You went through his

18   drawers?"

19           MS. HORAY:  "Yes."

20           MR. BRESNICK:  "Question:  Why did you do" --

21           MS. HORAY:  "I was taking care of him."

22           MR. BRESNICK:  "Question:  All right.  So when you

23   went through his drawers you saw guns there, is that right?"

24           MS. HORAY:  "Yes."

25           MR. BRESNICK:  "Question:  You said two guns?"

1          MS. HORAY:  "Yes."

2          MR. BRESNICK:  "Question:  Or you had seen more?"

3          MS. HORAY:  "Two."

4          MR. BRESNICK:  "Question:  You didn't see more than

5    that?"

6          MS. HORAY:  "Two."

7          MR. BRESNICK:  "Question:  All right.  Now, also

8    recovered from your home, ma'am, were 113 loose rounds of nine

9    millimeter ammunition.  Were those yours as well?"

10         MS. HORAY:  "I'm sure."

11         MR. BRESNICK:  "Question:  Why did you need to carry

12   that many rounds of ammunition?"

13         MS. HORAY:  "Practice."

14         MR. BRESNICK:  "Question:  What do you mean?"

15         MS. HORAY:  "Firearm practice, practice shooting.

16   You have to have precision."

17         MR. BRESNICK:  "Question:  Where would you practice

18   shooting?"

19         MS. HORAY:  "Normally in the woods."

20         MR. BRESNICK:  "Question:  The woods near your

21   house?"

22         MS. HORAY:  "Yes."

23         MR. BRESNICK:  "Question:  All right.  So you --

24   your gun -- by -- by the way, when it was seized, had seven

25   live rounds in it at the time."

1            MS. HORAY:  "I know that."

2            MR. BRESNICK:  "Question:  You're saying you put

3    those rounds in the gun?"

4            MS. HORAY:  "I did."

5            MR. BRESNICK:  "Question:  All right.  You had an

6    additional 113 rounds as well?"

7            MS. HORAY:  "I'm sure."

8            MR. BRESNICK:  "Question:  Just for practice?"

9            MS. HORAY:  "Yes."

10            MR. BRESNICK:  "Question:  What do you shoot at when

11    you practice?"

12            MS. HORAY:  "Cans."

13            MR. BRESNICK:  "Question:  Who goes with you when

14    you practice?"

15            MS. HORAY:  "No one."

16            MR. BRESNICK:  "Question:  You go by yourself every

17    time you practice?"

18            MS. HORAY:  "Yes."

19            MR. BRESNICK:  "Question:  You've never been with

20    another person?"

21            MS. HORAY:  "No.

22            MR. BRESNICK:  "Question:  Actually, ma'am, one

23    other thing.  I noticed there was a digital scale also

24    recovered from your house?"

25            MS. HORAY:  "I had no recollection of a digital

1    scale of being at my home."

2              MR. BRESNICK:  "Question:  So that wasn't yours?"

3              MS. HORAY:  "I don't recall it being there."

4              MR. BRESNICK:  "Question:  Do you remember buying a

5    digital scale?"

6              MS. HORAY:  "Not right off hand, no."

7              MR. BRESNICK:  "Question:  How about now?"

8              MS. HORAY:  "If I just said right off hand no, my

9    answer's going to be the same, no."

10             MR. BRESNICK:  "Question:  Do you need additional

11   time to think about it?"

12             MS. HORAY:  "No, I do not."

13             MR. BRESNICK:  "Question:  Now, ma'am, what does

14   James Morris do for a living?"

15             MS. HORAY:  "As far as I know, he works through the

16   union."

17             MR. BRESNICK:  "Question:  What does he do for the

18   union?"

19             MS. HORAY:  "He's a laborer."

20             MR. BRESNICK:  "Question:  Where does he work?"

21             MS. HORAY:  "Wherever they send him."

22             MR. BRESNICK:  "Question:  What has he told you

23   about that?"

24             MS. HORAY:  "We really don't discuss our jobs.  I

25   wouldn't understand his and he wouldn't understand mine."

1            MR. BRESNICK:  "Question:  But you say he's a

2      laborer.  Do you know what union it was?"

3            MS. HORAY:  "I think a -- Local 199."

4            MR. BRESNICK:  "Question:  Local 199, based out of

5      New Jersey?"

6            MS. HORAY:  "Delaware."

7            MR. BRESNICK:  "Question:  Did he report to

8      anybody?"

9            MS. HORAY:  "I don't know."

10           MR. BRESNICK:  "Question:  To your knowledge, does

11     he own any -- any property?"

12           MS. HORAY:  "No."

13           MR. BRESNICK:  "Question:  Does he own any stocks?"

14           MS. HORAY:  "No."

15           MR. BRESNICK:  "Question:  Bonds?"

16           MS. HORAY:  "Not to my knowledge."

17           MR. BRESNICK:  "Question:  CDs?"

18           MS. HORAY:  "Not to my knowledge."

19           MR. BRESNICK:  "Question:  How about IRAs?"

20           MS. HORAY:  "Not to my knowledge."

21           MR. BRESNICK:  "Question:  Did he have any bank

22     accounts?"

23           MS. HORAY:  "I really don't know."

24           MR. BRESNICK:  "Question:  Have you ever seen him

25     write a check?"

1           MS. HORAY:  "No."

2           MR. BRESNICK:  "Question:  He's never given you a

3    check?"

4           MS. HORAY:  "Not a personal check, no."

5           MR. BRESNICK:  "Question:  How about a business

6    check?"

7           MS. HORAY:  "No.  Just my child support checks."

8           (Reading of Tab 173 concluded.)

9           MR. BRESNICK:  If you could turn now to Tab 174,

10   ma'am, it's Government's Exhibit 600-5.  And, Your Honor, this

11   is page 79, line five, to page 83, line six of the complete

12   transcript.

13           Are you at that tab, ma'am?

14           MS. HORAY:  I am.

15           (Mr. Bresnick reads from transcript.)

16           MR. BRESNICK:  "Question:  How about your

17   grandmother, where is she living now?"

18           MS. HORAY:  "The same place, 333 East Broadway."

19           MR. BRESNICK:  "Question:  Is she -- does she work?"

20           MS. HORAY:  "She's 81."

21           MR. BRESNICK:  "Question:  Well, did -- did she used

22   to work?"

23           MS. HORAY:  "It's been years.  Most of the time, she

24   was a housewife."

25           MR. BRESNICK:  "Question:  How -- how is she

1    surviving at the moment, money-wise?"

2            MS. HORAY:  "Social Security."

3            MR. BRESNICK:  "Question:  She's getting Social

4    Security?"

5            MS. HORAY:  "Yes."

6            MR. BRESNICK:  "Question:  How about the money that

7    your grandfather gave you to help her out?  Are you giving her

8    any of that?"

9            MS. HORAY:  "How can I give it to her when I no

10   longer have it?"

11           MR. BRESNICK:  "Question:  Well, did you give it to

12   her when you had it?"

13           MS. HORAY:  "Whatever she needed."

14           MR. BRESNICK:  "Question:  All right.  Well other

15   than that money that you used to give her, do you know of any

16   other money that she used to get?"

17           MS. HORAY:  "No."

18           MR. BRESNICK:  "Question:  Is anybody giving her

19   money now, other than her Social Security?"

20           MS. HORAY:  "She has Eight children -- no, she has

21   seven."

