UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

865

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | 05-CR-440-1 |
| | ) | |
| | ) | |
| vs. | ) | |
| | ) | VOLUME III |
| | ) | |
| | ) | |
| ALTON COLES, et al. | ) | Philadelphia, PA |
| | ) | February 14, 2008 |
| Defendants | ) | 10:07 a.m. |

FILED
MAY 2 8 2008

TRANSCRIPT OF TESTIMONY OF WALLACE WRIGHT
BEFORE THE HONORABLE R. BARCLAY SURRICK
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:        MICHAEL J. BRESNICK, ESQUIRE
                          RICHARD A. LLORET, ESQUIRE
                          ASSISTANT UNITED STATES ATTORNEYS
                          UNITED STATES ATTORNEY'S OFFICE
                          615 Chestnut Street
                          Suite 1250
                          Philadelphia, PA  19106-4476


For the Defendant         CHRISTOPHER D. WARREN, ESQUIRE
Alton Coles:              Law Office of Christopher Warren
                          1500 Walnut Street
                          Philadelphia, PA  19102


For the Defendant         JACK J. McMAHON, JR., ESQUIRE
Timothy Baukman:         Law Office of Jack McMahon
                          1500 Walnut Street, Suite 900
                          Philadelphia, PA 19102


For the Defendant         LAURENCE HARMELIN, ESQUIRE
Monique Pullins:         P.O. Box 3574
                          Westchester, PA 19381


For the Defendant         RONALD THOMPSON, ESQUIRE
James Morris:            3002 Lincoln Drive, Suite J
                          Marlton, NJ 08053

Audio Operator:          MARK RAFFERTY


Transcribed by:          DIANA DOMAN TRANSCRIBING
                         P.O. Box 129
                         Gibbsboro, New Jersey  08026-0129
                         Office:  (856) 435-7172
                         Fax:     (856) 435-7124
                         E-mail:   Dianadoman@comcast.net


Proceedings recorded by electronic sound recording, transcript produced by transcription service.

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Wallace Wright | 4(Tho) | 30(Bre) | 47(Tho) | |

| EXHIBITS: | | IDENT. | EVID. |
|---|---|---|---|
| DM-8 | Photo of basement of 5 Burden Hill | 17 | 55 |
| DM-15 | Photo of basement of 5 Burden Hill | 17 | 19 |
| DM-4 | Photo of basement of 5 Burden Hill | 18 | 19 |
| DM-13 | Photo of basement of 5 Burden Hill | 19 | 19 |
| DM-10 | Photo of basement of 5 Burden Hill | 19 | 19 |
| DM-14 | Photo of basement of 5 Burden Hill | 19 | 19 |
| DM-5, DM-6, DM-7 | (not identified) | | 55 |
| DM-9, DM-11, DM-12 | (not identified) | | 55 |

Colloquy                                                            4

1                (The following is the requested portion of the

2       testimony which was heard in open court at 10:07 a.m.)

3                THE COURT:  All right, Mr. Thompson.

4                MR. THOMPSON:  Thank you, Your Honor.  We call

5       Wallace Wright.

6                (Pause in proceedings.)

7                COURTROOM DEPUTY:  Please raise your right hand.

8                WALLACE WRIGHT, DEFENDANT'S WITNESS, SWORN

9                COURTROOM DEPUTY:  Please state your full name,

10      spell your last name for the record.

11               THE WITNESS:  Wallace Wright.  Last name,

12      W-R-I-G-H-T.

13               MR. LLORET:  Your Honor, may we approach sidebar?

14               THE COURT:  Yes.

15               (Sidebar discussion as follows:)

16               MR. LLORET:  This witness wasn't sequestered, Your

17      Honor.  We asked for sequestration from the beginning.  He's

18      been in here listening to cooperators.  This --

19               MR. THOMPSON:  Your Honor, that's not exactly true.

20      He was here early on when we first -- when the trial first

21      began.  I think this may be the first time he's been here in

22      weeks.  So, and you certainly can question him about that.

23               MR. LLORET:  I think it's appropriate if you're

24      going to call a witness, then move for sequestration,

25      sequestration was granted. that you take the witness out of

1   the courtroom and not present.  I have no idea what he's been

2   listening to while he's been at trial.

3              MR. THOMPSON:  Your Honor, if I'm not mistaken he

4   wasn't here yesterday, I don't think he was here yesterday.

5   He first came in the beginning, but he hasn't been here since.

6              THE COURT:  Can you give me an offer of proof of

7   what he's going to say?

8              MR. THOMPSON:  Yes, he has some information

9   concerning Mr. Morris' use or non-use of that Suburban.  He's

10  familiar with the house at Burden Hill and what was -- where

11  in the house.

12             THE LLORET:  Well, that was the first few days of

13  testimony we went through Burden Hill.

14             MR. THOMPSON:  They have an opportunity to cross-

15  examine him, Your Honor.

16             THE COURT:  I'm not going to preclude the witness.

17             MR. LLORET:  Very well.

18             (Sidebar discussion concluded.)

19                    DIRECT EXAMINATION

20  BY MR. THOMPSON:

21  Q   Good morning.  Mr. Wright, would you please introduce

22  yourself --

23             THE COURT:  Mr. Wright, would you sit up and speak

24  into the microphone.

25  BY MR. THOMPSON:

Wright - Direct (Tho)                                        6

1    Q    Please introduce yourself again.   Your name is?

2    A    Wallace Wright.

3    Q    Okay.   Mr. Wright, where do you live generally?

4    A    Salem, New Jersey.

5    Q    Okay.   Pull that microphone back to you and speak up,

6    please.

7    A    Salem, New Jersey.

8    Q    Okay.   Are you acquainted with James Morris?

9    A    Yes.

10   Q    Are you also acquainted with Thais Thompson?

11   A    Yes.

12   Q    Okay.   How is it you're acquainted with them?

13   A    I go with the sister.

14   Q    Say it again?

15   A    I go with the sister.

16   Q    You go with the sister, you date her sister?

17   A    Yes.

18   Q    Okay.   And who do you live with?   Do you live with the

19   sister?

20   A    Yes.

21   Q    And how long have you been dating her?

22   A    About 12, 13 years.

23   Q    Okay.   Pull that mike, you're going to have to pull that

24   mike back to you.

25   A    12, 13 years.

1    Q    Scooch your chair up.  12 or 13 years?

2    A    Yes.

3    Q    Okay.  Where do you work?

4    A    I drive for Reagan's (phonetic), a gas truck --

5    Q    Reagan's?

6    A    -- yes.

7    Q    Okay.  How long have you done that?

8    A    About a year and like five months.

9    Q    And before you did that, where did you work?

10   A    I drove over the road for a company called Western

11   Express.

12   Q    Okay.  Have you ever been convicted of a crime?

13   A    No, I haven't.

14   Q    Okay.  Now, the -- are you familiar with 5 Burden Hill

15   Road?

16   A    Yes.

17   Q    Are you acquainted with the Thompson family?

18   A    Yes.

19   Q    Ms. Thais Thompson's family?

20   A    Yes.

21   Q    Now, do you recall that period of time back in August of

22   2005?

23   A    Yes.

24   Q    Do you recall when the Federal authorities came to the

25   Thompson house?

1   A    Yes.

2   Q    Now, you weren't there when that happened, were you?

3   A    No.

4   Q    Okay.  How is it you're able to recall that?

5   A    Basically it disrupted the whole family, everybody in the

6   family knew about it.

7   Q    Okay.  Now, there's been some question concerning a 2000

8   Suburban vehicle, gold 2000 Suburban vehicle.  Are you

9   familiar with that vehicle?

10  A    Yes.

11  Q    Do you know who owned that vehicle?

12  A    The mom.

13  Q    Whose mom?

14  A    Thias's.

15  Q    Had you ever used that vehicle yourself?

16  A    Yes.

17  Q    Have you ever used that vehicle back in and around August

18  of 2005?

19  A    Yes.

20  Q    Do you recall the day the Federal authorities came to the

21  house, correct?

22  A    Yes.

23  Q    Okay.  Taking that day, focusing on that day, when before

24  that date had you ever used that vehicle?

25  A    Actually had it like two to three days before they even

1    came to the house.

2    Q    Okay.  You're going to have -- you're going to have to

3    speak up.