22           MR. BRESNICK:  "Question:  Is she of sound mind?"

23           MS. HORAY:  "Yes, she is."

24           MR. BRESNICK:  "Question:  Just a little infirmed

25   for her age?"

1          MS. HORAY:  "She's arthritic."

2          MR. BRESNICK:  "Question:  She's arthritic?"

3          MS. HORAY:  "Yes."

4          MR. BRESNICK:  "Question:  Is she able to get around

5     though?"

6          MS. HORAY:  "She gets around."

7          MR. BRESNICK:  "Question:  All right.  Do you know

8     why your grandfather wouldn't leave the money to her?"

9          MS. HORAY:  "No, I don't."

10          MR. BRESNICK:  "Question:  Did your grandmother ever

11    ask you about that?"

12          MS. HORAY:  "No, she didn't."

13          MR. BRESNICK:  "Question:  Did you tell your

14    grandmother that your grandfather left you a large sum of

15    money?"

16          MS. HORAY:  "I did."

17          MR. BRESNICK:  "Question:  What did she say?"

18          MS. HORAY:  "She just said okay."

19          MR. BRESNICK:  "Question:  Were -- where were you

20    when you said that?"

21          MS. HORAY:  "Her home."

22          MR. BRESNICK:  "Question:  When was this?"

23          MS. HORAY:  "I don't remember the exact date of when

24    it was."

25          MR. BRESNICK:  "Question:  You don't?  But it was

1   sometime after your grandfather died?"

2            MS. HORAY:  "It was after his passing, yes."

3            MR. BRESNICK:  "Question:  A few months after he had

4   died?"

5            MS. HORAY:  "Probably, yes."

6            MR. BRESNICK:  "Question:  What did you tell your

7   grandmother?"

8            MS. HORAY:  "He told me to make sure that I took

9   care of her."

10           MR. BRESNICK:  "Question:  She didn't ask why?"

11           MS. HORAY:  "No, she did not."

12           MR. BRESNICK:  "Question:  Why the money couldn't be

13   left to her?"

14           MS. HORAY:  "No, she did not."

15           MR. BRESNICK:  "Question:  All right.  But you told

16   her that your grandfather left you a lot of money?"

17           MS. HORAY:  "For her use, yes."

18           MR. BRESNICK:  "Question:  All right.  Now, how

19   about" --

20           MR. BRESNICK:  -- and then, Your Honor, if I could

21   read Mr. Llorett's line as well?

22           THE COURT:  All right.

23           MR. LLORETT:  "Ma'am, let me -- I'm sorry, did --

24   did you tell our grandmother how much he left?"

25           MS. HORAY:  "No, I did not."

1          MR. LLORETT:  "But you knew how much it was at the

2  time because you counted it, correct?"

3          MS. HORAY:  "Yes."

4          MR. BRESNICK:  And then it's back to me, Your Honor.

5          "Question:  What did your grandfather do when he was

6  alive for a living?"

7          MS. HORAY:  "Were you a boiler maker?"

8          MR. BRESNICK:  "Question:  Boiler maker?"

9          MS. HORAY:  "Yes."

10          MR. BRESNICK:  "Question:  Where did he work?"

11          MS. HORAY:  "His last job was at Salem Vocational

12  School.  Prior to that he had numerous jobs.  He worked an

13  extended amount of time for Sears and he did a lot of other

14  work other than -- you know, his regular jobs.  Worked for

15  people in their -- at their homes and things such as that."

16          MR. BRESNICK:  "Question:  Handy work?"

17          MS. HORAY:  "Yes."

18          MR. BRESNICK:  "Question:  All right.  When he got

19  -- well, how long -- when did he stop working?  Was he working

20  up until the time he died?"

21          MS. HORAY:  "Basically, yeah.  He had retired from

22  his actual job but like I said, he still did handy things for

23  people."

24          MR. BRESNICK:  "Question:  Right.  Was he in the

25  union, ma'am?"

1          MS. HORAY:  "I don't think so, not that I recall."

2          (Reading of Tab 174 concluded.)

3          Your Honor, may I have a moment with counsel?

4          THE COURT:  Yes.

5          (Discussion off the record.)

6          MR. BRESNICK:  Your Honor, we're going to read a

7  selection from the Grand Jury transcript that is not included

8  in the books at the moment.  It's page 112, previously

9  discussed among counsel.

10          THE COURT:  Yes.

11          MR. BRESNICK:  Do you have that complete transcript,

12  Agent?

13          MS. HORAY:  I do.

14          MR. BRESNICK:  All right.  And then please go to

15  page 112.

16          MS. HORAY:  Okay.

17          MR. BRESNICK:  And there's a question from a Grand

18  Juror starting at line three.  I'll read the Grand Juror and

19  you read the witness's answer.

20          MS. HORAY:  Okay.

21          (Mr. Bresnick reads from transcript.)

22          MR. BRESNICK:  "Maybe this is just how your

23  grandfather was.  But why would he ask you to hold the money

24  if your grandmother was still able to make the decisions, why

25  did he want you to take care of your grandmother?"

1          MS. HORAY:  "My grandfather basically, like I said,

2   the neighborhood's getting bad.  A lot of people used to ask

3   them to borrow money, things like that.  He didn't want those

4   types of problems basically towards my grandmother.  He didn't

5   want anything like that as long as he is -- he didn't want any

6   -- he didn't want anybody to target her, you know, fell as

7   though they're getting over on her."

8          MR. BRESNICK:  And then the question from the Grand

9   Juror goes on, "So his last -- she could say, I don't have it

10  basically?"

11         MS. HORAY:  "Yes."

12         MR. BRESNICK:  "Grand Juror's question:  Because

13  actually you had possession of it?"

14         MS. HORAY:  "Right."

15         (Reading of Grand Juror question completed.)

16         MR. BRESNICK:  If you could turn now to Tab 175,

17  it's Government's Exhibit 600-6.  It's page 84, lines nine

18  through 23.

19         Do you have that, Agent?

20         MS. HORAY:  I do.

21         (Mr. Bresnick reads from transcript.)

22         MR. BRESNICK:  "Question:  Have you paid for anybody

23  else's lawyer?"

24         MS. HORAY:  "No, I have not."

25         MR. BRESNICK:  "Question:  Has anybody asked you to

1    pay for anybody's lawyer?"

2              MS. HORAY:   "No.

3              MR. BRESNICK:   "Question:   Do you know Alton Coles?"

4              MS. HORAY:   "I didn't know him by that name.   No, I

5    did not, until the article came out in the newspaper."

6              MR. BRESNICK:   "Question:   You knew him by the name

7    Ace?"

8              MS. HORAY:   "Yes."

9              MR. BRESNICK:   "Question:   Ace Capone?"

10             MS. HORAY:   "Just Ace."

11             MR. BRESNICK:   "Question:   Just Ace?"

12             MS. HORAY:   "Yes."

13             (Reading of Tab 175 concluded.)

14             MR. BRESNICK:   All right, turn to Tab 176, please,

15   Government's Exhibit 600-7.   It's page 96, line six to page

16   100, line 24 of the complete transcript.

17             (Mr. Bresnick reads from transcript."

18             MR. BRESNICK:   "Question:   Since James Morris got

19   arrested, you haven't made any payment on his behalf to any

20   lawyers, have you?"

21             MS. HORAY:   "No, I have not."

22             MR. BRESNICK:   "Question:   You haven't made any

23   payments to any attorney since he got arrested other than you

24   own, is that correct?"