4    A    I had it for like two or three days before they even came

5    to the house.

6    Q    Okay.  And when you used the vehicle, from whom did you

7    get permission to use the vehicle?

8    A    I don't -- I don't need no permission.  I just -- if it's

9    out there, I just take it.

10    Q    Well, from whom do you get a key when you use it?

11    A    I have my own key.

12    Q    You have your own key to that vehicle?

13    A    Yes.

14    Q    How many times back in 2005 would you say you used the

15    vehicle, starting say, the beginning of 2005, January to

16    August, how many times did you use that vehicle?

17    A    Like about two, two to three times, about two times a

18    week, three times a week.

19    Q    And when you use the vehicle --

20    A    Not a week, like every other week.  Basically whenever I

21    want it, I just take.

22    Q    And you didn't need anybody's permission?

23    A    No.

24    Q    It was your understanding that it was okay with the owner

25    for you to use the vehicle?

1   A    Yeah, nobody never said nothing to me about it.

2   Q    Okay.  Now, looking at August 10th, if you could focus on

3   that date, that being the date the authorities came to the

4   house at 5 Burden Hill Road, when was the last time you had

5   driven that vehicle in relationship to that time?

6   A    Like the day before.

7   Q    Okay.  What did you do with the vehicle, why did you have

8   it at that particular time?

9   A    Actually I used the vehicle -- I got a detail shop and I

10  used it to go get supplies.

11  Q    You have a detail shop?

12  A    Yes.

13  Q    When you say, detail shop, what do you mean, explain what

14  that is.

15  A    Just clean cars, you know, just make them look new pretty

16  much.

17  Q    Is this something you do on the side, or do you actually

18  have a business?

19  A    Actually I have a business.

20  Q    Do you have your own location, you own building?

21  A    Yes.

22  Q    And where is that?

23  A    It's in Salem.

24  Q    Now, when I ask you questions, unless I say otherwise, I'm

25  focusing back on 2005, in and around August 2005, okay?

1    A    Okay.

2    Q    So did you have that detail shop back then?

3    A    Yes.

4    Q    Okay.  Now, you usually get it, use the vehicle to pick up

5    supplies?

6    A    Yes.

7    Q    Okay.  Now, when you picked up the vehicle, where did you

8    pick it up from?

9    A    On Burden Hill Road.

10   Q    Okay.  And did you talk to anybody before you picked it

11   up?

12   A    No.

13   Q    Okay.  And how long did you have the vehicle before you

14   returned it?

15   A    About like -- about two-and-a-half days, three days.

16   Q    And when you finished with it, what did you do with it?

17   A    I parked it back at the house -- at the house and left.

18   Q    What house?

19   A    On Burden Hill Road.

20   Q    Where did you leave the vehicle?

21   A    In the driveway.

22   Q    Tell us how the vehicle was parked, if you recall, when

23   you returned it?

24   A    Basically it was backed up on the blacktop.

25   Q    Were any other vehicles in the driveway when you left it

1   there if you recall?

2   A    Not in the driveway.

3   Q    Well, were there any other vehicles anywhere around, do

4   you recall, if you recall?

5   A    There was a Mustang in the back.

6   Q    And who owns that Mustang, do you know?

7   A    I think Mr. Morris.

8   Q    Now, have you ever seen anyone else operate that vehicle,

9   I'm talking about back around 2005?

10  A    The Suburban?

11  Q    Yes.

12  A    Yes.

13  Q    Can you give us the names of people you've seen operate

14  it?

15  A    Basically everybody in the family uses it, the nephew, the

16  cousins, I mean everybody uses it.

17  Q    Can you give us any names of anybody specifically?

18  A    Kareem (phonetic).

19  Q    About how old is that person?

20  A    About 20, I give or take, 19, 20.

21  Q    Okay.  Anybody else?

22  A    Dietrich (phonetic), I drive it.

23  Q    Who's Dietrich?

24  A    The neighbor.

25  Q    You've seen the neighbor, Dietrich, drive the car?

Wright - Direct (Tho)                                      13

1    A    Yes.

2    Q    Back around 2005?

3    A    Yes.

4    Q    Do you know why he had it?

5    A    Basically, sometime he work with me, so I just tell him if

6    it's basically at my shop, take it, you know what I mean.

7    There's not no -- no problem with nobody uses it, as long as

8    they don't tear it up.

9    Q    Okay.  Now, you said you had the vehicle and you left it

10   back in August of 2005, left it in the driveway.  During that

11   period of time you had the vehicle, what was it a day-and-a-

12   half or two days?

13   A    About two-and-a-half days.

14   Q    Okay.  While you had the vehicle, did anyone else operate

15   it?

16   A    There's different people -- like one of my boys at the

17   shop might use it to run little errands, you know what I mean,

18   nothing -- nothing major.

19   Q    Well, it's important.  Do you remember specifically, I'm

20   not talking about what generally happens.  If you don't

21   remember, that's fine.  But while you had it during that

22   period of time, did anyone operate it, do you recall?

23   A    I don't remember.

24   Q    Okay.  Now, when you took the vehicle back to Burden Hill

25   Road, what did you do with the key?

1    A    I had my own key.

2    Q    What did you do with your key?  Where's your key now?

3    A    In my pocket.

4    Q    You still have the key to the Suburban?

5    A    Yeah.  I've got a key to all the cars.

6    Q    All, when you say, all the cars, all what cars?

7    A    The Honda, the Expedition, the Suburban.  I mean, like,

8    I'm like a -- I'm like a son, you know what I mean, so I

9    pretty much have the key to everything.

10   Q    Well, do you have a key to Burden Hill Road?

11   A    The house?

12   Q    Yes.

13   A    Yes.

14   Q    Do you have that key with you today?

15   A    Yeah, I got that -- yeah, I got all my keys, my -- her mom

16   house, my house, the -- her house, I mean I have them all.

17   Q    Why were you using that Suburban, didn't you have your own

18   car?

19   A    Yeah, it's a Honda.  I'm hauling supplies, this is a

20   little Honda Civic.

21   Q    So you -- that's not built for hauling supplies?

22   A    No.

23   Q    Okay.  Tell us what you did when you took that vehicle

24   back, if you recall, back in 2005 when you returned the

25   vehicle to the driveway, what did you immediately after you

1    got out of the vehicle?

2    A    Locked the doors, went in the house --

3    Q    Let me stop you right there.  You went in the house.  Did

4    you knock on the door, ring the bell?

5    A    No.

6    Q    Did you get in the house?

7    A    Yeah.

8    Q    How did you get in the house?

9    A    I had my own key.

10   Q    And you went in?

11   A    Yeah.

12   Q    You feel free to do that without somebody's permission?

13   A    Yeah.  It's just like --

14   Q    What did you go in the house for?

15   A    Like the house is like my -- you know, I just go in there,

16   I went in the house.  Most likely I went in the refrigerator.

17   Q    You feel free to go in the refrigerator without asking

18   anybody?

19   A    Ain't nobody home.  I mean, I do it all the time if they

20   home or not.

21   Q    Nobody ever complains about that?

22   A    No.

23   Q    Okay.  Well, have you done that since that day, you've

24   been to the house --

25   A    Yeah, I still do it to this day.  Actually I did it like

1    two days ago.

2    Q    Okay.  Okay.  Now, you are -- you say you've been -- is

3    all of this your freedom to do all these things based in part

4    of your relationship with the younger daughter --

5    A    Yes.

6    Q    -- younger sister, Ms. Thompson?

7    A    Yes.

8    Q    Now, have you ever walked around in the house?

9    A    Yes.

10   Q    Have you ever been in the basement?

11   A    Yes.

12   Q    Are you familiar with, generally with what the basement

13   looked like around 2005?

14   A    Yeah.

15   Q    August, 2005?

16   A    Yes.

17   Q    Now, had you been in the basement after the authorities

18   had left the house --

19   A    Yeah.

20   Q    -- in 2005?  Are you -- okay.

21            MR. THOMPSON:  Your Honor, I'm like to have marked

22   collectively --

23            THE COURT:  Mr. Thompson, why don't you mark each

24   one of those individually --

25            MR. THOMPSON:  I will, Your Honor.

1            THE COURT:  -- with consecutive numbers.

2            MR. THOMPSON:  Okay.  Starting at four, D-4.

3            THE COURT:  Yes.

4            (Pause in proceedings.)