25             MS. HORAY:   "No, I have not."

1          MR. BRESNICK:  "Question:  Have you paid your own

2    lawyer?"

3          MS. HORAY:  "Yes."

4          MR. BRESNICK:  "Question:  How much have you paid

5    him?"

6          MS. HORAY:  "1,500."

7          MR. BRESNICK:  "Question:  Did you pay that in cash

8    or my check?"

9          MS. HORAY:  "Cash."

10         MR. BRESNICK:  "Question:  When did you pay him in

11   cash?"

12         MS. HORAY:  "About a week or so ago."

13         MR. BRESNICK:  "Question:  Where did you get the

14   cash to pay him?"

15         MS. HORAY:  "Money I had."

16         MR. BRESNICK:  "Question:  Where was the money?"

17         MS. HORAY:  "In my purse."

18         MR. BRESNICK:  "Question:  Is that money from your

19   employment?"

20         MS. HORAY:  "No.  Money just -- I just have.  I

21   don't spend everything that I get."

22         MR. BRESNICK:  "Question:  Well, did someone give

23   you that money?"

24         MS. HORAY:  "Yes."

25         MR. BRESNICK:  "Question:  Who gave you the money?"

1          MS. HORAY:  "My mother."

2          MR. BRESNICK:  "Question:  That's Linda Fletcher

3     gave you?"

4          MS. HORAY:  "Yes."

5          MR. BRESNICK:  "Question:  So she gave you cash to

6     pay your lawyer?"

7          MS. HORAY:  "She's given me money.  I didn't say all

8     of it came from her.  Like I said, I don't spend everything I

9     that I get so I'll have in my purse."

10         MR. BRESNICK:  "Question:  Where did you get the

11    other money that your mom didn't give you?"

12         MS. HORAY:  "Babysitting for people, things like

13    that."

14         MR. BRESNICK:  "Question:  Little odd jobs?"

15         MS. HORAY:  "Yes."

16         MR. BRESNICK:  "Question:  Now how much of that

17    1,500 did your mom give you?"

18         MS. HORAY:  "500."

19         MR. BRESNICK:  "Question:  The rest, $1,000, you

20    just earned?"

21         MS. HORAY:  "Yes."

22         MR. BRESNICK:  "Question:  From various places?"

23         MS. HORAY:  "Yes."

24         MR. BRESNICK:  "Question:  Because you're not

25    working for the Lindsey (phonetic) house now, correct?"

1          MS. HORAY:  "No, I'm not."

2          MR. BRESNICK:  "Question:  Are you drawing

3    Unemployment?"

4          MS. HORAY:  "No, I'm not."

5          MR. BRESNICK:  "Question:  Do you have any source of

6    income other than the child support?"

7          MS. HORAY:  "No, I don't."

8          MR. BRESNICK:  "Question:  the child support, that's

9    dried up now?"

10          MS. HORAY:  "Yes."

11          MR. BRESNICK:  "Question:  Since Mr. Morris has been

12    in jail?"

13          MS. HORAY:  "Yes."

14          MR. BRESNICK:  "Question:  You have zero money

15    coming in other than your odd jobs, correct?"

16          MS. HORAY:  "Exactly."

17          MR. BRESNICK:  Now, other than your lawyer and this

18    $1,500, you haven't paid any other lawyers, have you?"

19          MS. HORAY:  "No."

20          MR. BRESNICK:  "Question:  Now, you just -- you

21    haven't had like 25 or $50,000 hanging around over the last

22    few months, have you?"

23          MS. HORAY:  "I wish.  No, I haven't."

24          MR. BRESNICK:  "Question:  Well, you know, your

25    family hasn't like just given you 25 or $50,000, right?"

1      MS. HORAY:  "No."

2      MR. BRESNICK:  "Question:  They haven't just said

3  here, here's %25,000 in cash, go do what you need to do?"

4      MS. HORAY:  "No.  They gave me a couple of hundred

5  at a time but that's basically about it."

6      MR. BRESNICK:  "Question:  Nobody's give you any --

7  like 25 or $50,000 to go pay lawyers or do the things in

8  litigation or anything like that, correct?"

9      MS. HORAY:  "No.  I don't know any lawyers that much

10  money."

11      MR. BRESNICK:  "Question:  You haven't paid that

12  money for something else?  You haven't been like a courier to

13  go pay somebody, correct?"

14      MS. HORAY:  "Not that I recall."

15      MR. BRESNICK:  "Question:  Well, let me ask you a

16  question because I know how I am.  If somebody puts $25,000

17  cash in my hand and says to go give it somebody, I would make

18  sure I would remember.  Is that the way you were?"

19      MS. HORAY:  "Yes, pretty much."

20      MR. BRESNICK:  "Question:  So if somebody gave you

21  $25,000 in the last six months to go give it to somebody, you

22  wouldn't sit here telling us you didn't remember all that,

23  would you?  Have you had any head blows or anything in the

24  last six months or" --

25      MS. HORAY:  "Actually, yeah, I did.  I fell down a

1    flight of steps."

2              MR. BRESNICK:  "Question:  So it might be around

3    that time you would forget something like that, is that what

4    you're telling us?"

5              MS. HORAY:  "Could you be more specific, please?"

6              MR. BRESNICK:  "Question:  Sure."

7              MS. HORAY:  "Thank you."

8              MR. BRESNICK:  "Question:  Just -- maybe we could

9    just cut back to the original question."

10             MS. HORAY:  "Okay."

11             MR. BRESNICK:  "Question:  You -- you haven't had

12   25,000 in cash over the last six months?"

13             MS. HORAY:  "No, I don't have $25,000 cash."

14             MR. BRESNICK:  "Question:  You haven't given $25,000

15   in cash to anybody, correct?"

16             MS. HORAY:  "No, I have not"

17             MR. BRESNICK:  "Question:  Not just in the last six

18   months.  You haven't given 25,000 in cash to anybody ever,

19   have you?"

20             MS. HORAY:  "No."

21             (Reading of Tab 176 concluded.)

22             MR. BRESNICK:  If you could  turn to Tab 177, it's

23   Government's Exhibit 600-8, it's page 103, line 11 to page

24   104, line six.

25             (Mr. Bresnick reads from transcript."

1      MR. BRESNICK:  "Question:  One more question about

2  that line of money that you got from your grandfather.  Where

3  did you store it in your house before the agents seized it on

4  August 10th?"

5      MS. HORAY:  "Various locations."

6      MR. BRESNICK:  "Question:  You split it up in

7  various amounts?"

8      MS. HORAY:  "Yes, I did."

9      MR. BRESNICK:  "Question:  Why did you do that?"

10      MS. HORAY:  "Just because I did."

11      MR. BRESNICK:  "Question:  Why did you split it up?"

12      MS. HORAY:  "Because I did.  That's how I am.  I do

13  things such as that.  I will remove things and put part here

14  and part there."

15      MR. BRESNICK:  "Question:  For what reason?"

16      MS. HORAY:  "None."

17      MR. BRESNICK:  "Question:  No reason?  You just like

18  -- split up the money?"

19      MS. HORAY:  "That's just the type of person that I

20  am."

21      MR. BRESNICK:  "Question:  Well, how many different

22  places did you store the money?"

23      MS. HORAY:  "One, two, three, four, five."

24      (Reading of Tab 177 concluded.)

25      MR. BRESNICK:  And, Your Honor, we'll go now to Tab

1    179, Government's Exhibit 600-10.  It's page 107, line one to

2    page 109, line 22.