5            MR. THOMPSON:  I've done so, Your Honor, and they're

6    marked in consecutive order from DM-4 to DM-15.

7            THE COURT:  All right.

8            MR. THOMPSON:  May I approach the witness, Your

9    Honor?

10           THE COURT:  Yes.

11   BY MR. THOMPSON:

12   Q   Now, Mr. Wallace, are you familiar with what the basement

13   looked like and how things were arranged generally back in

14   August 2005?

15   A   Pretty much, yes.

16   Q   Had you been in the basement around that time, not

17   specifically on any particular day, but around August 2005?

18   A   Yes.

19   Q   Okay.  I'd like to show you what's been marked DM-4

20   through DM-15.  And I'll start with, I'll start with DM-8 and

21   ask you to take a look at that.

22   A   Uh-huh.

23   Q   And I'll show you what's been marked DM-15, and ask you to

24   take a look at that.

25           In the first one, DM-8, do you know what that is?

1    A    Yes, this is a shelf with a --

2    Q    No, do you know what it is?

3    A    Yes.

4    Q    Okay.  What is it?

5    A    It's a shelf with paper towels, paper plates, cups and

6    bowls and all that kind of stuff.

7    Q    Were you able -- I'm sorry, are you able to tell from that

8    photograph what location that is?

9    A    Yes.

10   Q    DM-15, are you able to tell from the photograph what the

11   location is of this?

12   A    Yes.

13   Q    And what is the location?

14   A    The left side of the corner of the basement.

15   Q    Of what, 5 Burden Hill Road?

16   A    Yes.

17   Q    Now, I'll next show you what's been marked DM-4, and ask

18   you to take a look at that?

19   A    Uh-huh.

20   Q    Do these photographs fairly and accurately depict in a

21   general sense of what that basement looked like back in August

22   2005?

23   A    Yes.

24   Q    Now, I'll next show you DM-13.  And I suppose from this

25   photo you're not able to tell much other than what's on the

1    shelf.  Does this photo -- can you tell whether that's also

2    the basement?

3    A    Yes, yes.

4    Q    Okay.  And we're referring to DM-13.  Now, what is that?

5    A    A shelf with a sandwich bags and batteries and toilet

6    paper.

7    Q    And I'll show you what's been marked DM-10.  Are you

8    familiar with that?

9    A    Yes.

10   Q    DM-4, I believe it is, are you familiar with that?

11   A    Yes.

12   Q    Can you tell what it is?

13   A    Yes.

14   Q    DM-14?

15   A    Yes.

16   Q    Now, all the pictures I've shown you there, do they fairly

17   and accurately depict how the basement appeared or how items

18   appeared in the basement back in August 2005?

19   A    Yes.

20          MR. THOMPSON:  Your Honor, I offer these items, DM-

21   14, DM-4, DM-10, DM-13, DM-4 and DM-15.

22          MR. BRESNICK:  No objection.

23          THE COURT:  It may be admitted.

24          MR. THOMPSON:  Thank you.

25          (Defendant's Exhibits DM-4, 10, 13, 14 and 15 are

1    admitted in evidence.)

2    BY MR. THOMPSON:

3    Q    Now, Mr. Wallace, I'm holding up DM-14.  Can you see it

4    from where you're sitting?

5    A    Yes.

6    Q    Okay.  And it's been admitted into evidence.  I'm holding

7    it so the jury can see it.  What is this?

8    A    It's a treadmill for the dogs.

9    Q    Have you ever seen it used?

10   A    No.

11   Q    How do you know it's a treadmill for the dogs?

12   A    Because I've seen the dogs in the basement one day and

13   they had the dog leash already attached to the machine.  But I

14   actually never seen the dog on it.

15   Q    You never seen the dog run -- you seen the dog attached to

16   it, but just not moving --

17   A    Yeah.

18   Q    -- is that what you're saying?  Okay.

19            MR. THOMPSON:  May I have a moment, Your Honor?

20            THE COURT:  Yes.

21            (Pause in proceedings.)

22   BY MR. THOMPSON:

23   Q    Now, Mr. Wallace, I understand you've been around the

24   family quite a bit, and you've been at 5 Burden Hill Road. Why

25   are all these items in the basement?  Do you have an idea?

1    A    They get used.

2    Q    They get used?

3    A    Yeah.

4    Q    Well, does Ms. Thompson routinely store items in the

5    basement in bulk?

6    A    Yes.

7    Q    Is that why in DM-13, we see all these Ziploc bags on the

8    shelf?

9    A    Yes.

10   Q    I'd like you to look at this monitor in front of you.

11   It's showing Government Exhibit 20HHH.  Are you able to see

12   what that is?  Can you see it pretty clearly?

13   A    Yes.

14   Q    Now, the times that you had been in the basement, and I'm

15   talking about around about 2005, had you ever seen any Saran

16   Wrap in any box on the floor in the basement?

17   A    No, I haven't.

18   Q    Have you ever seen any duct tape in any box on the floor

19   in the basement?

20   A    No, I haven't.

21   Q    Had you ever seen any Saran Wrap anywhere else in the

22   basement?

23   A    On the shelves, but that's about it.

24   Q    On the shelves like --

25   A    Yes.

1    Q    -- depicted in the photographs?

2    A    Yes.

3    Q    Now, looking at this item, are you able to see Glad bags

4    right here, and I'm talking about 520 HHH --

5    A    Yes.

6    Q    -- Glad bags?  Could you please take a look at this,

7    Exhibit DM-13, and tell us if they appear to be the same kind

8    of bags?

9    A    Yes.

10   Q    Have you ever seen any Glad bags used in the house --

11   A    Yes.

12   Q    -- any kind of Glad bag?

13   A    Yes.

14   Q    For what have you seen them used?

15   A    The kids, for the kids' lunches and stuff like that.

16   Q    Okay.  Besides in the basement, do you happen to know

17   whether there are any similar items stored anywhere else in

18   that house?

19   A    Actually everything that's in the basement is upstairs in

20   the cabinet.

21   Q    Upstairs in the --

22   A    Yeah.

23   Q    -- explain that.

24   A    They got like a utility cabinet --

25   Q    Upstairs?

1    A    Yeah.

2    Q    Where upstairs?

3    A    It's in the kitchen.

4    Q    Okay.  And what's in the cabinet?

5    A    Like can goods and just different stuff for the kids and

6    food and Glad bags and aluminum foil.  I mean it's pretty much

7    stocked up pretty good because I go there myself.

8    Q    Quite often?

9    A    All the time.

10   Q    Have you ever had occasion back around that time to borrow

11   anything from this household?

12   A    You're talking about like everything that's in the

13   cabinet?

14   Q    Yes.

15   A    Yeah.  Actually, believe it or not, we do it like all the

16   time, everybody.

17   Q    The whole family.

18   A    Everybody.

19   Q    You don't by any chance contribute to that, do you?

20   A    No.

21   Q    Anybody ever complain about your doing that?

22   A    Nobody never complained.

23   Q    Okay.  Now, going back to August 2005, during the time you

24   had that Suburban, did you by any chance when you finished

25   with it, did you leave anything in the vehicle?

1    A    No.

2    Q    You got all your equipment out?

3    A    Yes.

4    Q    All right.  You said you have a detail shop.  Did you

5    happen to clean the vehicle up before you returned it?

6    A    Actually I was, but I never got to it.

7    Q    Never got to it?

8    A    Uh-uh.

9    Q    Okay.  Now, were you familiar with the fact that there

10   were dogs at 5 Burden Hill Road?

11   A    Yes.

12   Q    Had you, back around that time, ever seen any dogs in the

13   house?

14   A    I think it was like, they were -- I don't know, they were

15   like puppies, not no major big dogs or anything.  I think it

16   was like smaller dogs.

17   Q    Had you seen any dogs in the basement of the house?

18   A    Yes.

19   Q    Now, have you ever seen Mr. Morris working with dogs?

20   A    Yes.

21   Q    And what would you see him doing with dogs, talking about

22   August 2005?

23   A    Like -- just like -- just dealing with them.  I mean, he's

24   like the dog man, you know what I mean.  He would train dogs,

25   you know, do everything.  I mean he's like, sell them, he'd do

1    it all.

2    Q    Okay.  Are you familiar with his having trained other

3    people's dogs?