3                 (Mr. Bresnick reads from transcript.)

4                 MR. BRESNICK:  "Question:  But how was the money?

5    Was it rubber-banded?  Was it in envelopes?  Was it in boxes?

6    How did you keep it?"3

7                 MS. HORAY:  "It was rubber-banded.  I had already

8    stated that."

9                 MR. BRESNICK:  "Question:  Did you keep it envelopes

10   as well or just rubber-banded?"

11                MS. HORAY:  "No, it was just basically rubber-band,

12   bag, whatever."

13                MR. BRESNICK:  "Question:  So you had them in some

14   -- some locations you had them in bags?"

15                MS. HORAY:  "Yeah."

16                MR. BRESNICK:  "Question:  And some you had in

17   rubber bands?"

18                MS. HORAY:  "Most of them were rubber-banded in

19   bags."

20                MR. BRESNICK:  "Question:  How many different

21   locations were there?"

22                MS. HORAY:  "I told you, it was four or five."

23                MR. BRESNICK:  "Question:  I believe you said five,

24   is that right?"

25                MS. HORAY:  "Yes."

1          MR. BRESNICK:  "Question:  So these five -- are you

2    sure about the five?"

3          MS. HORAY:  "I said four or five."

4          MR. BRESNICK:  "Question:  But before you said five.

5    Are you changing your testimony now?"

6          MS. HORAY:  "I'm not changing anything.  I wasn't

7    sure.  You said I said four or five."

8          MR. BRESNICK:  "Question:  You said five, or are you

9    saying it was four or five?"

10          MS. HORAY:  "Then it's five if that's what I said."

11          MR. BRESNICK:  "Question:  That's currently your

12    answer now?"

13          MS. HORAY:  "Yes."

14          MR. BRESNICK:  "Question:  So five different

15    locations at your -- that you kept the money in that you got

16    from your grandfather?"

17          MS. HORAY:  "Yes."

18          MR. BRESNICK:  "Question:  All right.  Now, in these

19    five locations, you said some you had the money in bags, is

20    that right?"

21          MS. HORAY:  "Yes."

22          MR. BRESNICK:  "Question:  Some were in envelopes?"

23          MS. HORAY:  "Yes.  No -- I did not say envelopes.  I

24    said rubber=banded in bags."

25          MR. BRESNICK:  "Question:  Were they all in bags?"

1          MS. HORAY:  "Yeah, I think so."

2          MR. BRESNICK:  "Question:  So all different -- all

3    five locations had the money rubber-banded in bags, is that

4    right?"

5          MS. HORAY:  "Yeah, I'm pretty sure."

6          MR. BRESNICK:  "Question:  Do you know what

7    denominations you kept the different groups of money in?"

8          MS. HORAY:  "No.  Right off hand, no."

9          MR. BRESNICK:  "Question:  Do you know?"

10         MS. HORAY:  "No.  I mean, not right off hand.  I

11   mean, it was in fives or tens."

12         MR. BRESNICK:  "Question:  Did you have any singles,

13   any ones or anything like that?"

14         MS. HORAY:  "I don't remember."

15         MR. BRESNICK:  "Question:  But it was fives or tens?

16         MS. HORAY:  "In -- yeah, fives to tens."

17         MR. BRESNICK:  "Question:  Were they in 20s?"

18         MS. HORAY:  "I'm sure I had 20s, hundreds, 50s."

19         MR. BRESNICK:  "Question:  You had hundreds as

20   well?"

21         MS. HORAY:  "I'm sure."

22         MR. BRESNICK:  "Question:  Hundreds and 50s?"

23         MS. HORAY:  "Yes."

24         MR. BRESNICK:  "Question:  Was there a thousand

25   dollar bill?  Were there any thousand dollar bills?"

1              MS. HORAY:  "Not that I saw."

2              MR. BRESNICK:  "Question:  But you saw all the

3      money, right?"

4              MS. HORAY:  "Yes."

5              MR. BRESNICK:  "Question:  Because you counted it."

6              MS. HORAY:  "Yes."

7              MR. BRESNICK:  "Question:  All right."

8              (Reading from Tab 179 concluded.)

9              MR. BRESNICK:  Your Honor, I'm going to ask the

10     witness now to read from the selections that we discussed in

11     Tab 180 that had been removed from the juror's books so they

12     will not be able to follow along in the transcript but they'll

13     just hear the testimony.

14             THE COURT:  All right.

15             MR. BRESNICK:  Ma'am, do you have Tab 180 in your

16     book?

17             MS. HORAY:  No.

18             MR. BRESNICK:  You don't have that.

19             MS. HORAY:  I have it here.  That's fine, this one,

20     yes.

21             MR. BRESNICK:  Ma'am, could you turn -- it's the

22     bottom -- it's page three of Tab 180.  Do you have that,

23     ma'am?

24             MS. HORAY:  I do.

25             MR. BRESNICK:  All right.  And it's line 13.  Do you

Reading of Grand Jury Transcripts                118

1    see that?

2              MS. HORAY:  Yes.

3              MR. BRESNICK:  And the first question begins with,

4    "All right.  Where was the money counter located."  Do you

5    have that?

6              MS. HORAY:  Yes.

7              MR. BRESNICK:  All right.

8              Your Honor, this selection will be -- first, Your

9    Honor, it's Government's Exhibit 600-11 and the selection will

10   be page 121, line 13 to page 126, line one.

11             (Mr. Bresnick reads from transcript.)

12             MR. BRESNICK:  "Question:  Where was the money

13   counter located?"

14             MS. HORAY:  "On the side of my couch."

15             MR. BRESNICK:  "Question:  That is in your living

16   room?"

17             MS. HORAY:  "Yes."

18             MR. BRESNICK:  "Question:  Were you busy counting

19   the money out there?"

20             MS. HORAY:  "No, it had been there."

21             MR. BRESNICK:  "Question:  Had you been counting the

22   money there in the living room?"

23             MS. HORAY:  "It had been over a while.  It's been a

24   while since I had."

25             MR. BRESNICK:  "Question:  You're saying the money

Reading of Grand Jury Transcripts                    119

1    counter sat in your living room for like a year and a half?"

2          MS. HORAY:  "It sat to the side.  It sat on the side

3    of my couch."

4          MR. BRESNICK:  "Question:  For a year and a half?"

5          MS. HORAY:  "Probably, yes."

6          MR. BRESNICK:  "Question:  Did you put cups of

7    coffee on it or something?"

8          MS. HORAY:  "No.  Actually, my son's nebulizer sat

9    on it because it was up and they could reach their mask."

10          MR. BRESNICK:  "Question:  There was a nebulizer

11    found on the money counter?"

12          MS. HORAY:  "Yes.  It was a big box."

13          MR. BRESNICK:  "Question:  How about the digital

14    scale in the kitchen?  What was that doing there?"

15          MS. HORAY:  "I don't recall a digital scale."

16          MR. BRESNICK:  "Question:  You don't recall that?"

17          MS. HORAY:  "No, I don't."

18          MR. BRESNICK:  "Question:  You didn't own a digital

19    scale, do you?"

20          MS. HORAY:  "Not to my knowledge, no."

21          MR. BRESNICK:  "Question:  Not -- not to your

22    knowledge?"

23          MS. HORAY:  "No.  I don't ever recall."

24          MR. BRESNICK:  "Question:  What does that mean, not

25    to your knowledge?"