4    A    Yes.

5    Q    Do you know whether or not he's been paid for it?

6    A    I don't even know.

7    Q    Do you know -- do you happen to know, if you don't, it's

8    fine.  Do you happen to know whether -- strike that.

9              Back when you returned the car in August 2005, was

10   anyone else at the house at all?

11   A    No.

12   Q    All right.  Now, you mentioned that this person Dietrich,

13   you'd seen him drive a car before?

14   A    Yes.

15   Q    Had he ever been in your company when he had the car?

16   A    He drove without me being with him, and he drove when I

17   was with him, so --

18   Q    Uh-huh.

19   A    -- I would say, yeah, I guess, yes.

20   Q    Let me ask you a question, back in August 2005, I guess

21   shortly after the authorities finished, were you made aware

22   that something had been found in that car?

23   A    Yes.

24   Q    And what, if any, thoughts did you have about that?

25              MR. BRESNICK:  Objection, Your Honor.

1            THE COURT:  Sustained.

2   BY MR. THOMPSON:

3   Q    Did you have any suspicion about what had been found in

4   the car?

5            MR. BRESNICK:  Objection.

6            THE COURT:  Sustained.

7   BY MR. THOMPSON:

8   Q    Do you know anything about what had been found in the car?

9            MR. BRESNICK:  Objection.

10           MR. THOMPSON:  If he knows anything about what was

11  found in the car?

12           THE COURT:  Do you know anything?

13           THE WITNESS:  Yeah.

14  BY MR. THOMPSON:

15  Q    What do you know about that?

16  A    I just heard that they found something --

17           MR. BRESNICK:  Objection.

18           THE COURT:  Objection is sustained.

19  BY MR. THOMPSON:

20  Q    I'm asking you, okay, do you have any -- let me rephrase

21  the question.  Do you have any personal knowledge about what

22  was found in the car, or do you just have some suspicion?

23  A    To tell you the truth, I don't even know.  I mean, like --

24  Q    No, listen to my question.  If you don't know, it's fine,

25  but do you have any personal knowledge about how drugs got

1   into the car, or just a suspicion, if it's a suspicion, just

2   tell us.

3   A    What I heard --

4            MR. BRESNICK:  Objection.

5            THE COURT:  Objection sustained.

6            THE WITNESS:  Well, I had a suspicion --

7            MR. BRESNICK:  Objection, Your Honor.

8            THE COURT:  Just -- objection is sustained.

9            MR. THOMPSON:  Okay.

10  BY MR. THOMPSON:

11  Q    Now, when you had that vehicle in your care and custody

12  before you returned it, did anyone else have access to the

13  vehicle?

14           MR. BRESNICK:  Objection, it's asked and answered.

15           THE COURT:  The objection is overruled.  Do you know

16  whether anyone had access to the vehicle?

17           THE WITNESS:  Yes.  I mean, I leave the door -- I

18  mean, I leave doors open all the time, like, if it was out in

19  front, you know, I don't -- I leave it open.

20           MR. THOMPSON:  Okay.

21           THE WITNESS:  But I don't know.

22  BY MR. THOMPSON:

23  Q    Okay.  Who else would have had access to the vehicle while

24  you had it?

25  A    Everybody that works with me.

Wright - Direct (Tho)                                      28

1    Q    What do you mean, work with you where?

2    A    At the shop.

3    Q    At your shop?

4    A    Yeah.

5    Q    Do you have people who work for you back around that time?

6    A    Yeah.

7    Q    How many people?

8    A    Like two, like a couple of people help me out every day.

9    Q    Have any of those people ever used that Suburban while

10   you've had it in your custody, if not, then at any time?

11   A    Yes.

12   Q    Did anyone, any of those people have access to the vehicle

13   while you had it back in around August 2005?

14   A    Yes.

15   Q    After you found out what happened, did you happen to

16   discuss with anyone whether anything had been left in the car,

17   not talking about what they said, if it's even so, did you

18   talk with anybody who had worked with you?

19   A    I might --

20   Q    I'm not asking what anybody said, just if you talked to

21   any body?

22          MR. BRESNICK:  As long as it's a yes or no answer,

23   Your Honor.

24          THE COURT:  Is it a yes or no answer?

25          THE WITNESS:  Yes.

1          MR. THOMPSON:  Your Honor, that may be the

2   appropriate answer in this case, but -- I'll withdraw it, I'll

3   withdraw my comment.

4   BY MR. THOMPSON:

5   Q    And your conversation with someone, did it -- did it

6   factor into your belief about how drugs got in the car?

7          MR. BRESNICK:  Objection.

8          MR. THOMPSON:  I'll withdraw the question.

9          THE COURT:  Objection sustained.

10          MR. THOMPSON:  I understand, Your Honor.

11  BY MR. THOMPSON:

12  Q    Now, do you know whether Mr. Morris had -- I'll withdraw

13  that.

14          How many dogs did Mr. Morris have about that time,

15  August 2005, if you know?

16  A    About anywhere from like seven, give or take seven and

17  ten dogs, maybe.

18  Q    Okay.  Had you ever been involved in the care of any of

19  those dogs for any reason at all?

20  A    No more than just feeding them.

21  Q    Is that when nobody is around?

22  A    Yeah.

23  Q    Okay.

24  A    Like where I work at, I usually like come right there,

25  like sometime go there.  If there ain't nothing back there, I

1    throw a little food to them, but other than that I don't deal

2    with them.

3    Q    Okay.  Now, I want to ask you, the 2000 Suburban, you've

4    seen Mr. Morris drive that car before, correct?

5    A    Yes.

6    Q    Okay.  Now, do you know whether Mr. Morris lived at 5

7    Burden Hill Road or if he lived somewhere else, do you know?

8    A    No, he didn't live there.

9    Q    Beg your pardon?

10   A    He didn't live there.

11   Q    Do you know where he lived?

12   A    He lived in Salem with his grandmom.

13   Q    In Salem City, his grandmom?

14   A    Yes.

15   Q    Would you see Mr. Morris frequently at 5 Burden Hill Road?

16   A    Yeah.

17   Q    He was there quite a bit?

18   A    Yeah.

19   Q    Okay.

20              MR. THOMPSON:  I don't have anything further, Your

21   Honor.

22              THE COURT:  All right.

23              MR. BRESNICK:  Thank you, Your Honor.

24                        CROSS-EXAMINATION

25   BY MR. BRESNICK:

1    Q    Sir, you said you currently live in Salem, New Jersey, is

2    that right?

3    A    Yes.

4    Q    Now, how long have you lived there?

5    A    I've lived in Salem pretty much -- I lived in Salem pretty

6    much all my life.

7    Q    And how old are you now?

8    A    30.

9    Q    Have you ever lived anywhere else?

10   A    I lived in Delaware.

11   Q    All right.  And when was that?

12   A    Like '90, like '90-something, late '90s.

13   Q    Late '90s until when approximately?

14   A    To about only like five years, something like that.

15   Q    '99 to when?

16   A    To about 2000, about 2002.

17   Q    2000, 2002?

18   A    Yeah.

19   Q    All right.  And you're still using a Delaware license,

20   correct?

21   A    Yes.

22   Q    Okay.  In fact, that's the license that you used to get

23   into this courtroom?

24   A    Yes.

25   Q    All right.  So the license that you have doesn't reflect

1    where you currently live, is that right?

2    A    No.

3    Q    All right.  Now, let's talk about this Chevy Suburban.

4    You said you started driving it around January of 2005?

5    A    No, actually I've been driving it since they bought it.

6    Q    And when was that?

7    A    I can't recall, but I know I drive it like whenever I

8    want.

9    Q    Right.  So when did you start driving this car?

10   A    If they -- I don't know when they bought it, but I know

11   probably two -- two months after, you know, I mean, they had

12   it, I've been driving it.

13   Q    All right.  How many years have you been driving this car?

14   Well, obviously not from August '05 until today, but before

15   that, how many years were you driving the car?

16   A    I don't know, whenever they bought it.

17   Q    All right.  You just -- you don't know when that was?

18   A    No, I don't.

19   Q    All right.  Any idea?  Was it more than one year?

20   A    Yeah.

21           MR. THOMPSON:  Objection, Your Honor, asked and

22   answered.

23           THE COURT:  Overruled.

24           THE WITNESS:  Yeah, they had -- they had it for a

25   while.