1          MS. HORAY:  "I don't recall."

2          MR. BRESNICK:  "Question:  A digital scale -- who --

3    whose knowledge am I talking about?"

4          MS. HORAY:  "I don't know.  You tell me.  You found

5    the digital scale and" --

6          MR. BRESNICK:  "Question:  I'm just asking.  Do you

7    own a digital scale?"

8          MS. HORAY:  "No, I don't."

9          MR. BRESNICK:  "Question:  Okay, that's a simple

10   question, a simple answer."

11          MS. HORAY:  "Okay."

12          MR. BRESNICK:  "Question:  You said that your father

13   or your grandfather had a lot of ammunition in his stuff, is

14   that right?"

15          MS. HORAY:  "I said that I -- he had two guns and I

16   had took other things from the house.  What was in the boxes

17   and things, I don't exactly remember.  I never went through

18   all the boxes."

19          MR. BRESNICK:  "Question:  So you went through the

20   boxes.  You initially spent hours all day you said and you

21   found the money in the attic but you never saw any ammunition

22   when you looked through those boxes, did you?"

23          MS. HORAY:  "I don't recall.  I -- I probably did."

24          MR. BRESNICK:  "Question:  You don't know?"

25          MS. HORAY:  "I didn't pay any attention to the

1    cash."

2            MR. BRESNICK:  "Question:  You didn't pay any

3    attention to the amount of money, correct?"

4            MS. HORAY:  "If it was there, no, I didn't."

5            MR. BRESNICK:  "Question:  You're not even ready to

6    commit to the fact that it was there, right?"

7            MS. HORAY:  "Nine times out of ten it was there but

8    you're talking about two years ago and me going through

9    general stuff that wasn't pertinent to me right then."

10            MR. BRESNICK:  "Question:  Where was this extra ammo

11    found in your house?"

12            MS. HORAY:  "I have no idea.  I don't know where

13    anything is really.  All I was told was this is where -- this

14    is what we got, they gave me a list of things that they had.

15    A lot of things that they said was not on my list."

16            MR. BRESNICK:  "Question:  Well, did you take stuff

17    out of your grandfather's boxes and plop it in different

18    places in your house?"

19            MS. HORAY:  "Most of the stuff was just downstairs."

20            MR. BRESNICK:  "Question:  Downstairs?"

21            MS. HORAY:  "Yes."

22            MR. BRESNICK:  "Question:  Where was the dining room

23    located?"

24            MS. HORAY:  "Upstairs."

25            MR. BRESNICK:  "Question:  There's a drawer in the

1  dining room, right?"

2          MS. HORAY:  "On my table."

3          MR. BRESNICK:  "Question:  There's a drawer in the

4  table in dining room where you and your kids eat, correct?"

5          MS. HORAY:  "I eat there.  My kids don't eat there."

6          MR. BRESNICK:  "Question:  But you eat there, and

7  when your mom comes over or your family comes over, they eat

8  there, correct?"

9          MS. HORAY:  "If they're there, yes."

10          MR. BRESNICK:  "Question:  There's a box of 40

11  caliber ammunition found in the drawer of your dining room

12  table -- your dining table, is that right?"

13          MS. HORAY:  "No, that's not right.  I would never

14  have ammunition anywhere where my kids could access it."

15          MR. BRESNICK:  "Question:  So the box of 40 caliber

16  ammunition found in the drawer of the dining room table right

17  near the kitchen, that was not your 40 caliber ammunition, was

18  it?"

19          MS. HORAY:  "This is the first time I'm hearing of

20  any ammunition being found in the dining room table."

21          MR. BRESNICK:  "Question:  Right, so you didn't pull

22  it out of your grandfather's box in his attic and put it in

23  our dining room table, did you?"

24          MS. HORAY:  "No, I did not."

25          (Reading of Tab 180 concluded.)

1          MR. BRESNICK:  All right, Your Honor, we can turn

2    now to Tab 181 and that should be in the juror's books --

3    binders.  This is Government's Exhibit 600-12, page 130, lines

4    one to 14.

5          Do you have that, Agent?

6          MS. HORAY:  I do.

7          (Mr. Bresnick reads from transcript.)

8          MR. BRESNICK:  "Question:  No, I'm -- I'm asking

9    about the cash lying around your house where you live.  You're

10   saying that was not his money?"

11         MS. HORAY:  "No, it was not."

12         MR. BRESNICK:  "Question:  Your -- your" --

13         MS. HORAY:  "Money in my home belonged to basically

14   me or my family."

15         MR. BRESNICK:  "Question:  Basically?"

16         MS. HORAY:  "If it -- if you got it off his person,

17   then it was his."

18         MR. BRESNICK:  "Question:  So if they took it off

19   his pocket it was his, otherwise it was yours?"

20         MS. HORAY:  "Exactly."

21         Reading of Tab 181 concluded.)

22         MR. BRESNICK:  And Tab 182, Your Honor, Government's

23   600-13.  It's page 130, line 18 to page 131, line nine.

24         (Mr. Bresnick reads from transcript."

25         MR. BRESNICK:  "Question:  You weren't getting ready

1    to buy a car lot, were you, with that money?"

2            MS. HORAY:  "No, I wasn't."

3            MR. BRESNICK:  "Question:  And neither was he, is

4    that right?"

5            MS. HORAY:  "How could you buy a car lot?"

6            MR. BRESNICK:  "Question:  Well, you're looking at

7    me with a crazy look but you" --

8            MS. HORAY:  "How could he buy a car lot with

9    something that didn't belong to him?"

10           MR. BRESNICK:  "Question:  Well, you know, I don't

11   know.  I'm asking you, is that the case?  Was he going to buy

12   a car lot with that money or not?"

13           MS. HORAY:  "Not with anything that was in my

14   possession."

15           MR. BRESNICK:  "Question:  You weren't going to buy

16   a car lot?"

17           MS. HORAY:  "No.  I had no intentions of buying a

18   car lot."

19           MR. BRESNICK:  And that's all for the reading of the

20   transcripts, Your Honor.  If I could just call Agent Bowman

21   back to the stand for some brief testimony.

22           THE COURT:  All right, you may --

23           MR. HETZNECKER:  Your Honor, if I may have one

24   question of Agent Horay while she's sitting there -- a brief

25   question?  Just one question of Agent Horay?

 1          THE COURT:  Let's go to sidebar.

 2          (Sidebar discussion as follows:)

 3          MR. HETZNECKER:  All I'm going to ask her -- because

 4  the transcript's in front of her, is just the time it started

 5  and the time it ended.  That's it.

 6          MR. BRESNICK:  Well, at least --

 7          THE COURT:  Well, Agent Bowman can --

 8          MR. BRESNICK:  Maybe Bowman can testify to that,

 9  Your Honor.

10          MR. HETZNECKER:  That's fine, Your Honor.

11          MR. BRESNICK:  I'll explain it and I can stipulate

12  as well.

13          THE COURT:  You can stipulate it --

14          MR. BRESNICK:  Of course.  That's fine.)

15          (Sidebar discussion concluded.)

16          THE COURT:  You may step down.

17          MS. HORAY:  Thank you, Your Honor.

18          (Agent Horay leaves the witness stand.)

19          MR. BRESNICK:  Agent Bowman, can you please retake

20  the stand?

21          Your Honor, the Government stipulates that the

22  testimony of the defendant, Thais Thompson, began at 10:27

23  a.m. on June 7, 2006 and concluded at 12:58 p.m.