1   BY MR. BRESNICK:

2   Q   Okay.  Was it more than two years?

3   A   I don't recall, man.

4   Q   All right.  You don't know, it could have been more than

5   five years?

6   A   No, it wasn't that long.

7   Q   All right.  Somewhere between maybe one and what, three

8   years or so?

9   A   About -- guessing, about two, about two years.

10  Q   All right.  And how many days a week would you drive the

11  car?

12  A   Basically I'd drive it one, about two -- two to three

13  days.  Basically I drove it whenever I want it.  I had access

14  to a gang of cars, you know what I'm saying, so if I wanted

15  the Honda, I took the Honda, if I wanted the truck, I took the

16  truck.  If I wanted the Expedition, I took that.

17  Q   Right.  And so you -- I want to get this straight, how

18  many days a week were you driving the Chevy Suburban?

19  A   A couple of days.

20  Q   About two days a week?

21  A   Yeah, give or take.

22  Q   For a matter of a couple of years, right?

23  A   No, I mean, some weeks I didn't even get the car --

24  Q   All right.

25  A   -- the truck, you know what I mean.

1    Q    All right.  So off and on depending on the week, maybe two

2    times a week, maybe three times a week, something like that?

3    A    Yeah, basically, whenever I --

4    Q    And how did you get the key to the car?

5    A    I had my -- I had my own keys.

6    Q    Yeah, who gave you the keys?

7    A    My mother-in-law gave me the keys.

8    Q    All right.  What, soon after she bought it, I guess?

9    A    Basically I used it one day, and I used it again, and I

10   ended up making my own key.  She ended up knowing I had my own

11   key, so it went like that.

12   Q    And what would happen?  You said you'd go over to the

13   house and you'd -- you know, use the car, is that right?

14   A    Yes.

15   Q    How did you get to the house?

16   A    Either I get dropped off or drive one car and take another

17   car.  It depends on how I feel that day, you know what I'm

18   saying.

19   Q    You'd drive one car over to the house, then hop into the

20   Suburban and use that car?

21   A    I drive what I want.  Like sometimes I get friends to drop

22   me off, you know what I mean.  Who's to say, like, whatever I

23   wanted to drive.  Some days you feel good, you want to drive

24   something else, you know what I mean.

25   Q    So you're saying, some days you would drive one car over

1   to 5 North Burden Hill Road?

2   A    No, it was like this.

3   Q    Okay.  I'm trying to understand.

4   A    Basically it's like I might drive the Honda.  The car is

5   small.  If I want to go out of town, I'd jump in the truck,

6   clean it up and I'm off for the day, you know.  It's just like

7   getting in your wife's car and going to the mall and leave

8   your car there.

9   Q    Yeah, all right.

10  A    Something like that.

11  Q    And you listed a bunch of other people who drove this car

12  too, right?

13  A    Yes.

14  Q    It's kind of like a -- whatever, the car is for people to

15  drive around in, is that right?

16  A    No, basically like if you need something and it's there,

17  then -- you know, we're not a stingy family.  If we need it,

18  take it.

19  Q    Right.  And you said James Morris drove the car, right?

20  A    Yes.

21  Q    And how often would he drive the car?

22  A    Basically whenever he wanted it.  He had his own vehicle,

23  so basically he didn't drive it all the time.

24  Q    Right.  But he drove the car, right?

25  A    Yeah, he drove it before.

1   Q    In fact, when the agent searched it, after the search on

2   August 10, 2005, they found a lot of documents in James

3   Morris' name in that car, isn't that right?

4               MR. THOMPSON:  Objection.

5               THE WITNESS:  I don't know what he found in it.

6               THE COURT:  Objection is sustained.

7   BY MR. BRESNICK:

8   Q    You don't know what they found?

9   A    I don't know what they found in it.

10              MR. THOMPSON:  Objection, Your Honor.

11              THE COURT:  He answered the question.  He does not

12  know.

13              MR. BRESNICK:  Well, let me see.  Can we show for

14  the witness Government's Exhibit 521 B, Bravo.

15  BY MR. BRESNICK:

16  Q    Can you see that, sir?  Would you like me to hold it up

17  for you?  Can you see that?

18  A    Yeah.

19  Q    All right.  And that's in James Morris' name, is

20  that --

21              MR. BRESNICK:  Objection, Your Honor.

22              THE WITNESS:  Yes.

23              THE COURT:  Just a moment.  Make sure the

24  objection --

25              MR. THOMPSON:  The answer requires him to speculate.

1    It says, James --

2             THE COURT:  Let's go to sidebar.

3             (Sidebar discussion as follows:)

4             THE COURT:  Mr. Thompson, what is the objection?

5             MR. THOMPSON:  Well, Your Honor, he doesn't have any

6    personal knowledge as a basis --

7             THE COURT:  He drove the car.  If he could go

8    through every item that was found in the car and ask him

9    whether or not he ever saw it there.

10            MR. THOMPSON:  Well, Your Honor, if he asks him

11   first -- I think the foundation has to be laid if he has some

12   -- or if he knows anything about any documentation of the car,

13   and he doesn't know, he doesn't know, and then it's not

14   permissible for him to go through every item.

15            MR. BRESNICK:  Your Honor, I don't think there's any

16   particular order of inquiry that Your Honor suggested --

17            THE COURT:  There is absolutely no order of inquiry.

18   He says he drove the car.  Mr. Bresnick is trying to establish

19   whether he knew what was in the car which would support that.

20            MR. THOMPSON:  I understand, Your Honor.

21            THE COURT:  The objection is overruled.

22            MR. THOMPSON:  I understand that, Your Honor, but in

23   that scenario, Mr. Bresnick doesn't have to go up and ask him.

24   If it says James Morris, it says what it says.  If he asked

25   him if he's agreeing with the document --

1          THE COURT:  Well, he originally put it up on the

2    screen and it's been entered into evidence.  The jury knows

3    what it is.

4          MR. BRESNICK:  That's correct, Your Honor.  I just

5    wasn't going to go through each line and each document, but

6    I'd like to know if he ever saw that document before.

7          THE COURT:  Well, I think you already know what do

8    do, but go ahead.

9          (Sidebar discussion concluded.)

10          MR. BRESNICK:  Your Honor, I'm just going to put the

11   screen up on the witness stand here if it's all right.

12          THE COURT:  Yes, indeed.

13   BY MR. BRESNICK:

14   Q    Can you see that, sir?

15   A    Yes.

16          MR. BRESNICK:  And can defense counsel see the

17   monitor?  Any objection?

18          Can you see the witness all right?

19          MR. THOMPSON:  That's fine.

20          MR. BRESNICK:  All right.

21          THE COURT:  Go ahead, Mr. Bresnick.

22          MR. BRESNICK:  Thank you, Your Honor.

23   BY MR. BRESNICK:

24   Q    All right.  Now, this document here, it says, there's a

25   name of James Morris, right?

1    A    Yes.

2    Q    And the top right is dated July 27th, 2005, is that right?

3    A    Yes.

4    Q    Have you ever seen this document in the car?

5    A    No, I didn't.

6    Q    Then let's go to 521-C, Charlie, if we could.

7    A    All right.  Now, this is a document.  It's a fitness

8    center, it looks like a membership card, do you see that on

9    your screen?

10   A    Yes.

11   Q    All right.  And that's in the name of James Morris, right?

12   A    Yes.

13   Q    And it has an expiration date of July 6th, 2005.  Did you

14   ever see that in the car?

15   A    No, I didn't.

16          MR. BRESNICK:  Okay.  Let's go 521-D, Delta.  Let's

17   blow it up if we could.

18   BY MR. BRESNICK:

19   Q    It looks like a letter to Mr. Morris, do you see that?

20   A    Yes.

21   Q    Dated March 14, 2005?

22   A    Yes.

23   Q    Did you ever see that in the car?

24   A    No, I didn't.

25   Q    All right.  And how about 521-A?

1           MR. BRESNICK:  And blow up the top, please.

2   BY MR. BRESNICK:

3   Q    This is a South Jersey Gas bill addressed to Mr. James

4   Morris.  Do you see that?

5   A    Yes.

6   Q    All right.  And it looks like -- this is for January 2005,

7   do you see that, sir?