24          MR. HETZNECKER:  Thank you.

25          THE COURT:  All right.  Agent, you're still under

1    oath.

2                THE WITNESS:  Yes, sir.

3                        DIRECT EXAMINATION

4    BY MR. BRESNICK:

5    Q    Hello, Agent.

6    A    Hello.

7    Q    Agent, at the time that Ms. Thompson testified in the

8    Grand Jury on June 7th, 2006, had your investigation in this

9    case concluded or was it still ongoing?

10   A    It was still ongoing.

11   Q    And generally, what types of -- what were you

12   investigating?  What types of things were you looking at?

13   A    Really the whole overall investigation was still ongoing,

14   particularly some of the financial parts of the investigation.

15   We were reviewing all the evidence that we had -- still

16   reviewing all of the evidence that we recovered on August

17   10th, 2005 so it was just a systematic ongoing process at that

18   time.

19   Q    Agent, was the source of the cash recovered from 5 North

20   Burden Hill Road, was that part of the investigation as well?

21   A    Certainly.  We -- the source of that large amount of money

22   would certainly be of interest to us in our investigation,

23   yes.

24   Q    In addition, Agent, were you interested in knowing whether

25   or not Mr. Morris had any financial holdings of any kind?

1    A    Yes.

2    Q    And why is that?

3    A    It certainly could explain where that money came from.

4    Q    And you would have been interested in financial holdings

5    of Mr. Coles and others, is that right?

6              MR. WARREN:  Objection.

7              THE COURT:  Objection sustained.

8              MR. BRESNICK:  Very well.

9    BY MR. BRESNICK:

10   Q    Sir, and are you also interested or was it an interest to

11   you at any point in your investigation of knowing whether or

12   not one person might be paying for another person's lawyer?

13             MR. HETZNECKER:  Objection.

14             MR. WARREN:  Objection.

15             THE COURT:  Objection sustained.

16   BY MR. BRESNICK:

17   Q    Well, sir, do you know who was paying for Mr. Coles'

18   lawyer?

19             MR. WARREN:  Objection.

20             THE COURT:  Objection sustained, counsel.

21             MR. BRESNICK:  Oh, that's sustained as well, Your

22   Honor?  All right.  Might I -- it's -- might I see you at

23   sidebar?  I apologize.

24             (Sidebar discussion as follows:)

25             MR. BRESNICK:  Your Honor, one of the elements of a

Bowman - Cross (Het)                                         128

1    perjury case is that the information is material, not just

2    that there was a lie, if it's a material lie, and I just

3    wanted to ask the witness whether or not it was material that

4    -- who paid for Mr. Coles' lawyer because Ms. Thompson

5    testified she never paid $25,000 in cash to anybody when, in

6    fact, the evidence shows that she paid $25,000 in cash.

7            MR. HETZNECKER:  First of all, it assumes a fact not

8    in evidence.  She dropped off $25,000.  That's not material to

9    the perjury count at all.  She could have been running an

10   errand for somebody.

11           THE COURT:  The jury will have to determine whether

12   or not it's material.

13           UNIDENTIFIED SPEAKER 1:  Your Honor, it's true that

14   the jury may have to but (inaudible) any sense that the

15   question has to be asked was it important to them in the

16   investigation?

17           MR. BRESNICK:  As with any bank fraud or anything

18   like that.

19           UNIDENTIFIED SPEAKER:  Somebody has to be asked that

20   question or else the defense comes back and says we never put

21   on the evidence of materiality and then they may move to

22   dismiss under Rule 29.  So we're at -- we're at -- I mean,

23   I've been -- perhaps we could just ask the witness the --

24   what's the Government's interested in finding out if Ms.

25   Thompson had 25,000 in cash at some point.

1        UNIDENTIFIED SPEAKER:  My response is whether or not

2  they're interested in it I think is something we can argue in

3  closing.  That's the issue, not whether or not the agent --

4        THE COURT:  I'll permit that question.

5        MR. BRESNICK:  Thank you, Your Honor.

6        (Sidebar discussion concluded.)

7  BY MR. BRESNICK:

8  Q    Agent, were you interested in knowing whether or not Ms.

9  Thompson had $25,000 in cash at any time?

10 A    Yes.

11 Q    All right.

12       MR. BRESNICK:  I have no more questions, Judge.

13       MR. WARREN:  I have no questions, Judge.

14                        CROSS-EXAMINATION

15 BY MR. HETZNECKER:

16 Q    Good morning, Agent Bowman.

17 A    Good morning, Mr. Hetznecker.

18 Q    Agent Bowman, you had indicated that you -- and I don't

19 want to reiterate this but again, you're one of the co-agents

20 investigating this case, correct?

21 A    That's correct.

22 Q    And you had access to the information that had been

23 garnered by your agency during the course of this

24 investigation, correct?

25 A    Correct.

Bowman - Cross (Het)                                    130

1    Q    And it's fair to say that on June 6th, 2006, my client was

2    not charged with any criminal offense at that time, is that

3    correct?

4    A    Yes, that's correct.

5    Q    So she was not charged with operating a stash house,

6    correct, at that time?

7    A    No.

8    Q    She was not charged with a 924(c) count, is that correct,

9    at that time, is that correct?

10   A    That's correct.

11   Q    And she was not charged with any other offense, obviously

12   not with any perjury counts, is that correct?

13   A    On June --

14   Q    On June 7th, obviously, right?  She wasn't charged --

15   A    Yes, that's correct.

16   Q    So there were no charges that you were aware of at that

17   time, is that correct, pending against her?

18   A    That's correct.

19   Q    Now, we've heard from Kristina Latney and we've heard from

20   I believe Gusto, right?

21   A    Yes, we have.

22   Q    Both cooperating witnesses, correct?

23   A    Correct.

24   Q    Both testified before the Grand Jury, is that correct?

25        MR. BRESNICK:  Objection, Your Honor.

1          MR. HETZNECKER:  Well, I think it's a fair question.

2     I'll lay a foundation.

3          THE COURT:  Go ahead.

4     BY MR. HETZNECKER:

5     Q    Witnesses are called before the Grand Jury for a number of

6     different reasons, are they not?

7     A    Yes.

8     Q    Often times, witnesses are called before the Grand Jury as

9     cooperating witnesses, witnesses that are already -- made a

10    deal with the Government, correct?

11    A    Correct.

12    Q    All right.  And those witnesses are prepared in advance,

13    correct?

14    A    Well, if I could correct my last statement, they haven't

15    made a deal, at the end of your last question you said --

16    Q    In the process of making a deal.

17    A    Yeah.  There's -- well, I wouldn't use the word deal.

18    Q    A cooperation agreement, is that fair to say?

19    A    Fair to say, yes.

20    Q    All right.  And when I say cooperation agreement,

21    agreement meaning a deal, an agreement with the Government,

22    correct?  Is that fair to say?

23          MR. BRESNICK:  Objection.

24          THE COURT:  Objection sustained.

25          MR. HETZNECKER:  All right.

1   BY MR. HETZNECKER:

2   Q     Just so we're clear about it, the witnesses that are

3   called before the Grand Jury that have made an agreement, they

4   sit down and they discuss their testimony with the prosecutors

5   and the agent before they testify before the Grand Jury, is

6   that fair to say?

7   A     Not all the time.  I don't remember the specific incidents

8   with Ms. Latney or Mr. Gusto, if they had a cooperation

9   agreement at the time.  They may or may not have.  I really

10  don't recall.