8   A    Yes.

9   Q    All right.  Did you see this bill in the car?

10  A    No, I didn't.

11  Q    And, sir, do you have a cell phone?

12  A    Yes.

13  Q    What kind of cell phone is it?

14  A    Uh --

15          MR. THOMPSON:  Objection, Your Honor, beyond the

16  scope.

17          THE COURT:  Overruled.

18          THE WITNESS:  It's a Nextel.

19  BY MR. BRESNICK:

20  Q    Okay.  What kind of Nextel is that?

21  A    I got a regular Nextel.

22  Q    All right.  The question is, is that a Boost car phone?

23  A    No.

24  Q    No.  All right.

25          MR. BRESNICK:  Well, let's show 521-R, please.

Wright - Cross                                    41

1    BY MR. BRESNICK:

2    Q    All right.   This is for a Boost Mobile prepaid card.   Do

3    you see that?

4    A    Yes.

5    Q    All right.   That wasn't yours, was it?

6    A    No.

7    Q    And 521-Q.   All right.   Do you see this is another prepaid

8    Boost card, do you see that?

9    A    Yes.

10   Q    That wasn't yours, right?

11   A    No.

12   Q    521-P, that wasn't yours, sir?

13   A    No.

14   Q    521-S, and that wasn't yours either?

15   A    No.

16   Q    All right.   How about 521-N?   This is a -- it looks like a

17   dental appointment card in the name of James, do you see that?

18   A    Yes.

19   Q    That's for August 3rd, 4:00 p.m., do you see that?

20   A    Yes.

21   Q    Did you see that in the car?

22   A    No.

23   Q    All right, 521-M, Mary.

24        MR. BRESNICK:   And can you blow that up just a

25   little bit?

1    BY MR. BRESNICK:

2    Q    All right.  Now, sir, this is a U.S. Airways ticket in the

3    name of James Morris, right?

4    A    Yes.

5    Q    All right.  Dated May 7, do you see that?

6    A    Yes.

7    Q    I don't know if we got a year on that or not, but it looks

8    like we don't.  Did you see that in the car?

9    A    No.

10   Q    And 521-T.

11            MR. BRESNICK:  Let's blow up the top, please.

12   BY MR. BRESNICK:

13   Q    This looks like an auto repair slip in the name of James

14   Morris, do you see that?

15   A    Yeah, I see it.

16   Q    And that's for the Suburban that we're talking about,

17   right, see that '02 Suburban?

18   A    Yes.

19   Q    All right.  The same license plate number there?

20   A    Yeah.

21   Q    All right.  And that was dated February 8, 2005, right?

22   A    Yes.

23   Q    Did you see that in the car?

24   A    No.

25   Q    And see 521-U, it looks like just the receipt of some form

1    in the name of James Morris, correct?

2    A    Yes.

3    Q    And that's dated February 25, 2005?

4    A    Yes.

5    Q    Do you see that, sir?  Did you see that in the car?

6    A    I said, yes.

7    Q    Oh, you saw that in the car?

8    A    Oh, no, I didn't see that, no.

9    Q    Okay, I'm sorry.  So you did not see that in the car, is

10   that correct?  Is that correct?

11   A    Yes.

12   Q    Okay.  Sorry.  Thank you.

13             All right.  Sir, so isn't the fact that -- and there

14   were numerous other documents.  Isn't it the fact that there

15   was just a ton of documents with the name James Morris in that

16   Chevy Suburban?

17   A    I'm looking at it, sir.  Evidently there must have been

18   stuffed down in the -- in the console.  I don't snoop through

19   it, I just drive it.

20   Q    All right.  You didn't see any of that, right?

21   A    No.

22   Q    All right.  And there were no documents in the car in your

23   name, right?

24   A    The only thing I got in the car is my license.

25   Q    All right.  But there was nothing -- no documents in the

1    car with your name on it?

2    A    No.

3    Q    Or Dietrich's name on it?

4    A    No.

5    Q    Or any of these other people that you talked about, right?

6    A    No, I ain't see them on here.

7    Q    All right.  Now, let's -- by the way, have you ever been

8    to -- where does Mr. Morris live?

9    A    At his grandma house on Broadway.

10   Q    Where is that, is that 302 Broadway?

11   A    I don't know the address.

12   Q    All right.  He lives with his grandmother on Broadway?

13   A    Yes.

14   Q    Did you ever see any dogs there?

15   A    Yes.

16   Q    All right.  You saw dogs at that house?

17   A    Yeah.

18   Q    All right.  Now, let's go through -- you said you've been

19   in 5 North Burden, you've been in that property frequently,

20   right?

21   A    Yes.

22   Q    Did you ever see large bags of cash in the house, sir?

23   A    No, I haven't.

24   Q    Okay.  Well, let's show you 520-YY.  Do you see that

25   picture, sir?

1    A    Yes.

2    Q    All right.  And you can see that bag of cash in the

3    foreground there?

4    A    Yes, I see it.

5    Q    Did you see that in the house?

6    A    No.

7    Q    How about 520-BBB, have you seen that, sir?

8    A    Never seen it.

9    Q    That's another bag of cash, right?

10   A    Yeah.

11   Q    That's in the basement --

12              MR. THOMPSON:  Your Honor, I'm going to object.  He

13   asked the witness had he ever seen large bags of cash.  He

14   said, no.

15              THE COURT:  You did ask him that question.  He said

16   he never saw any cash in the house, Mr. Bresnick.

17              MR. BRESNICK:  Well, I just want to take him through

18   the specific instances, Your Honor, to see maybe it would

19   refresh his recollection.

20              THE COURT:  Well, if he's indicated that he's never

21   seen any bags of cash, that resolves it.

22              MR. BRESNICK:  All right.

23   BY MR. BRESNICK:

24   Q    You never saw any cash in the house, right?

25   A    No, I didn't.

1    Q    All right.  They never talked to you about having any cash

2    in the house like that?

3    A    No, they haven't.

4    Q    All right.  Sir, do you know Alton Coles?

5    A    No, I don't.

6    Q    Did you ever hear Mr. Morris talk about Alton Coles?

7    A    No, I haven't.

8    Q    You ever hear Thais Thompson talk about Alton Coles?

9    A    No --

10              MR. THOMPSON:  Objection.

11              THE WITNESS:  -- I haven't.

12              MR. THOMPSON:  Withdrawn.

13              THE COURT:  Go ahead.

14   BY MR. BRESNICK:

15   Q    I'm sorry, the answer was what?

16   A    No, I haven't.

17   Q    Okay.  Have you ever heard of Dante Tucker?

18   A    No, I haven't.

19   Q    Hakiem Johnson?

20   A    No, I haven't.

21   Q    Jamar Campbell?

22   A    No, I haven't.

23   Q    Gary Creek?

24   A    No, I haven't.

25              MR. BRESNICK:  Your Honor, can we have one moment?

1          THE COURT:  Yes.

2          MR. BRESNICK:  I have nothing else, Your Honor.

3          MR. WARREN:  I have no questions, Judge.

4          MR. HETZNECKER:  I have no questions.

5          THE COURT:  Any other questions on cross?

6          MR. McMAHON:  None, Your Honor.

7          THE COURT:  Go ahead, Mr. Thompson.

8                    REDIRECT EXAMINATION

9    BY MR. THOMPSON:

10   Q    Mr. Wallace, by your answers to Mr. Bresnick's questions,

11   you're not saying these documents weren't there, you're saying

12   you simply didn't see them?

13   A    Yeah.

14   Q    And did you look for any documents?

15   A    No, I didn't.

16   Q    So these documents could have been in the car as far as

17   you know?

18   A    Yeah, they could have.

19   Q    When you go into the house back around that time, did you

20   ever snoop?

21   A    No, I haven't.

22   Q    Ever look for anything other than food?

23   A    No, I just get like -- when there's different stuff I see

24   around, I like -- different stuff in the basement, different

25   stuff in the cabinet, warms the food up and keep on -- keep it

1    moving.

2    Q    Okay.  Now, you have a Delaware driver's license, is that

3    correct?

4    A    Yes.

5    Q    Was that from when you lived in Delaware?

6    A    Yes.

7    Q    And you live right now where?

8    A    I live in New Jersey.

9    Q    Okay.  What part, Salem, New Jersey?

10   A    Yes.

11   Q    How close is that to Delaware, if you could tell us?

12   A    About ten minutes, about ten, 15 minutes.

13   Q    Okay.  But you probably should have a New Jersey license?

14   A    Yes.  Actually we're talking about moving back, so I

15   didn't want to switch my license in there, and then I'd switch

16   it right back because it cost money, so.