11  Q     Here's my question.  You sat here throughout the course of

12  most of this trial, did you not?

13  A     I have, yes.

14  Q     Did you sit through the testimony of Kristina Latney?

15  A     I did.

16  Q     Did you sit through the testimony of Gusto?

17  A     I did.

18  Q     And do you recall them testifying --

19        MR. BRESNICK:  Objection to -- objection to Gusto.

20  That's not his name and I'm not sure where this whole line of

21  questioning is going.

22        MR. HETZNECKER:  Well, if I could -- if I could --

23

24        THE COURT:  Why don't you ask the question and then

25  we'll take the objection.

Bowman - Cross (Het)                                        133

BY MR. HETZNECKER:

Q    Do you recall that in fact both of them attended proffer

sessions before they testified before the Grand Jury?  Do you

recall that testimony?

A    Yes.

Q    All right.  So it's fair to say that the witnesses that

are called that have cooperation agreements that are called

before the Grand Jury generally sit down with the prosecutors

and the questions and answers are gone over before they

testify before the Grand Jury, is that fair to say?

Generally.

A    Generally, yes.

Q    And specifically in the case of Kristina Latney and

Gusto --

          MR. BRESNICK:  Objection, Your Honor.

          MR. HETZNECKER:  -- they were both provided with

those questions and they gave their answers before testifying

before the Grand Jury, correct?

          THE COURT:  Is that a question?

          MR. HETZNECKER:  It is.

          THE COURT:  Did they?

          THE WITNESS:  I don't -- I don't know.

          MR. HETZNECKER:  All right.  Fair enough.

          MR. BRESNICK:  Your Honor, if Mr. Hetznecker could

just refer to Mr. Costas (phonetic) by his name.

1              MR. HETZNECKER:  I apologize.

2    BY MR. HETZNECKER:

3    Q    You don't know.

4    A    I don't know, no.

5    Q    So based on their testimony, to the best of your

6    recollection, you don't recall if that's in fact what they

7    said, is that correct?

8    A    I don't --

9    Q    That they attended proffer sessions before they testified

10   before the Grand Jury.

11   A    Well, yeah, they did attend proffer sessions, yes.

12   Q    All right.  So the questions and the answers before they

13   got before a Grand Jury were already provided to the

14   prosecutor and the agent --

15             MR. BRESNICK:  Objection.

16             MR. HETZNECKER:  -- before they went in there,

17   correct?

18             MR. BRESNICK:  Objection, Your Honor.

19             THE COURT:  Is that correct?

20             THE WITNESS:  I -- I do not remember when they went

21   to the Grand Jury -- before -- I don't -- there was a lot of

22   Grand Jury testimony.  I don't remember the exact dates of

23   when things occurred.

24   BY MR. HETZNECKER:

25   Q    All right.  You've testified before the Grand Jury on a

1    number of occasions, have you not?

2    A    I have.

3    Q    And in fact, a Grand Jury is a room in which there are

4    about 23 -- there are 23 people, correct?

5    A    Not always --

6    Q    Not always, right --

7    A    -- but it varies.

8    Q    All right.  It varies.  And prosecutors ask questions,

9    correct?

10   A    Correct.

11   Q    And during the course of the questioning, the witnesses

12   will provide those -- those answers to the questions as best

13   they can, correct?

14   A    Yes.

15   Q    And that includes you as well, right?

16   A    Correct.

17   Q    As best you can.

18   A    Yes.

19   Q    Based on information that you've received -- either you

20   know directly, firsthand or based on information you've

21   received, correct?

22   A    Correct, it's one of the ways, yes.

23   Q    And when you're testifying before a Grand Jury, you often

24   have access -- in fact, you do have access to -- before

25   testifying, charts, evidence, physical evidence, photographs,

1    documents -- you have access to all of that before you're

2    called before a Grand Jury generally, is that correct?

3    A    On some occasions, yes.

4    Q    On most occasions, right?

5            MR. BRESNICK:  Objection, Your Honor.

6            MR. HETZNECKER:  Well, let --

7            THE COURT:  Objection is sustained.

8    BY MR. HETZNECKER:

9    Q    You're not going to go before a Grand Jury unprepared, are

10   you?

11   A    Sometimes I memorize it, sometimes I -- if there's charts

12   needed, it varies.

13   Q    Fair enough.  You're also aware of the fact -- because by

14   the way, you sat here during the testimony of Agent Weiers and

15   Christina Kelliher.

16           MR. BRESNICK:  Objection, Your Honor.  May we --

17           THE COURT:  Objection sustained.

18           MR. BRESNICK:  May we approach sidebar?

19           (Sidebar discussion as follows:)

20           MR. BRESNICK:  Sorry, but Mr. Hetznecker continues

21   to ask the witness to comment on testimony about other

22   witnesses at this trial.  It's clearly improper --

23           MR. HETZNECKER:  I understand.

24           MR. BRESNICK:  -- and I don't want to raise it in

25   front of the jury but it is clearly improper to ask

1    continually to comment on other testimony at this trial.

2            THE COURT:  There's no question that's exactly what

3    you're doing.

4            MR. HETZNECKER:  Can I do this then?  Let me ask

5    this, can I ask him whether or not he's aware of the fact that

6    she was not shown any of the exhibits or any of the documents

7    before her Grand Jury testimony?  Can I ask him that question?

8    And I'll leave it alone, I'll leave it at that.

9            THE COURT:  You can ask him whether or not --

10           MR. HETZNECKER:  I'll do that.  All right.  Thank

11   you.

12           (Sidebar discussion concluded.)

13           MR. HETZNECKER:  Thank you, Your Honor.

14   BY MR. HETZNECKER:

15   Q    Let me ask you this question, Agent Bowman.  Are you aware

16   whether -- are you aware whether or not my client, Ms.

17   Thompson, was shown photographs of the evidence that was taken

18   from her house, the actual evidence that was taken from her

19   house, including documents, ammunition, money, bags of money

20   -- were you aware whether or not she was shown any of that

21   before she testified before the Grand Jury on June 6th, 2006

22   -- June 7th, 2006?

23   A    No, I'm not.

24   Q    You're not aware?  Okay.

25           MR. HETZNECKER:  I have no further questions of this

Bowman - Cross (Tho)                                      138

1    witness.  Thank you, Agent Bowman.

2                        CROSS-EXAMINATION

3    BY MR. THOMPSON:

4    Q    You're one of the case agents in this case, correct?

5    A    Correct.

6    Q    Fair to say you are intimately familiar with the facts

7    concerning this investigation?

8    A    That's fair to say, yes.

9    Q    And concerning the money that was found at the house, the

10   half million dollars or so, as you testified, you were

11   certainly interested in determining where the money came from,

12   correct?

13   A    Yes.

14   Q    Okay.  Now you were aware, were you not, that Ms. Thompson

15   said her grandfather left it to her, correct?

16              UNIDENTIFIED SPEAKER:  Objection, Your Honor.  The

17   testimony is what it is.  That wasn't Agent Bowman's

18   testimony.

19              THE COURT:  That objection is overruled.

20   BY MR. THOMPSON:

21   Q    You were aware that Ms. Thompson claim her grandfather

22   left her the money or most of it, correct?

23   A    I believe I was told that after her Grand Jury testimony.

24   Q    I understand.  And you were also told that she recovered

25   it at 333 East Broadway Street, correct?  Her grandfather's

Bowman - Cross (Tho)                                        139

1    house.