17   Q    When you said, we talking about moving back, who is we?

18   A    Me and my girlfriend.

19   Q    Ms. Thompson's sister?

20   A    Yes.

21   Q    Again, how long have you been with her?

22   A    12, 13 years.

23   Q    Now, were you asked questions about how frequently you

24   would drive that Suburban, and I believe you said sometimes

25   two days a week, did you drive it on a consistent basis two

1   days a week or just every once in a while?

2   A    No, just like -- basically whenever I felt like going and

3   get it, but it was like whenever I felt like getting it, more

4   or less.

5   Q    Okay.

6   A    And it wasn't like -- it wasn't like I'd go get it Tuesday

7   and Wednesday and Thursday and parking, it's something else,

8   it's like whenever I wanted it.

9   Q    Okay.  Do you have your own car, or did you have your own

10  car back then?

11  A    I had my own car, but it wasn't running that great.

12  Q    Did you ever get -- use the Suburban cause you didn't have

13  gas in your own car?

14  A    That could have been a reason, too.

15  Q    Now, you said you drove other cars that were there, what

16  other cars did you drive?

17  A    I drive a -- I drove --

18  Q    I'm talking about around about 2005?

19  A    -- the Expedition.

20  Q    Okay.  Now, who owned the Expedition?

21  A    The father -- it was Thias's car.

22  Q    Okay.  When was the last time you drove that vehicle?

23  A    February 16th of last year.

24  Q    And where is that vehicle now?

25  A    It was totaled.

1   Q    Who totaled it?

2   A    I did.

3             MR. THOMPSON:  Nothing further.

4             MR. BRESNICK:  Nothing from the Government, Your

5   Honor.

6             THE COURT:  Anything further?

7             MR. HETZNECKER:  No questions, Your Honor.

8             MR. WARREN:  No, Your Honor.

9             THE COURT:  You may step down.

10            (Witness excused.)

11            THE COURT:  Ladies and gentlemen, we're going to

12  take a recess, ten minutes, go out, relax, don't discuss the

13  case.  We'll bring you back in ten minutes.

14            (Recess taken 10:55 a.m. to 11:15 a.m.)

15            THE COURT:  Counsel, I understand that you, Mr.

16  Warren, are ill and have a fever, is that correct?

17            MR. WARREN:  That is correct, Judge.

18            THE COURT:  I also understand that two of the jurors

19  are ill.  One of them, evidently just regurgitated.

20            MR. WARREN:  That's why I needed a break really bad

21  at 3:30 yesterday, if you'll recall I went up there at sidebar

22  and told you I needed to get out of the courtroom.

23            Whatever Ms. Pullins had, she has given to me.  My

24  client has it.  One of the marshals have it.

25            THE COURT:  Well, all right.  Counsel, I'm going to

1    -- under the circumstances, two jurors ill, one attorney,

2    we're going to recess.  Now, the question is, how long is it

3    going to take everybody to get well.

4              MR. WARREN:  Ms. Pullins is the best -- she's the

5    one who has had this.  How are you feeling now?

6              But here's my best concern is, she can't talk right

7    now, okay, and if my voice gets -- I mean, my big -- I can

8    take aspirin to deal with the -- with the -- what happens is,

9    I take aspirin and it knocks out the fever, it puts me into

10   cold sweats, but I don't have a fever anymore, all right.  But

11   if my voice goes, I don't know how I'm going to close.  And

12   she can -- how's your voice.

13             MS. PULLINS:  It's okay.

14             MR. WARREN:  I mean, in all candor, I think I

15   need --

16             THE COURT:  I think I'm going to write a book.

17             MR. WARREN:  What's that, Your Honor?

18             THE COURT:  I think I'm going to write a book.

19             Under the circumstances we're going to recess.  I

20   think it makes sense actually to recess today and not come

21   back tomorrow under the circumstances.

22             MR. HARMELIN:  Your Honor, can I be heard very

23   briefly?

24             THE COURT:  Yes.

25             MR. HARMELIN:  And I understand this is not what you

1    want to do.  I have three character witnesses.  Can I put them

2    on for ten minutes before we recess?

3                MR. BRESNICK:  I don't have a --

4                THE COURT:  Today?

5                MR. BRESNICK:  -- you've got them here today?

6                MR. HARMELIN:  Right now.  Your Honor, it's just

7    hard for them to get back.

8                THE COURT:  Counsel, if you have no objection, I'm

9    going to go back and talk to the jurors and find out whether

10   the two jurors who have indicated that they're ill can stand

11   to be here for another half-hour or 45 minutes.

12               UNIDENTIFIED PERSON:  We don't want a juror throwing

13   up in the jury box.

14               THE COURT:  Well, I don't either, and if there's no

15   objection I will talk to the jurors and we will determine

16   whether we can hear those witnesses today, or whether we're

17   going to hear them --

18               MR. POWELL:  Judge, if I could -- Judge, we

19   have --

20               UNIDENTIFIED PERSON:  -- I'm sorry, go ahead.

21               MR. POWELL:  -- we have another little bit of a

22   scheduling difficulty, Judge.  We have an expert to call on

23   behalf of Mr. Morris who actually should be getting on the

24   ground right now.  I'm really concerned, Judge, about

25   adjourning until Monday, we have to keep him here over the

1  weekend, he's here from North Carolina.

2          I'd like to propose, Judge, that it might be a lot

3  more prudent to give Mr. Warren a break for a few hours,

4  perhaps allow us to put the expert on this afternoon and

5  adjourned at that point.

6          MR. WARREN:  Can I sit really close to counsel

7  during that two-hour break, Your Honor?

8          THE COURT:  Just a moment, Mr. Warren, just a

9  moment.

10          I'm going to go find out from the jurors just

11  exactly what their status is, and then we will determine what

12  is an appropriate recess under the circumstances.

13          MR. McMAHON:  Your Honor, I'm sorry, just so you

14  know, I have similar scheduling problems.  I don't have an

15  expert coming in from North Carolina, but I do have several

16  character witnesses who have taken time off from work and have

17  had to issue letters and all that, and I'd like to be able to

18  put them on -- it won't take as -- it won't take long at all,

19  Your Honor, maybe a few minutes for each witness.  But I'd

20  like to be giving the opportunity to do that if possible so

21  not to lose them.

22          THE COURT:  When, when are you requesting that?

23          MR. McMAHON:  Well, if we're going to hear a few,

24  I'd like to add a couple more today.

25          THE COURT:  We'll see whether we're going to recess

1    for the day.  I'll be back in a couple of minutes.

2              MR. HETZNECKER:  Your Honor, just one second.  What

3    I can do is, I have character witnesses as well coming in, but

4    I can have them come next week.  I just need to know

5    specifically -- I don't want to be put in a position where,

6    you know, I tell them to come at 9:00, and they have to leave

7    by 1:00.  So if the Court can instruct or give me some

8    flexibility and I can say to them on Tuesday, be here at X

9    hour, I would appreciate that.

10             (Recess taken 11:19 a.m. to 11:24 a.m.)

11             THE COURT:  Okay.  Counsel, I've spoken with the

12   juror.  We are going to recess now.  We are going to come back

13   Tuesday.  One of the jurors is visibly ill.  Another juror is

14   ill.  Mr. Warren, you're ill.

15             MR. WARREN:  Yes.

16             THE COURT:  We will -- that's the only course of

17   action that makes sense under all the circumstances, so we

18   will recess now.

19             I'm going to bring the jurors in.  I'm going to give

20   them the cautionary instructions and then I'll let you all go

21   and we'll finish this case next week.  Okay.

22             MR. BRESNICK:  Very well, Your Honor.

23             MR. THOMPSON:  Your Honor, if I may, just one small

24   housekeeping matter.  I offered certain exhibits in.  I'd like

25   to offer DM-4 through DM-15.  I spoke with the Government, no

1    objections.

2              MR. BRESNICK:  No objection, Your Honor.

3              THE COURT:  All right.

4              (Defendant's Exhibits DM-4 through DM-15 are

5    admitted in evidence.)