2    A    I don't -- I don't recall that.  I don't recall that

3    specifically.

4    Q    Okay.  Well, did you ever go to 333 East Broadway Street

5    in an effort to investigate whether or not the money came from

6    that house?

7    A    I did not, no.

8    Q    Do you know of any agent who went to 333 East Broadway to

9    investigate whether the money came from that house?

10   A    I'm not sure about that.

11   Q    Okay.  Did you ever make any effort to interview Ms.

12   Thompson's grandmother, Charlotte Fletcher?

13   A    I don't believe so.

14   Q    Do you know of any other agent who may have made an effort

15   to interview Ms. Charlotte Fletcher?

16   A    I'm not sure.

17   Q    Agent, you don't have any way of knowing whether or not

18   that money was given to Ms. Thompson by her grandfather, do

19   you?

20   A    Based on -- based on our overall investigation, I don't

21   believe it was, no.

22             MR. HETZNECKER:  Objection, objection, as to his --

23             MR. THOMPSON:  Well, I'm going to object.  Non-

24   responsive.

25             MR. HETZNECKER:  Judge, move to strike.

1          THE COURT:   The question was asked and he answered

2     it.

3     BY MR. THOMPSON:

4     Q    I understand what you believe but I'm asking you about

5     what you know.   You don't know that she didn't get the money

6     from her grandfather, do you?   Do you need me to repeat the

7     question?

8     A    I just don't want another objection, I guess.   I don't

9     know.

10    Q    Now, you're aware, are you not, that Ms. Thompson's

11    grandfather died I believe it was February of 2004, correct?

12    A    That's -- that's what she says.   I'm not aware of that

13    personally.

14    Q    Okay.   The bags of cash that were recovered from the

15    house, you didn't look through the bags of cash to determine

16    whether there were any dollar bills, any US currency that was

17    dated after her grandfather died, did you?

18    A    I did not.

19    Q    You don't know of any other agent that did, do you?

20    A    No.

21    Q    Well, can we go today and look through the bag and see if

22    there are any bills that were printed in 2005?

23    A    No.

24    Q    Why can't we do that?

25    A    The money has been seized.   It's already been forfeited.

1    Q    Well, if it's seized, in whose possession is the money

2    now?

3                    MR. BRESNICK:  Objection, Your Honor.

4                    THE COURT:  Objection sustained.

5    BY MR. THOMPSON:

6    Q    Is it not true that the money had been deposited into the

7    bank?

8    A    That's true, yes.

9    Q    It's not available?

10   A    That's right.

11   Q    Did you ever attempt to interview any of Ms. Thompson's

12   family members concerning whether or not her grandfather

13   stored cash in his house?

14   A    I served subpoenas to I believe Ms. Thompson's mother but

15   I -- I personally did not conduct any interviews.

16   Q    Well, do you know of any other agents who may have

17   conducted interviews of members of Ms. Thompson's family in an

18   effort to find that information out?

19   A    I'm not sure about that.

20   Q    Okay.  Well, you served subpoenas on Ms. Thompson's

21   mother?

22   A    To the best of my recollection, yes, I believe I did, yes.

23   Q    But you're not sure.

24   A    I can't be a hundred percent.

25   Q    So you could be mistaken about even that.

Bowman - Cross (Har)                                          142

1    A    I wouldn't say mistaken.  I just -- I served a large

2    number of subpoenas and I'm fairly certain I served a subpoena

3    on a family member of Ms. Thompson.  I'm not sure if it was

4    the mother, father, somebody.  I'm not sure.

5    Q    By the way, Agent, as I sit here -- stand here asking you

6    questions, I notice before you give your response you turn and

7    look at the jury.  Is that --

8                THE COURT:  Counsel, ask questions.

9                MR. THOMPSON:  Withdrawn.

10   BY MR. THOMPSON:

11   Q    Have you been able to confirm --

12               MR. THOMPSON:  -- can I have a moment, Your Honor,

13   please?

14               (Pause in proceedings.)

15   BY MR. THOMPSON:

16   Q    Agent, you're aware that both Ms. Thompson's father and

17   mother were subpoenaed to the Grand Jury?

18   A    I believe they were, yes.

19   Q    And you know they didn't give any information inconsistent

20   with Ms. Thompson's testimony to the Grand Jury --

21               MR. BRESNICK:  Objection.

22               MR. THOMPSON:  -- are you aware of that?

23               THE COURT:  The objection is sustained.

24               MR. THOMPSON:  Withdrawn, Your Honor.  No further

25   questions.

1          MR. HARMELIN:  May I, Your Honor?

2                   CROSS-EXAMINATION

3    BY MR. HARMELIN:

4    Q    How are you doing, Agent Bowman?

5    A    How are you?

6    Q    I'm going great.  I'm through the obstacle course.  I'm

7    back up here.  So on June 7th, your investigation was still

8    ongoing, right?

9    A    Yes.

10   Q    I'm sorry, June 7th, 2006.

11   A    Yes.

12   Q    And it's been ongoing, right?

13   A    We're in Court today, yes.

14   Q    That's what I mean.  Okay.  And because your investigation

15   continued to be ongoing and more information was learned by

16   ATF, the Government decided periodically to file -- go back to

17   the Grand Jury, present whatever the new stuff was and ask for

18   superseding indictments, right?

19   A    Yes.  The evidence drives the case.

20   Q    Okay.  So that if new evidence comes up, I don't know,

21   September 1st, 2006 and you think it's important you go in

22   front of the Grand Jury and say --

23          MR. BRESNICK:  Objection, Judge.

24          MR. HARMELIN:  -- can we have a superseding

25   indictment?

Bowman - Cross (Har)

1            THE COURT:  Is that an objection?

2            MR. BRESNICK:  It's an objection, Your Honor, yes.

3            THE COURT:  Sustained.

4    BY MR. HARMELIN:

5    Q    Well, as more information was learned, you went back to

6    the Grand Jury and got other indictments, right?

7            MR. BRESNICK:  Objection, Your Honor.  What's this

8    have to do with the Grand Jury testimony?

9            MR. HARMELIN:  It has to do with the continuing

10   nature of his investigation that he testified to.

11           THE COURT:  The objection is sustained.

12           MR. HARMELIN:  I'll rephrase the question.

13   BY MR. HARMELIN:

14   Q    If you learn more information, can you seek a superseding

15   indictment?

16   A    As I stated, the evidence drives the investigation.  We

17   don't make haphazard decisions on what we're going to do.

18   It's evidence driven.

19   Q    And is there a day, like a statute of limitations where

20   you have to stop --

21           MR. BRESNICK:  Objection, Your Honor.

22           THE COURT:  Sustained.

23   BY MR. HARMELIN:

24   Q    So the evidence drives whether you seek a superseding

25   indictment, correct?

1    A    And the decision of the US Attorney's Office, yes.

2    Q    Thanks.

3              THE COURT:  Any more questions of Agent Bowman?

4              MR. BRESNICK:  No, Your Honor.

5              THE COURT:  You may step down.

6              (This completes the requested portion.  The balance

7    of this day was done under separate cover.)

8                          *  *  *

9

10

11

12              C E R T I F I C A T I O N

13

14              I, Diane Gallagher, court approved transcriber,

15    certify that the foregoing is a correct transcript from the

16    official electronic sound recording of the proceedings in the

17    above-entitled matter.

18

19

20    _____    May 23, 2008

21    DIANE GALLAGHER

22    DIANA DOMAN TRANSCRIBING

23