6              MR. SMITH:  Your Honor, one other housekeeping

7    matter.  I know it's going to be a long break between today

8    and Tuesday, and we had the problem last week that the counsel

9    were going to make an inquiry as to that newspaper article.  I

10   know we haven't had the results of their inquiry yet.  I'm

11   just fearful that there may be some more press and human

12   nature and all that.

13             MR. WARREN:  Mr. Anastasia is on vacation in

14   Italy --

15             UNIDENTIFIED PERSON:  He's in Italy.

16             MR. WARREN:  -- so I can assure counsel that I don't

17   think any articles are coming out.

18             MR. SMITH:  Well, I'm not asking, Mr. Warren, thank

19   you for that, but the -- I just wanted to find out, you know,

20   the results of the inquiry.

21             THE COURT:  We will -- as soon as we let the jury

22   go, you can --

23             MR. SMITH:  Very well, Your Honor.

24             THE COURT:  -- tell me where that is --

25             MR. SMITH:  Certainly.

1          THE COURT:  -- from your investigative point of

2     view.

3          MR. POWELL:  I'm sorry, one last matter, Judge.  I

4     understand that the Government has an objection to the defense

5     expert testifying in this case.  Mr. Lloret has indicated that

6     he is unaware of the basis of our expert's testimony.

7          In view, Judge, of the Court's ruling that we're

8     going to recess until Tuesday, I can represent to the Court

9     that we can prepare a summary of Dr. Rodman's (phonetic)

10    testimony supplied to the Government by tomorrow, and perhaps

11    that will resolve the Government's objection.

12         THE COURT:  That should certainly fix the issues.

13         MR. LLORET:  That would be great, Your Honor, I

14    would appreciate getting the information tomorrow so we have a

15    business day to check on things.  Thanks.

16         THE COURT:  All right.

17         (Pause in proceedings.)

18         (The jury enters the courtroom at 11:27 a.m.)

19         THE COURT:  Okay.  Have a seat.

20         All right.  Ladies and gentlemen, as I indicated to

21    you, we are going to recess at this point.  There are several

22    jurors that are ill.  There is at least one of the attorneys

23    who is ill.  There is a flu going around, and we're going to

24    recess under the circumstances.  I'm not going to ask you to

25    be back tomorrow.  I'm going to ask you to be back Tuesday.

1    Monday is a holiday. We will begin Tuesday at 9:15, and we

2    will continue to hear testimony and ultimately hopefully this

3    case will be in your hands before the week is out.

4            Again, I caution you, don't talk to anybody about

5    the case.  Don't let anyone talk to you.  Don't do any

6    independent investigation.  Take the matter as it's presented

7    here.  Don't read anything about the case.  Don't listen to

8    anything about the case.  Okay?

9            Hopefully on Tuesday everyone will be in good health

10   and we can move on with the trial.

11           All right.  Mr. Finney, will you take the jurors

12   out?

13           COURTROOM DEPUTY:  All right.

14           (The jury leaves the courtroom at 11:28 a.m.)

15           THE COURT:  Okay.  Mr. Lloret, we were inquiring as

16   to where the information that appeared in the newspaper came

17   from.

18           MR. LLORET:  Yes, Your Honor, I've learned -- made

19   inquiry down at ATF.  What had happened was the press officer,

20   or the press liaison at ATF had been requested by "The

21   Inquirer" to supply them with some photographs that had been

22   entered into evidence.  The press officer, who really is not

23   that familiar with the case, was supplied with some

24   photographs, and unfortunately one of the photographs, Your

25   Honor saw that there were two photographs that are of similar

1    circumstance, selected one that had not been put into evidence

2    inadvertently.

3          So I have requested of ATF that any request from the

4    media be funneled through me and our office.  I will note,

5    Your Honor, that "The Inquirer" reporter subsequent to this

6    episode has made request for certain items that have been

7    entered into evidence.  And I told him that I would have to

8    take it up with the Court before we took any further action in

9    light of the circumstance of this most recent episode.

10         I note, Your Honor, from the Government's standpoint

11   items that have been entered into evidence are part of the

12   public record.  It is a bit unusual in this case because there

13   are so many exhibits, and the Government still has -- or the

14   Government still has possession of them physically, how to

15   proceed in this.

16         Obviously, our inclination would be if "The

17   Inquirer" or another news organization ask for an exhibit that

18   we can determine definitively has been entered into evidence,

19   that it would be our normal custom to supply them with that,

20   just as in a sort of a smaller trial they could go to the

21   clerk's office and obtain a piece of evidence and make a copy.

22         But I wanted -- I told them that I needed to bring

23   it to the Court's attention and have Your Honor consider the

24   matter before we took any action.

25         THE COURT:  All right.  Well, counsel, do you have

1    anything you want to say at this juncture?

2              MR. WARREN:  Nothing, Judge.

3              THE COURT:  Counsel?

4              MR. McMAHON:  No thank you.

5              MR. SMITH:  No, Your Honor, but, you know, and I

6    appreciate the response.  Basically, as I'm sure you are,

7    we're just trying to ensure a fair trial for my client, as

8    well as everybody else, and I just didn't think it was in good

9    taste that a photograph to be in the paper on -- especially in

10   the Sunday edition, Your Honor.

11             THE COURT:  All right.  Well, it would appear that

12   there's been no wrongdoing at all in this situation.  Mr.

13   Lloret, in the future if a request is made, let the Court know

14   what that request is and we will make sure that there are no

15   more glitches, okay?

16             MR. LLORET:  Okay, Your Honor.  And I'm pretty sure

17   Mr. Anastasia indicated that when he's back from his vacation

18   on Tuesday, he'll be making some specific requests, so we'll

19   advise the Court.

20             THE COURT:  I don't doubt that.

21             MR. LLORET:  Thank you.

22             MR. McMAHON:  There's just one other issue, two

23   issues, one being I would assume some time today Mr. Bresnick

24   will be providing the Court in camera with his notes.  And

25   then the Court will, I guess, communicate with me if I'm going

1  to get them or not get them, whatever he rules, just so I --

2         THE COURT:  We will take a look at the notes.  We

3  now have some time to do that.

4         MR. MCMAHON:  Right.

5         THE COURT:  And you will be communicated with.

6         MR. MCMAHON:  And the second issue I'm requesting

7  that's similar in that, I'm asking for any of the -- which has

8  been talked about earlier by Mr. Warren, any of the notes,

9  considering what's going on in this trial, any of the notes of

10 Agent Tropea as to the Charlton Custis interview -- or Agent

11 Ricko too regarding that interview in light of the fact that

12 as to what was actually said and whatnot, I think it's -- you

13 have a summary here, and I think his notes as to what he

14 actually wrote down -- I mean I didn't ask for them before

15 necessarily, but in light of the testimony that's going on

16 here as to what was actually said in these numerous proffers,

17 I think we have a right to the rough notes.

18        THE COURT:  Well, I don't know that you do have a

19 right to the notes at this juncture.  What I will direct the

20 Government to do is compile those notes and let the Court

21 review them in-camera, and we will determine what is

22 appropriate.

23        MR. MCMAHON:  I think as Mr. Warren stated, and

24 under the agreement of rule, that it is <u>Jencks</u> material as to

25 Agent Tropea, not as to the witness, Charlton Custis, but it's

1       Agent Tropea's statements.

2               THE COURT:  Submit the notes to the Court and the

3       Court will review them and determine what is appropriate.

4               MR. MCMAHON:  Okay.  Thank you, Your Honor.

5               MR. LLORET:  Thank you, Your Honor, and will not

6       make argument, but just note that the Government has some

7       reservations about Mr. McMahon's legal theory.  We don't need

8       to argue at this point.  Thank you.

9               THE COURT:  All right.  We'll see you Tuesday.

10      Recess.

11              (Proceedings concluded at 11:34 a.m.)

12                              * * *

13

14

15

16

17

18

19

20

21

22

23

24

25

**C E R T I F I C A T I O N**

1
2
3
4          I, Ritajean Wioncek, court approved
5  transcriber, certify that the foregoing is a correct
6  transcript from the official electronic sound recording of the
7  proceedings in the above-entitled matter.
8
9
10
11  _____  May 27, 2008
12  RITAJEAN WIONCEK
13  DIANA DOMAN TRANSCRIBING
14
15
16
17
18
19
20
21
22
23
24
25